UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


LEE MARVIN HARRIS, SR.,     )
                        )
       Plaintiff,     )   Civil Action No.
                        )   1:21-cv-955-wo-jep
v.                    )
                        )
TOWN OF SOUTHERN PINES et al.,  )
                        )
       Defendants.    )
_____)


DEPOSITION OF

LEE MARVIN HARRIS, SR.

TAKEN ON

MONDAY, SEPTEMBER 26, 2022 AT 9:55 A.M.

AT THE OFFICES OF

TOWN OF SOUTHERN PINES FINANCE OFFICE, BOYD ROOM

180 SOUTHWEST BROAD STREET

SOUTHERN PINES, NORTH CAROLINA


REPORTED BY:
GLENDA L. BIGGERSTAFF
NOTARY PUBLIC

```
 1                      APPEARANCES

 2   ON BEHALF OF THE PLAINTIFF:
              Nichad Davis, Esquire
 3            Tin Fulton Walker & Owen, PLLC
              119 East Main Street
 4            Durham, North Carolina 27701
              ndavis@tinfulton.com
 5
     ON BEHALF OF THE DEFENDANTS:
 6            Glenn E. Jones, Esquire
              Hall Booth Smith, PC
 7            11215 North Community House Road, Suite 750
              Charlotte, North Carolina 28277
 8            gjones@hallboothsmith.com

 9   ALSO PRESENT:
              Kyle Marsh
10            Jason Perry

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    STIPULATIONS

2      1.  It is hereby stipulated and agreed by and

3 between the parties present that the testimony of LEE

4 MARVIN HARRIS, SR. may be taken by Glenda L.

5 Biggerstaff, a Notary Public in and for Scotland County,

6 North Carolina.

7      2.  Said deposition shall be taken pursuant to the

8 North Carolina Rules of Civil Procedure.

9      3.  Any objections of any party here as to notice

10 of the taking of said deposition or as to the time or

11 place thereof or as to the qualifications of the person

12 before whom the same shall be taken are hereby waived.

13      4.  The reading and signing of the transcript of

14 testimony by the deponent is hereby NOT waived.

15

16

17

18

19

20

21

22

23

24

25

```
 1                      TABLE OF CONTENTS

 2    WITNESS              EXAMINATION              PAGE

 3    Mr. Harris          by Mr. Jones            5-258
                          by Mr. Davis          258-262
 4
                            EXHIBITS
 5
      DEFENDANTS'
 6    NUMBER              DESCRIPTION              PAGE

 7    Exhibit 1      Assault complaint              52

 8    Exhibit 2      Harris v. USDHS, et al.        67

 9    Exhibit 3      Affidavits                     85

10    Exhibit 4      Darby statement                93

11    Exhibit 5      Plaintiff's responses         158

12    Exhibit 6      Hines note                    198

13    Exhibit 7      Harris, Jr. sentencing memorandum  230

14    Exhibit 8      VA progress notes             237

15    Exhibit 9      Medical record                245

16    Exhibit 10     Objections to draft presentence  253

17    PLAINTIFF'S
      NUMBER              DESCRIPTION              PAGE
18
      Exhibit 00*    Video                         178
19
      Exhibit R*     Incident/Investigation Report 206
20

21

22

23

24

25    *Previously marked
```

1  Thereupon:

2                    LEE MARVIN HARRIS, SR.

3  being first duly affirmed in the manner provided by law

4  was examined and testified as follows:

5            MR. JONES:        All right.  This will be

6  the deposition of Lee Marvin Harris, Sr., taken pursuant

7  to notice and agreement of counsel.

8  EXAMINATION BY MR. JONES:

9       Q.   Mr. Harris, I know we've been in this room the

10 last week, and you've heard all of the -- the various

11 instructions and things.

12      A.   Right.

13      Q.   And I'm here today to ask you a little bit

14 about your background and -- and your knowledge of this

15 case.

16      A.   Okay.

17      Q.   Nothing I am here to do today is to ask you

18 any kind of trick questions.  I -- I just want to know

19 what your knowledge is about this.

20           And so if I ask you a question that doesn't

21 make sense -- sometimes I -- I will ask two or three

22 questions at the same time.  I -- I try not to do that,

23 but if -- if at any time I ask you a question that

24 doesn't make sense, you're not sure exactly what I'm

25 getting at, please ask me to rephrase, and I'll be happy

LEE MARVIN HARRIS, SR. vs TOWN OF SOUTHERN PINES, ET AL.
Lee Marvin Harris, Sr. on 09/26/2022

Page 6

1    to do it.  Otherwise, if -- if I ask my question and --

2    and you answer it straightforward, is it fair to assume

3    you -- you understood my question and answered it

4    appropriately?

5         A.   Yes.

6         Q.   Okay.  You're doing a great job so far just

7    like all the other ones if you'll try and give verbal

8    responses.  As we sit here, it will be pretty

9    conversational, but you'll see that, you know, sometimes

10   you may say uh-huh or huh-uh or -- or something like

11   that.  I -- I know what you're saying.  But if I prompt

12   you "is that a yes," I'm not trying to be ridiculous.  I

13   just want to make sure we have a clean record.

14        The same thing, if you'll try and wait until I

15   finish any of my questions.  You'll see where I'm going

16   sometimes, and it's easy to do.  I'm not trying to be

17   rude if I say, you know, please wait until I -- I finish

18   the question, but just want to make sure -- so -- for

19   our court reporter, so it's -- it's hard for her take if

20   we're talking over each other.

21        I'm going to try and not take an overly

22   lengthy deposition today, but this is not a marathon.

23   If at any time you need to get up and use the restroom,

24   take a break, get some water, anything like that, please

25   feel free.  If you get hungry and we need to take a

www.huseby.com          Huseby Global Litigation          800-333-2082

Case 1:21-cv-00955-WO-JEP   Document 32-2   Filed 11/29/22   Page 6 of 265

1  lunch break happy to do that as well, just please let me

2  know, and if you'll answer whatever question is on the

3  table, I would appreciate it.

4          Let's see.  I think that's pretty much

5  everything.  You -- you realize today that you have been

6  sworn in, and your testimony is -- is under oath and

7  under the -- the threat of perjury, correct?

8      A.   Yes.

9      Q.   Okay.  Will you please state your full name

10  for the record?

11      A.   Lee Marvin Harris, Sr.

12      Q.   And, Mr. Harris, where were you born?

13      A.   I was born in Raeford, North Carolina.

14      Q.   Do you currently reside in Aberdeen still?

15      A.   Yes, sir.

16      Q.   And is it still the 803 Sycamore address?

17      A.   Yes.

18      Q.   How long -- approximately, how long have you

19  lived there?

20      A.   Approximately 22 years.

21      Q.   All right.  Have you ever lived in any other

22  of the towns or counties in this general vicinity?

23      A.   Yes.

24      Q.   All right.  Tell -- tell me where else you

25  lived.

1       A.   I lived in Hoffman.  I lived in Southern

2  Pines.

3       Q.   When did you reside in Southern Pines?

4       A.   After I got out of the military.  I got out --

5  I'm exactly sure the dates, but I got out of the

6  military in '87.

7       Q.   And approximately, how long would you say you

8  lived in Southern Pines?  Again, approximation is fine.

9       A.   Three years total maybe.

10      Q.   And what about Hoffman?  How -- approximately,

11  how long did you live in Hoffman?

12      A.   It was just months.

13      Q.   Okay.

14      A.   It was less than a year.

15      Q.   And when you were living in Hoffman, was that

16  before or after the arrest that we're here about today?

17      A.   That was before.

18      Q.   Okay.  We went last week to -- I guess it was

19  your brother's house in Hoffman.  Is that correct?

20      A.   Yes, sir.

21      Q.   Is -- is that where you were living at the

22  time, or was it somewhere else?

23      A.   Yes.  That's where I was living.

24      Q.   All right.  And you are married.  Is that

25  correct?

1     A.   Yes, sir.

2     Q.   And how long have you been married?

3     A.   Forty-two years.

4     Q.   And you have children.  Is -- is that correct?

5     A.   Yes, sir.

6     Q.   How many children do you have?

7     A.   Three.

8     Q.   All right.  And where -- where do your

9 children reside?

10    A.   My youngest resides in Charlotte.  My next

11 oldest resides in Aberdeen.  And my oldest resides in

12 Laurinburg.

13    Q.   Are you currently employed?

14    A.   No, sir.

15    Q.   I know that you served in the Army.  Is that

16 correct?

17    A.   Yes.  Yes, sir.

18    Q.   How long did you serve in the Army?

19    A.   From 1980 to 1987.

20    Q.   All right.  And as a result of your service,

21 you -- you were disabled.  Is that correct?

22    A.   Yes, sir.

23    Q.   And you testified that you got out of the Army

24 in approximately '87.  Do you have any employment

25 outside the home after you returned from the service in

1    '87?

2          A.   Yes, sir.

3          Q.   Take me though just generally your -- your

4    work history.

5          A.   I worked for Lowe's of Southern Pines after

6    that.

7          Q.   And how long did you work for Lowe's?

8          A.   Shy of seven years.

9          Q.   All right.  After that, did you work anywhere

10   outside the home?

11         A.   Yes, sir.  I worked for the North Carolina

12   Department of Corrections.

13         Q.   And were you assigned to one specific area, or

14   did you move around?

15         A.   I was assigned to actually two different

16   areas.

17         Q.   What -- what were they?

18         A.   I worked for Morrison Youth Institution in

19   Hoffman, and I worked for Hoke County Corrections in

20   Raeford.

21         Q.   And approximately, how long did you work for

22   then North -- department -- North Carolina Department of

23   Corrections?

24         A.   From 1993 until, if I'm correct as far as my

25   memory, it was 2000, the year 2000.

1      Q.   All right.  After 2000, did you have any other

2  employment?

3      A.   Not after that.

4      Q.   Okay.  Did you -- are you retired?  Would that

5  be accurate --

6      A.   Yes.

7      Q.   -- to say?

8      A.   I'm totally disabled.

9      Q.   Okay.  And what is -- is the nature of the

10 disability?  Is it -- is it entirely related to your

11 military service, or -- or was -- did something else

12 happened afterward as well?

13     A.   It's entirely.

14     Q.   Okay.  And what is the nature of the

15 disability?

16     A.   My back -- back problems, knees, stuff like

17 high blood pressure, anxiety, acid reflux.  I could go

18 on.

19     Q.   And where do you receive treatment for those

20 conditions?

21     A.   At the Veteran Administration in Durham.

22     Q.   And how long have you been using the VA

23 hospital in Durham for your primary care?

24     A.   Not exactly sure the -- the year or the date,

25 but I believe to best of my knowledge that I started

1   using Durham for the last -- say, maybe 15 years.

2        Q.   All right.  Outside of -- of employment, are

3   you involved in a religious organization as well?

4        A.   Yes.

5        Q.   Tell me about that.

6        A.   I'm a minister.  If I'm correct about the

7   year, I become a minister in 2000 -- or around 2008.

8        Q.   And -- and do you have a specific congregation

9   or a specific church?

10       A.   Yes.  I do now.  That has changed over the

11  years, but I do now.

12       Q.   Sure.  What -- what is it currently?

13       A.   It is the New Jerusalem Missionary Church.

14       Q.   And where is that located?

15       A.   That's on -- off of Highway number 5 going

16  toward Pinehurst.

17       Q.   All right.  And do you have a -- a title with

18  them

19       A.   Yes.  I'm an elder.

20       Q.   And what are your responsibilities as an elder

21  with the New Jerusalem Missionary Church?

22       A.   My responsibilities is -- well, I do ministry

23  services.  I do communions.  I do weddings.  I do

24  funerals.  I preach, you know, of course.  And I also do

25  children's ministry like working with children, you

1  know, basically.

2      Q.   Is there a -- a head pastor at New Jerusalem

3  Missionary Church?

4      A.   Yes.

5      Q.   Who is that?

6      A.   Her name is Deborah McLeod.

7      Q.   And do you work with Minister McLeod kind of

8  in and out of these various ministries within the

9  church?

10     A.   Yes.

11     Q.   How long have you been affiliated with the New

12  Jerusalem Missionary Church?

13     A.   Not to be exact, approximately seven years

14  maybe.

15     Q.   And is there -- do -- do you know how many

16  people are in that congregation?

17     A.   No, sir.

18     Q.   On a typical week, how -- how often are you

19  doing work that you would attribute to the New Jerusalem

20  Missionary Church?

21     A.   Daily.

22     Q.   Okay.  And how many hours per day, again,

23  typically?

24     A.   It depends on the -- the call, the situation,

25  or whatever.

1      Q.   Sure.  If you're doing a wedding, it's

2  probably pretty involved.  If you're --

3      A.   A wedding -- well, weddings may take two hours

4  maybe, hour and a half, just whatever it calls for.

5      Q.   Sure.  Do you get any kind of compensation one

6  way or another or stipend or -- or any -- any kind of

7  monetary considerations for your work with the church?

8      A.   No, sir.

9      Q.   Is it entirely a voluntary position?

10     A.   Yes, sir.

11     Q.   Prior to New Jerusalem Missionary Church,

12 again, approximately seven years ago, were you

13 affiliated with any other religious organizations in

14 this area?

15     A.   Yes.  I have to say that I had my own ministry

16 that was formed in '08 also, and I was in with the other

17 ministries --

18     Q.   Okay.  What were --

19     A.   -- to cover --

20     Q.   I'm sorry.  The ministry you formed in '08,

21 did it have a name?

22     A.   Yes.

23     Q.   What was it called?

24     A.   Jesus is King of Deliverance.

25     Q.   And where was it located?

```
1        A.   It started in Southern Pines, and then it
2   moved down to Ashley Heights.  Excuse me, not -- I'm
3   sorry, not Ashley Heights, that was probably after.  It
4   moved to Addor, North Carolina.
5        Q.   And approximately how long was -- I'm sorry.
6   Jesus is King of Deliverance, is that -- is that name?
7        A.   Yes.
8        Q.   Approximately, how long was that active?
9        A.   That was active maybe five years.
10       Q.   All right.
11       A.   I have to ask you --
12       Q.   Sure.
13       A.   -- referring back to a particular question.  I
14   want to make sure I was answering this based on what
15   you're asking.  When you were talking about the
16   ministry, were you talking about another ministry or the
17   ministry that I actually --
18       Q.   Fair -- fair enough.  I -- I guess I wasn't
19   really clear because I guess your ministry is within the
20   larger kind of --
21       A.   Right.
22       Q.   -- minister.  I -- I'm just asking about what
23   you are doing, your -- your personal involvement.
24       A.   Okay.  My personal ministry the -- my ministry
25   is called From Birth to Eternity, You have a Choice
```

1    Ministry.  That was my original ministry.

2         Q.   And when did that start?

3         A.   That was '08.

4         Q.   Okay.

5         A.   So the dates I gave with the other is --

6         Q.   Sure.  I understand.  All right.

7              Am I correct that -- that your educational

8    background is you -- you ultimately got a -- a graduate

9    equivalency diploma, a GED.  Is that correct?

10        A.   That's correct.

11        Q.   And then you went and had some -- did you get

12   an associate's degree from Sandhills or -- or just

13   classes?

14        A.   Just classes.

15        Q.   Was it in any particular area?

16        A.   No.

17        Q.   General studies?

18        A.   No.

19        Q.   Are you an ordained minister?

20        A.   Yes.

21        Q.   Do you have any other kind of state

22   certifications one way or another?

23        A.   In reference to --

24        Q.   Just anything.  Do you have any sort of -- any

25   certificates or certifications that you have gotten that

1    you're allowed to do this, that, or the other?

2         A.   No, sir.  Not to my knowledge, no.

3         Q.   Sure.  Did you have to -- when you were

4    working with the North Carolina Department of

5    Corrections, did you have to become any kind of formal

6    law-enforcement officer or have any sort of

7    law-enforcement training or certificate?

8         A.   Yes, sir.

9         Q.   Tell me about that.  What did you have to be

10   in order to be a corrections officer?

11        A.   We went through training for a -- a month

12   outside of the facility.  It gave all the different

13   information in reference to the job, the inmates, or

14   whatever.

15        Q.   Do you recall --

16        A.   Yeah.

17        Q.   -- where that training took place?

18        A.   I'm trying to think of the little town.  It

19   was in the state of North Carolina though.  It was up in

20   the mountains.  I can't recall the name of the little

21   town where -- where it took place, but we did.

22        Q.   And do you remember which agency was putting

23   on the training?

24        A.   Morrison Youth Institution is the one that

25   sent us there.  I don't know who actually gave the

```
 1  training.
 2      Q.   Sure.  And do you recall -- I know -- I know
 3  we're talking about decades ago now that --
 4      A.   Yeah.
 5      Q.   Do you remember generally the -- the type of
 6  training you received and -- and kind of what they
 7  taught you there?
 8      A.   They taught us in reference to -- how to
 9  basically deal with the inmates.  And we had firearms
10  training, of course, first aid, and different things
11  like that that went with the program.  It was different
12  stuff.
13      Q.   Sure.  Did you have any sort of training on
14  investigations one way or the other?
15      A.   No.
16      Q.   In your time as a corrections officer, did you
17  have a title?
18      A.   Just correction officer.
19      Q.   Sure.
20      A.   That's it.
21      Q.   And what were your job duties as a corrections
22  officer during your time period?
23      A.   It varied.  We would switch different duties
24  every day.  One day, I may be inside in the dormitories
25  with the inmates.  One day, I may be at the lockup.
```

1  Then next day, I may be on the gun tower.  The next day

2  I may be out on the recreation yard, or it just varied,

3  the medical station just different section, different

4  areas that we would --

5      Q.   Sure.

6      A.   -- be assigned to.

7      Q.   In your experience as a corrections officer,

8  did you ever have to have physical interactions with --

9  with inmates?

10     A.   Only to break up a fight.

11     Q.   Sure.  Was there ever a time where you were,

12 for instance, a -- a target or involved in an

13 altercation with any inmates?

14     A.   No.

15     Q.   Were you ever involved in any kind of

16 situation where you went into a cell or into the room

17 where the inmates were to find contraband or anything

18 like that?

19     A.   We did searches.

20     Q.   Okay.  And where did you get the training for

21 -- for the searches?  The same thing that we talked

22 about.

23     A.   Yes.  At the -- at the facility where I

24 trained over that 30-day period.

25     Q.   Do you recall any of the training on what

1   you've supposed to do when you're looking for

2   contraband, anything like that?

3       A.   Well, I was pretty informed on -- on the

4   procedure, the process as far as going in, as far as

5   where to search, what to do, what not to do, you know,

6   how to place the inmate, where to put him, whether to

7   handcuff him or whatever, you know, that type thing.

8       Q.   Do you recall if you ever found contraband in

9   a -- in a inmate's cell or room personally?

10      A.   I don't necessarily recall anything in

11  particular.

12      Q.   Sure.  Did you ever have any writeups or

13  complaints during your time as a corrections officer?

14      A.   Toward me?

15      Q.   Correct.

16      A.   Not to my knowledge.

17      Q.   All right.  Have you ever been involved in any

18  lawsuits prior to this lawsuit?

19      A.   Is -- I'm not exactly sure what --

20      Q.   Sure.  Have you ever -- has -- has anybody

21  ever sued you and -- and made you a defendant in any

22  sort of case?

23      A.   I think one time is -- if I can remember.  If

24  I'm remembering it correctly, I believe -- it's been a

25  long time ago, but I believe I -- I may have.

1      Q.   And what was -- what was the nature of that

2  lawsuit generally?

3      A.   If I'm correct, I think it had something to do

4  with an order for some rims or some property or

5  something or some rims that were rented for a car --

6      Q.   And -- and do you recall --

7      A.   -- or something.

8      Q.   -- which -- which decade that was in?

9      A.   I feel like it was over 20 years ago.

10     Q.   Sure.

11          MR. DAVIS:        Just -- not a formal

12  objection just for clarification.  Are you also asking

13  Mr. Harris any time that he sued or just any time he was

14  party or at all or what?

15          MR. JONES:        Yeah.  I'll -- I'll get to

16  that.  But, yeah, just -- right now, I'm just --

17          MR. DAVIS:        Yeah.  I just wanted to

18  clarify.

19          MR. JONES:        Yeah.

20  BY MR. JONES:

21     Q.   Do you recall where that case was pending?

22     A.   That was for -- out of Fayetteville.

23     Q.   Okay.

24     A.   Yes.

25     Q.   Did you hire an attorney for that matter?

1      A.   Sir, I don't believe I did.

2      Q.   And do you remember the outcome?

3      A.   Yes.  It was dismissed.

4      Q.   Do you recall the name of the party that sued

5  you?

6      A.   No, sir, I don't.  It was a rim company --

7      Q.   Sure.

8      A.   -- where they sold rims for a car.

9      Q.   All right.  Any other cases that you recall in

10  which somebody or some entity sued you?

11      A.   Sued me.  I don't -- I don't recall one.  I

12  don't recall one.

13      Q.   Okay.  Have there been any other suits, again,

14  prior to this one where you have sued somebody else or

15  been a part of a lawsuit towards another entity?

16      A.   Yes.  There was one in particular that I

17  remember.

18      Q.   Okay.

19      A.   It's been a while ago.

20      Q.   Tell me about that.

21      A.   Okay.  It was in reference to -- I believe it

22  was -- the amount of money was, like, $7,000 that was

23  taken by the Homeland Security out of my vehicle.

24      Q.   And that -- you answered some questions, and I

25  -- I saw the date on that.  Does that sound like 2013?

1    Does that sound about accurate?

2        A.    It's possible.

3        Q.    Sure.  The $7,000 that was taken out of your

4    vehicle, which vehicle was it taken out of it?

5        A.    It was a rented vehicle.

6        Q.    And were -- were you driving the vehicle at

7    the time?

8        A.    No, sir.

9        Q.    Who was driving it?

10       A.    My son was driving that.

11       Q.    And who -- who ultimately -- did the -- the

12   Department of Homeland Security, were they the -- the

13   agency that physically took the money --

14       A.    They --

15       Q.    -- originally?

16       A.    They physically -- no, sir.  It wasn't them

17   that actually took it.  It was Wellford -- Wellford

18   County or the city of Wellford, South Carolina.  They

19   actually initiated it, and they turned it over to the

20   Homeland Security.

21       Q.    What was the -- the purpose for Wellford to

22   pull the vehicle over and get the money?

23       A.    As far as I remember, I think they say he

24   swerved or something.  I don't know.  And they --

25       Q.    You say he swerved.  Were -- were you not

1  driving?

2       A.   No, sir.  I was not driving.  My son was

3  driving that car.

4       Q.   Were you in the vehicle?

5       A.   No, sir.

6       Q.   And -- and that case, you were the actual

7  plaintiff trying to get the money back.  Is that

8  correct?

9       A.   Yes, sir.

10      Q.   And was that because the $7,000 was your

11 money?

12      A.   Yes, sir.

13      Q.   What was -- well, strike that.

14           Did -- did you ultimately get the money back?

15      A.   Yes, sir.

16      Q.   And did you get the money back as a result of

17 your lawsuit?

18      A.   Yes, sir.

19      Q.   Did you hire an attorney for that one?

20      A.   Yes, sir.

21      Q.   All right.  Other than that case, have you

22 ever sued another person or entity prior to this case?

23      A.   To the best of my knowledge, no, sir.

24      Q.   Have you ever been involved in any kind of

25 workplace claims for workers' compensation, injury

1    on-the-job, anything like that, any other claims that

2    you have made?

3         A.   Where I have been injured?

4         Q.   Correct.  Or any kind of damages.

5         A.   Not to my remembrance, no, sir.

6         Q.   Have you ever sent in any kind of request for

7    compensation for any -- you know, that somebody has

8    caused a wrong to you or something like that that didn't

9    rise to a lawsuit?

10        A.   Could you rephrase it?

11        Q.   Sure.  So if -- if there was a disagreement

12   or, you know, potentially an assault or something like

13   that that ultimately didn't get to a lawsuit stage but

14   you wrote a letter saying, "Hey, I've been wronged, and

15   I think you owe me X, Y, or Z," have you ever done that

16   before?

17        A.   I don't recall that.

18        Q.   As part of the claims that you were making in

19   this case --

20        A.   Yes, sir.

21        Q.   -- you have talked about posttraumatic stress

22   disorder that you had prior to this incident and then as

23   a result of this incident as well.  Is that correct?

24        A.   No, sir.

25        Q.   Okay.  What -- what am I wrong about?

1        A.   The prior -- the prior to.

2        Q.   You -- you did not have posttraumatic stress

3   disorder prior to this incident?

4        A.   I had some anxiety, but posttraumatic stress,

5   I don't recall being diagnosed with that.

6        Q.   Tell me about the anxiety that you suffered

7   prior to February of 2018.

8        A.   I think it was probably based on -- according

9   to the doctor, it was based around my high blood

10  pressure, possibly just taking things too seriously, you

11  know, stuff like that.  I can't really say what it was

12  related to or anything like that.  Just -- just

13  altogether, it was a combination of things.

14       Q.   Sure.  There wasn't, like, a precipitating

15  event.  It was just a -- a condition that you had.

16       A.   No, sir.  I was in the military, but I can't

17  say how that was affected -- effective or not to -- it

18  wasn't part of my disability.

19       Q.   Okay.  The anxiety didn't -- wasn't part of

20  the disability?

21       A.   Well, it was.  It -- I was later, you know,

22  diagnosed with anxiety, but I can't say exactly if was

23  pertaining to a particular event or whatever in the

24  military.

25       Q.   Was the anxiety part of your disability

1    diagnosis at -- at any point?

2        A.    Yes, it was.

3        Q.    And do you receive -- let's say prior to

4    February 2018.  Were you receiving treatment or

5    medications for anxiety?

6        A.    I was receiving a medication.

7        Q.    What medication was that?

8        A.    What's the name?  Citalopram, I think.

9        Q.    Are you still taking that today?

10       A.    I do.

11       Q.    Okay.  How often do you take the --

12       A.    Daily.

13       Q.    -- citalopram?

14       A.    Daily.

15       Q.    All right.  Since February 20th, are there any

16   additional medications or treatment that you have gotten

17   for your anxiety?

18       A.    Treatment, yes.  The medications as far as I

19   can remember the last four years, it hadn't changed.

20   I've had some medications that were switched the --

21   based on -- on the time that I was on them for health

22   reasons.

23       Q.    Sure.

24       A.    You can only take one so long or whatever.

25       Q.    Right.  Yeah.  If you have something else that

 1    goes on, sometimes they give you a new medication.

 2         A.    Right.

 3         Q.    They don't go together, and they have to

 4    switch them up.

 5         A.    They have to switch them up.

 6         Q.    Sure.

 7         A.    Yes.

 8         Q.    You said you got some additional treatment.

 9    Can you tell me about the additional treatment --

10         A.    Yes.

11         Q.    -- that you got?

12         A.    With a therapist.

13         Q.    And was that provided through the VA?

14         A.    Yes.

15         Q.    Approximately, how many visits to a therapist

16    have you been to since February of 2018?

17         A.    I did an initial visit with them, and after

18    that, it was me contacting them when I needed to talk.

19    And I'm not sure how many times after that that actually

20    took place.

21         Q.    Sure.  When's the last time you contacted them

22    about needing to talk?

23         A.    Maybe just approximately -- thinking -- maybe

24    a month ago maybe.  I'm not really sure.

25         Q.    All right.  And is it a semi-regular

1    occurrence that -- that you get treatment for this, or

2    is it -- does it go in fits and spurts?

3        A.   It's -- it's in -- in spurts.  There's not

4    nothing that's -- that's timed.  It depends on what I'm

5    feeling, that I have somebody to call on.  And that's

6    what I do.  I talk to her when that happens.  It's

7    what's going on in my life at that time.

8        Q.   Other than the medication that you take and

9    the -- the visits that we've talked about, is there

10   anything else that you are doing to -- to manage the

11   anxiety or -- or -- or PTSD currently?

12       A.   Yes.  There is something else that I'm doing,

13   and it's tough because of this situation here.  It's

14   trying stay away from this situation, to not think about

15   it, to not relive it.  And I've been reliving it through

16   not just this but prior to this.  I relive it every day.

17       Q.   All right.  Getting ready for today -- have --

18   have you ever given a deposition before this case?

19       A.   No, sir.

20       Q.   Okay.  Did you review any documents,

21   photographs, videos, anything to prepare for today?

22            MR. DAVIS:        Objection.

23   BY MR. JONES:

24       Q.   Other than -- other than conversations with

25   your attorney, but in terms of documents and videos and

1  photographs --

2       A.   No, sir.

3       Q.   -- did you review anything?

4       A.   Through my attorney --

5       Q.   Sure.

6       A.   -- that stuff.

7       Q.   But did you review documentation other than

8  any notes?  I don't want to get into any

9  conversations --

10      A.   No.

11      Q.   -- that you-all have had.  But in terms --

12      A.   No, sir.

13      Q.   -- of the -- the actual documents or files or

14 -- or anything, have you reviewed anything to prepare

15 for the deposition?

16      A.   Not -- no, sir, not to prepare for.

17      Q.   Other than your attorneys, have you spoken to

18 anybody about the deposition today?

19      A.   Not to my knowledge.

20      Q.   Have you created any journals, logs, a

21 calendar, or anything for events or things that -- that

22 are relevant to this case over the past four or five

23 years kind of as you're going along?

24           MR. DAVIS:          Objection to form.  You

25 can still answer that.

1        A.    The things that I have either noted or

2   whatever was FOR my attorneys viewing or whatever.    As

3   far as notes or anything, I don't necessarily know

4   what --

5   BY MR. JONES:

6        Q.    Sure.  And I -- I --

7        A.    -- you're saying.

8        Q.    I don't -- I'm not asking about correspondence

9   with your attorney or anything about the case.

10       A.    Uh-huh.

11       Q.    But have you done anything where you have

12  created any kind of calendars, journals, notes of -- of

13  memories from the incident or -- or anything else that

14  is attributed to this lawsuit?

15       A.    That I put away for myself or to share -- to

16  share with them?  Memories to share with them or to --

17       Q.    Well, I -- I -- well, I -- I'm not trying to

18  ask about communications between you two.

19       A.    Okay.

20       Q.    But I do want to know if you have created

21  anything that is relevant to this lawsuit.

22       A.    I have documentation, different stuff that --

23  like my court case stuff that I got through my

24  discovery, that type stuff --

25       Q.    Sure.

1      A.    -- you know.

2      Q.    And did you turn that over to your attorney?

3      A.    Yes, sir.  They have it.

4      Q.    And we sent you -- and I'll -- I'll hand them

5  to you here in a second -- but some things called

6  interrogatories and request --

7      A.    Okay.

8      Q.    -- for production of documents.  Do you recall

9  -- it's --

10     A.    I think --

11     Q.    -- fancy words to say I sent you a bunch of

12  questions.  Do you recall going over those with your

13  attorney?

14     A.    Some.  Yeah.

15     Q.    Sure.

16     A.    Yes.  I -- not in detail, but I remember a lot

17  of stuff.

18     Q.    Fair enough.  And did you go over the

19  documents along with that -- with your attorney?

20     A.    Yes, sir.

21     Q.    Have you ever done any sort of reset --

22  research or information gathering on any of my clients,

23  any of the defendants, about their personal lives,

24  anything like that?

25     A.    No, sir.

1      Q.   All right.  Again, prior to February of
2  2018 --
3      A.   Uh-huh.
4      Q.   -- have you ever had any interactions with
5  members of the Southern Pines Police Department?
6      A.   Yes, sir.
7      Q.   Okay.  Take me through and -- and let's start
8  with the earliest.  And I don't mean, you know,
9  obviously not seeing them on the, you know, street
10  corner and saying hello or anything like that, but
11  interactions where -- where either an incident occurred
12  or -- or some kind of interaction -- substantive
13  interaction that you had with Southern Pines.  So let's
14  start earliest and -- and -- and tell me about those.
15      A.   Okay.  As best I remember -- you want each one
16  that I remember?
17      Q.   Yeah.  And let's -- we'll -- I'll -- I'll
18  probably ask you some questions about them.  So let's
19  start with one and -- and you -- you tell me what you
20  recall, and then I'll ask you some questions.
21      A.   Okay.  Ths is in reference to Carol Wright,
22  which was the -- a captain for the Southern Pines PD.
23      Q.   All right.  And --
24      A.   She just retired as a magistrate.
25      Q.   Sure.  When did this interaction take place?

1      A.   Not exactly sure about the month or anything,

2   but I believe it was in 2007.

3      Q.   Sure.  And tell -- tell me what happened in

4   that interaction.

5      A.   Okay.  There was an incident where a young man

6   that confided in me to -- to talk with him about the

7   situation that happened to him with two Southern Pines

8   PD officers.  And that this kid had been allegedly

9   beaten by a couple of Southern Pines PD officers.

10         And he and myself went to the Southern Pines

11  PD to talk with the chief.  I went with him just to

12  assist him.  And Carol Wright was captain at the time, I

13  believe.  She came out of the office with a video camera

14  and started videoing he and I and telling me that he

15  could go in -- the young man could go in and see the

16  captain, the chief, but I could not go with him.  And I

17  basically was asking her why I wasn't allowed to assist

18  him in going in there.  And she said that we have a

19  policy where you can't go in there.  And so we walked

20  outside.  She videoed us all the way -- you know, till

21  we left.  That was one incident with her.

22         Another incident with her was when myself, two

23  members of the NAACP met at the Southern Pines PD, I

24  believe it was.  And we discussed a young man that had

25  been beaten by another young man at a night spot.  Like,

1  a hub, I would call it.  And we were talking about that.

2  And the young man was beaten pretty bad.  I don't know

3  if he was hit one or twice.  But he was on life support

4  at the hospital.

5          And when the -- when she asked them about why

6  the young man that did this was only charged with simple

7  assault, that's when I interrupted, and I showed them

8  the -- the law where it says that -- and showed them a

9  picture of him on life support -- where it states that

10  that should have more or less been aggravated assault.

11          So we had some words.  I don't remember what

12  the words was in there, but she and I, Officer -- you

13  know, and --

14      Q.    The -- the first one was in 2007.  This one --

15      A.    Yeah.

16      Q.    -- with the -- the --

17      A.    This --

18      Q.    --- NAACP, do you recall when that was?

19      A.    No, sir.  But it was after.

20      Q.    Okay.

21      A.    It was after.

22      Q.    All right.

23      A.    And so --

24      Q.    Now, for the two that we've talked about with

25  Carol Wright so far, did you make any sort of complaint

1   to the Southern Pines Police Department based on those

2   interactions?

3       A.   About those two, there was -- as far as I

4   remember, Mr. Pratt the young man that this was about

5   with the assault with the police officers, he made some

6   complaints.  Matter of fact, he filed a lawsuit.  I

7   don't know what -- I don't remember what the end of it

8   was.  But concerning about me personally, I don't recall

9   doing a personal complaint against her.

10      Q.   Were you involved in -- in Mr. Pratt's lawsuit

11  at all?

12      A.   No.  No -- no more than talking to him or --

13  or he confiding in me or whatever, but, no, sir.  My

14  name wasn't -- as far as I remember it wasn't mentioned

15  in it.

16      Q.   The -- the Pratt lawsuit, was that regarding

17  the -- the first incident we talked about where somebody

18  was allegedly beaten by the officers, or is that the one

19  at the -- the Hub?

20      A.   The Pratt was with the one that was beaten by

21  the -- by the officers.  That was the one where we went

22  to the police department.

23           The second one was a young man named Germaine

24  [phonetic] McLeod.  I can't spell his first name.  But

25  that's what the second one was about.

1      Q.   Did that one involve any sort of litigation

2   that you recall?

3      A.   No, sir.  No, sir.  No more than the young man

4   was charged.  I don't know what came out of it --

5      Q.   Sure.

6      A.   -- you know, but he was charged for the

7   incident.

8      Q.   All right.  So we've got a 2007 one.

9      A.   Right.

10      Q.   Sometime after that, tell me -- tell me about

11   the next interaction you've had with Southern Pines

12   Police.

13      A.   I had several interactions with Mr. Perry,

14   Jason Perry --

15      Q.   Sure.

16      A.   -- the young man sitting right there.  I think

17   there was so many of them I about lost count.  I know we

18   had one -- and I don't remember what year -- where we

19   had some words over on Morganton Road in Southern Pines

20   at the -- the gas station.  And this also involved the

21   young man Lavar [phonetic] Pratt.  He was stopped by a

22   state trooper and pulled over there at the gas station.

23   And I just happened to be there.

24           And I don't remember how it started, but I

25   remember Officer Perry pulled up in his Southern Pines

1    vehicle.  And some sort of way, we got -- had some words

2    at that point.

3         Q.   Do you recall --

4         A.   What years?  No, sir.

5         Q.   Well, do -- do you recall how -- how the

6    conversation between you and Officer Perry started?

7         A.   No, sir.  I don't know more than him pulling

8    up.  It was a state trooper stop.  And when he pulled

9    up, he was talking to state trooper.  And some sort of

10   way -- either he said something to me or I said

11   something to him.  It was -- it was a point where when

12   he saw me and I saw him, we just -- we just -- how would

13   you say it?  We just didn't jell just -- I don't know

14   exactly what the wording was.

15        Q.   At -- at this point, the -- the -- had -- had

16   you had interactions with Officer Perry prior to this?

17        A.   I -- I believe that that was the -- may have

18   been -- no.  No, sir.  That wasn't the -- the first

19   time.  Or was that the first time?  No.  I think there

20   was one time prior to that.  And then I'm not sure.  I'm

21   not sure.

22        Q.   Sure.  Well, tell -- tell me about --

23        A.   I'm not sure.

24        Q.   -- the first time --

25        A.   I'm not sure.

1      Q.   -- that -- that you and Officer --

2      A.   He and I --

3      Q.   -- Perry had an interaction that -- a

4  substantive interaction?

5      A.   I'm not sure exactly which one was the first

6  time, because, like I said, we've had quite a few.  I do

7  remember one time, which could have been prior to that,

8  that he was there with the Southern Pines PD at my

9  mother-in-law's house on New York Avenue.

10         And my nephew -- my wife's nephew Ed

11  Dickerson, the police was there talking to him, and I

12  don't remember if he was arrested or not.  But I think

13  Mr. Perry and I had a few words then.

14         There was no complaint filed about it.  There

15  was -- I don't even think it went any further than that.

16  And I don't remember exactly what was said, but I know

17  we did have some words that day.

18      Q.   Do you know if -- if you were the first person

19  to say something to Officer Perry or if he was the first

20  person to say something to you?

21      A.   No, sir.  I'm not sure.

22      Q.   With regard to the -- the Morganton Road

23  interaction, were you there with Mr. Pratt?

24      A.   No, sir.  I was not there with him.  I was --

25  I was -- I was there after he was pulled.  But, no, I

1    wasn't -- I didn't go there with him.

2        Q.   Did you -- were you there when the -- the --

3    I'll call it intervention.  But when -- when the -- when

4    the trooper pulled over Mr. Pratt -- well, strike that.

5            Was -- was Mr. Pratt in a vehicle, or was he

6    at the gas station?

7        A.   He was in a vehicle.  I don't remember if he

8    was driving the vehicle or if he was just a passenger in

9    that vehicle, but he was in a vehicle that was pulled.

10       Q.   Were you there when the actual pull over --

11       A.   Yes, sir.

12       Q.   -- took place?

13       A.   Yes, I was there.  I was out in the -- in the

14   parking lot right there by where he was pulled out.

15       Q.   And were you --

16       A.   He was pulled up there.

17       Q.   -- shopping at the gas station, getting gas

18   there?  Do you recall what you were doing there?

19       A.   I was there shopping.  I don't remember if I

20   was getting gas, but I was there shopping at that store.

21       Q.   All right.  And prior to Officer Perry getting

22   there, was there anything that -- did -- did you

23   approach the trooper to speak to the trooper at all?

24       A.   I didn't speak to him.  I was standing close

25   by.  I didn't say nothing to him.

1      Q.   And I -- I assume you knew Mr. Pratt prior to

2   -- to him being pulled over there.  Is that correct?

3      A.   Yes, sir.

4      Q.   And was that based on the -- the incident in

5   2007 that we talked about?  Did you know Mr. Pratt

6   before that or -- or because of that?

7      A.   I -- I knew him just through seeing him and

8   everything before the incident in '07.  But having any

9   one-on-one with him, no, sir, because I knew his

10  parents.  I didn't --

11     Q.   Sure.  You -- you say you did know his

12  parents.

13     A.   I knew his mother.

14     Q.   Okay.  Who asked you in -- in 2007 to go to

15  Southern Pines with Mr. Pratt?

16     A.   He did.

17     Q.   All right.  We've talked about Morganton Road.

18  We've talked about the -- the -- the arrest of

19  Mr. Dickerson.

20          For the one at -- at your mother-in-law's

21  house, were you physically present at the location when

22  the arrest took place?

23     A.   I -- I still don't remember if it was an

24  arrest or not --

25     Q.   Sure.

Page 42

1      A.   -- ended in an arrest, but I was there.  It's

2   my mother-in-law.  I would be there two or three times a

3   week.

4      Q.   Sure.  And you were there when the police

5   showed up?

6      A.   Yes, sir.

7      Q.   Do you recall what prompted the police showing

8   up at the house?

9      A.   No, sir.  It was something to do with my

10  wife's nephew though.  It was something that they had

11  going on with him.  I'm not sure.

12     Q.   Do you recall what the basis of that was?

13     A.   No, sir.  I don't.

14     Q.   Do you know if it was -- involved drugs or

15  narcotics?

16          MR. DAVIS:         Objection to form.

17     A.   I don't.  I don't.

18  BY MR. JONES:

19     Q.   All right.  All right.  So we've talked about

20  those.  Take me through the next one that you recall

21  with -- with -- again, we've -- we've talked about --

22  we're talking about Perry, but -- but any --

23     A.   Any Southern Pines --

24     Q.   -- any Southern Pines including Officer Perry

25  but any -- any others that you recall from that time

1     forward.

2          A.    There was an incident with Captain Marsh.    I

3     won't say an incident, but it was something that took

4     place --

5          Q.    Sure.  And --

6          A.    -- involving him.

7          Q.    -- tell me about --

8          A.    Okay.  I received a -- a young man to -- come

9     to me.  I was at my mother-in-law's house on New York

10    Avenue.  A young man named Curtis Stubbs came to my

11    mother-in-law's house.  He saw me.  He told me that, I

12    think, at the time Lieutenant Marsh was looking for him

13    to talk to him about a situation at the pool hall where

14    a -- one young man had gotten killed.  My son got shot.

15    Mr. Stubbs got shot, and I think two more people were

16    shot that night.  And he had asked me would I go with

17    him over to the police department to talk to Lieutenant

18    Marsh.  And I told him that I would.  He said that he

19    was afraid to go over there by himself, would I assist

20    him and go over there, so I did.

21          When we got over there, Lieutenant Marsh

22    called us in his office.  When we went inside the

23    office, he started talking to Mr. Stubbs.  I did not

24    intervene with what was said or anything.  He was asking

25    him basically did he know who had committed the

```
 1    shooting, who did the shooting.  And I believe that
 2    Mr. Stubbs didn't have a whole lot to -- to tell him
 3    toward who exactly did the shooting.  And I remind you
 4    he was shot himself, and my son was shot at that time.
 5         Q.   Uh-huh.
 6         A.   But I don't think -- he did not give him a
 7    name of anybody in particular.  So that one particular
 8    incident I was with him when I saw Lieutenant Marsh at
 9    his office.
10         Q.   And was that a positive, negative, neutral
11    interaction?
12         A.   For me?
13         Q.   Sure.
14         A.   For me, it was -- it was neutral because
15    Lieutenant Marsh didn't say anything to me about why I
16    was there, or -- or he didn't tell me that I could not
17    come there or come inside.
18         Q.   Sure.
19         A.   He welcomed -- he said, "You-all come in."  So
20    -- and he and I didn't have any words about it.  We
21    didn't discuss it.  He and Mr. Stubbs did the talking.
22         Q.   Uh-huh.
23         A.   And then we left, and that was that.
24         Q.   All right.  Take me to the -- the next one
25    that you recall.  And let me -- let me -- strike that.
```

1          Up to this point on any of the ones that we

2    have talked about here, had -- did you file any sort of

3    complaint?  I say file.  Did you write any sort of

4    complaint to the Southern Pines Police Department on any

5    of the interactions that we've talked about so far?

6         A.    I don't believe I did.

7         Q.    All right.

8         A.    I don't believe I did.

9         Q.    Okay.

10        A.    There -- there was another time.  I think this

11   was in 2013, if I'm correct, when my son was arrested on

12   Stephens Street in Southern Pines.  And according to the

13   documentation, he was arrested by Officer Perry.  And

14   this was a drug-related incident where my son and some

15   other young men were inside of a house on that street.

16   And I was told that -- I had just -- my son had just

17   left me dropping his son off to me at Pinecrest.  So I

18   heard about it.  I got a call.

19          So when I went over there to see what was

20   going on, we had a few words about what was going on,

21   what was he being arrested -- what was he being arrested

22   for.  And I did ask.  And that ended up where my son was

23   charged with having possession of drugs, and he went to

24   court from that.  And I think it ended in -- the first

25   time in a hung jury.  I believe it was the first time.

1    And that was Officer Perry, and I think the -- the

2    district attorney was -- he's a judge now, Mr. Warren

3    McSweeney --

4         Q.   Uh-huh.

5         A.   -- was on that case.  And then I think they

6    refiled the charges against him again.  Like, around a

7    year later, he went back, and he ended up with -- I

8    think he took a plea on that last deal where I think he

9    got, like, a six-month probation or something like that.

10   I'm not sure.

11        Q.   Uh-huh.

12        A.   But that was that incident.

13        Q.   All right.  As a result of -- of that

14   interaction --

15        A.   Uh-huh.

16        Q.   Well -- well, strike that.

17             You said Officer Perry was -- you -- you

18   believe he was the one who arrested your son.

19        A.   According to documentation.

20        Q.   When you went to the scene of that arrest, who

21   -- who did you speak with, if you recall?

22        A.   I only said a couple of words to him through

23   passing.  I --

24        Q.   And when --

25        A.   I --

1      Q.    -- you say "him," who --

2      A.    Excuse me.

3      Q.    -- Officer Perry?

4      A.    I'm sorry.  I'm sorry.  Officer Perry.  I've

5    spoke with -- I believe this officer is retired now.

6    Forgive me if I can't remember his name.  But I spoke to

7    another officer that night --

8      Q.    Okay.

9      A.    Ritter -- I think his name was Ritter, I

10   believe.  And we had a few words of talking to him about

11   my son, my son's case or whatever.  He said what he

12   said, and they arrested him anyway, and that was

13   basically the end of that.  And then we had the court

14   case and then -- from that.

15     Q.    The interaction that you had with Officer

16   Perry at that scene, was it positive, negative, neutral,

17   you just didn't speak much or -- or --

18     A.    We said -- we said a few words.  It may have

19   been -- I don't think it was -- it -- it wasn't loving

20   words --

21     Q.    Sure.

22     A.    -- I'm sure.

23     Q.    Sure.

24     A.    But I don't remember what they were.

25     Q.    Sure.  Did you make any sort of complaint

1   based on that interaction?

2        A.   I don't -- I don't believe I did.

3        Q.   Okay.

4        A.   I don't believe I did.

5        Q.   All right.  Tell me about the next one that

6   you recall.

7        A.   Well, there was a -- a incident on -- off of

8   Pennsylvania Avenue where -- at the funeral home for

9   Kendrick -- Kent -- Ken -- Kenny Purcell's Funeral Home.

10  His son's name was Kendrick Purcell.  And Mr. Perry and

11  some of the other police officers was there on scene,

12  and I think it was in reference to -- I learned --

13  learned recently -- reminded recently about -- a little

14  bit about it.  It was about some marijuana or something,

15  plants or something inside -- that was allegedly inside

16  of his house.

17            And I saw the people there that day I was over

18  at the gas station, so it was right across the street.

19  So I walked over there to see what was going on over

20  there because I -- me and Kenny Purcell, the owners, was

21  good friends.  Kenny's passed.  He's gone on now.  But

22  we were good friends, so I walked over there.  And when

23  I walked over there, that's when I saw all the police

24  was in the yard.  A lot of other people was in the yard,

25  and that's where that incident took place.

Page 49

1      Q.   And you say you were across the street.  Is

2   that correct?

3      A.   Yes.  Well, I was at the gas -- there's a gas

4   station there.

5      Q.   And do you recall what you were doing at the

6   gas station?

7      A.   I was inside the store buying something.  I

8   didn't buy gas there --

9      Q.   Sure.

10     A.   -- so I was in the store purchasing something.

11     Q.   Had -- did anybody at the -- at -- at the

12  Purcell -- was there a -- a funeral party, or was it --

13  is it a funeral home or --

14     A.   No, sir.  The funeral home is here, and then

15  right beside it is this little house.

16     Q.   Uh-huh.

17     A.   He -- he owned both of them.  It was a little

18  house where his son I understand was living at.  But --

19  but it was -- it was Mr. Purcell's property.

20     Q.   Okay.  And what was -- what was happening that

21  afternoon at the Purcell property, if you recall?

22     A.   There was a lot of -- it was a lot of people

23  there.  There was a lot -- as far as what was taking

24  place?

25     Q.   Right.  There -- there -- as I understand it,

1   there was a gathering of people there.

2       A.    Right.

3       Q.    Is that correct?

4       A.    Right.

5       Q.    Do -- do you recall what that gathering was

6   for?

7       A.    It was -- to my knowledge, I would -- I would

8   assume that it was because that the police was there

9   that all the people were out in the yard and stuff

10  because I can't say it was a party or nothing.  What was

11  really going on prior to them getting there, I don't

12  know.

13      Q.    Sure.

14      A.    I know I wasn't there.  So --

15      Q.    Did you see anything at the Purcell house?

16  Prior to the police getting there --

17      A.    No.

18      Q.    -- did you see anything?

19      A.    I -- I -- I didn't.  I wouldn't -- I didn't

20  even see when the police came there.  They were already

21  there when I noticed it.

22      Q.    Did anybody from the Purcell resident --

23  residence ask you to -- to come over and help out or

24  anything?

25      A.    And -- and I think her name was Anjanette --

1   Anjanette Patterson.  And I -- I'm wondering -- I

2   thought about it.  I'm not sure if that was his mother,

3   or not.  But one of -- the Patterson family, one of

4   those ladies were his mother, were Kendrick's mother.

5   And I'm not sure if it was Anjanette, or not.

6        Q.   And what did -- Ms. Patterson, how did she see

7   you?

8        A.   I was back out at my vehicle right there

9   beside her -- like I said, it's right in front of the --

10  the funeral home is here, and then the store is here.

11  My vehicle was parked out here.

12       Q.   Okay.  And then tell -- tell me --

13       A.   So she --

14       Q.   -- what happened.

15       A.   She saw me.  She basically saw me.  I was

16  looking over there anyway.  When I saw her, she called

17  me.

18       Q.   Uh-huh.

19       A.   And she said, "They're trying to arrest my

20  son."  No.  She's trying to arrest Kendrick, like that.

21  And, like I say, I'm not sure if it was her son or --

22  I'm not sure which one was his mother.  But -- and I

23  walked over there.  When I walked up in the yard, that's

24  all -- I saw all the people, and I saw the police

25  officers and stuff.

1      Q.   Okay.  And that was the -- the interaction

2    that Officer Perry was -- was asked about on -- on

3    Thursday.  Is that correct?

4      A.   Yes.  Yes, I believe so.  Yes.

5      Q.   And as a result of that interaction, you did

6    make a complaint -- is that correct? -- with Southern

7    Pines.

8      A.   Yes, sir.  I did.

9      Q.   I'm going to show you what we'll mark as

10   Defendants' Exhibit 1.  And you don't have to read the

11   whole thing --

12             (Defendants' Deposition Exhibit Number 1

13             is marked.)

14     A.   Right.

15     Q.   -- but flip through and just see if that looks

16   familiar to you.

17     A.   I believe so.

18     Q.   Okay.  And -- and can you identify what this

19   document is?

20     A.   It's a -- a complaint that I filed with the

21   internal affairs with Southern Pines.

22     Q.   And is that as a result of the interaction

23   that we're talking about?

24     A.   Yes, sir.

25     Q.   Okay.  And who drafted this document that's

1    seen in -- in Defendants' 1?

2        A.    This -- who drafted this?

3        Q.    Yes.

4        A.    I did.

5        Q.    Okay.  And who did you send it to?

6        A.    To the internal affairs at the police

7    department.

8        Q.    Okay.  Did you send a copy to anybody else

9    that you recall?

10       A.    There were -- I think there was some -- ones

11   that's not showing it here, but I believe I did send it

12   to two or three or other -- other places.  I believe I

13   did.

14       Q.    And --

15       A.    It was on the bottom of it.

16       Q.    Sure.  Where -- where else did you -- again,

17   what your memory is.  But do you recall -- recall who

18   else you sent it to?

19       A.    Not right off, sir, I don't.  But I do believe

20   I sent a copy to -- to somebody else.

21       Q.    Okay.  Did you send it to news organizations

22   to your memory?

23       A.    I don't -- I -- I can't say exactly without

24   going over it -- seeing it.

25       Q.    Sure.

1    A.   But I -- I do believe I sent it to other

2  places.

3    Q.   Okay.  And why would you have sent it to

4  places other than internal affairs at SPPD?

5    A.   Because I wanted some attention, I believe, to

6  the situation.  And I didn't feel very good about it

7  actually getting -- honestly getting taken care of

8  without somebody else knowing about it.  I believe that

9  was my intention.

10    Q.   To your memory, is this the first written

11  complaint that you had made to Southern Pines Police

12  Department?

13    A.   I can't really say that because there were

14  probably one or maybe two other times that there were

15  some things that went on in reference to my son.  I

16  remember one thing was -- and I don't remember any

17  dates, any time, or exactly who the officers was.  But

18  as far as harassment goes, I believe I filed a complaint

19  about that one time.  And everything that I ever filed

20  came back unfounded.  So that may have been one reason

21  why I did send it to somebody else.  I can't say --

22    Q.   Sure.

23    A.   -- right off but --

24    Q.   But you -- you don't -- you don't recall if

25  this is the first one or if there may have been --

1      A.   No.

2      Q.   -- one --

3      A.   No, sir.

4      Q.   -- before this.

5      A.   No, sir.  I don't.

6      Q.   Fair enough.  If you'll turn to page 2, and up

7   at the top, it's Bates stamped 00423.  Up in the left

8   corner, you'll -- you'll see the numbers.

9           For the -- these all -- all have 001 on the --

10  on the bottom right corner.

11     A.   Right.

12     Q.   But they're -- they're -- they are numbered

13  sequentially up in the top left.  So if we look at 423

14  in the -- in the first full paragraph that starts "Some

15  of the people," I'm about -- halfway down, this is a --

16  a description of -- of the interaction that you had with

17  -- with -- with Detective Perry.

18     A.   Okay.  Okay.  Right.

19     Q.   And I'll direct you.  Kind of right in the

20  middle of it --

21     A.   Uh-huh.

22     Q.   -- you talk about how Detective Perry came out

23  and had a smile on his face.  It says that he asked

24  everybody to leave real -- real nasty like.  And then it

25  says -- you see the -- the line after he said this?

1      A.   Yes, sir.

2      Q.   Can you read that sentence?

3      A.   "I knew he was referring to me because he was

4  looking straight at me.  So then I said something in the

5  lines of, 'Well, if there wasn't any drugs inside the

6  house before he got here, there will be before he

7  leaves.'"

8      Q.   All right.  Do you remember making that

9  statement?

10     A.   I believe I did make that statement.

11     Q.   All right.

12     A.   I believe -- I believe I remember making that

13  statement.

14     Q.   Okay.  What was the purpose of that statement?

15     A.   Over -- over the years that I had known

16  Detective Perry, I had heard such things as him putting

17  drugs in places on people.  I've heard that from people

18  in the neighborhood, people that he had allegedly been

19  involved with.  And through the heat of the moment, I'm

20  sure I made that accusation because it's written in my

21  statement.

22     Q.   Sure.

23     A.   And that's the way I felt at the time.  And it

24  -- I will say that at that moment it was a heated

25  moment, and I -- and I did -- I did say it.

1      Q.   All right.  At that moment, did you have any

2   personal knowledge, meaning not what other people had

3   told but -- but observations that you had made that

4   Officer Perry had -- had placed drugs anywhere that they

5   weren't ahead of time?

6      A.   It was not an observation made by me.

7      Q.   All right.  And if you'll look down, you talk

8   about, you know, him telling people to go now and some

9   additional conversation.  And the -- the bottom part of

10  it, it says, "I also told the lieutenant that this kid

11  did not have any idea what he was doing and that I was

12  old school and he didn't know anything about what that

13  meant."  Do you recall making that statement?

14     A.   I'm trying to find it.

15     Q.   Sure.  Sorry.

16     A.   But I'm sure --

17     Q.   It's -- it is the second to last sentence of

18  -- of that paragraph starting with "I also told."

19     A.   Okay.  Okay.  And you're asking me --

20     Q.   Right.  And -- and do you recall making the

21  statement I -- that I was old school and he didn't know

22  anything about what that meant?

23     A.   Yes.

24     Q.   Okay.  What -- what did you mean when you

25  said, I -- I was old school and he didn't know anything

```
1   about what that meant?

2        A.   It meant that I wouldn't be pushed.  And, like

3   I said, it was in the heat of the moment.  But I'm sure

4   that's what I meant that I would not allow -- I wouldn't

5   allow him to push me.

6        Q.   And when you say --

7        A.   Not push, like -- but --

8        Q.   I'm -- I'm sorry.  I cut you off there.

9        A.   1.05.06.

10       Q.   You said pushed.  Do you mean --

11       A.   Right.

12       Q.   -- physically push, or you mean pushed as

13  in --

14       A.   Either or.

15       Q.   Sure.  And --

16       A.   At that time, yes, either or.

17       Q.   And when you say you wouldn't allow -- or you

18  wouldn't be pushed --

19       A.   Right.

20       Q.   -- what would you have done?

21       A.   I --

22       Q.   Was there anything to that statement of -- of

23  what you wouldn't have -- what you would've done --

24       A.   I can't --

25       Q.   -- to not allow it?
```

1       A.   I can't say that.  I -- I don't know.  I don't

2   know what I would've done, but I just -- I just felt,

3   like, that I wouldn't -- wouldn't be pushed because of

4   the -- like I said, the heat of the moment and the

5   attitude and the personality that I had seen and had

6   dealt with this -- with this young officer, I just

7   wasn't in the mood for an intervention with him.

8       Q.   Sure.  And your statement says that at that

9   point he backed up and had left at that point.  Is that

10  correct?

11      A.   I -- I backed -- where -- where is that, sir?

12  Let me --

13      Q.   The last --

14      A.   Where are --

15      Q.   The last sentence of that paragraph.

16      A.   Yes.  Yes.  Yes.  After he was in my face, he

17  -- he backed up when Lieutenant Austin intervened.  He

18  backed -- that was the end of it.  When he backed away,

19  I -- that's when I walked out.

20      Q.   Okay.  But it says that Jason Perry was the

21  one that -- that walked away at that point.  Is that

22  correct?

23      A.   We both walked away.  I said when Perry backed

24  -- I said, Jason Perry backed up and went back on the

25  porch.  We both did.  I left.

1     Q.   Okay.

2     A.   I turned and left.  He went down on the -- on

3  the -- went back on the porch, I'll say.

4     Q.   And if you'll flip to the back page of this

5  exhibit, it's page 425.

6     A.   Uh-huh.

7     Q.   And then the last paragraph is a conclusion.

8     A.   Uh-huh.

9     Q.   And I'll -- I'll direct you to the second to

10 last statement that starts "I must be honest with you."

11 Do you see that?

12    A.   Yes, sir.

13    Q.   All right.  Can you read that into the record,

14 please?

15    A.   "I must be honest with you.  From past

16 decisions to remove officers requested for wrongdoings,

17 there have been no results.  So I do not have a lot of

18 hope in this happening now."

19    Q.   Okay.

20    A.   "I will" -- just that part?

21    Q.   Yeah.  That's fine.  Do -- do you recall prior

22 decisions to remove officers requested for wrongdoing?

23    A.   At that particular time, I can't say today

24 that there was any that I remember.  But at that

25 particular time, I felt that there were others because

1    there was other times when I had filed a complaint or

2    whatever whether it was fault -- in reference to my son

3    or whatever that I had seen no recourse.  And -- and I

4    didn't have any faith that this would actually be dealt

5    with.  I just felt like that it would be like all the

6    rest.  But I had -- I felt like I had to write it.

7         Q.   As a result of -- of this interaction -- and

8    -- and this letter is dated November 21st, 2013.  Do you

9    recall if Officer Perry or any of the other responding

10   officers to this event had any other what I'll call

11   disagreements with any of the other folks at -- at -- at

12   this location, at the -- the Purcell home?

13        A.   And only through reading, this -- the other

14   day or something, everybody was arguing.  At the times,

15   a lot of voices, you know, arguing with -- with Mr.

16   Perry.  They were arguing with Lieutenant Austin at the

17   time.  What they were saying, I can't -- can't say

18   exactly what the words were.  But everybody was -- was

19   upset and -- and hyped up.  And this young lady

20   Anjanette Patterson, I recall hearing that she had an

21   intervention.  I'm not sure.  I think it was with

22   Officer Perry.

23        Q.   Sure.

24        A.   But other than that, everybody -- everybody

25   was just loud and all upset about what was going on.  It

Page 62

1    was -- it was a busy incident where there was a lot a

2    chaos.

3        Q.   Sure.  Do you know if anybody else filed any

4    -- and I say filed, but submitted any complaints to

5    internal investigations, anybody else that was there?

6        A.   Like, I mentioned this lady's name, Ms.

7    Patterson.

8        Q.   Uh-huh.

9        A.   I believe I heard she did.  But I -- I haven't

10   seen it.

11       Q.   Sure.

12       A.   If I've seen it, I didn't -- I don't -- I

13   didn't recognize -- don't remember.

14       Q.   Okay.  Fair enough.  All right.  After this

15   interaction in -- in November of 2013 -- and then,

16   again, we'll go up to February of 2018 --

17       A.   Okay.

18       Q.   -- any other interactions with Southern police

19   -- Southern Pines Police officers that you recall?

20       A.   I remember one time with Officer Hardy.  He

21   and I had some words in reference to an assault on my

22   son with him involving him, I'll say.  I think it was on

23   Stephens Street.  There was no complaint filed about it,

24   but I think we had a little disagreement or something --

25       Q.   And you --

1      A.    -- some words --

2      Q.    You said that there was --

3      A.    -- about --

4      Q.    -- an assault.  But was that --

5      A.    Yes.

6      Q.    -- between Officer Hardy and your son, or was

7  it --

8      A.    No.

9      Q.    -- in reference to something -- a different

10  assault and then you went and spoke with Officer Hardy?

11     A.    True.  That -- that's correct.

12     Q.    Okay.  All right.  And you said no -- no

13  complaint for that one.

14     A.    No, sir.

15     Q.    Okay.  Any others that you recall?

16     A.    Filed complaints or just interventions --

17  interactions --

18     Q.    Interactions.

19     A.    -- with --

20     Q.    Interactions, please.

21     A.    Lieutenant -- I forget his name -- Austin, we

22  were talking about -- I don't remember the exacts, but

23  I'm sure once or twice he and I talked and didn't agree

24  with each other either.

25     Q.    And do you know the -- the precipitating

1    reason for speaking with --

2         A.   Well --

3         Q.   -- with Officer Austin?

4         A.   I'm sorry.  I'm sorry for interrupting you.

5    One of the things I remember was a traffic stop one

6    morning on -- I think it was Leak Street in Southern

7    Pines.

8         Q.   And were you involved in that traffic stop?

9         A.   No, sir.  My son was.

10        Q.   All right.  And did the interaction with

11   Officer Austin -- did that result in a complaint?

12        A.   No, sir.

13        Q.   Any others that you recall?

14        A.   I'm sure there were others, maybe not as

15   upscale.

16        Q.   Sure.

17        A.   But I don't recall.

18        Q.   Any others that you recall that resulted in

19   complaints that you made either -- either, you know, via

20   writing or just going up there and saying, "You know,

21   hey, I've got a complaint about this officer?"  Any

22   others that you recall complaining to the department

23   about?

24        A.   I can't recall.

25        Q.   Other than Southern Pines Police Department,

1　have you made any complaints against law enforcement

2　officers in other jurisdictions or in -- from other

3　agencies?

4　　　　A.　Have I?　Bear with me.

5　　　　Q.　Sure.

6　　　　　　　　(Brief pause.)

7　　　　A.　Yes.

8　　　　Q.　Tell -- tell me about those that -- that you

9　recall.

10　　　　A.　I don't remember the year exactly, but there

11　was a -- a gentleman that was a friend of mine named

12　Dennis Howard Newsome.　And Dennis Howard Newsome was

13　charged with -- I believe it was a -- an aggravated

14　assault on Sheriff Herbert Peterkin in Hoke County.　And

15　I believe I wrote a letter to -- I believe it was --

16　what's her name? -- Loretta up in D.C.　Loretta --

17　　　　Q.　Lynch?

18　　　　A.　-- Lynch concerning that situation for him.

19　　　　Q.　And did anything come from that complaint that

20　you recall?

21　　　　A.　I'm not sure if it did.　I'm pretty sure that

22　-- well, they didn't let him out or anything based on

23　that, but I'm not sure what the outcome was.

24　　　　Q.　Any other agencies other than -- and -- and

25　this was a -- a complaint about Hoke County officers.

```
 1   Is that correct?
 2        A.   That was Hoke County.  That was the actual --
 3   that was the Hoke County sheriff --
 4        Q.   Uh-huh.
 5        A.   -- at that time.
 6        Q.   Any other agencies other than Hoke County
 7   outside of Southern Pines --
 8        A.   I don't --
 9        Q.   -- that you have made complaints about?
10        A.   I don't recall, sir.
11        Q.   Have you ever maybe outside of a formal
12   complaint submitted to the department accused other law
13   enforcement officers of misconduct, wrongdoing,
14   malfeasance?
15        A.   Not to my knowledge.
16        Q.   Okay.  In the lawsuit that we talked about
17   back in 2013 against -- for the $7,000 that --
18        A.   Yes.
19        Q.   -- we talked --
20        A.   Yes.
21        Q.   -- about --
22        A.   Yes.
23        Q.   -- did you make claims in that lawsuit that
24   officers had committed malfeasance or -- or wrongdoing?
25        A.   I believe -- I believe I -- to my attorney, I
```

1    believe I did based on the reason for the traffic stop
2    in Wellford.
3        Q.    Sure.
4        A.    I believe I did.  It's been a long time.  I'm
5    not sure.
6        Q.    Fair enough.  I'll show you what we'll mark as
7    Defendants' Exhibit 2.  I apologize in advance.  This is
8    kind of small writing.  It was -- just the website I was
9    able to pull it up on had --
10                   (Defendants' Deposition Exhibit Number 2
11                    is marked.)
12       A.    Okay.
13       Q.    -- had small writing.  Flip through this and
14   just -- you don't have to read the whole thing.  I'll --
15   I'll ask you some questions about it but --
16                   (Brief pause.)
17       Q.    And if you'd like to read the whole thing, you
18   certainly can.  But I -- I just -- do -- do you -- you
19   may not have seen this exact document before.  But do
20   you -- do you recognize the -- the information that's
21   shown in Defendants' Exhibit 2?
22       A.    I -- I do recognize some of it.  Like I say, I
23   didn't read it all, but I do recognize some of it.
24       Q.    And -- and I'll represent to you that this is
25   the --

1        A.    Uh-huh.

2        Q.    -- the -- the proceeding that was -- that was

3   pulled up based on the -- the lawsuit that you provided

4   in your responses to interrogatories.

5        A.    Uh-huh.

6        Q.    And this purports to be the same, you know,

7   $7,000 issue that we talked about and that -- that you

8   -- you talked about earlier.

9             And it goes through the background and says

10  and -- and -- strike that.

11            You are the plaintiff in this case.  Is that

12  correct?

13       A.    Yes, sir.

14       Q.    And if you'll look under report and

15  recommendation, it says Jacquelyn Austin, Magistrate

16  Judge.  And then it says, Lee Marvin Harris, Sr.,

17  Plaintiff, a pro se litigant.  It seems to indicate that

18  you -- that you did not have an attorney for this.  Is

19  that correct?

20       A.    Correct.

21       Q.    Does that refresh your recollection on that?

22       A.    Yes, sir.

23       Q.    Okay.  And if you'll go down under

24  background --

25       A.    Uh-huh.

1      Q.    -- and the second paragraph talks about kind

2   of the -- the claims in the case.  And the third

3   sentence states, "Plaintiff claims the officer."  Do you

4   see that sentence?  And, again, I'm sorry.  It's so

5   small but --

6           MR. DAVIS:         Which paragraph again?

7           MR. JONES:         Under background, the

8   second paragraph, the third sentence, "Plaintiff

9   claims."

10          MR. DAVIS:         It's right here.

11          THE WITNESS:       Okay.  Yeah.  Okay.

12     A.    I -- I see that.

13  BY MR. JONES:

14     Q.    Sure.  And I'll -- I'll spare you having to

15  read the -- the tiny writing here.  But I'll -- I'll

16  represent to you that it says, "Plaintiff claims the

17  officer fabricated a drug charge based on suspected

18  marijuana so the currency could be seized as a -- as

19  possible drug proceeds."  Does that sound like what you

20  claimed in the case?

21     A.    It's a -- it's a strong possibility that I

22  did.  I don't recall everything that happened, but

23  that's a strong possibility.

24     Q.    Okay.  Is it your memory that -- that the

25  officers involved in this stop fabricated drug charges

Page 70

1    against your son?

2         A.    At this point, there's -- as long as it's

3    been, I don't remember what all happened in this case.

4    I just -- I just don't, but I cannot say that I did

5    not --

6         Q.    Sure.

7         A.    -- make an accusation like that.  I just don't

8    -- I don't remember it.  I don't remember the full --

9    from A to Z or what exactly happened with this case.

10   It's been a long time --

11        Q.    Sure.

12        A.    -- passed.

13        Q.    In your representations to the court, would

14   you have been truthful back in 2013 about what your

15   beliefs about the case were?

16        A.    Yes, sir.

17        Q.    Do -- do you have any reason to disagree with

18   -- with the statements that I had you read in here?

19        A.    I don't a reason to disagree.

20        Q.    Okay.

21        A.    I just don't remember them, but I don't have a

22   reason.  No.

23        Q.    All right.  Did you make any sort of

24   complaint, or complaint letter?  To the Wellford --

25   Wellford Police of South Carolina, did you make any sort

1  of complaint of them based on their interaction with

2  your son?

3      A.   I don't recall if I did or not.  I do recall

4  going to the Wellford Police Department one time, but I

5  don't remember what -- what the conversation was about

6  or what my main reason for going there for, but I did go

7  there one time.  I remember that.  But I don't recall

8  what my reason was for going there.

9      Q.   Do you recall writing any sort of complaint

10 letter to them?

11     A.   I don't.  I don't.

12     Q.   Is there --

13     A.   I don't --

14     Q.   -- a reason --

15     A.   -- recall that --

16     Q.   -- that you wouldn't have complained to them

17 for fabricating drug charges against your son?

18     A.   I can't say that there wouldn't have been a

19 good reason to do that.  I just don't remember if I did,

20 or not.  I do know that I complained to -- when I filed

21 this, I don't know if I felt like that was enough, or

22 not.  I don't remember if I did, or not.  I just don't

23 -- when I felt that something was wrong through my years

24 of all this, I would write a complaint.  I wasn't shy

25 about that.  I just don't recall if I did, or not.

1      Q.   When you wrote complaints --

2      A.   Uh-huh.

3      Q.   -- like the ones we -- we've talked about, did

4   you keep a copy for yourself?

5      A.   When I would do it, yes, sir.  I would at that

6   particular time.  I was always -- well, I was taught in

7   the military that documentation is everything.

8      Q.   Sure.

9      A.   So I'm sure --

10     Q.   I haven't seen --

11     A.   -- I did.

12     Q.   -- a copy of the complaint --

13     A.   Right.

14     Q.   -- for this matter.  Do you know if one

15   exists?

16     A.   No, sir.  I don't know, but it's a strong

17   possibility that if it did exist that I would be able to

18   put my hands on it.

19     Q.   Sure.

20     A.   But I can't say right off if I did, or not.

21     Q.   Sure.  All right.  Turning to some of the kind

22   of background for the incident we're -- we're here about

23   today --

24     A.   Sure.

25     Q.   -- I want to ask you about some folks that --

1    that have been involved in the various portions of this

2    investigation and -- and see what your relationship is

3    with them and knowledge of them and -- and what you know

4    about them.

5              So who is Robert McRae?

6         A.   Robert McRae, to the best of my knowledge, now

7    lives in Southern Pines.  And I've known his father for

8    many years.  I've known Robert since he was younger.  He

9    was, and I would imagine still is, a -- a friend of my

10   son's.  I've -- I've known him myself personally sort of

11   like one of my kids with them knowing him.

12        Q.   What about Christian Terry?

13        A.   Christian Terry, I would basically say the

14   same thing.  I just wouldn't have -- I never had as much

15   interaction around my home or anything -- him coming to

16   my home ever or something like that, but being a friend

17   of my son, I would say yes.  But I didn't deal with him

18   probably on a level -- because once in a while, over the

19   years, Robert would come as a child, you know, but not

20   Terry.  I think I may have met Christian Terry in the

21   last maybe seven, eight years maybe, but not when he was

22   younger.  I didn't know him.

23        Q.   And for the last seven, eight years, your --

24   your son is -- is in his mid -- almost mid-30s.  Is that

25   correct?

1      A.   He's -- he's 37.  Yeah.

2      Q.   So seven, eight years ago, Mr. Terry was an

3  adult by that point?

4      A.   Yes, sir.

5      Q.   Robert McRae, you've known since he was --

6      A.   Since he was a -- a child.  Yes.  Uh-huh.

7      Q.   All right.  What about Calvin Fox?

8      A.   Calvin Fox was a -- a friend of my son's that,

9  I believe, he met in college at A&T College in

10 Greensboro.  And I can't remember exactly what year it

11 was that that was, but they were -- they were in school

12 in Greensboro together.

13     Q.   Do you know where -- in this time period,

14 2017, 2018, did Calvin Fox live in this area?

15     A.   To my knowledge, Calvin Fox lived in Sanford.

16 I never -- I never knowed [verbatim] him to live in the

17 Moore County area to the best of my knowledge.

18     Q.   And what about Calvin Fox making visits to

19 your home?  Did he do that sometimes?  Never?

20 Regularly?

21     A.   I would say probably in the last eight, nine,

22 ten years Calvin Fox may have been to my house maybe

23 three times if that many.  Maybe three times, I don't

24 think over that.

25     Q.   All right.  What about Tracy Williams?

1    A.    Tracy Williams.  Tracy -- Tracy -- I learned

2   who Tracy was for the first time in 2013 when Tracy

3   approached me about an incident with her, and, at the

4   time, I believe -- he was Detective Perry, I believe, at

5   that time.  And this was after my mother-in-law had been

6   arrested by Detective Perry in reference to her son

7   having drugs in the house or whatever.

8         But Tracy came to me and told me that

9   Detective Perry had threatened her to basically the word

10  snitch, she said, on my son and some of his friends and

11  my brother-in-law, Edwin Dickerson, concerning selling

12  drugs in the area.  And that's the -- was the first time

13  I had ever met Tracy.

14    Q.    Uh-huh.

15    A.    And she's basically said the reason she did it

16  because she felt bad about what happened to my

17  mother-in-law.

18    Q.    Since that interaction in 2013, have you

19  continued having a relationship with Tracy Williams, or

20  is that kind of a one-time thing?

21    A.    No, sir.  I -- I may have seen Tracy maybe two

22  times since, and she was working at -- maybe three,

23  maybe.  She was working at Mac's Breakfast in Aberdeen

24  back in the kitchen, and that's been a few years ago.

25    Q.    Sure.

1    A.   But I go to Mac's quite often --

2    Q.   Sure.

3    A.   -- and eat.  So I saw her there, and she went

4  to court one time on that case, particular case.

5    Q.   And were you involved in that?

6    A.   No, sir.

7    Q.   Okay.

8    A.   I was there, but I wasn't -- I didn't have

9  anything active going on with her, but I was there at

10  the courthouse.

11    Q.   And what -- what was your purpose for being at

12  the courthouse?

13    A.   It was the -- the 2013 case where Detective

14  Perry charged my son with drugs on Stephens Street, and

15  he was going -- getting ready to go to trial for that.

16  So that's what that was about.  That's why she was

17  there.

18    Q.   What -- what was her role in that?

19    A.   She was gonna witness -- be a -- a witness on

20  the stand for -- I think it was Attorney Costanza,

21  Richard Costanza.  That was her purpose, but he never

22  did call her.

23    Q.   And was -- Attorney Costanza, was he a defense

24  attorney, or was he a prosecuting attorney?

25    A.   He's a defense.  Defense.

1    Q.   All right.  What about Lamar Sealy?

2    A.   Lamar Sealy is a cousin to my son.  And I've

3 known Lamar since he is a little boy growing up with my

4 son in elementary school.

5    Q.   All right.  Would Mr. Sealy be a regular at

6 your home?

7    A.   No, sir.

8    Q.   How often would Mr. Sealy come to your house?

9 Would it be on -- for holidays and -- and family kind of

10 get togethers, more often than that, less often than

11 that?

12   A.   He was a relative to my son, but I don't

13 believe he -- over -- from the time from a child up to

14 now, I don't believe Lamar came to my house over maybe

15 four times over all those years.

16   Q.   All right.  And what about Arthur Darby?

17   A.   Arthur Darby.  Arthur Darby, I didn't know too

18 well, but in high school, when my -- when my younger

19 daughter was in high school, he used to date my

20 daughter.  And that was -- it was a short -- over a

21 short period of time.  But he -- he and her dated for a

22 little while.

23        And over the years since then, I hardly ever

24 -- ever seen the kid.  But I did know him.  I knew who

25 he was.  He wasn't raised up around my house.  He may

1   have been to my house maybe twice during that time when

2   they were dating during high school.  But other than

3   that, we didn't have any -- any regular conversations or

4   dealing.

5       Q.   Sure.  And forgive me.  That -- that high

6   school time period, what -- what -- would that have been

7   prior to 2015?

8       A.   Yes.

9       Q.   Okay.

10      A.   Yes.  She's -- what? -- 39 now.

11      Q.   I hear you.  So we're -- we're talking turn of

12  the -- turn of the millennium.

13      A.   Yeah.

14      Q.   All right.  Do you have any knowledge -- I'm

15  -- I'm going to go back through these folks and ask

16  about your knowledge with regard to their criminal past.

17      A.   Okay.

18      Q.   Do you have any knowledge about Robert McRae's

19  criminal past?

20      A.   I don't know what it was for or anything, but

21  I understand that he was incarcerated.  I'm not sure how

22  many years ago, but I believe Robert was incarcerated on

23  drug charges.  I believe it was -- I believe it was

24  federal.  I believe.  I'm not sure.  But I -- that's

25  back a while ago.

1          I'm familiar with him being incarcerated since

2    this February 20 thing.  One time after that, I don't

3    remember how long it was, but I remember he was.  Is --

4    is that just it, the incarcerations or --

5          Q.   Sure.

6          A.   -- anything else?

7          Q.   Or -- or obviously, that would be a -- a --

8    you know, they're criminal charges.  Did --

9          A.   Right.

10         Q.   Do you know -- have any knowledge of him

11   either selling drugs at any time?

12         MR. DAVIS:          Objection.

13         A.   I don't have any knowledge of him selling

14   drugs, no, sir.  No.

15   BY MR. JONES:

16         Q.   Had Mr. -- has Mr. McRae ever been to your

17   residence after he was incarcerated on what you thought

18   were the -- the federal charges for drugs?  Had he been

19   to your house after that?

20         A.   Robert McRae came to my house one time to the

21   best of my knowledge over all the -- over the years that

22   I've known him, and that was to bring his wife there.  I

23   think she opened a nail shop or something like that.

24   She was distributing cards or something like that.

25   These kids didn't hang out around my house.  I mean, I

1    know you didn't ask me that.

2         Q.   Sure.

3         A.   But -- but it wasn't -- it wasn't like that.

4    Maybe one time, you know, that I recall him coming with

5    his -- with his wife.

6         Q.   And that would've been after he served some

7    time?

8         A.   Yes.  I'm sure.

9              MR. DAVIS:         Objection.  Glenn, I'm

10   going to ask if my client to only ask -- answer

11   questions regarding criminal conduct related to this

12   incident.  Any other incidents for jeopardy reasons, I

13   don't think that they're relevant to any discoverable

14   information regarding Mr. Harris and this case.

15             MR. JONES:         I think he -- well, one,

16   discoverable information is certainly up to the judge to

17   decide and not for the terms of the --

18             MR. DAVIS:         I'm going to limit -- I'm

19   going to ask to limit the scope of your questions --

20             MR. JONES:         But in the --

21             MR. DAVIS:         -- to activity regarding

22   those persons as it relates to this incident.

23             MR. JONES:         Unless there's a Fifth

24   Amendment objection, if you're making a overbroad -- the

25   -- the discovery is incredibly broad as to -- lead to

1    the scope of -- of potentially admissible evidence, and

2    certainly, his knowledge about the drug proclivities of

3    -- of folks associated with his son specifically

4    including the allegations that he's making in this

5    complaint are incredibly relevant to the case.

6              MR. DAVIS:          So just to -- for scope

7    purposes, I'm going to ask that -- I agree that any

8    relevant information regarding activity to proclivities

9    are activities of the person's name, any of his

10   knowledge, he should be able to.  But any general

11   information about -- you asked about all criminal

12   activity regarding each one of these persons.  I'm going

13   to ask to limit the scope of that as it being overbroad

14   and not readily discoverable of any relevant information

15   in this case.

16             MR. JONES:          Certainly, I -- I mean, I

17   -- I will limit it to drug -- that -- knowledge that Mr.

18   Harris, Sr. has about --

19             MR. DAVIS:          Any of the persons that

20   you just mentioned.

21             MR. JONES:          Right.  But I was going to

22   ask him --

23             MR. DAVIS:          But you asked him --

24             MR. JONES:          -- about his -- his

25   knowledge of their drug charges and their drug

1    experience.

2              MR. DAVIS:          Which is perfectly fine.

3    He asked him about all criminal activity, which I'm

4    asking to limit the scope of that because he as a

5    layperson has -- not involved in any other criminal

6    matters has no knowledge or any --

7              MR. JONES:          Well, he can say he has no

8    knowledge.  That's not an objectionable question.  But

9    if you want to note your objection, that's fine.

10             MR. DAVIS:          I'm not -- I just --

11             MR. JONES:          If I need to -- if we need

12   to hold it open and -- and --

13             MR. DAVIS:          And I would never do that.

14   I only -- if it was overbroad -- so I'm just noting my

15   objection for the record, and I'm asking for the -- the

16   scope of your questions to be limited, if you could,

17   which I know you can.

18             MR. JONES:          I -- noted.  And if we

19   need to -- to note objections for the record, that's --

20   that's perfectly -- that's fine.

21             MR. DAVIS:          Thank you.

22             MR. JONES:          Sure.

23   BY MR. JONES:

24        Q.   Regarding Robert McRae, I -- I believe my

25   question was, has he been to your house subsequent to

1    serving time for drug charges that you're aware of?

2        A.   No, sir.

3        Q.   All right.  Christian Terry, are you aware of

4    any drug charges that Mr. Terry has gotten?

5        A.   Only what -- with this February 20 thing where

6    I was mentioned in.

7        Q.   Sure.

8        A.   Other than that, no, sir.

9        Q.   No -- no knowledge of -- of any connection to

10   drug activities prior 20 -- February of 2018?

11       A.   No, sir.  And you're speaking from my personal

12   knowledge.

13       Q.   That's correct.

14       A.   No, sir.

15       Q.   As a a result of the arrests on -- on February

16   20th, 2018, you have knowledge that Mr. Terry was

17   arrested in that.  Is that correct?

18       A.   Yes.  He was arrested in that, yes, sir.

19       Q.   Okay.  And do you know what happened to Mr.

20   Terry as a result of those arrests?

21       A.   He -- I don't know what the results was.  I

22   know he did some time.  I don't know how much.

23       Q.   Sure.  Is he out --

24       A.   Yes.

25       Q.   -- to -- to your knowledge?

1        A.    To my knowledge, he's out.

2        Q.    And has Mr. Terry come to your house since

3    getting out of jail for those --

4        A.    No, sir.

5        Q.    All right.  For Calvin Fox, are you aware of

6    -- again, let's say prior to 2018.  Are you aware of any

7    drug charges or drug activities, again, your personal

8    knowledge for Calvin Fox?

9        A.    No, sir.

10       Q.    Tracy Williams, I know you said you kind of

11   knew her on a limited basis.  Do you have any knowledge

12   about her either drug charges or relationship with --

13   with selling drugs?

14       A.    No, sir.

15       Q.    Same question for Lamar Sealy.  Do you have

16   any knowledge, again, prior to 2018 of Lamar Sealy

17   either selling drugs or -- or being incarcerated, or

18   charged, arrested for drugs?

19       A.    No, sir.

20       Q.    Same question for Arthur Darby.

21       A.    No, sir.

22       Q.    That was a no?

23       A.    No.

24            MR. JONES:        I think -- the train --

25   we can -- you want to take a little -- yeah.  We've been

1   going for -- for a few minutes now.  We can take a

2   little break while the train --

3                    (Off the record at 11:36 a.m.)

4                    (On the record at 11:49 a.m.)

5   BY MR. JONES:

6        Q.   Mr. Harris, we were talking a little bit about

7   some of your -- your son's friends and some other folks,

8   and -- and the reason I was asking you about those folks

9   is -- is some of them have signed affidavits in this

10  case that were provided to us.  Are you aware that --

11  that some of the people I just named have -- have signed

12  affidavits?

13       A.   No.  Not -- not really.

14       Q.   All right.  I'm going to show you what we'll

15  mark as Defendants' Exhibit 3.

16                    (Defendants' Deposition Exhibit Number 3

17                    is marked.)

18                    MR. DAVIS:        Is this all of them

19  together?

20                    MR. JONES:        Yes.  It's -- and it's a

21  -- it's a comprehensive exhibit.  I'm sorry.

22  BY MR. JONES:

23       Q.   Have you ever seen -- and I know you're --

24  you're still on the first page here.  Have you ever seen

25  what is being shown in -- in Defendants' Exhibit 3?

1          (Brief pause.)

2     A.   No, sir.

3     Q.   All right.  I'll represent to you that -- that

4 Arthur Darby, Christian Terry, Martha Dickerson, Robert

5 McRae -- yeah, Robert -- Robert's the last one -- but

6 those -- those folks have executed affidavits in this

7 matter.  Have you had any conversations with Arthur

8 Darby, Christian Terry, Martha Dickerson, or Robert

9 McRae about these affidavits?

10     A.   No, sir.

11     Q.   Are you aware that they executed affidavits?

12     A.   No, sir.

13     Q.   All right.  Those are just kind of a -- this

14 is -- I think this is unlikely, but I just want to -- I

15 want to check and see.  On page -- it is -- it is up in

16 the top left corner.  It's very small.  I apologize.

17 But it is -- there is a number up there that is --

18 indicates it's page 11, and it is the sworn affidavit of

19 Tracy Williams.  Do you see that?  It's the one that --

20 that kind of looks different than the rest.

21     A.   Yeah.

22     Q.   Do you see that one?

23     A.   Yes, sir.

24     Q.   On the next page, so Bates stamp number 12,

25 down at the bottom, it says, "Sworn and subscribed

1    before me this 26th day of May 2014."  Indicating that

2    this was executed in -- in 2014.  It says the Notary

3    Public is Lynette C. Harris.  Is Lynette Harris any

4    relation to you?

5        A.   No, sir.

6        Q.   Okay.  It's one of those that I just have to

7    ask.  In Defendants' Exhibit 3, the -- the first page is

8    the affidavit of Arthur Darby.  And it talks about -- or

9    avers rather that he had conversations with Officer

10   Perry about being an informant.  Have you ever had

11   conversations with Arthur Darby about his interactions

12   with Officer Perry?

13       A.   No, sir.

14       Q.   So you -- you don't have any independent

15   knowledge about Mr. Darby's interactions with Perry one

16   way or another.

17       A.   No, sir.  I don't know about it.

18       Q.   Okay.  The next affidavit, which is page 3 --

19   and, again, they're up in the top left corner.  I'm

20   sorry.  It's right under where the --

21       A.   Yes.

22       Q.   -- paperclip is --

23       A.   Yeah.

24       Q.   -- is Christian Terry, and I have the same

25   question.  Have you spoken with Christian Terry about

1    his interactions with Officer Perry?

2         A.   No, sir.  We haven't talked about it.

3         Q.   Okay.  The information in this affidavit talks

4    about an interaction between he and Officer Perry on

5    April 20, 2022, in which Officer Perry pulled him over

6    and seized some money.  Do you know -- have -- have you

7    spoken with Christian Terry about that interaction at

8    all?

9         A.   No, sir.  We haven't talked about it.

10        Q.   Do you have any knowledge about that

11   interaction at all from any source other than your

12   attorneys?

13        A.   Just from I and my attorneys talking --

14        Q.   Sure.

15        A.   -- that's all.  We talked about it.

16        Q.   All right.  Martha Dickerson on page 5, have

17   you had any conversations with Martha Dickerson about

18   her interactions with Officer Perry?

19        A.   Well, I will say that this happened in 2013.

20   She's my mother-in-law.  I remember when she went to

21   jail and all that, so I do remember that part of it.

22        Q.   Is this --

23        A.   And I was there.

24        Q.   Forgive me if I'm mixing up interactions.  Is

25   this the one found -- again, I'm on page 5.

1      A.    Uh-huh.

2      Q.    Is this the one that you were present for, an

3   interaction that you were present for?

4      A.    Yes.  I believe so.  Yes.

5      Q.    Okay.

6      A.    Yes.  This was in reference to her son.

7      Q.    Sure.  Number 5 in -- in -- in -- paragraph 5

8   of this affidavit indicates a statement that Officer

9   Perry made to her.  Do -- do you recall witnessing any

10  statements that Officer Perry made at that time?

11     A.    I'm reading this.

12     Q.    Sure.

13              (Brief pause.)

14     A.    Okay.  Your question.

15     Q.    Sure.  Do you recall any statements that

16  Officer Perry made?  Do you remember witnessing any

17  statements from that 2013 interaction?

18     A.    Not this particular statement, I can't say in

19  particular.  But I did hear -- hear -- I did hear some

20  words between he and her.

21     Q.    Sure.  Do you recall what was said or just

22  generally?

23     A.    I can -- I can -- not the exact wording, but

24  at that particular time, she didn't live there.  She

25  lived with her aunt across the street over on -- I

1    forgot the name of the street, but she was living there.

2    But she came there when the incident took place, and she

3    was talking to Officer Perry about it.

4         And the one thing that I do remember was that

5    she was saying that -- why you guys here basically.  And

6    he was making comments to her.  And she must've got a

7    little loud or something like that, and he said, "If you

8    don't -- if you don't be quiet," or something to that

9    affect, "I'm going to lock you up too."  That particular

10   thing, I do remember, not those exact, exact words but

11   something to that effect.

12        These words right here, they were talking.  I

13   didn't get too close to the incident because I was

14   standing basically in the highway because I felt if I

15   got on the property, you know, I'd be subjected to

16   whatever too.

17        Q.   Uh-huh.

18        A.   But I did hear that part.  They were standing

19   at the front step of her porch.  So --

20        Q.   All right.  And then the -- the final

21   affidavit is Tracy Williams, again, the one we looked at

22   page 11 that looks a little different.  Have -- have you

23   seen this affidavit before?

24        A.   We were talking to my attorneys.

25        Q.   She -- she did not provide this to you back in

1  -- in 2013 or 2014 when you were speaking with her?

2       A.   No, sir.

3       Q.   Do you know why she executed this document

4  back in 2014?

5       A.   When she went to court, she was saying to my

6  brother-in-law that she didn't like what had happened

7  to, she called her ,Ms. Martha, which is my mother-in-

8  law.  And the -- basically, I guess that's why she --

9  she come up with this, but she didn't like seeing Ms.

10 Martha get arrested knowing she -- you know, she didn't

11 feel she had something -- anything to do with anything.

12 So --

13      Q.   Sure.

14      A.   -- that's just to the best of my knowledge.  I

15 don't know.

16      Q.   Sure.  And then the final page, I -- I

17 apologize.  I thought there was -- that as it.  But

18 there is one on page 13 that is not an affidavit but  a

19 -- what purports to be a signed statement by Edwin

20 Dickerson dated May 13, 2014.  It's the very last page

21 of the document.  The -- the very -- the very last page,

22 have -- have you seen this document before?

23      A.   No, sir.  I can't say I have.

24      Q.   Okay.

25           MR. DAVIS:        Glenn, for clarity, the

1    first page I have was Robert McRae.  Am I out of order?

2              MR. JONES:          They may have been.  I'm

3    sorry.  The first page -- they -- they should be in

4    sequential order 1 through -- through 13 in the top left

5    corner.  So I -- I apologize if I've --

6              MR. DAVIS:          I just want to make sure I

7    got it.

8              MR. JONES:          And -- and these are from

9    your --

10             MR. DAVIS:          Discovery.

11             MR. JONES:          -- discovery.  So, yes,

12   it's -- pages 1 through 13 are your discovery.  Sorry

13   about that.

14                  (Brief pause.)

15   BY MR. JONES:

16       Q.   You've had a chance to read through it a

17   little bit.

18       A.   Yeah.  I was trying to see what it was --

19       Q.   Sure.

20       A.   -- what it says --

21       Q.   Does that --

22       A.   -- and what's it not.  Nothing I see.

23       Q.   -- refresh any memory?

24       A.   Nothing I see.

25       Q.   Sure.

1      A.   Huh-uh.

2      Q.   I'll show you want we'll mark as Defendants'

3  Exhibit 4 and see if you can identify this.  Do you

4  recall -- have you ever seen this document before shown

5  in D4?

6           (Defendants' Deposition Exhibit Number 4

7            is marked.)

8      A.   No, sir.  I don't recall seeing this.

9      Q.   Okay.  If you hadn't seen it, I don't have any

10 questions about it.

11     A.   I don't recall seeing this.

12     Q.   Prior to the arrest in February of 2018, on --

13 on February 20th, 2018, when is the last time you recall

14 your son visiting your home at 803 Sycamore?

15     A.   Just visiting my home, as far as I remember,

16 it was some -- some days before.  It wasn't -- I would

17 -- I'm not exactly sure, but it was probably within the

18 -- the -- in a -- within a week or two, I believe, as

19 far as I remember.

20     Q.   And do you recall the nature of that visit?

21 Did he just come and say hello?  Did he spend the night?

22     A.   No, sir.  I can't say I remember exactly what

23 the visit was about -- he come.

24     Q.   And do you recall if he had anybody with him

25 when he came?

1        A.    There -- there was one day, and I don't know

2    if that was the exact last visit or whatever, he came.

3    And I was sitting in the yard working on my car.  And he

4    pulled up.  He was driving, and Calvin Fox was in the

5    car with him in the passenger's side.

6        Q.    And what happened during that visit?

7        A.    Well, I was working on the car.  I saw the

8    car.  It pulled in the yard.  It pulled up behind me.  I

9    was pretty close to the highway.  My BMW was here.  I

10   had the hood up.  I was working on the headlights.  The

11   car pulled in this -- in the lane behind me and pulled

12   out.  And I felt like he got out because the door

13   opened.  I didn't look back, but I felt like he had got

14   out of the car.  But I kept working on the -- on the

15   headlight.

16            After a while, say, about -- I can't really

17   say how long it was, but it was probably within a few

18   minutes -- I knew that Calvin Fox was in the car, but he

19   didn't get out and didn't -- didn't speak.  Like, when I

20   would see him, he normally would speak.  So I turned

21   around like this, and I said, "You gonna get in --

22   you're gonna get" -- no, I looked this way.  I said --

23       Q.    And you're -- for purpose of the record,

24   you're looking over your left shoulder.

25       A.    I'm -- I'm looking over -- for the purpose --

Page 95

1   I'm sitting in the yard, and I'm looking -- I looked

2   over my right shoulder.  I believe I looked over my

3   right shoulder, and I called his name, I believe.  And I

4   said, "You're gonna" -- something in reference to -- "I

5   know you're not gonna pull in my yard and not at least

6   get out and speak," something like that.

7           And the next thing I know I hear the door open

8   and he got out, and he came -- he came up behind me and

9   walked up beside me on one side or the other.  And we

10  talked just, hey, how you doing or whatever the

11  conversation was for a second or two just -- maybe not

12  even a minute.

13          The next thing I know I hear my son's voice,

14  and I looked around at him, and he said, "All right.

15  Pop, how you doing."  He said -- he said, "How you

16  doing, Pop," something like that.

17          And I asked him, "How you doing," like that.

18          We always kinda -- and he said, "I'll holler

19  at you later," or something like that.  Calvin got in

20  the car.  He got in the car.  They backed out.  I went

21  back to working on the light.  I don't know if that was

22  the last time he came there, or not.  I'm not exactly

23  sure.  It's been a while.  But I vaguely remember what

24  happened that day when -- when Fox was with him.

25          Q.   All right.  The BMW -- BMW that you were

1    working on, was that a -- a functioning vehicle that you

2    drove around?

3         A.   It was my wife's vehicle.  Uh-huh.

4         Q.   What vehicle -- and -- and we'll say kind of

5    generally February 2018.

6         A.   Uh-huh.

7         Q.   What vehicle was your primary vehicle?

8         A.   The 2016 Dodge Ram truck.

9         Q.   Is that a silver-gray in color?

10        A.   Silver -- silver-gray in color.  Uh-huh.

11        Q.   All right.  Again, February 2018, did you have

12   -- did you own any other vehicles at that time?

13        A.   I owned -- my wife owned the BMW.  I had the

14   truck.  I had a 1968 Oldsmobile, which was parked out

15   beside the road right in front of the house.  And around

16   the back of my house under a cover was a 1994 red

17   Cadillac.

18        Q.   Was the '68 Oldsmobile operational?

19        A.   It was operational, but I don't remember if it

20   had an active registration, or not, at the time because

21   we didn't -- we didn't -- me and my wife, we didn't --

22   we didn't really drive it that much.  It was an older

23   car.  It didn't have air conditioning in it or nothing

24   like that.  So --

25        Q.   Other than the Oldsmobile, and the Cadillac,

 1  the Ram, and the BMW, any other cars that you owned on

 2  -- on your property at that time?

 3      A.   No.  No, sir.

 4      Q.   Prior to February 20th, 2018, what was your

 5  knowledge regarding your son's involvement in selling

 6  drugs?

 7      A.   I didn't have any knowledge of it because he

 8  never did it in front of me.  I never saw him do -- sell

 9  drugs.  So I didn't -- I didn't have any -- any personal

10  knowledge of it.

11      Q.   You were aware that -- that he had been

12  arrested on drug charges --

13      A.   Sure.

14      Q.   -- previously.

15      A.   I was -- I was aware that he had been arrested

16  on drug charges back in 2013, and I believe that was the

17  last date to my -- to my memory.  But that was the last

18  I can remember right off.

19      Q.   And you are aware that he -- I think your

20  testimony earlier was that he accepted a plea deal based

21  on those charges.  Is that correct?

22      A.   I believe he accepted a plea deal on those

23  charges.  Yes.

24      Q.   And do you recall which charges he pled guilty

25  to in that plea agreement?

1      A.   No, sir, I don't.

2      Q.   Do you recall the type of narcotic or drug

3 that he was accused of -- of possessing or selling at

4 that time?

5      A.   As of today, I don't remember what kind --

6 what -- what all it was or whether it was one or two or

7 whatever because I don't remember, sir.

8      Q.   Do you know if your son actually possessed or

9 sold drugs or narcotics based on that 2013 arrest?

10     A.   If he actually --

11          MR. DAVIS:        Objection.

12     A.   If he actually did it?

13 BY MR. JONES:

14     Q.   Correct.

15          MR. DAVIS:        Objection to form.  You

16 can answer.

17     A.   No, sir.

18 BY MR. JONES:

19     Q.   Did he ever tell you that he did or didn't do

20 it?

21     A.   No, sir.

22     Q.   Do you have any belief as to whether he did or

23 did not do it?

24          MR. DAVIS:        Objection to form.  You

25 can still go ahead and answer.

```
 1        A.    I have no opinion.
 2   BY MR. JONES:
 3        Q.    Well, do you have any belief?
 4        A.    No, sir.
 5        Q.    Do you believe that your son has ever sold
 6   drugs or narcotics?
 7        A.    To me, that's a judgment call.  And being a
 8   minister not just for my son or anybody else, I try not
 9   to judge people, but I never saw it.  So I didn't -- I
10   -- I don't have a belief either one way or the other
11   because I didn't see it.
12        Q.    Would it be then fair to say that you don't
13   have a belief that he's innocent of ever selling drugs?
14             MR. DAVIS:          Objection to form.
15        A.    I can't say that he's not guilty of selling
16   drugs.  I won't say that he's not guilty of selling
17   drugs.  I'll say that he's never did in front of me, and
18   I've never -- never seen him and never formed an
19   opinion.
20   BY MR. JONES:
21        Q.    Were you involved -- back in the 2013 arrest,
22   were you involved in any conversations with him about
23   how to defend the case or anything like that with his
24   attorneys or -- or -- or otherwise with him?
25        A.    I don't quite understand your question.
```

1      Q.   Sure.

2      A.   I'm sorry.

3      Q.   So, you know, as -- as part of the plea

4   agreement, obviously, he was accused of crimes.  You

5   testified there was a trial, a hung jury.  They refiled

6   and then ultimately a plea agreement.  I'm -- I'm just

7   asking it again.

8      A.   Okay.

9      Q.   I'm not trying to get into any attorney-client

10  stuff.  Although, if you were there, I don't -- don't

11  think it would be there.  But in any event, I'm just

12  trying to -- to figure out if you were kind of, you

13  know, as a father involved in the decision-making

14  process of coming to the plea agreement, agreeing to the

15  charges, fighting the charges, anything like that.  Were

16  you involved in any of that process with your son?

17     A.   No, sir.

18     Q.   Have you ever -- did you know that if -- any

19  of your -- the associates of your son that we talked

20  have sold drugs?

21     A.   No, sir.

22     Q.   Have you ever seen drugs in your son's

23  possession?

24     A.   No, sir.

25     Q.   Have you ever heard him talk about selling

Page 101

1  drugs?

2       A.   No, sir.

3       Q.   I can't imagine he would --

4       A.   He better --

5       Q.   -- talk to you about it, but I -- I don't know

6  if you ever overheard him as he's talking to friends,

7  anything like that.

8       A.   No, sir.

9       Q.   Okay.  Have you ever seen drugs in any of your

10  son's friends' possession?

11       A.   No, sir.

12       Q.   Have you ever suspected drug activity at

13  your home?

14       A.   No, sir.

15       Q.   Do you dispute the charges that were brought

16  against your son in 2013?

17            MR. DAVIS:          Objection to form.  You

18  can answer.

19       A.   Do I dispute the charges --

20  BY MR. JONES:

21       Q.   Correct.

22       A.   -- or the conviction of the charges?

23       Q.   Well, we can -- we can start with -- with

24  either.  The -- well, let's start with the charges.

25       A.   The charges, I believe, was two parted.  I

1  think there were charges that he was charged with --
2  based on my property, and then there were charges where
3  he was charged somewhere else.  And you want to know if
4  I agree with all of that.  Do I dispute --
5      Q.   And I'm talking about for the 2013, not --
6      A.   Okay.
7      Q.   -- not 2018.
8      A.   The 2013?
9      Q.   Correct.
10     A.   Okay.  Do I dispute that --
11     Q.   Yeah.
12     A.   -- the charges against him?
13     Q.   Yes.
14     A.   No, sir.
15     Q.   And, for instance, the lawsuit that we talked
16  about that's found in Defendants' 2, it -- it indicates
17  that you claim the officers fabricated drug charges
18  based on suspected marijuana.  You -- you don't believe
19  that officers fabricated charges against your son in
20  2013, do you?
21     A.   I don't -- I don't know.  I don't have an
22  answer for it.  I never --
23     Q.   Well -- well --
24     A.   I've never been --
25     Q.   -- do you believe --

se

1     A.   -- asked that question.  Do I believe they

2    fabricated it?  I can't say, sir, whether I believe

3    that, or not.

4         Q.   Do you have any --

5         A.   Because I didn't have any -- any dealing with

6    that case that way.  If the question is, do I believe

7    they fabricated it, I have no opinion on it.  I never

8    said it -- that they did or didn't.

9         Q.   Do you have any evidence or knowledge that

10   they fabricated charges in -- in 2013 against your son?

11        A.   No.

12        Q.   And, again, I'm talking about the Southern

13   Pines, the one we're talking about.

14        A.   No.  No, sir.  No.

15        Q.   Did you have any evidence that the officers

16   had fabricated drug charges against your son in Wellford

17   County, South Carolina?

18        A.   I don't remember all about that case or why I

19   made that statement according to the document.  But I

20   don't -- I don't recall whether there was -- it had to

21   be -- I feel like there had to be a reason for me to say

22   that at the time.  But I haven't looked over that case

23   for -- that's been years, and I just -- it don't -- it

24   don't sit in my head as to exactly everything that

25   happened or why.

1    Q.   Sure.

2    A.   It just doesn't.

3    Q.   Do you recall why -- why your son had $7,000

4    of -- of your money in -- in -- I guess this occurred in

5    2012 -- in Wellford, South Carolina.

6    A.   Yes, sir.  I do.

7    Q.   What -- why -- why did he have that?

8    A.   I left it in the car.  We switched cars.  We

9    were going to a -- a Harold Melvin & the Blue Notes

10   concert in Georgia down at the amphitheater, and we

11   decided to switch cars.  My wife and I was going to

12   drive the car that he drove, and we switched cars at the

13   last minute and that was it.  And it should be in my --

14   in my report, the -- in -- in the documents.  It

15   should've been mentioned before we --

16   Q.   It -- it may have been.

17   A.   -- before --

18   Q.   I -- I don't call seeing that.

19   A.   It was part of the case.

20   Q.   Was -- was your son -- if I recall your

21   testimony correctly --

22   A.   Uh-huh.

23   Q.   -- that was a rented car.  Is that correct?

24   A.   Yes.

25   Q.   And who -- who rented the car?

1      A.   I don't remember.  Myself or my wife, one,
2    rented the car.  It was our rental.
3      Q.   Was your son listed as permissive driver on
4    the rental?
5      A.   I don't remember.
6      Q.   What would've been the --
7      A.   I don't remember.
8      Q.   -- purpose of changing cars for him to take
9    the rental car?
10     A.   I don't remember why we made that decision,
11   but we made it.
12     Q.   And then --
13     A.   It's been a while.
14     Q.   And it's your testimony that you had placed
15   the $7,000 into the rental car.
16     A.   Yes.  We had a weekend with a hotel stays.  We
17   had -- we were gonna be down a few days.  And, yes, that
18   was -- yeah.  I put it in there.
19     Q.   Do you recall why you rented the car in the
20   first place?
21     A.   Well, he didn't have a car to drive.  He was
22   going down to be with some friends to whatever event
23   they were going to.  And we were going down to be with
24   the -- with the Blue Notes.
25     Q.   Well, I thought you had just said that you

1   guys had switched cars unexpectedly.

2       A.   We did it at the house.  We switched cars at

3   my house.

4       Q.   I -- I thought your testimony as it was

5   unexpected that you had switched cars.

6       A.   Unexpected?  No.  We switched it at my house.

7            MR. DAVIS:        I think he said at the

8   last minute.

9       A.   Yeah.  At -- at the last minute.

10  BY MR. JONES:

11      Q.   Yeah.  Fair enough.  And I'm not trying to

12  mischaracterize --

13      A.   Yeah.  I know.

14      Q.   Your testimony is what it is.  And I -- I --

15      A.   Yeah.  Yeah.  At -- it was just the last few

16  minute decision to -- him drive this car.  We drive that

17  car, you know, whatever but --

18      Q.   Okay.  But it's your -- your testimony that he

19  was not a registered or permissive driver of the rental

20  car, correct?

21      A.   I -- I don't remember if -- if we had him on

22  there as -- on the rental, or not.  I -- I don't recall.

23      Q.   All right.  Let's talk about 811 West New

24  York.  What -- what is your knowledge of the house and

25  -- and location of 811 West New York?

Page 107

1        A.    That old house has been there for many years.

2    A lot of people love -- well, when I first come to

3    Southern Pines, they started renting it.  It was a lot

4    of people renting that old house.

5        Q.    Uh-huh.

6        A.    But after a while, they started, like -- I

7    don't know if you call it -- people just -- just move

8    in, paying no rent, or whatever, just -- people just

9    staying there.  But that -- I -- I know that house.

10   It's -- it's right next door to where my mother-in-law's

11   fire lane is.  So it's been there a long time.

12       Q.    And despite them being right next door, your

13   mother-in-law's address is 823.  Is that correct?

14       A.    Correct.  Yes.

15       Q.    But they are -- they are physically right next

16   door to each other.

17       A.    They are physically pretty doggone close.

18   Excuse me French.  But it -- it's pretty close.

19       Q.    And they aren't -- for instance, there's no

20   structure or house between them?

21       A.    There -- there is, like, a -- a gate -- no, a

22   fence.  There's a fence that's between the driveway and

23   811.  There's a -- a fence right between there that

24   separates the two.

25       Q.    Is that your -- do you know if that's your

1   mother-in-law's fence or just one that's on the property

2   line?

3       A.   I -- I don't believe it's hers.  She never

4   believed it was hers.  So --

5       Q.   Sure.  Do you know who owns the house at 811

6   West New York?

7       A.   It was owned by a doctor -- a doctor.  It was

8   originated from the Hasty family.  Cap Hasty used to own

9   it.  He was the owner years ago.  But I think one of his

10  daughters owned the property because this -- this guy

11  has been -- he's been deceased a long time.

12      Q.   Sure.  Had you ever spoken with the owners of

13  the property ever?

14      A.   No, sir.  I didn't know those folks.  No.

15      Q.   Does the name Dr. Spooner ring -- ring a bell?

16      A.   I've heard her name through the guy that was

17  supposed to be the caretaker for that, Alfonso Fordham.

18  He lives up the street somewhere in Southern Pines, but

19  he was supposed to be the caretaker.  And I heard him

20  call a Dr. Spooner's name.  I didn't know her.  But --

21  yeah.

22      Q.   All right.  If you've never spoken with the --

23  the owners of the property, I assume then you -- you'd

24  -- you'd never gotten permission to -- to enter the

25  property.  Is that correct?

1      A.   No, sir.  I -- I didn't no reason to go over

2      -- to be there in that yard.

3      Q.   Have -- have you ever -- have you ever been

4      inside that house?  I -- as I understand it, it's --

5      it's abandoned.  Is that correct?

6      A.   Years -- years ago, like, in -- yeah, I -- I

7      went in there two or three times.  My wife's cousin used

8      to rent that house, but it was when it was up for rent.

9      Sandra Waddell, she lived there.  So that's been in the

10     '70s.  I think that was in the '70s.

11     Q.   Sure.

12     A.   Yeah.

13     Q.   And obviously, you had permission from the

14     tenant --

15     A.   Yeah.

16     Q.   -- when you went -- when you went over.

17     A.   Yeah.  They -- that was many years ago.

18     Q.   Have you been inside the home since it was

19     effectively abandoned?

20     A.   No, sir.

21     Q.   Did you ever see your son or his friends and

22     associates that -- that we've talked about in and around

23     811 West New York?

24     A.   Some of them were there quite often.

25     Q.   Do you know what they were doing there?

1      A.   Well, as far as my own personal vision, there

2   was a lot of people there.  My son would be there.  Some

3   of his friends would be there.  I would see other people

4   over there in the yard and parked outside the road that

5   it was kinda like a free neighborhood-type thing.  There

6   was a lot of people that were over there.

7           What they were doing over there?  I saw a

8   little drinking going on over there.  I see people come

9   up, and they would cook food out in the yard.  And they

10  would play music and a lot of different things, you

11  know, like that.

12     Q.   Do you know if -- if anybody over there ever

13  got permission from the owner to do those things?

14     A.   I was told back -- from Mr. Fordham, Alfonso

15  Fordham, that he gave my son and Germaine McLeod -- he

16  gave them approval to be over there.  And he didn't say

17  for what purpose.  He didn't say why they needed

18  approval.  I know they had a grill sitting out in the

19  yard.  But he's -- he told me years ago that he gave

20  them approval to be over there.  That's all I know about

21  that.

22     Q.   What was the condition of the -- of 811 West

23  New York at -- at -- in February of 2018 or thereabouts?

24     A.   The condition of the house?

25     Q.   Correct.

1    A.   Nowhere I would've laid my head.

2    Q.   Do you know if it had electricity?

3    A.   No, sir.  I don't.

4    Q.   Do you know if it had running water?

5    A.   I have no idea.  I don't know.

6    Q.   Did you ever see in your knowledge of seeing

7  people over there doing the -- the things that you

8  talked about, did you see people going in and out of the

9  house as well?

10    A.   I saw a lot of people in the yard.

11    Q.   Did you ever see anybody going in and out --

12    A.   No, sir.

13    Q.   -- of the house?

14    A.   No, sir.  I'm not sure if it was -- if it was

15  closed, bolted, or what, but I saw a lot of people in

16  the yard.

17    Q.   Do you know why people chose this location to

18  congregate rather than any other home?

19    A.   It appeared to be a hangout, where people hung

20  out at.  I really honestly don't think any -- anybody --

21  say, like myself, people don't hangout around my house.

22  I don't think I would've had that -- many people hanging

23  out around my house at any time, you know.

24        So it -- it -- I think it was just open season

25  kind of.  Whoever wanted to stop by, and that's what

1    they -- that's what was happening, I guess.  I can't

2    really speak on it but --

3        Q.   Sure.  And -- and all I'm asking for is your

4    -- your knowledge of that.

5        A.   Uh-huh.

6        Q.   You said you -- you wouldn't have people over

7    in your house like that.  Why not?

8        A.   I've never been that kind of person.  I've

9    never been a person that just allow a lot of people

10   hanging out around my house.  I love my privacy.

11       Q.   What about your mother-in-law?

12       A.   Uh-huh.

13       Q.   Did she had any issues with the groups of

14   folks playing music, drinking, doing the things you

15   talked about at the property next door to her?

16       A.   Well, she never brought it to my attention.  I

17   don't know if she did, or not.

18       Q.   Was it ever concerning to you that that was

19   happening in the hangout spot right next door --

20       A.   With --

21       Q.   -- to your --

22       A.   With them being --

23       Q.   -- mother-in-law?

24       A.   With them being that close, I didn't care

25   about it.  She's an old lady, you know, and my father-

Page 113

1  in-law, he was an older guy before he passed.  I

2  necessarily care about it, but I didn't have any control

3  over it.

4      Q.    Did you have any suspicion that drugs were

5  being sold out of that location?

6      A.    No, sir.  It's pretty hard to tell what's

7  going on when you see a lot of people congregate.

8  Especially young people like that, you just never know.

9      Q.    Did you ever observe anything you believe to

10 be drug-related activity at 811 West New York?

11     A.    No, sir.  I didn't hang out around there.  I

12 was either in my mother-in-law's yard, out in the

13 highway on New York Avenue for one reason or the other.

14 But as far as being in there really watching to see what

15 they were doing, no, I wasn't that observant of what

16 they were doing.  It was a lot of people there most the

17 time.

18     Q.    Sure.  One of the videos that has been

19 discussed in -- in -- in some of the other depositions

20 to date has been a -- a video of you handing money to

21 Robert McRae.  Have you seen that video?

22     A.    Yes.  Well -- yes, sir.

23     Q.    Okay.  And that video was taken out in front,

24 and -- and Mr. McRae and you were -- were speaking in  -

25 - in the vicinity of 811 West New York.  Is that

Page 114

1    correct?

2         A.    It was out on the New York Avenue in the

3    highway.

4         Q.    Correct.  But directly in front of 811,

5    correct?

6         A.    Right on the edge between right -- it was

7    close -- looking at that video, the truck was parked

8    right close to that -- not right up on the fence, but on

9    the fence line but out in the highway.  Yes.

10        Q.    Sure.

11        A.    And one was taken right in -- in the driveway

12   to my mother-in-law's.

13        Q.    Sure.  Do you recall if you actually went on

14   to the property of 811 West New York in that video?

15        A.    No, sir.  I remember stepping around the back

16   of the truck when I gave him that money for --

17        Q.    Sure.

18        A.    -- for what I gave it to him for.

19        Q.    Sure.  Do -- do you recall what date --

20        A.    That was --

21        Q.    -- range that was?

22        A.    No, sir.  Not right off, I don't.

23        Q.    Okay.  What was the purpose of you giving

24   money to Robert McRae on that date that is shown in the

25   -- in the video?

1      A.   If you look at the -- the video, it shows --

2   in the photos, it shows where Robert McRae's trailer

3   pulled up with his cleaning equipment on the trailer.

4   It also shows myself and Willie Rochester discussing him

5   cleaning my vehicle.  Willie Rochester was working for

6   Robert McRae at the time, helping him clean vehicles.

7   Willie pulled up with the trailer.  We discussed what I

8   wanted him to do to my truck.  I took my truck down in

9   front of I think it's 8 -- right beside 811, the house

10  down there where the water was at.  And that's where he

11  cleaned the vehicle.  He cleaned the vehicle.

12          When McRae came back, I paid him $40 for

13  cleaning my vehicle.  I left from in the highway in

14  front -- out in front of 811 on the side of 811 there

15  right where I paid him, and I walked over to my truck.

16  And I think it's 895 or something like that, the green

17  house.  I took my truck -- and in the video, you can see

18  my truck backing up shining like glass.  He cleaned it.

19  I paid Rod McRae with Willie Rochester cleaning my

20  vehicle that day.

21      Q.   And -- and his name is -- is Robert, and you

22  -- you --

23      A.   Robert.

24      Q.   He goes by Rod?

25      A.   Rod -- Rod McRae.  They call him -- his

1    friends call him Rod.  His name is Robert McRae.

2         Q.   Okay.  Approximately, how many times has Rod

3    McRae washed your vehicle?

4         A.   To the best of my knowledge, that was the

5    first and only time.

6         Q.   Was there a reason he did it that day and --

7    and never before and never again?

8         A.   Yes.  Because -- I want to say that when it

9    came to these young people, period, I wasn't a person

10   that lay blame or fault on these people.  I loved and I

11   enjoyed seeing them do something other than doing

12   something wrong.

13         So if I saw one trying to make a business

14   prosper, I would -- I would buy into it.  He had a

15   cleaning business.  He said, "Mr. Harris, I got a

16   cleaning business.  Let me clean your truck."  No

17   problem.  I paid him to clean my truck.  That's the kind

18   of thing that I would do.

19         I wouldn't never pass judgment on these kids,

20   because as a minister, it never helped them to pass

21   judgment.  So if I saw one trying to do the right thing

22   and they're not -- he's not the first -- I would

23   contribute financially if I could or any way that I

24   could to support that.  And that's what I did on that

25   day.  That's what that was all about.

```
1        Q.   When you're talking about passing judgment and
2    laying fault --
3        A.   Yes.
4        Q.   -- for what?
5        A.   If -- if -- if a group of kids or a particular
6    person was named or claimed or -- as being a drug dealer
7    -- and I will use that as -- as an emphasis -- if I have
8    not seen that kid sell drugs, I don't say, "Yes, he
9    sells drugs."  If anything -- if I see him without a job
10   or whatever and I see him trying to do something
11   positive, then I try and help and assist him with that
12   to keep him off.  Can I elaborate --
13       Q.   Please.
14       A.   -- on this?  I wrote a book called General
15   Crack Cocaine, Satan, Stop Man.  Inside that book, it
16   had information.  First of all, it had information about
17   the way that drug got in this country to my knowledge.
18   It talked about the sickness and the illness of the
19   user.  It talked about the sickness and the illness of
20   the dealer.  It talked about the effect it has on
21   families.  It talked about all that.
22            I felt it necessary to put information out.
23   And a lot of people used that book and have come and
24   told me that that book helped them with their drug
25   problems.  It helped them with their problems of -- out
```

1   in the streets trying to deal drugs.  It helped their

2   families to where their families knew how to handle it

3   and knew not to blame their loved one because they had

4   this sickness.  It talked about all that.  That was my

5   purpose.

6           I never, ever pointed a finger at nobody for

7   something that was allegedly said that they done unless

8   I saw them do it.  And that's the same thing with all

9   these young kids and older ones too as well.  And that's

10  how I gained my respect by trying to help these people

11  instead of trying to accuse them and blame them or hold

12  them fault for what they was doing, to try and change

13  their mind and their attitudes about the way that they

14  were living.  That's always been my purpose because I'm

15  not on drugs.

16          I don't drink.  I don't smoke.  I don't curse.

17  I don't do any of that stuff.  And I try to lead for

18  them by my own example.  And that's what the book was

19  all about and the reason for it.

20      Q.   When -- when did you finish this book or --

21  what -- when -- when did you finish it?

22      A.   This book was done in, I believe -- I don't

23  remember -- the year '8, 2008, something like that.

24      Q.   And where -- where was it -- where was it

25  published?

1      A.   Through -- through Publish America.  It was a

2  self published book.  But it -- according to my

3  feedback, it has helped a lot of people.  And it just --

4  to me, it -- it helps -- now today, to say that my

5  stance on this stuff, on drugs, I don't -- I don't -- if

6  it was my son accused or you accused or somebody else

7  accused, it wouldn't make me pass judgment on you.  It

8  would make me do all I could to help assist to make you

9  better.  That's what it was about.  That was the reason

10  for it.  I just thought I'd share that with you

11  because --

12      Q.   I appreciate it.

13      A.   -- I'm -- I'm not for anybody selling drugs,

14  never was.  Don't do it myself.

15      Q.   Are -- are there still copies of this book in

16  existence?

17      A.   Yes, sir.

18      Q.   Do you have a -- a copy of the book?

19      A.   You can get a copy.  I have access to where I

20  can get a copy of the book if I need to get a copy of

21  that book.

22      Q.   Is it -- is it generally -- if I wanted to get

23  a copy of it --

24      A.   Yes.

25      Q.   -- absent this --

Page 120

```
 1        A.    I believe --
 2        Q.    -- situation, if there's a --
 3        A.    I believe --
 4        Q.    If I wanted to get --
 5        A.    I --
 6        Q.    -- a copy of it --
 7        A.    I believe you can.  And -- and for -- and for
 8   -- for you -- for your -- for your -- your knowledge
 9   only, I didn't really do this book to make money off of.
10   I did this book for knowledge.  This book was basically
11   so people would know.
12            I even thought about sending out e-books on it
13   free of charge so that people would be able to read and
14   see what it says, because overall, I'm a little bit
15   proud of that book because I don't -- didn't remember
16   everything in it until I went over and read it again
17   back a few years ago.  I said, "This makes more sense
18   than it did at first."
19            Looking around and seeing people in all these
20   situations and going through the courts and all this
21   stuff, yes, it was very helpful, not just a lot of
22   people but it made me aware too.
23        Q.    We got on this topic kind of talking about
24   the --
25        A.    Yes.  I'm sorry.
```

1      Q.   No.  No.

2      A.   I'm talking --

3      Q.   You're fine.

4      A.   -- about all this stuff.

5      Q.   Like I said --

6      A.   -- and all this stuff.

7      Q.   No.  Listen, if I -- if I didn't want to hear

8  it I'd slow you down.  So -- no.  But we were -- were

9  talking about Rod McRae, and you had talked about

10  passing judgment or laying fault.  In -- in February of

11  2018 or -- strike that.

12        In -- at the time that you were helping him

13  get his business going with the -- with the car

14  cleaning, were you aware of his reputation or -- or --

15  or reasons why people might pass judgment or lay fault

16  on him at that time?

17      A.   No, sir.

18      Q.   Okay.

19      A.   No, sir.  I didn't look at him like that.  I

20  wasn't aware of it.  People don't -- didn't talk to me

21  about him.  No.

22      Q.   Okay.  So why were you attempting to help him

23  out under these circumstances?

24      A.   It wasn't because of him -- drugs, or nothing

25  like that.  I help -- see, I help -- earlier, if you

Page 122

1    listen, I help young people, period, with their

2    businesses.

3         Q.   Sure.

4         A.   It didn't matter.  Not just because they were

5    accused of doing drugs, they had been to prison for

6    doing drugs, or whatever, that wasn't the reason.  It

7    was helping people in general.

8         Q.   Sure.  But we -- I -- I was just asking about

9    that.

10        A.   No.

11        Q.   Then we started talking about --

12        A.   Yeah.

13        Q.   -- your book on crack cocaine.

14        A.   I'm sorry.

15        Q.   And so I'm just wondering why you drew the --

16   or the -- the next topic that came on was the book about

17   crack cocaine when I was asking --

18        A.   Okay.

19        Q.   -- you about passing judgment on --

20        A.   Understand.

21        Q.   -- Rod McRae.  And so my -- my question was,

22   did you have any knowledge about reasons why people

23   would pass judgment or lay fault on Rod McRae at that

24   time?

25        A.   No, sir.  No, sir.

Page 123

1      Q.   At that time, were you aware that Rod McRae

2   had been charged and convicted of any drug offenses?

3      A.   To my knowledge, no, sir, I wasn't aware of

4   it.  I was -- I know for a while he was gone.  I

5   understand that he was gone to prison back a few years

6   before that.  But what his charges was or what he was

7   accused of, I -- I -- I don't know.

8      Q.   Okay.  And you had testified that -- that you

9   were pretty close with Rod McRae familially, correct?

10     A.   I knew -- I -- I -- I pretty -- I knew him.

11   He -- he didn't grow up -- from a child up, I think Rod

12   was a grown man when I first met him.  He was one of the

13   -- I call them all kids.  But he was one of the kids

14   that was a friend of my son.  I didn't know him from a

15   -- from a little boy up.  But I think he might -- he was

16   pretty young when I met Rod.

17     Q.   I have here -- and -- and, again, the

18   testimony will be what it -- what it is.

19     A.   Sure.

20     Q.   But that you had known his father for many

21   years.

22     A.   Yes.

23     Q.   And he was a friend of your son's, and you're

24   known him as one of the kids.

25     A.   Yes.

1      Q.   Is -- is that accurate?

2      A.   Yes.

3      Q.   Okay.

4      A.   And he is.  I mean, even now, I call him a

5  kid.  But he was younger -- he was a lot younger when I

6  met him.

7      Q.   Sure.  But you -- you had no knowledge that he

8  went to prison for drug offenses?

9      A.   No, sir.

10     Q.   Okay.

11     A.   No, sir.

12     Q.   All right.  I want to ask you a little bit

13 about the -- the Cadillac that has been a -- a -- a big

14 part of this case.

15          What --- what was the status of that red

16 Cadillac in -- in, again, February 2018?

17     A.   The status in -- can you explain more?

18     Q.   What condition was it in?

19     A.   Okay.  The Cadillac had four flat tires, no

20 battery in it.  The transmission line in it was laying

21 in the back floor.  It was out, needed replacing.  Let

22 me see.  Was there anything else?  And it was my

23 vehicle.  So I knew that --

24     Q.   How -- how long had you owned it?

25     A.   I owned that Cadillac.  I think I bought that

Page 125

1    Cadillac in, let's see -- Edward Harris, he -- in my

2    brain -- he died in 2004.  I bought that Cadillac two

3    years before he passed.  So it had to be around -- I'm

4    thinking around 2002 when I bought that Cadillac.

5         Q.   All right.  Was it running in 2002 when you

6    purchased it?

7         A.   Yes, sir.

8         Q.   How -- how long had it been in a

9    nonoperational state as of February of 2018?

10        A.   Since 2014.

11        Q.   Did something happen in 2014?

12        A.   The transmission thing, I believe it was, that

13   -- we thought it was the transmission.  And I just -- I

14   parked it, took the line out, found out the line needed

15   replacing.  That was it.  That was -- I think that was

16   the main -- main thing, but it sit there so long the

17   tires went down, and it was --

18        Q.   Did you have any kind plan for that vehicle

19   long-term one way or another?

20        A.   Well, in my mind, it was a pretty car, and it

21   was a nice old car.  And I wanted it always to stay in

22   my family.  And so it was covered and hadn't ran in a

23   while.  But I hadn't planned on getting rid of it.  I

24   didn't know what my future plans was for it or nothing,

25   but --

1      Q.   Had -- had you made any -- any plans to fix it

2   up?

3      A.   Eventually.  Eventually.

4      Q.   But nothing -- nothing present.

5      A.   No.  I wasn't -- well, '14, definitely wasn't

6   present.

7      Q.   When the vehicle was in running condition and

8   in your possession from 2002 to 2014, who -- who was the

9   primary driver?

10      A.   My son was.

11      Q.   Okay.  Had you ever driven it?

12      A.   Not a whole lot.  I think when I first got it

13   maybe from 2002 to maybe 2005, '6.  Maybe after that, it

14   was -- it was all him basically.  I would drive it from

15   time to time but hardly ever.

16      Q.   Prior to February 20th, 2018, when's the last

17   time you recall entering the red Cadillac?

18      A.   Well, the last time, and I don't recall the

19   date or anything.  There was a blue tarp on that car at

20   one time, and the blue tarp got weather beaten real bad

21   from being on it so long.

22          And I remember -- I don't remember when I did

23   it, but I remember changing the cover on it, took the

24   blue cover off.  And I just -- I don't know.  I -- and I

25   put a -- a -- I think it was the gray cover on it.  So

Page 127

1   I'm not sure what date or month or how many months it

2   was before then.  But prior to February, it was quite a

3   while before that, that that gray top -- tarp was on it.

4   So I hadn't been in that car till that particular time,

5   and that was just through randomly changing the cover or

6   -- or whatever.  I don't really recall the last time.

7        Q.   When you changed the tarp --

8        A.   Yes, sir.

9        Q.   -- to the car cover --

10        A.   Uh-huh.

11        Q.   Strike that.

12             Do you -- do you know where you got the car

13   cover from?

14        A.   Not sure.  It's possible that I ordered the --

15   the wrong tarp or something because it didn't fit that

16   good.  I'm not really sure where I bought that cover at.

17   And, like -- I'm sure -- I'm -- I'm not sure if it was

18   the right cover or not, but it did cover it.  But I --

19   I'm not sure if it was the right -- because it didn't

20   fit like I felt, like, it should fit for that car.

21        Q.   When you said it didn't fit, can you --

22        A.   It was --

23        Q.   -- describe what -- what didn't fit --

24        A.   Well --

25        Q.   -- about it?

1      A.   Well, it would fit so far around the bumper,

2   you know.  It would show a little bit of the -- the

3   bumper still.  Maybe as if it wasn't -- it may be -- it

4   may be big enough or something.  I don't know.  I

5   can't --

6      Q.   That the cover --

7      A.   It --

8      Q.   -- was too small?

9      A.   It -- it could've been too small, or it

10  could've just been me.  I'm not sure.  It -- it -- it --

11  I just didn't feel like it fit, like, a car for a '94

12  Cadillac should fit.  I feel like it should fit and go

13  all the way underneath the car, and if you want to tuck

14  it or whatever just cover all the car.  It didn't

15  necessarily fit like that to me as far as I remember.

16     Q.   And it was you that -- that changed the tarp

17  to the cover.  Is that correct?

18     A.   Yes, sir.

19     Q.   How long had the tarp been on there?

20     A.   Gracious.  I'm not sure.  I'm not sure.  I'm

21  not sure how long it was --

22     Q.   When you --

23     A.   -- the tarp had been on there.

24     Q.   When you switched the tarp to the cover, did

25  you go inside the vehicle?

1      A.   I can't say for sure.  I can't say for sure I
2   did.
3      Q.   Do you know the last time that you first
4   physically got -- you know, opened the door and -- and
5   looked in the vehicle?
6      A.   No, sir.  It had been a while though, because
7   with the car being covered, it's out of sight out of
8   mind.  That's kind of the way I've always looked at it.
9   The car had been there so long, three or four years or
10   whatever, I don't remember having a reason to enter it.
11   I just don't.
12      Q.   Was there anything stopping you from being
13   able to access the vehicle during that time period?
14      A.   Well, it was parked in my yard.  When you say
15   anything stopping, can you --
16      Q.   Sure.  I mean, there --
17      A.   -- explain --
18      Q.   -- there was --
19      A.   -- to me --
20      Q.   -- no reason -- that if you wanted to go
21   inside the car on Saturday afternoon, there was nothing
22   that precluded you from getting into it, correct?
23      A.   Anybody could've went in that car.  Anybody --
24   it just -- just had a cover over it.
25      Q.   In February of 2018 and -- and in that general

1    time frame --

2         A.    Uh-huh.

3         Q.    -- are you aware about which doors worked or

4    were locked or kind of how -- if the -- if the hood

5    worked, if the trunk opened?  Were you aware of -- of

6    kind of the -- how it functioned?

7         A.    A little bit with it being my car, I vaguely

8    remember.  It didn't have a battery in it, so the

9    electronic part, the -- a lot of things wouldn't have

10   worked on it through the electronic.

11            But as far as I remember, the driver's door

12   was unlocked.  I'm not sure about the other doors.  It's

13   been a long time.  But I believe -- I vaguely remember

14   that the driver's door -- I think -- I know there's --

15   was a latch under my hood that you could pop.  And I

16   believe if you lift that hood you could probably -- I

17   believe you could lift it without any electronics being

18   done to that.  But I don't -- I don't -- the rest, I

19   don't -- I don't recall.

20        Q.    Why didn't you lock the front door of the

21   Cadillac?

22        A.    Nothing in it.  No -- didn't feel no reason

23   to.  There was nothing in it just -- and it was down all

24   those years.

25        Q.    There were -- there were some car parts in it,

```
 1    correct?
 2         A.    No.  It was just an old -- the old
 3    transmission line that actually came out from under the
 4    hood laying on the backseat that I remember.
 5         Q.    As -- as I recall, we -- we went out and ==
 6    and -- and looked at the Cadillac last week.
 7         A.    Uh-huh.
 8         Q.    Is that correct?
 9         A.    Yes, sir.
10         Q.    And there looked to be some additional items
11    in there rather than -- other then just the transmission
12    line.  Do you know who put those items in there?
13         A.    A lot of -- what items in particular?  Can
14    you --
15         Q.    There were --
16         A.    -- tell me --
17         Q.    -- just --
18         A.    -- what --
19         Q.    There were just --
20         A.    -- items?  It was trashy.  It was nasty.
21         Q.    Right.  There -- there were a lot of things in
22    there.  And -- and so I'm wondering if you were -- if --
23    if those items were in the vehicle back in 2018, or not.
24         A.    I'm not really sure what all is in there,
25    because what I saw when we went there the other day it
```

1   looked just -- the way they tore the car up, tore the

2   seats out and all that, threw the seats out on the

3   ground and all kinds of stuff, it was -- I don't know

4   what all is in that car.  I don't know -- I just don't

5   know.  It's a mess.  It's trashy.  There's trash in it.

6   The seats -- the cushions is tore out.  The radio that

7   the under dash is tore out.  Speakers is tore out.  The

8   trunk is busted up.  Wasn't none of that like that

9   before that car was gone in.  And so I don't know, sir,

10  what all is in that car.

11      Q.   The trunk in -- in particular, I know there's

12  been some testimony about that.  Do you know in February

13  of 2018 prior to February 20th if the trunk was in

14  functioning condition or not?

15      A.   There was -- there was a problem with that

16  truck as far as being able to put a key in it and turn

17  that key ignition.  For some reason, it was a pretty

18  hard thing to do.  I do know that we -- the key that

19  actually operates that trunk and the door locks is a

20  round Cadillac key.

21           So I couldn't get in it, because at the time,

22  I didn't have the key to that trunk or that car.  And I

23  didn't have or couldn't find the key that I could

24  specifically say was the ignition key for that car.  So

25  -- no, the trunk had a little problem with it.

1      Q.   We've -- skipping ahead a little bit but since

2  -- since we're on it, it only makes sense to -- to talk

3  about it now.  You said you -- you -- well, strike that.

4          You had some keys to -- to a Cadillac in your

5  possession.  Is that correct?

6      A.   No, sir.

7      Q.   All right.  On February 20th, 2018, is it your

8  testimony that you did not have any keys to a Cadillac

9  in your home?

10     A.   There was a key ring.  The key ring that the

11 police officers have now, it has some keys on that ring.

12 We've owned no less than three Cadillacs.  And that key

13 ring there to the very best of my knowledge, not one key

14 on that ring that they had is the key to my car.  That

15 key -- that -- whatever key it was the gentleman put in

16 there the other day is not a Cadillac key.  So I can't

17 answer to that.

18     Q.   Sure.

19     A.   But the Cadillac keys with the chips in them

20 like the statement said, those are not the keys to my

21 Cadillac.

22     Q.   Did the keys that we took out there, did those

23 come --

24     A.   Yes, sir.

25     Q.   -- from your home?

1    A.   I believe they came from my home, yes.

2    Q.   Okay.  But the --

3    A.   Yes.  That were the keys that the -- that Mr.

4 Marsh -- Captain Marsh took out, I believe.  Those are

5 the ones that he said he took --

6    Q.   Okay.

7    A.   -- out.

8    Q.   And -- and you're not disputing that -- that

9 keys that -- that you provided some keys or showed him

10 where keys were  --

11   A.   He --

12   Q.   -- purportedly to the vehicle?

13   A.   He and I walked in the door.  I showed him

14 where my key rack was.  I didn't hand him any keys.  The

15 keys that he got, he -- he took.

16   Q.   Sure.  And that key rack, was that kind of

17 around your bedroom door.  Kind of behind your bedroom

18 door, is that where it would've been?

19   A.   No, sir.

20   Q.   Where -- where was it in your -- in your home?

21   A.   On the outside of my door to my bedroom, and

22 it's still there today.

23   Q.   Gotcha.

24   A.   It wasn't in my bedroom.  It wasn't behind the

25 door.

Page 135

1      Q.   All right.  Okay.  I -- you said it was on

2  that -- the outside of your door.

3      A.   Exterior of my bedroom door.

4      Q.   Exterior bedroom door.

5      A.   Yes, sir.

6      Q.   Okay.  I gotcha.  Am -- am I understanding

7  your testimony correctly that as of February 20th, 2018,

8  you don't believe you had a key to the Cadillac, the red

9  Cadillac, 1994 Cadillac?

10     A.   I did not believe I had it.  And I think I

11  specified that several times.

12     Q.   Sure.  And that -- and -- and forgive me for

13  asking a ridiculous question.

14     A.   That's fine.

15     Q.   -- because I just want to make sure I -- I

16  understand it correctly.  But you -- you're saying that

17  it is your belief that you didn't -- that none of the

18  keys you had went to door, ignition, trunk, any portion

19  of the 1994 Cadillac.  Is that correct?

20     A.   I do not believe that the Cadillac keys that

21  was on the ring that the police seized that any of those

22  Cadillac keys fit that vehicle as was said in their

23  statement.

24     Q.   Gotcha.  Where were the keys to the 1994

25  Cadillac?

1      A.   Lost at the time.

2      Q.   And when you say at that time, have they

3   subsequently been found?

4      A.   Yes.

5      Q.   Where are those keys located now?

6      A.   My brother.

7      Q.   And is -- is he the one that lives in Hoffman?

8      A.   Yes.

9      Q.   Do you know where those keys were found?

10     A.   Inside my house.

11     Q.   Where were they inside the -- your house?

12     A.   In the back of a junk drawer inside my

13   bedroom.

14     Q.   And do you recall when those keys were found?

15     A.   Around -- I believe it was around 2000 -- late

16   2019, I believe it was.  This was after I requested the

17   keys back from the U.S. Attorney through my defense

18   attorney.  Federal defense attorney requested for

19   Officer Perry to return the keys.  The U.S. Attorney

20   sent him an email, and we didn't get an answer back.  I

21   don't know if the U.S. Attorney got an answer back about

22   returning my keys, but the keys wasn't returned to me

23   that they have now on that ring.  And it was after that

24   that I found those keys.

25     Q.   Did you -- have you verified that those keys

1    work?

2         A.   I know they're the keys.

3         Q.   How do you know they're the keys?

4         A.   No, sir.  Because I remember what they looked

5    like.  One is also a Cadillac key, a round one, which

6    Captain Marsh stated that he used one of the round keys.

7    It wasn't that round key.

8         Q.   And you said it was -- it was found in -- in

9    the back of a junk drawer.  And the drawer was located

10   where?

11        A.   Inside my bedroom, sir.

12        Q.   All right.  Prior to February 20th, 2018,

13   when's the last time you saw anybody enter that

14   Cadillac?

15        A.   I don't recall seeing anybody enter that

16   Cadillac.

17        Q.   Ever?

18        A.   No, sir.  Not since that Cadillac had the

19   cover put on it, I don't recall seeing anybody go to

20   that Cadillac and go inside of it because it was

21   covered.

22        Q.   Would it -- it -- it was an inoperable

23   vehicle, correct?

24        A.   Yes, sir.

25        Q.   Would it have arisen some suspicion in you if

1    you saw somebody going into that vehicle?

2        A.    It would -- it might've been more than

3    suspicion if I would've caught them out there.  So, no,

4    I'm sorry about the answer but --

5        Q.    Would it?

6        A.    Yes, it would.  It would.

7        Q.    Did you ever see your son go to the vehicle?

8        A.    No, sir.  Not when it was covered, not since

9    it's been down.

10       Q.    Sure.  Yeah.  Obviously --

11       A.    Right.

12       Q.    -- when he was driving it --

13       A.    Right.

14       Q.    -- but --

15       A.    Right.  No, sir.

16       Q.    Since 2014 when the cover was placed on and --

17   and it -- it was inoperable, do you recall ever seeing

18   your son --

19       A.    No, sir.

20       Q.    Do you recall seeing any of your son's friends

21   go to the vehicle?

22       A.    No, sir.

23       Q.    After the arrest of February 20th, 2018, what

24   -- what happened with the red Cadillac?

25       A.    I was locked up.  Let me get this right in my

1    head, the -- the event, the way -- the timing.  When the

2    Cadillac was -- okay.  I was -- I was not locked up.  I

3    don't believe.  I was at my brother's house in Hoffman

4    on house arrest with the federal court.  And my car was

5    seized by IRS Agent Oxendine.

6        Q.   And was that -- the -- the '94 Cadillac was

7    seized?

8        A.   The -- the '94 Cadillac was seized from my

9    house.  It was taken from my house, and the 1968

10   Oldsmobile was taken from my house.  And when I got the

11   news, I called the agent -- or I talked with the agent.

12   I don't know if he calling me or what.  I don't even

13   remember how I got it.  I think my wife called me and

14   told me that it had happened.

15            I talked with the agent and I told the agent

16   at the time -- I said, I have filed a Chapter 13

17   bankruptcy at this time because of my bills.  I said,

18   because -- I said -- and my vehicles, I believe I told

19   him was listed in there.

20            So he allowed me -- I called the probation

21   officer.  He allowed me to go to the wreck -- wrecking

22   company that took the cars and present my ID to them,

23   and they would release the cars back to me.  So at that

24   time, I went up -- I drove up -- my truck up there, and

25   they brought the two vehicles back down to my brother's

1    house because the court wouldn't let me go to my own

2    house.  So my brother took the car down there.

3          And that -- I had to pay the -- the storage

4    fee, I believe, and the towing fee before I could get

5    them, and I paid them that.  And that's how the cars got

6    back down there.

7    Q.   Why -- why didn't -- why were they taken to

8    Hoffman rather than back to your --

9    A.   To my house.

10   Q.   -- house?

11   A.   I wasn't even allowed to go to my house, you

12   know, the court's order.  And they were taken there --

13   asked where they wanted to be taken to.  I asked my

14   brother could -- the house where I was living at, his

15   house where you went, I asked him if I could bring --

16   have them brought there, and he said yes.  So they

17   brought them down there.

18   Q.   Was there a reason that you wanted them where

19   you were staying at that moment rather than your home?

20   A.   Well, in my mind based on the fact that I

21   didn't know that they were gonna be seized like that, I

22   wanted to safeguard them myself because I was living

23   there to make sure that they were where I were, and my

24   wife had enough pressure on her already, I felt.  And so

25   I chose my brother's address, and he said okay.  So

1  that's where they brought them to.

2      Q.   I -- I'm -- sorry.  I -- I don't -- I don't

3  quite understand why you wanted them at -- at your

4  brother's house.  And I understand at that time you were

5  -- you were having to stay there.  You're allowed to go

6  back to -- to --

7      A.   Right.

8      Q.   -- your home at Sycamore.

9      A.   Right.

10     Q.   But why -- why the -- why you wanted the cars

11  to be in Hoffman rather than back to where they were at

12  -- at your home.

13     A.   Well, they took them from my house.  I didn't

14  feel comfortable with them being at my house.  And, like

15  I say, when they came to get those cars, my wife was

16  there, and it made her very, very nervous and upset.  I

17  wanted the vehicles to be parked away from my house.

18          Any -- any transactions or anything that took

19  place, I didn't want it around my wife.  She -- I felt

20  like she had had enough problems, enough pressure living

21  there by herself, and I didn't want them there.  It was

22  my idea to bring them to my brother's house and park

23  them once -- because he got a big backyard.  You saw

24  that.

25     Q.   Uh-huh.

1      A.   You know, and he's got plenty cars around

2   there, so it wasn't like it was odd.  So I felt that was

3   the best place for both vehicles --

4      Q.   Sure.

5      A.   -- at that time.

6      Q.   And what -- what time frame was this when you

7   -- you got the vehicles back?  Do you recall?

8      A.   This -- I'm not sure but I was there in -- I

9   think went down there in -- August is when I went there

10  to stay with my brother.  It may have been maybe a month

11  later.  I'm not sure.

12     Q.   And was this 2018 or 2019?

13     A.   This was 2018.

14     Q.   So this would've been prior to you finding the

15  keys?

16     A.   That would've been prior to me finding the

17  keys.

18          MR. JONES:          All right.  It's 1

19  o'clock.  I am happy to do -- I mean, I -- I probably

20  have -- I -- I am getting to the arrest next, and we can

21  go off the record.

22              (Off the record at 1:05 p.m.)

23              (On the record at 2:02 p.m.)

24  BY MR. JONES:

25     Q.   All right.  We've -- I think we have now

Page 143

1    gotten through all of the appropriate background, so

2    let's talk about incident itself and -- and the arrest

3    itself.  So just tell me in -- in your own words,

4    February 20th, 2018, what do you recall?

5        A.    A long story.  Well, that particular morning,

6    I went outside my house to tiller up MY garden.  I plant

7    a garden every year for the neighborhood, give away the

8    vegetables.  So I went out and got the ground set and

9    everything.

10           I don't recall what time it was, but I came

11   back inside the house to take a shower.  And I think I

12   had got undressed.  I was in my bathroom and about --

13   hadn't gotten in the shower yet, had it running.  And

14   then all of a sudden, I heared [verbatim] a lot of noise

15   outside.  And I heared a lot of yelling and hollering

16   and stuff.  So I -- it scared me a little bit because I

17   didn't know what it was.

18           But then I went to the window.  I didn't have

19   any clothes on at the time.  I think I did manage to get

20   my pajama pants on.  My shirt's off, no shoes, no

21   nothing.  And I went to the window, and I looked out.

22   And when I looked out, I could see police officers,

23   like, toward my door, around my door.  And I could see

24   some like they were going left, like, around my house

25   like the -- well, of course, my adrenaline started

1  running.  And they were hollering open the door or

2  whatever, whatever words were use.

3           And I hollered back and said, "Do not bust my

4  door open.  I will open the door.  Just hold on.  Hold

5  on."

6           So by the time I got to the door and opened

7  the door up, one officer stepped in.  I think he had an

8  assault rifle or whatever it is pointed right at me.

9  And I was asking what are you doing here.  Basically --

10  what are you doing here at my house?  You know, where is

11  your search warrant?  What are you -- I really -- at the

12  time, I didn't realize if it was Southern Pines,

13  Aberdeen, Hoke County, who it was, but I knew it was

14  police officers.  And I started backing up a little bit

15  when they came in with a gun in my face.

16           So after this officer -- I think another

17  officer stepped in and, like, went to the left.  This

18  officer came straight ahead.  And all of a sudden,

19  Officer Perry stepped in.  He was -- I think he was an

20  investigator or -- or a detective at the time.  He

21  stepped in the door, and I had some words with him,

22  asked him why was he here.  Where's your search warrant?

23  What are you doing at my house?  I think I even told him

24  he outside his jurisdiction.  I think I said that.  I

25  believe I did.  And he said, "Oh, it's coming."

1          I said, "You need a search warrant basically
2     to come here."
3          He said, "It's coming.  Don't worry about
4     that.  It's coming."
5          So he came in the door, and he and one other
6     officer -- I don't quite remember which one -- put the
7     handcuffs on me, but had me turn around.  They may have
8     assisted each other doing it.  I'm not sure.  But -- put
9     -- put them on.  I didn't ask nothing but why are you
10    here or -- but nobody told me at the time that they were
11    there to look for drugs or my son or what the reason was
12    at that particular time.
13         So I asked them over and over again, "Where's
14    your search warrant.  Where's your search warrant?"
15         He kept saying, "Don't worry about it.  It's
16    coming.  It's coming.  It's coming."
17         So after, and I'm guessing -- some went down
18    the hall.  You know, my room door was open.  I didn't
19    know who went where because I'm standing there like
20    this, and my mind is blank.  So I asked again about the
21    search warrant.
22         And about that time, about -- maybe -- I would
23    estimate 10, 15 minutes maybe after all the looking
24    around and everything, they going down and searching or
25    whatever they were doing, this officer from Aberdeen PD

1    came in.  He walked to the table that was sitting in the

2    middle of the floor, and I said, "Sir, what do you

3    have."

4              He said, "I have the search warrant here."

5              And I asked him -- I said, "Could you please

6    read it for me to let me know what this is all about."

7              And Officer Perry said, "He don't need to --

8    you don't need to read that to him."

9              And he started reading it anyway.  He read

10   about -- if I had to estimate, he probably read six,

11   seven lines of it -- of it, and then Officer Perry

12   stopped him and took the search warrant in his hand.  He

13   said, "He don't -- you don't need -- you don't need to

14   read it," like that.

15             And so a few minutes later -- I'm not really

16   sure if Detective Marsh at the time walked in the house

17   prior to me going outside to get in the truck with

18   Officer Perry, but I don't recall him coming in at that

19   time.  Officer Perry and I went to the truck.  He read

20   me my Miranda rights while they were searching inside

21   the house.  And we talked, had a discussion.  I -- it's

22   on the tape what we talked about.

23             After that, when I got out of the vehicle, I

24   stood around in the yard with my wife, my daughter, and

25   Carl Colasacco, the deputy chief from Aberdeen.  And

1    Carl -- the one thing that Carl did tell me while I was

2    standing there for a few minutes, he said, "They found

3    drugs in that car back there."

4            And Officer Perry walked around by the -- the

5    trailer that was parked in my yard.  He walked around

6    the trailer, and I said, "If there is drugs in a vehicle

7    in my yard, let me see them."

8            And he said, "You don't need to see nothing."

9    He said, "You don't see them," like that.  And he

10   started going toward my house like to go back in the

11   house.

12           And then a few minutes later, Captain Marsh,

13   Lieutenant Marsh at the time as I recall, came up to me

14   and asked me about some keys for the car.  And that's

15   when I explained to him that I did not believe that we

16   had the keys for that car around the back, but I would

17   show him where my keys were that I had that I knew about

18   was there, but it's been a long time.  The car was old,

19   been a long time, so I didn't think we had keys in our

20   possession.

21           But we went inside.  He and I, we went to the

22   door -- to the front door -- as you come in my door, my

23   bedroom is to the right.  There's a key rack about this

24   long on the door.  He looked through the keys on the

25   door, and the key ring I believe the same key ring that

1  they have in their possession now is the key ring that

2  he took off the door.

3          When he went outside, I went back to stand in

4  the yard behind my truck with Colasacco and my wife and

5  my daughter.  And a few minutes later, Carl called me

6  behind the building -- behind my little trailer, gold

7  trailer, and he said -- he said, "Marsh told me to tell

8  you that if you didn't cooperate with him about his son

9  he was gonna -- about your son he was gonna take you to

10 jail and lock you up."

11         And that's when I put my hands out to him.  I

12 said, "You tell him he might as well lock me up because

13 I don't know anything about my son.  My son's a grown

14 man."

15         We walked from behind the building, and the

16 next thing that I recall happening was this K-9 officer

17 walked up to me and said, "Mr. Harris, walk with me over

18 here."  Now, all this happened in a period of time.

19    Q.   Sure.

20    A.   I don't know if it's ten minutes, three

21 minutes, five minutes, twenty minutes.  Walk -- he said,

22 "Mr. Harris, walk with me over to my truck."  I walked

23 with the officer over to the truck.  The dog was in the

24 back raising sand.  He opened up the back and said, "Get

25 inside.  I'm -- I'm -- you're gonna be" -- "you're going

1    with me," I think he said.

2           We got in the vehicle.  He rode to Southern

3    Pines PD.  I went inside.  I was searched.  Nobody told

4    me why -- what the charges was or nothing.  I was

5    searched.  He put me back in the vehicle after a period

6    of time.  I think I did some shots -- mug shots or

7    whatever.  They took some pictures.  We went to Carthage

8    in the truck, and he and I talked all the way up to

9    Carthage.  We was talking about his son or something

10   like that.  He had some problems, some issues with his

11   son.  Just a conversation just nothing negative about

12   the situation.

13          When we got there is when I ended up going

14   before the magistrate with this officer.  And from that

15   point on, it's -- you know, a lot of little things

16   happened in between.  But that's the -- I think that's

17   the main things that I -- that's not all I remember, but

18   that's the main things that --

19       Q.   Sure.

20       A.   -- I recall.

21       Q.   I -- I -- and I appreciate that, and I'll --

22   I'll ask you some additional questions about it.  And

23   then as -- if you remember other things that you think

24   are important as we're going through it feel free to

25   tell me about it because I want to know what -- what

1    your memories are of that.

2         At -- at the time that the search was

3    initially served on -- on your home, were you home by

4    yourself at that time?

5         A.   Yes, sir.

6         Q.   Okay.  And then, at some point thereafter,

7    your wife and daughter came up

8         A.   Yes, sir.  They came up after I -- I believe

9    after I was out in the yard, or right as Officer Perry

10   was taking me to his vehicle, they pulled up.  I'm not

11   exactly sure.  But, yes, it was after --

12        Q.   Okay.

13        A.   -- they both -- they both came up.

14        Q.   And when -- when the initial officers first

15   made entry into your home when you opened the door, did

16   you step back into your home, or did they kind of usher

17   you aside, outside?

18        A.   The -- the first officer that came in -- and

19   I'm looking up because I'm trying to remember.  The

20   first officer that came in the door, the gun was in my

21   face.

22        Q.   Uh-huh.

23        A.   So I automatically stepped back, and he made

24   his way on in.  And I remember him saying, "Rifle in the

25   corner.  Rifle in the corner."

1      I had a pellet rifle over by my freezer

2  against the wall.  And I said, "That's not a rifle.

3  That's a pellet rifle," or something to that -- and then

4  another officer came in, I believe.  And then I think

5  the third person that came in was Officer Perry right

6  behind them.

7      Q.   Okay.  And -- and at this time, you were --

8  you were inside the interior of your home.

9      A.   I inside the interior.  Yes.

10      Q.   Okay.  And you talked about that -- that they

11  came in, and there were -- you are asking about the

12  search warrant.  Is that right?

13      A.   Yes, sir.

14      Q.   And at that point -- or -- or strike that.

15          When were you placed into handcuffs?

16      A.   When they came in the door, it was sort of

17  like immediately, not quite immediate -- it was right

18  after they got in, because the first officer that came

19  in, if I'm facing him, I think he came in sort of to my

20  left, to his right when he came in the door.  And then I

21  backed up.

22          But I had a few seconds to ask about the

23  search warrant.  And like I said, I don't remember which

24  officer put those handcuffs on, but I think by the time

25  the handcuffs came on, I think, Officer Perry was

Page 152

1    assisting or either standing beside him or something --

2          Q.    Sure.

3          A.    -- to that effect.

4          Q.    And at that time, you were -- you were still

5    inside your home, correct?

6          A.    Yes.  Yes, sir.

7          Q.    Okay.  And were you standing at the time?

8    Seated at -- because I -- you said something about

9    seated at a table.  Were you standing?  Seated?  Do you

10   recall?

11         A.    No, sir.  I was standing.

12         Q.    Okay.

13         A.    It was in my living room.

14         Q.    Once you were placed into handcuffs, did you

15   stay in the same area?  Were you moved to a different

16   area?  Do you recall?

17         A.    No, sir.  As -- as far as I remember, I was in

18   the same, you know, general area.  And I have to say me

19   and Officer Perry going back and forth about the search

20   warrant --

21         Q.    Sure.

22         A.    -- you know, and that was basically what was

23   going on at that time.  And then there was officers

24   going up and down the hallway, clear.  It's, you know,

25   how they do whatever the calls are --

1    Q.   Sure.

2    A.   -- and going toward my bedroom and different

3  places just going around the house.

4    Q.   Sure.  Is -- is -- that area of your home,

5  would you call that a living room or den or -- or what

6  room --

7    A.   I call it a living room.

8    Q.   Sure.

9    A.   Uh-huh.

10   Q.   And did you stay in that room?  I know you

11 went outside ultimately, and I know you went back to

12 your bedroom to -- to -- to locate the keys.  But during

13 this initial period, were you staying in that living

14 room?

15   A.   Yes, sir.

16   Q.   Okay.  And did you -- were you standing the

17 whole time?

18   A.   I don't ever remember sitting down.

19   Q.   Approximately, how long -- and I understand

20 that this is a -- hard --

21   A.   Yes, it is.

22   Q.   -- to tell kind of how -- how fast things

23 happened or how slow things happened.  But do you have

24 an approximation of how long you were inside the home

25 before you -- you went out in the front yard?

1      A.   If I had to guess, it would probably be maybe

2    15 minutes --

3      Q.   Sure.

4      A.   -- or better.

5      Q.   And when you went outside the first time, did

6    somebody escort you out?

7      A.   Officer Perry did.

8      Q.   Okay.  And was that the time -- the first time

9    you went out of the house, was that to go to Officer

10   Perry's vehicle for the interview that's -- that's on

11   the recording?

12     A.   Yes, sir.

13     Q.   Okay.  And after that recording and interview

14   ended, forgive me, did you go back inside the house or

15   were you standing by your truck?

16     A.   No, sir.  He -- I told him that -- I told him

17   or he told me -- well, he said, "I'll let you go sit on

18   the porch," or something like that.

19     Q.   Uh-huh.

20     A.   I -- I don't think I went and sit on the porch

21   because Carl was there in the yard.  I think -- as far

22   as I remember, I don't think I even sit on the porch.  I

23   think -- I think I just went straight behind my --

24   beside my truck -- behind my truck where he was at

25   because he was kinda like the -- doing security, I

1    think, in the yard.  He -- to my knowledge, he wasn't in

2    on the search, so he was basically keeping an eye on me.

3         Q.   Uh-huh.

4         A.   So I believe that's what happened.  I can't be

5    sure whether I sit on the porch, or not.  I don't think

6    I did.

7         Q.   And then was it before you went and -- and --

8    and stood by Carl or after that you had your first

9    conversation with -- with Lieutenant Marsh?

10        A.   I stood by Carl first to the best of my

11   knowledge.

12        Q.   Okay.  And then at some point, you talked to

13   Lieutenant Marsh, and then at some point, then I guess

14   you go back inside and show him the keys then.  Is that

15   -- is that how that happened?

16        A.   I -- I believe so.

17        Q.   Okay.

18        A.   Yeah.  I believe so.

19        Q.   And after that going back inside the home, did

20   you spend any other time kind of inside while they were

21   looking through things?

22        A.   No, sir.  They were still inside but the only

23   -- the only thing that I was doing was with him --

24        Q.   Sure.

25        A.   -- as far as the keys go --

```
 1        Q.   Sure.
 2        A.   -- finding the keys.  I told him I didn't
 3   think they were right -- the keys were there but, you
 4   know --
 5        Q.   Sure.  And then after that, did you go back
 6   outside?
 7        A.   Yes.
 8        Q.   And then, did you speak with -- speak with
 9   Carl again?
10        A.   Yes.
11        Q.   Okay.  And then, again, you know, I understand
12   a lot of things are happening --
13        A.   Yeah.
14        Q.   -- at that --
15        A.   Yeah.
16        Q.   -- time but --
17        A.   It's a lot going on.
18        Q.   The next sequence of events is -- is that the
19   K-9 officer comes and then ultimately transports you to
20   -- to Southern Pines.
21        A.   Well, in -- in between that, as I said before,
22   I and Lieutenant Marsh went inside.  I came back out.
23   Carl and I walked behind the trailer when he gave me
24   that information about talking to Lieutenant Marsh or
25   this -- whatever.  And from that point, I think that
```

1    that was the last -- because my wife was standing there.

2    My daughter was there with me.  I think that was the

3    last interaction other than me hollering at Officer

4    Perry about the -- if he found something in the car let

5    me see it.  That -- I think that was -- that might've

6    been --

7         Q.   Sure.

8         A.   -- it.

9         Q.   The -- the statement about -- about, you know,

10   saying something about your son to help you out or

11   something like that, you never heard Marsh say that to

12   you, correctly -- or correct?

13        A.   Say that -- explain that for me, please.

14        Q.   Sure.  The -- the statement that you said

15   where -- where Marsh said that -- that you needed to,

16   you know, tell on your son or something like that to

17   help you out.

18        A.   Uh-huh.

19        Q.   -- that -- that -- you never heard Captain

20   Marsh make that statement.

21        A.   No, sir.

22        Q.   Okay.

23        A.   No, sir.  I didn't.

24        Q.   That was through -- through Carl.

25        A.   Yes, sir.

1        Q.   Okay.  I'm going to show you what we'll mark

2     as Defendants' Exhibit 5.  And I will represent these

3     are referred to you that these are -- we -- we referred

4     to these earlier, the interrogatories and request for

5     production.  Fancy words to say --

6                    (Defendants' Deposition Exhibit Number 5

7                    is marked.)

8        A.   Okay.

9        Q.   -- these are -- these are the questions that I

10    sent to -- to you and your attorneys, and ultimately,

11    you-all answered and sent back to me.

12            Do you recall that process of -- of going

13    through some questions?

14       A.   Yes.

15       Q.   Okay.  And, you know, there's -- there's some

16    basic questions about your background and then about the

17    -- the incident itself, and I wanted to ask about a

18    couple of these things.

19            On page 5, question 9 asks to list and

20    describe each physical and emotional injury that you

21    received as a result of the incident.  And I want -- the

22    -- the last full sentence on here starting with "when

23    he," it says -- do you -- you see when --

24       A.   Yes.

25       Q.   -- the last full sentence on page 5.  So it

1   kind of starts "when he," right towards the bottom.

2      A.   Towards the bottom.  Right here.  Yes, sir.

3      Q.   It says, "When he was arrested, he was forced

4   to the ground and suffered cuts and minor bruises."  Is

5   that accurate?  Your testimony earlier, you indicated

6   that you stayed standing the whole time and were in the

7   family room of your home.  Is -- is that statement

8   accurate?

9      A.   No, sir.

10      Q.   Do you have any idea where this information

11   came from?

12      A.   No, sir.  It may have been some

13   miscommunication somewhere.  But, no, I hadn't been on

14   the ground.

15      Q.   And so obviously, you did not suffer any cuts

16   or bruises as a result of the -- of the arrest.  Is that

17   correct?

18      A.   No, sir.

19      Q.   All right.  And then if you'll go to page 7,

20   if you'll look at the top, I think the second paragraph.

21   "I was told," do you see that?

22      A.   Yes.

23      Q.   "I was told that unless I cooperated with

24   Marsh and informed him about my son's alleged dealing

25   drugs I would be locked up."  That -- that's the

1    statement we're talking about, correct?

2         A.    Yes.

3         Q.    Right.  And this -- this does not say that

4    Marsh told you that, correct?

5         A.    It doesn't say that Marsh told me.

6         Q.    Correct.

7               The next one says, "The police had me standing

8    outside my home in a pair of pajamas pants, shower

9    shoes, and no shirt until Carl Colasacco took me inside

10   and let me put on a wool jacket."  Do you recall that?

11        A.    I'm trying to find the --

12        Q.    Sure.  I'm sorry.  It's the --

13        A.    Okay.

14        Q.    Yeah.

15        A.    Yes.  Okay.  Gotcha.  Let's see.  Yes.

16        Q.    Do you recall that happening?

17        A.    Yes.

18        Q.    Okay.  You --

19        A.    And no underwear.

20        Q.    You -- you had testified earlier that -- that,

21   I think, Captain Marsh had said you could go sit on the

22   steps or anything like that.  Did you ever request the

23   opportunity to get additional clothing, anything like

24   that?

25        A.    No, sir.  It was Officer Perry --

```
 1        Q.   Officer --
 2        A.   -- in the vehicle in our interview.  Is --
 3   well, he said, "Well, I'll let you go up here and sit on
 4   the porch."
 5        Q.   Uh-huh.
 6        A.   And I didn't -- now, I don't think I went to
 7   porch like I just said a minute ago.  I think I actually
 8   went straight -- I think he walked me over to where Carl
 9   was because Carl was told to watch me, and I'm pretty
10   sure it was him because I hadn't come in contact with
11   Lieutenant Marsh at that time.
12        Q.   Did anybody out there refuse to get you
13   additional clothing or anything like that?
14        A.   Refused?
15        Q.   Correct.
16        A.   No, sir.  They didn't refuse out there.  No.
17        Q.   Did -- did you --
18        A.   Huh-uh.
19        Q.   I'm sorry.  Did you make any requests for --
20   for clothing as you were standing around?
21        A.   I talked to Carl about it.  I didn't argue
22   with either one of these guys about it.  I told Carl I
23   needed some clothes on.  I had been out there a while.
24        Q.   Sure.  All right.  If we go -- flip over to
25   page 9, if you don't mind.  There's a section here.
```

Page 162

1  Question 15, it says, "Identify each witness to the

2  incident and/or the injuries you sustained."  And there

3  are a -- a number of folks here, obviously, all the

4  defendants, a number of -- of the involved parties that

5  we've talked about.

6          And about halfway through the first person

7  that's -- that's kind of not employed by the government

8  is -- is Martha Dickerson, your mother-in-law.  What --

9  what is Martha Dickerson's knowledge of the incident or

10 injuries that you sustained?

11      A.  I would say that she's -- with her being my

12 mother-in-law that she knew because of my daughter.  My

13 daughter had to confide in her whole family when I --

14 when I was gone, so that's the only thing that I can

15 say --

16      Q.  Okay.

17      A.  -- about that.

18      Q.  And -- and you -- you have not had any

19 conversations with Martha -- Martha Dickerson about the

20 incident or injuries you sustained?

21      A.  No, sir.

22      Q.  Okay.

23      A.  No, sir.

24      Q.  And she -- and she was not, for instance, at

25 the scene?

1    A.   No, sir.  She wasn't at the scene.

2    Q.   Okay.  Obviously, your wife.

3         Same question about Edwin Dickerson.  Was he a

4    witness to the incident or to the injuries you

5    sustained?

6    A.   A witness, no, sir.  I can't say he was a

7    witness.  He wasn't there.

8    Q.   Sure.  And -- and what about the -- the

9    injuries you sustained?  Have you had any conversations

10   with Mr. Dickerson?

11   A.   He's a -- a veteran like I am.  He knows that

12   I've been to the VA to see a -- a -- a mental health

13   person.

14   Q.   Sure.

15   A.   He's aware of that, but I -- if that -- any

16   other kind of injury other than -- just the way I carry

17   myself on a day-to-day around him, other than that, I

18   can't -- I can't say yes to that.

19   Q.   Did you tell him that -- that you were going

20   to the VA for mental health treatment?

21   A.   I don't know how it came up, but I'm pretty

22   sure he's aware.

23   Q.   Sure.

24   A.   My wife's his sister.  I'm sure he knows.  I'm

25   sure he knows.

1      Q.   Sure.  Same question for William Stanley
2   Harris.  He -- he was not at the scene, correct?
3      A.   No, sir.
4      Q.   Okay.  And what about knowledge of the
5   injuries you sustained?
6      A.   Yes.  He's my brother.  He -- he knows what
7   happened pretty much that day based on just checking
8   with my wife on what happened.  During the time I was in
9   jail, I don't recall ever talking to him or anything.
10      Q.   Sure.  Obviously, your daughter would -- would
11   know.
12      A.   Yes.  She was there.
13      Q.   Sure.  The -- the next name -- if -- and -- is
14   -- your daughter is -- is a -- an adult, correct?
15      A.   Yes.
16      Q.   Okay.  Have you had any conversations with her
17   kind of aside from, you know, dealing with the things,
18   but specifically about the investigation of the arrest
19   itself?
20      A.   No, sir.  No more than -- she knows that I was
21   -- when she was there --
22      Q.   Sure.
23      A.   -- when I was taken away.  She dealt with my
24   wife on that -- during that time.
25      Q.   Uh-huh.

```
 1        A.   She had to help her.  And all my children know
 2   what happened, you know, based -- through family and
 3   through talking --
 4        Q.   Sure.
 5        A.   -- through everything else.  I'm sure she know
 6   -- she knew --
 7        Q.   Okay.
 8        A.   -- because she was there.
 9        Q.   The next name on this list is Roger McCreary.
10   Do you know who Roger McCreary is?
11        A.   Right off the bat, you got the best of me.
12             MR. DAVIS:        Off the record, Glenn.
13                  (Off the record at 2:28 p.m.)
14                  (On the record at 2:28 p.m.)
15   BY MR. JONES:
16        Q.   All right.  And we've spoken -- well, you've
17   got Arthur Darby on here.  Was Arthur Darby a witness to
18   the incident?
19        A.   He wasn't at my house.
20        Q.   Does he have any knowledge of the injuries you
21   sustained?
22        A.   No, sir, not to my knowledge.  I didn't tell
23   him.
24        Q.   Okay.  What about Christian Terry?
25        A.   He was one of the guys that was locked up.  He
```

1  knows I was locked up.  I was actually in the same

2  cellblock with him in the federal court and in the state

3  court.  So he -- he's aware through his documentation I

4  was part of that -- of that arrest or whatever.

5      Q.   Sure.  He -- he was not at -- at the Sycamore

6  location on the day of your arrest, correct?

7      A.   No, sir.

8      Q.   Okay.

9      A.   Huh-uh.

10     Q.   And does he have any knowledge about the

11 injuries you sustained other than, you know, being on --

12 in the -- in the same jails?

13     A.   No, sir.  Not to my knowledge.  He -- I don't

14 see how he'd know.

15     Q.   Okay.  And the next one is -- is the Aberdeen

16 Chief of Police Carl Colasacco that we've talked about.

17 Is that correct?

18     A.   Yes.

19     Q.   Okay.  And then the rest -- criminal offense

20 -- defense attorneys Peter Brownback.  Who -- who did

21 Peter represent?

22     A.   Myself.

23     Q.   Okay.  What about Peter Zellmer?

24     A.   Peter Zellmer was my son's attorney, federal

25 attorney.

1        Q.    Okay.  About Jamie Vavonese, V-a-v-o-n-e-s-e?

2        A.    She was my federal attorney, defense attorney.

3        Q.    Okay.  And Jeffrey McIver?

4        A.    Jeffrey McIver is an attorney that worked with

5     me on my record expungement.

6        Q.    Okay.  And it says here, the last line is, "My

7     injuries are otherwise known generally throughout the

8     community in Southern Pines and Aberdeen."  What --

9     what do you mean by -- by that statement?

10       A.    Where -- where is that one?

11       Q.    The last -- the last line of -- of page 9.

12       A.    Okay.  What do I mean by it?  Because before

13    everything happened, I was a minister doing -- doing

14    ministerial work in the community.  And when this

15    incident happened, in the media, it pretty much sorta,

16    say, destroyed my image a lot.  A lot of my goodness was

17    spoken bad of, and I -- I feel that it was because bad

18    news sells.  And it killed -- killed my character quite

19    a bit.

20             Some of the churches and -- and different

21    churches and organizations that used to call me, used to

22    have trust and faith in me stopped calling.  People

23    would turn their heads and not want to talk to me as

24    they did before.  It was -- it -- it got pretty bad.  It

25    got pretty bad where -- where the whole entire

1    community, not everybody but a large number, allowed --

2    I feel allowed this case to dictate who I was as a

3    person.

4         Q.   Uh-huh.

5         A.   And it -- it just -- it -- it hurt that way.

6    I'm a -- I'm a big boy, but it didn't feel good, and it

7    still doesn't because the same thing that was happening

8    then is happening now.

9         Being a minister, you have to be trusted.  I

10   was trusted before, but I can't say I'm not trusted now,

11   but I can say that it's been a large damper put on my

12   name.  And it's -- I don't feel like it will ever be

13   back to where it need to be -- to -- back -- back to

14   where it was.

15        That's -- that's not all.  A lot of the things

16   that I deal with now and had to deal with then -- I

17   spent 62 years trying to do the right thing, and for one

18   day all of a sudden, it was all turned around.  It's not

19   a good feeling.  It -- it works on you mentally, which

20   can also work on you physically.  I'm not associative.

21   You didn't ask me this, but it's -- it goes pretty deep.

22   Just -- it wasn't a good -- it wasn't a good outcome,

23   I'll say.

24        Q.   I appreciate that.  Going back to the -- the

25   arrest itself and the time frame surrounding that, were

1    you ever aware of any drugs in your home?

2         A.   No, sir.  Never.

3         Q.   Were you ever aware of any large sums of money

4    other than money from your bank account for your

5    purposes but -- of large sums of money in your home?

6         A.   No, sir.

7         Q.   Are you aware any firearms that were in your

8    home in this time period?

9         A.   Yes.

10         Q.   All right.  Tell me about the firearms that

11    were in your home.

12         A.   The firearms, which I -- which I volunteer --

13    when I and Detective Perry talked, I volunteered.  He

14    didn't ask me.  I volunteered to tell him that I had

15    some firearms inside my room, and I explained to him

16    which -- where they came from, and I explained to him

17    what -- what -- basically what kind they were and all

18    that.

19              There was another firearm that I had in my

20    back bedroom in the right-hand side of the house up on

21    the top shelf in a shoebox put away that had been there

22    for -- let's see 2009 to 2018 -- nine -- approximately

23    nine years that belonged to a young man that was -- that

24    I feel like I may have messed up.  I took that gun from

25    him because I felt like he was about to get in some

Page 170

1   trouble, and I asked him for it, and he gave it to me.

2   And I forgot the gun was there.  It had been away for so

3   long.

4          But 35 maybe 40 minutes after I got home from

5   seeing this young man and this event, I got a phone call

6   saying that he had just been shot and killed.  I felt

7   bad about it because I didn't feel good with him having

8   it.  And now that he didn't have it, I guess they -- so,

9   say, at the time to protect himself, I felt kinda at

10  fault.  And I still kinda look back at it.

11         But that was -- that was it as far as the guns

12  and the weapons inside my house, and I did not mention

13  that that day because it had been there so long.

14     Q.   That gun that was in the -- the shoebox in the

15  bedroom --

16     A.   Yes, sir.

17     Q.   -- you said you got it in approximately 2009.

18     A.   Around 2009.  The year he died -- the day he

19  died, a few minutes before he died.

20     Q.   And whose gun was it?

21     A.   It was a kid.  I can't spell his name.  It was

22  Daniek Burns.  He was a young man from New York that was

23  a friend of my son's.  And his grandparent Bennie

24  McCallum lived in Southern Pines at the time.  He was --

25  he was living with him, and that was his name, Daniek --

1    Daniek Burns.

2         Q.   Where -- where was he killed?

3         A.   He was in killed in my mother-in-law's

4    driveway.  Well, actually, sir, he was shot in my

5    mother-in-law's driveway.

6         Q.   Sure.

7         A.   He ran up the street and died on this -- a

8    porch up on Stephens Street.

9         Q.   And that was your mother-in-law's driveway at

10   823 --

11        A.   Yes.

12        Q.   -- West New York?

13        A.   Yes, sir.  Right beside the road.  It was

14   actually not in the road but right at the end of the

15   driveway about dusk-dark that day.

16        Q.   And -- and I'm sorry.  Did you say he was in

17   the driveway or in the road?

18        A.   It was -- it was at the end of the driveway.

19   If this is the driveway, this is right at the end, and

20   then you've got the -- New York Avenue here.  It was

21   right -- he was shot right there.  There were witnesses

22   to it.

23        Q.   So he was standing in the driveway.

24        A.   To my understanding, yes.

25        Q.   Do you know why he was on -- on the driveway

1   of 823 West New York?

2      A.   He -- he had been there for a while standing

3   out there talking.  They were all friends.  My brother-

4   in-law was friends of his.  Matter of fact, my brother-

5   in-law ended up marrying his -- his cousin, I think.

6      Q.   Uh-huh.

7      A.   And he was there.  He was like part of the

8   family to them.

9      Q.   And once you got the gun and -- and then he

10  was shot and passed away, did you have any plan to do

11  anything with the gun?

12      A.   No, sir.  I put it in there thinking -- not

13  knowing he was gonna get killed or die or whatever.  My

14  only intentions that I had at that particular time was

15  getting it away from him because he was a little -- he

16  would get -- he would defend himself.  He was a little

17  -- a little kid that was a little -- a little hotheaded.

18  He had been in a few fights around town and stuff.  And

19  I -- I felt I knew his attitude.  Like I said before, I

20  always tried to help these kids.

21      Q.   Uh-huh.

22      A.   So he was just one of them.  He was young.  I

23  think Daniek was 20 years old at the time, and

24  unfortunately, that happened.

25      Q.   Do you know -- going back to the arrest in

1    February of 2018, do you know who owned the drugs that
2    were ultimately found in the Cadillac?
3          A.   Well, sir, I can say that it wasn't me.
4    That's all I can say.  It wasn't me.  One -- at one
5    particular time, you know, I -- I -- I wondered.  I
6    really did.  But I -- I knew they weren't mine, and --
7    and I wasn't going to claim them.
8          Q.   When you say you wondered, what did you
9    wonder?
10         A.   No.  I just -- I just -- I just wondered how
11   they got there when -- when it first happened because it
12   shocked me when I said, "Well, let me see them.  If --
13   if they're in that car, I want to see them."  Because I
14   had doubts that it was even in there, you know, on my
15   property.  And I know that whatever it was if it was
16   found it wasn't mine.  So --
17         Q.   Do you have doubts as we sit here today that
18   drugs were found in the red Cadillac?
19         A.   No, sir.  Because the documentation -- all the
20   documentation shows, and my attorney, Carl, told me they
21   were found in there.  My attorney said that they found
22   them in there, so I -- I can't doubt it.
23         Q.   And you said you know that they weren't yours.
24   But do you know whose drugs they were?
25         A.   Do I know whose drugs they were?

1          MR. DAVIS:          Objection.  Asked and

2     answered.

3          MR. JONES:          Well, he -- I asked.  He

4     said he didn't -- he didn't know -- he said he -- I

5     asked if he knew whose they were.  I think his response

6     was, I know they weren't mine.  That's not really an

7     answer to the question.

8     BY MR. JONES:

9          Q.   The question is, do you know who's drugs they

10    were?

11         A.   As of today, my son took a plea bargain saying

12    the drugs was his.

13         Q.   Do you know who placed them?  We talked about

14    ownership, whose drugs they were.  Do you know who

15    placed the drugs in the red Cadillac?

16         MR. DAVIS:          Objection.  Asked and

17    answered as well.

18         A.   No, sir.  I don't know who placed them there.

19    BY MR. JONES:

20         Q.   Do you know if your son took a plea deal

21    stating that he placed them there?

22         A.   I'm -- I'm not sure what -- I don't recall

23    seeing his -- his plea deal.  I don't recall seeing it,

24    so I'm not sure.  I can't say I'm sure about that.  All

25    I know is he took a plea.

1     Q.   Do you have any knowledge -- aside from the

2    plea agreement or charges or kind of formal

3    documentation, do you have any knowledge based on

4    conversations that you have had that your son placed the

5    drugs in the Cadillac?

6     A.   That I have had with anyone in particular?

7     Q.   Correct.

8     A.   I'm not really sure how to answer that.  Could

9    you repeat that for me --

10     Q.   Sure.

11     A.   -- because I'm not --

12     Q.   Has -- has anybody --

13     A.   -- sure how you --

14     Q.   -- else -- yes.  Has -- has anybody else told

15    you who placed the drugs there?

16     A.   My federal attorney, she stated that -- that

17    it's knowledge to me that my son placed them in that

18    car.  My defense attorney for the state --

19     Q.   And I -- I don't want to get into

20    conversations that you've had with any of your

21    attorneys.

22     A.   Right.

23     Q.   So I'm -- I'm --

24     A.   Okay.

25     Q.   But -- but aside from conservation with

1    attorneys, have you spoken with anybody who told who

2    placed the drugs in the vehicle?

3        A.    No, sir.

4        Q.    Okay.  Do you have any knowledge about your

5    son storing drugs in other locations?

6        A.    No, sir.  No more than what I've seen in this

7    discovery.

8        Q.    Okay.  Are you aware that drugs were found at

9    811 West New York Avenue?

10       A.    I believe I read something in the discovery

11   about -- something about it.  But I'm not -- I didn't

12   know anything about it --

13       Q.    Sure.

14       A.    -- personally.

15       Q.    And when you say "discovery," are you talking

16   about the discovery in the lawsuit that we are here

17   about today --

18       A.    Yes, sir.  Yes.

19       Q.    -- or the discovery for the federal -- for the

20   -- for the criminal charges?

21       A.    The -- there were -- there were what they call

22   an affidavit that was done, reading that, and that was

23   presented in my case also, reading that.  But other than

24   that, this lawsuit here, that information.

25       Q.    So other than the lawsuit -- the affidavit in

1    your criminal suit, you never heard about drugs being

2    placed in other locations --

3        A.    No.

4        Q.    -- or 811 West New York, I think was my actual

5    question?

6        A.    No, sir.  No.

7        Q.    Are you aware that drugs were found in a

8    storage unit belonging to your son?

9        A.    Only what I read in the -- the -- I keep

10   saying discovery, but it's the information that was

11   presented by -- from the state.

12       Q.    From the state.

13       A.    Right.

14       Q.    How far is 811 West New York Avenue from 803

15   Sycamore either in terms of drive time or distance?

16       A.    You said 811 -- 811?

17       Q.    Correct.

18       A.    I would -- I would say that to the best of my

19   knowledge it's approximately four miles.

20       Q.    Do you have any reason to believe that your

21   son did not place the drugs in the red Cadillac?

22       A.    No, sir.

23       Q.    All right.  I'm going to -- I'd like to go

24   through a couple of things in the -- in the audio --

25       A.    Okay.

1      Q.   -- interview.  We'll see how this works.  I

2  believe this is -- this was Plaintiff's Exhibit 0 -- or

3  oh-oh if I -- if memory serves but --

4              (Plaintiff's Deposition Exhibit 00 was

5              previously marked.)

6          MR. DAVIS:        Glenn, if you need me to

7  play it, I can too.

8          MR. JONES:        No.  I think I've got it

9  cued up here.

10             (Brief pause.)

11         MR. JONES:        If we can go off the

12  record for a second.

13             (Off the record at 2:46 p.m.)

14             (On the record at 2:47 p.m.)

15  BY MR. JONES:

16     Q.   All right.  I'm starting at approximately at

17  5:05 of the video here, then we'll play it, and then

18  I'll ask you some --

19     A.   Okay.

20     Q.   -- questions about it.

21             (Video begins.)

22             (Video stopped.)

23     Q.   All right.  And I'm stopping it at 5:33.  And

24  so this is the interview with you and -- and Officer

25  Perry immediately after the search warrant has kind of

1    come on and -- and you guys walked outside to his car.
2    Is that correct?
3         A.   That is correct.
4         Q.   All right.  And in this statement, you said
5    that -- that your son hadn't brought anything to your
6    house and that nobody comes to your house.  Is that
7    correct?
8         A.   I made that statement.  Can I explain what --
9         Q.   Sure.
10        A.   -- what I said?
11        Q.   Please.
12        A.   When I said that, my son hadn't brought
13   anything to my house, that means that I didn't know of
14   anything that he had brought to my house at -- at any
15   time.
16             As far as when I said nobody comes to my
17   house, to me, that means that I'm not a -- a -- like a
18   welcoming party for company.  Nobody comes to my house
19   regularly.  There's hardly anybody ever -- anybody ever
20   come to my house.  So that -- that -- that's -- that's
21   what I was saying.
22        Q.   Sure.  We talked a little earlier though that
23   Calvin Fox had recently been in your house.  Is that
24   correct?
25        A.   Not in my house.

Page 180

1    Q.   Sorry.

2    A.   No.

3    Q.   At your house.

4    A.   Yes, sir.

5    Q.   Okay.  All right.  I'm going to go to 6:20.

6  Well, we'll call it 6:21.

7              (Audio begins.)

8              (Audio stopped.)

9    Q.   All right.  Now, I'm stopping at 6:37.

10 That's, again, you saying the same thing.  He -- he

11 didn't bring it to your house that you know of.

12   A.   Yes, sir.

13   Q.   Okay.

14         MR. DAVIS:         When did you stop it?  I'm

15 sorry.

16         MR. JONES:         6:37.

17 BY MR. JONES:

18   Q.   All right.  I'm going to go to 7:10.

19              (Audio begins.)

20              (Audio stopped.)

21   Q.   And I'm going to stop at 17:52 -- or excuse

22 me, 7:52.  All right.  And that's the conversation about

23 the -- the Cadillac keys.  Is that correct?  And in the

24 statement you said you didn't believe the -- the

25 Cadillac key was there.  Is that correct?

Page 181

1      A.   Yes, sir.

2      Q.   Okay.  And your testimony was that you then

3  found that key approximately a year and half later.

4      A.   Yes.  After I had requested it from the

5  officer there through my defense attorney from the --

6  the federal --

7      Q.   Sure.

8      A.   -- system, it was after that.

9      Q.   And in the statement, you describe that --

10  that the door will open, that the hood will open.  Is

11  that correct?  You said the side door --

12      A.   Yes.

13      Q.   -- I think.

14      A.   Yes.  I said I believe.  I don't think I

15  mentioned the side door.  You can play it back if you'd

16  like, but I -- I think -- I said that the -- the

17  driver's side, I believe, would open.  And I still do.

18  And I believe the hood -- the hood would open because

19  it's not, you know, electronic.  It's got a latch on the

20  -- to lift that.  The trunk, I didn't know for sure if

21  it would open or not because it was -- had a -- a -- a

22  bad -- what do they call it? -- the cylinder in it.  We

23  always had trouble getting in that.  I don't think it'll

24  open today.  But the doors, I don't -- I don't think I

25  mentioned the door.

1      Q.   Okay.  But as -- as of, again, the day of the

2    arrest, you -- you weren't sure if the trunk opened, or

3    not.

4      A.   I wasn't sure.  I wasn't sure.  It had been --

5    it had been a little while since I had tried to go in

6    the trunk or anything.

7      Q.   And I'm going to go to 8:45.

8              (Audio begins.)

9              (Audio stopped.)

10     Q.   All right.  And I'm stopping at 9:20.  And

11   that's the conversation that we just had.  And -- and

12   you said you had forgotten that there was an additional

13   gun in there.  Is --

14     A.   Yes, sir.

15     Q.   -- that correct?

16          Okay.  The location of the gun that -- that

17   we're talking about that you had forgotten about --

18     A.   Yes, sir.

19     Q.   -- was that in the bedroom that your son

20   generally stayed in?

21     A.   That was in the -- the room that was actually

22   his room when he lived in my house.  When he would come

23   to visit -- we had my bedroom.  We had two other

24   bedrooms on the left side, and we had that particular

25   bedroom.  He stayed in any of those rooms at any given

1    time.

2         Q.   Uh-huh.

3         A.   But, yes, he did occupy in that particular

4    room sometimes or quite a bit because he did live --

5    that was his room when he lived in my house.

6         Q.   When did he live in your house what I'll --

7         A.   The last time --

8         Q.   -- call firm -- firm -- full time?

9         A.   When was the last -- or could you rephrase it?

10   To -- is that when he left or --

11        Q.   Sure.

12        A.   -- when --

13        Q.   You're -- you're saying when he -- when he

14   lived in my house.

15        A.   Right.  Right.

16        Q.   So I'm -- I'm just trying to figure out when

17   that was.

18        A.   He stayed there from the time that the home

19   was -- was built.  I think we built that house in, like,

20   '99.  And he stayed there until he was, like, 17 -- 18

21   -- 18, and then he went off to college at A&T and was

22   sort of living here and living there and so forth after

23   that.

24        Q.   When did he go -- what -- what year did he go

25   off to college at A&T?

1          A.    If I'm correct, he was 18 or 19.

2          Q.    And what year would that have been?

3          A.    He'd be -- what year?  He's 37 now.  Do the

4    math.

5          Q.    Well, do you know what -- what year he was

6    born?

7          A.    '85.

8          Q.    '85.  So that would -- that would put it

9    probably 2003, 2004 thereabouts.  Does that sound about

10   right?

11         A.    Yeah.  That -- that's a possibility.  Yeah.

12         Q.    Okay.  And then once he returned from North

13   Carolina A&T, where did he live?

14         A.    He lived in different places.  I know he lived

15   in a couple of places around Southern Pines.  He lived

16   in Charlotte a couple of times.  So I can't be exactly

17   sure when he came home, exactly where he was living.

18   It's been a while, but he lived in three, four different

19   -- different places --

20         Q.    Was there ever a time --

21         A.    -- outside --

22         Q.    -- that --

23         A.    -- out of town some.

24         Q.    -- that 803 that -- that your home wasn't his

25   residence when he was in Aberdeen or the --

1       A.    He --

2       Q.    -- surrounding areas?

3       A.    My understanding is -- well, he would let --

4    he would come to my house when he got in Aberdeen, and I

5    would know he was there, or he would call and say, "I'm

6    in town," or whatever.

7             But there was many times that he didn't live

8    in Aberdeen because he had a -- he had, like, two

9    businesses going -- well, actually three.  He had an

10   entertainment business where he was dealing with, like,

11   celebrities.  He had a business -- a cooking business,

12   which my wife and I and a lot of family members in our

13   family helped him with.  And he ran a nightspot up here

14   in Southern Pines for a while, Mr. D's Take Away.  So

15   that was three different things.  So a lot of that would

16   cause him to stay different places --

17      Q.    Uh-huh.

18      A.    -- you know, other than where he normally

19   would live, Charlotte or wherever.  He would be down

20   here sometimes, but not always at my house.  He would

21   stay different places, but I don't know.

22      Q.    And when he came to your home --

23      A.    Uh-huh.

24      Q.    -- it's your testimony that he would sleep in

25   -- in different bedrooms.  Is that correct?

1      A.   He -- he -- wherever that -- that boy laid his

2  head, that's where -- he would sleep on the couch in the

3  living room sometimes.  He didn't sleep in my bed

4  because I didn't play that, but he would sleep anywhere

5  in that house.  He slept more in that back room what

6  used to be his room than any other room, but he slept

7  all over that house.

8      Q.   Did anybody else sleep in that room in the

9  last 10, 15 years?

10     A.   Yes.  If -- if I had a guest and if I can

11 explain.

12     Q.   Sure.

13     A.   One of the rooms like right now, I use -- I've

14 got a -- I've got a husky, Alaskan husky.  That's --

15 that's her room now.  And I've got an exercise room in

16 the left corner of the house.  So anybody that comes

17 there to stay, when I have relatives come, or a -- a

18 daughter, or a nephew, or a niece, or whatever, they

19 live in that particular room because there's a bed in it

20 about as wide as this whole table, so they love it.  So

21 they all mostly stay in that one particular room now,

22 all guests.

23     Q.   So if that's the room that is the guest room

24 and -- and a place where -- where folks lay their heads

25 from time to time --

1      A.    Uh-huh.

2      Q.    -- why did you place a gun in a shoebox in

3  that room rather than in your bedroom?

4      A.    I placed it in there because it was away from

5  everything.  It was in a closet.  It was sitting up on

6  the high shelf.  And just at that particular time, I

7  didn't want to have it too close to the front of the

8  house.  In my mind, it was in the back room.  It was in

9  the back not really thinking, well, maybe safety or

10 whatever at that particular time, but that's where it

11 was from the time I got it until the time that it was

12 taken out of there.  That's where I put it.  That's

13 where it was.  I --

14     Q.    And that was not with your other firearms.

15     A.    No, sir.  No, sir.  That wasn't my firearm

16 personally.  So, no, it wasn't with my firearms.

17     Q.    Sure.

18     A.    No, sir.

19     Q.    All right.  I'm going to go to -- strike that.

20           Do you -- do you know what type of firearm

21 that is, the one we're talking about?

22     A.    It was a -- it was an older -- an old model.

23 It was faded and everything.  It was a -- a Springfield

24 .45.  And I'll tell you I read that in the thing since

25 then too.  But I knew what that was the whole time.

Page 188

1    Q.   Sure.

2    A.   I knew about it, all -- the clip, everything.

3    Q.   Is it a .45 or a .40?

4    A.   .40.  I mean -- I didn't mean .45 -- a .40.

5    Q.   I'm going to go to 17:20.

6              (Audio begins.)

7              (Audio stopped.)

8    Q.   All right.  And I'm stopping 18:15.  Do

9  remember that -- the interaction that you just described

10 in -- in that time period?

11   A.   Yes, sir.  I do.

12   Q.   Do you recall who it -- you -- you referred to

13 somebody as a clown.  Do you -- do you recall who that

14 was?

15   A.   Yes, sir.

16   Q.   Who -- who was that?

17   A.   It was Oliver Hines.

18   Q.   All right.  And tell me about that interaction

19 with -- with Oliver Hines.

20   A.   Okay.  I worked with children over the years.

21 I worked with some of the community projects.  I also

22 did a lot of putting together programs and stuff for

23 people like Oliver, helping them with doing things for

24 kids.

25              There was this particular day they call

Page 189

1    Juneteenth.  It's a holiday.  And that particular

2    morning, Oliver Hines called me around 8 o'clock that

3    morning and asked me what I was doing.  And, now, he had

4    been to my house only one time before prior to that.  He

5    asked me what was I doing and asked me if I was busy.

6              And I said, "No.  What do you need?"

7              He said, "Well, I want to talk to you about

8    the Juneteenth holiday coming up at the" -- we call it

9    the clay hole in Southern Pines.

10             And I said, "Okay."

11             He said, "I want to get something together for

12   these kids."

13             I said, "Well, okay."  Well, a lot of them

14   came to me a lot of times for information and stuff,

15   because I got some good ideas, I thought.

16             And so he said, "Well, meet me at Mac's

17   Breakfast about 9:00.  Can you do that?"

18             I said, "Yes.  I can."  So I got up, got

19   showered, got dressed.  I was at Mac's by 9 o'clock.

20             It was 9:30, 9:45 before he came in the door.

21   When he walked in the door, I was sitting sort of at the

22   front of the restaurant facing the entrance.  And he

23   walked in, and he was -- he was sweating.  He was

24   pouring sweat, and he was acting real nervous.  And I

25   had my phone laying on the -- on the table, and I said,

Page 190

1   "Are you okay."

2          And he was still standing up, and he was

3   looking around like this saying, "For people like you

4   and I" -- sort of quiet, he was saying, "You never know

5   who's looking or who's listening."

6          And that's when I said, "I don't care who's

7   looking or who's listening.  We're not doing anything

8   wrong.  Have a seat," you know.  And he finally sit

9   down.

10          So after he sit down, he had a notepad with

11   him, which I thought was a notepad where he had written

12   down something concerning some questions on Juneteenth

13   or something.  He took the notepad and took a pen and

14   said, "Hold on a minute."  And he was looking around

15   like somebody might've been listening to us.  And he

16   started writing.  And he wrote a note.  I can't quote

17   the note word for word.  But he took the note, tore it

18   off and slid to me like that, and was looking around.

19   And I took the note and picked it up, and I read it like

20   this.  And it said something in reference to -- say

21   something in regards to you're going to shoot up the

22   police station, or department, today at 1 o'clock.  I

23   believe that's what he said.  And I took it, and when I

24   looked at it, I said, "Are you for real."

25          And he said, "Yeah," like that.

1        And I said, "You lost your mind."  And

2   thinking right then, I felt what is he on, or what is --

3   what is it -- so I took it and fold the note up and slid

4   it in my pocket.  And when I did, he started asking me

5   questions.  He kinda forgot I had the note, so he didn't

6   ask.

7        So when they brought the food out, a friend of

8   ours stopped by the table.  She sit down and talked to

9   us a few minutes.  But in my mind, I'm saying, "What is

10  this guy trying to do."  So he never mentioned

11  Juneteenth to me.  He never said why we were there.

12        After a while, he said, "Well, I gotta go.  He

13  said, "I got the ticket," so he grabbed the ticket up.

14  We got up.  We went outside.  And when we got outside,

15  he started saying, "You know, Southern Pines Police

16  Department is stopping people over on the west side all

17  the time giving them tickets for no reason, but they're

18  not doing that on the east side."

19        I said, "Well, you live in Southern Pines.  I

20  don't."  I said, "That's something that you will have to

21  deal with."  And I said, "I gotta go home," because I'm

22  a -- I'm a little nervous about what he did, and I don't

23  want to be around this guy no more, so I'm trying to get

24  away from him.  So he said that.  And he left and I

25  left.

1        But before I got home, which is about a mile

2    and a half, two miles from my house, my phone ring.  And

3    he said, "I'm in Southern Pines right now, and Southern

4    Pines police officer got somebody pulled up here

5    already."  Wanted to start -- basically, start a

6    conversation with me about Southern Pines PD, and I

7    didn't want to talk about it.

8        So I said, "Okay.  Well, you take care of it."

9    And I hung up, because I don't trust you no more, you

10   know, in mind.  So I hung up.  And that particular day

11   was -- well, it was over.

12       And then I think it was like eight days later

13   maybe -- eight days later he showed up at my house that

14   afternoon about dusk-dark.  I didn't know he was out

15   there.  My wife said, "Do you know somebody's in your

16   front yard."

17       I said, "No, I don't."  So I got off the bed.

18   I was getting ready to watch TV, and I went outside.

19   Well, I didn't go all the way outside.  I opened up my

20   door, and I looked to the left.  And this guy was

21   standing on the left corner of my house.  Well, around

22   my house was a trailer sitting there on the side.  In

23   back of that that car we're talking about, that

24   Cadillac, was still sitting there.  But he wasn't around

25   the house.  He was at the corner of my house, but the

Page 193

1    driveway is right over here.

2           So he said, "Hey, you didn't hear me calling

3    you or you didn't see my call."

4           And I said, "No, I didn't see your call."  I

5    saw his calls, but I wasn't answering it.  So he walked

6    up on my porch.  I sit down.  He sit down.

7           He said, "I've been trying to get in touch

8    with you about the Juneteenth thing."

9           And I said, "Well, what'd you got."

10          And he went from that to talking about the

11   Southern Pines Police Department arresting people again.

12   He never mentioned Juneteenth.

13          So I looked at my phone, and I saw what time

14   it is.  And I had to think of something to get this guy

15   away from me.  So I said, "Aren't you a Carolina fan."

16          He said, "Yes."

17          I said, "Well, Carolina's playing" -- I think

18   like -- I think that was Syracuse or somebody -- "at 8

19   o'clock.  So can you -- you know, are you -- are you

20   gonna watch the game."

21          He said, "Yeah.  Yeah.  Yeah.  I gotta go home

22   and catch that.  Yeah.  Yeah."

23          I said, "I'm gonna watch it too."  Well, I'm

24   not a Carolina fan.  Anybody who is, excuse me.  Well,

25   I'm not a Carolina fan, so I wasn't going in and watch

1    Carolina.  I was trying to get this guy off my porch.

2              So he actually start walking off the porch,

3    and then he stopped at the end of my step, and he turned

4    around and looked at me, and he said, "Hey, that note

5    that I wrote to you a few days ago, do you still have

6    that."

7              And I played dumb.  I said, "No.  What note

8    are you talking about?  I don't -- I don't know what

9    you're talking about."

10             And he said, "The note that I wrote to you."

11             And I said, "Oh, that note."  I said, "No.

12   You didn't see me throw it in the trash can in the -- in

13   the restaurant?"  I said, "No."  I said, "You didn't

14   mean that, did you."

15             He said, "No.  No.  No."

16             I said, "Well, what were you gonna do with

17   that if you had it.  What are you gonna do with it?"

18             He said, "I don't know.  I was gonna do

19   something with it.  I had something I was gonna do with

20   that kinda" --

21             I said, "Oh, okay."  I said, "Well, I don't

22   have it.

23             He said, "You sure you don't have it."

24             I said, "No.  I don't have it."

25             So he got in his Mustang, and he backed out of

1    my yard, and I haven't seen him since.

2        Q.   How -- how close was that in proximity to your

3    ultimate arrest on February 20th, 2018?

4        A.   It was, like -- if I'm correct, it was between

5    -- and I think I got the dates somewhere.  I'm pretty

6    sure I do, somewhere in my mind or somewhere.  I think I

7    know the dates.  But I think it was anywhere between

8    maybe eight and five days or something like that.

9        Q.   Close proximity.

10       A.   It was close.  It was pretty close.  Yeah.

11       Q.   Is there a reason -- so if I understand your

12   testimony correctly --

13       A.   Uh-huh.

14       Q.   -- this man who handed you a note that said

15   let's shoot up -- or, you know, I'm going to shoot up

16   the police department --

17       A.   Right.

18       Q.   -- or something shows up at your house and is

19   around the corner where the -- where the drugs are

20   ultimately found in the Cadillac within days of your

21   arrest and you -- on the day of your arrest are you

22   talking to Officer Perry, and you bring up that first

23   interaction, why didn't you bring up the second

24   interaction where he is found on your property -- where

25   you see him on your property in a spot that, you know --

1   not on the sidewalk, not on the driveway --

2       A.   Yeah.

3       Q.   -- somewhere that --- that --

4       A.   Right.

5       Q.   -- that normal people wouldn't -- wouldn't

6   be --

7       A.   Right.

8       Q.   -- walking?

9       A.   I can't tell you why I didn't.  I think we

10  were in -- in a pretty -- pretty tight conversation.

11  Myself and Officer Perry, we were discussing a lot of

12  stuff.  And I didn't want to point the finger at Oliver

13  and say, basically, I believe, or I think, that you put

14  drugs in that car if they were in there or if there's

15  any in there that he did it.  I didn't want to point a

16  finger at him.

17            But in the back of my mind and -- and I can --

18  I won't say prove -- but I think it would to my other

19  attorney that did the expungement for me -- that idea,

20  that it was a strong possibility in my head at the time

21  that he did.  But I didn't want to name anybody because

22  I -- first of all, I didn't know that he had found drugs

23  in the car when I was in the truck with Officer Perry.

24  I didn't find that out until after I got back out of the

25  vehicle.

```
 1            So just the incident of this clown, I said,
 2    you know, talking to me about that, I don't even know
 3    why I brought that up to Officer Perry.  But for some
 4    reason, my instincts said, "Say it," and I said it
 5    because I felt like that he was wired.  I felt like he
 6    was wired.  For some reason, I did.  And I felt like
 7    that with it being a close proximity from the time that
 8    this happened and him coming back to my house looking
 9    for that note that they may have had something in
10    common.  That's where my mindset was, but I didn't want
11    to accuse nobody.
12         Q.   Sure.  But you certainly had no problem
13    bringing him up about --
14         A.   No.
15         Q.   -- that first encounter.
16         A.   No.  No.
17         Q.   And you --
18         A.   No.
19         Q.   -- you certainly accused him of providing the
20    note --
21         A.   He provided it.
22         Q.   -- that said to shoot up a police department,
23    but you didn't feel comfortable bringing up that you had
24    seen him days before --
25         A.   Just didn't --
```

1    Q.   -- around the side of your house.

2    A.   Just -- just didn't think.  Just didn't think,

3 sir.

4    Q.   I want to show you what we will mark as

5 Defendants' Exhibit 6, I believe.  Do you recognize this

6 document?

7             (Defendants' Deposition Exhibit Number 6

8             is marked.)

9    A.   Yes, sir.

10   Q.   Is the note that we were talking about that --

11 that Mr. Hines presented to you at Mac's --

12   A.   Yes.  That's a --

13   Q.   -- Restaurant?

14   A.   That's a copy of it.

15   Q.   Okay.  And up at the top here, it says,

16 "Original at home."  Is that -- is that your handwriting

17 up there?

18   A.   No, sir.  I don't know whose handwriting that

19 is.  I -- I don't write that good.

20   Q.   And then at the bottom, there is some

21 additional writing that's -- it looks like it's in blue.

22 Do you see that?

23   A.   Yes, sir.

24   Q.   Okay.  Do you know whose handwriting that is?

25   A.   That's some of my stuff.

1      Q.   Okay.  When did you write the note at the

2  bottom of Defendants' 6?

3      A.   I don't know, sir.  I don't -- I don't

4  remember when I wrote that.  That is my writing, but I

5  don't remember exactly when I wrote it.

6      Q.   Would this have been prior to your arrest or

7  after the arrest?

8      A.   That I wrote the note?

9      Q.   Correct.

10      A.   Let's see.  You said the arrest, not the note.

11  Okay.

12      Q.   Correct.

13      A.   I believe -- I believe this was written --

14  this had to be written after the arrest.  Yeah.  This

15  was written after the arrest.

16      Q.   Okay.

17      A.   And the note -- just for the record, I'll --

18  I'll just read the whole thing because it's not all that

19  long.

20      A.   Okay.

21      Q.   The -- the part that Mr. Hines ostensibly

22  wrote says, "Just say something to the effect of

23  shooting up the police department at 11 o'clock today,

24  and let's see what or if any reaction.  This will let us

25  know if someone is in here."  Is that correct?

1      A.   Yes, sir.

2      Q.   Okay.

3      A.   I think I said 1 o'clock before, but it's

4   11:00.  Yeah.

5      Q.   I -- I won't hold you to it.  And then below

6   is -- is a -- is a narrative that -- that -- in your

7   handwriting talking about that interaction.  Is that

8   correct?

9      A.   Yes.

10      Q.   And it says -- the first line is, "This note

11   was handed to me to read just days before I was arrested

12   on February 20th, 2018," correct?

13      A.   Yes.  That's what it says.

14      Q.   Okay.  And then skipping over a couple of

15   the --

16      A.   Well, I said before.  Okay.

17      Q.   Well, I -- I -- I think it's referring to the

18   note that Mr. Hines gave you was a couple days before.

19      A.   Okay.  Okay.

20      Q.   And a couple lines down, it says, "I felt he

21   was wired and working with the SPPD as he had done so

22   many times in the past."

23      A.   Uh-huh.

24      Q.   When you say he had worked with SPPD so many

25   times in the past, what -- what does that statement

 1    mean?

 2         A.   It meant that around the town of Southern

 3    Pines for quite a few years it was just public -- public

 4    record that he was doing that, but I've seen him myself

 5    a couple of times off in the cubby or something talking

 6    to the police.  And I knew -- I mean, I knew that of him

 7    myself to some extent, you know, that that's pretty much

 8    what he betrayed himself doing and what people betrayed

 9    him as doing.

10         Q.   Sure.

11         A.   Yes.

12         Q.   Do you have any independent knowledge of -- of

13    Mr. Hines working for the -- or with the SPPD in any

14    kind of formal capacity?

15         A.   A formal capacity, no, but dealing with -- and

16    he would tell you that he did not deal with the Southern

17    Pines Department, but I would see him and others would

18    see him in a -- up in a dirt road or a back road

19    something.  It wasn't too long ago I saw that with

20    him --

21         Q.   You personally.

22         A.   -- a few months ago.  Yes, sir.  Yes, sir.

23    And that's why I made that comment.

24         Q.   A few months ago when you saw -- where --

25    where did you see Mr. Hines and a -- a police officer?

1      A.   At -- there's -- it's in Southern Pines.  It's

2   right where the old Days Inn used to be in Southern

3   Pines.  There's a little building there.  It's a

4   business there, and I don't know what kind of business

5   it is.  But it was up in that area right there, up in

6   the little bush area.  Yeah.

7      Q.   Okay.  Do you have any independent knowledge

8   that -- that he has ever supplied information to the

9   Southern Pines Department?

10      A.   I've been told that by different people.  My

11   brother-in-law, Edwin, and different people have told me

12   that he had, but I didn't -- I didn't hear him do it.

13      Q.   Sure.

14      A.   No.

15      Q.   And the next line says, "Roughly three days

16   later, Hines showed up at my home around dark and was

17   walking from the direction of the red Cadillac when I

18   saw him."

19      A.   Yes.  Which is the corner of my house.

20      Q.   Okay.  And then the next -- one more line

21   down, it says, "Roughly four days later, the SPPD raided

22   my house -- my home, and we -- straight to the -- and

23   went" -- well, it says "we", but I assume --

24      A.   Uh-huh.

25      Q.   -- that means went --

1     A.   Yeah.

2     Q.   -- "straight to the red cover Cadillac.  They

3  bypassed my two other vehicles."

4     A.   Yes, sir.

5     Q.   Okay.  Do you believe that Oliver Hines placed

6  drugs in -- in the red Cadillac?

7     A.   Do I believe that today?

8     Q.   Correct?

9          MR. DAVIS:          Objection.

10    A.   No, sir.

11         THE WITNESS:          Sorry.

12  BY MR. JONES:

13    Q.   All right.  That's all I've got.

14    A.   Did I answer it?

15    Q.   Yes.  Yes.

16    A.   Anymore on this?

17    Q.   No.  You can put --

18         MR. JONES:          I'm sorry?

19         COURT REPORTER:     May we take --

20         MR. JONES:          Yes.  We can take a short

21  break.  Absolutely, yeah.

22              (Off the record at 3:18 p.m.)

23              (On the record at 3:28 p.m.)

24  BY MR. JONES:

25    Q.   Mr. Harris, we've been talking about a number

1    of things, but we've been talking about the .40 caliber

2    gun, semiautomatic gun that was in the -- in the shoebox

3    in the back bedroom of your home.

4              I'm going to show what you was previously

5    marked as Plaintiff's Exhibit R.  And I'm going to try

6    and show you -- I'm trying to find exactly where it is.

7    I believe it's in here, but let me --

8              MR. DAVIS:          You said our Exhibit R?

9              MR. JONES:          Correct.  Well, strike

10   that.  I don't believe it's in R.  Let me see here.  I

11   don't recall -- I didn't write down which exhibit this

12   is of you-all's.  It is -- it was a Plaintiff's exhibit.

13   Let me see if I have it written elsewhere.

14             MR. DAVIS:          If you tell me, I can tell

15   you.

16             MR. JONES:          It's -- it's -- it was --

17   it's Bates stamped 477.  It's a case supplemental

18   report.

19             MR. DAVIS:          Okay.  It's our Exhibit T

20   as in temp.  000477.

21             MR. JONES:          Correct.  It starts with

22   that, and then there is 478.  I'm sorry.  I -- I --

23             MR. DAVIS:          Yeah.  That's our --

24             MR. JONES:          It's a continuation page.

25   So I guess I didn't staple these together correctly.

```
 1    It's Harris 000346.
 2             MR. DAVIS:          You said 346?
 3             MR. JONES:          Yes.
 4             MR. DAVIS:          Yeah.  346 is -- is our
 5    Exhibit R, but it's identical to the other -- Exhibit U
 6    if I'm not mistaken.
 7             MR. JONES:          Okay.
 8             MR. DAVIS:          You guys told us that
 9    basically you had the -- you guys had the computer
10    verison, which is identical to the Marsh statement
11    that's identical to the --
12             MR. JONES:          Okay.  So that's -- that's
13    what it is.  I've got a full R here and then a portion
14    of it.  So that's --
15             MR. DAVIS:          Yeah. So what's marked as
16    R, they put all those supplemental reports together into
17    one.  It's identical.
18             MR. JONES:          And make sure these are
19    all actually sequential so we have -- looking at the
20    same thing here.
21             MR. DAVIS:          I've got it on my
22    computer, so don't worry about it.
23             MR. JONES:          Okay.
24    BY MR. JONES:
25        Q.   All right.  I'm going to show you what was
```

Page 206

1    previously marked as Plaintiff's Exhibit R.  And if you

2    will turn to page 347, which is down in the bottom right

3    corner, and I will represent to you that this is a -- a

4    supplement prepared by Defendant Marsh.  And it goes

5    through a -- a number of things.  And towards the -- the

6    bottom of the -- of this portion right here, it talks

7    about the guns.

8          And it says here kind of about a quarter of

9    the way up, "Mr. Harris went on to say that he had a few

10   rifles that were passed down to him and they were old."

11   You -- you see where I'm reading from?

12                (Plaintiff's Deposition Exhibit R was

13                previously marked.)

14   A.   Starting in this area.  Wait a minute.  Are

15   you right down here?

16   Q.   Here.  Right here.

17   A.   Went on to say -- okay.  Yes.  Yes.

18   Q.   It says, "Harris later stated that he had a

19   handgun under his bed that he described as a .357

20   revolver."  And that -- that's one -- that's the one I

21   think you said was registered.  Is that correct?

22   A.   Yes, sir.

23   Q.   Okay.  And it says, "I asked Mr. Harris if he

24   owned any other weapons, and he replied no."  And then

25   it says, "I asked Mr. Harris if he owned a semiautomatic

1    handgun, and he replied no.  I asked Mr. Harris if his

2    son, Lee Marvin Harris, Jr., had a bedroom in his home.

3    He advised that the southernmost room was his son's

4    room.   Mr. Harris advised that if -- that any weapon

5    found in his son's room would belong to his son, and

6    that he would have no knowledge of it."

7            Do you recall having a conversation with

8    Captain Marsh about a semiautomatic handgun that was

9    found in the home?

10        A.   We never had that conversation.

11        Q.   Are you saying that the information found in

12   -- in Plaintiff's Exhibit R is a result of a

13   conversation that never occurred between you and Captain

14   Marsh?

15        A.   It never occurred between me and Captain

16   Marsh.

17        Q.   Okay.  But it is your testimony that you had

18   no knowledge of that gun.

19        A.   I forgot that gun was there as I spoke before.

20        Q.   Sure.  On February 20th, 2018 --

21        A.   I -- I -- at that particular time, I had no

22   knowledge of that gun being there at the time.

23        Q.   So if he had asked you about a gun, what would

24   your answer have been?

25        A.   I -- more likely -- I feel like I more than

Page 208

1   likely would have said that I didn't know about it

2   because at the time I didn't remember it was there.  And

3   if I may make it just a little longer, Officer Perry is

4   the one that I told about the weapons, period.  It

5   wasn't Captain Marsh.

6        Q.   All right.  I've got one more -- sorry.  I'm

7   jumping around a little bit.  But going back to the

8   interview audio, I'm going to start it at 23:00 on the

9   dot.

10                 (Audio begins.)

11                 (Audio stopped.)

12        Q.   And I'm going to stop it at 23:10.  Were you

13  able to hear what you said there?

14        A.   Yes, sir.

15        Q.   And you said, "This is like your house.  It's

16  a big piece of property."  Do you want me to play it

17  again?

18        A.   Yes, please.

19        Q.   It ain't going back to -- I'll back it up just

20  a little bit.  I'm going to go to, well, 22:59 here.

21                 (Audio begins.)

22                 (Audio stopped.)

23        Q.   All right.  23:10.  You say, "This is like

24  your house.  It's a big piece of property," correct?

25        A.   Yes.

1       Q.   Do you know where Mr. Perry lives?

2       A.   I -- I don't know why I said that, but I do

3   know where he used to live one time.  I believe that he

4   lived there close to where -- where my nephew lived out

5   near the West End area out there.  There was a big house

6   out there that my nephew had pointed out to me years ago

7   that belonged to Officer Perry.  And that was not my

8   reason for saying that.  I don't know why I mentioned

9   his size or his house, but, yes, I did know where he

10  lived at that one time or where I was told he lived at.

11  It was a pretty big piece of property, probably bigger

12  than that -- than the land I got probably.

13      Q.   Why would your nephew have pointed out where

14  Officer Perry lived?

15      A.   He was one of the people that -- when we

16  talked earlier about the case about somebody at my

17  mother-in-law's house, the nephew, that was the guy, the

18  same one.  He just years ago mentioned it.

19      Q.   Did you ask how the nephew found out where Mr.

20  Perry lived?

21      A.   No.  He lived there.  He lived there himself.

22  It's in his neighborhood.

23      Q.   And when you said the nephew, which -- which

24  nephew are you talking about?

25      A.   His made was Ed Dickerson, same as the

 1    grandfather, stepfather.

 2        Q.   Have you ever inquired specifically in to

 3    Officer Perry about where he lived?

 4        A.   For me to him asking where -- no, sir.

 5        Q.   Have you ever asked anybody else --

 6        A.   No, sir.

 7        Q.   -- where Officer Perry lives?

 8             Have you ever asked anybody where Officer

 9    Perry's children go to school?

10        A.   No, sir.

11        Q.   Have you ever asked anybody for information

12    about any of the families of the Defendants in this

13    matter?

14        A.   No, sir.

15        Q.   Have you ever asked about personal information

16    for any police officer involved in an investigation

17    against you or your family?

18        A.   No, sir.

19        Q.   All right.  I am going to play for you an

20    audio clip that previously had been produced to your

21    attorneys.

22             MR. JONES:        What --

23             MR. DAVIS:        Let's just keep it with

24    this since it's a -- let's just keep it as an exhibit to

25    the -- to the deposition so that -- for the record, and

Page 211

1   it's part of the deposition.

2          MR. DAVIS:          Perfect.

3   BY MR. JONES:

4      Q.   I'm going to play for you some calls that have

5   been produced to your attorneys that were taken from

6   jail conversations that -- that you had and ask you a

7   few questions about these.  Let's see.  And I not sure

8   how to identify these other than by the length of the --

9          MR. DAVIS:          Yeah.  Just --

10         MR. JONES:          -- video.

11         MR. DAVIS:          If you -- if you tell me

12  the original -- give me one second.  If you tell me the

13  original phone call, I -- I'll get it.  Don't worry

14  about it.

15         MR. JONES:          I think I -- I renamed

16  them call 1, call 2, and call 3, but I'll -- I'll figure

17  it out and send you the actual --

18         MR. DAVIS:          All right.

19         MR. JONES:          -- file names.

20         MR. DAVIS:          Give me one second so I

21  can get there with you.

22         MR. JONES:          Sure.

23         MR. DAVIS:          And --

24         MR. JONES:          The first one is 15:23

25  long.

1        MR. DAVIS:        I can -- it's pulling up

2   right now.  It's loading.  Just give me a few seconds,

3   and then I'll be there with you.  Okay.  So you said

4   it's -- I got one that 29:50 and one that's 17:13.

5        MR. JONES:        So the 29:50 is Perry's

6   interview.

7        MR. DAVIS:        Uh-huh.

8        MR. JONES:        And you said 17 what?

9        MR. DAVIS:        I have 17:15 for -- you

10  know what?  I've got the -- no.  No.  I got -- I got

11  them.  I got 11:09.  15:07, you said?

12       MR. JONES:        15:23.

13       MR. DAVIS:        15:23, I got it.

14       MR. JONES:        Okay.

15       MR. DAVIS:        Yeah.

16  BY MR. JONES:

17       Q.   So this is the what I'm -- I'm calling call 1,

18  which is 15:23 long, and I'm going to start playing at

19  4:07.

20            (Audio begins.)

21            (Audio stopped.)

22       Q.   And I'm going to start it -- stop at 5:11.

23  There's some ambient noise back there.  You can't really

24  hear.  Do you remember this call?

25       A.   Yes.

1    Q.   Who were you speaking to on this call?

2    A.   My son.

3    Q.   Okay.  And you -- you refer to him as Harris

4    on the -- on the phone call?

5    A.   I still call him that.

6    Q.   In the call, it sounds like you are saying

7    that they're trying to play me on the 40.

8    A.   Uh-huh.

9    Q.   What does trying to play you on the 40 mean?

10   A.   It was talking about him.  It was meant him

11   because he didn't have that -- that gun is what I meant.

12   I looked at it like it's my property.  It was my gun.  I

13   didn't want them to charge him with that gun and it

14   wasn't his.

15   Q.   Sure.

16   A.   That's what I was talking about.

17   Q.   But you said, "They're trying to play me on

18   the 40."

19   A.   No.  If I said that, that was in -- that was

20   not meant to -- it was him because nobody ever came to

21   me and tried to charge me for that gun.

22   Q.   Sure.

23   A.   So that was -- that was an error --

24   Q.   All right.

25   A.   -- or a misrepresentation of it.

1    Q.   You talk about in this clip that they -- they

2    haven't seen writing.  What -- what writing are you

3    talking about?

4    A.   Just general slang talk.  Another words, the

5    truth about it basically.  Another words, I was just

6    talking about basically it -- it wasn't his.  It was

7    mine, and I knew it was mine.  And I didn't feel like --

8    I honestly didn't feel, like, there was no way that they

9    could prove it was his gun with it being mine and being

10   in my house, you know.  He didn't live there.  I owned

11   the property, owned all that.  So that's what I meant,

12   slang.

13   Q.   At this time of this phone call --

14   A.   Uh-huh.

15   Q.   -- had you told the police that it was your

16   gun?

17   A.   The police hadn't asked me.

18   Q.   Okay.

19   A.   Huh-uh.

20   Q.   So why would you think they were trying to

21   play anybody if -- if you hadn't --

22   A.   I learned --

23   Q.   -- been provided any information?

24   A.   I learned from my attorney.  My attorney told

25   me.

1      Q.   But if you hadn't provided them the

2   information that it was your gun, why would you think

3   they were trying to play you?

4      A.   No.  Once my attorney came to me with it,

5   that's when I told him about the gun.  Yeah.

6      Q.   And do you know if he notified the police?

7      A.   I don't -- I don't know if he did or not.

8      Q.   So --

9      A.   I don't know.  He only come to see me twice.

10     Q.   Why would you think that they were trying to

11  play you then?

12     A.   Well, when I say play me, like I said, I was

13  talking about my son because I felt, like, that they

14  were trying to put the gun on him instead of me.  It was

15  mine.  It was in my house, so that's what I was

16  referring to.

17     Q.   Sure.  But, again, they -- they hadn't been

18  told.  I mean, they -- from you, you said that you

19  weren't aware of any other guns.

20     A.   I told my attorney.  I didn't -- it wasn't

21  told -- well, I'm not sure what he told or who he told,

22  but he and I had talked about it --

23     Q.   Sure.

24     A.   -- my attorney had.

25     Q.   And you believe at that point that the police

1  were trying to charge your son for the gun.

2       A.    Right.

3       Q.    And do you believe the police were

4  purposefully, wrongfully trying to charge him with the

5  gun?

6       A.    Well, it was -- I felt like it was my house.

7  I was charged with drugs that was inside the -- the

8  vehicle because they said it was registered to me.  The

9  house was my house.  I owned it.  So I'm trying to

10  figure out why are you charging my son at the time for

11  the weapon that was in my house in my closet.  You

12  didn't charge him for the alleged drugs that was found

13  in the Cadillac.  You charged me.

14       Q.    Do you believe it would've been right -- do

15  you believe it was the right decision to determine that

16  the gun was yours?

17            MR. DAVIS:          Objection to form.

18       A.    I can't say what would've been right for then,

19  but I knew the gun didn't belong to my son.  And, like I

20  said, it was so long, and after a while, I realized that

21  the gun that they -- they had found a gun in there, and

22  that's when it hit me, and I told my attorney about it.

23  "Hey, that -- that's the gun that I put in there."  I

24  didn't feel good about them charging my son with that

25  gun.  And I -- I knew that he had felonies anyway, and I

1   felt like that they were probably trying to do that

2   because he had a felony and now a gun charge, but it

3   wasn't -- I didn't feel like it was fair.

4        Q.   Uh-huh.  All right.  I'm going to move to

5   9:50.

6                  (Audio begins.)

7                  (Audio stopped.)

8        Q.   I'm stopping at 10:20.

9        A.   Uh-huh.

10       Q.   In this conversation, are -- are you talking

11  about the magistrate?

12       A.   Yes.

13       Q.   And is that Carol Wright that we've discussed?

14       A.   Yes, sir.

15       Q.   And is it your position that she gave you an

16  excessive bond on this case that violated your Eighth

17  Amendment right?

18       A.   $5 million.  Yes, sir.

19       Q.   Okay.  And you had a history with Ms. Wright.

20  Is that correct?

21       A.   Yes, sir.

22       Q.   Do you believe that Ms. Wright wrongfully gave

23  you a bond?

24       A.   A $5 million, I felt like it was excessive

25  knowing that I wasn't -- my record versus I wasn't a

1    flight risk or anything, first offense, yes, I felt like

2    it was very much excessive.

3         Q.   All right.  And do you believe that that was

4    in any way caused by your prior relationship with her?

5         A.   I felt like it had a lot to do with it, but I

6    didn't feel like that was all of it.

7         Q.   Sure.

8         A.   I felt like she had input from somewhere else.

9         Q.   All right.  And you say, "I've got something

10   for her."

11        A.   Uh-huh.

12        Q.   What does "I've got something for her" mean?

13        A.   I believe at the time that the information

14   that I had based on what I basically presented to you

15   already that she and I had already had issues in the

16   past, that my attorney would use that to -- to try and

17   rectify this case on why she gave me that bond.  That's

18   what I was referring to.

19        Q.   Did you ultimately bring any sort of claim

20   against Carol Wright?

21        A.   Against Carol, no, sir, I didn't.

22        Q.   Is there any reason why you didn't bring a

23   claim against Carol Wright?

24        A.   After referring with my attorneys, I came to

25   that conclusion.

Page 219

1      Q.   As we sit here today, do you believe that the

2  right -- the bond given to you by Carol Wright was

3  appropriate?

4      A.   No, sir.

5      Q.   All right.  I'm going to go to the second call

6  here, and this is the one -- this is 15:00 -- 15:07.

7  And I'm going to go to 1:55.

8           MR. DAVIS:       Give me one second.

9           MR. JONES:       Sure.

10           MR. DAVIS:       You said start at what

11  time?

12           MR. JONES:       1:55.

13           MR. DAVIS:       Okay.  Thanks.

14                (Audio begins.)

15                (Audio stopped.)

16  BY MR. JONES:

17      Q.   Now, I'm stopping it at 2:45.  Do you recall

18  this phone call?

19      A.   Yes, sir.

20      Q.   And who were you spoken -- speaking with at

21  this time?

22      A.   My wife.

23      Q.   Okay.  And you -- you asked about speaking

24  with somebody else.

25      A.   Uh-huh.

1      Q.   Is that correct?

2      A.   Yes, sir.

3      Q.   And who -- who was that referring to?

4      A.   I believe I was referring to my son.

5      Q.   Okay.  And the conversation goes something to

6   the effect of "did he say anything about the back room.

7   Yay or nay on the back room."

8           And your wife, I think, responds, "You don't

9   want that G."  What is that conversation referring to?

10     A.   That was referring to that gun that we talked

11  about, him not getting that charge on him, but I never

12  referred to the vehicle like that.  The gun in the back,

13  I didn't want him to have that felony because I knew it

14  wasn't his.  That's what that was referring to.

15     Q.   So why would you say yay or nay on the back

16  room?

17     A.   Because he -- I felt that he would probably

18  try to take whatever to look out for me, thinking that

19  it might've been a problem for me.  I believe that, and

20  I didn't want that to happen.

21     Q.   Well, why didn't you just say, "It's mine.

22  I'm taking it" --

23     A.   Well --

24     Q.   -- rather than yay or nay on the --

25     A.   Well --

1      Q.   -- had -- did -- did he say yay or nay on the
2   back room?
3      A.   WELL, we were talking on the phone and talking
4   in code because I knew our phone calls --
5      Q.   Sure.
6      A.   -- were being recorded, and we were all a
7   little nervous at that time on what to say or what not
8   to say or how to say it and all that, and that's how all
9   that came about.
10     Q.   Because this -- this telephone call sounds
11  like you are trying to determine who's going to take
12  ownership of the gun.
13          MR. DAVIS:        Objection to the form.
14     A.   That's not what it meant.  I think there was a
15  -- something that you played.  Can you play that --
16  BY MR. JONES:
17     Q.   Sure.
18     A.   -- play --
19     Q.   Sure.
20     A.   -- play that again?
21     Q.   Yeah.  I'm going to start it at 1:55.
22          (Audio begins.)
23     A.   Okay.  Right there.
24          (Audio stopped.)
25     A.   That question right there that she asked me

Page 222

1    about do I know what kind it was and I said yes, it's

2    because I did know.

3         Q.    Sure.  And she also says -- or you said --

4         A.    Uh-huh.

5         Q.    -- that they were going to say something

6    because they asked you this and they asked that --

7         A.    Yeah.

8         Q.    -- and you're gonna have to handle that.

9         A.    Yes.,

10        Q.    What's that?

11        A.    How -- however it falled [verbatim], I was

12   gonna have to handle whatever -- whatever fell on me, I

13   was gonna have to handle it no matter what.  And that's

14   one of the reasons why I didn't put up a big a fight

15   about being locked up because I knew that whatever came

16   from this I was gonna have to deal with it.  That's all.

17         But as far as knowing the gun, knowing what

18   the gun was, if I didn't know the gun was there, I never

19   would've knew what kind it was, and I did know what kind

20   it was because I put it there.

21        Q.    Uh-huh.  And the question you ask is, that --

22   what I want to know from him is yay or nay on the back

23   room.  That -- that's the quote is --

24        A.    Yes.

25        Q.    -- what you want to know from your son --

1      A.    Uh-huh.

2      Q.    -- is yay or nay on the back room.

3      A.    Yeah.  That's right.

4      Q.    Why would you son have any say in whether you

5   owned a gun or not?

6      A.    Because he -- me knowing him, I felt like that

7   he would accept and take the fall for that gun being

8   there --

9      Q.    So why would you ask him --

10     A.    -- not knowing -- I didn't want him to.  I

11  wanted to know --

12     Q.    That's not --

13     A.    -- how he felt about --

14     Q.    That's not -- you were asking.

15     A.    Yes.

16     Q.    You were asking your son, "What I want to" --

17     A.    Yes.

18     Q.    -- "know from him is yay or nay on the back

19  room."

20     A.    Uh-huh.

21     Q.    Not -- not it's my gun.  It's my -- or, you

22  know, and I understand that you're in a jail telephone

23  call, but you weren't instructing saying this is mine.

24  I know what's going on.  I know I answered this, and

25  I'll deal with it.

1      A.   Okay.

2      Q.   It was, I want to know from him yay or nay on

3  the back room, right?

4           MR. DAVIS:        Objection to form.

5      A.   Right.

6           MR. DAVIS:        You can still answer.

7      A.   And I did -- I did want to know that from him.

8  BY MR. JONES:

9      Q.   Why?

10     A.   Because I didn't want him to take that gun to

11  say it was my gun -- his gun when it wasn't.  That's

12  what I wanted to know was how he felt about it.

13     Q.   Sure.  And your wife said -- I mean, your wife

14  answered the question, correct?

15     A.   Uh-huh.

16          MR. DAVIS:        Objection.  Speculation.

17  BY MR. JONES:

18     Q.   Well, she said -- I mean, on the video, that's

19  a yay --

20          MR. DAVIS:        He didn't --

21  BY MR. JONES:

22     Q.   -- correct?

23          MR. DAVIS:        He didn't know what her --

24  his wife was saying.  But that's -- you're asking him to

25  speculate.

1    BY MR. JONES:

2        Q.   Well, you -- we'll listen to it again.  On the

3    1:55 --

4                    (Audio begins.)

5                    (Audio stopped.)

6        Q.   I mean, that's your wife answering the

7    question, correct?

8        A.   She -- she -- she answered that question that

9    I asked her.  I don't know exactly what she was

10   referring to, whether she was saying that he wanted me

11   to -- would he be comfortable with me taking that charge

12   for that gun or him taking the charge for the gun

13   because I don't think it was known -- well, I know it

14   wasn't known at the time whether the gun was even a hot

15   gun, whether it was stolen, or whatever.  So that was

16   what that was all about.  She -- sounds like she

17   answered that question.  So I don't -- I can't answer

18   for her, what she meant.

19       Q.   When you asked what I want to know from him is

20   yay or nay on the back room --

21       A.   Yes.

22       Q.   -- what if the answer had been nay?  Would --

23   what would that have meant to you?

24               MR. DAVIS:           Objection.  Speculation as

25   well.

```
 1        A.   Nay --
 2   BY MR. JONES:
 3        Q.   Correct.  Well, you said, "What I want to know
 4   is yay or nay."  You got a yay.  I want to know what nay
 5   meant.
 6        A.   I'm not sure if he was -- if that was
 7   referring to nay that I should take the charge for the
 8   gun or -- or admit that the gun was mine --
 9        Q.   I'm just saying --
10        A.   -- or him.
11        Q.   We'll go back to 1:55 here, and I just want --
12        A.   Uh-huh.
13        Q.   I want --
14        A.   Uh-huh.
15        Q.   Your -- your wife answers the question and
16   says, "That's a yay."  So I --
17        A.   Okay.
18        Q.   The question that you ask on here, I want to
19   know what -- what a nay means.
20        A.   Uh-huh.
21                  (Audio begins.)
22                  (Audio stopped.)
23        Q.   "I want to know for me yay or nay on the back
24   room."
25        A.   Uh-huh.
```

1      Q.   What does nay mean there?

2      A.   Whether -- whether he felt that it was right

3   for me to take the charge on that gun.

4      Q.   Okay.  And --

5      A.   That's what it sounds like that was -- what

6   was being said.

7      Q.   And what would a nay mean in that

8   circumstance?

9      A.   A nay -- a nay, it sound like it would've

10  meant that he wouldn't have wanted me to take the charge

11  on the gun.

12     Q.   And if your son had said nay there --

13     A.   I would --

14     Q.   -- what would've happened then?

15     A.   I don't -- I wouldn't have.  I would -- it

16  would've been a yay.  I wanted his opinion, but I

17  would've taken the charge on that gun because it was my

18  gun.  I would have accepted that charge.  I wanted to

19  know his opinion on it, what he thought about it because

20  I knew that -- how dangerous that situation was with

21  that gun being in there and they trying to blame the gun

22  on him.  So if he had said, for me, that he felt that it

23  wasn't right for me take the gun or whatever, I would've

24  took it any way because it was mine.

25     Q.   Okay.  All right.  I'm going to go to the

1   third call here.  And this one is 11:09 long.  And I'm

2   going to go to 2:15.

3            MR. DAVIS:        Just let me know.

4            MR. JONES:        We ready?

5       A.   Yes, sir.

6                (Audio begins.)

7                (Audio stopped.)

8   BY MR. JONES:

9       Q.   All right.  Do you remember this phone call?

10      A.   I do.

11           MR. DAVIS:        Where did you stop at?

12           MR. JONES:        At four minutes.

13      A.   Yes, I remember that.

14  BY MR. JONES:

15      Q.   All right.  And -- and who were you speaking

16  with there?

17      A.   I was speaking with my wife.

18      Q.   All right.  And you have a couple of comments

19  in here about what about me doing bedroom and him old

20  school.

21      A.   Yes.

22      Q.   So what -- what are you referring to when you

23  say about me doing bedroom?

24      A.   I was talking about me taking ownership for

25  the gun that was back there based on the fact that I

1    knew the gun was mine.  I didn't want him to take it.

2    And as far as the old school goes, I didn't sell drugs,

3    and I felt like if there were drugs found in the car it

4    must've been his, and I was not taking a drug charge.

5         Q.   And that -- is that what he -- him doing old

6    school?

7         A.   I believe that's what the -- that's what I

8    meant.  If you notice before, I asked the question of

9    him giving his opinion as far as those things -- a

10   couple of those things go.  That was the same thing

11   right there.  The -- the room where the gun was at, it

12   was my gun.  I didn't want him taking responsibility for

13   it.

14            As far as the old-school out there with

15   whatever they said they found in that car, it definitely

16   wasn't mine.  If it was put out there, he had to be the

17   one to put it out there, and I was not taking the charge

18   for it.

19        Q.   Again, you -- you were doing this as a

20   question.  What does he think about it?

21        A.   Right.  At the time, it was a heated moment.

22   I was a little nervous.  I'm not really sure how I meant

23   that, but it comes over pretty clear.

24        Q.   Sure.  And there were multiple questions --

25        A.   Right.

1    Q.   -- to your wife about --

2    A.   Right.

3    Q.   -- what your son wanted to do --

4    A.   Right.

5    Q.   -- in this circumstance.

6    A.   Right.  You say -- a lot of things are mixed

7  up, I would imagine, when it's -- you're on the phone

8  and you don't trust what you're saying or who you're

9  saying it to or whatever.  So

10    Q.   I'm going to show you what we'll mark as

11  Defendants' Exhibit 7.

12                (Defendants' Deposition Exhibit Number 7

13                is marked.)

14    MR. DAVIS:        You said 7?

15    MR. JONES:        Yes.

16  BY MR. JONES:

17    Q.   Do you know if you've ever seen this document

18  before?

19    A.   I have seen some of these documents from his

20  -- sentencing and presentencing and stuff like that.

21    Q.   Correct.  And this -- this was provided by

22  your attorneys, and this appears to be a sentencing

23  memorandum on behalf of your son.  Is that correct?

24    A.   Yes, sir.  That's what it's saying there.

25    Q.   Were you involved in the creation of -- of

 1   this document or the information that -- that went into

 2   this document at all?

 3        A.   Not to my knowledge.  No, sir.

 4        Q.   Okay.  If you'll look at page 4 of the

 5   document and Bates stamp number 399, it goes through --

 6   at the top, it has a list of locations and -- and amount

 7   of narcotics found there.  Do you see that?

 8        A.   Yes, sir.

 9        Q.   And it says just under -- per the plea

10   agreement, "Defendant agrees to the attribution of the

11   18.2 grams of heroin located at 811 West New York,

12   Southern Pines in addition to the above listed

13   narcotics."  You see that?

14        A.   Yes.

15        Q.   And one of the above listed narcotics is the

16   -- are the narcotics found at your address.  Is that

17   correct?

18        A.   Yes, sir.

19        Q.   Okay.  And is that -- you testified earlier

20   you understand that he admitted to -- to possessing

21   those drugs.  Is that correct?

22        A.   Yes, sir.

23        Q.   Okay.  All right.  If you'll turn to page 5,

24   and, again, this is Bates stamp number 40.  The second

25   paragraph says, "In addition to the firearms,

Page 232

1    Defendant's father informed the police of a Springfield

2    XD .40 handgun, which the probation officer seeks to

3    attribute to the defendant, was located in a box on top

4    of the top shelf at the back of the closet off of

5    Defendant's old bedroom."  You see that?

6         A.   Yes.

7         Q.   And that is -- indicates that -- I guess the

8    probation officer was attempting to either charge or

9    attribute that -- that gun to your son.  Is that

10   correct?

11        A.   Yes, sir.

12        Q.   And then down below, the next paragraph, it

13   says, "Defendant's father was not informed that his

14   handgun have been located until several days later when

15   he was told that Defendant had been charged with

16   possession of said firearm."  And that comports with --

17   with what you were telling me earlier?

18        A.   Yes.

19        Q.   Okay.  It says, "Defendant's father states

20   that he placed a gun there years ago.  Mr. Harris, Sr.,

21   then stuck it in the box in the back of the closet to

22   keep the weapon from causing any trouble.  He then

23   forgot about the pistol over the years."  Is it -- do

24   you know where they got this information from?

25        A.   I received a -- a call from the probation

1     officer, the one that -- I think she does the -- what's

2     the thing called? -- the presentencing stuff, from the

3     federal probation officer.  And it may have been

4     discussed with her.

5          Q.   And is that an accurate statement found on

6     page 5 that we just read?

7          A.   Yes, sir.

8          Q.   Okay.  If you'll turn to page 10, it's Bates

9     stamp 405.  And this is under section -- the page prior

10    to that talks about the history and characteristics of

11    Lee Marvin Harris, Jr.  And there's a long narrative

12    about his life and things that he's done.

13             And the last paragraph on page 10 here says,

14    "Though Mr. Harris, Jr. resorted to engaging in drug

15    distribution, he always retained the goal of having a

16    successful legitimate business and always made sure that

17    his illegal drug interactions and his legitimate

18    businesses were entirely separate."  Is that your --

19    well, strike that.

20             Do you -- is that an -- an accurate statement?

21         MR. DAVIS:        Objection.  Speculation.

22         A.   I don't know, sir.

23    BY MR. JONES:

24         Q.   Okay.

25         A.   I'm not aware of that.

1      Q.   Do you know where your son's attorneys got

2    this information?

3           MR. DAVIS:          Objection.

4      A.   I do not know.

5    BY MR. JONES:

6      Q.   Did they get it from you?

7           MR. DAVIS:          Objection.

8      A.   No, sir.

9    BY MR. JONES:

10     Q.   In any event, your son has pled to drugs --

11   placing drugs ultimately in the red Cadillac in your

12   home, correct?

13     A.   Say that again, please.

14     Q.   Ultimately, your son pled guilty to possession

15   of drugs and placing the drugs in the red Cadillac at

16   your home, correct?

17     A.   Yes.

18     Q.   Okay.

19     A.   When he accepted those charges, yes.

20     Q.   Okay.  That would tend to make this statement

21   incorrect --

22           MR. DAVIS:          Objection to form.

23   BY MR. JONES:

24     Q.   -- correct?

25     A.   I can't say.

```
1         Q.    Well, if --

2         A.    I don't have any answer for that.

3         Q.    If he pled guilty to placing drugs --

4         A.    Uh-huh.

5         Q.    -- in the Cadillac at your home, were his

6    illegal drug interactions and his legitimate businesses

7    entirely separate?

8              MR. DAVIS:         Objection.  Glenn, are you

9    asking him about his -- about -- you're asking him about

10   this statement regarding his son that he didn't write.

11   And there -- he's never testified that there was any

12   legitimate business going on at his house.  So how can

13   he have any grounds to answer this question?

14             MR. JONES:         Well, I'm just asking him

15   if he -- if he knows if it's true or not.

16        A.    I don't -- I don't -- I don't know.

17   BY MR. JONES:

18        Q.    You don't know, for instance --

19        A.    Uh-huh.

20        Q.    -- if your son's illegal drug interactions

21   were entirely separate from his legitimate businesses.

22        A.    I -- I don't know.

23        Q.    Okay.  As a result -- we talked a little bit

24   about this.  But as a result of the arrest and -- and

25   some of the damages that you're claiming in this lawsuit
```

1    include some of the mental issues and -- and treatment

2    that you have received after the fact, correct?

3         A.   Yes, sir.

4         Q.   And in -- I believe it was Officer Perry's

5    deposition.  He was asked about you losing VA benefits.

6    Do you recall that line of questioning?

7         A.   I remember the conversation coming up through

8    his deposition, something about my VA benefits.

9         Q.   Is it your belief that Officer Perry had

10   anything to do with the loss of your VA benefits?

11        A.   I was told, sir, that when -- from the VA that

12   someone from Moore County -- and they didn't specify

13   whether it was from the Southern Pines PD or whether it

14   was from the sheriff's department -- had notified them

15   that I had been arrested, found guilty, and was serving

16   time out in Ashland, Kentucky.  That was -- that was

17   what I was told and that was -- and the same thing

18   happened with the state with my social security.  They

19   stated that someone notified them that I had been

20   convicted and was in federal prison at the time in an

21   attempt to have my benefits --

22        Q.   Sure.  You weren't convicted.

23        A.   No, sir.

24        Q.   Are you -- are you saying somebody notified

25   them that you had been convicted?

Page 237

1      A.   That came from -- that came from the Social

2  Security Administration and that came from the Veteran

3  Administration about my benefits and myself.  I had a

4  tough time with trying to get it straight, that my son

5  was, not me.

6      Q.   I'm going to show what we'll mark as

7  Defendants' Exhibit 8.  And these are medical records

8  that your attorneys provided to us regarding your --

9  your treatment and care after the arrest.  If you look

10  on the first page, it looks likes notes around the time

11  of May 11th, 2018, May 21st, 2018.

12                (Defendants' Deposition Exhibit Number 8

13                is marked.)

14      A.   Uh-huh.

15      Q.   And on May 11th, 2018, it says, "Contacted

16  Valerie Harris, wife of Lee Harris."  Do you see -- you

17  see where I'm reading from?

18      A.   Yes.  Yes, sir.

19      Q.   "As per ACS request," do you know who ACS is?

20      A.   Not right off, I don't.

21      Q.   "Informed wife that patient is excluded from

22  VA care while in Moore County Detention Center.  See

23  explanation for 4/6/18 note.  Wife verbalized

24  understanding."  So -- and this note is -- is signed

25  5/11/2018.  Do you see that?

1        A.    Yes.

2        Q.    Okay.  And if we'll go to the last page of

3   this, which is -- it says 304314 on the bottom, but up

4   at the top, it is Bates number 000320, the last page.

5   And this is the -- up at the top, you see it says, "Date

6   of note April 6th, 2018."

7        A.    Yes.

8        Q.    And, again, it says, "ACS message note."  And

9   it says, "Provider vias," v-I-a-s, which I don't --

10  don't know what that means.  It says relationship to

11  veteran:  Self."  Do you recall calling the VA on

12  April 6th, 2018?

13       A.    No, sir.  I -- I was in -- I was in jail.

14       Q.    Sure.  And if you'll go down, it says, "This

15  message is in regards to other."  And it says, "Brief

16  note in detail:  Veteran cannot make his April 13th

17  appointment.  Would like to speak with PCP about other

18  issues that he is having."  Do you see that?

19       A.    I see that.

20       Q.    Okay.  Do you know if you spoke with your

21  treating providers at that time?

22       A.    No, sir.  My wife was doing the communicating

23  between myself and the VA.

24       Q.    Okay.  And it says self here, correct?

25       A.    Well, it's -- it's -- it's incorrect.

1      Q.   Okay.  If you'll flip to the page prior to

2   that, number 319, page number 319, it says -- if you'll

3   look kind of near the bottom, the 4/25/2018 addendum, it

4   says here, "Please note that under Title 38," et cetera,

5   "VA excluded from the medical benefits package hospital

6   and outpatient care for a veteran who is either a

7   patient or inmate in an institution of another

8   government agency if that agency has a duty to give care

9   or services."  Do you see that?

10      A.   Yes, sir.

11      Q.   And just under that, it says, "As such, this

12   veteran is not eligible to receive VA healthcare

13   services until he is released from the Moore County

14   Detention Center."  Is that correct?

15      A.   That's what's on the paper.  Yes.

16      Q.   So as of April 25th, 2018, the VA was aware

17   that you were incarcerated, correct?

18      A.   Yes.

19      Q.   Okay.

20      A.   According to these documents, they were.

21      Q.   And these are documents that you provided to

22   your attorney, correct?

23      A.   These documents came from the VA.

24      Q.   Okay.  All right.  Do you have any reason to

25   dispute the information that's found on these documents?

1      A.   Well, no, sir, not -- not what's listed on the

2   paper.  That is what the document says.  I had actually

3   no access to the VA, period --

4      Q.   Sure.

5      A.   -- myself.  They -- Moore County --

6      Q.   All right.

7      A.   -- changed its set up.

8      Q.   If you'll -- and if you'll flip to page 318,

9   again, the -- the 318 is in the top left corner.  So --

10  at the bottom, it actually says, I think, 3020314.  So

11  do you see that?

12     A.   This might be it.

13     Q.   And about halfway down, it says -- and, again,

14  relationship to veteran, self.  And it says, "This

15  message is in regards to", and it says, "Brief note in

16  detail.  Moore County Detention Center needs a medical

17  release to bring patient to his appointment.  Please

18  contact Jenny Donaldson," at a number.  Do you see that?

19     A.   Yes, I do see that.

20     Q.   Do you know if you ever got a medical release

21  to attend an appointment?

22     A.   I -- I don't know.  I had no contact with the

23  -- the VA in jail.  I didn't have any.  So I don't -- I

24  don't know.  I know I kept asking Moore County to take

25  me, and they wouldn't.

1    Q.   You kept --

2    A.   They never --

3    Q.   -- asking them.

4    A.   -- mentioned -- yes.  And they --

5    Q.   To take you where?

6    A.   To my appointments.  To my appointments

7  because a lot of my medications was -- was being

8  withheld.  I didn't get the medications that I was

9  supposed to be on for five months or something --

10   Q.   And --

11   A.   -- up there.

12   Q.   Where were your appointments that you were

13  asking them to take you to?

14   A.   At the VA in Durham.

15   Q.   So you were asking them to contact the VA.

16   A.   I was asking them to -- to take me to my

17  appointments to the VA because it was -- it's always

18  been my understanding that if I was in custody I should

19  have medical attention, and I wasn't getting any.  And

20  the only communication with Durham was with my wife.  It

21  wasn't with me.

22   Q.   Okay.  Did your wife communicate with the VA

23  on your behalf during this time period?

24   A.   She did the best she could.

25   Q.   Well, do you know if she did?

1          A.    Sir?

2          Q.    Do you know if she did contact the VA during

3     this time period?

4          A.    She was talking to them and letting them know

5     that I wasn't getting my medication and stuff like that.

6          Q.    That who wasn't --

7          A.    That the detention center wasn't giving me my

8     blood pressure medication and all that stuff.

9          Q.    So she would've had to tell them that you were

10    incarcerated at that time.

11         A.    I don't know --

12              MR. DAVIS:          Objection.

13         A.    -- how --

14              THE WITNESS:        Excuse me.

15              MR. DAVIS:          Objection for the record.

16    Speculation.

17         A.    I don't know how they found out that I was

18    incarcerated.  I don't know.

19    BY MR. JONES:

20         Q.    Well, if --

21         A.    I didn't do it.

22         Q.    Maybe I'm not understanding you here.

23         A.    Uh-huh.

24         Q.    Are you saying that you were having trouble

25    getting medication in the Moore County Detention Center?

1      A.   Yes, sir.

2      Q.   Okay.  And your medication is prescribed by

3  the VA.  Is that correct?

4      A.   Yes, sir.  My medication was in their

5  possession at that time.

6      Q.   Sure.

7      A.   My wife brought them all my medication, and

8  they said they would give it to me.  But when I got

9  there, they wouldn't let me have it, my anxiety

10  medication, my blood pressure medication, my acid reflux

11  medication, all that stuff, my pain medication.

12      Q.   Sure.

13      A.   They wouldn't give me anything.

14      Q.   Okay.  And so then what happened?

15      A.   I -- I went through a hard time up there

16  without it.  I was threatened by the -- the captain up

17  there over the jail that if I didn't take medication

18  that they wanted to give me instead of taking my own

19  that he'd lock me in a cold room up there.  He took me

20  to the cold room and opened up the door, and I felt the

21  frost coming out.  He threatened me if I didn't take

22  their medication.

23          And then when I told him that I was a 100

24  percent disabled veteran, that's when he told the

25  sergeant to take me back to my dormitory, but they still

Page 244

1  didn't give me my medication.

2      Q.   Do you know if anybody ever communicated this

3  information to the VA on your behalf?

4      A.   I'm not sure, sir.

5      Q.   Okay.

6      A.   I'm not --

7      Q.   And I'm going to show what we will mark as

8  Defendants' Exhibit 9.  All right.  And these are,

9  again, records provided to me by your attorney, and

10  these are records talking about, I think, some of the

11  mental health treatment that you are having.

12          And I want to ask you a question about a note

13  at the very bottom of page 154, Bates number 154, that

14  goes into Bates number 155.  And it says here,

15  "Functional assessments.  Trauma PTSD symptoms.  Mr.

16  Harris reports that he finished his book describing the

17  traumatic event that occurred in February 2018.  He also

18  shared he -- his lawyer took his case, and he is in the

19  process of suing four police officers in the city.

20  Shared that the process will involve listening in on

21  their depositions next month, which causes him anxiety."

22          And then it goes on to talk about anxiety that

23  you get -- got from the arrest and -- and issues of K-9.

24  It says, "He also shared that he does not like the word

25  hate, but if he could hate anyone, it would be those

1  officers."  Do you remember stating this to the mental

2  health provider?

3              (Defendants' Deposition Exhibit Number 9

4              is marked.)

5      A.   Did you read that whole thing, sir?

6      Q.   I -- I skipped a few parts.  I'm -- you --

7  happy to read --

8      A.   Could you please read it, the whole thing, for

9  me, please --

10     Q.   Sure.

11     A.   -- if you don't mind?

12     Q.   I'll start -- "He shared -- the process will

13 involve listening in on their depositions next month,

14 which will cause him anxiety.  He also shared getting

15 triggered by recent news about a person detained in a

16 K-9 cage noting that he was also detained in a K-9

17 vehicle next to the dog.  Endorsed feeling tense.

18 Shared that he has never cursed, but believes that if he

19 ever would it would be about the police officers who

20 targeted him.  He also shared that he does not like the

21 word hate, but if he could hate anyone, it would be

22 those officers."  Would you like me to keep going?

23     A.   No, sir.

24     Q.   Okay.  Do you recall having those

25 conversations?

1      A.    Yes, sir.

2      Q.    Is that how you feel today?

3      A.    Yes, sir.

4      Q.    Okay.  Let me ask you about this book that you

5  have finished.  Have -- have you written a book about

6  this?

7      A.    I've noted a lot of things that happened.

8  It's not a book because it's not a complete book.  It's

9  nothing that's been published or nothing that I've

10  showed around or had edited or anything just keeping

11  information that that I needed, documents, and different

12  stuff about my story.  Inside of me, I always said to

13  myself that no matter what the outcome of my life be, I

14  -- one day, I'm going to tell what happened to me, and I

15  wanted people to know.

16      Q.    I asked you earlier today if you had kept any

17  journals, notes --

18      A.    Yes.

19      Q.    -- calendars, anything about this, and you

20  said no.

21      A.    It's not a journal.

22      MR. DAVIS:          Yeah.  I'm going to object

23  because I can tell you that the client was instructed --

24  because this is a diary that he's published to us, and

25  we turn -- turned it over into privilege law, and this

1   is a set of diaries that he's shared with counsel.

2          MR. JONES:          I understand that, but he

3   is describing it as a -- finishing a book.

4       A.   It's not a book.  It's not complete.

5   BY MR. JONES:

6       Q.   Your medical records says it's a book.

7       A.   Well, it's not a book, and it's not complete.

8       Q.   Do you know that you referred to it as a book

9   in multiple medical records --

10      A.   I'm not --

11      Q.   -- that you were three quarters of the way

12  through your book?

13      A.   I told them that I was keeping up with my

14  story, and anything that happened in it, I wanted to

15  tell it.  I also told my story to the therapist --

16      Q.   What is the --

17      A.   -- at that time.

18      Q.   What is the purpose of this diary?

19      A.   The purpose, I don't want to forget it.  I

20  don't ever want to forget what happened to me.  Can I

21  elaborate?

22      Q.   Please.

23      A.   When I -- when I leave my home, I look out

24  across the woods at where those police officers were 75,

25  100 feet away from my house at times when I didn't even

Page 248

```
1    know they were out there watching my home, watching me.
2    When I look, I look across the woods to see if anybody's
3    there.
4              When I hear a door slam in my yard, I'm
5    jumping up to my window looking out.  When I go out to
6    -- take my dog out to put my dog in a cage, it bothers
7    me because I'm putting her in a cage.  It's for her
8    safety, but I think about when I was in a cage, and it
9    bothers me to do that.
10             When I talk to my family and my children and
11   everybody and anything comes up about any of this case
12   or anything that happened to me, it bothers me, and it
13   makes me furious.  I don't have a good outlook at the
14   police no more.
15             I don't -- I -- I got -- I dream about it.  I
16   dream about myself being in places where it's all men as
17   if I'm in a camp or a prison camp or something all the
18   time.  I dream about police brutality all the time.  I
19   dream about -- I think about how my wife went through a
20   terrible time trying to keep my household up all the
21   time.  When I look and see where my ceiling is busted
22   from where the police busted it going in my house when I
23   see that, it irritates me.  It bothers me.
24             This whole thing traumatized me.  The way that
25   people look at me, the way that people characterized me,
```

1    every time my name goes in Google other than being a

2    writer or a minister, it comes up that I was in a group

3    of -- of people that were charged with drugs and a gang

4    called the DBC or whatever they called it, that I was a

5    member of that.  People looking at me like -- that I was

6    a part of all this wrongdoing and all that.  Every day

7    and every night, I relive this.  I live this.

8           I don't even come to Southern Pines, sir,

9    unless I have to come to Southern Pines, because when I

10   cross over Highway 1 and go on towards Southern Pines, I

11   start looking around.  I automatically look around

12   because I feel like that one of these guys are somewhere

13   and can't wait to get their hands on me again.  That's

14   just my feeling.  That's just from all the traumatized

15   and all the things that happened.

16           I'm constantly picking up my -- my -- I sleep

17   with my weapon beside me because I hear things at night

18   that's not there and stuff.  It was a hard way.  I think

19   about all the months that I stayed in jail.  I think

20   about me losing 25 or 30 pounds in jail from not being

21   able to eat the slop that they had in there.  I think

22   about how they would come to my cell during the morning

23   and take a broom and a mop and pass it through my hole

24   and have me to clean up my room and pass it back through

25   and wouldn't even wipe it out and hand me my tray

1      through that hole.  I think about all those indecent

2      things.

3            I think about when I went before the captain

4      and asked him, "Who are you to -- to penalize or punish.

5      You're supposed to keep me and everybody else here and

6      -- and take care of us until we go to court and the

7      judge give us our fate.  It's not your job." But I was

8      mistreated in there.  I was threatened in there.  And

9      when I got out, this young man right here wouldn't even

10     let me go to the bathroom without standing up on me so I

11     couldn't urinate.

12           It's -- I think about it all the time.  It's

13     going to be with me the rest of my life no matter what

14     happens with this case.  It was wrong.  I've -- I had no

15     record.  I hadn't done anything wrong.  They never saw

16     me selling drugs to anybody.  They never even suspected

17     me, I don't believe, of selling drugs.  My whole life

18     has been turned around.  My family went through a hard

19     time with me being gone.  I went through a hard time.

20     It cost us money, shot me into bankruptcy.  Yes.  I --

21     yes.  This is -- this is enough to remember.  This -- I

22     don't ever want to forget it, sir.  And I didn't mean to

23     be so -- I just wanted -- as I said --

24           Q.   Mr. Harris, if --

25                MR. DAVIS:        Glenn, may I for the

1    record just to clarify?  For the record, I'll just --

2    just put this on record that, again, Mr. Harris, any

3    references to a book -- we're aware of any references to

4    the book or something in his medical records.  But he

5    had been instructed -- he still is instructed to not

6    discuss or disclose the contents of his memoir/diary as

7    it being an attorney-client privilege, and it being a

8    document that we have in our privilege log.  So he

9    answered correctly.  You can go into whatever question

10   you'd like.

11              MR. JONES:        Sure.

12              MR. DAVIS:        But I just want to note

13   for the record that Mr. Harris was instructed by his

14   attorneys to not disclose the contents of his diary that

15   he's writing.

16              MR. JONES:        Sure.

17   BY MR. JONES:

18       Q.   You have disclosed that it exists to your

19   medical providers though, correct?

20       A.   We've talked about what happened in my life --

21       Q.   Did you talk --

22       A.   -- talked about it.

23       Q.   -- to them about what was in your book?

24       A.   No, sir.  Well, I can't say I didn't talk to

25   them about when I told them I was arrested and when I

1  told them that -- about my medication not getting --

2  going five months without any medicine.  I told them

3  about stuff like that.  As far as going into the whole

4  thing, no.  We mentioned different parts, about I felt

5  like I was wronged about being arrested, stuff like

6  that.

7       Q.   Is it a book, or is it a diary?

8       A.   It's not -- really, you can't call it either

9  right now because it's not complete.

10      Q.   Okay.  And -- but you admit that in

11  Defendants' 9 it says that he finished his book.

12      A.   They said I finished my book.  I don't recall

13  telling them it was a book.

14      Q.   Mr. Harris, if you had found drugs in your

15  Cadillac prior to being arrested --

16      A.   Uh-huh.

17      Q.   -- what would you have done?

18      A.   I would have figured that it would've probably

19  had to be my son's.

20      Q.   Would you have called the police?

21      A.   I can't say I would have.  I can't say that

22  for sure.

23      Q.   At any time during the prosecution of your

24  case by federal prosecutors, was there any time in court

25  that you had to admit that probable cause existed for

Page 253

1    your arrest?

2        A.   No, sir.

3            MR. DAVIS:          Objection.

4            THE WITNESS:        Sorry.

5            MR. DAVIS:          Objection.  Go ahead.  You

6    can answer.

7        A.   No, sir.

8            MR. JONES:          Give me half a second, I

9    may be very close to done.  If you give me five minutes.

10               (Off the record at 4:32 p.m.)

11               (On the record at 4:42 p.m.)

12   BY MR. JONES:

13       Q.   All right.  Mr. Harris, I -- I promise I am

14   almost done.

15       A.   It's all right.

16       Q.   I appreciate your time this afternoon and

17   answering the questions.

18           I have one more exhibit that I'd like to ask

19   you about.

20           MR. JONES:          10?

21           COURT REPORTER:     Yes.

22   BY MR. JONES:

23       Q.   It's Defendants' Exhibit 10.  Do you recognize

24   this document?

25               (Defendants' Deposition Exhibit Number 10

1            is marked.)

2        A.   Yes, I believe so, sir.

3        Q.   What -- what is this document?

4        A.   It -- it says, "Objection," and this is my

5    son's case.  So I believe that it's an objection to a

6    presentencing report done in the federal court.  I think

7    this -- I think my son's attorney did this.

8        Q.   Okay.  There is some handwriting up in the top

9    corner that says, "Draft.  Not to be filed."  Do you

10   know who wrote that?

11       A.   No, sir.  I don't.

12       Q.   Is -- is that your handwriting?

13       A.   No, sir.

14       Q.   Okay.

15       A.   I don't write that good.

16       Q.   And then about halfway down, there's a section

17   that is highlighted in yellow.  Do you know who

18   highlighted this?

19       A.   Not sure.  I'm not sure.

20       Q.   Do you know where this document came from?

21       A.   This is from my son's presentencing report, so

22   it -- it's one of his.  It's from his records.

23       Q.   All right.  Do -- do you --

24       A.   I have -- I've shared some stuff with my

25   attorneys but --

1    Q.   Sure.  And -- and --

2    A.   -- that's about --

3    Q.   -- do -- do you have access to his records as

4  well?

5    A.   To my son's records?

6    Q.   Correct.

7    A.   No, sir.  I don't -- I don't -- his court

8  records from the federal court --

9    Q.   Correct.

10    A.   -- that stuff?  Well, no.  He sent a lot of

11  stuff home when he left the federal prison in Asheboro,

12  a lot of different stuff, books, and different papers,

13  and stuff like that.  I can't say that some of them are

14  not there.  Some of his stuff is in there.

15         MR. DAVIS:         Glenn --

16    A.   But his --

17         MR. DAVIS:         -- for -- for the record,

18  we emailed you about that and said that we ordered a

19  transcript because we don't have the full document

20  either.  But this was in all of our documents.  So we

21  emailed in our last exchange and told you that we are

22  ordering the presentence report from Junior, and as soon

23  we get it, we'll send it to you --

24         MR. JONES:         Sure.

25         MR. DAVIS:         -- so you'll have the full

Page 256

1    document.

2          MR. JONES:          Do you know whose

3    handwriting is on this?

4          MR. DAVIS:          No.  That's how we

5    received it from Mr. Harris.

6          MR. JONES:          Okay.

7          MR. DAVIS:          So whatever he got, he

8    just turned it over.  And the reason why we turned it

9    over is because we didn't think that it was privilege

10   between --

11         MR. JONES:          Sure.

12         MR. DAVIS:          -- us.

13         MR. JONES:          Fair enough.

14         MR. DAVIS:          Just being transparent.

15         MR. JONES:          No.  I -- I appreciate

16   that.

17         MR. DAVIS:          We don't have the full

18   document.

19         MR. JONES:          Yeah.  Like I said, I -- I

20   -- I can't -- I couldn't make heads or tails --

21         MR. DAVIS:          Yeah.

22         MR. JONES:          -- of it, so I was just

23   trying to -- trying to ask and figure out.

24         MR. DAVIS:          I mean, if it -- if it was

25   us, obviously, we wouldn't turn it over because --

Page 257

```
1            MR. JONES:          Sure.
2            MR. DAVIS:          -- it would be privileged.
3            MR. JONES:          Sure.
4            MR. DAVIS:          But it looks like a draft
5     from his old criminal charges.
6            MR. JONES:          Sure.
7     BY MR. JONES:
8        Q.   Mr. Harris --
9        A.   Sir?
10       Q.   -- do you believe that any officers from
11    Southern Pines Police Department planted evidence at
12    your home?
13       A.   No, sir.
14       Q.   Okay.
15       A.   I can't say I do.
16       Q.   Do you believe that any Southern Pines police
17    officers fabricated evidence in your case against you?
18       A.   Yes, I do.
19       Q.   Okay.  And what evidence do you believe they
20    fabricated?
21       A.   There are -- there's a lot of things that has
22    been mentioned that took place that I know did not
23    happen.  One of the things being -- and I'll stop right
24    there.  One of the things being what Lieutenant Marsh
25    wrote about talking to me about different things in his
```

1 statement the day that I said no to, that type of thing.

2 And I've seen plenty of that, but that's it.

3     Q.   Okay.  Have you ever told anybody or said that

4 Officer Perry would "get his?"

5     A.   No, sir, not to my knowledge.  I've never said

6 anything like that.

7           MR. JONES:       All right.  That's all.

8           MR. DAVIS:       I got a little follow-up.

9           MR. JONES:       Sure.

10           MR. DAVIS:       It might be a few seconds.

11 EXAMINATION BY MR. DAVIS:

12     Q.   Okay.  A few questions for you, Mr. Harris.

13 Just to start off with discussing with -- Mr. Jones

14 asked you about some of your VA medical records.  I just

15 want to discuss some of that.

16     A.   Uh-huh.

17     Q.   As we looked at the medical records, it seems

18 as if you -- there was some communication to Moore

19 County Detention Center, correct?

20     A.   Correct.

21     Q.   Is it possible that someone other than your

22 wife communicated with Moore County Detention Center?

23     A.   I really don't know for sure.  Because I --

24 being locked up, I had no access even to the phone most

25 of the time, so I don't -- I can't say.  I -- I don't

Page 259

1  know.  I think anything's possible.  It's possible that

2  somebody else did, but I can't say that they did or

3  didn't.

4       Q.   In -- in September of 2019, did you ever

5  receive any correspondence from the Veteran -- Veteran

6  Affairs?

7       A.   I believe that was when I did receive a letter

8  from them --

9       Q.   And were you ever --

10      A.   -- 2019.

11      Q.   -- informed that your veteran benefits were

12  going to change or had changed?

13      A.   Yes, sir.

14      Q.   And where they reduced?

15      A.   It's been a while.  I don't remember if they

16  was actually ever reduced, or not.  I can't say for

17  sure.  It's been a while, but I do know that they --

18  they did threaten to -- to do that based on the fact

19  that I was incarcerated out in Ashland in federal

20  prison.

21      Q.   Just a few more questions.  Earlier, Mr. Jones

22  was asking you about your injuries and witnesses to your

23  injuries.  Do you remember that?

24      A.   Yes.

25      Q.   And those were responses that you had in your

```
 1    interrogatories from -- from the Defendants, the
 2    questions that they asked you.
 3         A.   Yes.  I believe so.
 4         Q.   And when you discussed injuries, do you think
 5    that injuries are only physical, or can they be
 6    financial, emotional, or reputational?
 7         A.   To me, injuries is mental, financial,
 8    emotional, characteristic.  Injuries is not just, to me,
 9    physical.  A scar or a scratch, it's way deeper than
10    that.
11         Q.   In those same responses, you said that -- you
12    said that your injuries are otherwise known throughout
13    the community of, I think you said, Aberdeen and
14    Southern Pines.  What did you mean by that?
15         A.   I meant that people that know me, that knew me
16    and knew how I was before all this happened see a
17    difference in me and the way that I do things in my
18    surroundings and the whole nine.  It's just -- they see
19    the difference.
20              I've been told as far as -- and they've
21    noticed that the ministry -- my ministry has totally
22    shrunken because of it, and there's a lot that --
23    churches I was going to, now, I don't go to any more
24    because I'm not called to come there.  So there -- yes,
25    the community knows quite a bit about what I was dealing
```

1    with and still dealing with.

2         Q.   And lastly, just talking about some of the

3    questions that defense counsel asked you about, the

4    Cadillac, which is a key part of this case.  Were you

5    present for Officer Lowery and Perry's depositions last

6    week?

7         A.   Yes, sir.

8         Q.   And have you been shown a picture that defense

9    counsel showed us with a -- a gray cover on the

10   Cadillac?

11        A.   Yes, sir.

12        Q.   And earlier, you said that you placed a gray

13   cover on this Cadillac, correct?

14        A.   Yes, sir.

15        Q.   Do you recall how long before this -- before

16   February 20, 2018, that you had put the gray cover on

17   the Cadillac?

18        A.   Approximately -- anywhere from six months to a

19   year.  Because the old blue tarp I had, I just pulled

20   that off because it -- it was weatherbeaten and I put

21   the gray cover on somewhere between six months and a

22   year from the time of the search at my house.  It had

23   been on there a while.

24        Q.   At Officer Lowery's deposition last Thursday,

25   you recall that he stated several dates that he had done

Page 262

1   woods surveillance across from your home at 803 Sycamore

2   Street in Aberdeen.

3       A.   Yes.

4       Q.   And the -- most of that surveillance was in

5   January of 2018.

6       A.   I believe it was one or two in that -- during

7   that time.

8       Q.   So at the time when Officer Lowery was doing

9   surveillance as a part of the investigative team for

10  Southern Pines Police Department, what color cover, or

11  tarp, was on the Cadillac at that time?

12      A.   Gray.

13      Q.   And is that consistent with the Rule 11

14  Memorandum that was read in the federal case that said

15  that the Cadillac had a gray tarp, or a gray cover, on

16  it, which is where the drugs were found on your

17  property?

18      A.   Yes, it is.

19          MR. DAVIS:        No further questions.

20          MR. JONES:        I don't have anything.

21  Mr. Harris, I appreciate your time.

22          (Deposition testimony concluded at 4:52 p.m.)

23              (Review and signature NOT waived.)

24

25

Page 263

```
 1   SCOTLAND COUNTY, NORTH CAROLINA
 2   C E R T I F I C A T E
 3            I, Glenda L. Biggerstaff, a Notary Public in
 4   and for Scotland County, North Carolina, do hereby
 5   certify that LEE MARVIN HARRIS, SR. appeared before me
 6   on SEPTEMBER 26, 2022, and was duly sworn or affirmed
 7   prior to giving testimony in this proceeding; that he
 8   was subsequently examined, and that I was present for
 9   and created a record of said examination; that the
10   foregoing pages 1-262 constitute a true and complete
11   transcript of said examination to the best of my
12   knowledge and belief; and that the reading and signing
13   the transcript was requested.
14            I further certify that I am not attorney nor
15   counsel for, nor related to or employed by, any of the
16   parties to the action in which this deposition was
17   taken, and further, that I am not a relative or employee
18   of any attorney or counsel employed by the parties
19   hereto, nor interested, directly or indirectly, in the
20   matters of controversy nor financially interested in the
21   result of this action.
22            In witness whereof, I have hereunto set my
23   hand and seal on this, the 13TH day of OCTOBER 2022.
24                              _____
                                GLENDA L. BIGGERSTAFF
25                              NOTARY COMMISSION # 20002760244
```

1                    SIGNATURE PAGE

2

3        I, LEE MARVIN HARRIS, SR., do hereby state under

4    oath that I have read the above and foregoing

5    examination in its entirety and the same is a full,

6    true, and correct transcript of my examination, subject

7    to the attached list of corrections, if any.

8

9                    _____

10                        LEE MARVIN HARRIS, SR.

11

12

13   Sworn to and subscribed before me this_____day

14   of_____ , 20_____.

15

16                    _____

17                        Notary Public

18

19   My commission expires:_____

20

21

22   Mail to:

23   Depositions, Inc.

24   1000 N. Main Street, Suite 215

25   Fuquay-Varina, North Carolina 27526

Page 265

1                       ERRATA SHEET

2   Case name:     Harris v. Town of Southern Pines, et al.

3   File number:   1:21-cv-955-wo-jep

4   Witness name:  Lee Marvin Harris, Sr.

5   Date:          September 26, 2022

6   PAGE  LINE      READS           SHOULD READ

7   ____/____/_____/_____

8   ____/____/_____/_____

9   ____/____/_____/_____

10  ____/____/_____/_____

11  ____/____/_____/_____

12  ____/____/_____/_____

13  ____/____/_____/_____

14  ____/____/_____/_____

15  ____/____/_____/_____

16  ____/____/_____/_____

17  ____/____/_____/_____

18  ____/____/_____/_____

19  ____/____/_____/_____

20  ____/____/_____/_____

21  ____/____/_____/_____

22  ____/____/_____/_____

23  ____/____/_____/_____

24  ____/____/_____/_____

25  ____/____/_____/_____