```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
               CIVIL ACTION NO.:  1:21-CV-955
```

```
LEE MARVIN HARRIS, SR.,               )
                                      )
                  Plaintiff,          )
                                      )
     vs.                              )
                                      )
THE TOWN OF SOUTHERN PINES,           )
Officer JASON PERRY, Officer SEAN     )
LOWERY, and Officer KYLE MARSH,       )
sued in their individual             )
capacities, and Chief of Police       )
ROBERT TEMME, sued in his official   )
and individual capacity,              )
                                      )
                  Defendants.         )
_____)
```

<u>D E P O S I T I O N</u>

OF

**<u>JASON S. PERRY</u>**

At Southern Pines, North Carolina

Thursday, September 22, 2022

```
REPORTER:   WANDA B. CONSTANTINO, CVR-CM-M
            Notary Public
```

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of the Plaintiff:

      Mr. Abraham Rubert-Schewel
      Mr. Nichad Davis
      TIN, FULTON, WALKER & OWEN, PLLC
      119 East Main Street
      Durham, North Carolina  27701
      Phone:  919-451-9216
      schewel@tinfulton.com
      ndavis@tinfulton.com

On Behalf of the Defendants:

      Mr. Glenn Jones
      HALL, BOOTH & SMITH, PC
      Suite 750
      11215 North Community House Road
      Charlotte, North Carolina  28277
      Phone:  980-859-0380
      gjones@hallboothsmith.com

In Attendance:

      Mr. Lee Marvin Harris, Sr.


* * * * *

C O N T E N T S

                                                              PAGE

Examination by Mr. Rubert-Schewel . . . . . . . . . . . 4

Examination by Mr. Jones  . . . . . . . . . . . . . . 173

Further Examination by Mr. Rubert-Schewel . . . . . . 175


PLAINTIFF'S EXHIBITS:

Exhibit CC - Dickerson Affidavit  . . . . . . . . . .  36

Exhibit DD - Perry Employment Appraisal . . . . . . .  19

Exhibit JJ - Perry '09 Complaint  . . . . . . . . . .  65

Exhibit KK - Perry 2013 Complaint . . . . . . . . . .  79

Exhibit L  - Magistrate Order . . . . . . . . . . . . 168

Exhibit LL - Jan. '20 Perry Surveillance  . . . . . . 112

Exhibit MM - January 24-25 Perry Surveillance  . . . . 113

Exhibit NN - Rule 11 Memorandum . . . . . . . . . . . 108

Exhibit OO - Harris Sr. Interview with J. Perry . . . . 147

Exhibit P  - Surveillance Harris, Jr. Drugs
             in Cadillac  . . . . . . . . . . . . . . 115

Exhibit SS - Darby Affidavit  . . . . . . . . . . . .  33

Exhibit UU - Perry Handwritten Diagram of Search
             Warrant Execution  . . . . . . . . . . . 177

Exhibit Y -  Case e-mails . . . . . . . . . . . . . . 105

* * * * *


*Reporter's Note:  This transcript contains quoted material.*
*Such material is reproduced as read or quoted by the*
*speaker.*

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

1           This is the deposition of JASON S. PERRY,

2   taken in accordance with the Federal Rules of Civil

3   Procedure in connection with the above case.

4           Pursuant to Agreement, this deposition is

5   being taken at the Southern Pines Finance Building,

6   180 Southwest Broad Street, Southern Pines, North

7   Carolina, beginning at 11:36 a.m. on Thursday,

8   September 22, 2022, before Wanda B. Constantino, Certified

9   Verbatim Reporter and Notary Public.

10

11           <u>JASON S. PERRY</u>, upon first being duly sworn,

12   testified as follows:

13

14           <u>EXAMINATION BY MR. RUBERT-SCHEWEL</u>

15   Q.   Good morning, Officer Perry?

16   A.   Good morning.

17   Q.   My name is Abraham Rubert-Schewel.  I'm with the law

18        firm of Tin Fulton Walker & Owen.  We represent Lee

19        Harris, Sr., in his lawsuit against the Town of

20        Southern Pines against -- and individual --

21        individual named officers such as yourself.  You are

22        testifying under oath and under the penalty of

23        perjury today just as if you were in a court of law.

24        Do you understand that?

25   A.   Yes, sir.

1  Q.   Have you ever been deposed before?

2  A.   No, sir.

3  Q.   Have you ever been a party to a lawsuit?

4  A.   No, sir.  If I may explain that.  I was made aware

5       about a month ago of a lawsuit that was attempted

6       back in 2013, I believe.  I had no prior knowledge of

7       that until about a month ago or so.  That, my

8       understanding, did not follow through.  It was thrown

9       out by a federal court magistrate or a judge.  I was

10      never served.

11 Q.   You understand that these questions and answers are

12      being transcribed by a court reporter.  I know you've

13      testified before in court, so it's important you

14      speak loudly and clearly.  You also must answer the

15      questions verbally, for example, using yes or no.  Do

16      you --

17 A.   Yes.

18 Q.   -- understand?

19           And as you've seen over the two depositions

20      that you've watched, your attorney Glenn may object.

21      Most times you will still have to answer the question

22      unless he instructs you not to for some reason.  Do

23      you understand?

24 A.   Yes.

25 Q.   Can you spell your name for the record?

1    A.    J-a-s-o-n P-e-r-r-y.

2    Q.    What year did you first become a police officer?

3    A.    2005.

4    Q.    And was Southern Pines the first department you ever

5          worked in?

6    A.    Yes.

7    Q.    And how many other police departments have you worked

8          for?

9    A.    I've only been employed by the Town of Southern

10         Pines.

11   Q.    What is your current job title?

12   A.    Sergeant.

13   Q.    And are you over a particular division?

14   A.    It's called a Directed Patrol Team.  So it's a team,

15         not necessarily a division but is a team.

16   Q.    And does that -- what does that team do?

17   A.    Proactive response, proactive -- going out and

18         stopping cars and trying to get into stuff.

19         Basically try to keep the streets clean.  We're also

20         a support unit for normal patrol.  So if they -- they

21         need assistance with something they have going on,

22         we're there.

23   Q.    You were previously in Investigations?

24   A.    Yes.

25   Q.    What year did you end your term in Investigations?

1   A.   2020.

2   Q.   And you are also a sworn federal officer?

3   A.   Yes.

4   Q.   What is your federal title?

5   A.   I wouldn't consider myself as being an agent, but I

6        am sworn through the Fayetteville -- I was sworn at

7        the Fayetteville office in the FBI.  It Is a local

8        task force.

9   Q.   Is this the Sandhills Task Force that Officer Lowery

10       referred to?

11  A.   Yes.

12  Q.   So this task force is an ongoing task force?

13  A.   Yes.

14  Q.   Does it have any date on which it ends?

15  A.   I -- I'm not sure.

16  Q.   What is the purpose of the task force?

17  A.   I would only be guessing as to what the purpose.  The

18       FBI -- that's their name for this tax -- task force.

19       That name was given prior to any Southern Pines

20       officer being part of it, but it's good to have

21       relations with local law enforcement agencies to have

22       an understanding of where their FBI territorial

23       jurisdiction -- they cover Moore County, so basically

24       they want to make sure they know what's going on in

25       their backyard.

1    Q.   When you were brought onto the task force, did any

2         FBI agent or anyone tell you, "Jason, we want you to

3         be on the task force so you can help with this?"

4    A.   No.

5    Q.   So you -- do you have any idea of why you were

6         brought onto the task force?

7    A.   I was recommended by Chief Temme.

8    Q.   I mean, is the task force -- is the purpose of it

9         drug interdiction?

10   A.   I believe -- it is my opinion it has something to do

11        with the drug aspect, but it's also in that

12        Sandhills, the title of it, it mentions safe streets.

13        I don't know -- I can't remember the exact title, but

14        that's their purpose.

15   Q.   So being sworn as a federal law enforcement officer,

16        what does that -- what responsibilities does that

17        give you?  What does that allow you to do?

18   A.   Given my current situation, my current title, I am a

19        sergeant over Directed Patrol.  It lessens my

20        involvement with the FBI, my engagement with them

21        currently.  I am still sworn, but as an investigator,

22        it assisted with working narcotics investigations.

23             At the same time we assisted them with any

24        search warrants that they had in Moore County or

25        possibly surrounding counties.  We were there to help

 1          search.  We were there to -- any investigation they
 2          had going on, if they needed manpower, we're there.
 3     Q.   Were you allowed to say -- or are you allowed to say
 4          that you are a federal officer?
 5     A.   I've never been told not to say it.
 6     Q.   Okay.  Does being sworn as a federal officer, what
 7          does it allow you to do that you couldn't previously
 8          already do as a Southern Pines officer?
 9     A.   I don't know that it allows me to do anything I
10          couldn't previously do.  It does open engagement with
11          the US Attorney's Office.  Those communications were
12          not as often as a normal Southern Pines officer, but
13          it did open that communication.
14     Q.   Okay.  Did it also open engagement with other FBI
15          agents?
16     A.   Yes.
17     Q.   Other DEA agents?
18     A.   Not necessarily.
19     Q.   You haven't worked with DEA agents in this task
20          force?
21     A.   I don't recall.
22     Q.   Are you paid by the federal government?
23     A.   No.
24     Q.   Are you able to initiate federal investigations?
25     A.   Currently?

1   Q.   Yes.

2   A.   I imagine I would be able to initiate investigations

3       that could ultimately end up in the federal system,

4       but most investigations now currently and previously,

5       I would initiate those investigations anticipating

6       that they're going to stay at the state level.

7   Q.   If you wanted an investigation to go federal -- and

8       let -- and let's go back now to 2018 when you were

9       working in Investigations in Southern Pines.  If you

10      wanted an investigation to go federal, what would you

11      do?

12  A.   It all depends on the situation.  It depends on the

13      situation.  Can you clarify?

14  Q.   Sure.  So let's say you have a case.  You think it's

15      a case that's a complicated case or it's a case that

16      involves a lot of drugs, a lot of money, a lot of

17      players.  You think it's a good federal case.  What

18      would be the next steps you would take to make sure

19      it goes federal?

20  A.   Given I -- I don't know the outcome of what that

21      investigation is going to be, I would make the

22      Assistant US Attorney that I would -- I was assigned

23      to work with, I would make that Assistant US Attorney

24      aware of the investigation, but at the same time we

25      don't know what the end result is going to be.  So

1        whether it ends up at the federal level, it's not
2        known.
3   Q.   Okay.  And so just so I'm clear, the -- the process
4        typically is to skip over any other FBI agent or
5        other federal agent and go directly to the US
6        Attorney and communicate with them about the case?
7   A.   I'm not skipping FBI agents.  My -- the communication
8        was opened up, but if full-time FBI agents -- they
9        are fully aware, they were fully aware of the
10       investigation.
11  Q.   Sure.  But you -- you were permitted and you did
12       speak directly with US attorneys.
13  A.   Yes.
14  Q.   And they relied on you for information.
15  A.   Yes.
16  Q.   For truthful and accurate information.
17  A.   Always.
18  Q.   And they used that information in their
19       investigations.
20  A.   I would assume so.
21  Q.   In their court filings.
22  A.   I would assume so.
23  Q.   And you testified in federal grand juries.
24  A.   I have.
25  Q.   Well, let's go back.  You said you assume so.  Have

1       you not read any paperwork of any of these federal

2       investigations?  You haven't read any indictments or

3       any -- anything at all?

4    A.  Are we referring to this case?  What are we referring

5       to?

6    Q.  I'm referring to any case.  You said you assume that

7       the federal US attorneys rely on your information and

8       you assume that they use that information in court

9       documents.  Have you never seen or have you seen any

10      of the information you have provided to federal --

11   A.  Without the information that is provided, those court

12      documents would not exist.

13   Q.  So they use the information that you provide them in

14      court.

15   A.  Correct.

16   Q.  Now, you -- you heard us ask Officer Lowery about

17      this and I -- about warrant execution.  Prior to

18      executing a search warrant, what occurs?

19   A.  That's a very broad question.

20   Q.  Okay.  Let's narrow it to prior executing a search

21      warrant on a home, what occurs?

22   A.  Yet again, it is a very broad question.  I'm not sure

23      how far in -- back in history prior to the search

24      warrant being executed you're looking for.  That's --

25      that's what I'm trying to figure out.

 1  Q.   Okay.  So I'll -- I'll narrow it down further.  Let's
 2       say you've already done an investigation.
 3  A.   Yes, sir.
 4  Q.   It's a lengthy investigation.  You have all of your
 5       probable cause.  You're prepared -- you've -- you've
 6       -- you've -- and let's say you've actually taken it
 7       to a judge.  A judge has signed off on your warrant.
 8       Your warrant is good to go.  What is the next step
 9       after you've received your warrant?  What do you do?
10  A.   I make the SRT commander -- I make him aware of the
11       search warrant being signed.  As far as what the SRT
12       commander does after that point, I'm unsure.  I've
13       never been in his position.  Usually at some point
14       soon after, there is a briefing at the police
15       department where information is exchanged, and soon
16       after that the search warrant is executed.
17  Q.   Okay.  At the briefing, is the SRT commander present?
18  A.   Usually.
19  Q.   And you're saying that after -- you're saying that
20       you have no idea what the SRT commander does with the
21       information you provide them?
22  A.   I've never been in his shoes.
23  Q.   Well -- well, let me ask you this.  At the briefing,
24       are you informed by the SRT commander of how they
25       plan to enter the home?

1    A.    A plan is set in place.

2    Q.    Okay.

3    A.    Yes.

4    Q.    And how does that typically what -- what -- how --

5          what does that look like?

6    A.    That's between the SRT commander -- I -- I have no

7          say in how the S- -- the search warrant is executed.

8    Q.    I know you don't have a say.  I will -- I understand

9          that you're saying you don't have a say in it, but my

10         question is at the briefing is it explained how that

11         process will occur?

12   A.    It is explained how they hope it will occur, but yet

13         things can change at all times.

14   Q.    So do they do things such as say, "Well, you know,

15         these officers are going to go in the front door,

16         these officers are going to go around back.  We're

17         going to use, you know, a hammer to enter the door in

18         this occasion because we believe someone's

19         dangerous"?  Are those types of things --

20   A.    Yes.

21   Q.    -- discussed?

22   A.    Yes.

23   Q.    Okay.  Is there a physical document that is created

24         that outlines the SRT entry plan?

25   A.    I'm unsure.

1    Q.   You've never seen that.

2    A.   I -- I don't recall.

3    Q.   Okay.  What else would be discussed at a briefing

4         like this before entering a home?

5    A.   Any threats that are known; dogs in the residence, on

6         the residence; guns that are known; any children, if

7         they're present or not.  Typically SRT, they will, as

8         you said, make a plan as far as how to make entry to

9         the residence, make a plan as far as how to approach

10        the residence, those type of things.

11   Q.   Do you discuss with SRT if you believe there is drugs

12        or contraband at the residence?

13   A.   At that point it is just for them to execute the

14        search warrant.  Their concern is not drugs.  Their

15        concern is to make entry to the house to secure the

16        residence, execute the search warrant, and then it's

17        turned over to the investigators.

18   Q.   Okay.  How many investigations were you working on at

19        a particular time -- at any given particular time in

20        2018?

21   A.   That would be difficult to say.

22   Q.   More than ten?

23   A.   I have no idea.

24   Q.   You have no idea.

25   A.   No, sir.

1   Q.   You could be working on a hundred.

2   A.   We're talking about four years ago.

3   Q.   Yeah.

4   A.   It would be difficult for me to put a certain number

5        on how many investigations I was --

6   Q.   I'm -- I'm not asking for an exact number.  I'm just

7        saying, is it more than ten?

8   A.   Throughout the entire 2018.

9   Q.   No, in a single time.

10  A.   That could change -- that could change from January

11       to December.

12  Q.   I understand it could change, you know, the same way

13       my caseload is changing.

14  A.   Yes, sir.

15  Q.   I have ten clients one day, I have 12 the next day,

16       but I'm asking for a rough estimate of approximately

17       how many investigations you are typically working on

18       in 2018.

19  A.   Yet again, October -- let's see.  2018.  I'm thinking

20       of 2020 when I went to be sergeant.  2018?  I don't

21       know.  This case here was the only case we worked on

22       from February 2017 to 2018.

23  Q.   Wow.  So when you were -- okay.  So during that time

24       period, you had a single case?  With many -- with

25       many targets, I realize, but --

1    A.    Let me correct myself here.  There were instances
2          where other investigators, they needed assistance
3          with cases that they had going on.  There were times
4          whenever we were pulled from this case to help them.
5          And I remember there being times whenever myself and
6          Lowery were actually pulled from this case to work
7          smaller-profile cases, okay?  But this was the major
8          case, yes.
9    Q.    Okay.  So this was your main case, your main
10         responsibility.  You had other intermittent --
11   A.    Right.
12   Q.    -- responsibilities throughout, things that you
13         helped with.
14   A.    As far as 2018 at one point in time, it would be
15         difficult for me to say how many cases I was working
16         on.
17   Q.    Okay.
18   A.    I'm sorry.
19   Q.    I understand.  That's fine.  You know, but I -- I get
20         your answer is that this was the primary thing you
21         were working on.
22   A.    That is correct.
23   Q.    Okay.  Now, Officer Marsh, if you recall at his
24         deposition stated, "Jason probably gives too much to
25         the job."  Do you recall that?

         1  A.    Not those exact words.

         2  Q.    But something to the effect of that?

         3  A.    Yes.

         4  Q.    What do you think he meant when he said that?

         5  A.    It would be difficult for me to express what he

         6        meant.

         7  Q.    Do you think you give too much to the job?

         8  A.    I think I give what the citizens of Southern Pines

         9        deserve.

        10  Q.    I mean, you -- you've been highly commended at your

        11        job.

        12  A.    Okay.

        13  Q.    Is that -- am I wrong about that?

        14  A.    Some would say that.

        15  Q.    I mean, you received the Ed Harris award, right?

        16  A.    I'm a normal person.

        17  Q.    Did you receive the Ed Harris award --

        18  A.    I did.

        19  Q.    -- with Officer Lowery --

        20  A.    That's correct.

        21  Q.    -- for this investigation?

        22  A.    Yes.

        23  Q.    And in your 2021 evaluation or employment appraisal,

        24        you received very high marks.

        25  A.    Okay.

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 18 of 180

1   Q.   Is that a yes or a no?

2   A.   I -- I would have to look at my performance appraisal

3        to actually say what I received.

4   Q.   Okay.  I'm going to show it to you.  This is

5        Plaintiff's Exhibit DD.  You see where it -- this is

6        your --

7                MR. RUBERT-SCHEWEL:  I've got a copy.

8                MR. JONES:  Okay.

9   BY MR. RUBERT-SCHEWEL:

10  Q.   This is your employment appraisal, right?

11  A.   This is part of it.

12               (Plaintiff's Exhibit DD was identified.)

13  Q.   And it says total rating 29, right?

14  A.   That's correct.

15  Q.   Is that a high mark?

16  A.   I am unsure what the highest mark that could be

17       received.  I'm not sure of that number.  But I would

18       say it is a high mark, yes, sir.

19  Q.   Okay.  And also if we go down there's supervisor

20       summary comments.  The one in the middle is

21       handwritten.  It says, "Nice job thus far, Jason.

22       Keep up the good work and growth!  Chief."

23  A.   Yes, sir.

24  Q.   Now, if we turn it over, there are signatures from

25       the supervisory manager, the department manager, the

1          town manager, and one of them has written -- it's

2          kind of hard to tell -- "Another great review.  Thank

3          you for all you do, Jason!"

4     A.   Yes, sir.

5     Q.   Did you receive high marks in 2022 as well?

6     A.   The current year?

7     Q.   Yes.

8     A.   I'm -- I'm not even sure that -- I'm trying to

9          remember if I've received my performance appraisal.

10         Understand that these performance appraisals are not

11         from January to December --

12    Q.   Uh-huh.

13    A.   -- of that year.

14    Q.   Okay.

15    A.   Okay?  This is on a -- if -- if your appraisal is due

16         in May, then it's going to go from May of '21 to may

17         of '22.

18    Q.   Right.  And I -- I thought that I had seen a document

19         that your -- your 2022 one you were supposed to

20         receive in June.  Did that not occur?

21    A.   I'm not sure.

22    Q.   Okay.  Does this job wear on you?

23    A.   It can.

24    Q.   It can?  In what ways?

25    A.   Depending on what the situation is, depending on what

1       case you're working on, on a personal level.

2   Q.  Uh-huh.  Just -- just -- what do you mean by that?

3   A.  Well, as far as this case goes, I was getting up at

4       two o'clock in the morning on a normal basis to go

5       change tracker batteries out.

6   Q.  Wow.

7   A.  That's after working ten, 12 hours the day before.

8       That will wear on you.

9   Q.  Is that something you were required to do, or was

10      that going above and beyond the call of duty?

11  A.  If you want the case to continue, you need to change

12      the tracker battery out.

13  Q.  Was Officer Lowery doing that as well?

14  A.  He was.

15  Q.  Was Lieutenant Marsh?

16  A.  I don't recall if Lieutenant Marsh assisted with

17      changing batteries out on this case.  He has before

18      in other cases.  But this case in particular, I'm not

19      sure.

20  Q.  And when you would wake up at 2:00 in the morning and

21      go, I presume, to the station to get the batteries to

22      change the tracker, would Lieutenant Marsh also be

23      present?

24  A.  Yet again, I didn't go to the station to get

25      batteries.  If I know that that battery level is

 1          getting low, I'm going to have batteries with me so
 2          that I can go directly to wherever it's at three
 3          o'clock in the morning.
 4     Q.   Would you log in?
 5     A.   Log in?
 6     Q.   Yes?
 7     A.   What do you mean?
 8     Q.   Well, when you get on duty, do you have to tell
 9          someone you're on duty?
10     A.   Yes.
11     Q.   How do you do that?
12     A.   By radio.
13     Q.   Okay.  So would you radio in it to at 2:00 a.m. when
14          you're going to change tracker batteries?
15     A.   Usually, yes.  I don't recall if I did each time, but
16          yes.
17     Q.   Okay.  So usually you would call in.  You would get
18          on the radio and you -- what -- what would you say?
19     A.   My number is 887 and the code to be on duty is 10-41.
20     Q.   Okay.  And was that a common occurrence during this
21          investigation for you to be up at 2:00 a.m. working
22          on the case?
23     A.   If batteries needed to be changed out, yes.
24     Q.   Well, what if there's other stuff that needed to be
25          done?

1   A.   I will do whatever needs to be done for the case to
2        come to a conclusion.
3   Q.   And I guess my question is during the time period of
4        the case, was it common for you to get up in the
5        morning at 2:00 a.m. and work on the case?
6   A.   Not common.
7   Q.   Okay.
8   A.   If that needed to be done based off the battery level
9        of the tracker, it would be done.
10  Q.   When you were investigating this case, were you
11       working seven -- seven days a week on it?
12  A.   No.
13  Q.   How many days a week were you working on it?
14  A.   When you say work on it, you mean 887, I'm 10-41, I'm
15       at the office working on it, or do you mean I am
16       watching tracker locations seven days a week.
17  Q.   Seven days a week?
18  A.   I'm asking.  Which do you mean.
19  Q.   I mean the latter, doing any type of work on it at
20       all?
21  A.   Not usually.  Not usually.  Normally five to six,
22       more along the five range.
23  Q.   Okay.
24  A.   If I'm off, I try to be off.
25  Q.   And you said that you had -- well, you gave an

1         example, I guess, of saying, "I'd been up at two a.m.
2         and the day before I worked a 12-hour day."  Was it
3         typical that you would work a 12-hour day on these
4         cases on the days you worked?
5   A.    It's typical for your hours to range ten to 12 hours
6         each day.  An investigator works four days a week.
7         They're assigned four days a week.  So you're working
8         ten to 12 hours a day every day.
9   Q.    Got it?
10  A.    Not me, only me.  It's every investigator.
11  Q.    Uh-huh.  Okay.  So the typical standard practice is
12        four days a week, ten to 12 hours a day.
13  A.    Yes.
14  Q.    And then you can obviously, like most jobs, you can
15        work in addition and above that if the -- if it
16        requires or if it's needed or if there's things to
17        do?
18  A.    Correct.
19  Q.    Okay.  And I guess this all started with you saying
20        that in some ways that wore on you personally just
21        because it was a lot of work.
22              (Brief pause.)
23  Q.    Do you need me to repeat that question?
24  A.    Yes.
25  Q.    Okay.  There's someone cleaning the windows outside

Case 1:21-cv-00955-WO-JEP  Document 32-3  Filed 11/29/22  Page 24 of 180

1          now.

2                    MR. JONES:  I can warranty you that that was

3                not set up on our part.

4     BY MR. RUBERT-SCHEWEL:

5     Q.   And so you -- we started this line of questioning by

6          you saying or me asking if it had worn on you.  And

7          you said some ways it did personally by the amount of

8          time I was working.

9     A.   Yes.

10    Q.   Were there any other ways that it wore on you

11         personally?

12    A.   I don't recall.

13    Q.   So not the subject matter, not -- not what you were

14         doing, not, you know the fact that you're arresting

15         people or locking people up, that -- that -- that

16         doesn't wear on you?

17    A.   That's my job.

18    Q.   It doesn't -- it doesn't -- I mean, you understand --

19         well, I guess I would say I assume you understand,

20         you know, the impact that it has on people.

21    A.   What do you mean?

22    Q.   Going -- be -- being locked up and having bonds set

23         on them.  You understand the impact that it has on --

24         on someone when that happens.

25    A.   I've seen the impact many times.

1   Q.   And -- and -- and what -- what type of impact is
2        that?
3   A.   It depends on the situation.  It depends on -- it --
4        it varies from person to person.
5   Q.   Is it usually a tough thing for that person and their
6        family --
7   A.   It depends on --
8   Q.   -- when it happens?
9   A.   It depends.  It depends on a number of things.
10       Sometimes they look at you and grin and they'll say,
11       "I'll make a phone call and I'll make bond, and I'll
12       be back at home before you get back to the station."
13  Q.   Uh-huh.
14  A.   It goes from one extreme to the other.
15  Q.   What about if their bond is set at millions of
16       dollars?
17  A.   Okay.
18  Q.   Is that a tougher situation?
19  A.   What do you mean is it a tougher situation?
20  Q.   Well, I mean, you're telling me that it depends on
21       the situation and sometimes people -- it's not a big
22       deal for people and it's not a big deal for their
23       families and it doesn't really matter.  They grin and
24       look at you and they bail out the next day and their
25       case gets dismissed.

1            Have you seen situations where it's different

2        than that and where it is really hard?

3    A.   It's hard on them, I'm sure, yes.

4    Q.   Okay.  And do you -- because of that, or because of

5        the nature of your job and because of the

6        ramifications of it, I presume you -- you take it

7        very seriously.

8    A.   Absolutely.

9    Q.   Did you know Lee Harris, Jr., prior to this

10       investigation?

11   A.   I knew of him.

12   Q.   I mean, had you prosecuted him before?

13   A.   I had not prosecuted him.  I had charged him before.

14       I had cases that he was involved with.  The District

15       Attorney's Office is responsible for the prosecuting.

16   Q.   Sure.  So you were aware even prior to this

17       investigation --

18            MR. RUBERT-SCHEWEL:  Can we just take a

19                five-minute break?

20            MR. JONES:  Yeah.  And, in fact, it is

21                12:0- -- don't want to jump in if -- if

22                this --

23            MR. RUBERT-SCHEWEL:  I think he's going to be

24                done in three minutes.

25            MR. JONES:  Yeah, these are pretty quick, but,

1                          yeah, if you guys want to --
2                    MR. RUBERT-SCHEWEL:  Let's just take a
3                          three-minute break.
4                    (Recess from 12:05 p.m. to 12:12 p.m.)
5        BY MR. RUBERT-SCHEWEL:
6        Q.    All right.  So I was asking you about Lee Harris,
7              Jr., and I believe you stated that you had charged
8              him previously?
9        A.    Yes, sir.
10       Q.    Do you know how many times?
11       A.    Not right off.
12       Q.    Were you aware prior to the start of this
13             investigation that Lee Harris, Jr., sold narcotics?
14       A.    I was aware that he's been charged with that.
15       Q.    Had you charged him with that?
16       A.    I had.
17       Q.    Approximately what year?  Was it approximately --
18       A.    2013.
19       Q.    Thank you.  Had you arrested or charged Lee Harris,
20             Jr., on other occasions?
21       A.    I don't recall any other occasions.
22       Q.    Had you -- apart from this investigation and apart
23             from 2013, had you heard of Lee Harris, Jr., selling
24             drugs from other officers or other informants Or had
25             you witnessed it at all on other occasions?

1  A.   It's a three-part question you just asked.

2  Q.   Well, we can start with one.  Had you heard of Lee

3       Harris, Jr., selling drugs?

4  A.   The name had came up, yes, sir.

5  Q.   With informants?

6  A.   Yes, sir.

7  Q.   With other witnesses?

8  A.   Normally a witness is an informants typically.  I

9       don't know what you're looking for there.

10 Q.   That's a fair enough answer.

11 Q.   What about from other officers?

12 A.   A normal officer isn't really going to have knowledge

13      of who's selling drugs.  That type of talk really

14      didn't come about until I started working narcotics

15      in 201.

16 Q.   When you started working narcotics, how many

17      informants would you have at any one time?

18 A.   I'm sorry, but that is -- yet again, it's a hard

19      answer to give.

20 Q.   More than five?

21 A.   Yes.

22 Q.   More than ten?

23 A.   There was potential.

24 Q.   And these informants, were they typically paid

25      informants, or were they working off a charge?

1    A.    Both.
2    Q.    And how would they be paid?
3    A.    Through the funds of either the sheriff's department
4          or the Southern Pines Police Department.
5    Q.    And that money would be released to you and then you
6          would then pay the informant?
7    A.    That's correct.
8    Q.    What would you typically pay an informant for
9          providing you with information that led to a drug
10         seizure?
11   A.    Very broad question.  It all depends on the
12         situation.
13   Q.    Okay.  Does it depend on the amount and the type of
14         product that you seize?
15   A.    Yes, but this would not happen overnight type thing,
16         if that's what -- not at all.
17   Q.    What do you mean by that?
18   A.    I'm not going to meet Joe -- Joe Blow on the street
19         and offer him money to go buy drugs from John Smith.
20         This -- it builds up to an investigation.
21   Q.    Because you need to trust the informant.
22   A.    That's correct.
23   Q.    Okay.  You stated that Lee Harris, Jr., was charged
24         in 2013 by you for selling narcotics.
25   A.    Yes.

1    Q.    What type of narcotics?

2    A.    Cocaine.

3    Q.    Okay.  And how -- in that case, did you have video

4          footage of him selling narcotics?

5    A.    I don't recall.

6    Q.    Do you recall if there was a confidential informant

7          who was used to purchase narcotics from Lee Harris,

8          Jr.?

9    A.    I don't recall.

10   Q.    Was he convicted at trial of that offense?

11   A.    I don't recall.

12   Q.    Were you present at trial?

13   A.    I'm sure I was.

14   Q.    And so you don't recall him being acquitted at trial.

15   A.    Sitting here today, I'm -- I don't recall what the

16         outcome was.

17   Q.    Do you recall Lee Harris, Sr., being present at that

18         trial?

19   A.    Going back to your previous question, I've -- I've

20         been thinking about it since you asked it.  I'm not

21         sure "acquitted" would fit.  I -- I want to say it

22         was a hung jury.

23   Q.    Okay.

24   A.    Yes, sir.

25   Q.    Did that upset you?

1   A.   No.

2   Q.   You didn't care.

3   A.   It is what it is.  I have a job and it's his right to

4        take it before a jury, and that's what he chose to

5        do.

6   Q.   Even though you're spending hours and hours building

7        these cases and putting your life into it, it doesn't

8        bother you.

9   A.   (Shook head negatively.)  Move on to the next.

10  Q.   Do you recall Lee Harris, Sr. being at that trial?

11  A.   I remember him being there some.  I'm not sure how

12       often.

13  Q.   Do you recall him being involved at all in the

14       defense?

15  A.   I can't answer that question.  I -- I'm -- his

16       involvement I'm not sure of.  As far as the defense

17       goes, that's beyond my knowledge.

18  Q.   Are you aware -- well, you stated you were aware

19       earlier of a lawsuit from an individual named Arthur

20       Darby.

21  A.   I did not mention Arthur Darby earlier, but yes, that

22       is the one I was referring to.

23  Q.   Who is Arthur Darby.

24  A.   It's been a number of years since I have talked with

25       Arthur Darby.  He was a local resident of Moore

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 32 of 180

 1        County.  I don't know how to explain who he is
 2        necessarily, but I've met him through my job.
 3   Q.   Around 2013, did you ask Arthur Darby to work for you
 4        as a confidential informant or as an informant at
 5        all?
 6   A.   I don't recall.
 7   Q.   I'm going to show you an affidavit signed by Arthur
 8        Darby.  And --
 9             (Mr. Rubert-Schewel and Mr. Davis conferred.)
10   BY MR. RUBERT-SCHEWEL:
11   Q.   So this is going to be Exhibit SS.  Have you seen
12        this document?
13   A.   (Witness reviews document.)  I am unsure only because
14        at the top of this document it has Lee Marvin Harris,
15        Sr., as the plaintiff versus the Town of Southern
16        Pines.  Hang on.  So this is -- I understand what it
17        is, yes, sir.
18             (Plaintiff's Exhibit SS was identified.)
19   Q.   How about -- read it to yourself.  Will you read the
20        full thing to yourself and then I'll ask you
21        questions about it, okay?
22   A.   Yes.  I gotcha.  (Witness reviews document.)  Okay.
23   Q.   Have you seen this document?
24   A.   Yes.
25   Q.   When did you see it?

1   A.   I would say approximately three to four weeks ago.

2   Q.   Okay.  So did your attorney show you this document?

3   A.   Yes.

4   Q.   And in this document, Arthur Darby -- in this --

5        sorry.  In this -- in this affidavit Arthur Darby

6        states under -- under oath that:

7              "I was approached by Southern Pines Police

8              Department Officer Jason Perry and asked to

9              become a confidential informant and

10             specifically to provide information on Lee

11             Marvin Harris, Jr., and any known drug activity

12             in the area."

13             And your testimony is that you do not recall

14        asking Arthur Darby to become an informant.

15  A.   Sitting here today, I do not recall that.

16  Q.   What do you -- you stated earlier that you met him

17        through your job.  What do you recall about meeting

18        him through your job?

19  A.   Okay.  This was apparently nine years ago that he's

20        saying I approached him.  My only recollection of

21        Arthur Darby was a traffic stop near the airport.  I

22        have researched Arthur Darby since learning of this

23        document.  I could not find any documentation where

24        he was charged with anything or where he could have

25        been charged with anything or why he would even be a

1        potential informant is -- I do not remember having
2        this conversation with him.
3   Q.   Okay.  So you don't have an informant file on Arthur
4        Darby.
5   A.   No.
6   Q.   Okay.  On line 4 it states:
7                "After the first encounter and request, I was
8                confronted by Officer Perry on more than two
9                occasions where I was offered $50 for every
10               person that I gave him information on."
11  A.   Yes, it does.
12  Q.   On line 5, the next page, it says:
13               "Even after I repeatedly told him that I had
14               no information to give Officer Perry made
15               numerous attempts to coerce me into falsifying
16               evidence to help build his cases, and I
17               refused every offer."
18  A.   Yes, it does.
19  Q.   Do you recall doing that?
20  A.   For me not to even remember having any conversation
21       with Arthur Darby about being an informant, that
22       would give the follow-up answer that I don't remember
23       offering him $50 for information he gives on people
24       or me attempting to coerce him into falsifying
25       evidence to help build my case.  No.

1    Q.   You're saying you don't recall that happening.

2    A.   No, I do not.

3    Q.   Okay.  Are you familiar with an individual named

4         Martha Dickerson?

5              (Mr. Rubert-Schewel and Mr. Davis conferred.)

6    Q.   This is Exhibit CC.  I'm going to hand you this so

7         you can look over it.

8              (Plaintiff's Exhibit CC was identified.)

9    Q.   And I -- I guess actually before you look over it,

10        why don't you tell me who is Martha Dickerson?

11   A.   Mother-in-law of Lee Harris, Sr.

12   Q.   And where does she reside?

13   A.   I don't know where she currently resides.

14   Q.   In 2018, where did she reside?

15   A.   Yet again, I'm not sure.  I know it sounds crazy for

16        me -- me not to be sure where she lived in 2018.  Her

17        listed address is 823 West New York Avenue.

18   Q.   Okay.

19   A.   Now, whether she's living there, I have no idea, sir.

20   Q.   Okay.  But are you aware that she lived there at some

21        point?

22   A.   At some point she has.

23   Q.   Okay.

24   A.   Yes.  I'm sorry.  I -- I'm trying to be direct with

25        my answers --

1    Q.    That's fine.

2    A.    -- and very --

3    Q.    That's fine.  I know you can't say for one -- with

4          100 percent certainty, but it's -- you know.  It's

5          her listed address.

6    A.    Yes, sir.

7    Q.    Okay.  What interactions have you had with Martha

8          Dickerson?

9    A.    Only one interaction that I can think of was a search

10         warrant that was executed at her residence.

11   Q.    Okay.  And why did you execute a search warrant at

12         her residence?

13   A.    Probable cause had been established for a search

14         warrant at her residence.

15   Q.    Based off of what?

16   A.    As I'm sitting here now, this search warrant was in

17         2013.  I don't recall the exact probable cause that

18         led to that search warrant.

19   Q.    Was it drug-related?

20   A.    Yes.

21   Q.    Okay.  Was it related to her son?

22   A.    Do you have a name?

23   Q.    Edwin Dickerson.

24   A.    Yes.

25   Q.    As part of that investigation and after the execution

1          of that search warrant, did you arrest Ms. Dickerson?
2    A.    Yes.
3    Q.    Did you arrest Ms. Dickerson because she would not
4          provide evidence for you against her son?
5    A.    No.
6    Q.    Did you tell Ms. Dickerson "We are working on you to
7          get your son"?
8    A.    No.
9    Q.    Why did you arrest Ms. Dickerson?
10   A.    Based off the amount of drugs that were located at
11         823 West New York Avenue.  That was her residence at
12         the time, along with her son, Edwin Dickerson.
13         Through interviews, nobody claimed the six ounces of
14         cocaine that was located in her living room.
15         Everybody that had access to those drugs was charged.
16   Q.    Were you aware at the time or had you observed Edwin
17         Dickerson selling narcotics?
18   A.    Had I personally observed this?
19   Q.    Were you -- or were you aware of him selling
20         narcotics?
21   A.    That's what the search warrant was based off of.
22   Q.    So you knew that he was selling narcotics or you had
23         probable cause to believe that Edwin Dickerson was
24         selling narcotics.
25   A.    That's correct.

1    Q.   Okay.  And did you say anything similar to "We are

2         working on you to get to your son"?

3    A.   That statement -- I have read this before.  That

4         statement does not even make sense to me.  Why would

5         I say, "We are working on you to get to your son"?  I

6         believe --

7    Q.   Well --

8    A.   -- I believe at this time her son had already been

9         arrested.

10   Q.   Well, could you have said something to the effect of

11        "We are arresting you so you will give us information

12        on your son"?

13   A.   No.

14   Q.   You're saying --

15   A.   No.

16   Q.   -- you did not say that or are you saying you could

17        not have said that?

18   A.   You just asked did I say "We are arresting you unless

19        you give information on your son."

20   Q.   Or to get information on your son?

21   A.   No.

22   Q.   Okay.  You're saying you did not say that.

23   A.   I -- that is not something I would say.

24   Q.   Okay.  And that's not something you would do either,

25        right?

 1   A.   No.

 2   Q.   How about Tracy Williams?  Are you familiar with

 3        Ms. Williams?

 4   A.   I know of her.

 5   Q.   What do you know about her?

 6   A.   Heavy drug user, used to be.  Not currently.  I have

 7        no idea.  Many, many years ago I talked to her.

 8   Q.   Okay.  And how do you know that she was a heavy drug

 9        user?

10   A.   Through working with the police department for many,

11        many years.  My first recollection of Tracy Williams

12        was Thanksgiving of probably 2008, somewhere in

13        there.  I was on mechanic street.  She had an active

14        warrant.  I recognized her.  She was coming from the

15        West New York Avenue area -- possibly from Edwin

16        Dickerson's house, I believe.  She was walking down

17        the street.  And I got out with her in regards to the

18        active warrant she had and she became sick very

19        quickly.  She threw up all over the back of my car.

20        And that is something I will never forget.  So that

21        -- Tracy Williams is still --

22   Q.   Sticks out?

23   A.   The story -- story behind that is there turkey and

24        dressing all over the trunk of my car.

25   Q.   Okay.  How many interactions did you have with her

1          after 2008 in that throw-up incident?

2     A.   Not -- not very many that I remember.

3     Q.   And let me -- let me just back up a second to Martha

4          Dickerson.  Have you ever observed Martha Dickerson

5          selling narcotics?

6     A.   No.

7     Q.   Have you ever heard that she sold narcotics?

8     A.   No.

9     Q.   Have you ever -- I'll strike that question.  So

10         essentially, then, Martha Dickerson was charged

11         entirely off of a constructive possession theory that

12         the drugs were in a home that she was listed as an

13         owner of.

14              MR. JONES:  Object to the form.

15    A.   It was her listed address.  She also had belongings

16         there, and I believe her son told me that she lives

17         there.  So --

18    BY MR. RUBERT-SCHEWEL:

19    Q.   But did she have large amounts of cash?

20    A.   I don't recall what -- what exactly was located as

21         far as cash is concerned.

22    Q.   Okay.  Any other facts that you recall that led you

23         to arrest Ms. Dickerson and charge her with the

24         narcotics that were found in her home?

25    A.   I believe that sums it up.

1   Q.   Okay.  So back to Ms. Williams.  Are you familiar
2        with an affidavit that Ms. Williams provided in 2013
3        related to the prosecution of Edwin Dickerson?
4   A.   I have seen this, yes.  Well, I have seen that.  I do
5        not have it in front of me yet.
6   Q.   And are you aware of the text messages or the text
7        message exchange that she provided that occurred
8        between you and herself?
9   A.   I am aware of apparently what she has typed in as
10       text messages between me and her, yes.
11  Q.   Did you ever see those original text messages?
12  A.   I don't recall.
13  Q.   So is it -- is it your testimony today that you did
14       not send these text messages?
15  A.   It is my testimony that I text -- send text messages
16       to informants or potential informants all the time.
17       What consists of those text messages, without seeing
18       the original form, a picture of a cell phone showing
19       the conversation between myself and her, I can't say
20       for certain that all those text messages were my
21       words.
22  Q.   When you were assigned to narcotics, were you
23       assigned a Southern Pines cell phone?
24  A.   Yes.
25  Q.   How long did you use that cell phone for?

1   A.   I'm not sure.

2   Q.   Do you still have the same number --

3   A.   No.

4   Q.   -- today?

5   A.   No.

6   Q.   Do you know when your number changed?

7   A.   I no longer have a phone by the Southern Pines Police

8        Department.

9   Q.   When did you lose access to your phone?

10  A.   Whenever I stopped working narcotics and I was

11       assigned -- promoted to a sergeant as Director of

12       Patrol.

13  Q.   What year was that?

14  A.   2020.

15  Q.   Okay.  So when you were in narcotics, you were

16       narcotics in the Investigations Division.

17  A.   Yes, sir.

18  Q.   So you're saying, just -- just so I'm clear on your

19       testimony, is that you're not sure if you sent these

20       text messages or not.  You would have to see the

21       originals or a -- or a picture of the originals.

22  A.   The context of what is being displayed in those text

23       messages, I'm not comfortable saying that that's

24       exactly what I had --

25  Q.   Okay.

1    A.    -- in text messages.  I would -- I would need to see

2          the original to confirm that.

3    Q.    Okay.

4    A.    Either through my phone, her phone, someway.

5    Q.    Do you recall telling Ms. Williams that if she did

6          not wear a wire you would make sure that she spent a

7          lot of time in prison?

8    A.    That doesn't sound like something I would say.

9    Q.    Do you recall saying that?

10   A.    No, I don't.

11   Q.    Do you recall telling her that you would lock her up

12         if she did not cooperate?

13   A.    No.  With that, I don't even remember what led me to

14         have discussions with her.  A person that stands to

15         be a potential informant, sometimes they have charges

16         that they can be charged with.  If she did, I'm not

17         sure.  But a person like that, it's their decision if

18         they want to follow through with the --

19   Q.    Cooperation agreement.

20   A.    -- being charged or whether they want to cooperate

21         and provide information.  Now, it's normal for me to

22         advise them of what type of outcome they might have

23         depending on what their record is like.  That's

24         normal.  As far as -- I'm not going to say, "If you

25         don't cooperate, you're going to prison for a long,

1        long time."  Not a lot.

2   Q.   But you could say what?

3   A.   I can make suggestions that this is probably what

4        will happen.  "This -- this could happen.  This is

5        what I've seen happen in the past."  But I'm not

6        going to threaten somebody to say, "If you don't

7        cooperate, you're going to prison for a long, long

8        time."

9   Q.   And what you've seen happen in the past is that you

10       will be charged and prosecuted for what you were

11       caught with or whatever you were charged with

12       originally, and that could cause you to go to prison.

13  A.   It could, yes.

14  Q.   So you could say something like that.

15  A.   In that -- not necessarily in that fashion, but I --

16       I want them to be aware of the potential of what they

17       could be charged with, yes.

18  Q.   What fashion would you say it?

19  A.   It all depends on the situation.  It depends on what

20       has led up to our discussions.

21  Q.   Did you tell Tracy Williams to erase every message?

22  A.   I don't recall if I told her to erase every message.

23       Yet again, it is normal for any narcotics detective

24       to express to potential informants to erase messages,

25       especially if they're not using their own phone

1          because you want that person to remain confidential.

2          That's -- that's the name of it.  And if they don't

3          erase their messages, then there stands a chance of

4          somebody else finding out.

5     Q.   Did you say, "Hey girl!  What's your decision?"

6     A.   I don't recall.

7     Q.   Is that normal to say?

8     A.   (No audible response.)

9     Q.   Is that normal --

10              COURT REPORTER:  I'm sorry?

11    Q.   -- for you to say?

12    A.   I don't recall if I said that or not.  I would need

13         to see the original format of the text messages.

14    Q.   My question is just if that's normal for you to say.

15    A.   Could it have been said?  Yes.

16    Q.   Over the years you've received training in narcotics

17         and drug investigations.

18    A.   Yes.

19    Q.   And that's field training --

20    A.   Yes.

21    Q.   -- as well as -- I guess I would say class training?

22    A.   Yes.

23    Q.   Have you also received training on interrogating or

24         questioning witnesses?

25    A.   Yes.

1  Q.   Who at the Southern Pines Police Department has

2       provided you field training in investigations?

3  A.   I -- I'm not sure if you're looking for an answer as

4       to whenever I first became an investigator.  If

5       you're looking for that answer, I have no memory of

6       that.  Field training, you're in the field.  I was in

7       the narcotics field from 2012 until 2020, and so many

8       people came along, they come and go, and taught me

9       things.

10 Q.   Could you just give me a couple names of some

11      officers who provided you with field training?

12            MR. JONES:  Are you talking about general --

13 BY MR. RUBERT-SCHEWEL:

14 Q.   From 2012?

15 A.   Right.

16            MR. JONES:  Formal training or -- or on --

17            MR. RUBERT-SCHEWEL:  No, on field training.

18            MR. JONES:  Okay.

19            MR. RUBERT-SCHEWEL:  Field training.

20 A.   Field training in the field, on-the-job training.

21      That's what you're --

22 BY MR. RUBERT-SCHEWEL:

23 Q.   That's what I'm asking for.

24 A.   From Southern Pines Police Department.

25 Q.   Yes.

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 47 of 180

1  A.    I know this sounds crazy.  Whenever I was first

2        assigned as narcotics detective, I was sent to the

3        Moore County Sheriff's Office.  Okay.  Most of my

4        narcotics tenure was not at the Southern Pines Police

5        Department.  So most of what I've learned was through

6        the Moore County Sheriff's Office.

7  Q.    Okay.

8  A.    Yes, sir.

9  Q.    Have you received any field training from any

10       officers at the Southern Pines Police Department

11       including Officer Lowery?  Has he provided you any

12       field training?

13 A.    If you work one-on-one with a person day in and day

14       out, he -- he can teach me stuff that I wasn't aware

15       of, no matter how minor or severe this -- if he knows

16       something that I'm not sure of, he can teach me.

17 Q.    So just tell me this.

18 A.    I'm not sure exactly what you're --.

19 Q.    How many officers are -- are -- were in

20       investigations in 2018?  Approximately?

21 A.    I believe there were six assigned detectives,

22       lieutenant, and a sergeant.

23 Q.    Okay.  Let's go over that.  That when -- so we know

24       that it was Lieutenant Marsh, Officer Lowery, Perry

25       yourself.  Who are the other ones?

1   A.   Sergeant Edwards.

2   Q.   Okay.

3   A.   Detective Chris Garner.  Detective Chris Coleman.

4        And there have been quite a few investigators that

5        have came in to Investigations.  They only stay for

6        six months to a year and then they move on.

7   Q.   Who were the most senior officers of those who you

8        just listed?

9   A.   Coleman, Marsh, Edwards.

10  Q.   Did Coleman, Marsh, and Edwards all provide you with

11       field training at some point?

12  A.   At some point from 2012 on?

13  Q.   Yes.

14  A.   I'm sure they've taught me something.

15  Q.   Okay.  What about Gardner?

16  A.   I'm sure he's taught m something.

17  Q.   You've worked with all these officers in the field at

18       some point.

19  A.   Yes.

20  Q.   You've worked with all these officers doing drug

21       investigations at some point.

22  A.   I was never assigned to work drug investigations with

23       Captain Marsh or Sergeant Edwards or Detective

24       Coleman.  I worked narcotics investigations with

25       Lowery.  And the only one among that list that I

1       worked, Chris Garner.  I did work investigations with

2       him.  Those are the only two.

3    Q.  Okay.  Marsh, though, was your supervisor, right?

4    A.  Yes.

5    Q.  Would he give you instructions and advice and per se

6       training on what to do during drug investigations?

7    A.  Recommendations.

8    Q.  Was he ever out with you in the field?

9    A.  Yes.

10   Q.  He was out with you on occasion doing surveillance.

11   A.  Yes.

12   Q.  He was out with you on occasion making arrests.

13   A.  Yes.

14   Q.  And doing search warrants.

15   A.  Yes.

16   Q.  Or executing search warrants.  So as we've touched

17      on, this case obviously involves drug possession and

18      trafficking charges.  Now, you have had cases before,

19      in addition to this one, where drugs were found on a

20      person --

21   A.  Yes.

22   Q.  -- or where you actually observed a hand-to-hand

23      sale --

24   A.  Yes.

25   Q.  -- or some other type of sale.

1    A.    Yes.

2    Q.    But here, the drugs at issue were found in a

3          non-functioning vehicle.

4    A.    Yes.

5    Q.    Have you received training, including field training

6          or experience in the field, on this type of case

7          involving a constructive possession theory.

8    A.    Have I received training?

9    Q.    Or do have experience in addition to this case where

10         drugs are found in an area such as a home or a car, a

11         locker, and you cannot directly attribute this

12         someone to possessing the drugs?

13   A.    Experience, yes.

14   Q.    Okay.  What -- what types of cases have you

15         experienced that in?

16   A.    Much like the case at hand.

17   Q.    Homes?

18   A.    Property, yes, sir.

19   Q.    Cars?

20   A.    Yes.

21   Q.    You've done car stops where you found something in

22         the car with multiple people in the car.

23   A.    Yes.

24   Q.    And in that type of situation or the home type of

25         situation, what factors do you consider in deciding

 1       who to charge with the contraband?

 2   A.   It -- that is a very broad question, depending on the

 3        situation that you take different factors into

 4        account.

 5   Q.   So I'll give you the specific situation.  There is a

 6        car.  You stop the car.  There are multiple people in

 7        the car.  There is a gun found in the center console

 8        of the car.  There's four people in the car.  What

 9        factors do you consider in addition to what I've just

10        said in deciding who to charge with that firearm?

11              MR. JONES:  Assuming there's a violation.

12              MR. RUBERT-SCHEWEL:  Assuming it's an illegal

13                  firearm.

14   A.   I would take statements into account, anything I

15        observed with my own eyes.  Access.

16   BY MR. RUBERT-SCHEWEL:

17   Q.   What do you mean by access?

18   A.   Was his in the center armrest console.

19   Q.   Well, I was -- I -- good question.  I was saying in

20        the center front console.

21   A.   Under the stereo type console?

22   Q.   No.  I was saying on the armrest on the center front?

23   A.   Okay.  So in -- basically in the center of the car.

24   Q.   In the center of the car.

25   A.   All four people would have direct access to that.

1   Q.   Any other factors you would consider?

2   A.   Potentially, you could take into account if any

3        latent fingerprints were on that gun.

4   Q.   DNA?

5   A.   Yes.

6   Q.   What about if the -- let's say hypothetically there

7        was no top to the console.

8   A.   Okay.

9   Q.   Would that contribute to your decision?

10  A.   If the top was missing, it would make the rear

11       occupants more accessible to that area.

12  Q.   Potentially, it's also in plain view?

13  A.   Plain view to me?

14  Q.   To the -- to the rear occupants and to the front

15       occupants.

16  A.   Yes.  It will also be in plain view to me as I'm

17       approaching the car.  Yet again, it all depends on

18       the situation.  If everybody in the car is not a

19       convicted felon and that gun is not obscured in some

20       way and I can see it, there's no crime that's

21       occurred.

22  Q.   Right.  I'm just assuming we're talking about a case

23       where a crime's occurred.  So let's say it's heroin

24       in the car in the center console.

25  A.   Okay.

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 53 of 180

1   Q.   If it's heroin, are there other factors you'd

2        consider?

3   A.   Accessibility, statements, what I observed --

4   Q.   Cash?

5   A.   -- any -- any physical evidence.  That could play a

6        factor.

7   Q.   Why would cash play a factor?

8   A.   Well, yet again, the heroin:  how was it packaged?

9        What amount of heroin are we talking about?  Are we

10       talking about a user amount, seller amount, was it in

11       three different bags, one bag?  All this plays a

12       factor into how it -- if it was there for use or if

13       it was there for distribution.  A lot of factors go

14       into this.

15  Q.   Can you also use packaging to potentially determine

16       the source of the heroin?

17  A.   It all depends on what I'm explaining.

18  Q.   Is it possible?

19  A.   It's possible.

20  Q.   Why?

21  A.   Without having further details, it's -- I can't give

22       you an answer as to why it would be possible.

23  Q.   Let's say you had been doing surveillance of the

24       vehicle --

25  A.   Okay.

1    Q.    -- and you had seen Person X earlier that day going

2          -- what appeared to be hand-to-hand transaction with

3          Person Y and then go and get into that vehicle.  You

4          arrest Person Y.  Person Y has heroin that's packaged

5          the same as the heroin you then later find in the

6          vehicle --

7    A.    Okay.

8    Q.    -- with Person X?

9    A.    Yes.

10   Q.    Would that be a significant factor?

11   A.    Absolutely.

12   Q.    Why?

13   A.    Based off what I observed previously.

14   Q.    And that would tell you that Person Y was in all

15         likelihood the supplier of the heroin.

16   A.    Okay.

17   Q.    I'm asking.

18   A.    It could go both ways.

19   Q.    It could go both ways.  Person X could have supplied

20         it --

21   A.    Yes, sir.

22   Q.    -- to Person Y.  Fair enough.  And I guess, you know,

23         part of the point is that these are not really

24         clear-cut cases.  They are -- they are somewhat

25         difficult cases to determine if many individuals are

1          involved who is -- should be charged with a crime.

2    A.    Yes.

3    Q.    Have you ever threatened to arrest someone if they

4          did not provide you with information about

5          contraband?

6    A.    I don't recall.

7    Q.    How about an informant who was working off charges?

8    A.    Threaten is such a harsh word.  I would make them

9          aware of the potential charges that they can have.

10         I'm -- I'm not going to force anybody to do anything.

11         It's of their own regard of whether they want to or

12         not.

13   Q.    Have you ever threatened to arrest an innocent person

14         who -- if they did not provide you with information?

15   A.    I would have no reason to threaten an innocent

16         person.  I don't threat.  If this person is innocent,

17         I have no opportunity to even explain to them what

18         potential they have of being charged with something

19         if they've done nothing wrong.

20   Q.    Well, you can talk to an innocent person, right, as a

21         police officer?

22   A.    Yes.

23   Q.    So I guess my -- my -- my question is just have you,

24         in the same way you told a CI who's working off

25         charges what the consequences are for refusing to

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 56 of 180

         1          cooperate with you, have you ever told an innocent
         2          person that they can be arrested if they refuse to
         3          cooperate?
         4    A.    If they're innocent, I'm not going to say, "These
         5          will be the repercussions if you don't cooperate."
         6    Q.    So the answer is no?
         7    A.    I don't recall.
         8    Q.    Well, is it no or you don't recall?
         9    A.    I -- I can't think of a situation where I would ever
        10          do that.
        11    Q.    So you don't remember.
        12    A.    I don't recall.
        13    Q.    Okay.  And have you ever arrested someone for
        14          refusing to give you information about contraband?
        15    A.    Have I ever arrested someone for refusing to give me
        16          information about contraband.  Them refusing to give
        17          me information about contraband is not a crime.
        18    Q.    I'm -- I'm not saying it is.  I'm just asking have
        19          you ever arrested someone for refusing to give you
        20          information about contraband?
        21    A.    I have arrested folks that did not wish to cooperate,
        22          if that's what you're asking.
        23    Q.    Have you ever arrested an innocent person for
        24          refusing to give you information about contraband?
        25    A.    I can't think of an example that I would have

1     arrested an innocent person, whether they're giving
2     information or not.
3 Q.  So in your mind you -- you -- I mean, you -- would
4     you concede that wrongful arrests and wrongful
5     convictions sometimes do occur in police work?
6 A.  Whenever I make an arrest, I'm not there to say this
7     person's guilty, you must be arrested.  I am there to
8     say there's probable cause that's been established.
9     I'm not there to say, "You're innocent, but yet I'm
10    going to arrest you anyway."
11 Q. Okay.  And so my question is, would you concede that
12    sometimes police officers are wrong about probable
13    cause and sometimes police officers make mistakes
14    about probable cause?
15 A. That is difficult for me to answer amongst all police
16    officers.  I am responsible for the decisions I make.
17 Q. Well, let me ask you a different way.  Do you think
18    any police officer ever has falsely arrested someone,
19    arrested someone without probable cause in the
20    history of the United States?
21 A. I'm sure it's happened.
22 Q. Okay.  Do you think it's ever happened in Southern
23    Pines?
24 A. That's difficult for me to answer.
25 Q. I mean, Southern Pines police officers have probably

1       made, what, 10,000 arrests over the years?  100,000

2       arrests?

3    A.   I have no idea.

4    Q.   You don't think a single one of those was made

5       without probable cause?

6    A.   I can speak what I am involved with.

7    Q.   Do you think you have ever made an arrest without

8       probable cause?

9    A.   No.

10   Q.   Have you ever arrested someone because you believed

11      they could give you information and would be more

12      forthcoming if they were charged with a crime?

13   A.   I can't think of a situation where that's occurred.

14   Q.   Have you ever seen other officers in the Southern

15      Pines Police Department use any of the tactics that

16      we just discussed?

17   A.   No.

18   Q.   In 2017 and 2018, were you in charge of your own

19      investigations.

20   A.   In regards to drug investigations, myself and

21      Detective Lowery worked those cases together.  It was

22      a joint effort.

23   Q.   Would either of you be considered the lead

24      investigator?

25   A.   There were multiple search warrants, arrests from

 1          2017, 2018 you're talking about --
 2     Q.   Well, let's --
 3     A.   Or --
 4     Q.   Of Operation Leader?
 5     A.   Okay.  One was not the lead detective over the other.
 6          That is my opinion.
 7     Q.   So you two were equally in charge?
 8     A.   We worked together.
 9     Q.   And I think you were here when I asked Kyle Marsh
10          this.  As your supervisor, did Kyle Marsh have the
11          power to stop you from making an arrest?
12     A.   I believe his answer to that was if it's a wrongful
13          arrest or probable cause has not been established,
14          absolutely he has the power to overstep that, yes.
15     Q.   He can intervene and stop you.
16     A.   Yes.
17     Q.   And you agree with that.
18     A.   Yes.
19     Q.   He could overrule your decision.
20     A.   Yes.
21     Q.   In your experience in narcotics, did any supervisor
22          ever overrule your decision or stop you from making
23          an arrest?
24     A.   I can't recall.
25               MR. RUBERT-SCHEWEL:  It's one o'clock.  Do we

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 60 of 180

1                    want to keep going for a little longer, or

2                    do you want to break for lunch?

3              MR. JONES:  Do you have a --

4              THE WITNESS:  I'm good.

5              MR. JONES:  -- recommendation?

6              MR. RUBERT-SCHEWEL:  Do you want to keep going

7                    a little longer?

8              THE WITNESS:  I don't care.  That's a thick

9                    sheet -- thick bunch of papers there.

10             MR. RUBERT-SCHEWEL:  So let -- let's -- let's

11                    go --

12             THE WITNESS:  If we want to get done --

13             MR. RUBERT-SCHEWEL:  -- Let's go five more

14                    pages.

15             MR. JONES:  Madam Court Reporter, are you all

16                    right with that?

17             COURT REPORTER:  I'm fine.

18             MR. JONES:  All right.  That's fine.

19             COURT REPORTER:  Thank you for asking.

20             MR. RUBERT-SCHEWEL:  And then you can tell us

21                    where to get a sandwich.

22   BY MR. RUBERT-SCHEWEL:

23   Q.   Did you know Lee Harris, Sr., prior to this

24        investigation?

25   A.   I knew of him.

1  Q.   What did you know about him?

2  A.   The father of Lee Harris, Jr.

3  Q.   What was your relationship like with Lee Harris, Sr.?

4  A.   There wasn't one.

5  Q.   What does that mean?

6  A.   A relationship, I would say you talk on a normal

7       basis.

8  Q.   Well, you recall an interview that you did with Lee

9       Harris, Sr., in your squad car on the day he was

10      arrested.

11 A.   Yes.

12 Q.   And in that interview you told him something to the

13      effect of, "The last couple of times I've seen you,

14      you've been really nice to me.  We've had a good

15      relationship."

16 A.   I don't remember saying we've had a good

17      relationship, but I remember we discussed those

18      interactions, yes, sir.

19 Q.   So what did that mean to you when you were telling

20      him that?

21 A.   That had no -- it didn't mean anything to me.  I was

22      just covering our previous encounters.  That's all.

23 Q.   Well, let me -- let me back up a little bit, I guess.

24      You were here when Officer Marsh said that it is

25      legal to lie to witnesses.

 1   A.   Yes.

 2   Q.   Do you believe that to be true?

 3   A.   Yes.

 4   Q.   When you were telling Lee Harris, Sr., that, that the

 5        last couple a couple of times you'd had good

 6        interactions with him, was that true?

 7   A.   Without listening to that exact recording, it would

 8        be difficult for me to say what -- repeat what I said

 9        verbatim in that interview.  I can sit here now and

10        tell you that previous to this case, and even since

11        this case, if I was to meet Lee Harris, Sr., in the

12        -- out in public, I would be more than cordial

13        towards him.  Previous to this case, it is my opinion

14        that those encounters were very friendly.

15   Q.   Okay.

16   A.   Yes.

17   Q.   So then what you were saying was true?

18   A.   Yes.  If I said that, then yes, it was true, because

19        that's my opinion now.

20   Q.   Right.

21   A.   So I'm not -- have no reason to -- (no further

22        response).

23   Q.   Okay.  And over the years, approximately how many

24        interactions have you had with Lee Harris, Sr.?  More

25        than ten?

1   A.   I wouldn't say so.

2   Q.   Okay.  Less than ten.

3   A.   Yes, sir.

4   Q.   And how many of those would you say have been

5        negative interactions?

6   A.   I can think of two.

7   Q.   Okay.  Can you tell me which two those are?

8   A.   The first was Kendrick Purcell, marijuana plants in

9        the closet.  Lee Harris, Sr., was in the yard.

10  Q.   What -- what's the first one?  Or sorry.  What's the

11       second negative interaction?

12  A.   I believe that one was the most recent.  Prior to

13       that was the search warrant in 2013 involving his son

14       where I charged his son with drugs.

15  Q.   Was there also a 2009 car stop of Lee Harris, Jr.?

16  A.   I don't recall.

17  Q.   Okay.  I mean, you do recall that Lee Harris, Jr.,

18       has made formal complaint -- Lee Harris, Sr. --

19       sorry, strike that.  You do recall that Lee Harris,

20       Sr., has made formal complaints with -- against you

21       over the years as your -- in your capacity as a

22       Southern Pines police officer?

23  A.   I can -- I remember one of the incident of Kendrick

24       Purcell's residence.  That's what I can remember.

25  Q.   Okay.  All right.  I'm going to pass you what is

1      marked as Plaintiff's Exhibit JJ.  Can you just tell
2      me what's at the top of this?
3   A.  It says "Complaint Cover sheet."
4   Q.  Does it say date reported, January 14th, 2009?
5   A.  Yes, sir.
6           (Plaintiff's Exhibit JJ was identified.)
7   Q.  And it says "Employee names."  Do you see that
8      section?
9   A.  Yes, sir.
10  Q.  And it says Officer J. Perry --
11  A.  Yes, sir.
12  Q.  -- badge 887?
13  A.  Yes, sir.
14  Q.  Is that you?
15  A.  Yes, sir.
16  Q.  And it says complainant, Lee Marvin Harris, Sr.,
17      person initiating complaint, further down.
18  A.  Yes, sir.
19  Q.  All right.  I'm going to turn the page now to the
20      second page, then the third page, then the fourth
21      page, what is Bates-stamped Harris 295.  Do you see
22      that?
23  A.  Yes, sir.
24  Q.  And at the top of the page it says in the first
25      sentence:

1          "On the last stop, Officer Perry told them that
2          he heard the pipes and felt he must be speeding
3          and then asked my son if his father was on the
4          way.  To add to that, several officers have
5          turned around and followed the truck very
6          closely no less than four times when they see
7          it going down the road.  Your department
8          doesn't know that my son doesn't have an active
9          license, but sometimes he is driven by someone
10         else."
11         I'm going to turn the page now to 297 where it
12    says "Memorandum from Officer Jason Perry.  Vehicle
13    stop of Lee Marvin Harris, Jr."  You can read that to
14    yourself and let me know when you're done.
15  A.   (Witness reviews document.)  Okay.
16  Q.   Does reading that refresh your recollection of this
17       incident or -- or does it refresh your recollection
18       that Lee Marvin Harris, Sr., made a complaint against
19       you in 2009?
20  A.   I remember the traffic stop.  I'm not sure that I
21       knew that there was a complaint made.  I -- I didn't
22       recall that.
23  Q.   You would have been informed of that, though, right?
24  A.   Yes.
25  Q.   And you would have been informed of the outcome of

1       the complaint, whether it was substantiated or

2       unfounded?

3   A.  One would assume, yes.  Yes, that's correct.

4   Q.  And, in fact, it says that it was unfounded, right?

5   A.  It does.

6   Q.  Now I'll -- I'll put you -- point you back to 295 for

7       when I ask you this question.  Is it true that you

8       felt the pipes of Lee Harris, Jr.'s, vehicle and

9       stated that he must be speeding based on the feeling

10      of the pipes?  And this is on the very top of 000295?

11  A.  Yes, sir.  If I may, can -- do -- would you mind if I

12      read the entire --

13  Q.  Go for it.

14  A.  -- complaint?

15  Q.  Not at all.

16  A.  Only because B. Perry is also listed here.

17  Q.  Got it.

18  A.  And in the complaint it says "Officer Perry."

19  Q.  Got it.  That's fine.

20  A.  (Witness reviews document.)  Okay, I've -- I've read

21      up to that paragraph.

22  Q.  Okay.  And so what is your response to the question

23      if you made the statement that he must have been

24      speeding based on your feeling of the pipes on his

25      car?

1    A.   I don't -- I don't read that as I felt the pipes.
2    Q.   How do you read it?
3    A.   It says that I -- this says:  "Officer Perry told
4         them he heard the pipes and felt he must be
5         speeding."
6    Q.   You're right.  Do you recall saying that?
7    A.   No, I do not.
8    Q.   Okay.  Did you -- do you recall interacting at all
9         with Lee Marvin Harris, Sr., related to this
10        occasion?
11   A.   I do not recall.
12   Q.   Do you recall having any conversation with the Chief
13        of Police related to this, Chief --
14   A.   I do not recall.
15   Q.   Do you recall talking to any Southern Pines police
16        officers at any time about Lee Marvin Harris, Sr.?
17   A.   At any time?
18   Q.   Unrelated to this investigation.  Have you spoken to
19        Chief Polidori about Lee Harris, Sr.?
20   A.   That's very difficult to answer.  Prior to this case,
21        I had been working with the police department for 13,
22        14 years.  And for me to sit here and remember every
23        conversation that I've had in those 13 years is
24        difficult to do.
25   Q.   Do you know how many complaints have been made

1     against you in your 13 or 14 years prior to this

2     case?

3  A.   I'm unsure.

4  Q.   So you mentioned that you recalled that Lee Harris,

5       Sr., had also made a complaint against you in 2013.

6  A.   Yes, sir.

7  Q.   And whose house was that at?

8  A.   Kendrick Purcell.

9  Q.   And this incident occurred while you were

10      investigating a house that contained marijuana

11      plants.

12 A.   Yes, sir.

13 Q.   And the plants were located in a closet?

14 A.   Yes, sir.

15 Q.   And during your investigation, you were attempting to

16      take Kendrick Purcell outside.

17 A.   I believe so.

18 Q.   Why were you going to take him outside?

19 A.   I believe for an interview.

20 Q.   And there was a crowd in the front yard.

21 A.   Backyard.

22 Q.   Backyard?

23 A.   Yes, sir.

24 Q.   So you took him out the front door?

25 A.   No, sir.

1    Q.    You took him out the back door?

2    A.    Yes, sir.

3    Q.    Okay.  Was Lee Harris, Sr., part of the crowd in the

4          backyard?

5    A.    Yes.

6    Q.    Was there also someone named Antoinette Patterson?

7    A.    I don't recall.  I -- I don't know that person.

8    Q.    And you instructed everyone in the backyard to leave?

9    A.    If they did not live there, yes.

10   Q.    And Mr. Harris at that point -- well, let me -- let

11         me back up.  The backyard -- the back porch or the

12         back of this house, was there a porch on the house?

13   A.    I believe so.

14   Q.    And were you standing on the porch when you

15         instructed everyone to leave?

16   A.    Yes.

17   Q.    And where was Mr. Harris standing?

18   A.    I believe he was standing off to my right just a bit.

19   Q.    Okay.

20   A.    Yes, sir.

21   Q.    In the yard.

22   A.    Yes, sir.

23   Q.    And did you have to go down -- were -- were there

24         stairs to get up the porch?

25   A.    I don't recall.

1    Q.    Was it -- was the porch level to the ground or was

2          it -- I mean, most porches are, but --

3    A.    I don't know.

4    Q.    You just recall that there was a porch.

5    A.    I don't re- -- I remember there was an outside

6          portion that had a cover over it, and it was used as

7          a porch.

8    Q.    In the backyard, was there a road in the back or was

9          the road in the front of the house?

10   A.    A road as in a highway?

11   Q.    A street?

12   A.    Street?  There was not a road that joins directly

13         with the back side of the property, if that's what

14         you're asking.

15   Q.    So the road was out front.

16   A.    Yes.

17   Q.    Was there a driveway to the house?

18   A.    Yes.

19   Q.    So the people who are in the backyard had to walk up

20         the driveway to get into the backyard?

21   A.    Yes.

22   Q.    And approximately how far away from you was Lee

23         Marvin Harris, Sr.?

24   A.    I don't recall.

25   Q.    But he was in the yard?

1    A.    Yes.

2    Q.    And approximately how many other people were in the

3          yard?

4    A.    I don't recall.

5    Q.    Was it more than ten?

6    A.    I -- I would say more than ten, less than 20.

7    Q.    And why did you ask them to leave?

8    A.    I felt as if for safety reasons I needed to clear the

9          area so that a proper interview could be conducted of

10         Mr. Purcell.

11   Q.    And at some point after you asked everyone to leave,

12         Mr. Harris, Sr., said something to the effect of, "If

13         there weren't already drugs there, they're there

14         now."

15   A.    Okay.

16   Q.    You don't recall that.

17   A.    Sitting here now, I've read that in the complaint.

18         I -- I don't remember that.

19   Q.    Okay.  I mean, do -- do you think that happened or

20         didn't happen or --

21   A.    I have no opinion.  I -- I don't remember that

22         happening.

23   Q.    Okay.  Well, do you recall coming off the porch?

24   A.    Yes, I do.

25   Q.    Do you recall why you came off the porch?

1   A.   No, I do not.

2   Q.   Do you recall confronting Mr. Harris, Sr.?

3   A.   Confronting?

4   Q.   What did you do when you came off the porch?

5   A.   I believe I told -- I asked him to leave, as I had

6        already asked him to do previously.

7   Q.   How close did you get to him?

8   A.   I don't believe I got extremely close.  I would say

9        three to five feet, somewhere in that range.

10  Q.   Okay.  And all you did was ask him to leave again?

11  A.   I don't remember the exact words that was said.  I

12       just remember coming out closer to him.

13  Q.   I'm going to read to you from your statement written

14       on December 2nd, 2013, to Lieutenant Rodney Hardy in

15       a memorandum related to this complaint.  You state:

16            "I then raised my voice a little louder and

17            instructed people to leave the property."  It

18            says, "I this point a black male called my name

19            and stated, quote, 'Let me tell you something,

20            Perry.  There were drugs in that house before

21            you got here today and there will be drugs in

22            that house after you leave.'  I then agreed

23            with him and stated, 'I'm sure you're right.  I

24            would appreciate it if you would call me and

25            let me know when you see them.'

1              "I had no idea who this man was.  I then

2              noticed a camera around his neck and that he

3              was using a walking cane.  I then realized that

4              this was Lee Marvin Harris, Sr.  I instructed

5              him for a third time to leave the property.  I

6              felt as if he was trying to get the crowd

7              worked up by making these statements to me.

8              "Lee Harris, Sr., continued to talk towards me,

9              so I walked off the porch and stood in front of

10             him in an interview stance. Harris continued to

11             talk towards me and started pointing his finger

12             at me while talking.  I then told him it's the

13             last time I was going to tell him to leave the

14             property, as I stood a bit closer.  He then

15             said he was leaving.  I then said, 'Okay, bye,'

16             as I waved at him.  Lee Harris, Sr., than

17             turned and walked away."

18             What is an interview stance?

19    A.    Typically it's just standing with your hands in

20          front, unsure what's exactly getting ready to happen,

21          whether I need to guard myself or just -- just

22          standing there.  I mean, there's nothing -- nothing

23          special about it.

24    Q.    Uh-huh.  So it's a stance that could allow you to do

25          lots of different things.  You could take an

1        interview from that stance, you could also defend
2        yourself from that stance?
3   A.   That's correct.
4   Q.   Okay.  You then warned him and took a step closer to
5        him.
6   A.   Okay.
7   Q.   That's what you said in your statement.
8   A.   Okay.
9   Q.   Is that accurate?
10  A.   If that's what I put in my statement, it should be
11       accurate.
12  Q.   And why did you take a step closer to him?
13  A.   I can't answer that question now as to why.  I don't
14       recall.
15  Q.   If he hadn't left, were you planning to arrest him?
16  A.   I had no reason to arrest him.
17  Q.   Well, in your statement you said, "I then told him
18       it's the last time I was going to tell him to leave
19       the property as I stepped a bit closer."
20  A.   Okay.
21  Q.   And you said if it's in your statement, it's
22       accurate, right?
23  A.   I had no reason to arrest him.  So I'm not the
24       property owner.  I had no reason to arrest him.
25  Q.   So what were you going to do then?  If it was the

1       last time you were going to ask him to leave, what
2       was your next action going to be?
3   A.  Those were just the words that I said, not
4       necessarily what my next physical action was going to
5       be, but that -- those were the words that I said, so
6       therefore I put it in writing.
7   Q.  Uh-huh.  So you're saying that may not -- it may not
8       have been true.  You may have asked him to leave
9       again?
10  A.  I probably would have.  I have no other option.
11  Q.  Could you not have arrested him for obstruction?
12  A.  If he was there delaying an investigation, he
13      probably could have been arrested for that.
14  Q.  But it wasn't your plan to arrest him at that point?
15  A.  No.  I'm there for Kendrick Purcell and a drug
16      investigation.
17  Q.  Were you concerned at all at that point that there
18      was going to be a physical interaction?
19  A.  I don't recall.
20  Q.  Okay.  But at some point you recall Mr. Harris made a
21      complaint against you.
22  A.  Yes.
23  Q.  And that complaint was investigated by the Southern
24      Pines Police Department.
25  A.  Yes.

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 76 of 180

1    Q.   How did that complaint make you feel?

2    A.   Anytime there's a complaint -- whether it's me or

3         another officer, when you have a complaint, it's

4         frustrating.  It's frustrating.  We have tough jobs

5         as it is, and sometimes you do the job the best you

6         can.  But anytime there's a complaint, it's

7         frustrating, so.  That's my answer.

8    Q.   Why is it -- what's frustrating about it?

9    A.   All I was looking for was cooperation from him, from

10        the crowd.  I'm just trying to do my job and trying

11        to talk with Mr. Purcell.  I'm not there to create

12        tension in no sort of way.  And the tension was

13        created by Lee Harris, Sr.  I was not there trying to

14        do that.  And for that complaint to come about

15        because of me trying to do my job, that's

16        frustrating.  On a property that wasn't his.

17   Q.   Were you -- were you disciplined at all because of

18        this complaint?

19   A.   I don't recall what the outcome was.  Pretty sure it

20        was unfounded.

21   Q.   It was.  Would you guess that Lee Marvin Harris, Sr.,

22        has made more complaints against you than any other

23        person in Southern Pines?

24   A.   I would not be able to guess that.  I don't know.  If

25        -- if a -- a complaint is filed, it's not something

1           that we all discuss with each other type thing.  It

2           stays amongst the person doing the internal

3           investigation and maybe any witnesses that come

4           about, but we don't discuss that.

5    Q.    And the chief, right?

6    A.    It's discussed with the chief, yes.

7    Q.    And who else is it discussed with.  Is there anybody

8           else who's part of the Internal Affairs complaint

9           process?

10   A.    As I said, any witnesses potentially.

11   Q.    What about a captain?  For example, is Captain Marsh,

12          now that he's in charge of Communications and

13          whatnot, is he also involved in Internal Affairs?

14   A.    He -- currently he leads that area, that -- if there

15          was an internal complaint or Internal Affairs

16          complaint of some sort, as long as it's not against

17          him in some capacity that he would -- and he's on

18          duty, he would spearhead that investigation.

19   Q.    Were you disciplined for telling Antoinette Peter- --

20          Patterson to shut up?

21   A.    I don't remember that name.

22   Q.    During this incident.

23   A.    I don't remember any of that.

24   Q.    All right.  I'm going to show you Plaintiff's

25          Exhibit K.  This is -- just so you know, this is the

1       same incident report for Kendrick Purcell that we've

2       been talking about.  I'm going to ask you to turn to

3       what's Bates-stamped 314.

4               MR. DAVIS:  Pardon me.  It's Exhibit KK, two

5                   Ks.

6               MR. JONES:  Double K?

7               MR. DAVIS:  Uh-huh.

8               MR. JONES:  Gotcha.  Do you want me to

9                   update -- I'm sorry, this says K on it.  Do

10                  you want me to update it?

11              MR. RUBERT-SCHEWEL: Are you sure it's KK?

12              MR. DAVIS:  Uh-huh.

13              MR. RUBERT-SCHEWEL:  Okay, yes.  Sorry.

14              MR. JONES:  Sorry.  It's easier to do it now

15                  than --

16              MR. RUBERT-SCHEWEL:  Oh, yeah, thank you.

17              MR. JONES:  And you're -- page 314 you were

18                  asking about?

19              MR. RUBERT-SCHEWEL:  Yes, sir.

20              MR. JONES:  Sorry.

21              (Plaintiff's Exhibit KK was identified.)

22  A.   Okay.

23  BY MR. RUBERT-SCHEWEL:

24  Q.   Okay.  So this is to Robert Temme -- or Temme -- is

25       that right?

1   A.   Yes, sir.

2   Q.   -- who was the chief of police at the time from

3        Charles Campbell, who was the captain, who I assume

4        is now the role that Lieutenant Marsh is in or

5        Captain Marsh is in dated December 17th, 2013,

6        internal investigation 13-015.  And this describes

7        the incident that we've been discussing.

8             And in this description of it, it states that

9        the allegations of Mr. Harris, Sr., were unfounded.

10       But I'm going to ask you to turn to 315, the next

11       page.  The last paragraph reads:

12            "During this internal investigation, Mr. Harris

13            and Antoinette Patterson both expressed concern

14            about Officer Perry's demeanor.  Ms. Patterson

15            stated during her interaction with Officer

16            Perry, he told her to shut up and was very

17            rude.

18            "Because internal investigation one 13-015 was

19            a written complaint alleging an assault by

20            Mr. Harris, the demeanor concern was voiced

21            after the complaint was filed and during this

22            investigation has been handled as a quality of

23            service inquiry.  See attached."

24            Do you recall that?

25  A.   I do not.

1    Q.    Do you recall if you were ever disciplined as part of

2          a quality of service inquiry?

3    A.    I do not.

4    Q.    So just so I'm clear for the record, you -- you do

5          not recall whether or not you told Antoinette

6          Patterson to shut up on this date.

7    A.    I do not.

8    Q.    Okay.

9                 MR. RUBERT-SCHEWEL:  I did five pages.  Let's

10                   take a break.

11                MR. JONES:  All right.

12                (Luncheon recess from 1:27 p.m. to 2:11 p.m.)

13   BY MR. RUBERT-SCHEWEL:

14   Q.    Good afternoon, Officer Perry.

15   A.    Good afternoon.

16   Q.    So I have to grab one exhibit.  In your capacity as a

17         Southern Pines law enforcement officer as well as a

18         sworn federal officer, are you able to seize property

19         or cash to enforce drug taxes?

20   A.    No.

21   Q.    Are you able to work with any other agency to seize

22         property to enforce drug taxes?

23   A.    No.

24   Q.    Are you able to alert any other agency to seize

25         property or cash to enforce drug taxes?

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 81 of 180

1   A.   Alert any other agency?  Make a phone call?

2   Q.   Sure?

3   A.   I'm able to, yes.

4   Q.   In your career as a Southern Pines Police Department

5        officer, have you seized cash or property to enforce

6        drug taxes?

7   A.   Yes.

8   Q.   So when you did that, that was illegal.

9   A.   No.

10  Q.   Why not?

11  A.   I was a task force officer with the Moore County

12       Sheriff's Office.

13  Q.   Okay.  So when you were working with the sheriff's

14       department, you could legally do that?

15  A.   That's correct.

16  Q.   Did -- are you familiar with an individual named

17       Christian Terry?

18  A.   Yes.

19  Q.   Did you recently in the last year or two stop

20       Christian Terry?

21  A.   No, I did not.

22  Q.   Did you recently, in the last year or two, respond to

23       a stop with Christian Terry?

24  A.   Yes, I did .

25  Q.   At that stop did you seize cash from Christian Terry?

1    A.    Yes.

2    Q.    Did you seize it related to drug taxes?

3    A.    Yes.

4    Q.    Did you provide that cash to the IRS?

5    A.    I personally did not.

6    Q.    Was that a legal seizure?

7    A.    Yes, if I may explain.

8    Q.    You may.

9    A.    That traffic stop was done by a K9 officer, Presley

10         Stevenson.  I do not remember the purpose of the

11         stop, the reason for the stop, but I do remember

12         Christian Terry being the driver.  I remember him

13         being the sole occupant of the car.

14              Sometime during the traffic stop there was a

15         K9 sniff performed on the exterior of the vehicle,

16         which resulted in a positive alert to the odor of

17         narcotics, which led to a search of the vehicle and

18         Mr. Terry.  There was a quantity of cash that was

19         located.  I knew that Mr. Terry had involvement with

20         this case.  He had a previous drug tax.  I called the

21         Moore County Sheriff's Office -- Jason Brown was the

22         detective's name -- in regards to a physical tax

23         warrant being available for Christian Terry.  He told

24         me that there was one.  I told him that "I've got him

25         here.  He's got 1500-some-odd dollars on him."  And I

1        was basically given the green light to go ahead and

2        seize that money for tax purposes by Jason Brown.

3   Q.   And sorry, Jason Brown is a sheriff -- is a deputy

4        with Moore County Sheriff's Office?

5   A.   Yes.  So that's what I did.  That money was taken to

6        the police department and entered into evidence

7        there.

8   Q.   What do you mean, "basically given the green light"?

9   A.   I don't remember his exact words, but between me and

10       him, I know that I called him in regards to what I

11       had found.  I knew there was a tax warrant from this

12       previous case and --

13  Q.   Are you still assigned to the Moore County Sheriff's

14       Office today?

15  A.   No.

16  Q.   Did that assignment end when you ended your -- your

17       assignment in the Investigations Division?

18  A.   No, sir.  That ended approximately 2016, sometime in

19       that timeframe.

20  Q.   Okay.  So you're telling me that it is legal for you

21       as a Southern Pines officer to enforce IRS taxes if

22       you get an okay from the Moore County Sheriff's

23       Office to do so.

24  A.   No, that's not what I'm saying.  It was my

25       understanding at the time that I was okay to seize

1           that money for tax purposes, so that's what I did.

2     Q.    Okay.

3     A.    At a later time I was told that a sworn police

4           officer, anything other than a sheriff's deputy,

5           cannot seize that money for tax purposes.  And that's

6           the reason it was given back.

7     Q.    So as you sit here today, you agree that that was an

8           illegal seizure.

9     A.    It was an illegal --

10    Q.    Yes.

11    A.    -- seizure?  I'm not going to say whether it was

12          legal or illegal.  I'm going to say it was in good

13          faith and I did what I thought was right at the time.

14    Q.    I know.  I'm not questioning your morality or your

15          ethics here.  I'm just saying it was against the law

16          to do that?

17    A.    I'm not familiar with a law in regards to who can

18          seize money and who can't.  I'm not familiar with a

19          law existing such as that.  I know that the North

20          Carolina Department of Revenue, either they can seize

21          property and money or a sheriff's deputy.  So I know

22          now.

23    Q.    Who told you that you were not allowed to do that?

24    A.    Captain Heaton at a later time told me that was not

25          right.

1    Q.   Okay.  And are you aware that that money was returned
2         to Christian Terry?
3    A.   Yes.
4    Q.   Did you receive any sort of discipline because of
5         that?
6    A.   No.
7    Q.   Was there an Internal Affairs complaint made because
8         of that?
9    A.   I don't believe so.
10   Q.   Are you aware that -- of any of Lee Harris, Sr.,'s
11        items being seized related to Operation Leader or his
12        arrest?
13   A.   Any of his belongings being seized as a result of his
14        arrest?
15   Q.   Well, I'm not referring to evidence.  I'm referring
16        to items that were seized or taken related to drug
17        taxes or something of that sort.
18   A.   I am not aware of any that has been seized.
19            (Brief pause.)
20   A.   Not that I can recall anyway.
21            (Brief pause.)
22   Q.   Do you recall sending an e-mail to Jonathan B.
23        Oxendine of the North Carolina Department of Revenue
24        stating "Lee Marvin Harris, Sr., another
25        co-defendant, also has this on the property that is

1       paid for:  1968 Oldsmobile with a price tag of

2       $4,500"?

3   A.  I believe I did.

4   Q.  And are you aware if that item was seized?

5   A.  I'm not sure.

6   Q.  But what was the purpose of you sending that e-mail?

7   A.  In order to let the Department of Revenue know that

8       there's property that could be seized to go towards

9       that tax warrant if they wish to.

10  Q.  Do you -- is there any benefit to you or Southern

11      Pines to do that?

12  A.  No benefit to me.  The Town of Southern Pines does

13      receive a percentage of any money that's collected,

14      yes, sir.

15  Q.  By the IRS or the Department of Revenue?

16  A.  The Department of Revenue is what I'm familiar with,

17      yes, sir.

18  Q.  And so are you encouraged by your supervisors to

19      report things that can be seized by the Department of

20      Revenue or the IRS?

21  A.  Not necessarily.

22  Q.  So you went out and you just take the liberty to do

23      it on your own.

24  A.  I'm not there researching for any certain thing or

25      researching for any certain piece of property.  If I

1    come across something that "That looks familiar," I'm

2    going to make it known.

3  Q.  How did you figure out the value of that car?

4  A.  I believe there was a price tag.  The vehicle was

5    being -- trying to be sold.

6  Q.  Okay.  There's a price tag on it?

7  A.  It was attempting to be sold.

8  Q.  Or there was a price tag online.

9  A.  Yes, sir, that's correct.

10  Q.  And you took a screenshot -- what looks like a

11    screenshot of a picture of the car with a price tag?

12  A.  I believe so.

13  Q.  Okay.  Did you also -- were you aware at the time of

14    Mr. Harris, Sr.,'s arrest that he was a veteran?

15  A.  He made me aware of that, yes, sir.

16  Q.  Were you aware that he was receiving veteran's

17    benefits?

18  A.  I don't recall if I was aware of that.

19  Q.  Do you recall notifying the Veterans Administration

20    of his arrest and incarceration?

21  A.  I -- I don't remember doing that, no, sir.

22  Q.  Are -- are you certain that you did not do it?

23  A.  I don't remember doing it.  That's what I'm saying.

24  Q.  So it's possible you did.

25  A.  If I did it, I should remember it, and I don't

1         remember it.

2    Q.   Well, let's just clarify this because you've said "I

3         don't remember" quite a few times today.  So every

4         time you say you don't remember, you're saying it did

5         not happen?

6    A.   No, sir, I'm not.

7    Q.   Okay.  So then let's -- let's go back here?

8    A.   If I say I don't remember, that means I don't

9         remember.

10   Q.   Right.  So it means you could have.

11   A.   It's possible.

12   Q.   Anything's possible, right?

13   A.   If I don't remember one way or another, I guess it's

14        possible.

15   Q.   Of course it's possible.

16   A.   Okay.

17   Q.   I mean, or tell me you did not do it?

18   A.   I don't -- I don't recall doing it.

19   Q.   Okay.  Are you -- are you aware that because of this

20        arrest and incarceration, Mr. Harris, Sr.'s,

21        veteran's benefits were cut off and he lost his only

22        source of income?

23   A.   Am I aware?

24   Q.   Are you aware of that?

25   A.   No, I'm not.

1  Q.  Do you think that that's an appropriate thing to

2      happen?

3  A.  When you say if that's an appropriate thing to

4      happen, can you clarify?

5  Q.  Well, how does that make you feel now to find out

6      that he lost his veteran's benefits because of this

7      arrest?

8  A.  Anytime a person has their income go away, that's not

9      a good thing, whether it's him or any other person.

10     You've got to have money to live off of.  I don't

11     recall that ever coming about.  I don't know.  To my

12     recollection, this is the first time I'm hearing

13     this.

14 Q.  So you're saying contacting the VA administration and

15     telling them about this arrest is not something you

16     would have done because you wouldn't want that to

17     happen.

18 A.  I -- I don't know that I would even think of that.

19 Q.  Well, how -- how is that any different than seizing

20     someone's property?

21 A.  That car, it just came up in a for sale ad that I was

22     looking at.  I was not out searching for any property

23     that belonged to him to be seized.  It was just

24     there.

25 Q.  You just stumbled across it?

1   A.   That's exactly right.

2   Q.   Were you looking for a car for yourself?

3   A.   I can't answer that.  I don't recall.

4   Q.   Well, why were you looking at classified ads for 1968

5        Oldsmobiles?

6   A.   I was not necessarily looking at classified ads for

7        1968 Oldsmobiles.  I believe it was on a app of some

8        sort called OfferUp or Letgo, similar to Craigslist

9        or Facebook Marketplace.  And as I'm scrolling

10       through, I recognized the picture.  I recognize the

11       car.  So -- (no further response).

12  Q.   And you just figured, "I'll just take a screenshot

13       and send it over to the DOR"?

14  A.   Yes.

15  Q.   All right.  You are aware, of course, that

16       Mr. Harris, Sr.'s state charges were dismissed in

17       this case.

18  A.   I'm aware of the document that states the charges

19       were dismissed, yes, sir.

20  Q.   Well, do you not believe that document?

21  A.   I believe it.  But furthermore, it's as a result of

22       being adopted by the federal system.

23  Q.   Right.  He was indicted and charged federally.

24  A.   Yes, sir.

25  Q.   Yes.  And because he was -- he -- what actually --

1          the steps of what occurred, and we can go back

2          through this in more detail, is that he was let out

3          on bond.

4     A.   Yes, sir.

5     Q.   His -- he was -- he was indicted federally.  The case

6          was adopted federally.

7     A.   Yes, sir.

8     Q.   And then his state court charges were dismissed.

9     A.   Yes, sir.

10    Q.   So he was actually at home out on bond when he was

11         indicted and charged federally.

12    A.   I believe so.

13    Q.   And you, with Brian Edwards and an Aberdeen police

14         officer, came to his house on August 8th, 2018, to

15         serve a federal detainer on him.

16    A.   Okay.

17    Q.   True?  Yes or no?

18    A.   I remember going.  I don't remember who was with me.

19         I don't remember the date.  But I remember doing it,

20         yes, sir.

21    Q.   And you took him to the Moore County jail?

22    A.   Yes, sir.

23    Q.   And when you arrived at his house, he told you that

24         he needed to use the restroom?

25    A.   Okay.

1    Q.    Yes or no.  Do you recall?

2    A.    I don't recall.  I don't recall.

3    Q.    And you grabbed him by the arm and -- while he walked

4          towards the restroom.

5    A.    I'm not sure.

6    Q.    And you stood next to him in the bathroom as he used

7          the restroom.

8    A.    Okay.

9    Q.    Yes or no.

10              MR. JONES:  Well, is there a question there?

11   BY MR. RUBERT-SCHEWEL:

12   Q.    Is that true?  Did that occur?

13   A.    It seems like I do remember what you're talking

14         about.  There you go.

15   Q.    I'm just asking did that happen?

16   A.    I believe so.

17   Q.    Okay.

18   A.    It did not strike my memory until you mentioned him

19         being in the bathroom, using the restroom, and I'm

20         standing there alongside him.  That's when it --

21   Q.    That's fine.  I'm just asking if it occurred.

22   A.    Part -- parts of that occurred.  I don't remember

23         grabbing his arm necessarily.

24   Q.    Okay.

25   A.    I remember him saying he had to go to the restroom

1          and I remember him going to the restroom and I was --

2     Q.   Escorting him to the restroom.

3     A.   That's correct.  Holding --

4     Q.   And watching him --

5     A.   -- him by an arm.

6     Q.   -- while he was in the bathroom.

7     A.   Yes, sir.

8     Q.   And you then put him in a squad car and took him to

9          the Moore County jail?

10    A.   Yes, sir.

11    Q.   And on the way to the Moore County jail, you said to

12         him, "Mr. Harris, don't worry about this.  God's not

13         going to put any more on you than you can bear."

14    A.   Okay.

15    Q.   Did that happen?

16    A.   I believe it did.

17    Q.   Why would you say that?

18    A.   He's a man of faith.  He should know what -- exactly

19         what I'm talking about.  I could tell this was

20         bothering him.  I could.  And I'm -- I'm doing my

21         best to let him know it's not the end of the world.

22         And I'm just trying to do my best to console him in

23         any way possible.  That's -- that's what I was trying

24         to do.  I knew he'd never been through anything like

25         this, and I'm -- I'm doing my best to try to explain

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 94 of 180

1       to him the steps that we're taking and how -- where

2       it's going to go next and -- (no further response).

3   Q.  Do you believe that God was putting that on him or

4       that you were putting that on him?

5   A.  Putting what on him?

6   Q.  Well, you said to him, "God's not going to put on you

7       any more than you can bear."  So do you believe that

8       you were responsible for arresting and charging Lee

9       Harris, Sr., or that that was God's doing?

10  A.  No.

11  Q.  Which one?

12  A.  I put the handcuffs on him, okay?  But the full

13      context of that is we all have a purpose in life.  We

14      don't know what tomorrow holds.  We don't -- we don't

15      know.  All we know is what yesterday held and we can

16      learn from our mistakes, whatever yesterday

17      contained.  I --

18  Q.  I mean -- go ahead.

19  A.  So that's my way of trying to talk with him and

20      explain it in a way that he might could understand.

21      He was taking it personal.  Clearly, he was taking it

22      personal.  And none of this is personal at all.

23  Q.  Well, at the end of the day you could have gone to

24      Officer Lowery and Officer Marsh when this started

25      and you could have said to them, "Look, I don't think

1        Lee was involved in this at all.  I don't think he

2        knew about the drugs.  I don't think he should be

3        charged with anything.  I don't think we have

4        probable cause."  You could have done that.

5   A.   At the beginning?  As during the investigation you're

6        saying, or after?

7   Q.   On -- on February 20th, 2018, you could have done

8        that.

9   A.   Anything could have been said, yes, sir.

10  Q.   You had the power to do that.

11  A.   Anything could have been said.

12  Q.   Yes.  The answer is yes to my question.

13  A.   But the probable cause existed.

14  Q.   Well, I'm saying -- so let's -- let's say it didn't.

15       Let's say you believed it didn't.

16  A.   Okay.

17  Q.   Let's say you believe what I just said.

18  A.   Uh-huh.

19  Q.   You could have said that.

20  A.   If -- if the probable cause to arrest does not exist,

21       absolutely, there's no reason to arrest.

22  Q.   So the power was in your hands.

23  A.   The probable cause was there.

24  Q.   Determined by you.

25  A.   Determined by myself and Lieutenant Marsh after

1          discussion.  That's it.

2     Q.   So when you're saying to him "God's not going to put

3          any more on you than you can bear," are you really

4          saying to him "I'm not going to put any more on you

5          than you could bear"?

6     A.   I don't refer to myself as God.

7     Q.   But you're the one who was doing this.  You're the

8          one who's putting him in handcuffs.  You're the one

9          who's coming to his house for the second time to lock

10         him up and now take him and have him charged

11         federally.  Right?

12    A.   That's correct.

13    Q.   And further, at this point, had you wanted to you,

14         you could have gone to JoAnna McFadden or Randall

15         Galyon and you could have told them, "Lee's not

16         involved.  Lee didn't do this.  Lee didn't know about

17         the drugs."  These are things you could have done.

18    A.   It could have been done.  Can I explain what did

19         happen, how -- how they adopted the case?

20    Q.   Sure.

21    A.   I had discussions with JoAnna McFadden.  She got

22         copies of the prosecution summary, she listened to

23         jail phone calls, and she made the determination on

24         her own to adopt Lee Harris, Sr.  I have -- little

25         ol' me from Southern Pines, North Carolina, I'm not

1          going to be able to have any power to have him

2          adopted into the federal system.  That's of her own

3          accord.

4   Q.    Did you tell JoAnna McFadden that you had seen his

5          son put items into the Cadillac three weeks before?

6   A.    I had not seen that.

7   Q.    All right.  Well -- we'll -- we'll come back to that

8          in a second.  Do you know why this operation was

9          named Operation Leader?

10  A.    I do not.

11  Q.    You're not aware that it was the mission name of a

12         successful air attack conducted by the United States

13         against German shipping vessels during World War II?

14  A.    I believe I've read that, yes, sir, now that who --

15  Q.    So who came up with that name?

16  A.    I believe it was Chief Temme.

17  Q.    Are you aware that Lee Harris, Jr., was born in

18         Germany?

19  A.    Now -- now that you mention it, I believe I have seen

20         on arrest reports where he has mentioned he was born

21         in Germany, yes, sir.

22  Q.    Is that why it was named that?

23  A.    I can't answer that question.  I didn't make that

24         name.

25  Q.    Chief Temme did?

1    A.    That's correct.

2    Q.    Was there a mutual aid agreement with Southern Pines

3          and the Moore County -- or sorry, strike that.  Was

4          there a mutual aid agreement between Southern Pines

5          and the Aberdeen Police Department for Operation

6          Leader?

7    A.    For the execution of search warrants, I believe there

8          was, yes, sir.

9                MR. RUBERT-SCHEWEL:  Just as a note for the

10                    record and for Glenn, I don't think we've

11                    ever received that mutual aid agreement and

12                    we'll -- we'll follow up to request that.

13               MR. JONES:  Sure.  Can we go off the record

14                    real quick?

15               MR. RUBERT-SCHEWEL:  Yeah.

16               (Discussion off record.)

17   BY MR. RUBERT-SCHEWEL:

18   Q.    So this investigation began in early 2017.

19   A.    Yes, sir.

20   Q.    And it began at least in part with surveillance

21         operations.

22   A.    Yes, sir.

23   Q.    And I think you know Officer Lowery went over a

24         number of the different targets of the operation or

25         the investigation initially, so I won't go over that

1      again.  But I'll just ask, did you hear the targets
2      that Officer Lowery mentioned in his deposition?
3   A.  I did.
4   Q.  Do you agree with those folks being the main targets
5      at the start of the investigation?
6   A.  I remember Lee Harris, Jr.; Christian Terry; Lamar
7      Sealy, the main three in the beginning, yes, sir.
8   Q.  And obviously Lee Harris, Sr., was not a target.
9   A.  That's correct.
10  Q.  And that's because you had no indication or no
11     observation of Lee Harris, Sr., ever dealing in
12     narcotics.
13  A.  That's correct.  Although there were observations of
14     him at 811 West New York Avenue.
15  Q.  Well, that's occurred during the investigation.
16  A.  That's correct.  Yes, sir.
17  Q.  So we'll get to that in a second.
18  A.  Yes, sir.
19  Q.  Okay.  You just mentioned JoAnna McFadden.  Other
20     than JoAnna, were there any other US attorneys who
21     you dealt with related to this investigation?  And
22     just to jog your memory, Randall Galyon and someone
23     named Anand Ramaswamy are two others who were
24     involved.
25  A.  I remembered Randall Galyon.  I did not remember

1        Ramaswamy.

2   Q.   Ramaswamy was the one who conducted Lee Harris,

3        Sr.,'s bond hearing that you testified at.

4   A.   Okay.

5   Q.   And Galyon and McFadden, did you both speak to them

6        prior to this case being adopted federally?

7   A.   You said did you both speak to them?

8   Q.   Did you speak to both of them?

9   A.   I don't believe I spoke with Randall Galyon prior to

10       it being adopted.  JoAnna McFadden for sure.  She

11       went out on maternity leave soon after.  Randall

12       Galyon took over the case.  I'm not sure exactly if I

13       talked with him prior to it being adopted.

14  Q.   Okay.  And when you talked to JoAnna, I presume you

15       told her about the case?

16  A.   Yes, sir.

17  Q.   And you provided her with documents related to the

18       case.

19  A.   Prosecution summaries.

20  Q.   So your testimony is you provided her with the full

21       prosecution summary.

22  A.   Eventually, she was, that's correct.

23  Q.   Were there any initial things that you provided her?

24       Did you provide her all at once?

25  A.   I don't remember the order in which she was provided

         information.

Q.    But at some point -- but -- but you -- strike that.

      You may have provided it piecemeal; you may have

      provided it all together.  You're not sure.

A.    I'm not sure, that's correct.

Q.    Okay.  But at some point you are sure that everything

      in that file was given over to her.

A.    Yes, sir.

Q.    Could some of that have occurred after you testified

      in the grand jury?  And in the federal grand jury I'm

      referring to?

A.    Could it have?  I guess it's possible.  Yet again,

      I'm not sure the order in which information was

      passed along.

Q.    Okay.  And the US Attorney's Office, the information

      that you provided them, as we've stated earlier, they

      relied on you for the truthfulness and the accuracy

      of that information.

A.    Yes.

Q.    And they relied on you to provide them complete

      information, not just a part of what had happened.

A.    Yes.

Q.    And they provided [verbatim] you not to leave out any

      important details or exculpatory evidence.

A.    I'm sure.

1    Q.   Because that would be a Brady violation, well, if
2         they didn't turn it over.
3    A.   I'm not sure of the violation, but that's correct.
4    Q.   Okay.
5    A.   Any information I had was passed along.
6    Q.   And you testified in the federal grand jury.
7    A.   I don't recall if I did or if Sergeant Lowery did.
8    Q.   Do you recall if you testified in the state grand
9         jury?
10   A.   I believe so, yes, sir.
11   Q.   Okay.  And do you recall the substance of your
12        testimony in the state grand jury?
13   A.   No, sir, I do not.
14   Q.   Is it fair to say the substance of your testimony in
15        the state grand jury would be the facts that led you
16        to find probable cause against Lee Harris, Sr.?
17   A.   Anytime you are testifying before the grand jury, you
18        are to establish probable cause for the charges at
19        hand, yes, sir.
20   Q.   When you testified before the state grand jury, did
21        you inform the state grand jury that you had observed
22        Lee Harris, Jr., placed items in the Cadillac weeks
23        or maybe days before the arrest?
24   A.   I don't know that we observed him placing items into
25        the Cadillac.

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 103 of 180

1   Q.   Well, it's a yes or no question.

2   A.   If it didn't happen, we didn't observe it, no.

3   Q.   So your answer is no.

4   A.   We never observed him placing items into a Cadillac.

5   Q.   But is your answer -- your answer is you did not

6        state that to the state grand jury.

7   A.   If it was not a fact, it did not come out of my

8        mouth.  We did not observe him putting items into a

9        Cadillac.

10  Q.   Now, did you observe him putting items under a tarp?

11       You know what?  We'll strike that and we'll come back

12       to it.

13            If you testified in the federal grand jury,

14       would you have provided the same testimony in sum and

15       substance as in the state grand jury?

16  A.   If -- yes.  The facts are the facts, yes, sir.

17  Q.   And just to be clear, when I'm asking you about

18       testifying in the grand jury, I'm -- I'm referring

19       specifically to against Lee Harris, Sr.?

20  A.   Yes, sir.

21  Q.   Okay.  I'm going to show you what is marked as

22       Exhibit Y.  Just give me a second.  I got it right

23       here somewhere.  These are a series of e-mails

24       produced by your lawyer, and these e-mails contain

25       exchanges between you, between Kyle Marsh, between

1       Chris Garner, between a number of folks.  And I'm

2       going to ask you to look at page six of these e-mails

3       in which -- I don't know why I put a note on six, but

4       it is Bates stamp 1893.

5           (Plaintiff's Exhibit Y was identified.)

6  A.   Yes, sir.

7  Q.   Let me know when you are there.

8  A.   I'm there.

9  Q.   Okay.  So there is a signature block at the top and

10      directly below that you state:

11          "JoAnna, this is Detective Perry with the

12          Southern Pines PD.  I'm set to be on vacation

13          all of next week also but still available part

14          of the week if needed.  What day is the grand

15          jury set for?  I will do what I can to work it

16          out because I've been looking forward to

17          getting into the federal system.  Thanks for

18          your help. Detective Perry, Southern Pines

19          Police Department."

20 A.   Yes, sir.

21 Q.   That's your e-mail.

22 A.   Yes, sir.

23 Q.   So you wrote that.  Yes?

24 A.   I believe so.

25 Q.   Why were you eager for this case to get into the

1          federal system?

2    A.    I don't have an answer for that.

3    Q.    You're not sure?

4    A.    No.

5    Q.    Okay.  Can you turn to one page before that?  It's

6          1892.  So these are -- I know we're going in reverse

7          order, but these are -- this is the follow-up e-mail.

8          JoAnna -- and I guess let -- let's go back real quick

9          to 1893 just so we can get the time.  Your e-mail to

10         JoAnna was June 19th, 2018, at six p.m.  If we go to

11         JoAnna's response, she actually responded eight

12         minutes later on June 19th, 2018, At 6:08 p.m.  She

13         says:

14              "Hi, gentlemen.  The grand jury only meets on

15              June 25th and 26th, unfortunately, and not

16              again until July 30th.  Would it be best to put

17              it down for June 26th?  Jason, if you would

18              like to enjoy your vacation, you are welcome to

19              find a colleague who can come in your stead.  I

20              can certainly simplify the subject matter that

21              we cover."

22         You respond:

23              "June 26 will be good.  Is the plan to indict

24              Marvin Harris, Jr., Marvin Harris, Sr., Lamar

25              Sealy, and Christian Terry from my area?

1              Thanks again!"

2              Does that refresh your recollection as to

3        whether or not you testified in the federal grand

4        jury?

5    A.   I have no idea, sir.  I don't know.

6    Q.   It doesn't refresh your recollection to at least that

7         you were having conversations with JoAnna McFadden --

8    A.   Clearly I had conversations.  Clearly, yes, sir.

9    Q.   About testifying in the grand jury.

10   A.   Yes, sir.

11   Q.   That you scheduled to testify in the grand jury.

12   A.   There were conversations.  Whether I did or not, I'm

13        not sure.

14   Q.   But the conversations were scheduling to testify the

15        following week in the federal grand jury.

16   A.   Yes.

17   Q.   Okay.  Was McFadden the US attorney who you

18        interacted with the most in this case?

19   A.   Initially, yes.  Towards the middle -- towards the

20        end, Randall Galyon.  Yes, sir.

21   Q.   Do you know why that happened?

22   A.   As I stated earlier, she went out on maternity leave.

23   Q.   All right.  I'm going to hand you what is marked as

24        Exhibit NN, and I want you to take a look at the

25        heading.  And I'll just read it out loud.  It says:

1              "In the United States District Court for the

2              Middle District of North Carolina, United

3              States of America versus Lee Marvin Harris,

4              Jr.  Factual basis."

5         Have you seen this document?  And -- and I

6    guess what we can do is if you turn to the very back,

7    the last page, you'll see it's signed by Randall

8    Galyon on December 19th, 2018.

9    A.   I can't say for certain that I have.  I'm not sure.

10   Q.   Do you recall seeing documents similar to this

11        involving the federal cases of Junior and Senior?

12   A.   Yes.

13   Q.   And again -- well, just so you know, this document is

14        called a Rule 11 Memorandum.  It's filed and served

15        as a factual basis for a plea agreement.  Can you

16        please read the first page to yourself?  You don't

17        have to read it out loud, just to yourself, and let

18        me know when you're finished with the first page?

19             (Plaintiff's Exhibit NN was identified.)

20   A.   (Witness reviews document.)  Okay.

21   Q.   And now we can flip to the second page, and just read

22        through the end of that paragraph at the top of the

23        second page.

24   A.   (Witness reviews document.)  Okay.

25   Q.   This is all information related to your

1        investigation.

2   A.   Our investigation, yes, sir.

3   Q.   It was your investigation, Officer Lowery's, Southern

4        Pines' investigation --

5   A.   That's correct.

6   Q.   -- that you and Officer Lowery were in charge of.

7   A.   Yes, sir.

8   Q.   And -- so this information or the basis of this

9        information was the discovery or the prosecution

10       summary that you provided the US Attorney?

11  A.   It should have been, yes, sir.

12  Q.   Or your conversations with the US Attorney.  I mean,

13       how else would they have known --

14  A.   I've never typed one of these up, but that would be

15       the only way they would receive information, yes,

16       sir.

17  Q.   Was from you somehow.

18  A.   That's correct.

19  Q.   Okay.  Now, if we skip down to the bottom of page 2,

20       I'm just going to ask you to read that bottom

21       paragraph out loud for the record, please.

22  A.   "On or about January 25th and January 31st, 2018,

23       officers surveilled the residence of 803 Sycamore

24       Street in Aberdeen, North Carolina.  Harris Junior's

25       parents live at the Sycamore Street residence and

1        Harris Junior often stayed at the residence during

2        2017 and 2018.  On both surveillance occasions,

3        Harris Junior arrived at the residence and then went

4        over to a Cadillac covered with a gray car cover for

5        a few minutes consistent with placing and item in or

6        retrieving an item from the vehicle.  Powder cocaine

7        and crack cocaine were later recovered from that

8        covered Cadillac on February 20th, 2018, pursuant to

9        a search warrant."

10   Q.   So this memorandum states that on -- surveillance

11        states on the 25th and the 31st, dates where you were

12        there with Lowery and Reilly from Aberdeen, Harris

13        Junior went to the vehicle, the Cadillac covered with

14        a gray car cover, consistent with placing an item in

15        or retrieving an item from the vehicle.

16   A.   You just stated that I was there.  I was not.

17   Q.   You were not there on the 25th or the 31st.

18   A.   I do not recall being there, no, sir.  In Officer

19        Lowery's notes, he clearly stated who he was with.

20        That was Officer Reilly.

21   Q.   Officer Reilly?

22   A.   Yes, sir, with the Aberdeen Police Department.

23   Q.   All right.  We'll -- we'll look at that in one

24        second.  Okay.  So let's say you weren't there.

25        Where does this information come from?

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 110 of 180

1    A.   I would imagine it came from the prosecution summary.

2    Q.   So --

3    A.   Lowery's notes.

4    Q.   So -- so now that this says Harris Junior went over

5         to the Cadillac on these two dates with the gray

6         cover.  Earlier today at this deposition you said

7         that didn't happen.

8    A.   I said what didn't happen?

9    Q.   You said you had no information that he ever went

10        over to the gray Cadillac with -- to the Cadillac

11        with the gray cover.

12   A.   I said I wasn't there.  I was not there.

13   Q.   So where did they get this information from?

14   A.   I would assume from the prosecution summary and

15        Lowery's notes.

16   Q.   So today you sat here during Lowery's deposition,

17        right?

18   A.   Yes, I did.

19   Q.   And during Lowery's deposition he testified that he

20        did not see anyone go over -- well, he said, "I did

21        not see Lee Harris, Jr., go over to the Cadillac with

22        the gray cover."  Do you recall that?

23   A.   I remember him referring to his notes on the 31st.  I

24        believe it says Lee Harris, Jr., went to a car

25        covered with a blue tarp.  There was no indication

1        that anything was placed in or taken out of the

2        vehicle.

3    Q.  Right, and that's different.  That's -- that's

4        entirely contradicted by what's written right here.

5    A.  I would agree.

6    Q.  So what happened?

7    A.  I can't answer that.  I didn't type this, sir.

8    Q.  Okay.  So I'm going to show you what is marked as

9        Exhibit LL.  And I'm going to hand you this, and this

10       is Bates stamp Harris 0001.

11   A.  Yes, sir.

12   Q.  This document states:

13               "Black Charger driven by Lee Harris, Jr.,

14               parked in driveway at 803 North Sycamore on

15               January 20th, 2018, Jason Perry operating the

16               video camera."

17   A.  Yes, sir.

18   Q.  What is this document?

19   A.  Just a running log of any videos that we might have

20       and who operated the equipment.

21   Q.  Surveillance --

22   A.  Yes, sir.

23   Q.  -- notes?  Did you type this note?

24   A.  I did.

25               (Plaintiff's Exhibit LL was identified.)

1   Q.   Okay.  So on January 20th, 2018, you admit that you
2        were there.
3   A.   I was there.
4   Q.   And you admit that you saw Lee Harris, Jr., park in
5        the driveway.
6   A.   Yes, he did.
7   Q.   Okay.  I'm now going to show you MM.
8              MR. DAVIS:  I want to make sure we have it.
9              MR. RUBERT-SCHEWEL: Yeah, this is the one we
10                 showed Officer Lowery earlier today.
11             MR. DAVIS:  Yeah.
12             MR. JONES:  Let's see if you already have --
13                 it's already here.
14             MR. RUBERT-SCHEWEL:  It's a single-page one.
15             MR. JONES:  Trying to keep it together.
16  BY MR. RUBERT-SCHEWEL:
17  Q.   Okay.  So this document, is it -- what would you call
18       this document?
19  A.   Surveillance notes.
20             (Plaintiff's Exhibit MM was identified.)
21  Q.   These surveillance notes state:
22             "Wood surveillance, January 25th, 2018, 803
23             North Sycamore Street, Aberdeen North
24             Carolina, ZIP Code, Lee Marvin Harris, Sr.'s,
25             home.  MPO Lowery, SPPD Officer Reilly, APD."

1              Reilly is from the Aberdeen Police Department.
2    A.   Yes, sir.
3    Q.   These documents do not state your name, do they?
4    A.   Do not.
5    Q.   They do not state your name on the 24th or the 25th.
6         Is that correct.
7    A.   That's correct.
8    Q.   So you, your testimony is that you were not present
9         these dates.
10   A.   I was not.
11   Q.   And your testimony is that you also did not speak to
12        -- well, let me ask you.  Did you speak to Officer
13        Lowery about what happened on these dates?
14   A.   I'm sure I did.
15   Q.   Did Officer Lowery inform you that he observed Lee
16        Harris, Jr., go into -- well, I want to read it word
17        for word from here:  "Go over to a Cadillac covered
18        with a gray car cover for a few minutes consistent
19        with placing an item in or retrieving an item from
20        the vehicle"?
21   A.   What I remember is what his notes say.  It says:
22              "Lee Junior then goes to the front right edge
23              of the property and is placing or retrieving
24              something from underneath a tarped item
25              located to the right of the enclosed trailer."

1          Does not mention a vehicle there.  It's a

2     parked item.

3  Q.  Which one are you reading from, 24th?

4  A.  The 25th.

5  Q.  The 25th?

6  A.  Yes, sir.

7  Q.  Okay.  All right.  Let's -- let's take a look at

8     Plaintiff's Exhibit P.

9          MR. RUBERT-SCHEWEL:  Glenn, I think we had

10             that from Lowery's deposition too?

11         MR. JONES:  Yeah.

12  BY MR. RUBERT-SCHEWEL:

13  Q.  Okay.  January 31st, 2018.  Same wood surveillance,

14     same location, same officers.  MPO Lowery, Southern

15     Pines, and Reilly, Aberdeen, right?

16  A.  Yes, sir.

17          (Plaintiff's Exhibit P was identified.)

18  Q.  You're not listed.

19  A.  That's correct.

20  Q.  If you go down to the third paragraph that starts at

21     "At or around 1509 hours," and then you go down to

22     the middle of that paragraph.  It starts at "he then

23     approaches."  Do you see that.

24  A.  Yes, sir.

25  Q.  "He then approaches a vehicle covered with a blue

 1          tarp on it."
 2     A.   Yes, sir.
 3     Q.   Did you have a conversation with this -- about this
 4          surveillance with Officer Lowery as you stated you
 5          did the previous one?
 6     A.   I'm sure we did talk about it.
 7     Q.   And was it your understanding that on this date, as
 8          on the previous date, Lee Harris, Jr., went to a
 9          Cadillac that was covered with a gray tarp and placed
10          an item or appeared to place an item under it?
11     A.   I go based off his notes.  It states he then
12          approaches a vehicle covered with a blue tarp on it.
13          Nowhere does it mention he placed anything in the
14          vehicle or took anything out.  Doesn't mention
15          Cadillac.  It mentions a  vehicle with a blue tarp on
16          it.
17     Q.   So you would say and you would agree, as you said
18          before, that those two statements are very different
19          statements.
20     A.   What do you mean, those two statements?
21     Q.   "He then approaches a vehicle covered with a blue
22          tarp on it" is different from "Harris Junior arrived
23          at the residence and went over to a Cadillac covered
24          with a gray cover."
25     A.   They are.

1   Q.   Had you known at the time you decided there was

2        probable cause to arrest Lee Harris, Sr., that Lee

3        Harris, Jr., had in fact done what is on -- written

4        at the bottom of this paragraph --

5             MR. JONES:  You said "this paragraph."

6   BY MR. RUBERT-SCHEWEL:

7   Q.   Exhibit NN, the factual basis that Lee Harris, Jr.,

8        had on the 25th and the 31st, when these locations

9        were surveilled, "arrived at the residence, went over

10       to a Cadillac covered with a gray cover for a few

11       minutes consistent with placing an item in or

12       retrieving an item from the vehicle."

13            Had you known that at the time you decided

14       there was probable cause to arrest Lee Harris, Sr.,

15       for the drugs in that Cadillac, would that have

16       changed your opinion?

17  A.   No.

18  Q.   Why not?

19  A.   There were so many other factors that went into

20       probable cause for Lee Harris, Sr.

21  Q.   Such as what?

22  A.   An interview with Lee Harris, Sr.  During this

23       interview, he mentions to me, his words, that his son

24       hadn't brought anything to his property.  Okay?  He

25       told me that he hadn't seen his son at the property

1          prior to that morning.  He hadn't seen his son at the

2          property within the past month or two.

3    Q.    Okay.  So the interview?

4    A.    Yes, sir, the interview.  The knowledge of Lee

5          Harris, Sr., of the inner workings of that Cadillac,

6          what doors were locked, what doors were unlocked, the

7          fact that it was missing a battery, the fact that the

8          trunk was not operable.  I asked Lee Harris, Sr.,

9          specifically, "Are there any areas around your

10         property that your son goes to on a regular basis

11         that you believe is strange?"  His answer was no.

12                The vehicle in question was registered to Lee

13         Harris, Sr.  When asked about the keys, he took

14         officers to his bedroom to a set of keys that

15         contained the Cadillac emblem, I believe.  And as

16         Captain Marsh stated two days ago, we discussed this

17         then.  Lee Harris, Jr., had so many other places that

18         he could place and sell drugs from such as 811 West

19         New York, 1090 West Indiana, the storage building, it

20         made no sense for him to put his parents in harm's

21         way, put their property in question by placing drugs

22         on his parents' property like that.

23                All this combined, along with seeing Senior at

24         811 West New York Avenue speaking with known drug

25         dealers, the main narcotics distribution point of

Case 1:21-cv-00955-WO-JEP  Document 32-3  Filed 11/29/22  Page 118 of 180

1          this investigation, he was there.  All of this

2          combined led to probable cause to arrest.

3    Q.    So what do you think Lee Harris, Jr., was doing when

4          he was going under the gray cover of the Cadillac?

5          Do you think he was just messing around, just hanging

6          out out there, just dropping off some bubble gum?

7    A.    From notes, there was never a gray Cadillac -- a gray

8          cover observed.  There was a blue tarp.

9    Q.    Well, I'm -- I'm asking you to assume that what the

10         US Attorney from the Middle District of North

11         Carolina, Randall Galyon, wrote in a factual basis

12         Rule 11 statement is an accurate and truthful

13         statement.  So if we're operating under that

14         assumption that this is true --

15   A.    Okay.

16   Q.    -- what was the Lee Harris, Jr., doing there?  How do

17         you explain that?

18   A.    I can't --

19               MR. JONES:  Object to the form.

20   A.    -- answer that question.

21   BY MR. RUBERT-SCHEWEL:

22   Q.    And that doesn't factor into your probable cause

23         determination over who put the drugs in the vehicle.

24   A.    No.

25   Q.    As you sit here today, you still think that Lee

1        Harris, Sr., put those drugs in that vehicle.

2   A.   Probable cause existed to arrest on the day of.

3   Q.   And -- and -- and reading this right here, we assume

4        that to be true.  That doesn't change your mind.

5   A.   I can't answer as to how their information is

6        different from what the surveillance notes say.

7   Q.   I'm not asking you to answer that.

8   A.   Okay.

9   Q.   I'm asking you if that information -- if you believe

10       that information is true, does that change your mind?

11       That's what I'm asking you.

12  A.   Not necessarily, no.  Let's say -- let's -- we're

13       going to play what ifs?

14  Q.   Sure?

15  A.   What if Junior did put the drugs in the Cadillac?

16       How do we know he wasn't putting them there for his

17       dad to sell when he's out of town?

18            (Mr. Lee Harris, Sr., stood.)

19            MR. RUBERT-SCHEWEL:  Stop, stop, stop, stop,

20                stop, stop, stop.  You're going to have to

21                leave if you do that.  You can't do that.

22                Really.  Do you need to step outside?

23            MR. HARRIS, SR.:  Yes.

24            MR. RUBERT-SCHEWEL:  Why don't you go take a

25                break?

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

1                    (Mr. Harris, Sr., left the room at 3:11 p.m.)

2                    (The sound of a train passing was heard.)

3                    MR. JONES:  Go off the record for a moment.

4                    (Discussion off record.)

5    BY MR. RUBERT-SCHEWEL:

6    Q.   So I think your hypothetical that you just posed was

7         how do we not know that Lee Harris, Jr., placed them

8         in with the knowledge of his father.

9    A.   We -- that's right.  We don't know.

10   Q.   Was that -- was that your theory that you were

11        operating under when you --

12   A.   No.

13   Q.   -- made your probable cause decision?

14   A.   No, sir.  I explained my probable cause a minute ago.

15   Q.   And -- and your theory that you were operating under

16        was that Lee Harris, Sr., had placed the drugs in the

17        Cadillac.

18   A.   He had the drugs within his care, custody, and

19        control in a vehicle registered to him with him

20        having the keys.

21   Q.   So, I mean, let -- let's take another hypothetical.

22        You're at your house.  I don't know if you have kids

23        or a wife.  I'm not going to comment on that.  But

24        let's say you have friends.  You invite your friends

25        over to your house.  One of them goes to your car,

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 121 of 180

1        unbeknownst to you, puts drugs in your vehicle.

2   A.   Okay.

3   Q.   You have keys to that vehicle.  You have control over

4        that vehicle.  You have custody over that vehicle.

5        That vehicle is registered to you.  And now guess

6        what?  You're seen with a known drug dealer.  Is that

7        enough for probable cause to arrest you?  You have no

8        clue over it.

9   A.   Have I been seen at a known drug distribution place

10       giving cash to a known drug dealer?  So many other

11       things to take into account when deciding this.

12  Q.   Were you there on that day at 811?

13  A.   On the day of --

14  Q.   The day that you're --

15  A.   -- passing the money?

16  Q.   Yeah, the day that you're claiming he was handing

17       money to --

18  A.   I don't know if I was there --

19  Q.   -- a known drug dealer.

20            MR. JONES:  Wait for him to finish.  I'm

21            sorry.

22            COURT REPORTER:  Got it.

23  A.   I don't recall if I was personally there.

24  BY MR. RUBERT-SCHEWEL:

25  Q.   Are you aware of the identity of the person who you

1        claim he was passing money to?

2   A.   Yes.

3              (Mr. Harris, Sr., reentered the room at

4              3:12 p.m.)

5   Q.   Who was that person?

6   A.   Robert McRae.

7   Q.   Are you aware that he owns a car washing company?

8   A.   Yes.

9   Q.   Were you aware in 2018 that he owned a car washing

10       company?

11  A.   Yes.

12  Q.   When you watch that surveillance video, don't you see

13       Lee Harris, Sr., pulling up in his truck and parking

14       his truck in front of the house?

15  A.   I don't remember if he did or not.  I don't recall.

16  Q.   Well, I'm telling you that's what happened in that

17       video.

18  A.   Okay.

19  Q.   Do you recall that Lee Harris, Sr., got his car

20       washed by Robert McRae's carwash company after

21       handing him cash?

22  A.   We performed surveillance, and during the

23       surveillance the cash was observed to be exchanged.

24       We did not observe the actual vehicle being washed,

25       so, therefore, I'm not going to assume that.

1    Q.   Well, you just told me today that you weren't sure if
2         you were there or not.
3    A.   I -- I've seen the video.  I was -- don't remember if
4         was wood surveillance, if it was pole camera footage.
5         I -- I'm not sure.
6    Q.   And you're certain that there's no video showing that
7         car being washed.
8    A.   I'm not certain.  I don't recall that.
9    Q.   Okay.
10   A.   The car being washed?  I have not seen a video of any
11        car being washed.
12   Q.   So let -- let's -- let's go back to my hypothetical
13        again.  You're at your house.  There's cops outside
14        in the woods doing surveillance of your home.  Your
15        friend comes to your house, goes in your car, places
16        drugs in your car.  You've given cash to your friend
17        to wash your car, clean your car.  The police know
18        that your friend placed an object inside your car.
19        Do they have probable cause to charge you with
20        possession of those drugs?
21   A.   If they know I placed an item and --
22   Q.   No.  That he --?
23   A.   Placed an item in my car, they should have a general
24        idea of where that item was placed.  It all depends
25        on the circumstances.  There's a lot more details

 1          that go into this.  Depends on how well the
 2          surveillance is being conducted by the police
 3          officer.
 4     Q.   But the point is the fact that your friend placed
 5          those drugs in your car places a lot of question on
 6          whether or not they should arrest you for that,
 7          right?
 8     A.   If they observed him putting an item in my car, I --
 9          my question is, how well did they see it?  How well
10          was their vision -- their view?
11     Q.   But if we assume it to be true that they observed
12          them doing that --
13     A.   I don't assume.
14     Q.   Well, okay.  So did you write notes every single time
15          you surveilled Lee Harris, Sr.'s, residence?
16     A.   I don't recall.  I'm not sure.
17     Q.   Okay.  Approximately three weeks after the last noted
18          surveillance report, you apply for a warrant to
19          search Mr. Harris, Sr.'s, home.
20     A.   Yes, sir.
21     Q.   Your warrant's granted on February 20 of 2018?
22     A.   Yes, sir.
23     Q.   And before you execute that warrant, you meet with
24          the SRT team and officers in the Southern Pines
25          Police Department to plan the execution of the

1        warrant.

2    A.   Yes, sir.

3    Q.   Those officers included Marsh?

4    A.   I believe so.

5    Q.   Lowery?

6    A.   I believe so.

7    Q.   And is it Edwards who's the head of the SRT?

8    A.   I don't recall who was the -- I believe Captain

9         Heaton was the head of SRT at that point.

10   Q.   Was Captain Heaton present?

11   A.   He should have been.

12   Q.   How many SRT officers were present for that?

13   A.   I don't recall.

14   Q.   Approximately?

15   A.   Eight to ten.

16   Q.   Okay.  And do you recall having a meeting to discuss

17        the execution of the warrant?

18   A.   I don't recall doing it, but I'm sure we did.  You

19        always do that prior to executing your search

20        warrant.

21   Q.   And did you discuss that Officer Lowery was going to

22        go to 1090 and you were going to go to 803?

23   A.   Yes.

24   Q.   Mr. Harris's home was searched on February 20th,

25        2018.  What did you do when you first arrived at his

1        home?

2   A.   When I first got there, SRT went up on the porch.  If

3        I may go back to the briefing, I remember -- and I

4        remember saying this to Lee Harris, Sr.  I made it

5        known that there's no need to go into his house with

6        a ram and hit that front door.  He's going to open

7        the door.  Just let him open the door and let's go

8        from there.  So I made that known from the beginning.

9             Upon our arrival, SRT got up on the porch.

10       They knocked on the door.  Entry was made into the

11       residence without using a ram.

12  Q.   And just so I'm clear, you were present for this.

13  A.   I believe so, yes, sir.

14  Q.   Okay.  So you parked your car where?  Outside of the

15       residence somewhere?

16  A.   Yes.

17  Q.   And does SRT arrive in a van?

18  A.   I believe so.

19  Q.   And do you know who you arrived with or did you

20       arrive by yourself?

21  A.   I'm not sure.

22  Q.   So do you park out front and then stay inside your

23       car while SRT does the execution, or did you get

24       outside?

25  A.   I believe I stood in the yard.

1   Q.   Okay.  So what happens next?

2   A.   I heard on the radio they need other officers to come

3        inside to assist with detaining Lee Harris, Sr.  So

4        that's what I did.  I went inside the front door of

5        the residence.  There was an officer there with Lee

6        Harris, Sr.  And I believe I put him in the handcuffs

7        to detain him while the rest of the house was being

8        searched or cleared by SRT.

9   Q.   Okay.  At that point did you take Mr. Harris outside

10       of the house to be interviewed?

11  A.   I believe I read the front -- top page of the search

12       warrant.  I read that out loud.  And sometime

13       thereafter he was taken outside to my vehicle.

14       That's correct.

15  Q.   Do you know what happened between you reading the

16       front page of the search warrant and taking him

17       outside to the vehicle?

18  A.   What happened in between?

19  Q.   Yes.  If anything?

20  A.   I don't recall anything else.

21  Q.   So it happened pretty quickly is what I'm trying to

22       say.

23  A.   Ten minutes maybe, 15 minutes, somewhere in that

24       timeframe, but there wasn't a whole lot of time.

25  Q.   Were you inside the whole time that that --

1   A.   I don't recall.

2   Q.   Okay.  But at the time of the interview, Mr. Harris

3        was not yet under arrest.

4   A.   That's correct.

5   Q.   He was handcuffed.

6   A.   I believe so.

7   Q.   And he wasn't yet under arrest because you had not

8        yet located the cocaine in the vehicle.

9   A.   I'm not sure if it had been located yet or not.  I

10       believe during my interview with Lee Harris, Sr., I

11       explained that he is not under arrest, but I'm going

12       to cover the Miranda rights just to be on the safe

13       side.

14  Q.   Do you believe that the cocaine was located by

15       Officer Marsh during your interview?

16  A.   I'm -- I'm not sure.

17  Q.   Were you present when the cocaine was located?

18  A.   No.

19  Q.   Were you present when the car search happened?

20  A.   No.

21  Q.   When you brought him into the car --

22  A.   To interview?

23  Q.   Yeah.

24  A.   My car, yes, sir.

25  Q.   -- had anyone told you -- did Marsh come up and tell

1       you "we just found cocaine"?

2   A.  I don't remember that.

3   Q.  Well, I mean, you tell him at the time he's not under

4       arrest.

5   A.  Yes, sir.

6   Q.  And in the interview -- okay.  I'll strike that

7       question.  So after you advise him of his Miranda

8       rights, was part of it advising him, you told him

9       that he could stop answering questions -- that he

10      could start answering questions but stop at any time.

11  A.  That's part of the Miranda rights, yes, sir.

12  Q.  And you told him that this was mainly about his son,

13      not him.

14  A.  That's correct.

15  Q.  And Lee told you that when Harris Junior comes here,

16      he stays at Harris Senior's home just like all of his

17      other kids.

18  A.  I believe so.

19  Q.  He told you, "I don't do dope.  I don't curse.  I

20      don't drink liquor."

21  A.  And I believe he said, "I don't even smoke

22      cigarettes."  Yes, sir.

23  Q.  And he also said, "What my kids do, I can't control."

24  A.  I believe so.

25  Q.  And you told him that the last few times you had met

Case 1:21-cv-00955-WO-JEP   Document 32-3   Filed 11/29/22   Page 130 of 180

1      or seen each other out, it changed your perception of

2      him.

3   A.  I don't remember if I used those exact words, but I

4      remember something to that effect.

5   Q.  And you asked him about his son and if he believed

6      his son had brought anything to his house?

7   A.  Okay.  Yes, sir.

8   Q.  Any drugs to his house --

9   A.  Yes.

10  Q.  -- or contraband.  Why did you ask him that question?

11  A.  I am in a position I'm trying to learn from him.  And

12     not only am I looking for words from him, a response,

13     but I'm also looking for a reaction, okay?  That's

14     should part of interview/interrogation.

15  Q.  So it wasn't because Officer Lowery had told you that

16     he had seen Junior place items in the Cadillac?

17  A.  Not at all.  I don't know what's -- I didn't go there

18     expecting to find anything anywhere, but probable

19     cause had been established for the search warrant.  I

20     had no idea what was going to be where.

21  Q.  I mean, when you do a search warrant application, you

22     list items that you expect to seize, right?

23  A.  That's correct.

24  Q.  And when you -- on that application you listed drugs.

25  A.  What I'm saying is I had no knowledge of any drugs or

 1       anything being placed into a Cadillac.  When I asked

 2       that question, "Has your son brought anything here,"

 3       that's not a purpose for that question.

 4    Q.   Okay.  Now, you stated to Lee that "On February 7th,

 5       your son spent the night here."

 6    A.   It sounds familiar.

 7    Q.   Did you do surveillance on February 7th?

 8    A.   I don't recall without looking at notes, without

 9       looking at --

10    Q.   Well, you don't have any notes saying you did any

11       surveillance on February 7th that I've seen.

12    A.   Tracker notes?

13    Q.   What are tracker notes?

14    A.   The history of the tracker.

15    Q.   Have you turned that over to your attorney?

16    A.   He has everything I have.

17    Q.   I don't think I've ever seen any tracker notes.  What

18       are tracker notes?  Why don't you describe them for

19       us, please?

20    A.   There's a handwritten set of notes of where the

21       tracker went throughout that time.

22    Q.   Okay.  Do you know where those notes are located

23       currently?

24    A.   They were a part of the prosecution summary.

25            MR. JONES:  They're --

1              MR. RUBERT-SCHEWEL:  They're in the

2                  prosecution summary?

3              MR. JONES:  They are, yeah.

4              MR. RUBERT-SCHEWEL:  Okay.

5              MR. DAVIS:  I -- I've never seen anything --

6                  off the record.

7              (Discussion off record.)

8   BY MR. RUBERT-SCHEWEL:

9   Q.   But as you sit here today, you don't know if you were

10       actually doing surveillance in February.

11  A.   Without referring to my notes, a certain day -- if I

12       told him that his son stayed there on February 7th, I

13       had no reason to say anything otherwise.  So there's

14       a fact behind me saying that.

15             MR. RUBERT-SCHEWEL:  Why don't we take a short

16                 break, if that's okay?

17             MR. JONES:  Yeah, that'll be great.

18             (Recess from 3:29 p.m. to 3:42 p.m.)

19  BY MR. RUBERT-SCHEWEL:

20  Q.   So these notes that you pointed out to us of the GPS

21       tracker, they're handwritten notes.

22  A.   Yes.

23  Q.   Are those handwritten by you?

24  A.   I believe so.

25  Q.   And they're handwritten on a spiral notebook?

1    A.   Yes.
2    Q.   A spiral binder?  And they also appear to contain
3         notes about what occurred on these dates.  For
4         example, some of the notes say "dropped something on
5         left side of house" --
6    A.   Yes.
7    Q.   -- which you could only have known from visual
8         surveillance.
9    A.   Yes.
10   Q.   Either done in person or potentially with a pole
11        camera.
12   A.   Yes.
13   Q.   So is it fair to say that these notes are a
14        compilation of both a GPS tracker surveillance and
15        visual surveillance.
16   A.   Yes.
17   Q.   How did you get the information to provide the notes
18        about the visual surveillance in this notebook pad.
19   A.   Can you repeat that, please?
20   Q.   Yeah.  So where did the -- I understand the GPS.
21        It's obvious, right?  You were, I assume, looking at
22        the GPS tracker, seeing where it was going, saying,
23        "Okay, he's at this location.  This is dad's house."
24   A.   Yes, sir.
25   Q.   I can put in 1634 arrive at dad's.

1    A.    Right.

2    Q.    Where did the information come from that says "Met

3          Calvin," for example?

4    A.    Through physical surveillance or video surveillance.

5    Q.    Okay. And so when you're filling out this notebook,

6          were you going back through Lowery's and Reilly's

7          reports and other officers' reports to fill it out,

8          or was this being done in real time where someone was

9          calling you up and saying "I'm here right now and

10         he's meeting Calvin"?

11   A.    Do you remember the location of -- does it have a

12         location we can look at?

13   Q.    Yes.  Okay.  So, for example, on February 16th, 2018,

14         it says "Dash Charger 1500 arrive American Cleaners,

15         1512 arrive Cold Stone parking lot, met Calvin."

16   A.    Okay.  That's physical surveillance.  I believe I

17         personally observed that.

18   Q.    Okay.

19   A.    That's just from my memory.

20   Q.    Okay.  So is it possible that in addition to your own

21         physical surveillance -- or -- or tell me.  Is -- are

22         any notes in here a product of your own physical

23         surveillance?

24   A.    Yes.

25   Q.    And is it possible that some of your notes in here

1          are also products of others' physical surveillance?

2    A.    It's possible.

3    Q.    So Lowery or someone could have called you and said,

4          "Jason, I'm here right now," and you could have put

5          it in your notebook.

6    A.    It's -- it's possible.  Those were my notes.  I don't

7          remember that happening necessarily --

8    Q.    Okay.

9    A.    -- but it's possible.

10   Q.    I'm just trying to figure out the basis for this

11         information.  So it sounds like most of this

12         information was provided by you or the GPS tracker.

13   A.    Yes, sir.

14   Q.    Okay.  And is this all surveillance of Lee Harris,

15         Jr.'s, vehicle?

16   A.    Yes.

17   Q.    So on this document for 2/20/18, it says "At 1125

18         dad's."  Is it fair to say that at 2/20/18 Lee

19         Harris, Jr., was at Lee Harris, Sr.'s, residence?

20   A.    The vehicle was there.  He was thought to be there

21         also.

22   Q.    It says on that same date at 11:17 He was at a

23         storage locker.

24   A.    Yes.

25   Q.    What does "storage locker" refer to?

1   A.   Storage locker, storage building, business across

2        from Bernie's Hardware in Aberdeen.

3   Q.   Did you ever search that locker?

4   A.   I personally did not.

5   Q.   Did someone from Southern Pines search that locker?

6   A.   Yes.

7   Q.   Did they find narcotics in that locker?

8   A.   Yes.

9   Q.   What type of narcotics?

10  A.   Cocaine.

11  Q.   Was the cocaine packaged in the same way as the

12       cocaine that was located in the Cadillac?

13  A.   I don't recall.

14  Q.   Okay.  But according to these notes, Lee Harris, Jr.,

15       was at the storage locker on the date of the search

16       at 11:17, and then eight minutes later was at his

17       father's house.

18  A.   Okay.

19  Q.   Does that seem accurate to you?

20  A.   Very probable.  Without looking at it, I --

21  Q.   Now, according to these notes also, it says on

22       February 18th of 2018 at 12:46 he was at dad's.  Is

23       it fair to say that when it says "dad's" in here it's

24       referring to Lee Harris, Sr.'s?

25  A.   Yes, sir.

 1  Q.  And it also here shows that shortly before he was at
 2      dad's, eight minutes before he was at the storage
 3      locker.  On either of these dates that we just talked
 4      about, the 18th through the 20th, do you recall doing
 5      physical or in-person surveillance and observing
 6      either of those instances that we just discussed?
 7  A.  In-person surveillance, I don't recall.
 8  Q.  What does "arrive at T dot H" stand for?
 9  A.  I believe that's going to be target house.
10  Q.  What is "target house"?
11  A.  I don't recall if that was 811 West New York Avenue
12      or 1090 West Indiana.
13  Q.  Okay.  In -- in -- in this note that I'm looking at,
14      it says 1310 and this is -- just for the record, it's
15      February 13th, 2018.  It says, "at 1310 arrived at
16      1090.  At 13" -- it's hard to read exactly, but at
17      some point after that he left, and then at 1318 he
18      arrived at the target house.  Does that tell you --
19  A.  It should be 811 West New York Avenue.
20  Q.  If it was an address other than 1090, likely 811?
21  A.  Yes, sir.
22          (Brief pause.)
23  Q.  Okay.  I'm looking at 1/31/18, so on one of the dates
24      that your -- that Officer Lowery took notes about.
25  A.  Yes, sir.

1    Q.   It starts -- Exhibit P is the document that I'm

2         referring to Officer Lowery taking notes.  It says it

3         starts at 1048 hours.  Says, "Leave home."  There's a

4         few other entries, and around 13 -- at 1313, it says,

5         "Arrive at TH," target house, and it looks like "drop

6         dope left of house steps," comma, "behind."

7              And let me -- let me just back up, so --

8         sorry.  Strike that.  I'll keep going.

9              After the target house, he leaves at 1330.  He

10        arrives at Greensboro Ave/Hill Ave.  Do you know what

11        that location is?

12   A.   No, sir.

13   Q.   He leaves that location at 1400.  1430 he arrives at

14        back roads, 397 Lees Branch Road?

15   A.   Yes, sir.

16   Q.   Do you know that location?

17   A.   I do.

18   Q.   What is that?

19   A.   The residence of Calvin Fox.

20   Q.   Okay.  1437 leaves that location, arrives at store in

21        Vass.  Do you know what that refers to?

22   A.   No, sir.

23   Q.   "1450 leaves.  1503 arrives ant car hunters.  1505

24        leaves.  1509 arrive at dad's.  Calvin Fox in car

25        with Junior.  Junior goes to tarp."

1   A.   Okay.

2   Q.   So these are your handwritten notes.

3   A.   Yes, sir.

4   Q.   And you said earlier that any handwritten notes were

5        a product of your personal surveillance.

6   A.   I said it was possible that any handwritten notes

7        could also be from other officers.  It was possible.

8   Q.   Okay.

9   A.   But what I remembered was most of that was from my

10       observations.

11  Q.   Okay.  So in this situation, do you recall if that

12       statement "Calvin Fox in car with Junior.  Junior

13       goes to tarp," was that statement based off of your

14       observations or another officer's?

15  A.   I was not at the father's house doing surveillance at

16       that point.  It had to be -- had to have been from

17       another officer's surveillance.

18  Q.   And were are these notes taken real time as this

19       occurred?

20  A.   Some were.  Some were playing catch-up.  It's a

21       weekend.

22  Q.   Okay.  So it's possible that what happened here is

23       you went back, looked at the GPS tracker, compared it

24       to the Lowery's report, and filled it in?  Or I'm

25       just trying to figure out how that would work?

1   A.   This notebook -- I mean, I kept it with me pretty
2        much the whole time.  I -- I don't recall if this was
3        real time or if I went back to refer to Lowery's
4        notes --
5   Q.   Or if you had a conversation with him?
6   A.   I don't recall.
7   Q.   When Lowery was out in the woods doing surveillance,
8        did he have -- how would he have gotten in
9        communication with you if he wanted to?
10  A.   Probably through either radio or a phone call.
11  Q.   Would that radio have been recorded?
12  A.   It all depends on what channel is being used.  There
13       are times when an event channel is being used and
14       that's monitored by the -- the state, you could say,
15       in Raleigh.  I -- I don't recall what channel was
16       being used for our conversation.
17  Q.   And if a channel was being used, it would create an
18       event report like the one I showed to Officer Marsh
19       at his deposition?
20  A.   That was -- what you showed Captain Marsh was
21       directly through dispatch.
22  Q.   Uh-huh.
23  A.   A CAD was called --
24  Q.   Uh-huh.
25  A.   -- for call for service --

1   Q.   Yeah.

2   A.   -- basically.  Whenever we're just talking from one

3        officer to another, dispatch is not entering notes

4        necessarily.  They're -- they're paying attention to

5        what patrol officers are doing.  I'm referring to

6        conversations from one officer to another.  Patrol's

7        not -- Communications is not necessarily monitoring

8        that.

9   Q.   But if there's an event report created, it's possible

10       that they could have been?

11  A.   There was not an event report created for wood

12       surveillance that I'm aware of, no, sir.

13  Q.   Okay.  If there was one created, would they -- could

14       there have been notes of that?

15  A.   Could have been, but I don't remember any wood

16       surveillance being CAD'd out -- it's called CAD'd --

17       through dispatch.

18  Q.   But you also said that it could have been audio

19       recorded.

20  A.   it depends on what channel is being used.

21  Q.   What channel is -- is audio recorded?

22  A.   The main dispatch to -- through the police department

23       is recorded.  I'm not sure if -- there's an

24       investigations channel.  I'm not sure if it's

25       recorded or not.

1  Q.   Okay.

2              MR. RUBERT-SCHEWEL:  And we'll request those

3                   as well.

4  BY MR. RUBERT-SCHEWEL:

5  Q.   Do you know how long those are preserved for?

6  A.   I do not.

7  Q.   I know you're not the custodian of records.

8  A.   No, sir.

9  Q.   Do you recall Officer Lowery ever calling you from

10       surveillance and giving you details of what was

11       happening live or shortly after they were happening?

12 A.   It was possible.  I don't remember that necessarily

13       happening on one certain event, but there are times

14       when the radios -- the transmission doesn't pick up.

15       The frequency is not clear, so the phone call needs

16       to be made.

17 Q.   A cell phone call.

18 A.   Yes, sir.  I don't -- it's possible, but I don't

19       remember one certain event of that happening.

20 Q.   Do you recall him ever texting you?

21 A.   I don't recall it.

22           (Brief pause.)

23              MR. RUBERT-SCHEWEL:  All right.  Here you go,

24                   Nichad.

25              MR. JONES:  If you don't mind, can you either

1                              now or afterwards just give me a heads-up

2                              on the Bates numbers for that that you were

3                              referring to just so we can --

4                    MR. RUBERT-SCHEWEL:  Yeah.  Why don't you go

5                              ahead and just tell him now, Nichad?

6                    MR. DAVIS:  Yeah.  Of all the notes?

7                    MR. RUBERT-SCHEWEL:  Here.  Pass it over here.

8                              I'll tell him.

9                    MR. DAVIS:  Okay.

10                   MR. JONES:  Just one so I can --

11                   MR. DAVIS:  Yeah.

12                   MR. RUBERT-SCHEWEL: I think in the -- in the

13                             prosecution summary they're mark 682 to

14                             690, maybe 700, but it starts here around

15                             -- I can tell you exactly -- Harris 1048.

16                   MR. JONES:  Okay.  Perfect.  It's -- I just --

17                             so that I know.

18                   MR. DAVIS:  Thank you.

19                   MR. RUBERT-SCHEWEL:  Here you go, Nichad.

20      BY MR. RUBERT-SCHEWEL:

21      Q.   Okay.  So let's go back to our conversation about

22           your interview with Harris Senior.  At some point we

23           were talking about your stating approximately that

24           meeting him recently or talking to him recently had

25           changed your perception of him.

1           Now, after y'all had that conversation, or you
2      said that or approximately that, he told you that as
3      far as he knew his son had not brought nothing here.
4  A.   Yes, sir.
5  Q.   He said, "I live here.  I am retired.  I'm a disabled
6      veteran.  I'm here all the time."  Do you recall
7      that?
8  A.   Sounds accurate.
9  Q.   And then you said, "Brought nothing that you know
10     of."
11 A.   Okay.  It sounds accurate.  Without listening to it,
12     I'm --
13          MR. RUBERT-SCHEWEL:  Nichad, why don't you
14             pull it up and five minutes, please?
15          MR. DAVIS:  Go ahead and play it?
16          MR. RUBERT-SCHEWEL:  Uh-huh.
17          (Mr. Davis played a portion of a recording.)
18          MR. RUBERT-SCHEWEL:  You can turn it up.
19          (Mr. Davis continued to play a portion of a
20             recording.)
21          MR. RUBERT-SCHEWEL:  You can pause it.
22 BY MR. RUBERT-SCHEWEL:
23 Q.   So does that refresh your recollection to the -- at
24     some point you said "that you know of"?
25 A.   What he said was, "Don't nobody even come here."  And

1       I said, "That you know of."  Yes, sir, that's

2       correct.

3  Q.   And what you meant by that is that there could have

4       been people coming there with contraband to his house

5       and that he didn't know of it.

6  A.   If he said people didn't come here and I know for a

7       fact he talked with Calvin Fox just a few weeks

8       before, there might have been other folks that had

9       stopped by that he wasn't aware of.

10              MR. RUBERT-SCHEWEL:  Nichad, can you back that

11                  up a little bit, please?

12              MR. DAVIS:  Can we go off the record?

13              MR. RUBERT-SCHEWEL:  What's up?

14              MR. DAVIS:  He -- we could play the recording

15                  back, but he -- he actually said --

16              MR. RUBERT-SCHEWEL:  Well, I don't -- no.

17              MR. DAVIS:  -- he had brief --

18              MR. RUBERT-SCHEWEL:  Go back to -- go to four

19                  minutes, please.

20              MR. DAVIS:  Okay.

21              (Mr. Rubert-Schewel and Mr. Davis conferred.)

22              MR. RUBERT-SCHEWEL:  And before you do that,

23                  what exhibit is this?

24              MR. DAVIS:  This is Plaintiff's Exhibit OO.

25              MR. RUBERT-SCHEWEL:  Okay.  And this is the

1                    audio recording of the interview between

2                    Jason Perry and Lee Harris, Senior, that

3                    occurred in Jason Perry's squad car on

4                    February 20th, 2018, at some point after

5                    the search warrant was executed.

6             (Plaintiff's Exhibit OO was identified.)

7             (Mr. Davis played a portion of Plaintiff's

8             Exhibit OO.)

9             MR. RUBERT-SCHEWEL:  Pause that.

10    BY MR. RUBERT-SCHEWEL:

11    Q.   So what you said to him was, "Things have happened

12         that have come directly from this house."

13    A.   Uh-huh.

14    Q.   Right?

15    A.   Yes.

16    Q.   What did you mean by that?

17    A.   I believe that I was referring to the ounce of heroin

18         that was recovered at 811 West New York Avenue by an

19         officer.

20    Q.   And did -- from your recollection, did Lee Harris,

21         Jr., come from his father's house?

22    A.   I believe he was at the father's house.  He went to

23         the storage building and then to 811.

24    Q.   And then -- so after that you said "nothing that you

25         know of" in response to him saying had -- "he hasn't

1  brought nothing here" or "nobody's brought nothing

2  here."

3 A. He said nobody comes here, and I said "That you know

4  of."  Not in regards to he had brought nothing here.

5  I didn't say "That you know of" there.  He said,

6  "Nobody comes here," and my response was, "That you

7  know of."

8 Q. Well, let me just ask you, then.  I mean, you --

9  you'll admit that you knew that Junior was bringing

10  or you thought that Junior was bringing drugs to

11  Senior's house.

12 A. It was a normal stop for him, yes.

13 Q. So you thought --

14 A. He laid his head there also.

15 Q. It was certainly a high possibility that Junior was

16  bringing drugs to his house.

17 A. He laid his head there.  What he was doing there, I'm

18  not sure.

19 Q. So you don't think that.

20 A. I had no opinion as to what he was doing while he was

21  there.

22 Q. I'm -- I'm not asking you what he was doing or, you

23  know.  I'm -- I'm just asking you if you think when

24  Junior was at his house if Junior had drugs in his

25  possession somehow.

1   A.   If we saw drugs in his possession, then it was took

2        -- taken down in notes.  I have no opinion as to what

3        he was doing while he was there.  Most of the time he

4        was there throughout the nighttime hours.

5   Q.   Okay.

6             MR. RUBERT-SCHEWEL:  All right.  Can you just

7                 start at six minutes, please?  This is the

8                 same exhibit.

9             (Mr. Davis played a portion of Plaintiff's

10                Exhibit OO.)

11            MR. RUBERT-SCHEWEL:  Pause it, please.  Where

12                are we pausing this?  What minute is it?

13            MR. DAVIS:  This is seven minutes.  I can go

14                back to where you said pause it at.

15            MR. RUBERT-SCHEWEL:  No, no, no.

16            MR. DAVIS:  7:13.

17            MR. RUBERT-SCHEWEL:  Just 7:13?

18            MR. DAVIS:  Yeah.

19            MR. RUBERT-SCHEWEL:  Okay.  So just for the

20                record, it's paused at 7:13.

21  BY MR. RUBERT-SCHEWEL:

22  Q.   So you just asked Lee who's got the keys to the

23       Cadillac.

24  A.   Okay.

25  Q.   You stated earlier that you did not think that at

1       this point Marsh had informed you that drugs were
2       found in the Cadillac?
3   A.  Unsure.  I don't -- I'm not sure at what point I was
4       notified of drugs being in the Cadillac.
5   Q.  Well, why are you asking Lee about who's got the keys
6       to the Cadillac if you don't think -- why are you
7       asking him that?
8   A.  I'm unsure.  I'm not sure the sequence of events that
9       occurred, whether I asked that question prior to the
10      cocaine -- the Cadillac being searched, whether I was
11      notified that three of the doors were locked on the
12      Cadillac and therefore I'm asking where's the keys
13      at.  It's very possible.  I'm not sure.  I don't
14      know.
15  Q.  Why didn't you ask for the keys to his truck?
16  A.  If I was there in the moment right now, I could give
17      you an answer to that.  But four years ago and
18      looking back on it now, I -- I can't give you the
19      sequence of events as to why I asked the question
20      when I did.
21  Q.  Why did you not ask for the keys to the storage unit?
22  A.  We weren't at the storage unit yet.
23  Q.  Well, the store -- whatever the unit is directly
24      behind his house or next to his house in the
25      driveway?

1   A.   Storage building?  I don't know.  It's -- it's

2        possible that Captain Marsh had -- I don't know if

3        the -- the K9 had already alerted.  I'm not sure.  I

4        do not know.

5   Q.   Yeah.  Earlier when I asked you that, you said you

6        did know.  You said you didn't think so, actually.

7   A.   I do not know.  I don't know the sequence of events

8        as far as timing goes.

9   Q.   Is it possible it's because you thought that there

10       were drugs in the Cadillac.

11  A.   No.  No.  No.

12  Q.   You really did not think that.  As you're sitting

13       here today, you're telling me --

14  A.   I have no knowledge.

15           MR. JONES:  Wait.

16  BY MR. RUBERT-SCHEWEL:

17  Q.   -- you did not think when you went to that house that

18       there were drugs in that Cadillac?

19  A.   I had no knowledge of drugs being in the Cadillac.

20  Q.   I'm not asking you if you had knowledge of them.  I'm

21       saying did you think that you were going to show up

22       there and find drugs in that Cadillac?

23  A.   I had no opinion of that.

24  Q.   Well, what do you mean by "no opinion"?

25  A.   No.  I didn't go there expecting that.  That's what

1          you're asking.

2     Q.   So you don't know why you asked about the keys to the

3          Cadillac.

4     A.   I can't give a good answer based off this audio

5          interview.  As far as timing, there were many other

6          moving parts and everything else that's going on on

7          the property.  I can't give a accurate answer.

8               MR. RUBERT-SCHEWEL:  Nichad, can you go to

9                    10:30, please?  Or a little before 10:30, I

10                   think, in the same exhibit?

11              MR. DAVIS:  Would 10 minutes be fine, or

12                   10:12?

13              MR. RUBERT-SCHEWEL:  Sure.  Just tell the --

14                   for the report -- reporter on the record,

15                   you've got to say when you're starting it.

16              MR. DAVIS:  Okay.  I am going to start the

17                   video at 10 -- sorry.  I'll start the video

18                   at 10:15.

19              (Mr. Davis played a portion of Plaintiff's

20                   Exhibit OO.)

21              MR. RUBERT-SCHEWEL:  Will you pause it?

22                   What's it -- what's the minute?

23              MR. DAVIS:  Paused at 11:08.

24    BY MR. RUBERT-SCHEWEL:

25    Q.   So he invoked Miranda.

 1  A.   I believe so.

 2  Q.   And then you continued to ask him questions.

 3  A.   We started talking about his wife that pulled up in

 4       the parking lot.

 5  Q.   Well, you asked a question about his wife.

 6  A.   Yes.

 7  Q.   Do you believe that was a Miranda violation?

 8  A.   No.

 9  Q.   Why not?

10  A.   I was not trying to interrogate him of any wrongdoing

11       of his own.  I'm not trying to -- nothing illegal

12       about his wife pulling up in the yard.

13  Q.   So he invoked Miranda when you asked him about money

14       or cash in the house.

15  A.   I'm not sure if he was trying to invoke in regards to

16       that particular question or all questions.

17  Q.   But that is when he did invoke.

18  A.   In regards to that question yes, sir.

19  Q.   So by that, you're -- you're -- you're telling me

20       that by asking him about his wife, because that was

21       not, let's say, investigatory questioning, that was

22       not a Miranda violation.

23  A.   In my opinion.

24  A.   Okay.

25            MR. RUBERT-SCHEWEL:  Nichad, can you please go

1                    to 23:30 of the same exhibit?  And just let

2                    us know what you start on.  Give me a

3                    little bit before.

4              MR. DAVIS:  I am at 23:04 on the video.

5              Ready?

6              (Mr. Davis played a portion of Plaintiff's

7              Exhibit OO.)

8              MR. RUBERT-SCHEWEL:  Pause it, please.  Where

9                    are you pausing that?

10             MR. DAVIS:  Paused at 23:31.  I can back it up

11                    if you want.

12   BY MR. RUBERT-SCHEWEL:

13   Q.   So you just asked, "Is there any place around your

14        house that your son goes on a regular basis that is

15        kind of strange?"

16   A.   Yes, sir.

17   Q.   Why did you ask that question?

18   A.   I'm trying to figure out if there was any truth to

19        it, if there is any place he goes to that's strange

20        on a regular basis.  I'm trying to learn from him by

21        words, by reactions.

22   Q.   But were you asking that question because of the

23        observations of Junior walking around the back of the

24        house placing items?

25   A.   Not necessarily, no, sir.

1    Q.   So why were you asking that question?

2    A.   Yet again, I'm -- I'm looking for a response from

3         him.  I'm looking for reactions to see if his

4         reactions is equally what the words coming out of his

5         mouth is.

6    Q.   I know, but when we ask questions, we do them based

7         typically on what we know or what we think they may

8         elicit.  So it doesn't make any sense to me that

9         you're asking him that question just out of the blue.

10   A.   I ask that question on a regular basis with drug

11        investigations.

12   Q.   You ask, "Is someone just walking around strange or

13        being somewhere around the house they shouldn't be?"

14   A.   Right.

15   Q.   It was just a coincidence that y'all had actually

16        observed Junior doing that?

17             MR. JONES:  Object to the form.  Are you

18                 asking is it a coincidence or are you

19                 asking --

20   BY MR. RUBERT-SCHEWEL:

21   Q.   I'm asking if it is a coincidence that you had in

22        your notes that we just read through, your

23        handwritten notes as well as surveillance logs of

24        Officer Lowery and Officer Reilly, and on -- on

25        January 20th of yourself showing Junior or

1           documenting Junior walking around the house.  It's

2           just a coincidence that you also asked him that

3           question.

4    A.    I'm trying to figure out what he can tell me.

5    Q.    And that question was about whether or not -- that

6           question stated, "Is there any place around your

7           house that your son goes to on a regular basis that

8           is kind of strange?"

9    A.    Yes.

10   Q.    That son is about -- that -- that -- what does that

11          question mean to you.

12   A.    Are there any locations around your house that your

13          son goes to on a regular basis that's strange.

14   Q.    Okay.

15   A.    That question to me is exactly what I asked, but

16          there's no reading into it.  It is what it is.

17   Q.    Is it fair to say that that means "Have you seen

18          Junior" or "Are you aware of Junior going around your

19          house and doing -- in -- in some locations that you

20          think are odd?"

21   A.    That could be construed in the same --

22   Q.    Okay.  So it's clear, you agree with me that this --

23          it is what it is.  We should take it for face value.

24          There's no other meaning?

25   A.    It's black and white.

1    Q.   Okay.   Thank you.

2               MR. RUBERT-SCHEWEL:  Can you play it -- well,

3                 just play it.

4               MR. DAVIS:  23:50?

5               MR. RUBERT-SCHEWEL:  No, play it now.

6               MR. DAVIS:  All right.  Starting at -- again

7                 at 23:31.

8               (Mr. Davis played a portion of Plaintiff's

9               Exhibit OO.)

10              MR. RUBERT-SCHEWEL:  So pause it right there.

11   BY MR. RUBERT-SCHEWEL:

12   Q.   So when he just answered your question about going

13        around the house, he says, "The first time I've seen

14        him around the house is when he just took my dog

15        around the house on a walk."

16   A.   That's what he said.

17   Q.   First time in a month or two.

18   A.   That's what he said.

19   Q.   And he's referring to the last time he had seen his

20        son walk around the house.  Right?

21   A.   I can't answer as to what he's referring to, but

22        that's what he said.

23   Q.   Well, what's your opinion on what that means?  What's

24        he referring to?

25   A.   When he saw him earlier that day, that was the first

1      time he had seen him around his house in a month or

2      two.

3  Q.   What do you think that means?

4  A.   The first time he had been there.  First he had been.

5  Q.   But I thought that you just told me that you were

6      asking him if he had seen him any odd places around

7      the house in any strange areas.

8  A.   Uh-huh.

9  Q.   That's what --

10              MR. JONES:  That's a yes.

11              THE WITNESS:  Yes.

12  BY MR. RUBERT-SCHEWEL:

13  Q.   That's what your question was eliciting a response

14      of, had you seen him anywhere strange around your

15      house, going into strange areas, right?

16  A.   That's correct.

17  Q.   And he tells you, he responds, "Not in two months.

18      The first time I've seen him do it in two months is

19      when -- today when he walked the dog oddly around the

20      house," right?  He wasn't saying I haven't seen my

21      son in two months.  He wasn't saying he hasn't been

22      here in two months.  He's saying, "I haven't seen him

23      walk around the house in -- in two months or so.  The

24      last -- the first time he's done it is today.  He's

25      saying -- and then after this he says, "Pretty much

1        every time he's here, he comes in, goes to sleep, and
2        leaves."  Do you disagree with me?
3   A.   My interpretation of what he said, "When I saw him
4        earlier today, that was the first time I had seen him
5        around my house within the past month or two."
6   Q.   Even though your question was about anything strange
7        around the house or in any strange areas around the
8        house.
9   A.   Absolutely.
10  Q.   That was still your interpretation?  Okay.
11               MR. RUBERT-SCHEWEL:  Nichad, can you keep
12                  playing it?
13               MR. DAVIS:  For the record, I stopped it at
14                  23:48 and I'm going to play it again at
15                  23:48.
16               (Mr. Davis played a portion of Plaintiff's
17               Exhibit OO.)
18               MR. RUBERT-SCHEWEL:  Can you pause it?  So
19  what -- where are you pausing it at?
20               MR. DAVIS:  24:03.
21  BY MR. RUBERT-SCHEWEL:
22  Q.   Did you hear him say, "My son comes here and leaves"?
23  A.   I did not.
24               MR. RUBERT-SCHEWEL:  Can you rewind it ten
25  seconds, please, Nichad?

1              MR. DAVIS:  Rewinding to 23:53.

2              (Mr. Davis played a portion of Plaintiff's

3              Exhibit OO.)

4              MR. RUBERT-SCHEWEL:  Pause.

5    BY MR. RUBERT-SCHEWEL:

6    Q.   You didn't think that said, "My son comes here and he

7         leaves"?

8    A.   There was a lot of communication right through there,

9         a lot of I'm talking, he's talking, we're both

10        talking, and something else sounds like it's

11        rattling, and I --

12   Q.   Do you want to try it one more time?

13   A.   I still can't hear it.

14   Q.   We can pass it over here.

15             MR. RUBERT-SCHEWEL:  Can you pass it over

16                here?

17             MR. DAVIS:  Yeah.  I'm going to rewind it ten

18                seconds.

19             (Mr. Davis played a portion of Plaintiff's

20             Exhibit OO.)

21   BY MR. RUBERT-SCHEWEL:

22   Q.   I'm just going to turn it up as loud as I can and I'm

23        going to play it at 23:52.

24   A.   Uh-huh.

25   Q.   Just one more time.

1               (Mr. Davis played a portion of Plaintiff's

2               Exhibit OO.)

3    A.    It did sound like -- he said, "He don't -- he don't,"

4          and then something to the effect of "comes here and

5          leaves" is what I heard.

6               MR. RUBERT-SCHEWEL:  Can you continue playing

7                    the same exhibit, the audio, Nichad, just

8                    from where we are now?  What -- what are we

9                    at?

10              MR. DAVIS:  We're at 24:01.

11              MR. RUBERT-SCHEWEL:  Go ahead and play it

12                   until I tell you to pause, please.

13              (Mr. Davis played a portion of Plaintiff's

14              Exhibit OO.)

15              MR. RUBERT-SCHEWEL:  Pause it.

16              MR. DAVIS:  24:24.

17   BY MR. RUBERT-SCHEWEL:

18   Q.    So he says, "I'm sure he was here three weeks ago."

19   A.    I believe so.

20              MR. RUBERT-SCHEWEL:  Keep playing, Nichad.

21              (Mr. Davis began to play a portion of

22              Plaintiff's Exhibit OO.)

23              MR. JONES:  I'm sorry, what -- where are we

24                   starting?

25              MR. DAVIS:  Started at 24:24.

Case 1:21-cv-00955-WO-JEP  Document 32-3  Filed 11/29/22  Page 161 of 180

1                    (Mr. Davis continue to play a portion
2                    Plaintiff's Exhibit OO.)
3                    MR. RUBERT-SCHEWEL:  Pause it, please.
4                    MR. DAVIS:  Paused at 24:45.
5     BY MR. RUBERT-SCHEWEL:
6     Q.   So you just asked him again if there was any large
7          amounts of money in his house, right?
8     A.   Yes, sir.
9     Q.   In your opinion, was that a Miranda violation?
10    A.   I'm not sure.
11    Q.   I believe that earlier you stated one of your factual
12         basis for believing that there was probable cause to
13         arrest Mr. Senior was that he was deceptive in his
14         answers.  Is that accurate?
15    A.   I believe Captain Marsh saying that is a factor?  I
16         don't think I mentioned that.
17    Q.   So I have in my notes, and it will be on the
18         transcript --
19    A.   Yes, sir.
20    Q.   -- that one of the facts you stated was in your
21         interview -- he stated that he hadn't seen his son at
22         his property in the last month.  And that was one of
23         the factors that contributed to you finding probable
24         cause.
25    A.   Yes.  The -- I did not state the fact that he was

1     being deceptive, those words didn't come out of my
2     mouth.  I remember Captain Marsh talking about that
3     two days ago, but yes.
4  Q.  Do you believe that he was being deceptive?
5  A.  I know that -- I knew that to not be the truth.
6  Q.  Well, didn't we just hear him say that I'm sure my
7     son was here three weeks ago?
8  A.  I believe he did.
9  Q.  So isn't that within the last month?
10 A.  It would be.
11 Q.  So do you want to revise your earlier statement?
12 A.  At the same time he did state, "When I saw him here
13     earlier today, that was the first time I had seen him
14     here in a month or two."
15 Q.  Okay.  I think the statement was more to the effect
16     of that was the first time I'd seen Him go around the
17     house.
18 A.  Okay.
19 Q.  But we can let the record speak for itself.  Okay.
20     At the time of the search warrant application --
21 A.  That is my recollection of what was said.  Just know
22     that.
23 Q.  Sure, and I -- but -- but there is an actual audio
24     recollection --
25 A.  Yes.

1    Q.    -- that --
2    A.    I was explaining my recollection earlier and -- (no
3          further response).
4    Q.    And you're saying that your recollection may have
5          been somewhat inaccurate.
6    A.    I'm just stating what my recollection was.  That's
7          all.
8    Q.    But you don't -- you don't claim that that audio is
9          inaccurate in any way, do you?
10   A.    It is not.
11   Q.    So on the date you apply for the search warrant, at
12         the time you applied for the search warrant, February
13         20th --
14   A.    Yes, sir.
15   Q.    -- at that point, based on what you knew, did you
16         believe there was probable cause to arrest Lee
17         Harris, Sr., for narcotics?
18   A.    No.
19   Q.    Sometime after this interview you and Lee get out of
20         the squad car.  Yes?
21   A.    Yes.
22   Q.    And Marsh testified that he called Lowery.  Were you
23         present for that call?
24   A.    I don't remember that.
25   Q.    Do you recall calling Lowery?  I believe Lowery also

1          testified today that you did call him.
2     A.   I'm sure that there were discussions as far as what
3          Lowery had learned, what he had located at 1090 West
4          Indiana.
5     Q.   Did you also provide Lowery with information related
6          to what you had found at 803 North Sycamore?
7     A.   I don't remember the context of the conversations.
8          I'm sure they were had at that point.
9     Q.   So at some point you spoke to Lowery that day.
10    A.   Yes.
11    Q.   Do you recall if you spoke with him at the Southern
12         Pines Police Department?
13    A.   I do not recall.
14    Q.   Lowery testified that what he thinks occurred is that
15         he drafted the magistrate's order with Captain Marsh.
16         Do you recall that.
17    A.   I remember him saying that, yes.
18    Q.   Do you recall that occurring?
19    A.   I was not there.
20    Q.   You were not present for that?
21    A.   No.
22    Q.   Do you recall informing Officer Lowery that cocaine
23         was found in the Cadillac?
24    A.   I do not remember telling him that.
25              MR. RUBERT-SCHEWEL:  Can I see Exhibit L,

 1                      please?
 2    BY MR. RUBERT-SCHEWEL:
 3    Q.    Although you do not remember telling him that, do
 4          you -- as you sit here today, do you believe that you
 5          did tell him that?
 6    A.    He had conversations with myself and Captain Marsh.
 7          The context of those conversations I'm not positive
 8          on what he'd heard from who, but he spoke with both
 9          of us, and from by speaking with both of us, he
10          learned our probable cause for arrest.
11    Q.    Okay.  And that included the fact that you had found
12          drugs in the Cadillac.
13    A.    Yes.
14    Q.    And that was one of the key facts, right?
15    A.    It was.
16              (Brief pause.)
17    Q.    When you had your conversation with Officer Lowery,
18          do you recall him telling you or saying to you or any
19          discussion about the fact that he had observed Junior
20          place items in the Cadillac with the gray cover on
21          it?
22    A.    Do I remember Lowery telling me that during the
23          conversation after the search warrant had been
24          executed?
25    Q.    Yes.

1   A.   No.

2   Q.   Did you bring that up?

3   A.   He didn't observe that.

4   Q.   I'm not asking you if he observed that.  I'm asking

5        you if he told you that.

6   A.   That conversation had not been had.

7   Q.   What do you mean "that conversation had not been

8        had"??

9   A.   A gray tarp or a gray car cover?  Lowery saw a blue

10       tarp.

11  Q.   Well, okay.  I realize that that's what you're

12       saying, but I'm asking you if he told you that he had

13       seen Junior place any items in a Cadillac with a gray

14       cover.  Did he tell you that after the search warrant

15       was executed?

16  A.   I don't believe so.

17  Q.   Did you bring that fact up with him?

18  A.   I don't believe so.

19  Q.   Did Marsh?

20  A.   I can't answer that.

21  Q.   Does Marsh do that in your presence?

22  A.   No.

23            (Brief pause.)

24  Q.   Do you have Exhibit L in front of you?

25  A.   Yes, sir.

1  Q.   This is the magistrate's order --

2  A.   Yes.

3  Q.   -- signed by Carol Wright?

4  A.   Yes.

5         (Plaintiff's Exhibit L was identified.)

6  Q.   Is it accurate to say that the basis for the

7      information contained in the magistrate's order

8      finding probable cause against Lee Marvin Harris,

9      Sr., was the information provided by you and at he

10     time Lieutenant Marsh to Officer Lowery?

11  A.   In which this is written out.

12  Q.   Yes.

13  A.   This is basically a summarization of what the charges

14     are.  This does not contain the actual probable

15     cause.

16  Q.   Okay.  So the probable cause was what was told to the

17     magistrate?

18  A.   That's correct.

19  Q.   Is there a recording of that?

20  A.   I don't believe so.

21  Q.   Is it your presumption that -- well, did you hear

22     Officer Lowery testify today about what he told

23     Magistrate Wright was his probable cause for this

24     order?

25  A.   He stated he did explain the probable cause.  The

1          actual facts of the probable cause that he told the

2          magistrate, he couldn't recall exactly the ins and

3          outs of all of the facts, but he passed on what

4          information he had been told by Captain Marsh and

5          myself.

6    Q.    Well, he at least included the fact that -- and --

7          and we can tell from what's written here that drugs

8          were found in the Cadillac.

9    A.    As far as what he told the magistrate, I was not

10         present.

11   Q.    How else would this get -- I mean, clearly, the

12         magistrate read this order and signed this order,

13         right?

14   A.    I would assume.

15   Q.    And in this order it says that drugs were found in

16         the Cadillac.

17   A.    Yes.

18   Q.    And you told that information or Marsh told that

19         information to Officer Lowery.

20   A.    Yes.

21   Q.    Did you speak to Magistrate Wright?

22   A.    No.

23   Q.    Are you aware that bond was set on Lee Harris, Sr.,

24         by Magistrate Wright after this order?

25   A.    Yes.

1    Q.    Are you aware of what the bond was?

2    A.    I believe so.

3    Q.    What was it?

4    A.    Five million.

5    Q.    What was the bond for Junior?

6    A.    I don't recall.

7    Q.    Was it approximately --

8    A.    It was --

9    Q.    -- nine million?

10   A.    -- it was more, but I don't remember the exact

11         number.

12   Q.    Have you ever had a case where bond was set at nine

13         million or five million other than this?

14   A.    I sure have.

15   Q.    How many?

16   A.    As I sit here right now, I can think of one.

17   Q.    One.  Did you meet with District Attorney McSweeney

18         at some point after the magistrate's order was

19         signed?

20   A.    I'm sure we spoke.  Physically meeting, I don't have

21         any recollection of that, but -- we -- we certainly

22         spoke about what had taken place.

23   Q.    Over -- and -- and is it sometimes your practice

24         would be to speak over the phone.

25   A.    Yes.

1   Q.   And just so I'm clear, you were not present for any

2        of the search of the Cadillac.

3   A.   I don't believe so.

4   Q.   And you were not present for -- strike that question.

5        At Marsh's deposition, you heard Marsh testify that

6        he tested the keys on the Cadillac a number of times

7        on the different doors and on the ignition to see if

8        they worked?

9   A.   Remember him saying he put the -- one of the keys

10       into the ignition and physically turned the ignition,

11       yes, sir.

12  Q.    And he also testified that he put a different key

13       into the door and opened the door.  Do you recall

14       that?

15  A.   I can't say that a hundred percent.

16  Q.   Were you present for him testing the keys on the

17       Cadillac?

18  A.   No.

19            MR. RUBERT-SCHEWEL:  What time is it?

20            MR. DAVIS:  4:41.

21            MR. JONES:  20 -- 20 till.  Are you still

22               thinking five or --

23            MR. RUBERT-SCHEWEL:  We're close.

24            MR. JONES:  Sure, sure.

25            MR. RUBERT-SCHEWEL:  Depends on how many

 1                    questions you've got.
 2              THE WITNESS:  And I'm going to need to take a
 3              break before too, so.
 4    BY MR. RUBERT-SCHEWEL:
 5    Q.   All right.  I'm going to ask you to see Plaintiff's
 6         Exhibit Y again.  This is the e-mails.  Starts at the
 7         top with Kyle Marsh, Bates stamp 1888.
 8              THE WITNESS:  I'm not sure if we wrote on it,
 9              so it --
10              MR. RUBERT-SCHEWEL:  You can just use this one
11              if you want to.
12    A.   Yes, sir.
13    BY MR. RUBERT-SCHEWEL:
14    Q.   Can you go to page 1898, please?  It's the second to
15         last page from the top.  So on December 18th, 2018,
16         Penny Simmons from the DOJ sent you an e-mail at
17         12:24, which was an order to dismiss Lee Marvin
18         Harris, Sr.  Four minutes later you forwarded that
19         e-mail to Marsh and Lowery and attached to that
20         e-mail was a PDF with the order of dismissal.
21              (The witness conferred with Mr. Jones.)
22    A.   I'm not seeing -- to Hughes.  I'm not -- okay, there
23         it is.  12:24, 12:28, yes, sir.
24    Q.   And attached to that e-mail as Bates stamp 1899 was
25         the order of dismissal.

1  A.    Yes.

2  Q.    How did you feel when you received that?

3  A.    I have no recollection of feelings.  I just wanted to

4        make everybody aware of what was happening.

5  Q.    Were you disappointed?

6  A.    Not necessarily.

7              MR. RUBERT-SCHEWEL:  Can we just take a five-

8                  minute break and see if we have any other

9                  questions?  And it won't be long.

10             (Recess from 4:43 p.m. to 4:57 p.m.)

11  BY MR. RUBERT-SCHEWEL:

12  Q.    When you entered Mr. Harris, Sr.'s, home on February

13        20th, 2018, did you hear him curse?

14  A.    I don't remember that.

15  Q.    Have you ever heard him curse?

16  A.    Sitting here right now, I don't remember him ever

17        cursing that I can recall.

18             MR. RUBERT-SCHEWEL:  We have no further

19                  questions.

20

21                  EXAMINATION BY MR. JONES

22  Q.    Detective Perry, when you were in the vehicle with

23        Mr. Harris, Sr., on February 20th where you recorded

24        the -- the conversation with him, were you able to

25        see the Cadillac or the -- the covered Cadillac at

1        that time?

2    A.  Yes.

3    Q.  All right.  Would you have been able to see Captain

4        Marsh going through the Cadillac at that time?

5    A.  Yes.

6    Q.  Do you know if that's what caused you to ask those

7        questions at that time?

8    A.  It's very possible.

9    Q.  Do you know one way or the other?

10   A.  I had an entire view of the whole yard.  If I was --

11       I remember Mr. Lee Harris, Sr., state -- sitting to

12       my right.  As he's sitting to my right, that would

13       have been in the direction of where the Cadillac was

14       parked.  It's very possible as I'm talking with

15       Mr. Lee Harris, Sr., I'm overlooking him and seeing

16       Captain Marsh trying to get into the Cadillac.  It's

17       very possible.

18   Q.  Do you have a recollection one way or the other,

19       though?

20   A.  No.  I don't remember the -- the sequence of events

21       as to when I asked for keys to the Cadillac, what

22       else had happened or what was happening, but it's

23       very possible.

24           MR. JONES:  That's all I've got.

25           MR. RUBERT-SCHEWEL:  I'm just going to have

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

1    some follow-up on that.

2

3            FURTHER EXAMINATION BY MR. RUBERT-SCHEWEL

4    Q.   What is the -- so the road directly in front of Lee

5         Harris, Sr.'s, house is North Sycamore.

6    A.   Yes.

7    Q.   You just stated that Lee was on your right.

8    A.   Yes.

9    Q.   Which means that the right of your squad car was

10        facing his home on North Sycamore.

11   A.   Yes.

12   Q.   Do you recall whether you were parked on the -- in --

13        in his parking lot -- or sorry, in his driveway, or

14        on the shoulder of North Sycamore?

15   A.   I don't recall.  It was closer to the driveway, I

16        believe, but it was not in the yard.  It was not --

17        it -- it was closer to the driveway near Sycamore.  I

18        mean, it was right in that area.

19   Q.   So you were actually on the road.  You were parked on

20        the road.

21   A.   Not on the asphalt itself.  I believe I was on the --

22   Q.   The shoulder.

23   A.   -- grass, but I was not up in the yard necessarily.

24   Q.   Got it.

25   A.   Still the right-of-way for the town.

                        REED & ASSOCIATES
              MATTHEWS, NORTH CAROLINA  980.339.3575

1    Q.    Okay.  So if this is Sycamore and this is Lee Harris,

2          Sr.'s, home, could you mark approximately where your

3          squad car was parked?

4    A.    (Witness complied.)  His driveway was here.  I

5          believe I'm somewhere in this area right here.

6    Q.    Okay.  Could you also -- and if you'd just hand that

7          back.  Could you also mark where approximately the

8          Cadillac was that you say you could observe?

9    A.    (Witness complied.)

10              MR. JONES:  And just for the purposes of the

11                  record, he just circled an area that I

12                  believe he's saying he was located in and

13                  maybe -- maybe an X for where the -- the

14                  Cadillac was located.

15              MR. RUBERT-SCHEWEL:  And -- and the circle,

16                  just so we're clear, is the squad car.

17              THE WITNESS:  Yes.

18              MR. JONES:  Yes.

19   BY MR. RUBERT-SCHEWEL:

20   Q.    And you can do an X for the Cadillac.

21   A.    (Witness complied.)

22   Q.    That's fine.  So the Cadillac, was it actually in the

23         driveway?

24   A.    I don't recall if it was on a gravel portion or if it

25         was in a grass portion.  If it was not exactly in the

1              driveway, it was just beyond it.

2    Q.    Were there any other cars parked in the driveway?

3    A.    I believe so.

4    Q.    What cars were those?

5    A.    I remember a trailer being there.

6    Q.    Was that between you and the Cadillac?

7    A.    No.  I wouldn't have been able to see past it.  Kind

8          of between the trailer and the house.

9                   (Mr. Rubert-Schewel and Mr. Davis conferred.)

10                  MR. RUBERT-SCHEWEL:  No further questions.

11                  MR. JONES:  All right.  We will read and sign.

12                  COURT REPORTER:  Were you going to mark that

13                     as an exhibit?

14                  MR. RUBERT-SCHEWEL:  Yeah.  What was the last

15                     one?

16                  MR. DAVIS:  I think UU, if I'm not mistaken.

17                     Double U.  I think double U is the --

18                  MR. JONES:  The exhibit?

19                  MR. DAVIS:  Yeah, double U.

20                  (Plaintiff's Exhibit UU was identified.)

21                  (The taking of the foregoing deposition was

22                  concluded at 5:03 p.m. on September 22, 2022.

23                  Signature was reserved.)

24

25                           *  *  *  *  *


                            REED & ASSOCIATES
                  MATTHEWS, NORTH CAROLINA  980.339.3575

## WITNESS CERTIFICATE

I have read the foregoing pages, 1 through 177, inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

Signed this _____ day of _____ 2022.

_____
JASON S. PERRY

Sworn and subscribed before me this the _____ day of _____ 2022.

_____
Notary Public

My Commission Expires: _____.

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

**ERRATA SHEET**

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or email to Vreed@carolina.rr.com**

The reasons for making changes:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct major transcription errors.

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

**Page no.** \_\_\_\_\_ **Line no.** \_\_\_\_\_ **Reason:** _____

Change _____ to _____

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

STATE OF NORTH CAROLINA

COUNTY OF WAKE

<u>C E R T I F I C A T E</u>

       I, WANDA B. CONSTANTINO, CVR-CM-M, Notary Public, do hereby certify that JASON S. PERRY was duly sworn prior to the taking of the foregoing deposition, that said deposition was taken and transcribed personally by me, and the foregoing pages constitute a true and accurate transcript of the testimony of said witness.

       I do further certify that the parties were present as stated in the caption.

       I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of said action.

       I have hereunto subscribed my name this the 26th day of October, 2022.

                                 _____

                                 WANDA B. CONSTANTINO, CVR-CM-M
                                 Notary Number:  19971130022

Case 1:21-cv-00955-WO-JEP  Document 32-3  Filed 11/29/22  Page 180 of 180