```
          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
            CIVIL ACTION NO.:  1:21-CV-955
```

```
LEE MARVIN HARRIS, SR.,              )
                                     )
               Plaintiff,            )
                                     )
   vs.                               )
                                     )
THE TOWN OF SOUTHERN PINES,          )
Officer JASON PERRY, Officer SEAN    )
LOWERY, and Officer KYLE MARSH,      )
sued in their individual            )
capacities, and Chief of Police      )
ROBERT TEMME, sued in his official   )
and individual capacity,             )
                                     )
               Defendants.           )
_____)
```

<u>D E P O S I T I O N</u>

OF

**<u>KYLE ALAN MARSH</u>**

At Southern Pines, North Carolina

Tuesday, September 20, 2022

```
REPORTER:   WANDA B. CONSTANTINO, CVR-CM-M
            Notary Public
```

                REED & ASSOCIATES
        MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of the Plaintiff:

       Mr. Abraham Rubert-Schewel
       Mr. Nichad Davis
       TIN, FULTON, WALKER & OWEN, PLLC
       119 East Main Street
       Durham, North Carolina  27701
       Phone:  919-451-9216
       schewel@tinfulton.com
       ndavis@tinfulton.com

On Behalf of the Defendants:

       Mr. Glenn Jones
       HALL, BOOTH & SMITH, PC
       Suite 750
       11215 North Community House Road
       Charlotte, North Carolina  28277
       Phone:  980-859-0380
       gjones@hallboothsmith.com

In Attendance:

       Mr. Lee Marvin Harris, Sr.
       Officer Jason S. Perry

* * * * *

Case 1:21-cv-00955-WO-JEP  Document 32-4  Filed 11/29/22  Page 2 of 197

# C O N T E N T S

PAGE

Examination by Mr. Rubert-Schewel . . . . . . . . . . . 4

Examination by Mr. Jones  . . . . . . . . . . . . . . 192


PLAINTIFF'S EXHIBITS:

Exhibit B - Application in Support of Warrant . . . . . 112

Exhibit L - Magistrate Order  . . . . . . . . . . . . 122

Exhibit N - Transcript of May 1, 2018, Bond Hearing,
            Officer Perry Testifies . . . . . . . . . 143

Exhibit P - Surveillance Harris, Jr. Drugs in Cadillac  100

Exhibit R - Incident Report . . . . . . . . . . . . . 128

Exhibit T - Price Supplemental Report . . . . . . . . 102

Exhibit W - Photograph of keys  . . . . . . . . . . . 173

Exhibit X - Event Report  . . . . . . . . . . . . . . 157

\* \* \* \* \*

*Reporter's Note:  This transcript contains quoted material.
Such material is reproduced as read or quoted by the
speaker.*

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 3 of 197

1          This is the deposition of KYLE ALAN MARSH,

2     taken in accordance with the Federal Rules of Civil

3     Procedure in connection with the above case.

4          Pursuant to Agreement, this deposition is

5     being taken at the Southern Pines Finance Building,

6     180 Southwest Broad Street, Southern Pines, North

7     Carolina, beginning at 10:06 a.m. on Tuesday,

8     September 20, 2022, before Wanda B. Constantino, Certified

9     Verbatim Reporter and Notary Public.

10

11          KYLE ALAN MARSH, upon first being duly sworn,

12     testified as follows:

13

14          EXAMINATION BY MR. RUBERT-SCHEWEL

15     Q.   My name is Abraham Rubert-Schewel.  I'm with the law

16          firm of Tin Fulton Walker & Owen.  We represent Lee

17          Harris, Sr., in this lawsuit against the Town of

18          Southern Pines and the individually named officers

19          such as yourself.

20          I have my Zoom rules written down here, but

21          we're not on Zoom anymore.

22          (General laughter.)

23     Q.   You understand that you are testifying under oath

24          today under the penalty of perjury?

25     A.   I do.

1   Q.   Have you ever been deposed before?

2   A.   Deposed, no.

3   Q.   Have you ever been a party to a lawsuit?

4   A.   No.

5   Q.   These questions and answers are being transcribed by

6        a court reporter, meaning it is very important that

7        you speak loudly and clearly.  Do you understand?

8   A.   I understand.

9   Q.   You must answer questions verbally, for example,

10       using yes or no, not phrases such as "uh-huh" or

11       "huh-uh."

12  A.   Yes, sir.

13  Q.   Your attorney, Glenn, may object to certain questions

14       that I ask.  You should know that you are still

15       required to answer every question unless instructed

16       not to, which should happen rarely.  Otherwise,

17       you're required to answer each question truthfully

18       and completely as possible.  Do you understand?

19  A.   If there were to be an objection -- can -- can you

20       read that again?

21  Q.   Your attorney may object to certain questions that I

22       ask.

23  A.   Uh-huh.

24  Q.   You should know that you are still required to answer

25       every question unless instructed not to.

1    A.    Who would that instruction of not to come from?

2    Q.    Your counsel.

3    A.    Okay.

4    Q.    And if there is an objection, you can always pause

5          and --

6    A.    Gotcha.

7    Q.    -- he will tell you.

8    A.    Okay.  I understand.

9    Q.    Please state and spell your name for the record.

10   A.    Kyle Marsh.  K-y-l-e M-a-r-s-h.

11   Q.    And what year did you become a police officer?

12   A.    July 9th, 2001.

13   Q.    And what was the first department that you worked in?

14   A.    Southern Pines.

15   Q.    Have you ever worked in any other departments?

16   A.    Yes.  From July 2006 to November 2013, I worked for

17         the Moore County Sheriff's Office.

18   Q.    Who was the sheriff at that time?

19   A.    Sheriff Lane Carter was the sheriff in 2006.  He

20         retired in May of 2013.  Neil Godfrey was appointed

21         sheriff in May of 2013, and he was the sheriff when I

22         left.

23   Q.    Is he the current sheriff?

24   A.    No.

25   Q.    Who is the current sheriff?

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 6 of 197

1    A.    Ronnie Fields.

2    Q.    Okay.  And I believe that your current job title is

3          Administrative Captain?

4    A.    Correct.

5    Q.    And you are in charge of administration and

6          communications?

7    A.    Yes.

8    Q.    Any -- anything that I missed?

9    A.    So the administration, we have two captains:

10         Operations Captain and Administration Captain.  I

11         oversee the Communications Center, property and

12         evidence, the building, training, and Internal

13         Affairs.

14   Q.    Who is the other captain?

15   A.    Robert Heaton.  He's the operations captain.

16   Q.    So as Administrative Captain, your responsibilities

17         are training, Internal Affairs, and what -- what was

18         the last item that you said?

19   A.    Property and evidence.  Now, I'm not a property and

20         evidence custodian, but the Property and Evidence

21         Division does fall under my command.

22   Q.    Okay.

23   A.    And you have Communications?

24   Q.    I do.

25   A.    Yeah.  We have a Communications Center.

```
 1    Q.    Okay.  And so I guess let's just go through those.
 2          Internal Affairs:  What is your role in the Internal
 3          Affairs Division?
 4    A.    At -- so for Internal Affairs, if I am -- a complaint
 5          comes in for a policy violation, you know, the
 6          supervisor -- watch commander, if you will, or the
 7          supervisor for that team or division would forward
 8          the complaint to me and then I would investigate that
 9          Internal Affairs complaint, the -- the allegation of
10          a policy violation or something of that nature.
11    Q.    Okay.  And is it your responsibility to determine if
12          a violation occurred?
13    A.    I make a recommendation.  I look into the complaint.
14          If -- you know, if I find that it has, you know,
15          violated a policy, then, you know, I can make a
16          recommendation, but the final say-so falls with the
17          Chief of Police.
18    Q.    Okay.  And was there an Internal Affairs
19          investigation related to Lee Harris, Sr.'s, case?
20    A.    What do you mean to a --
21    Q.    Well, to this case that we're here for today --
22    A.    No.
23    Q.    -- was there an Internal Affairs investigation to
24          your knowledge?
25    A.    Not that I'm aware of.
```

1   Q.   Okay.  And there's currently not one today?

2   A.   I'm unaware if there's a -- I -- I should be made

3        aware.

4   Q.   You -- you would know.

5   A.   Not -- well, at being named as a party in a suit, I

6        mean, I -- I wouldn't be in charge of investigating

7        my own case.

8   Q.   Okay.

9   A.   However, you know, if there's allegations of, like, a

10       policy violation -- (clearing throat) -- excuse me,

11       or something like that, I would be advised of, like,

12       my Garrity rights or -- or something to -- to that

13       effect, but I'm not aware of any Internal Affairs

14       investigation.

15  Q.   Okay.  So you're saying if there was one, you would

16       have recused yourself or you would have been taken

17       off the --

18  A.   I -- I wouldn't --

19  Q.   -- the investigation.

20  A.   -- have had the opportunity to.  So the -- the Chief

21       of Police -- and I've only been doing internal

22       investigations since October of 2020, I believe.  You

23       know, if -- if I'm a party to it, he -- I wouldn't

24       have any access to -- to anything or -- or anything

25       like that.

1    Q.   Okay.

2    A.   You know, he could designate himself the outside

3         person or deputy chief to -- to conduct those.

4    Q.   Okay.  But as far as you know, there's no internal

5         investigation of any sort that is being done related

6         to this lawsuit.

7    A.   Not that I'm aware of.

8    Q.   Okay.

9    A.   Now, could there have been an administrative review

10        opened or something like that?  It's possible, but

11        not with my -- you know, not to my knowledge.

12   Q.   But -- and Chief Polidori would be the one who would

13        know that?

14   A.   Yes.

15   Q.   And I -- I apologize if I mispronounce any names.

16        Are you in charge of personnel?

17   A.   In -- in what way?

18   Q.   Well, I guess personnel over the -- I mean, you

19        oversee, it sounds like, a number of different

20        divisions.

21   A.   Uh-huh.

22   Q.   Are you in charge of personnel within your divisions?

23   A.   Within my divisions, yes.

24   Q.   I'm going to ask you a number of names of officers,

25        and I just want you to tell me if they're still at

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 10 of 197

1          Southern Pines Police --

2     A.   Sure.

3     Q.   -- Police Department.  Victoria Price?

4     A.   No longer.

5     Q.   Christopher Garner?

6     A.   No longer.

7     Q.   Brian Edwards?

8     A.   Yes, he's still there; not under my command.

9     Q.   Do you know why Ms. Price left?

10    A.   She was a civilian employee, a part-time civilian

11         employee for the Town of Southern Pines.  She is now

12         a sworn deputy sheriff with the Moore County

13         Sheriff's Office full time.

14    Q.   Okay.  And how about Mr. Garner?

15    A.   He's a -- I believe his rank is corporal with the

16         sheriff's office.  He previously worked there and

17         he's went back to work at the sheriff's office.

18    Q.   Okay.  So let's -- how about Communications?  What

19         does the Communications Division do at Southern

20         Pines?

21    A.   So, you know, they answer 911 calls --

22              (Mr. Davis sneezed.)

23              THE WITNESS:  Bless you.

24              MR. RUBERT-SCHEWEL:  Bless you.

25              MR. DAVIS:  Thank you.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 11 of 197

1  A.    -- that are forwarded from Moore Central in Carthage,

2        so we're not a true 911 center.  However, we do have

3        our own center to dispatch police only.  So they

4        don't do fire, EMS, or anything like that.  So if

5        someone calls 911 for an emergency in the town limits

6        of Southern Pines, they'll be transferred to our

7        center and then they will dispatch our cars.

8  BY MR. RUBERT-SCHEWEL:

9  Q.    Okay.  And what about -- in -- well, are those

10       communications recorded?

11 A.    Yes.

12 Q.    How --

13 A.    When -- you're saying like those communications like

14       phone and radio traffic?

15 Q.    Yes.

16 A.    Yes.

17 Q.    And by -- and -- and so phone traffic we mean 9- --

18       911 calls, and I understand that you're not a 911

19       center, but they're transferred to Southern Pines --

20 A.    Yes.

21 Q.    -- and you have a Communications Center.

22 A.    Correct.

23 Q.    How many people work in that Communications Center?

24 A.    Now we have seven full-time employees.  We have a

25       communications supervisor and six telecommunicators.

1    Q.   And these 911 calls or radio traffic, are those

2         recorded?

3    A.   Yes.

4    Q.   And how long are those kept for in the ordinary

5         course of business?

6    A.   I do not know.

7    Q.   And by radio traffic, that also would include if an

8         officer responds to the Communications Center?

9    A.   Yes.

10   Q.   And what type of things would an officer respond to a

11        Communications Center, get in contact with the

12        Communications Center about?

13   A.   Arriving to calls; clearing calls for service;

14        calling in, you know, things that they run across

15        that they don't have -- you know, emergency

16        situations, calling for help; you know, things of

17        that nature.

18   Q.   What about if -- would they ever call the

19        Communications Center to request certain types of

20        information --

21   A.   Sure.

22   Q.   -- to like a -- run somebody's background?

23   A.   Sure.

24   Q.   And how does the Communications Center assist with

25        that?  Is it they have, I assume, computers in front

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 13 of 197

1       of them and they can look that up, or --

2    A.    Yes.

3    Q.    -- how does that work?

4    A.    They have a -- what's called a DCI, Division of

5          Criminal Information terminals --

6    Q.    Okay.

7    A.    -- that can access state and federal databases.  They

8          can run driver's license, vehicle registrations,

9          wanted -- stolen articles, items, persons, missing

10         persons, and they can also enter those same thing --

11         same things.  So stalling -- stolen vehicles, stolen

12         items, missing persons, wanted persons.  They -- they

13         can also enter those -- those things.

14   Q.    Okay.  And do you have a computer in -- in your squad

15         car?

16   A.    In my car, no.  I have one in my office.

17   Q.    In your office.

18   A.    Yes.

19   Q.    What about detectives with the Southern Pines Police

20         Department?  Will they have computers in their squad

21         cars?

22   A.    There's only -- so that's another one of the things I

23         do is -- now is the fleet, order cars and things of

24         that nature.  I -- there's not many investigations

25         vehicles that have what -- MDTs.  So mobile data

1      terminal -- terminal.  There's not many of those that
2      have those types of stands.  Now, having said that,
3      they're all issued laptops.  They're all issued --
4      today, they're all issued hotspots so they can -- can
5      take it mobile.  But more often than not, they --
6      they don't.
7  Q.  Okay.  So if the Communications Center -- if you call
8      in for information and they want to give you, let's
9      say, an offender's or a suspect's background, their
10     arrest history, will they convey that to you over the
11     phone and say, "Oh, he's got priors for this, this,
12     and that," or is that something they'll send you on
13     your iPhone?  How -- how will that information be
14     conveyed to you?
15 A.  That -- so you really don't want to try to tie up the
16     radio communications for -- you don't want to be
17     talking about something that's non-emergency when an
18     emergency could be taking place, so a lot of times
19     that could take place by phone.
20 Q.  Okay.  So usually it's just by phone.  Is there ever
21     a situation where an officer has their laptop in
22     their car and that -- that information will be
23     conveyed to them on their laptop?
24 A.  As sent from the Communications Center?
25 Q.  Sure.

1   A.   It could be added to a call.  Now, officers, in their

2        vehicles, any of the -- the laptops, they do not have

3        full access to DCI like they do in Communications.

4   Q.   Okay.

5   A.   Now, on their CAD program, information can be placed

6        from DCI into the CAD system, which would allow the

7        officers to pull that call up that they're on to --

8        to view information.  That is a possibility.

9   Q.   And is that what then creates an event report?

10  A.   An event report is -- a CAD report/event report, I

11       think, could be viewed one and the same.

12  Q.   Okay.  And could you just summarize again what that

13       is for me, a CAD report and an event report?

14  A.   A call -- it's a call for service.

15  Q.   A call for service.

16  A.   So any -- any type of call for service.  It could be

17       a citizen contact or, you know, a motor vehicle

18       accident.  It could be a traffic stop.  It creates a

19       call for service.

20  Q.   Okay.  In 2018, what was your role with the Southern

21       Pines Police Department?

22  A.   I was lieutenant of the Investigations Division.

23  Q.   And at that point were you assigned your own squad

24       car?

25  A.   Yes.

1   Q.   And in your squad car, did you have a laptop?

2   A.   In my squad car, no.  I do believe I had a mount at

3        the car.  I'm trying to remember what car I had then.

4        I didn't have one permanently assigned to the car,

5        but I did have a laptop assigned to me.  So if I

6        wanted to take it in the car, I could.

7   Q.   Okay.

8   A.   But --

9   Q.   I see.

10  A.   Yeah.  But during that time, too, we didn't have, you

11       know, the mobile hotspots that we have now.  A lot of

12       times it would be tethered to your work phone.  And

13       when you start talking about running the programs

14       that we ran, especially during that time, our records

15       management system -- the bandwidth for a cellular

16       connection just wasn't strong enough.  So it was --

17       almost rendered it useless in the field.

18  Q.   So if it's tethered to your work phone, how do you

19       get Wi-Fi on your laptop?

20  A.   Through the work -- that's what I mean.

21  Q.   So it's like a physical -- you attach it?

22  A.   No, no.  Just create the mobile hotspot.

23  Q.   Mobile hotspot.  Okay, I gotcha.  Oh.  And then now

24       you actually have, like, these, you know --

25  A.   Yeah.

1   Q.   -- yeah, okay, I gotcha -- physical hotspots that are

2        smaller devices --

3   A.   We've advanced a little bit.

4   Q.   -- are no longer on your phones.

5   A.   Yeah, correct.

6   Q.   I used to lose my cell phone, so -- okay.  So in

7        2018, it is -- well, was it your practice to bring

8        your laptop with you in your car?

9   A.   Not always.  For a patrol officer out here working a

10       beat, yes.  They -- you know, they're -- they're

11       married to their laptops in their car.

12  Q.   Okay.

13  A.   In my position then and even more so -- well,

14       definitely more so now, I'm in the office more than I

15       am anywhere, so I wouldn't -- you know, I would take

16       my laptop home from time to time, but every time I

17       went and got in the car, no.

18  Q.   Okay.  And let me just back up.  The other divisions

19       you said you're in charge of are Training and

20       Property and Evidence.  What is your role in

21       Training?

22  A.   I'm the in-service training coordinator, so annually

23       all sworn officers and telecommunicators are required

24       to take, you know, X number of -- of training hours

25       that the Justice -- or that the Training and

1       Standards requires to maintain certification.  I
2       ensure that those classes are administered.
3              Most of the training today is -- is online
4       with the Justice Academy now, but there are some
5       in-person classes.  For example, firearms.  I'm the
6       lead firearms instructor, and I teach that every
7       year.
8   Q.  Okay.  Do you -- are -- are officers required to take
9       or receive any training related to arrest?
10  A.  I don't know that I --
11  Q.  Let me -- let me --
12  A.  -- completely understand your question.
13  Q.  -- let me withdraw that question, then.  Are they --
14      are they required to take or receive any training
15      related to investigations?
16  A.  It's kind of a broad question, but, you know, in
17      Basic Law Enforcement Training, all officers to be
18      certified as a police officer, you must attend Basic
19      Law Enforcement Training.  That -- you know, I don't
20      know what the hours of that are today; somewhere
21      probably north of 800 hours.
22             When I went through 21 years ago,
23      approximately 600 hours, but part of the Basic Law
24      Enforcement Training is, you know, criminal
25      investigations, arrest, search and seizure,

1       constitutional law.  You know, there's quite a bit of

2       training that takes place in that -- in that Academy.

3   Q.  What about when you become a detective or when you

4       become a member, I guess, of the Investigations

5       Division?  Do you receive additional training at that

6       point?

7   A.  So we actually have, just like we do for patrol

8       officers, a field training evaluation program.  We

9       have an investigations training and evaluation

10      program where there is a -- a manual that is provided

11      to -- to the trainee, to the newly appointed

12      detective, or whatever the case may be.  That's --

13      that's assigned to them in different aspects of the

14      division that have to be signed off on by a training

15      officer and -- and by the newly appointed

16      investigator.

17          Outside training -- I think, and I don't want

18      to assume, but I'm -- I'm assuming you're asking for

19      additional training above and beyond a basic academy?

20      So those -- those classes are encouraged.  We have a

21      career development program, so our when -- when

22      someone is hired straight out of an academy, they're

23      considered a police officer trainee.  From there they

24      can go to a Police Officer I, Police Officer II,

25      Master Patrol Officer, and then they stay at that

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 20 of 197

1       until, you know, anything above master patrol officer

2       is -- it starts with sergeant, and those are done by

3       assessment centers.

4            The Career Development Program requires you to

5       obtain certain courses or a category of courses to

6       advance to the next rank, and also time is a factor.

7       There is a police officer track and there is an

8       investigations track.  It's -- an investigator is a

9       lateral transfer.  It's not a promotion.  It's a

10      lateral transfer.  So someone who is, you know, goes

11      to Investigation and their rank at the time is a

12      Police Officer I, then they would be taking more

13      investigative courses to obtain Police Officer II and

14      Master Patrol Officer in the Investigations side of

15      the house, if you will.

16   Q.  Okay.

17   A.  But, yes.  To answer your question, it -- these, you

18      know, courses are, you know, encouraged.  And, you

19      know, outside training, we -- you know, we -- we

20      promote that.

21   Q.  And the manual that's provided to newly appointed

22      officers in the investigating division, how many

23      pages is that manual?

24   A.  I don't have an answer for that.

25   Q.  Okay.  When was that manual -- was -- was that manual

1        in effect in 2017?

2   A.   Yes.

3            MR. RUBERT-SCHEWEL:  Glenn, I don't know if we

4               received that manual, but if not, we'll

5               make a request for that.  And Nichad, if

6               you could make a note for that.

7            MR. JONES:  Sure.  And I -- I -- I don't think

8               I've seen it, so I --

9            MR. RUBERT-SCHEWEL:  Yeah.

10           MR. JONES:  -- would imagine --

11           MR. RUBERT-SCHEWEL:  We'll -- we'll follow up.

12           MR. JONES:  Yeah.

13           MR. RUBERT-SCHEWEL:  Yeah.

14  BY MR. RUBERT-SCHEWEL:.

15  Q.   Does that manual discuss things such as probable

16       cause?

17  A.   I don't recall if probable cause is specifically

18       mentioned.  I wouldn't have seen one of these manuals

19       page by page since probably 2014 when I went to

20       Investigations.

21  Q.   Okay.  So you don't train new members of the

22       Investigative Division on that manual yourself.

23  A.   No.  I don't recall if I ever did.

24  Q.   Is there any officer whose responsibility that is?

25  A.   So like today, nearly all the investigators are field

1          training officers, so -- and the way we try to do it,

2          we try not to assign you to one person.  We try to

3          assign you to multiple people so you can see all

4          different people do the same thing.  You can get

5          different perspectives, if you will.  So I -- I don't

6          recall when I was in Investigations if I trained

7          anyone, specifically one-on-one.

8     Q.   Okay.

9     A.   Now, I would have reviewed to make sure everything

10         was checked off on in the manual, things of that

11         nature.  There may have been specific parts that --

12         that I would cover.  The -- I don't have a good

13         answer for you on that.

14    Q.   Okay.  And a field training officer, does that

15         actually mean that they are training someone

16         one-on-one in the field?

17    A.   Yes.

18    Q.   Okay.  And is -- as part of field training, are there

19         specific guidelines for that?

20    A.   Yeah.  The manual itself.

21    Q.   The manual itself.  Okay.

22    A.   We also have a general order that covers field

23         training evaluation program and investigations

24         training evaluation program and communications

25         training and evaluation program.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 23 of 197

1   Q.    Okay.  Does the manual cover drug investigations?

2   A.    The investigations manual, in addition to the field

3         training manual for police officers, I do believe

4         there is a section that deals with talking about drug

5         investigations with confidential informants and

6         things of that nature.

7   Q.    To your knowledge, do Southern Pines police officers

8         receive any training related to probable cause for an

9         arrest?

10  A.    Yes.

11  Q.    And with that training, is that in Basic Law

12        Enforcement Training, or does it happen at some other

13        time?

14  A.    The -- the foundation is laid during Basic Law

15        Enforcement Training in great detail.  The Farb book

16        is used for that class for arrest, search, and

17        seizure, and -- and in addition to that, you know,

18        officers are encouraged to attend Police Law

19        Institute.

20              During that time whenever I was over the

21        Investigations Division, I can't say with certainty,

22        but most of those officers had attended Police Law

23        Institute, which is a 86-hour course, I believe.  At

24        least a two-week course through the North Carolina

25        Justice Academy is still offered today.  That teaches

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 24 of 197

1          you the bare bones of writing search warrants,

2          probable cause, and it -- it just delves in much

3          deeper to arrest, search, and seizure than, you know,

4          a lot of other courses do.

5               But in addition to that, I mean, there are a

6          lot of other courses that -- that are encouraged and

7          -- and officers take and investigators take dealing

8          with drug investigations and interview and

9          interrogation, things of that nature.

10    Q.   At Basic Law Enforcement Training or -- or any other

11         time, are officers taught about the idea of

12         constructive possession?

13    A.   I -- it's been so long since I've went to Basic Law

14         Enforcement Training, I -- I don't recall every

15         aspect of it.

16    Q.   Okay.  To your knowledge, is there a policy at the

17         Southern Pines Police Department related to probable

18         cause or making an arrest when drugs are found on

19         someone's property or in someone's constructive

20         possession?

21    A.   That specifically, I don't recall.  We do have

22         policies that pertain to arrest procedures, evidence

23         collections.  The -- the 500 series of the general

24         orders are more often than not applicable to or

25         directly applied to the Investigations Division, but

```
 1        I don't -- you know, to -- to be specific to your
 2        question, I'm -- I -- I don't have a good answer for
 3        that.
 4   Q.   What about in practice?  Is it your practice to make
 5        an arrest of someone if drugs are found on their
 6        property.
 7   A.   Can you be more specific?
 8   Q.   So you go to a scene of a crime.  You could say we'll
 9        start with a car stop.  There's four people in a car.
10        Drugs are found in the center console.  Would it be
11        your practice in that situation to arrest everyone in
12        the car?
13   A.   It would depend on the exact circumstances of that
14        particular incident.  I don't think you can broadly
15        say that every time this happens, you know, then this
16        is the outcome without knowing all of the details
17        that surround that.
18             You know, to be considered, you know, what is
19        the likelihood of -- of that person being able to --
20        to access it?  You know, what -- what factors come
21        into play?  There's -- every situation is different.
22   Q.   So it's -- so probable cause, you're saying, is a
23        fact-specific inquiry.
24   A.   Well, to -- probable cause, many definitions of it,
25        but probable cause for -- to me, my -- my knowledge
```

1      of probable cause is, you know, a set of

2      circumstances that are supported by facts and

3      evidence that would lead, you know, a reasonable

4      person -- myself, someone else -- to look at those

5      facts and come to a similar conclusion.  It's not a

6      guaranteed, you know, crystal clear, this is exactly

7      what it is, but a reasonable person looking at a

8      situation, you know, what conclusion would they come

9      to.

10  Q.  So there's no bright-line rule.

11  A.  Say again?

12  Q.  There's no bright-line rule that you --

13  A.  I don't understand.

14  Q.  There's no set rule for probable cause in every

15      single case.

16  A.  I -- I don't think I understand your --

17  Q.  Well, so I gave you a hypothetical, right, of four

18      people in a car, and you're telling me that you can't

19      say for certain in that instance because every case

20      is different.

21  A.  Uh-huh.

22  Q.  Yes?

23          MR. JONES:  Is that a yes?

24          THE WITNESS:  I'm sorry.

25  A.  Sorry.  Yes.  Every case is different.

1  BY MR. RUBERT-SCHEWEL:

2  Q.   Okay.  And I'm just saying that -- and -- and the

3       reason why you can't say that is because there is no

4       bright-line rule of determining when there is

5       probable cause or when there is not probable cause.

6  A.   I believe that to be true.

7  Q.   Okay.

8  A.   I'm not completely sure I understand, you know, if --

9  Q.   It's not a trick --

10 A.   -- if I'm answering that --

11 Q.   You are, you are.

12 A.   -- correctly, but, you know, what -- what I am saying

13      is probable cause, thing -- things can change.  It's

14      evolving.  You know, every investigation evolves.

15      Circumstances evolve.

16 Q.   Uh-huh.

17 A.   And there are things that can tip a scale more one

18      way than the other.  So, you know, probable cause is

19      not written, you know, in -- in a manual as in if

20      this happens, then -- then you're at that level.

21      It's -- you know, it's a totality of -- of

22      everything.  Totality of all the circumstances in a

23      given situation.

24 Q.   And it can evolve throughout an investigation.

25 A.   Sure.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 28 of 197

1    Q.    So your -- your perception of probable cause or your

2          determination of probable cause can change from the

3          time of arrest and if you learn new information to

4          the time of arraignment.

5    A.    Sure.

6    Q.    So just back to the car hypothetical.  Factors that

7          you could -- that you stated, I think, you could

8          consider.  I think you stated you could consider a

9          number of different factors.  Would that include also

10         possession of a large amount of money?

11               So I'll -- I'll back up and strike that

12         question.  I'm talking about you pulled over a car.

13   A.    Uh-huh.

14   Q.    There's four people inside of the car.  Okay?  You

15         find drugs in the center console.  You're determining

16         now whether to charge anyone for those drugs.  If one

17         of the passengers had a large amount of cash on them,

18         would that be part of your consideration for probable

19         cause to charge that person?

20   A.    Again, every circumstance is different, but would

21         that have a bearing on -- on the decision?  It could.

22         It very well could.  But, again, it just -- it

23         depends on more than -- than just what you're giving

24         me.

25   Q.    Well, and I'm not -- I'm not asking you to tell me if

Case 1:21-cv-00955-WO-JEP  Document 32-4  Filed 11/29/22  Page 29 of 197

1         there is probable cause or if there isn't probable

2         cause.  I'm just asking if that's a factor --

3    A.   Could it be a --

4    Q.   -- you would consider.

5    A.   It could be a factor to be considered, yes.

6    Q.   Okay.  What about if you saw someone place a package

7         into the center -- center console at the time you

8         pulled the car over?

9    A.   Yes.  At the -- at that time, yes.  But could it have

10        been that -- again, it's -- you know, it's a totality

11        of -- of everything, but would I consider that as a

12        factor?  Yes.  Yes, I would.

13   Q.   Okay.  So prior to your new role, you were lieutenant

14        in charge of the Investigations Division.

15   A.   Yes.

16   Q.   What were your responsibilities in the Investigations

17        Division?

18   A.   To oversee the personnel that were assigned to the

19        Investigations Division.  I believe during that time

20        we had eight, between investigative staff and a part-

21        time crime scene technician.  Evaluate employees,

22        scheduling.  Case management was -- ate up most of my

23        time.  That would be every report that came through,

24        to review that report for errors, assign it back for

25        corrections, and then make case assignments to the

1          investigators or assign the case back to the

2          reporting officer for follow-up.

3     Q.   Okay.  So we'll just go through these, I guess.

4     A.   Sure.

5     Q.   Evaluate -- I'm sorry.  You said you had eight

6          employees?

7     A.   I believe that's -- I believe that's right.

8     Q.   Approximately.

9     A.   Yeah.  It's -- it has -- you know, the O chart did

10         change.

11    Q.   And were -- were -- and one of those, you said, was a

12         part-time officer who was a evidence technician?

13    A.   No.  Not a part-time officer.  It was a part-time

14         civilian employee who was --

15    Q.   Was that Victoria Price?

16    A.   Victoria Price during that time.  And she was, like,

17         a crime scene technician.

18    Q.   And the other seven, were those all Southern Pines

19         Police Department officers?

20    A.   Yes.

21    Q.   And were they all detectives?

22    A.   It was Detective Sergeant Brian Edwards who's still

23         the sergeant of the Investigations Division.  He

24         oversees the division now.  And then the -- the rest

25         were made up of detectives.

1   Q.   Okay.  And at the time, did that include Officer

2        Heaton?

3   A.   No.  At that time Heaton was a lieutenant as well.

4        He was lieutenant, I believe, on a directed patrol

5        unit.  I think -- yes.  It was called Echo Team at

6        that time.  He was the lieutenant that oversaw that

7        team.

8   Q.   Okay.  And you said that one of your responsibilities

9        was also case management.

10  A.   Yes.

11  Q.   And case management, you said, was largely reviewing

12       paperwork or reports.

13  A.   Reports through our records management system,

14       signing those -- assigning those reports to

15       detectives for follow-up.  There --

16            So anytime an officer -- you -- you know, even

17       today when an officer completes an incident report

18       for a call for service they -- they go on, that

19       report gets submitted to their supervisor for

20       approval and then it would be routed to whoever

21       oversees the Investigations Division.  The

22       Investigations Division commander then secondary

23       reviews reports, you know, can assign them for

24       correction, assign them out for further

25       investigation, things of that nature.

1  Q.   So just because you're in charge of the

2       Investigations Division does not necessarily mean

3       that you're the supervisor of everyone in that

4       division.

5  A.   During that time I -- I was also the -- yes --

6  Q.   Okay.

7  A.   -- I was the supervisor also.

8  Q.   Okay.  But it's not necessarily always that way.

9  A.   I don't understand.

10 Q.   Well, I -- I thought what you were saying is that

11      there could be a situation where a report is sent to

12      a supervisor who is not the person in charge of the

13      Investigations Division to review.

14 A.   Yeah.  So it -- it's -- it's a layered system, if you

15      will.

16 Q.   Yeah.

17 A.   So when an officer -- a patrol officer, when they

18      complete a incident report, accident report, it goes

19      to their immediate supervisor.

20 Q.   Okay.

21 A.   And it's all done electronically.  It's not paper or

22      anything like that.  It's -- it's electronically.  So

23      through the system it would go to that supervisor for

24      their initial approval.  Once that report would be

25      approved, it would then be forwarded to the

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 33 of 197

1     Investigations Division.  Not accident reports, but

2     all incident reports --

3  Q.  Okay.

4  A.  -- would be forwarded to that division --

5  Q.  But --

6  A.  -- for a secondary review.

7  Q.  But in 2017 and 2018, you were the lieutenant in

8     charge of the Investigations Division as well as the

9     supervisor over each of these eight employees.

10 A.  Not the entire time, no.  I didn't become lieutenant

11    of Investigations until the late fall of 2017.

12 Q.  So at the -- let's -- then let's say February of --

13    of 2018 --

14 A.  Yes.

15 Q.  -- so the time of the arrest is the --

16 A.  I was the Investigations Division commander.

17 Q.  And you were also the supervisor who would review the

18    reports of each of these employees.

19 A.  Yes.

20 Q.  Okay.  And so --

21 A.  Well, I guess to clarify on that as well, if -- if I

22    may.  In my absence, Sergeant Edwards would do the --

23    do my job --

24 Q.  Sure.

25 A.  -- in -- in that instance to review reports, you

1       know, assign cases.  So if I wasn't there or if I was

2       tied up, and there may be times that I would -- I'd

3       just tell him, "Hey, review -- these reports are in.

4       Can you review them?"

5  Q.  How many investigations were occurring at a single

6       time in -- in 2018?

7  A.  I have no idea.

8  Q.  Approximately?

9  A.  I would be afraid to guess.

10  Q.  More than ten?

11  A.  Absolutely.

12  Q.  More than 50?

13  A.  So every agency does case management a little

14       different.  At the sheriff's department, for example,

15       we never inactivated cases.  You -- you know, that --

16       so --

17  Q.  I see.

18  A.  -- you have case status.  Case status is open

19       ongoing; closed, cleared by arrest; closed, cleared

20       by exceptional means; unfounded.  And if I hadn't

21       said inactive, inactive.

22            The sheriff's office, during my time there,

23       they never inactivated a case.  They'd file it away.

24       It may not be actively being worked, but they never

25       changed the status to a case as inactive.  You know,

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 35 of 197

1     by our -- you know, I don't recall exactly what the

2     policy is today because I don't deal with it on a

3     daily basis, but during that time investigators,

4     officers who were assigned to follow up on cases, so

5     they were required to complete a supplementary report

6     -- I think it was every ten working days or ten days

7     that they worked.

8          So in an instance like that, that's, you know,

9     why you would inactivate a case.  You don't have

10    enough to close it out.  You -- maybe you didn't have

11    cause to make an arrest.  So you would in essence

12    inactivate the case or request that the case be

13    inactivated.  So you have those different case

14    statuses.

15         I -- I -- I'm not comfortable guessing at how

16    many ongoing investigations would be -- 'cause it --

17    it varies, but each detective would have multiple

18    open cases at any given time.

19 Q.   Okay.  Do you --

20 A.   And when I say "open," active investigations that are

21    not placed in a inactive status.

22 Q.   And -- and as a supervisor or now as a captain, is

23    there any effort to limit those investigations or put

24    a cap on the number of investigations that each

25    individual officer is working on?

1    A.    When I was lieutenant of Investigations, my goal

2          initially was to -- because I was a detective from

3          2014 until I got promoted to lieutenant and went back

4          on patrol.  One of the things I wanted to do during

5          that time was to have case management more

6          streamlined to make it make more sense.  So what I

7          changed was I started assigning cases geographically.

8          So the town is broken into three districts:  Zone 1,

9          Zone 2, Zone 3.

10               Technically, there's a downtown district, but

11         in our records management system it's really not

12         recognized, if you will.

13               So Zones 2 and 3, by far, are the more busier

14         districts, Zone 1 being the largest, but 2 and 3 by

15         far are more populated, more commercial, and a lot

16         busier.  So I would have a detective assigned to each

17         zone and then would, in turn, assign someone to float

18         between 2 and 3.  And that's how I started assigning

19         cases.  I can't answer if that's the way it still is

20         or not, but when a case came in in a zone, you knew

21         you were getting it.

22   Q.    Uh-huh.

23   A.    It also streamlined it with the division commanders.

24         Each patrol lieutenant is responsible for a district,

25         so it allowed -- anytime something happened in the

1        downtown district, whether it be the Zone 1 or Zone 2

2        side, it allowed that district commander to know

3        exactly who was going to get assigned their case to

4        make things flow more efficiently.

5   Q.   Okay.  So I guess, then, the -- the answer to my

6        question of any sort of cap on a number of

7        investigations is really no.

8   A.   I don't recall ever not assigning a case because of a

9        cap.

10  Q.   Or because an officer --

11  A.   There was no magic number written down somewhere --

12  Q.   Yeah.

13  A.   -- that they can't have more than this.

14  Q.   Okay.  And -- but you don't -- do you recall how many

15       investigations that -- you know, the -- the most

16       investigations any officer in your unit was working

17       on at that time?

18  A.   I have no clue.

19  Q.   Okay.  So what was your role in overseeing the

20       investigations?

21  A.   Case management was the biggest part of it.  If

22       someone hadn't followed up on a case or had made

23       contact with the victim, I would be the one to answer

24       those calls and get answers as to why haven't you

25       spoke with this victim.

1          During -- during my -- my tenure as lieutenant

2     of Investigations, to be quite honest with you, we

3     had a great division.  Very seasoned officers.  They

4     worked very well together during major cases, very

5     difficult cases.  I had no complaints of -- of any of

6     those guys.  They did a great job, and they really

7     made my job a little easier.

8  Q.  So how would an investigation typically begin?

9  A.  Any specific investigation or in general?

10  Q.  In general.

11  A.  We get a call for service that patrol responds to.

12     They take an incident report that they list the

13     facts, you know, in the -- or the information they're

14     provided by the caller or the reporting party in the

15     investigative report.  They try to work it until it

16     can't be worked.  If it's something of a more serious

17     nature that needs to be forwarded up to an

18     investigator, then, you know, once I got that report,

19     I would assign it out.  But some -- some cases are --

20     are -- are left on the patrol level.

21  Q.  And how many of these investigations or the

22     investigations that you were overseeing at that time

23     involved outside law enforcement agencies?

24  A.  I -- I don't know the number.  We work across, you

25     know, jurisdictional lines on a regular basis.  One

1           of -- you know, during part of my tenure as

2           lieutenant in Investigations, I had nearly the entire

3           division dual sworn as deputies with the Moore County

4           Sheriff's Office.  Also, two detectives were sworn

5           with the FBI as well, but we -- we have a good

6           working relationship with our surrounding agencies

7           and -- and connections, you know, through --

8           throughout the state that, you know, we work with on

9           a -- on a regular basis.  But I can't tell you a

10          number of this many cases outside agencies were

11          assisting on.

12     Q.   Did every case involve outside agencies?

13     A.   Every case?  No.

14     Q.   So there's some cases that were handled just

15          internally with the Southern Pines Police Department.

16     A.   Sure.

17     Q.   Okay.  How many cases would you say involved the FBI?

18     A.   Couldn't give you a number.

19     Q.   Okay.  And -- and I guess just to back up a little

20          bit, investigations are not always long-term

21          investigations before an arrest is made, are they?

22     A.   Not always, no.

23     Q.   So sometimes it's someone calls 911.  They say, you

24          know, "A burglary has happened here."  You send an

25          officer, they show up, and -- and they make an arrest

 1         right away.
 2    A.   Sure.
 3    Q.   That could happen.
 4    A.   Correct.
 5    Q.   Okay.  But in some cases, you also do have longer-
 6         term investigations prior to an arrest.
 7    A.   Yes.
 8    Q.   How many investigations would you say when you were
 9         in charge of the division were actually these longer-
10         term investigations that -- that, you know, were
11         months or a year prior to an arrest being made?
12    A.   It -- again, it varies.  So, you know, part -- and in
13         -- in the 500 general orders, I don't recall if it's
14         in case management or which one it is, which one of
15         the GOs it is, but it's in the 500s.  The
16         Investigations Division commander is -- you know,
17         conducts a cold case review.  And so you find cases
18         that are, you know, either in an inactive status that
19         have not been closed out.  A lot of times those -- or
20         the ones that you focus on aren't the found property.
21         It's the homicide -- a open suicide or something like
22         that.  And, you know, it can be years later that --
23         that those cases -- you know, they -- they've spanned
24         over several years.
25                   An example:  when I got assigned the

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 41 of 197

1          Investigations Division as a detective in 2014, I

2          came -- I came back to work in Southern Pines,

3          Veterans Day of '13 in November.  I was assigned to

4          the Investigations Division as a detective at the

5          completion of my field training period.

6                During that time it was a rough time for this

7          area.  The south end of the county had several

8          unsolved murders.  So 2012, 2013, cases I ended up

9          getting assigned when I worked in the Investigations

10         Division.  So those cases were -- you know, the --

11         the youngest one, 12 months old at least whenever I

12         was assigned it.

13               So, you know, any type of investigation could,

14         you know, span over a long period of time, but I -- I

15         can't give you a number of, you know, this is how

16         many do span over --

17    Q.   Sure.

18    A.   -- over a long period of time.

19    Q.   What type of investigations are the -- is the FBI

20         typically involved in?

21    A.   Drug cases, robberies.  When I say robberies, not --

22         you know, not your gas station, but of financial

23         institutions.  Gun cases, weapon seizures, other --

24         you know, other types of robberies.  So things in

25         commerce.

1           So I say not gas stations, but in theory, the

2      -- the FBI, if you did have a gas station that was

3      robbed and an item was -- was stolen that crossed

4      state lines in its delivery to the -- the merchant,

5      they could get involved.  But, you know, worked with

6      the FBI, you know, numerous times on -- on drug cases

7      and -- and robbery cases.

8  Q.  Okay.  And how is the FBI brought into an

9      investigation that originated with Southern Pines?

10 A.  Going back to my time in Moore County -- well, even

11     when I started my career here in Southern Pines as a

12     patrol officer, I had several cases that went

13     federal.  Usually, in -- you know, in the beginning

14     of my career, if it was a gun or drug case, ATF.  It

15     was always ATF that would adopt the case.

16          And in recent years, in the past, you know,

17     five, ten years, if you will -- not exactly sure

18     when, but we were assigned Special Agent in Charge

19     Andy de la Rocha.  And Andy was really one of the

20     first people that we started having, you know, a -- a

21     frequent relationship with the FBI.  And, you know,

22     missions change and, you know, he relayed that the

23     FBI's mission was to do more work with local law

24     enforcement to assist in federal prosecutions or

25     resources.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 43 of 197

1           Andy would attend our comp stat meetings that
2      are held biweekly, and he was -- was an incredible
3      asset for us.  So whereas most people think the FBI
4      are only going to come out for a bank robbery, they
5      actually have their own narcotics section and -- and
6      -- and other things, too, to the point that we ended
7      up having, you know, two detectives dual -- you know,
8      sworn in as task force officers with the FBI,
9      basically giving them global jurisdiction.
10  Q.  Which officers were those?
11  A.  Sergeant Perry and Sergeant Lowery.
12  Q.  Was Andy -- was Officer de la Rocha or FBI Agent de
13      la Rocha, was he involved in Operation Leader?
14  A.  I don't recall.  His -- I know he -- one of his
15      agents were, had some component to it.  Specifically,
16      I believe the camera on New York Avenue belonged to
17      the FBI, and Mike Martin was the agent that I believe
18      our officers worked with.  Again, I'm not 100 percent
19      certain on -- on that because all of that happened
20      prior to me becoming lieutenant in Investigations.
21           So Rodney Hardy was the lieutenant in
22      Investigations when this case began.  I was
23      lieutenant -- became lieutenant in Investigations in
24      October of 2017 when Rodney Hardy retired.
25  Q.  What were you doing prior -- directly prior to the

1         time you were the lieutenant in Investigations?

2    A.   I was lieutenant on patrol for David Team.

3    Q.   Now, to get Andy de la Rocha or to get the FBI

4         involved in the case, I understand that he would be

5         at your comp stat meetings, but how would that occur?

6         Would he approach you about a case or would you

7         typically approach him about a case to get them

8         involved?

9    A.   Me personally, I would have very little with any

10        doing that, like communication with him about that.

11        So that would be the -- you know, the officer who's

12        working a case.  And more often than not, it's going

13        to be us as an agency reaching out to them for either

14        resources, manpower, whatever the case may be.  But

15        it would typically be us reaching out to them.

16   Q.   And just so I'm clear, typically the person who would

17        do that at Southern Pines would be the detective in

18        charge of that investigation.

19   A.   Yes.  Now, with an investigation such as this, you

20        know, it would likely be in consultation with the

21        division commander, possibly even the chief, but --

22        but, yes, it would be us reaching out to them.

23   Q.   Why would it be different in -- in this type

24        investigation, in Operation Leader?

25   A.   What -- what do you mean why would -- why would it be

 1       different?
 2    Q.  Well, so you just stated in investigations such as
 3        this they may reach out to the commander or the
 4        chief.  Why would that be so in this instance?
 5    A.  Just to keep them up to speed.  Not necessarily
 6        asking for permission, but just to -- to, you know,
 7        keep the command staff, you know, up to speed, to
 8        bounce ideas off of a direction, a reason -- you
 9        know, what's -- what's the reason.  You know, things
10        of that nature.
11    Q.  And my -- I guess my question is, is that just
12        because Operation Leader was a more large-scale
13        investigation?
14    A.  It -- it was a large -- a larger-scale investigation,
15        you know, especially for a small agency to -- to
16        spearhead.  But -- but, yeah, I mean, you would --
17        you would want to keep command staff, you know, in
18        the loop.  We wouldn't want necessarily, you know, a
19        detective to -- to reach out to -- to multiple
20        agencies to --
21    Q.  Sure.
22    A.  -- for assistance and then you get a call from the
23        town manager, "Well, why are all these other cars
24        bouncing around in our neighborhood?"
25    Q.  Uh-huh.

1    A.   So -- but, yeah, I mean, something like that, you

2         would typically consult; not necessarily asking for

3         permission or anything like that, but to bounce ideas

4         off of.

5    Q.   Okay.  So how about the District Attorney's Office?

6         In a large -- or a long-term investigation such as

7         Operation Leader, what is the District Attorney's

8         Office role -- role in an investigation like that?

9    A.   To review search warrants; applications for, you

10        know, trackers or pen orders, things of that nature;

11        to -- to review affidavits; to make sure they're okay

12        with the direction it's going.  It could vary.

13   Q.   What do you mean to make sure they're okay with the

14        direction it's going?

15   A.   That -- like in the -- in an affidavit to -- to put a

16        tracker on, well, you know, this is -- this is why,

17        you know, the -- we feel, you know, information would

18        be gathered from that tracker.  You know, things like

19        that.  You know, who would be a better federal

20        candidate versus state candidate.  You know,

21        conversations like that could take place.

22   Q.   In your experience, why would someone be a better

23        federal candidate versus a state candidate?

24   A.   I've had a lot of experience prosecuting -- I say

25        prosecuting -- sending cases to -- to federal court.

1          From, again, early in my career as a patrol officer

2          with traffic stops, with narcotics and weapon

3          seizures to my time as a narcotics detective with the

4          sheriff's office would present our own cases without

5          having to go through a federal agency.  There's

6          typically qualifiers.  Criminal record, the quantity

7          of -- of narcotics.

8                At one point in time -- and I do not know what

9          the boundaries are now, but a -- you know, a

10         qualifying felony conviction and five grams of crack

11         cocaine was a minimum mandatory sentence in the

12         federal system.

13   Q.    Uh-huh.

14   A.    There were different thresholds that -- you know,

15         that -- that the federal system had, but those

16         guidelines are constantly evolving.  I can't tell you

17         what they are today.  I can tell you what they were

18         in 2018.

19   Q.    Uh-huh.

20   A.    But I had a lot of experience, you know, with sending

21         cases to -- to the federal level.  More often than

22         not, the criminal record would come into play.

23   Q.    And -- and how would that work?  Would it be that you

24         would typically contact an FBI agent, or would you

25         contact the US Attorney's Office?

1   A.   It could be both.  Some Assistant US Attorneys will

2        not take a case unless it comes from a federal

3        agency.  My time at the Moore County Sheriff's

4        Office, we could call an Assistant US Attorney and

5        meet with them on a case and they would adopt it

6        straight from us.  I don't know what the rules are

7        now as far as, you know, can local agencies still do

8        that?  I don't know.

9             But it -- it -- it could be both ways.  It

10       could be through a federal agency or straight through

11       an AUSA.  I believe during those years we -- we did

12       it both ways.  But, again, once our detectives became

13       sworn federally, it really didn't matter at that

14       point.

15  Q.   Why not?

16  A.   Because they were federal agents.

17  Q.   And so you could just refer cases directly through

18       them?

19  A.   Doesn't mean they would take them, but -- but, yes.

20  Q.   So essentially, if you had a case when you were

21       supervisor of the Investigations Division or in

22       charge of the Investigations Division that you

23       thought or you wanted to go federally, you would get

24       in touch with Detectives Perry or Lowery and you

25       would ask them to communicate that to --

1   A.   With an Assistant USA.

2   Q.   -- with an Assistant USA.

3   A.   But, again, that conversation could also go, you

4        know, "Communicate with the DEA or a full time FBI

5        agent or ATF." The Moore County Sheriff's Office has

6        at least one TFO with the ATF and -- and has for a

7        majority of my career. Sometimes we would take --

8        take things through that person as well.

9   Q.   And when you were supervisor in Southern Pines and

10       y'all would do this, you would take a case federally,

11       would it typically be -- would you -- would you

12       provide the federal agents with a packet of

13       information, would you provide them with incident

14       reports, or would it generally just be a conversation

15       to describe the case?

16  A.   They almost would always want something and a

17       prosecution summary is typically what they were

18       given. So the prosecution summary being what is

19       turned out to the state for state prosecutions, we

20       would put something like that together and submit it

21       to the AUSA. I can't think of a time where it would

22       have been just a conversation.

23  Q.   And when you're providing that to the FBI or to the

24       US Attorney, is that provided in hard copy or is it

25       provided via e-mail?

1    A.    In my experience as a case officer, it would be done

2          in person.

3    Q.    In person.

4    A.    It would -- it would be done in person.  Now, I -- I

5          can't speak for, you know, how -- how these -- these

6          files would have been transmitted specifically like

7          for this case.

8    Q.    Uh-huh.

9    A.    I don't know how -- how they would have been

10         transmitted.  To the state, you know, they're

11         uploaded to a portal, but with the federal system, I

12         -- I don't want to misspeak about how things, you

13         know, are accepted, you know, since -- since I've

14         done it.  And it's been many years since I have

15         personally.

16   Q.    And just so I'm clear, when you would have done it,

17         you would have actually met with the US Attorney.

18         You would have a meeting, you'd discuss the case,

19         you'd show them the evidence, you'd show them the

20         incident reports, and the prosecution summary?

21   A.    Yes, sir.

22   Q.    Okay.  And in 2018, was the District Attorney's

23         Office here using the portal?

24   A.    Yes.  NCAWARE.

25   Q.    As part of an investigation, would you also

1          communicate with the DA's office via e-mail?

2     A.   Sure.  It's possible.

3     Q.   How about via text message?

4     A.   Highly doubtful but yet possible.  By phone, yes.

5          Again, e-mail, but especially today most definitely.

6          But I -- through text?  I really can't answer.

7     Q.   Did the DA's Office have their own investigators?

8     A.   Over time, yes.  All the time, no.  I know of two

9          investigators that the Moore County District

10         Attorney's Office has had in the past.  I can't tell

11         you when they worked there.  One was Kip Dennis, and

12         I do not recall the gentleman's name from Ohio.

13    Q.   But generally --

14    A.   But I remember when they worked there.

15    Q.   -- for -- when you're on an investigation and you're

16         communicating with the District Attorney, you're

17         communicating with the District Attorney who's

18         assigned to the case.

19    A.   Yes.  More often than not, yes.

20    Q.   And the phones that you're using to communicate with

21         them -- well, let me strike that question.

22              You were assigned phones by the Southern Pines

23         Police Department.

24    A.   Yes.

25    Q.   And those phones had text message capabilities.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 52 of 197

1    A.    Yes.

2    Q.    Okay.  So let's -- let's talk about a typical

3          long-term investigation such as Operation Leader.

4          Who was typically in charge of running this sort of

5          investigation?

6    A.    The case officer.  And when I -- I didn't mean that

7          if it came off wrong, but the case officer being the

8          detective.

9    Q.    Sure.

10   A.    Yeah.

11   Q.    And could there ever be two case officers?

12   A.    Sure.

13   Q.    Why would there be two cases officers?

14   A.    In -- in this type of investigation, there were two

15         detectives that were assigned the narcotics/gang

16         function.  That was their job.  They didn't -- I'm

17         not going to say they never investigated general

18         crimes, but their job was to investigate, you know,

19         narcotics and gang activity, things of that nature.

20         So in a long-term investigation, they -- you know,

21         they would both be lead, if you will, on it.

22   Q.    So there were investigations where Detective Lowery

23         and Detective Perry were independently in charge.

24   A.    Could there have been investigations that -- where

25         they were independently in charge?  Sure.  It -- it's

1      possible.  Like, you know, I'd said, that they could

2      also work general cases during their times as task

3      force officers with the FBI.  Anytime we had a major

4      robbery, I've tasked them with working that robbery.

5   Q.  Uh-huh.

6   A.  You know, jewelry stores, financial institutions.

7      Those are things that are easily federally

8      prosecuted, so I would assign them to it to eliminate

9      any middle person.  And in an instance like that,

10      they -- they would be individually responsible for

11      that investigation, if you will.

12   Q.  And when you would assign them, you would almost

13      always assign them to work on it together.

14   A.  On like a robbery incidence that I'm talking about,

15      or are we talking about like a drug case?

16   Q.  Well, let's -- let's add both.

17   A.  So a drug case, that's their job.  They're narcotics

18      detectives.  That their job.  So, yes, they -- they

19      should be working together.  If one's unavailable,

20      somebody else could fill in.  But, you know, if a

21      specific task needed to be done, meeting with an

22      informant, conducting surveillance, that -- that

23      could be -- we can pull from anybody, you know, that

24      -- that you need.  You know, things happen.

25      Vacations, sicknesses, things like that.  You know,

1        you have to -- to be able to -- to improvise and to
2        keep things alive.
3   Q.   Would you have considered -- would -- would either of
4        them ever have been assigned as a lead directive over
5        one or the other?
6   A.   Over one or the other?  No.  If -- if I was going to
7        assign, you know, a -- a lead detective to this case
8        -- and when I say assign, if I was going to put
9        somebody's name as they were the lead on this case,
10       it would be Sergeant Perry.
11  Q.   Why?
12  A.   Well, I'll be honest with you.  I've worked with a
13       lot of people in my career, and he gets the job done.
14       He spends more time with this job than he should.
15       He's dedicated to it, and I know he's going to do it
16       right.  I mean, that's -- I know of two other people
17       that were assigned to work with him, and they had a
18       hard time keeping up.  And it's because of his level
19       of -- of dedication to -- to, you know, staying on
20       top of things.
21  Q.   Okay.  But just from a structural or organizational
22       standpoint, if Lowery and Perry are both assigned to
23       a case, are they both equally responsible for that
24       case?
25  A.   I don't want to make -- make an assumption, but --

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 55 of 197

1       but, yes.  I mean, do -- they both share

2       responsibility in the case, but saying that they're

3       equally responsible, I mean, it's not a -- you know,

4       it's not a this person's name goes at -- you know,

5       they're the ones who wrote this book and they're the

6       ones who get credit for writing this book.  That's --

7       that's now how any case works.  You may not be the

8       person whose name goes on that arrest report.  That

9       doesn't mean you didn't have a major component to

10      that case.

11              So I don't -- I've never really labeled "It's

12      your case."  I mean, it's -- it's a team effort, and

13      I really don't know any better way to -- to answer

14      that -- that question as far as, you know, a 60/40, a

15      50/50.  I mean, it's -- at the end of the day it's a

16      Southern Pines case and, you know, like in anything,

17      somebody does more work than the others.

18   Q.  Let's say there was a disagreement and Officer Lowery

19      said, "I believe there is probable cause to arrest

20      this person" and Sergeant Perry said, "I don't think

21      there is."  Who would win in that instance?

22   A.  They would take it to a superior officer.  More often

23      than not, that would end up being me during -- during

24      those times.

25   Q.  So, essentially, the buck stops with you if there is

1           some sort of conflict.

2    A.     Well, sure.

3    Q.     How do you decide who is the arresting officer?

4    A.     I don't necessarily make that decision.

5    Q.     How is that decision made in the field?

6    A.     Well, it's -- I mean, it's kind of a roll, I mean,

7           saying who's the arresting officer.  You know, we can

8           have a case to where we obtain warrants on someone

9           and, you know, a -- another officer from another

10          jurisdiction finds the person and makes the arrest.

11          That's the arresting officer.  You know, in

12          situations like this case here, it's what's best for

13          the team.  You know, "Everybody find a job."  You

14          know, "You type the warrants.  You transport the

15          person.  You serve the warrant."  It's -- it's not a

16          -- you know, assigning an arresting officer, if you

17          will.  I mean, it's --

18                 Did I answer -- did I answer that question?

19   Q.     Yeah.  And so, you know, we can -- we'll take a --

20          we'll take a break soon.  I'm -- I'm coming to --

21          well, I say that, but I think I'm coming to a good

22          stopping point.  And let me know if you ever --

23   A.     You're fine.

24   Q.     -- want one.

25                 But, you know, it sounds like you're out in

1          the field or let's say you -- you -- you execute a
2          warrant and there's multiple officers on the scene,
3          and officers can be doing different responsibilities.
4          One can be collecting evidence, one can be doing
5          something different, and some officer who's there at
6          part of the scene can just be assigned to take that
7          person down to the magistrate and be assigned as the
8          arresting officer.
9   A.     Yes.  That -- that happens, especially in a -- if
10         you're executing a search warrant, that's -- that's
11         going to happen.  The person who physically is -- if,
12         you know, makes the physical arrest as far as
13         transporting the person before a judicial official
14         may not be the person who is the -- you know, one of
15         the originating case officers.
16             It could be anybody.  We may have other places
17         we need to go, and those other places may not be --
18         we may not need to send someone who is not versed on
19         the case.  You -- that's something you don't want to
20         just send anybody to.  Everybody knows how to get to
21         the magistrate and how to serve a warrant.  I mean,
22         so, you know, it's -- it's -- it's case-dependent on
23         what resources you have and -- and what needs to be
24         done.
25  Q.     Okay.  So -- but when -- when you go to the

1       magistrate, you do have to provide them, if there was

2       not a warrant already --

3   A.  The facts of a case.

4   Q.  -- provide them with probable cause, right?

5   A.  Yes.

6   Q.  And if someone goes who is not versed on the case,

7       how is that done?

8   A.  It's relayed from one officer to another.

9   Q.  Okay.  So --

10  A.  And one officer can testify to what they know from

11      another officer.

12  Q.  Is -- is there ever a situation where a report will

13      also be brought or handed from one officer to an

14      arresting officer to then be put in front of the

15      magistrate?

16  A.  What type of report?  Like I -- I don't know.

17  Q.  Just any -- any writing:  an incident report,

18      anything at all.  Is there -- a supplement.  Is there

19      anything that could be --

20  A.  Again, not a -- I mean, it's not a 100 percent every

21      time answer.  But if you were taking someone before a

22      judicial official without a warrant in hand, then you

23      call that an on view arrest, arrest without a

24      warrant.  A lot of times in those types of situation,

25      no report exists yet.  So like if you're talk- --

1          referring to, like, an incident investigation report,

2          a lot of times that wouldn't exist.

3   Q.    Uh-huh.

4   A.    An example, you pull someone over and -- in a traffic

5          stop and they, you know, have a illegally possessed

6          firearm.  There hasn't been an incident report yet.

7          There's no warrant.  It's an on view arrest.  So,

8          therefore, you would just be testifying to the facts

9          of it.  You could have another officer transport.

10              So let's say that the person was combative and

11         the officer who pulled him over was a K9 officer who

12         doesn't have a prisoner transport.  Then that arrest

13         could be turned over to someone that had a cage car

14         and, you know, the -- the arrest move forward that

15         way, and that officer, you know, testify to -- to

16         what the previous officer told him.

17              Other ways of -- of doing that are through

18         what used to be called the Jabber system and,

19         unfortunately, it's been a little while since I've

20         had to go before a magistrate.  But the Jabber system

21         was the online system -- call it FaceTime, but it was

22         their -- their version of it through a -- a camera

23         that was in our patrol officers' room.  And there was

24         a Bible and you could swear to the facts remotely

25         that way.  Those were other ways that an arrest could

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 60 of 197

1    be made without the -- the initiating officer, if you
2    will, being present.
3  Q.  Could an officer ever call the magistrate and say,
4    "This is what happened at the scene.  This is what we
5    observed.  These are the facts for probable cause"?
6  A.  Just calling them?
7  Q.  Well, I'm saying if there's someone else who brings
8    them physically in.  In your experience, have you
9    ever had a situation where a different officer is
10   called in to explain the facts for probable cause?
11 A.  Not that I'm aware of because they wouldn't be
12   swearing to anything.  There was no way to -- without
13   some type of video or a notarized affidavit or
14   something like that, I don't see how you could -- you
15   could do that.
16 Q.  And tell me again, the Jabber system.  Where was
17   that?
18 A.  The patrol officers' room at the police department.
19   Aberdeen had one; the sheriff's office.  I don't know
20   what all agencies had them.
21 Q.  Does Southern Pines?
22 A.  I don't know if we have that anymore or not.  I don't
23   know.
24 Q.  Did you have it in 2018?
25 A.  I'm pretty sure we did.  We had it for many years.

1   Q.   Okay.  And so essentially what it was was a FaceTime

2        or, you know, a Zoom type thing where you can see a

3        video of the magistrate, they can see you, and you

4        explain to them the facts of probable cause.

5   A.   Yes.  They would swear you in.  And there was -- a

6        Bible was in the room.  They -- you know, the camera

7        would have to be on.  They would have to know that

8        your hand -- you know, that you were swearing or

9        affirming to the facts of the case.  And that was a

10       common practice.  The site was through AOC, but

11       that's really all I can tell you about it.

12  Q.   Okay.  So who on an investigation would make the

13       decision to take out a warrant for a search or an

14       arrest?

15  A.   It could be the -- the officer, you know, who's --

16       who's investigating the case, that's assigned the

17       case.  You're -- and you're -- you're talking about

18       like if they're assigned a case, who makes that

19       decision?

20  Q.   Yes.

21  A.   Okay.  Then, yeah, it would -- it would be the

22       investigating officer.

23  Q.   Would you ever -- as their supervisor, would you have

24       the ability to review that decision and say, "No,

25       we're not going to do that in this instance"?

1    A.    Could I?  Yes.

2    Q.    In your experience, did you ever do that?

3    A.    I don't recall.

4    Q.    Would you be -- were you required to review arrest

5          warrants?

6    A.    Arrest warrants, no.

7    Q.    What were you required to review?

8    A.    My title specifically at that time -- the only reason

9          I hesitate is there -- in the 500s when it comes to

10         search warrants, there is a requirement that the

11         search warrant be reviewed.  I don't want to

12         misspeak.

13   Q.    Uh-huh.

14   A.    To paraphrase, it's the on-call investigator, the

15         watch commander, I think, are listed as people to

16         review a search warrant.  More often than not, if a

17         search warrant was typed, I would review it.

18   Q.    Okay.

19   A.    But it has to be reviewed prior to being executed --

20         or, actually, before being presented to a judicial

21         official.

22   Q.    By someone, and you're just not sure exactly what it

23         says in the --

24   A.    I can't remember what the policy says, but more often

25         than not, Sergeant Edwards or myself would be the one

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 63 of 197

1           to review a search warrant.

2    Q.     What about an arrest warrant?

3    A.     No.

4    Q.     So if you assigned a case to Officer Perry or Officer

5           Lowery, they can go and make an application for an

6           arrest warrant on their own and then go --

7    A.     Yes.

8    Q.     -- make an arrest without any sort of --

9    A.     Yes.

10   Q.     Would you typically review those arrest warrants?

11   A.     I don't recall very many times of reviewing an arrest

12          warrant prior to it being issued.  I'm sure it's

13          happened.  I've helped officers type warrants.

14              The typical practice is for -- especially for

15          investigators is when they're obtaining a warrant on

16          someone -- it could be a magistrate's order, it could

17          be an arrest warrant -- they would actually type the

18          warrant themselves in NCAWARE and then go before the

19          magistrate with a temp number and the magistrate

20          would either find probable cause, not find probable

21          cause, and then issue the actual process.

22              I've -- I've helped type those and I've typed

23          very many of them, but actually reviewing them before

24          they go and -- and swear to them -- and, again,

25          speaking to arrest warrants, very far and few

1        between.

2   Q.   Okay.  So there's a policy in the Southern Pines

3        manual or -- or policy book that search warrants have

4        to be reviewed by a supervisor but arrest warrants do

5        not.  There's no policy in the system.

6   A.   I don't recall a policy dealing with arrest warrants.

7        Now, would I be made aware that they were going to

8        make an arrest in a case or -- yes.  I wouldn't just

9        find out about it doing secondary review of reports.

10       I -- you know, I would be aware of it.  But actually

11       physically reviewing an arrest warrant?  Few and far

12       between.

13  Q.   Okay.  And by being made aware of it, would that mean

14       they would actually tell you about the case?

15  A.   They could actually tell me about it or reviewing it

16       in a supplemental report that, you know, "These are

17       the facts and I plan to seek" or "I have an

18       appointment to seek" or something to that effect.

19             It's -- again, it's very rare that I ever

20       physically reviewed an arrest warrant, but it would

21       be just as rare for an arrest warrant to appear or to

22       have been obtained and I not know about it.

23  Q.   Okay.

24  A.   If that makes sense.

25  Q.   It does.  And just so I'm clear, and I think we

1          covered this already.  If Officer Lowery or Officer
2          Perry or any of your other officers came to you and
3          they said, "We want to -- we're about to make this
4          arrest.  These are the facts of the arrest.  Here's
5          the supplemental reports or whatever we've been --
6          here's the evidence," and you said, "Whoa, I don't
7          think there's probable cause here," you would be able
8          to stop that.
9     A.   I would -- I would have that ability, yes.
10    Q.   But as far as your recollection, you don't ever
11         recall doing that.
12    A.   In this case or in general?
13    Q.   In general.
14    A.   I don't recall.
15    Q.   After an arrest occurs, what are the next steps in
16         the process?  And I'll say after an arrest occurs
17         without an arrest warrant.  What happens next?
18    A.   Facts are provided to a judicial official, conditions
19         of release are set by that judicial official.  Any
20         evidence that needs to be entered gets entered.
21         Reports are completed.
22    Q.   And -- and just to back up, the judicial official
23         will write what's called a magistrate's order?
24    A.   If it's an on view arrest, more often than not, that
25         is what they choose to do.  You can't get a

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 66 of 197

1           magistrate's order for someone who's not in custody.

2           Otherwise, it would be a warrant for arrest.

3   Q.   So if they're not in custody, what -- what happens?

4   A.   A warrant for arrest or indictment.  But, of course,

5           that would be going before a grand jury.

6   Q.   So I think we -- you mentioned this already, but

7           could you tell me again what the prosecution summary

8           is?

9   A.   Prosecution summary is all the investigative incident

10          reports, notes.  For lack of a better word,

11          everything that's in the case file goes as part of

12          the prosecution summary.  You know, papers are

13          scanned and uploaded.  Other types of media are also

14          uploaded if there's room.  You do have size/space

15          limits.  Anything that can't be uploaded gets hand-

16          delivered.

17  Q.   So physical evidence, is that part of a prosecution

18          summary?

19  A.   The actual evidence itself -- and when we say, you

20          know, in a robbery case, the gun that they use?

21  Q.   Yeah.

22  A.   No.  But photographs, property receipts, evidence

23          records, they could all be part of it that pertain to

24          that item.  But the physical evidence stays with the

25          evidence room.

1  Q.   Okay.  And this is all uploaded through the NCAWARE

2       system?

3  A.   Yeah.  It's called the eWarrants now, and I'm not as

4       versed on it as I was NCAWARE.

5            COURT REPORTER:  I'm sorry, repeat that?

6            THE WITNESS:  eWarrants is what it's called

7                now.

8  BY MR. RUBERT-SCHEWEL:

9  Q.   But in 2018 it was --

10 A.   In 2018 it was NCAWARE.

11 Q.   So what you're saying is that in some instances

12      media, videos, surveillance may be uploaded, but in

13      some instances it may not be.

14 A.   It may have to be hand-delivered.

15 Q.   Okay.  So that -- that's more of a discretionary

16      decision.

17 A.   Not so much discretionary as it is the system you're

18      dealing with itself.  You have file size limits.

19 Q.   Okay.

20 A.   So with -- today, with HD cameras, you know, it can

21      -- a 27-minute video could be eight gigabytes.

22 Q.   Yeah.

23 A.   That would be too large, you know, for that.

24 Q.   Okay.

25 A.   So you would have to throw those on a USB and then

1           hand-deliver those, a copy of that to the prosecutor.

2    Q.    So in -- in your opinion, the prosecution summary

3          would include all physical evidence as well.

4    A.    All phys- -- include all physical evidence, no.  But

5          the way I interpret your question is all physical

6          evidence being items that are physically in our

7          evidence room.

8    Q.    Well -- well --

9    A.    Am I wrong?

10   Q.    Yes.

11   A.    Okay.

12   Q.    Pictures of those items.

13   A.    Pictures of those items, yes, would be turned over.

14   Q.    And this would all happen at the same time.

15   A.    Not always.

16   Q.    Okay.  Tell me why, why it would not always happen at

17         the same time.

18   A.    There could be multiple delays.  The items may not

19         exist yet; things can get overlooked, especially when

20         you start talking about, you know, a thousand pages.

21         Some things could be copied front to back and not

22         realized whenever they're scanned in that you didn't

23         get the back page.  You know, mistakes can happen

24         like that, but, you know, oftentimes it's -- they may

25         not exist yet.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 69 of 197

1    Q.    Is there a checklist of what to provide the
2          prosecution anywhere?
3    A.    The prosecution summaries during that time actually
4          had a checklist built into it with a table of
5          contents and everything else.
6                    MR. RUBERT-SCHEWEL:  We'll do a follow-up
7                        request for that as well.
8                    MR. DAVIS:  Yeah.  I got it.
9                    MR. RUBERT-SCHEWEL:  If you'll make a note for
10                       that.  I'm not sure if we have that or not.
11                   MR. JONES:  You do.
12                   MR. RUBERT-SCHEWEL:  We do?  Okay.  Nachid,
13                       will you try and pull that up?
14                   MR. DAVIS:  Yeah.
15   A.    It usually is on page 2 or 3 of the prosecution
16         summary.
17   BY MR. RUBERT-SCHEWEL:
18   Q.    Okay.
19   A.    And if you have multiple prosecution summaries for
20         the same case, like you have to upload a summary for
21         every defendant.
22   Q.    Okay.
23   A.    In a larger case, the summary may be the exact same.
24         The only difference is the face page is changed where
25         it's got defendant/co-defendant, and you just -- you

1           switch those and you may just send multiple face

2           pages because everything else is the same in certain

3           cases, so.

4    Q.     Okay.  And is it typically the lead detective on the

5           case or the case officer who is in charge of

6           providing the prosecution summary?

7    A.     The charging officer is -- is responsible for

8           producing them.

9    Q.     And how about the incident or investigation report?

10          Who is in charge of completing that?

11   A.     Normally, the -- well, on cases assigned for

12          follow-up, it'd be the initial responding officer.

13          You know, self-initiated cases by a detective, then

14          they would be responsible for that investigative

15          report. Execution of a search warrant, you know, the

16          -- the person who has applied for that search warrant

17          or is executing that search warrant, they're the ones

18          who would -- would handle that -- that incident

19          report.

20   Q.     Okay.  And in a case that's a long-term investigation

21          where you've already assigned officers to that, are

22          those officers you've assigned to the case in charge

23          of the incident or investigation report?

24   A.     It could vary.  There could be multiple reports that

25          come out of a single incident or -- not single

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 71 of 197

1    incident -- single investigation.  So you have -- it

2    used to be the UCR reporting requirements by the FBI.

3    Now they've converted to NIBRS.  There are -- with

4    that conversion, there were changes to date, time,

5    location, victims that can dictate when multiple

6    reports have to be done out of the same event.

7  Q.  What about officers who provide supplements or

8    narratives to an incident report?  How are those

9    gathered?

10 A.  Through the same records management system.  Instead

11   of doing an incident -- are you -- are you asking

12   like how are they collected?

13 Q.  Well, I guess I'm asking really, let's say one of

14   your officers is in charge.  Let's say Officer

15   Lowery's in charge of an incident report and he wants

16   to get a supplement from you.  Does he go and ask you

17   for that supplement?  Do you put that in on your own?

18   He knows you were at the scene?  How is that done?

19 A.  In a perfect world, he shouldn't have to ask for

20   anything.

21 Q.  Yeah.

22 A.  But let -- let's face it.  People get busy and

23   sometimes you have to come around and ask, "Hey,

24   where's your supplement?  I need your supplement."

25   You know, those -- those things happen.

1   Q.   In your computer system, will that person -- does

2        that person get an automatic notification that a

3        supplement is due?  Can -- can Officer Lowery go in

4        and add everyone to that case who was on the scene?

5   A.   Not that I'm aware of.

6   Q.   Okay.  So what has to happen is either that person

7        has to, on their own, write a supplement and provide

8        it, or that officer has to go and ask them for it.

9   A.   Yeah, that's fair to say.

10  Q.   Is every officer who's on the scene required to write

11       a supplement?

12  A.   Not always.

13  Q.   How do you decide who writes a supplement?

14  A.   If they did something important.  Just the mere fact

15       that someone was there doesn't necessarily mean that

16       they have to complete a report.  It varies.  I mean,

17       it varies from case to case or incident to incident,

18       you know, who would be required.  And it may be that,

19       you know, there could be an internal -- so (coughing)

20       -- excuse me.

21            Take a search warrant, for example.  You have

22       Special Response Team members that their job is to

23       secure a location and to keep that location secure

24       while others process the scene and collect evidence.

25       Sometimes their role could be to aid in searching.

1          Sometimes it may just be a security post.  A Special

2     Response Team member that just stood in a yard and

3     didn't do anything that was security, I wouldn't

4     necessarily expect them to complete a supplemental

5     report.

6              However, in situations like that, they may

7     have to complete an internal memorandum or something

8     to that effect for a Special Response Team, but I've

9     never been a -- a -- ran the Special Response Team

10    for Southern Pines, so I -- I can't answer if they do

11    those types of things or not; everybody.

12             But just the mere fact of someone's presence

13    on a scene does not necessarily mean that they're

14    required to write a report.

15             MR. RUBERT-SCHEWEL:  Let's also request any

16                 reports written by the Special Response

17                 Team.

18 BY MR. RUBERT-SCHEWEL:

19 Q.   Is it SRRT or just SRT?

20 A.   SRT.

21 Q.   Okay.  And so what you're saying is that it's

22    possible that SRT or an officer in SRT could have

23    written a report -- report about this incident and it

24    may not have gone into the incident report that was

25    written by Officer Lowery or Officer Perry.

1    A.    Yeah.  So, well, yeah, very possible.  So they

2          wouldn't have written the -- like Lowery or Perry

3          would not have written a report for them --

4    Q.    Right.

5    A.    -- all.  Now, could they list in their report what

6          someone else did?  Sure.  But they're not doing it

7          for someone.  But, you know, if -- if you're asking

8          could someone have written something that wasn't a

9          supplement, so like an internal special response

10         document or something like that, it's -- yes, that is

11         possible.

12   Q.    And for the supplemental reports that are written and

13         included in incident investigation reports for

14         investigations that you were overseeing at this time,

15         who is responsible for reviewing the supplemental

16         reports?

17   A.    So I would do most of those.  Sergeant Edwards,

18         during that time, would have -- have done some.  Our

19         old system that we had during that time -- when I say

20         "our old system," our old records management system.

21         The vendor was -- it used to be OSSI.  I think they

22         changed the name to, like, Central Square or

23         something to that effect.  We went away from them in

24         October of 2019 and went to our current vendor.

25               But, anyway, during the -- the -- 2018, the

1        vendor at that time, I -- Sergeant Edwards couldn't

2        check my report.  It had to be somebody of a higher

3        rank.  So like deputy chief or the captain at the

4        time would be responsible for checking mine, but I

5        could check anybody below.

6              Now, with investigators, you're not -- the

7        grammar, if you will, is not as much of what you're

8        looking for, you know, in -- in those reviews or

9        everything, but it's -- it's still -- it was done

10       through the same -- same process.

11   Q.  You're --

12   A.  So to secondary review.

13   Q.  -- you're looking for accuracy.

14   A.  Sometimes.  Again, I mean, some of those things can

15       be overlooked.  You know, sometimes you're just

16       making sure that somebody that was there that you

17       were expecting -- expecting a report to be from was

18       completed.

19   Q.  Well, I assume if you were also there and you saw

20       something in a report that was inaccurate or untrue,

21       you would correct that or have a conversation with

22       them about correcting that.

23   A.  I would actually sometimes have conversations.  I

24       wouldn't always make them correct it, and the reason

25       being is, you know, anytime -- we all -- we're all

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 76 of 197

1          human.  We make mistakes.  And you may see something

2          one way and later find out that it was this way.  I

3          don't want them to go back and edit a report because

4          they made a mistake, but I want them to be able to

5          remember that they made a mistake and be able to

6          explain it later.

7                  You know, I mean, that's -- that's just me.

8          So if I seen something that either I didn't catch or

9          that I thought to be wrong, I may not deny that

10         report just because of that.  You know, I may let it

11         stand because those are their words.  That's -- their

12         perception is their reality.  But we would probably

13         have a con- -- more likely than not have a

14         conversation about that.  You know -- you know, "Why

15         did you put this?"

16   Q.    And -- and just to be clear, I mean, these reports

17         are going to the District Attorney, and the District

18         Attorney is basing their charging decision or their

19         decision to pursue this and indict based off of these

20         reports.

21   A.    In a whole, yes.

22   Q.    And the facts of these reports.

23   A.    Yes.

24   Q.    So, potentially, if a fact in this report is not true

25         or is wrong or is incorrect, that could cause someone

1          to be wrongfully arrested.

2    A.    Is there a circumstance where, you know, what you

3          just said could be true?  Yes.  The mere fact that

4          someone after the fact makes an error in completing a

5          report, the arrest has already been made.

6    Q.    Right, but that information is being passed to the

7          District Attorney, so it's important that it's

8          accurate.

9    A.    Sure.

10   Q.    But what you're saying is that there are certain

11         situations where even if something is inaccurate or

12         wrong, you still would not correct it.

13   A.    I would address it.  If it was something so egregious

14         that needed correcting, then -- then, yes.

15   Q.    If someone had said in a report, "I found cocaine,"

16         and they didn't actually find cocaine.

17   A.    If it was a lie, then I would have a serious problem

18         with that.  If -- you know, and -- and that would be

19         dealt with accordingly --

20   Q.    Uh-huh.

21   A.    -- you know.  But if it was an error or a

22         misstatement or something like that, you know, I

23         would ask, you know, the person, you know, "Why?"

24         You know, "What -- what happened here?"  And if they

25         said, "Well, that's what I thought happened," if it's

1    nothing that affects the case, per se, or is

2    detrimental to the case, either way, then, you know,

3    we would just have that person prepared for that.

4  Q.  So even if it was a mistake that is -- was a mistake

5    that could have caused someone to be wrongfully

6    arrested, you wouldn't necessarily correct it.

7  A.  If it was a mistake that caused somebody to be

8    wrongfully arrested, yes.

9  Q.  Okay.  But you're saying if it's a minor mistake that

10    may have just been a difference of perception or

11    somewhere around the edges, that's not necessarily

12    something you would correct.

13  A.  You know, it's -- it completely depends on the

14    circumstances of -- of what the -- the error, the

15    misconception, the mistake, on -- on what that is.

16    It completely depends on -- on the -- on -- you know,

17    on the -- the facts of it all, on what it is.

18        If -- if someone says "It's dark outside" and

19    it's not, and I ask them about it:  "Did you mean to

20    put it's dark outside or did you mean to put it was

21    light outside," and they say, "I meant to put it was

22    dark outside," well, that could be a problem.

23  Q.  Uh-huh.

24  A.  But if I went to them and said, "You put it's dark

25    outside and it's -- it was light," and they were

1          like, "Well, I meant to put it was light," okay,

2          well, that's -- that's two -- two --

3     Q.   Uh-huh.

4     A.   -- two different reasons for what was written, you

5          know.

6     Q.   Uh-huh.

7     A.   And one I can live with; one I can't.

8     Q.   Uh-huh.  But that information is being passed to the

9          District Attorney.

10    A.   Uh-huh.

11    Q.   And in that hypothetical that you're giving us, if

12         this was a -- a case where, you know, later on in

13         that report they had written "And I had had a

14         conversation with a sole eyewitness who observed

15         someone from 30 feet away and it was light outside,"

16         that fact of whether it's dark or light is a very

17         important fact.

18    A.   Yes.

19              MR. JONES:  Object to form.

20    BY MR. RUBERT-SCHEWEL:

21    Q.   Okay.  So I just have two more questions and then

22         we'll take a break -- or two more series of

23         questions.

24              So a case that goes federal:  Of your cases

25         that have gone federal, have you ever had an

1          experience where that case was later dismissed?

2    A.    I don't know.  I don't recall.

3    Q.    Does the FBI -- or in -- in your experience, does the

4          FBI or the US Attorney's Office typically reach out

5          to you after a resolution of a case that went

6          federal?

7    A.    What do you -- what do you mean, reach out to you

8          afterwards?  Are you saying --

9    Q.    Let's say --

10   A.    -- made aware --

11   Q.    -- let's say --

12   A.    -- of an outcome of a case?

13   Q.    Made aware, yeah.

14   A.    Yes.

15   Q.    So someone's sentenced, someone pleads guilty,

16         someone -- they usually update you on that.

17   A.    Yes.  Usually as part of federal prosecution, you're

18         kept up to speed, normally, on what the outcome of

19         the case is.

20   Q.    And in your experience and when you were a

21         supervisor, did Southern Pines police officers ever

22         testify in a federal grand jury?

23   A.    Yes.

24   Q.    Did Officer Lowery or Officer Perry ever testify in a

25         federal grand jury?

1    A.   I'm certain they have.

2    Q.   Did they testify in a federal grand jury in Operation

3         Leader?

4    A.   I believe they did.

5    Q.   Did they testify in a federal grand jury related to

6         Lee Harris, Sr.?

7    A.   I believe they did.

8    Q.   And that's both officers?

9    A.   I do not know.

10   Q.   But you believe at least one of them did.

11   A.   I believe so.

12   Q.   Do you believe Officer Perry testified in a federal

13        grand jury against Lee Harris, Sr.?

14   A.   I'm not sure.

15   Q.   But you believe either Perry or Lowery did.

16   A.   I believe so.  And what I mean by "I believe so," I

17        don't know if someone else did, but I'm -- I -- I

18        feel confident that it was one of the two.  I'm not

19        confident of which one or was it both.

20   Q.   Okay.  Are you familiar with Oliver Hines?

21   A.   I know who Oliver Hines is.

22   Q.   How do you know him?

23   A.   He's a former employee of the Town of Southern Pines.

24        Participated in a search warrant of his home

25        previously when I worked for the Moore County

1          Sheriff's Office.  Was involved in a federal

2          investigation of his son.

3     Q.   Has Oliver Hines ever worked as a confidential

4          informant for Southern Pines Police Department?

5     A.   Not that I'm aware of.

6     Q.   Was Oliver Hines involved at all in Operation Leader?

7     A.   Not at all.

8     Q.   And you would have known that.

9     A.   Confidential informants can only be used by Southern

10         Pines officers after being vetted, and Oliver Hines

11         was never used under my tenure.

12              MR. RUBERT-SCHEWEL:  All right.  Let's take a

13                  break.  Is that okay?

14              THE WITNESS:  Yeah.

15              (Recess from 11:47 a.m. to 12:07 p.m.)

16    BY MR. RUBERT-SCHEWEL:

17    Q.   All right.  Good afternoon, Captain Marsh.

18    A.   Thank you.

19    Q.   Sorry we don't have lunch today, but we can do

20         that in a little bit, I think.

21              In any of your roles at the Southern Pines

22         Police Department, were you aware of any complaints

23         against Officer Lowery?

24    A.   Not that I recall.

25    Q.   Were you aware of any complaints against Officer

1          Perry?

2     A.   During the times I supervised him I'm not aware of

3          any.

4     Q.   During any other times.

5     A.   When this case was filed, I was made aware -- I think

6          there was an IA that was done.  I don't even think I

7          was employed by the department at the time, but I

8          don't -- I don't recall the facts of it.

9     Q.   Have you ever heard of anyone complain of Officer

10         Perry using unreliable confidential informants?

11    A.   Not that I recall, no.

12    Q.   Have you ever heard anyone complain about Officer

13         Perry planting drugs on innocent citizens?

14    A.   No.

15    Q.   How about fabricating drug charges?

16    A.   No.

17              MR. JONES:  Can we go off the record for a

18                moment?

19              MR. RUBERT-SCHEWEL:  Yes.

20              (Discussion off record at 12:10 p.m.; back on

21              the record at 12:10 p.m.)

22              MR. JONES:  Sorry about that, Abe.

23    BY MR. RUBERT-SCHEWEL:

24    Q.   Have you ever had a situation in your experience

25         where you had a suspect under arrest or a witness who

1          you were interviewing and where you told them that if

2          they did not give information against someone else

3          they would be arrested?

4    A.   Not that I can recall, no.

5    Q.   And -- and, in your opinion, would that be

6          constitutional, legal police work?

7    A.   Can you repeat the question?

8    Q.   Sure.  So you -- you are -- you're investigating a

9          case.  There is a witness who you believe is a

10         witness to a crime.  You want that witness to work

11         with you to help you, to assist you in some way.

12         Would it be legal to threaten to arrest that person

13         if they do not provide you with information?

14   A.   Based on the way you worded it, and I -- no, I would

15         say that would not be legal.

16   Q.   Are officers permitted to lie to witnesses?

17   A.   Interviewing a witness, yes.

18   Q.   Are officers permitted to lie to defendants or

19         suspects?

20   A.   To some degree, yes.

21   Q.   So what was wrong or illegal about my hypothetical?

22   A.   Well, it would depend on the circumstances.  I mean,

23         is this witness, you know -- in my mind I'm thinking

24         of, you know, someone who has committed a crime.  And

25         if they're not willing to -- to -- for lack of a

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 85 of 197

1      better word, work off the charges, then they would be

2      crime -- charged with the crime that they actually

3      committed.

4              But to the extent that if you don't either

5      cooperate or work -- you know, however you worded

6      that -- you know, there would have to be a crime

7      committed.

8  Q.   Okay.  So you -- it -- it would be wrong or -- or I

9      guess what my question was, it would be illegal to

10      threaten someone who had not committed a crime with

11      an arrest if they did not give information.

12  A.   If they hadn't committed a crime, there would be no

13      way to arrest them.

14  Q.   Right.  And I'm not saying actually arresting them;

15      I'm saying threatening to arrest them.

16  A.   I mean, if there's not a crime, whether it's illegal

17      or not, I'm not sure.  Would it -- could it be

18      ethically wrong to say something like that?  It's

19      possible.  I mean, I don't completely understand the

20      circumstance you're describing.

21  Q.   So you're investigating a case.  Let's say it's a

22      drug investigation.  You go to a house.  You -- there

23      -- there's a mother at the house who's there with her

24      son.  You believe the son is trafficking drugs from

25      that location or near that location.  You want more

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 86 of 197

1          information from the mother.  You don't believe the

2          mother has actually committed a crime.  Would it be

3          legal to threaten the mother with arrest if she does

4          not provide information on her son?

5     A.   Possibly, yes.

6     Q.   Would it --

7     A.   Did you say would it be legal or illegal?  I'm sorry.

8     Q.   Legal.

9     A.   Would it be legal?  It's possible.

10    Q.   Would you encourage your officers to do that as their

11         supervisor?

12    A.   It would depend on the circumstance.

13    Q.   Have you ever encouraged officers to do that?

14    A.   No.  Not that I recall.

15    Q.   Have you ever done that in your career?

16    A.   I don't recall.

17    Q.   Have you ever lied to witnesses in your career?

18    A.   Yes.

19    Q.   Have you ever lied to suspects?

20    A.   Yes.

21    Q.   Have you encouraged your officers or trained your

22         officers to lie to suspects or witnesses?

23    A.   Encouraged, no.

24    Q.   So -- so just so we're clear, the answer to my

25         question is that, yes, it may be legal to threaten

1            someone with an arrest even if they are innocent.

2    A.     If they are -- if you know they're innocent, no.  I

3           -- I don't know if it would be illegal.  I -- I don't

4           know the answer to that, whether it would be legal or

5           illegal to do it.  I mean, that -- that's my answer.

6           I don't know.

7    Q.     Okay.  And you also -- to your knowledge, you have

8           never heard of any officers in the Southern Pines

9           Police Department doing that.

10   A.     Doing that?  Just for clarification, my

11          understanding, "doing that" meaning threatening

12          someone they know to be innocent with an arrest.

13   Q.     If they do not provide information.

14   A.     I don't know if that -- I mean, if that's ever

15          happened, you know, did that person commit a crime, I

16          don't know.

17   Q.     No, I'm not asking you that.  I'm asking you --

18   A.     Am I aware?

19   Q.     -- if ever you're aware of that ever happening at the

20          Southern Pines Police Department.

21   A.     I -- I don't recall that ever happening.  I don't

22          know.

23   Q.     Okay.  If one of your officers reported that they did

24          that and they came to you and they said, "I just did

25          that," would you discipline them for that?

1   A.   I would have to research it.

2   Q.   Do you know why this investigation was called

3        Operational Leader?

4   A.   I do not.

5   Q.   Do you know what agencies were involved in this

6        investigation?

7   A.   Southern Pines Police Department, Aberdeen Police

8        Department, FBI, Lee County Sheriff's Office.  There

9        could be others that -- I'm sure there are -- that I

10       don't remember, and agencies named don't necessarily

11       take that as they were involved the entire time.  It

12       could have been just for one aspect of it or -- or

13       something to that effect.

14  Q.   Was there a mutual aid agreement for Operation

15       Leader?

16  A.   Not for this investigation.  I remember a mutual aid

17       agreement with Lee County Sheriff's Office.  I

18       remember a mutual aid agreement with Aberdeen Police

19       Department.  Actually, Aberdeen Police Department --

20       for sure Aberdeen Police Department.

21            MR. RUBERT-SCHEWEL:  I'm not sure if we've

22                 received those or not, but we'll follow up

23                 and request those.

24            MR. DAVIS:  I believe those are in there as

25                 well.

1              MR. RUBERT-SCHEWEL:  Okay.

2    BY MR. RUBERT-SCHEWEL:

3    Q.   And just for the record, what does a mutual aid

4         agreement allow you to do as part of an

5         investigation?

6    A.   The best way I can describe it is the state statute

7         allows for officers of a jurisdiction to request the

8         assistance of officers in another jurisdiction, or

9         vice versa, to conduct an investigation, complete

10        tasks, whatever the case may be.  With -- with mutual

11        aid, you know, in certain circumstances gives you the

12        same authority as the jurisdiction that's requesting

13        it.

14   Q.   Does it give you authority to go outside of your

15        jurisdiction without that agency specifically

16        requesting it?

17   A.   I don't know how -- I'm not sure I understand.

18   Q.   So you have a mutual aid agreement with Aberdeen.

19        You're investigating a drug crime.  Could you go and

20        surveil a location in Aberdeen without Aberdeen

21        requesting you to do that?

22   A.   Yes.

23   Q.   Because you have that mutual aid agreement for that

24        investigation.

25   A.   For conducting surveillance, you don't need a mutual

1         aid agreement.  Anywhere that you can legally be, you

2         can be.  You're not conducting --

3                  (A thump was heard.)

4   A.    -- an enforcement -- an enforcement action.

5                  MR. JONES:  That was a bird that --

6                  THE WITNESS:  Poor bird.

7                  MR. JONES:  -- just face-planted.

8   BY MR. RUBERT-SCHEWEL:

9   Q.    What about for executing a search warrant?

10  A.    Depending upon the circumstances.  You have a one

11        mile ex- -- beyond your jurisdiction, but the safe

12        bet is to have a mutual aid in place for -- for

13        something of that effect.  Those were -- I've had

14        quite a bit of experience with those types of

15        situations.

16  Q.    Okay.  And -- and -- and so you want to execute a

17        search warrant in Aberdeen.  You have a mutual aid

18        agreement in place.  Do you still need Aberdeen Chief

19        of Police to call you up and say, "We need your help

20        coming in to execute this"?

21  A.    There should be a request.

22  Q.    So they have to make a request.  You can't just go on

23        your own, apply for a search warrant and say, "We

24        have this agreement with Aberdeen.  We're going to go

25        into Aberdeen and execute this search warrant."

1   A.   That wouldn't be a good practice.

2   Q.   They have to ask you to do it.

3   A.   (Nodded head affirmatively.)

4             COURT REPORTER:  Yes?

5             THE WITNESS:  Yes, sorry.

6   BY MR. RUBERT-SCHEWEL:

7   Q.   Did you know Lee Harris, Sr., prior to this

8        investigation?

9   A.   Yes.  Yes.

10  Q.   What did you -- how -- how did you know him?

11  A.   So in 2014 when I was assigned to the Investigations

12       Division, there were at least three open homicide

13       cases that I was assigned, cold cases, to -- to work.

14       One of those homicide cases was of Maurice White, who

15       was murdered at Leather Pockets in 2012 or '13.  I

16       believe '13.

17            On at least one occasion, Mr. Harris

18       accompanied an individual to the police department

19       for an interview, demanded to be present during the

20       interview as -- as if he was, like, an attorney.

21            Sergeant Edwards worked with me on those cases

22       and had previously been assigned those cases; that he

23       had informed me that that had happened during the

24       initial investigation.  I believe that was my first

25       interaction with Mr. Harris.

1   Q.   And did you feel like Mr. Harris's involvement in any

2        way stymied or limited your investigation?

3   A.   I felt that that was the intention.

4   Q.   And were you able to -- did you close that case?

5   A.   Yes.

6   Q.   And you -- so you solved that case.

7   A.   Yes.

8   Q.   So -- and the witness who Mr. Harris came in with --

9             MR. RUBERT-SCHEWEL:  I'm sorry.  Off the

10                 record one second.

11            (Off the record at 12:25 p.m. and back on the

12                 record at 12:26 p.m.)

13  BY MR. RUBERT-SCHEWEL:

14  Q.   I've just been informed from Mr. Harris that the

15       witness's name was Curtis Stubbs, Jr.  Do you recall

16       if you received information later on from that

17       witness?

18  A.   I don't recall.

19  Q.   But even without that information, you were able --

20       well, strike that question.

21            Why did you feel that it was Mr. Harris,

22       Sr.,'s intention to limit your investigation?

23  A.   If I recall, Mr. Stubbs had been shot that night.

24       Several people had.  Mr. Stubbs was being treated as

25       a witness.  Mr. Harris, with Mr. Stubbs being --

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 93 of 197

1    really not saying anything in the lobby, was very

2    demanding that he be present for -- for any

3    interviews.  It just didn't make sense.  That wasn't

4    a normal course of business.

5  Q.  Well, I mean, Mr. Stubbs could have had an attorney

6    present, right?

7  A.  Could have.

8  Q.  If he'd -- if he'd chosen to?

9  A.  If he wanted to, he could have.

10 Q.  But do you -- do you recall Mr. Stubbs' age at the

11    time?

12 A.  He was an adult, but no.

13 Q.  So why -- I guess, again, what about Mr. Harris, Sr.,

14    being present, what about that do you feel like was

15    limiting your investigation?

16 A.  I felt as if he wanted to control what was being

17    said.

18 Q.  Any reason -- did -- what made you feel that way?

19 A.  His -- again, I wasn't working there.  I was going

20    off of what Sergeant Edwards had informed me and

21    Lieutenant Hardy, that he was making himself present

22    as they were trying to interview people and was, you

23    know, not encouraging people to cooperate.  And then

24    with him showing up --

25        I don't completely recall if it was just

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 94 of 197

1          Curtis Stubbs or if it was another co-defendant in
2          this drug case who was also interviewed.  I just
3          remember having that feeling.
4     Q.   By "this drug case," do you mean Operation Leader?
5     A.   Yes.
6     Q.   And just -- do you mean a co-defendant in Operation
7          Leader who was interviewed at some earlier time?
8     A.   Yes.
9     Q.   Okay.  So not in 2018.
10    A.   No.
11    Q.   Okay.  Were you present for the Curtis Stubbs
12         interview?
13    A.   I believe I'm the one who conducted it, but I --
14    Q.   Okay.
15    A.   -- I'm not a hundred percent sure.
16    Q.   So -- so I just want to make sure I'm understanding
17         everything.  You're saying there were some earlier
18         interviews that Edwards and Hardy completed and they
19         told you about those --
20    A.   Yes.
21    Q.   -- but you were also present and you conducted, you
22         think, the Stubbs interview where Mr. Harris was
23         present.
24    A.   Yeah, I -- it was so long ago I -- I'm not
25         comfortable giving you an answer on that.  It was so

1        long ago.

2   Q.   And so just generally, your impression was that

3        Mr. Harris, Sr., had impeded your investigation.

4   A.   The -- some of the individuals I was trying to

5        interview, so Mr. Stubbs being one that was being

6        interviewed as a witness -- he was a victim.  And

7        with Mr. Harris, you know, being demanding of -- of

8        being present for that interview when, you know, this

9        gentleman is an adult, he wasn't being treated as an

10       offender, yes, he was very vocal about not wanting

11       the interview to take place without Mr. -- or without

12       him being present.

13  Q.   Did he interrupt at all during the interview?

14  A.   I don't remember if we conducted the interview

15       without Mr. Harris or if he was in there.  I don't

16       remember.

17  Q.   Did Mr. Harris say anything to you personally?

18  A.   I don't -- I -- I don't remember.

19  Q.   Do you remember saying anything to Mr. Harris?

20  A.   I don't remember.

21  Q.   Any other interactions or memories or recollections

22       about Mr. Harris, Sr., prior to Operation Leader?

23  A.   Not that I recall.

24  Q.   Any -- do you remember being told anything by any

25       other officers or community members about Mr. Harris,

1        Sr.?
2   A.   Not that I remember.
3   Q.   Okay.  What about Mr. Harris, Jr.?
4   A.   My time working in Southern Pines when I started my
5        career at the sheriff's department, when I worked
6        narcotics, he was the subject of investigations
7        there.  I've heard his name pretty much my entire
8        career.
9   Q.   And those investigations, were they typically drug
10       investigations?
11  A.   Yes, sir.
12  Q.   And maybe associated violence?
13  A.   Yes, sir.
14  Q.   And when you heard his name, did you ever hear his
15       father's name associated with it?
16  A.   I don't remember.
17  Q.   You were the supervisor of Operation Leader?
18  A.   I was the Investigations Division supervisor during
19       that time, during the end of the investigation.
20  Q.   So would that make you the supervisor of every
21       investigation in that division?
22  A.   During that time I was the supervisor of the
23       division.
24  Q.   Were you the supervisor of Operational Leader?
25            MR. JONES:  Object to form.

1   BY MR. RUBERT-SCHEWEL:

2   Q.   Were you the supervisor of the investigation

3        Operation Leader?

4             MR. JONES:  Same objection.

5   A.   I really don't know how to answer that.  You know, my

6        narcotics detectives, it was their case and I

7        supervised them.  So if by default, then, yes.  And

8        that's really the only way I know how to -- to answer

9        that.

10  BY MR. RUBERT-SCHEWEL:

11  Q.   We kind of -- we discussed your responsibilities

12       previously as -- as supervisor, but what -- for this

13       investigation, what were your responsibilities as

14       supervisor of the division for the Operation Leader

15       investigation?

16  A.   Case management, my experience working drug cases,

17       strategy would be talked from time to time, time

18       management, to assist with surveillance if needed, to

19       allocate, you know, resources and -- and manpower to

20       what the case may need.

21  Q.   Review incident reports?

22  A.   Yes.

23  Q.   Review supplemental reports --

24  A.   Yes.

25  Q.   -- for accuracy and truthfulness?

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 98 of 197

1    A.   Yes.

2    Q.   Did you meet with the detectives running the

3         investigation?

4    A.   Yes.

5    Q.   How often would you say you did that?

6    A.   I don't know.

7    Q.   Do you have -- are you required or do you -- when you

8         were supervisor, did you have set meeting times with

9         detectives?

10   A.   Set?  No.

11   Q.   Okay.  So you wouldn't meet once a week or once every

12        other week?

13   A.   We would meet very often, but set times, no.

14   Q.   And previously I think you said that you were

15        required to do supplemental reports within ten days?

16   A.   That was the guideline in the general order was a

17        supplemental -- supplemental report would be

18        completed.  Now, this is for an open investigation to

19        where a report number's already been generated.

20   Q.   Uh-huh.

21   A.   That -- that was always something.  You had to stay

22        on top of paperwork.

23   Q.   Okay.  But there's no similar guideline about how

24        often you have to meet with your detectives in an

25        open investigation.

1    A.   No.

2    Q.   Did you review surveillance reports?

3    A.   I'm not familiar with what a surveillance report is.

4    Q.   Give me one second.

5              MR. RUBERT-SCHEWEL:  Nichad, can you pull up

6                 the discovery?

7              MR. DAVIS:  Gotcha.

8              MR. RUBERT-SCHEWEL:  Okay, I got it.  I think

9                 I got it right here.

10   BY MR. RUBERT-SCHEWEL:

11   Q.   So I'm going to show you Plaintiff's Exhibit P.

12             (Plaintiff's Exhibit P was identified.)

13             MR. RUBERT-SCHEWEL:  And I have a copy for

14                you, Glenn, and the reporter can have --

15             MR. JONES:  Thank you.

16             MR. RUBERT-SCHEWEL:  And this is -- I'm sorry,

17                it's not marked, but that is P.  Actually,

18                you know what?  I can give you this copy

19                that is marked.

20             COURT REPORTER:  Perfect.

21   A.   Thank you.

22   BY MR. RUBERT-SCHEWEL:

23   Q.   So that is -- well, can you just read the top of that

24        and tell me what that is?

25   A.   OCA 2018 00199.

1   Q.   And can you read the -- the typed part directly below
2        that?
3   A.   Case supplemental information.  It gives a date and
4        it talks about wood surveillance at Mr. Harris's
5        residence.
6   Q.   So what is that document?
7   A.   Without seeing the original --
8   Q.   Well, I'm not saying -- asking you what's in the
9        document.  I'm just saying -- is that a supplemental
10       report?
11  A.   I don't know.
12  Q.   Have you ever seen that document?
13  A.   I don't remember if I've seen it or not.  The -- some
14       of the statements made sound very familiar, but --
15       (no further response).
16  Q.   So --
17  A.   I'm not a hundred percent sure.
18  Q.   Just so I'm clear -- can I -- can I see it?
19  A.   Sure.
20  Q.   I mean, it says on it "Case Supplemental
21       Information," so I was assuming that this was a
22       supplemental report, but you're telling me it's not
23       one.
24  A.   It doesn't look like a supplemental report.
25  Q.   So why would it ever be typed -- in what situation

1       would you type something up in this format?

2   A.  Maybe notes.

3   Q.  Okay.  So these are officers' notes.

4   A.  Maybe.  I -- I don't -- they're not mine, so I don't

5       know.

6   Q.  Okay.  And for practical purposes, after an officer

7       takes notes, will sometimes they then type it up and

8       put it in a supplemental report?

9   A.  I would say that that'd be safe to say.

10  Q.  Not always, but that can happen.

11  A.  Sure.

12  Q.  Okay.  So I'm going to show you another exhibit.

13      This is T.

14          (Plaintiff's Exhibit T was identified.)

15  Q.  I'm sorry, I think this is the second page to T.

16      What is this document?

17  A.  Supplemental report.

18  Q.  Okay.  And so how is this document created?

19  A.  Through our records management system or our previous

20      records management system.

21  Q.  Which is a computer system.

22  A.  Yes.

23  Q.  So an officer goes into your computer system.  They

24      click "Supplemental Report" and they type that up.

25  A.  Yes.

1    Q.   Now, can you tell me which officer created that
2         supplemental report?
3    A.   That was our civilian, Victoria Price.
4    Q.   And you were her supervisor?
5    A.   Yes.
6    Q.   And what's the date of that?
7    A.   February 21st, 2018, was the date that it was
8         created, I believe.
9    Q.   Okay.  And what -- what date did you review it?
10   A.   It says February 22nd, 2018.
11   Q.   Okay.  So back to what I believe is -- is Exhibit P.
12        Exhibit P, just so we're clear, is not a supplemental
13        report.
14   A.   I don't think so.
15   Q.   To you, that appears to be officers' notes.
16   A.   It's a guess only on my part, but that --
17   Q.   Okay.
18   A.   -- would be my assumption.
19   Q.   And as you sit here today, do you recall seeing that
20        document?  Not the words in that document, but do you
21        recall seeing that document?
22   A.   I -- I don't remember.
23   Q.   Okay.  During this investigation, was it your --
24        during Operational Leader, was it your practice to
25        review, or did you review officers' notes?

1   A.    No.

2   Q.    Did you review officers' supplemental reports?

3   A.    Yes.  On several occasions I reviewed their

4         supplemental reports.

5   Q.    When an officer conducted surveillance, would an

6         officer be required to put that in a supplemental

7         report?

8   A.    Not always.

9   Q.    So as the supervisor, you would not always have known

10        about everything that was observed during

11        surveillance.

12  A.    Every single thing?  Probably not.

13  Q.    Because they might not have told you.  Yes?

14  A.    That's possible.

15  Q.    Or it might have not been included in a supplemental

16        report.

17  A.    Also possible.

18  Q.    What was your -- what's the first involvement that

19        you recollect with this investigation?

20  A.    Oh.  I knew -- I knew prior to becoming the

21        Lieutenant in Investigations that there was an -- a

22        like -- a drug investigation, a long-term case

23        ongoing.  I didn't know all the details.

24              When I became Lieutenant of Investigations,

25        Lieutenant Hardy -- I worked with him for probably a

1       month -- he brought me up to speed as did Detective

2       Perry and Detective Lowery.  Shortly after Lieutenant

3       Hardy retiring, end of October, first part of

4       November of '17, I remember having a meeting with

5       Lowery and Perry and asking them what is the end

6       game, what's -- when is it coming to an end.  I

7       believe that was my first involvement or knowledge of

8       it.

9   Q.  I'm sorry.  Approximately when was that?

10  A.  I'm -- this is a guess.

11  Q.  Yeah.

12  A.  October, November of '17.

13  Q.  And when did you become supervisor?

14  A.  October -- first part of October of 2017.

15  Q.  Okay.  And what was their response when you asked

16      them that question?

17  A.  To gather as much evidence as they could.

18  Q.  So once they'd gathered all the evidence they could,

19      then it would come to an end.

20  A.  Yes.

21  Q.  Were you involved at all in surveillance in Operation

22      Leader?

23  A.  Yes.

24  Q.  What was your involvement in surveillance?

25  A.  What I can remember, driving to Greensboro,

1         Charlotte.  I don't remember -- I mean, I can't
2         remember every single time.  Monitoring trackers.
3    Q.   Okay.  Let -- let's back up.  Why were you -- who
4         were you surveilling in Greensboro and Charlotte?
5    A.   I believe it was Lee Harris, Jr.
6    Q.   Okay.  And what type of trackers were you monitoring?
7    A.   They were trackers that were installed on some
8         vehicles.
9    Q.   Were any trackers installed on Lee Harris, Sr.'s,
10        vehicles?
11   A.   No.
12   Q.   Why not?
13   A.   I don't recall.  We only had two trackers, and they
14        were already out.  We didn't have anymore.  They're
15        expensive.  But I don't know if we would have had
16        reason.  I don't know.
17   Q.   So at the time at the Southern Pines Police
18        Department in the Investigations Division, y'all had
19        two trackers.
20   A.   The best I recall.  I remember us having one.  I
21        believe we purchased another when I became
22        lieutenant.
23   Q.   And these are GPS trackers.
24   A.   Yes.
25   Q.   Do you have to get a warrant to put a GPS tracker on

1        someone's car?

2   A.   You have to get a process, yes.

3   Q.   Okay.  So you have to get court approval.

4   A.   Yes.

5   Q.   What about surveillance of 1090 West Indiana Avenue?

6        Did you participate in that at all?

7   A.   I don't recall.

8   Q.   What about 811 West New York?

9   A.   By video, surely.

10  Q.   So what do you mean by that?

11  A.   Pole camera that was installed across the street.

12  Q.   And you operated it or you watched that?

13  A.   Watched.

14  Q.   Okay.  Tell me how that pole camera works.  Does it

15       -- is it running 24/7?

16  A.   I'm not the person to ask on that.  I don't have all

17       the details of how it works.

18  Q.   Well --

19  A.   I know it's not ours.

20  Q.   -- when you watch that footage, it looks like the

21       pole camera is moving, right?

22  A.   Uh-huh.  Yes.

23  Q.   And is that moving based off of an officer

24       controlling it, or is it moving as -- is it

25       motion-sensored?

1   A.   I believe both, but, again, I'm not versed enough in
2        that camera system to --
3   Q.   Were you ever out in the woods operating it?
4   A.   No.
5   Q.   Were you ever out in the woods as it was being
6        operated at 803 -- sorry -- 811 West New York?
7   A.   Not that I recall.
8   Q.   To your recollection, did you -- did you review all
9        of the surveillance taken at that location?
10  A.   All?  No.
11  Q.   How did you determine what to review?
12  A.   What I was told about by Officer Perry or Lowery;
13       what I was shown.
14  Q.   And did you review that when you started as
15       supervisor?
16  A.   I don't remember.
17  Q.   Well, did you review it after the execution of the
18       search warrant on the -- on the various locations?
19  A.   I don't remember.
20  Q.   So you think it's possible that the search warrant
21       could have been executed, all these arrests could
22       have been made, and then you reviewed the
23       surveillance footage after that?
24  A.   Could I have reviewed surveillance footage after
25       that?  Yes.

1   Q.   Okay.

2   A.   Did I wait -- (clearing throat) -- excuse me.  Did I

3        wait until then to review any of it or -- or all of

4        it?  You know, I'm not sure I exactly understand your

5        -- your question, but I did not wait for the

6        investigation to be over before I reviewed video.

7   Q.   So you did review some video prior to the execution

8        of the search warrant --

9   A.   I had seen some of the video.

10  Q.   -- from February 20th of 2018.

11  A.   Yes, I had seen some of the video prior to.

12            MR. JONES:  Just try and wait for him to

13                finish the question so you guys aren't

14                talking over each other.

15            THE WITNESS:  Sorry.

16            MR. RUBERT-SCHEWEL:  No, I'm sorry.  I

17                interrupted you a little bit.

18  BY MR. RUBERT-SCHEWEL:.

19  Q.   How about 803 North Sycamore Street?  Were you ever

20       outside in the woods conducting surveillance at that

21       location?

22  A.   Not that I recall.

23  Q.   And I know earlier we discussed that you did not

24       review notes -- officers' notes for this

25       investigation.  Would anyone have been responsible

1      for -- for reviewing officers' notes?

2  A.   Not that I'm aware of.

3  Q.   So we've established that the FBI was involved in

4       this investigation.  What was your first interaction

5       with any FBI agents as part of this investigation?

6  A.   I don't remember.

7  Q.   Did you interact with any FBI agents as part of this

8       investigation?

9  A.   I remember Mike Martin, Agent Mike Martin being at

10      the police department.

11  Q.   For a meeting?

12  A.   I just remember him being there about this case from

13       time to time, but that's -- that's really all I can

14       tell you.

15  Q.   What was the FBI's role in this investigation?

16  A.   I believe that the pole camera belonged to them that

17       was installed across from West New York Avenue.

18  Q.   Are you aware of any other evidence or interviews

19       that they conducted?

20  A.   Yes.  After the search warrants were all executed in

21       February, I know Mike Martin conducted some

22       interviews.

23  Q.   With the defendants?

24  A.   I don't know who all he interviewed, but I do know

25       that he did conduct some.

1    Q.    Have you seen those interviews or heard those

2          interviews?

3    A.    I think I have seen some, but I don't remember who or

4          when or anything to that nature.  He could have

5          interviewed everybody.  I -- I don't recall.

6                MR. RUBERT-SCHEWEL:  Glenn, do we have those

7                     interviews?

8                MR. JONES:  The ones for the -- during the

9                     Harris, Jr.?  I think there are additional

10                    interviews of witnesses.  I don't believe

11                    the ones -- I don't believe we've produced

12                    ones that weren't --

13               MR. RUBERT-SCHEWEL:  Related to Mr. --

14               MR. JONES:  -- related to Mr. Harris --

15               MR. RUBERT-SCHEWEL:  So all --

16               MR. JONES:  -- Sr.'s.

17               MR. RUBERT-SCHEWEL:  Okay.  Okay.  But we have

18                    the Harris Senior FBI interview.

19               MR. JONES:  I would have to go back and see.

20                    I don't recall if he was interviewed by --

21               MR. RUBERT-SCHEWEL:  Okay.  We'll

22                    double-check.

23               MR. JONES:  -- the FBI.  But, yeah, I'll --

24                    I'll -- I'll check.  And to the extent that

25                    any of that exists, I'll -- I'll confirm

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 111 of 197

1                    whether we've produced it or not.

2                    MR. RUBERT-SCHEWEL:  Okay.  Thanks.  And we'll

3                         -- we'll double-check too.

4                    MR. JONES:  Sure.

5                    MR. RUBERT-SCHEWEL:  We may have missed it.  I

6                         -- I think I've seen it.

7    BY MR. RUBERT-SCHEWEL:

8    Q.   Okay.  So -- and I'm sorry.  This one I have not

9         labeled or separated enough, but I think everyone

10        knows what this is.  So -- well, before I show you

11        this, any other FBI agents whose names you recall who

12        were involved in the investigation other than Mike

13        Martin?

14   A.   I don't remember.

15   Q.   Okay.  All right.  So Mr. Harris's home was searched

16        on February 20th of 2018.  I'm showing you the

17        application for a search warrant.  This is Exhibit B.

18                    MR. RUBERT-SCHEWEL:  And, I'm sorry, this is

19                         not marked.  Glenn, I think this is a full

20                         copy of it as well.

21                    (Plaintiff's Exhibit B was identified.)

22   BY MR. RUBERT-SCHEWEL:

23   Q.   Do you -- have you -- do you recognize this document?

24   A.   It looks familiar.

25   Q.   Did you -- so you -- you think you've seen this

1       previously?
2    A.   I need to read through --
3    Q.   Sure.  Take your time.
4    A.   -- the document itself.
5    Q.   Take your time.
6    A.   It -- but it does look familiar.  (Witness reviews
7         document.)  This looks to be the affidavit for
8         Sergeant Perry's search warrants.
9    Q.   Did -- did you help prepare this document?
10   A.   No.
11   Q.   Did you review this document prior to the
12        application?
13   A.   I believe so.
14   Q.   Did you make any changes to the document?
15   A.   I don't recall.  Can I -- did I make any changes to
16        the document?  No.  I don't recall if I requested any
17        changes to be made.
18   Q.   So was it your typical practice, when reviewing a
19        report, to request changes to be made and not make
20        them on your own?
21   A.   You -- so we're talking about an affidavit, but
22        you're saying a report.
23   Q.   Or an affidavit.
24   A.   I would never make changes on my own.
25   Q.   To --

1   A.   Unless it was mine.

2   Q.   Okay.  So -- and -- and that's -- for an affidavit

3        you would never make changes on your own.  What about

4        a report?

5   A.   I would not change someone else's report.

6   Q.   Okay.

7   A.   I would have them change it.

8   Q.   Okay.  But you would discuss it with them in certain

9        instances and -- and talk to them about it.

10  A.   Usually, yes.

11  Q.   Okay.  So at this time of the investigation, this is

12       February 20th, 2018.  At this point, did -- based on

13       what you knew, did you believe that there was

14       probable cause to arrest Lee Harris, Sr.?

15  A.   Prior to February 20th?

16  Q.   Well, prior to the search warrant being executed.

17  A.   I don't recall.  I don't think so.

18  Q.   You do not think so.  Okay.

19  A.   To clarify, you asked prior to executing of the --

20  Q.   Yes.

21  A.   -- search warrants, right?

22  Q.   Yes.  After the execution of the search warrant on

23       February 20th, at that point once the search was

24       completed, did you believe that there was probable

25       cause to arrest Lee Harris, Sr.?

1   A.   Yes.

2   Q.   For what?

3   A.   Possession of narcotics.

4   Q.   What about trafficking?

5   A.   I don't recall the weights.  I do believe it was a

6        trafficking amount.

7   Q.   And what were the facts that led you to that

8        conclusion?

9   A.   During the search of Mr. Harris's home, a Cadillac

10       parked outside the residence, covered up outside his

11       bedroom end of the house, that's where narcotics were

12       found.  The Cadillac had a license plate that, when

13       ran, came back to him.  It was an expired plate, but

14       nonetheless, it was registered to him.

15            Detective Perry was interviewing Mr. Harris, I

16       believe in the driveway.  At some point I believe

17       before the drugs were found -- maybe the drugs had

18       already been found.  I asked about keys belonging to

19       that Cadillac, and Mr. Harris took me into his

20       bedroom, gave me a key ring, and it had Cadillac keys

21       on it.  I remember going to the Cadillac and that key

22       turning the ignition switch.  Didn't turn it -- like

23       the car wouldn't run, but it would operate the

24       ignition switch.

25            After Perry's conversation with Mr. Harris, he

```
 1        and I conferred.  We also spoke with Lowery, who I --
 2        if I recall, was on Indiana where Junior was
 3        arrested.  Mr. Harris, Sr., had said to Officer Perry
 4        in his interview that his son had not been to his
 5        home in quite some time.  I believe weeks or months.
 6        We knew that to be untruthful based upon wood
 7        surveillance to where Mr. Harris interacted with his
 8        son in the yard.
 9             And, again, it -- Junior, throughout this
10        investigation, had other locations to store his
11        narcotics.  He had no reason to store narcotics at
12        Sycamore Street.  It only made sense for those
13        narcotics to be under the care and control of Lee
14        Harris, Sr.
15             He had a storage unit that only -- "he" being
16        Junior.  He had a storage unit that only he had
17        access to.  There was no reason to store any other
18        drugs.  And with Mr. Senior being deceptive about his
19        son even being at the home, led, you know, my opinion
20        to believe that they belonged to him.
21   Q.   Okay.  So just to summarize, the -- the main facts
22        that led you to your probable cause decision were
23        drugs in the Cadillac.  Yes?
24   A.   Yes.
25   Q.   Keys to the Cadillac found in the bedroom --
```

1   A.   Yes.

2   Q.   -- that -- that turned the ignition.

3   A.   Yes.

4   Q.   Did -- did the keys also operate the locks?

5   A.   I don't recall.  I -- I do know that they did not

6        operate the trunk.  The trunk had to be forced open.

7        I believe they operated the door locks, but without

8        reviewing my supplement --

9   Q.   Uh-huh.  Okay.  Well, we'll -- we'll -- I'll -- I'll

10       show you that in a second.

11  A.   Okay.

12  Q.   And then the other big factor for you was that you

13       believed that Mr. Harris had been deceptive about Lee

14       Harris, Jr., staying at his location or his home.

15  A.   I knew he had been deceptive.

16  Q.   Okay.  And you knew that based off of what Officer

17       Perry told you.

18  A.   Based upon the interview he just had with him, yes.

19  Q.   Were you present for that interview?

20  A.   No.

21  Q.   So -- so Officer Perry told you, "He just lied to me

22       about Lee Harris, Jr., being present."

23  A.   Yes.

24  Q.   And that contributed to your decision.

25  A.   Wasn't a -- the deciding factor, but it was part of,

1       you know, the -- the process of coming to that
2       conclusion.
3   Q.  Okay.
4   A.  In addition to Mr. Harris, his knowledge of the trunk
5       not operating on the Cadillac, his knowledge of a
6       door being open on the Cadillac, all things that, you
7       know, Detective Perry relayed to me when we were
8       conferring of, you know, what -- what all was -- was
9       taking place.
10  Q.  Okay.  In addition to the fact that the license plate
11      came back to him?
12  A.  (Nodded head affirmatively.)
13  Q.  Yes?
14  A.  Yes.  I'm sorry.
15  Q.  And then also in addition to the fact that Harris,
16      Jr., had other locations where he could have stored
17      the drugs.
18  A.  Yes.  Yes.
19  Q.  Okay.  Any other facts that you recall that were
20      relevant to your probable cause determination?
21  A.  Not that I recall.
22  Q.  And is it accurate to say that when you met with
23      Lowery off --
24  A.  To -- yes.
25  Q.  You have some knowledge?

1   A.   Your -- your previous question, can you repeat it?

2   Q.   Yeah.  Are there any other facts that you recall that

3        were relevant to your probable cause determination?

4   A.   Yes.  Seeing Mr. Harris, Sr., at 811 West New York

5        Avenue, associating with other known drug dealers.

6   Q.   Okay.  So -- and just following up on that question,

7        you saw that in surveillance footage?

8   A.   The pole camera footage.  Well, I don't recall if it

9        was pole camera footage or wood surveillance footage.

10  Q.   But -- but you saw --

11  A.   But it was from West New York Avenue.

12  Q.   It was not from you physically being present for

13       that.

14  A.   That's correct.

15  Q.   Okay.  And did you -- to your knowledge, did you

16       observe on surveillance or in person Mr. Harris, Sr.,

17       at any other drug locations?

18  A.   I don't recall.

19  Q.   Okay.  So the facts -- all right.  Do you recall any

20       other facts as you sit here today that led you to

21       find probable cause to arrest Mr. Harris, Sr., for

22       possession of narcotics?

23  A.   No.

24  Q.   When you, Perry, and Lowery met and discussed what

25       Officer Perry's interview with -- with Mr. Harris and

1          what you had found at the scene, did you-all together

2          make a decision to arrest and charge Mr. Harris, Sr.,

3          at that point?

4    A.    Lowery, Perry, and I did not meet.  Perry and I met.

5          Lowery was on West Indiana Avenue.

6    Q.    Okay.

7    A.    He was responsible for West Indiana Avenue as far as

8          making sure things were collected and whatnot.

9    Q.    Okay.

10   A.    Perry and I discussed, you know, everything that led

11         to Mr. Harris being arrested.

12   Q.    Okay.  And is it fair to say you made a decision at

13         that point to arrest Mr. Harris, Sr.?

14   A.    We made a decision to arrest him before clearing the

15         search warrant at his -- his residence.

16   Q.    Okay.  But at the time you made the decision, you

17         knew of all the facts that you just relayed to me.

18   A.    After drugs were found in the car registered to him

19         that he had knowledge of the way the car worked and

20         took me personally to the keys that he said belonged

21         to the car, yes.

22   Q.    And you tested the keys on the car.

23   A.    Yes.

24   Q.    Okay.  So is it fair to say that the decision was

25         made by you and Perry together?

1   A.   Probably.

2   Q.   What does "probably" mean?

3   A.   Frequently on a situation -- a search warrant, if you

4        will, the detective that obtained the search warrant

5        -- the case officer, if you will -- they may consult

6        with "This is what I've got and this is where I want

7        to go."  And the best of my knowledge, that's what

8        happened at Mr. Harris's home; that we discussed what

9        we knew, what was found, and what we knew, and then,

10       you know, I don't know if he reached a decision and I

11       agreed to it or -- I -- I don't recall how that

12       transpired.

13  Q.   But you did not disagree with the decision.

14  A.   Not at all.

15  Q.   You did not attempt to stop the arrest.

16  A.   No.

17  Q.   Or avoid the arrest.

18  A.   No.

19  Q.   And just so I'm clear, what is the information that

20       Officer Lowery relayed to you?

21  A.   What was found on West Indiana Avenue.  I believe we

22       had him -- we -- I had him or Perry had him question

23       Junior to drugs found at Senior's house.

24  Q.   Okay.  And did he relay to you a response of what

25       Junior said?

1   A.   I -- I don't recall.

2   Q.   So -- so as you sit here today, you're not saying

3        that that was part of your probable cause

4        determination.

5   A.   I'm saying it could have been.

6   Q.   It could have been?  But you don't recall what was

7        said.

8   A.   Not right off the top of my head, no.

9   Q.   Okay.  I mean --

10  A.   In all honesty, I don't think we needed it, but -- I

11       don't recall.

12  Q.   All right.  I'm going to show you what's marked as

13       Exhibit L.  This has already been marked in the last

14       deposition.  This is the magistrate's order.

15            (Plaintiff's Exhibit L was identified.)

16            (Discussion off record with court reporter

17            regarding exhibits.)

18  A.   The last one had an extra page that was blank.

19  Q.   You can -- don't worry about that.  This is the

20       magistrate's order from Lee Harris, Sr., right?

21  A.   Yes, sir.

22  Q.   And the magistrate judge who signed this order was

23       Carol Wright.

24  A.   Yes, sir.

25  Q.   And it was issued on February 20th, 2018.

1    A.    Yes, sir.

2    Q.    And Officer Lowery is listed as the arresting

3          officer --

4    A.    Yes, sir.

5    Q.    -- which -- and in this order Magistrate Wright

6          determines -- and I'll -- I'll just read from the

7          fist line:

8                "The defendant named above has been arrested

9                without a warrant, and the defendant's

10               detention is justified because there is

11               probable cause to believe that on or about the

12               date of offense shown and in the county named

13               above, the defendant named above unlawfully,

14               willfully, and feloniously did possess 28

15               grams or more."

16               And so Magistrate Judge Wright determined

17         there was probable cause to arrest Mr. Harris.

18   A.    Yes.

19   Q.    And she did that, I believe, for four different

20         offenses:  possession of cocaine, possession of 28

21         grams or more.  Is that correct?

22   A.    I see four charges.

23   Q.    You see four charges, okay.  And are they possession?

24   A.    No.

25   Q.    Is possession of 28 grams or more?

1    A.    That is trafficking cocaine.

2    Q.    Trafficking.  Okay.  Possession of drug

3          paraphernalia?

4    A.    Yes.

5    Q.    Using a vehicle to store narcotics?

6    A.    Maintaining a vehicle/dwelling place.

7    Q.    And possession with intent to self or distribute.

8    A.    Correct.

9    Q.    Okay.  And Officer -- Lee Harris, Sr., was taken from

10         his -- his house to the magistrate's office.

11   A.    Yes, sir.

12   Q.    So Officer Lowery must have come to the scene, to

13         803, to pick up Lee Harris, Sr.

14   A.    Not necessarily.

15   Q.    Someone could have transported him to Lowery and then

16         Lowery transported him to the magistrate?

17   A.    I don't recall the order that that was done.  Could

18         have been transported to the police department.

19   Q.    But this indicates to you that Lowery did transport

20         him to the magistrate.

21   A.    It indicates to me that Lowery is the one who swore

22         to the magistrate's orders, not necessarily the

23         person who served him or transported anyone.

24   Q.    Did you talk to Lowery prior to him swearing to the

25         magistrate?

1   A.   Very likely.

2   Q.   Do you recall doing that in person?

3   A.   No.

4   Q.   Do you recall doing that over the phone?

5   A.   I -- I -- I don't recall it.

6   Q.   Well, you just told me that you had a phone

7        conversation with Officer Lowery.

8   A.   We did.

9   Q.   Okay.  And so on that phone conversation, do you

10       recall telling Officer Lowery what you had learned at

11       803 at Mr. Harris, Sr.'s, residence?

12  A.   I don't remember telling him as much as asking him

13       what he had found.  I don't recall.

14  Q.   Do you know if Officer Perry had a conversation with

15       Officer Lowery where he informed him of this

16       information that led to Magistrate Wright's probable

17       cause -- or magistrate's order?

18  A.   It's very possible.

19  Q.   But as you sit here today, you do not recall an

20       in-person conversation with Officer Lowery.

21  A.   I don't recall.

22  Q.   Okay.  Did you have any communication with Magistrate

23       Wright?

24  A.   No.  Not that I remember.

25            MR. RUBERT-SCHEWEL:  Do you have the

1                    prosecution summary?

2              MR. DAVIS:  Yeah.

3              MR. RUBERT-SCHEWEL:  Can you show it to him?

4                   We'll just go off the record for one

5                   second.

6              COURT REPORTER:  Sure.

7              (Recess from 1:10 p.m. to 1:12 p.m.)

8    BY MR. RUBERT-SCHEWEL:

9    Q.    Do you recall when the prosecution summary was

10         provided to the District Attorney's Office?

11   A.    I do not.

12   Q.    Would it have been sometime after the arrest of Lee

13         Harris, Sr.?

14   A.    It would have been after the arrest, but I have no

15         clue when it was actually sent.

16   Q.    And is the prosecution's summary, is it -- is it also

17         provided on a physical document as well as on

18         NCAWARE?

19   A.    To the state District Attorney's Office?

20   Q.    Yeah.

21   A.    It would depend.  I mean, if the file was too large,

22         it would be provided in person.  This particular

23         incident, I don't -- I don't know.

24   Q.    Does the prosecution summary ever include handwritten

25         documents?

1   A.    Yes.

2              (Brief pause.)

3   Q.    Did you review the prosecution summary before it was

4         submitted?

5   A.    No.

6   Q.    Did you meet with the District Attorney related to

7         Lee Harris, Sr.'s, prosecution?

8   A.    I don't recall.

9   Q.    Is it your typical practice to meet with the District

10        Attorney related to investigations that you are

11        supervising?

12  A.    No.  Does it happen from time to time, yes; but on a

13        regular basis, no.

14  Q.    Are you aware that Lee Harris, Sr., was indicted by

15        the state?

16  A.    Yes.

17  Q.    And an officer in the Southern Pines Police

18        Department testified against him in the grand jury?

19  A.    Yes.

20  Q.    Was that Officer Perry?

21  A.    I don't recall.

22  Q.    Do you recall if it was Officer Lowery?

23  A.    I don't recall who it was.

24  Q.    Okay.  I'm going to show you what is marked as

25        Exhibit R.  This is the incident investigation

1          report.

2                    (Plaintiff's Exhibit R was identified.)

3                    MR. RUBERT-SCHEWEL:  Glenn, I think I have one

4                        more copy.

5                    MR. JONES:  Thank you.

6     BY MR. RUBERT-SCHEWEL:

7     Q.   Do you recognize this document?

8     A.   Yes, sir.

9     Q.   Have you seen it previously?

10    A.   Yes, sir.

11    Q.   And I'm just going to ask you some of the items on

12         the top, the identifying information.  On the top it

13         says "Southern Pines Police Department."  It says "At

14         Found 2/20/2018," right?  Month, day, year?

15    A.   (Nodded head affirmatively.)

16    Q.   Is that a yes?

17    A.   Yes.

18    Q.   And it says "Location of Incident, 803 North Sycamore

19         Street" --

20    A.   Yes.

21    Q.   -- "Aberdeen, North Carolina 28315."

22    A.   Correct.

23    Q.   And it also says that it was reported on February

24         20th, 2018, at 15:42.

25    A.   Correct.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 128 of 197

1   Q.   And further down where it says "Others Involved," it
2        says "RP - Perry, Jason."
3   A.   Yes.
4   Q.   What does RP stand for?
5   A.   Reporting party or reporting person.
6   Q.   Why would Jason Perry have been the reporting person
7        or why was he the reporting person?
8   A.   'Cause he was the one who completed that
9        investigation report for that search warrant.
10  Q.   Okay.
11  A.   Furthermore, somebody has to be.  There has to be a
12       reporting person or today NIBRS, then UCR would throw
13       an error code.
14  Q.   And as we discussed previously, typically the person
15       who completed the incident or investigation report is
16       the case officer assigned to that investigation.
17  A.   A lot of times, yes.
18  Q.   Okay.  If you'd turn to the second page, you'll see a
19       narrative section.  And if you'd turn -- well, this
20       narrative section, it starts with "MO."  And, sorry,
21       three lines down it says, "I, Detective Perry."  Do
22       you see that?
23  A.   I do.
24  Q.   Now, if you flip through this, on page 3, page 4,
25       page 5, there are a number of different supplemental

1          reports provided by other officers.  Do you see that?
2     A.   I do.
3     Q.   Do you have a supplemental report in front of you?  I
4          think it was Exhibit T that I showed you.
5                    MR. RUBERT-SCHEWEL:  Can you just show it to
6                    him real quick?
7     BY MR. RUBERT-SCHEWEL:
8     Q.   The supplemental report that's plugged into the
9          computer, will that be identical to what is provided
10         in the narrative section?
11    A.   So -- yes.  This one is old system (holding up a
12         document).  This is what it looks like printed on new
13         system (holding up a document).  So going back to
14         page 2 --
15    Q.   So basically what you're saying is that --
16    A.   Well --
17    Q.   -- Exhibit T, which is the Price supplemental report
18         was the old system.
19    A.   That's the way it looked when it printed on the old
20         system.
21    Q.   Exhibit R is the -- is the -- how it looks on the new
22         system.
23    A.   Yes, sir.
24    Q.   Okay.  And so the old system, if I'm correct, had a
25         number of different attachments to the main incident

1        report?

2  A.    What do you mean "attachments"?

3  Q.    Well, in the new system on, you know, Exhibit R,

4        they're -- all the supplemental reports are together

5        as part of one document, right?

6  A.    Yes, sir.

7  Q.    And it looks like in the old system they were

8        individualized reports.

9  A.    Yes.

10 Q.    Okay.  So I'm going to show you the supplement that

11       you wrote, and yours is on page 6 of 9.  Please let

12       me know when you're there.

13 A.    I'm there.

14 Q.    And it says Supplement Number 4, Kyle Alan Marsh,

15       February 26, 2018.  Now, before we -- we talk about

16       this, I mean, you start out by saying:

17              "I assisted with the execution on the search

18              warrant.  Upon my arrival at the location,

19              members of SPPD SRT had taken Mr. Lee Harris,

20              Sr., into custody."

21              Where were you prior to your arrival?

22 A.    I think I drove from Southern Pines Police Department

23       to there.

24 Q.    And you arrived after the SRT team?

25 A.    They would have been the first to arrive.  I don't --

1          I don't know how far after them I was.

2    Q.    Okay.  But you were after them.

3    A.    Yes.

4    Q.    Okay.  And did you-all go in a caravan?  You know,

5          were you driving behind them?

6    A.    I don't remember.

7    Q.    Okay.  And -- and is there a way that that is

8          typically done or procedurally supposed to be done?

9    A.    Procedurally supposed to be done?  Not necessarily.

10   Q.    Okay.

11   A.    Depends on the mission and what the mission requires.

12   Q.    So sometimes you may send SRT out ahead of you-all

13         and you're fine showing up later.

14   A.    Yes.

15   Q.    Okay.  Now, but the point is that by the time you got

16         there, Mr. Harris was already in custody.

17   A.    He was detained, yes.

18   Q.    And just to be clear, you drove there in your squad

19         car.

20   A.    I don't know if I drove or rode with someone else.

21   Q.    Okay.  Were you at 1090 West Indiana previously?

22   A.    I don't remember going there.

23   Q.    At all that day.

24   A.    No.  Not that I remember.

25   Q.    Okay.  When you arrived, where did you park?

1   A.   I don't remember.

2   Q.   Do you recall what other officers were present there?

3   A.   Not entirely, no.

4   Q.   Was Officer Perry present?

5   A.   Officer Perry was present.

6   Q.   Was Officer Lowery present?

7   A.   No, I don't believe so, on Sycamore.  I could be

8        wrong.

9   Q.   Was Officer Edwards present?

10  A.   I don't remember.

11  Q.   How about Officer or Civilian Price?

12  A.   When I arrived, I don't believe so, but she was

13       present at some point.

14  Q.   How about Chief Temme?

15  A.   I don't remember Chief Temme coming.  I don't -- I

16       don't remember.

17  Q.   You don't -- you don't -- to your recollection he was

18       never there.

19  A.   I don't remember.

20  Q.   You don't remember if he was or if he was not.

21  A.   That's correct.

22  Q.   Do you -- and -- and so I guess you don't recall ever

23       speaking to Chief Temme.

24  A.   No, sir.

25  Q.   Were officers from other jurisdictions present?

1   A.   Yes.

2   Q.   What -- what jurisdictions?

3   A.   Aberdeen, for sure.

4   Q.   Was Carl Colosco [verbatim] present?

5   A.   Yes.

6   Q.   Is that his name?

7   A.   Close enough.

8   Q.   Colasacco?

9   A.   There you go.  We're getting there.  He is the

10       current Chief of Police.  At the time he was the

11       Deputy Chief of Police.

12  Q.   Did you contact Aberdeen and request to be able to

13       execute this search warrant at this location on this

14       date?

15  A.   No.  I originally requested that they execute the

16       search warrant.

17  Q.   And what happened?

18  A.   Carl, Chief Colasacco, was very familiar with the

19       case.  He was the point of contact in getting mutual

20       aid set up previously.  Chief Wenzel, I think, was

21       the -- was the chief at the time who signed the

22       mutual aids, but Carl was instrumental in that and

23       providing us with detectives to conduct surveillance

24       on Sycamore.

25            But I -- Carl was informed that we would be

1            executing search warrants on these locations and was

2            requested that they execute the one in Aberdeen, and

3            his request was, "Y'all have been, you know, working

4            this case the whole time.  We'll go with you and

5            y'all can do it."

6    Q.     Okay.  So it wasn't that he thought it was not

7            justified.

8    A.     Not at all.

9    Q.     He thought it was justified.

10   A.     Yes.

11   Q.     That's your recollection.

12   A.     Yes.

13   Q.     Did he actually tell you that?

14   A.     We -- Carl and I talked about the case a few times.

15          I mean, he knew pretty much every step of the --

16          well, I'm not going to say every step of the case,

17          but he helped in putting the camera on the storage

18          unit by Bernie's Hardware.  You know, Carl was -- was

19          very helpful in providing people, other detectives

20          from Aberdeen to assist with surveillance on

21          Sycamore.

22   Q.     Did he say anything about Lee Harris, Sr.?

23   A.     I don't remember.  I don't remember if --

24   Q.     Did he ever tell you that he did not believe Lee

25          Harris, Sr., was involved --

1   A.   No.

2   Q.   -- in selling narcotics?

3   A.   No.

4   Q.   He never told you that?

5   A.   Not that I recall.

6   Q.   So his -- his sole basis for saying "I don't want to

7        serve this warrant" was that you-all had been in

8        charge of the investigation and running the

9        investigation?

10  A.   He didn't say he didn't want to serve the warrant.

11       He said something to the effect of, you know, "It's

12       y'all's case."  Like, "We don't want to mess anything

13       up.  We'll help you however you need it.  Y'all can

14       do it."

15  Q.   Okay.  So when you first arrived, you said Mr. Harris

16       was in custody.  Where did you first interact or see

17       Mr. Harris?

18  A.   I don't remember the exact location.  My supplement

19       states that "as I entered the home," so he must have

20       been inside, just inside the home.

21  Q.   And was he handcuffed at that point?

22  A.   I believe so.

23  Q.   And was he sitting or standing?

24  A.   I don't recall.

25  Q.   Well, you state that he was cursing at officers.

Case 1:21-cv-00955-WO-JEP  Document 32-4  Filed 11/29/22  Page 136 of 197

1   A.   Yes.

2   Q.   What exactly did Mr. Harris say?

3   A.   My report indicated that he said he didn't sell drugs

4        and that he was cursing at officers.  I don't

5        remember all of his exact statements.

6   Q.   But you -- so you don't recall the curse words that

7        he said.

8   A.   I do not.

9   Q.   Okay.  Do you recall how many curse words he stated?

10  A.   I do not.

11  Q.   At this point in your supplement you -- you state

12       that you told Mr. Harris to calm down and you

13       informed him that Detective Perry would be explaining

14       the situation to him in detail.  Is that when Harris

15       was interviewed by Officer Perry in his car?

16  A.   Shortly thereafter, yes, sir.

17  Q.   And at that point you continued to search the

18       residence.

19  A.   I believe we had Tori take photographs first.

20       Typical practice would have been to have a K9 also to

21       conduct a sniff before we start disturbing things.

22       And I do -- I do remember Officer Dean being there

23       with his K9.

24  Q.   Okay.

25            (Brief pause.)

1    Q.   And at some point the K9 alerted to the Cadillac
2         parked on the property.
3    A.   I believe so.
4    Q.   Were you present for that?
5    A.   I don't remember if I was told that the dog alerted
6         or if I actually observed it.  I don't -- I don't
7         recall.
8    Q.   And after the K9 alerted, you called in the license
9         plate number on the Cadillac to Communications.
10   A.   I believe so.
11   Q.   Do you recall who you spoke with at Communications?
12   A.   I believe I called it in over the radio, but I -- I
13        don't -- I don't recall who was working that night
14        or --
15   Q.   Okay.
16   A.   -- or if I did it by phone.  I don't -- I don't
17        recall.
18   Q.   And you did it to determine who the plate was
19        registered to.
20   A.   That would have been one reason, yes.
21   Q.   What was the other reason?
22   A.   So we could enter -- whoever it comes back to could
23        be entered into CAD for the call.
24   Q.   I see.
25   A.   So there could be a record of it.

1   Q.   Okay.  Why -- why would it be significant to know who
2        the plate was registered to?
3   A.   Well, it's the vehicle we're searching, so we want to
4        document, you know, that this is the vehicle, not
5        just a Cadillac, but this specific Cadillac.
6   Q.   Uh-huh.
7   A.   I mean, that would -- that would be the main reason
8        for documentation purposes.
9   Q.   Well, earlier you stated that it was significant to
10       your probable cause finding.
11  A.   It is.
12  Q.   Why?
13  A.   Because it -- it goes to show ownership, that you own
14       the -- you own the car.  It's on your property.
15       You're responsible for the contents therein.
16  Q.   Okay.  And Communications, when you contacted them,
17       they searched a database to come up with this
18       information, right?
19  A.   Yes, sir.
20  Q.   And they reported to you that the car was registered
21       to Lee Harris, Sr.
22  A.   Yes, sir.
23  Q.   Did they say that it was an active registration?
24  A.   I don't recall, but I believe the registration was
25       expired.

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 139 of 197

1    Q.   And they told you that.

2    A.   It's like- -- all likeliness they did.  I don't

3         recall specifically them telling me that.

4    Q.   Okay.

5    A.   I may have documented it, but -- (no further

6         response).

7    Q.   And --

8    A.   (Witness reviews documents.)  I didn't indicate

9         whether it was an active registration or not.

10   Q.   What -- what line are you looking at?

11   A.   I was just looking -- let's see.  Page 7.

12   Q.   Uh-huh.

13   A.   The sixth line where it says, "I called in the

14        registration plate to Communications."

15   Q.   Okay.

16   A.   "And the vehicle returned being registered to

17        Mr. Harris."

18   Q.   So you didn't think it was significant that the

19        registration was inactive?

20   A.   No, not at all.

21   Q.   Even though it was years old?

22   A.   No.

23   Q.   Why?

24   A.   It's still registered to you.  It doesn't have to be

25        a moving, operable vehicle.  The fact that the

1       vehicle's operable or inoperable didn't really have a

2       bearing on anything at the time.

3   Q.  Well, part of what you're looking to establish is

4       ownership, right?

5   A.  Sure.

6   Q.  For possession of whatever's -- of what's found

7       inside the vehicle, right?  Possession of the drugs?

8   A.  Yes.

9   Q.  Abut -- but you're also looking to establish primacy

10      and recency, right?

11  A.  Hmm.  Give me the definition of that.

12  Q.  So in -- in that, you know, someone had an

13      opportunity, a recent opportunity to actually enter

14      that vehicle, go into that vehicle, or place drugs in

15      that vehicle.

16  A.  Sure.

17  Q.  That's important.

18  A.  Sure.

19  Q.  Right?  So an active registration would show that

20      someone is actually going into that vehicle on a

21      recent -- or, you know, primacy and recency.  It

22      would show that someone has gone into that vehicle

23      recently.

24  A.  I disagree.

25  Q.  Why?

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 141 of 197

1   A.   If the vehicle -- if the Cadillac in question had

2        been in a swamp in Robeson County and at the bottom

3        of that swamp, then it's a different story.  It --

4        you know, the fact that the vehicle was on

5        Mr. Harris's property outside his bedroom, that end

6        of the home, and it is his vehicle, you know, the

7        registration being valid or -- or invalid doesn't --

8        doesn't mean the door is shut just because the

9        registration is invalid.  Where the vehicle is, you

10       know, I think can -- can be a factor as well.

11  Q.   Do you know that the registration had expired in

12       2015?

13  A.   I -- I feel confident that the registration was

14       expired.  Well, I know the registration was expired

15       based upon a conversation that happened later, but

16       that would not have -- a valid registration, a -- you

17       know, an expired registration, a revoked registration

18       would not have had any bearing whatsoever.

19  Q.   Well, let me -- did you know -- do you recall who the

20       chief Superior Court judge was in this case?

21  A.   When you say "in this case" --

22  Q.   Who was responsible for this case, who -- whose --

23       who had this case on their docket, who did the bond

24       hearings?

25  A.   No.  That could be multiple people.  So a Superior

1      Court Judge signed the search warrants.  I know that

2      was Judge Webb.

3  Q.   Yeah.  Okay.

4  A.   I believe he was a Superior Court Judge for other

5      proceedings in it, but I'm -- I'm not certain of

6      that.

7           MR. RUBERT-SCHEWEL:  Just give me one second.

8           (Brief pause.)

9  BY MR. RUBERT-SCHEWEL:

10 Q.   Okay.  I'm going to show you what is marked as

11     Exhibit N.

12          MR. RUBERT-SCHEWEL:  And I apologize, Glenn.

13             I only have one copy.  That's the one I'm

14             planning on showing him.

15 BY MR. RUBERT-SCHEWEL:

16 Q.   This is a court transcript of the modification of

17     bond hearings.  It's from May 1st, 2018.  It says

18     "Honorable James Webb Presiding," and this was shown

19     at Judge McSweeney's deposition too.

20          (Plaintiff's Exhibit N was identified.)

21 Q.   I'm just going to ask you to read to yourself from

22     page 31 -- let's start at the top, line 1, to page

23     32, line 10.  And then when you're done with that,

24     please just hand it back.

25          MR. JONES:  Do you mind if I take a look

1                  first?

2                  MR. RUBERT-SCHEWEL:  Yeah, yeah, please.

3                  MR. JONES:  And you said 31, line --

4                  MR. RUBERT-SCHEWEL:  Just at the top of 31

5                  to --

6                  MR. JONES:  So 31 to 32.

7                  MR. RUBERT-SCHEWEL:  -- to just the middle of

8                  32 --

9                  MR. JONES:  Okay.

10                  MR. RUBERT-SCHEWEL:  -- or so, yeah.

11                  (Brief pause.)

12   A.   All right.  So tell me again, sir?

13   BY MR. RUBERT-SCHEWEL:

14   Q.   Just the top of 31 to the middle of 32 to -- I think

15        it's line 10 on 32.

16   A.   On 31, "The Court."

17   Q.   Yeah.  And you don't have to read it out loud.

18                  MR. JONES:  To yourself.

19   BY MR. RUBERT-SCHEWEL:

20   Q.   Just to yourself, and then I will --

21   A.   No, you're good.  No, you're good.

22   Q.   -- and then let me know when you're done and hand it

23        back to me, please.

24   A.   Roger that.  (Witness reviews document.)

25   A.   Where do you want me to stop?

1  Q.   Line 10.

2  A.   Line 10.  (Witness reviews document.)  Okay.

3  Q.   So at this bond hearing, it's accurate to say that

4       Judge Webb is questioning Officer Perry.

5  A.   Yes.

6  Q.   And he's asking Officer Perry about the vehicle.

7  A.   Yes.

8  Q.   And he's asking Officer vehicle -- Officer Perry

9       facts about the vehicle that would show proof that

10      were -- or lend proof to the fact that the vehicle

11      was, in fact, in the custody and control and

12      ownership of Lee Harris, Sr.

13 A.   I don't know his reasons for asking Perry those

14      questions.

15 Q.   Okay.  Well, he is asking -- I mean, did it seem to

16      you like that those -- those were what those

17      questions were seeking?

18 A.   Yes.

19 Q.   And --

20           MR. JONES:  Just -- you're -- you're asking

21               him his opinion of Judge Webb's opinion?

22 BY MR. RUBERT-SCHEWEL:

23 Q.   Did the facts that he was eliciting was -- tend to

24      show that this was in the control of Lee Harris, Sr.?

25 A.   That conclusion could be drawn.

1    Q.   And one of the -- so some of the questions he asked

2         was, "Was the vehicle operative?"

3    A.   Yes.

4    Q.   "Was the vehicle registered?"

5    A.   Hold on.  Were you just asking me that, for me to

6         answer --

7    Q.   I'm asking you if he --

8    A.   -- that question?

9    Q.   No.

10   A.   Okay.

11   Q.   I'm asking you if he -- if he asked that question.

12   A.   That's what I just read.

13   Q.   Did he -- and he asked, "Was the vehicle registered?"

14   A.   Correct.

15   Q.   He also asked, "Do you know who all" -- and I'm

16        summarizing -- "had access to the vehicle?"

17   A.   Yes.

18   Q.   And the access question is important because you want

19        to have to -- you want to be able to consider if

20        someone else could have placed the drugs in the car.

21             MR. JONES:  And, again, object to form.

22                  You're saying "you."  Are you saying "you"

23                  as in Judge Webb?

24             MR. RUBERT-SCHEWEL:  No, I'm saying "you" as

25                  in you, Officer Marsh, sitting here today.

1    BY MR. RUBERT-SCHEWEL:

2    Q.   The question of access to the vehicle, the Cadillac,

3         is an important question because you want to know if

4         someone else put the drugs in the car.

5    A.   Could it be important?  Is that what you're asking

6         me?

7    Q.   Is it important?

8    A.   Well, yes.

9    Q.   Is -- is access to the vehicle an important

10        question --

11   A.   Yes.

12   Q.   -- for probable cause in this case?

13   A.   Yes.

14   Q.   And one of the other questions that Judge Webb asked

15        was whether or not it had a valid registration on it.

16   A.   Yes.

17   Q.   And Officer Perry said yes.

18   A.   Yes.

19   Q.   And so you're saying that was not true.

20   A.   What was not true?

21   Q.   The car --

22   A.   That he said that?

23   Q.   -- the car did not have a valid registration.

24   A.   Valid registration.  So was it active, meaning you

25        could legally drive it on the road?  Then, no, it was

1    -- it was either revoked or would be that.

2          Is it a valid registration meaning is it a

3    legitimate registration plate that belongs to that

4    vehicle, yes.  I mean, valid as the VIN number

5    matches, you know, that -- then yes.

6  Q.  Is it your opinion than when the Court asked, "Even

7    though you say the vehicle was not operable because

8    at least it didn't have the battery in it, it still

9    had a valid registration on it," you -- you -- you

10   think that question about the valid registration is

11   whether or not it was valid from 2015?

12 A.  I think that if the question is valid versus revoked

13   registration is the question, I think by the response

14   of, "Well, the car didn't run.  It didn't have a

15   battery in it" kind of satisfies what you're getting

16   at as far as --

17 Q.  Well, let -- let me ask -- let me ask you this, a

18   different way.  I mean, clearly, Judge Webb thought

19   it was a significant point, right?  He asked Jason

20   Perry that question --

21 A.  Yes.

22 Q.  -- whether or not --

23         MR. JONES:  Object to form.

24 BY MR. RUBERT-SCHEWEL:

25 Q.  -- there was a valid registration.

1           MR. JONES:  You can answer.

2    A.   Can you repeat the question?

3    BY MR. RUBERT-SCHEWEL:

4    Q.   He asked Jason Perry whether or not the car had a

5         valid registration.

6    A.   According to that, yes.

7    Q.   And earlier today, you told me that you did not think

8         it was significant of whether the registration was

9         valid or not.

10   A.   It's not significant.

11   Q.   So then why was he asked that at a bond hearing?

12   A.   If I remember it --

13          MR. JONES:  Object to form.

14          THE WITNESS:  Okay.

15          MR. JONES:  Go ahead.  You can answer.

16   A.   I remember exactly why it was -- it was asked.  And

17        the reason I remember why is I received a call from

18        Perry right after this hearing.

19          And Judge McSweeney was the Assistant DA at

20        the time.  And in probable cause hearings, a DWI

21        plea, if you will, those types of proceedings, the

22        District Attorney will summarize the facts of a case.

23        And sometimes they get those facts wrong, and he did

24        in this case, "he" being McSweeney.

25          And McSweeney, in giving his summary -- and --

1        and this is, again, based upon a phone call that I

2        had with -- with Perry after this hearing that

3        started out with "You're not going to believe what

4        Warren did."

5              So Judge Webb, and rightfully so, would have

6        needed to ask additional questions.  And -- and I

7        think that's probably why Warren asked for Perry to

8        go on the stand to give the summary because I think

9        he realized he was screwing it up.

10   Q.   So you think the question about the valid

11        registration, to you, that has nothing to do with

12        probable cause --

13   A.   Not at all.

14   Q.   -- or ownership or -- or --

15   A.   That's two --

16   Q.   Well, sorry.  Let me -- let me withdraw that.  It has

17        nothing to do with access or opportunity for probable

18        cause, whether or not the registration was valid or

19        not.

20   A.   Those are three different things.

21   Q.   Okay.  How about access?

22   A.   Valid registration, no.

23   Q.   What about opportunity?

24   A.   No.

25   Q.   What -- what if the registration had been 20 years

```
 1        old?
 2   A.   No bearing.
 3   Q.   Let's say if -- so -- so take -- take a car, a
 4        brand-new car, sit it in your parking lot, a truck in
 5        the driveway, and then a Cadillac with an expired
 6        registration with a cover on it sitting in your
 7        backyard.  Do you think it's fair to say that the
 8        owner of those two vehicles is just as likely to
 9        enter those two vehicles or have the same amount of
10        access to those two vehicles?
11   A.   That was very long.  But can -- can you go through
12        that scenario?
13   Q.   Yes, sir.  You're -- you're -- you've been sitting
14        here telling me that registration does not matter --
15   A.   I'm not --
16   Q.   -- that it has no bearing on your probable cause
17        determination.
18   A.   I'm not saying it can't have any bearing.  In this
19        case it has no bearing.
20   Q.   Well, you told me -- okay.  So why does it have no
21        bearing in this case?
22   A.   Because it is a car registered to Mr. Harris that was
23        on his property, and furthermore, you know, the
24        probable cause came from a totality of everything and
25        he had, according to what Perry had told me and
```

1      according to what, you know, I later learned

2      listening to the audio conversation between

3      Mr. Harris and Detective Perry, he knew everything

4      about the car to include a door would be unlocked.

5      The trunk, he thought, was broken.

6           It's his car and he knows all of these things

7      about this car.  The car is at his house.  And

8      according to the warrant, over two ounces of cocaine

9      were found in his car.

10  Q.   Is the fact that a car is in someone's backyard,

11       covered, and not registered -- let's start with a

12       cover.  Is that indicative to you that they may not

13       be going in it every single day?

14  A.   Could it?  Yes.

15  Q.   Okay.  And the fact that it doesn't have a battery,

16       could it be indicative of that?

17  A.   Of?

18  Q.   The fact that they may not be going in it every day?

19  A.   Let me clarify "going in it."  What does that mean?

20  Q.   Entering the car.

21  A.   Entering the car?

22  Q.   Yeah.

23  A.   No.

24  Q.   No.  Okay.  How about the fact that it's not

25       registered?

1    A.   You're ask -- ask -- ask me what -- what you --

2    Q.   I'm -- I'm asking --

3    A.   -- your question.

4    Q.   -- you these questions to see if you think these are

5         indicative or suggest that someone may not be going

6         inside the vehicle.

7    A.   To me, no.

8    Q.   No?

9    A.   No.

10   Q.   You don't think it has any bearing on their access to

11        the vehicle or them going in the vehicle that it's --

12        has a cover on it.

13   A.   No.

14   Q.   Why?

15   A.   Going in the vehicle to the store, yes.  It has

16        everything.  You know, no battery.  Car doesn't run.

17        They're not going to go somewhere in it.  But, you

18        know, a car on your property, just because it has a

19        cover on it, doesn't keep you from accessing it

20        anytime you want to.

21   Q.   Did -- did you have any -- I'm not -- did you have

22        any surveillance or did you know of any surveillance

23        at the time that you made this decision with Officer

24        Perry to arrest Lee Harris, Sr.?  Did you have any

25        surveillance showing Lee Harris, Sr., going into the

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 153 of 197

1       Cadillac?

2    A.   I don't know.

3    Q.   Well, I'm asking what you knew.

4    A.   I -- I'm not aware of any.

5    Q.   Okay.  Were you aware of surveillance that occurred

6         approximately three weeks prior showing Lee Harris,

7         Jr., going under the cover of the Cadillac and

8         placing something inside the Cadillac?

9    A.   No.

10   Q.   You weren't aware of that.

11   A.   I do recall a document where -- or something -- notes

12        or something.  I believe it was Lowery and an

13        Aberdeen detective and something about a tarp, but,

14        no, I -- I don't remember the Cadillac specific.  It

15        could be there and I --

16   Q.   And so you don't --

17   A.   -- just don't remember it.

18   Q.   -- recall that three weeks prior to execution of the

19        search warrant and the arrest of Mr. Harris, you

20        don't recall that officers in your police department

21        observed Lee Harris, Jr., place an object -- go under

22        the tarp and place an object in the Cadillac.

23   A.   I don't remember it being the Cadillac, but it very

24        well could have been.  Well, I'm not saying it didn't

25        happen.  I'm saying I don't recall it.

```
 1   Q.   And -- and so now sitting here and knowing that
 2        today, that your officers observed his son go put
 3        something in the Cadillac, does that change your
 4        opinion at all to probable cause?
 5   A.   No.
 6   Q.   Why?
 7   A.   Because I fully believe that the drugs that were
 8        found in that Cadillac belonged to Harris Senior.
 9   Q.   Even though you saw -- even though your officers in
10        your department saw Harris Junior place an object in
11        that car.
12   A.   Well, during the surveillance, we observed Junior
13        placing objects in various spots --
14   Q.   And you knew Junior --
15   A.   -- going back --
16   Q.   -- was a known drug dealer.
17   A.   Yes.
18   Q.   You observed Junior yourself make drug transactions.
19   A.   Yes.
20   Q.   Did you ever --
21   A.   Well, observe -- observe myself through video, watch
22        video.
23   Q.   Through video.
24   A.   Yes.  Yes.  And --
25   Q.   So -- so why does that not change your opinion as to
```

1       whose the drugs were?

2  A.   Based upon what Mr. Harris said the day he was

3       arrested, the intimate knowledge that he had of the

4       Cadillac, of the doors that would be unlocked, the

5       doors that wouldn't work.

6  Q.   So based on the fact that he knew about the Cadillac.

7            MR. JONES:  Object to form.

8            THE WITNESS:  Can I answer?

9            MR. JONES:  You can answer.

10           THE WITNESS:  Okay.

11 A.   Yeah.  I -- I had -- yes.  It led me to believe that

12      he would go into that Cadillac.  Yes.

13 BY MR. RUBERT-SCHEWEL:

14 Q.   And it led you to believe essentially that he had

15      gone into that Cadillac within the three weeks prior

16      and knew about the drugs, who knew they were there.

17 A.   "He" being --

18 Q.   Mr. Harris, Sr.

19 A.   -- Mr. Harris, Sr.?

20 Q.   Yeah.

21 A.   Yeah.

22 Q.   Well, let me -- let me ask you this.  Did you think

23      that Lee Harris, Sr., put the drugs there?

24 A.   I don't know.  I don't know who put them there.

25 Q.   So it was just of no consequence to you that Lee

1    Harris, Jr., had been observed -- or it's no -- I

2    mean, you're saying at the time you didn't know this,

3    but now today you're saying it's no consequence that

4    he was observed doing that.

5         And -- and let me -- let me strike that,

6    actually, and back up.

7         There was a -- a target in this investigation.

8    There was a Hispanic target, and I'm sorry that I

9    forget his name, who was a supplier.

10   A.   Uh-huh.

11   Q.   And --

12   A.   Yes.  Sorry.

13   Q.   -- he -- he had a mark that he -- he put on his

14        drugs.  Do you recall that?

15   A.   I don't.

16   Q.   Okay.

17   A.   I do recall a supplier.

18   Q.   Yeah.

19   A.   But a mark?  I don't recall.

20   Q.   Do you -- okay.  We'll come back to that.

21        (Brief pause.)

22   Q.   Okay.  I'm going to show you Exhibit X.  And you can

23        move those out of your way, if you want.  This is an

24        event report?

25        (Plaintiff's Exhibit X was identified.)

1    A.    Yes.

2    Q.    And just -- just so I'm clear, it says "Prime Unit

3          887; Perry, Jason Sinclair"?  Do you see that at the

4          top?  At the very top.

5    A.    Yes.

6    Q.    And does that indicate to you that Officer Perry made

7          the original call?

8    A.    It's very likely.

9    Q.    And it says, "Location:  803 North Sycamore"?

10   A.    Yes.

11   Q.    And call taker says "A. Grigg"?

12   A.    Correct.

13   Q.    What does that mean?

14   A.    That's Amanda Grigg, dispatcher.

15   Q.    And under "Times," it has "Call received, call

16         routed, call take finished," and it says the first

17         call, I believe, was received at 16:25:27.

18   A.    Yes.

19   Q.    And then if you go down further, it also says --

20         there's a section that says "Radio log."

21   A.    Yes.

22   Q.    How are these two sections different, times and radio

23         log?

24   A.    I can't give you an educated answer on why they're

25         different.

1   Q.   Okay.

2   A.   The radio log is when a unit checks en route --

3        dispatched, en route, on scene, and clear.  But it's

4        not stamped by them picking up the radio and saying,

5        "I'm clear."  It's whenever the dispatcher enters a

6        code to clear them.  That's what the radio log is.

7        Yeah, other than that, I'm --

8   Q.   Okay.

9   A.   -- I can't answer.

10  Q.   And I believe if we turn it over -- okay, yeah.  No,

11       sorry.  At -- at -- and the far left of radio log, it

12       says "Unit."  And those are squad car units, right?

13  A.   Those are badge numbers.

14  Q.   Those are badge numbers?

15  A.   Yes.

16  Q.   Okay.  What was your badge number?

17  A.   861.

18  Q.   And I see you're down here on page 2 -- oh, sorry,

19       you're on page 1 also.  So you were dispatched at

20       1627, out event at 1090 West Indiana.

21  A.   I don't recall going there.

22  Q.   But is that what that indicates to you, that you --

23       you went to West Indiana?

24  A.   So at the very beginning, there would have been a

25       briefing that would have taken place.

1    Q.    Okay.

2    A.    After that briefing, someone -- could have been

3          myself, could have been Detective Perry, it could

4          have been Lieutenant Heaton -- would have informed

5          dispatch that we're going to these locations and gave

6          them the address.  It could have been that she got

7          confused or whosoever was in dispatch about who went

8          to what.  I -- I can't answer that.

9    Q.    I mean, could it have also been that you went to West

10         Indiana?

11   A.    It's possible.

12   Q.    And, I mean, so this -- this out event, this isn't

13         where you're going on the radio and you're saying,

14         you know, "This is Officer Marsh.  I'm headed to 1090

15         West Indiana."

16   A.    No.

17   Q.    That's not how it works.

18   A.    That's not what that is, no.

19   Q.    Okay.  How is this information --

20   A.    Completely was entered by the officer in their car or

21         the dispatcher in the Comm Center.

22   Q.    Okay.  So either you had to put this in your car or

23         she had to put it in as this is where you were

24         headed.

25   A.    And it actually tells you.  So when you're off to the

1      side under --

2   Q.  Uh-huh.

3   A.  -- "radio log" at far right, it says "A. Grigg."

4   Q.  Okay.

5   W.  It tells you who entered what.

6   Q.  So she entered it.

7   A.  Yes.  If you go down on page 2 further, "K. Frick, C.

8       Kennedy" --

9   Q.  Uh-huh.

10  A.  -- these are different dispatchers --

11  Q.  Uh-huh.

12  A.  -- based upon the times after shift change.

13  Q.  Uh-huh.  And where it says "Comments" on page 2, all

14      of that is entered by A. Grigg.

15  A.  Yes.

16  Q.  But you're telling me that none of it is based off of

17      what she heard on radio traffic.

18  A.  I'm not saying that.  I'm not saying it's not what

19      she --

20  Q.  But it could be.

21  A.  -- heard.  It's either going to be what she heard --

22      what she was told in person, what she was told over

23      the phone, or what she would have been told over the

24      radio.

25  Q.  Okay.  So you could have gotten over -- it would have

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 161 of 197

1         been possible for you to get over radio --

2    A.   Yes.

3    Q.   -- traffic and say, "I'm headed to 1090."

4    A.   Yes.

5    Q.   Okay.

6    A.   It just wouldn't have my name beside "User."  It

7         would have whoever changed me in the system.

8    Q.   Got it.  Okay.  Now let's go to the third page, and

9         at the very bottom it says "Vehicle Detail Response."

10        Do you see that?

11   A.   The very bottom.

12   Q.   Well, yeah, the last --

13   A.   Yes, yes, yes.

14   Q.   And it says VIN number "1994 Cadillac."

15   A.   Yes.

16   Q.   And then it's -- further down it has a customer ID.

17        It says "Lee Marvin Harris, Sr."

18   A.   Yeah.

19   Q.   And it says "PLT Status: Expired."

20   A.   Correct.

21   Q.   What does that mean?

22   A.   Plate status is expired.

23   Q.   So the plate was expired.

24   A.   Yes.

25   Q.   And then further down it says "Current plate number,"

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 162 of 197

1          and then it says "Issue date," "Valid thru 11152015."

2     A.   Yes.

3     Q.   So that means it was expired in 2015.

4     A.   Yes.

5     Q.   Were you present for the search of the vehicle?

6     A.   Yes.

7     Q.   Did you search the vehicle?

8     A.   I believe I did.

9     Q.   Tell me how that occurred.

10    A.   I remember a K9, Officer Dean doing an exterior

11         sniff.  I remember -- may I refer back to my

12         supplement?

13    Q.   Yes, of course.

14    A.   Let me find it.

15    Q.   Yeah, it's 6 and 7.

16    A.   (Witness reviews document.)  So as Mr. Harris had

17         stated in his interview, the driver door was

18         unlocked.  I indicated that the rear driver's side

19         door and both passenger-side doors were locked.

20              I'm sorry.  What was your question again?

21    Q.   What actually happened in the search if the two rear

22         doors were -- what -- what did you do?

23    A.   So ended up opening the doors; you know, having to

24         physically reach in to unlock the other doors.  I

25         indicated and I -- I remember it today, the -- the

1         smell of cocaine when you opened the door.

2    Q.   What does cocaine smell like?

3    A.   Cocaine.

4    Q.   Okay.  What -- can you describe that at all?

5    A.   No.  It's a chemical smell, but it's cocaine.  It's

6         very unique.  It --

7    Q.   It's distinct from fentanyl or heroin or --

8    A.   Very much so.

9    Q.   Okay.

10   A.   It's -- yes.

11   Q.   Okay.

12   A.   The rear armrest is where I located suspected cocaine

13        and some digital scales.  I remember not being able

14        to get into the trunk through normal means.  And I

15        believe we had SRT members pry open the trunk.

16   Q.   Did you conduct the search of the back of the car,

17        the backseat, by yourself?

18   A.   I don't remember.

19   Q.   You don't remember if other officers were present?

20   A.   Well, there were other officers present, but I don't

21        remember who --

22   Q.   If they were physically inside the vehicle.

23   A.   No, I don't -- I don't remember.

24   Q.   So what you did is you opened up the front door, then

25        you reached over, opened -- pulled the lock up and

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 164 of 197

1      opened up the back door?

2  A.   I believe so.

3  Q.   And in the backseat in the armrest, that's where you

4      located cocaine.

5  A.   I believe so.

6  Q.   And did you have to lift up the armrest?

7  A.   I don't remember if it was inside the armrest or if

8      it was an armrest that folded down and it was in that

9      compartment.  I don't -- I don't remember.  I just

10      remember that being the general area it was.

11 Q.   But -- and then at some point you tried to go in the

12      trunk.

13 A.   Yes.

14 Q.   And did you say you had to force open the trunk?

15 A.   If I remember correctly, SRT members forced open the

16      trunk.

17 Q.   Were you present for that?

18 A.   I think so.

19 Q.   Well -- okay.  I mean, you state that in the report.

20      You state the trunk of the -- "The trunk was broken.

21      The trunk of the vehicle had to be" --

22 A.   Yes.

23 Q.   -- "forced open."

24 A.   Correct.

25 Q.   Is that accurate?

Case 1:21-cv-00955-WO-JEP  Document 32-4  Filed 11/29/22  Page 165 of 197

1    A.    That sounds -- sounds accurate, yes, sir.
2    Q.    Now, are you aware -- well, can you go to Exhibit T?
3          I think you have it.  It's a supplemental report.
4                MR. JONES:  You're talking about Price.
5                MR. RUBERT-SCHEWEL:  Yeah.
6    A.    I got it.
7    BY MR. RUBERT-SCHEWEL:.
8    Q.    And this report was reviewed by you.
9    A.    Yes.
10   Q.    And let's see here, before I get my stuff out of
11         order.  It starts with -- well, the one I'm looking
12         at starts with Cannon Rebel EOS T6i camera.  Is that
13         what yours starts with?
14   A.    Yes, sir.  Is this a two-page supplement?
15   Q.    It is.
16   A.    477, 478?
17   Q.    Yeah.  I'm just looking at it on Exhibit R --
18   A.    Okay.
19   Q.    -- but I know that they're identical -- or I believe
20         they're identical.
21               MR. JONES:  I'm sorry, identical to --
22               MR. RUBERT-SCHEWEL:  To -- to the supplement.
23               MR. JONES:  Okay.
24               MR. RUBERT-SCHEWEL:  Yeah.
25   BY MR. RUBERT-SCHEWEL:

1    Q.   So do you see further down where she discusses

2         searching the home and finding a set of Cadillac

3         keys?

4    A.   Yes.

5    Q.   And where she says:

6              "In the process of searching this home, entry

7              was finally made into the trunk of the

8              Cadillac using a set of keys that had been

9              located hanging on the master bedroom door."

10   A.   Yes.

11   Q.   "I left the inside of the residence to take a photo

12        of the keys for evidence purposes.  Photos were also

13        taken of the inside of the trunk; however, no items

14        were recovered from the trunk."

15             So just to be clear, Victoria Price says she

16        searched -- "that the home was searched and entry was

17        finally made into the trunk of the Cadillac using a

18        set of keys that had been located hanging on the

19        master bedroom door."

20   A.   That's not correct.

21   Q.   That's inaccurate.

22   A.   Correct.

23   Q.   When you reviewed her report, did you tell her that?

24   A.   No.

25   Q.   Why not?

1   A.   I don't think so.  I may not even completely read it,

2        but it is inaccurate.

3   Q.   Well, you -- can I -- can I see the report, please?

4   A.   Sure.

5   Q.   Just the top of it.  At the top of it, it says

6        supervisor Kyle Marsh, review date February 22nd,

7        2018, but you're telling me today that although it

8        says you reviewed it, you may not have reviewed it.

9   A.   Reviewed it meaning approved it.  I -- I most

10       definitely did with it having my credentials for --

11       for supervisor.  But reading it line for line, it's

12       very possible I didn't.

13  Q.   Okay.  So you're saying that it's your practice

14       sometimes to approve documents that you don't

15       actually read.

16  A.   Sometimes, yes, especially from someone like this.

17  Q.   What does that mean?

18  A.   That as an evidence custodian, her -- she would

19       submit more supplementary reports than pretty much

20       any other detective.  There would be some one-liners

21       of -- of a generic paragraph of "I removed item X

22       from evidence to process it, photographed it."  I

23       mean, a lot of times they were, you know, pretty --

24       pretty generic.

25            Or I could have just missed it.  I don't know.

1   But I definitely did approve it.  But I will say the

2   -- it's an assumption that she was misinformed

3   because the keys did not open the trunk of that

4   Cadillac.  It -- I'm fairly confident it had to be

5   forced open.  But, yeah.

6  Q.   Okay.  And if we can go back to your statements on

7       page 6 of Exhibit R and page 7 of Exhibit R.  So

8       eventually you asked Mr. Harris if he had a key to

9       the vehicle.

10 A.   Yes.

11 Q.   And at that point I presume you -- you wanted the key

12      to try and get into the trunk?

13 A.   I believe so.

14 Q.   And you walked to the northernmost bedroom in the

15      house --

16 A.   Yes.

17 Q.   -- and in that bedroom there was a key rack.

18 A.   I can't remember if it was a hook or a rack, but it

19      was right by the master bedroom door.

20 Q.   Was it inside the bedroom?

21 A.   I don't remember if it was on the door or right

22      behind the door.  I do not remember.  But I just

23      remember it being right there by the door, on the

24      door, in the master bedroom.

25 Q.   Okay.  Well, in your report, you say:

1                  "Mr. Harris walked me into his home in the
2                  northernmost bedroom to a hanger on the wall
3                  and provided me a key that was hanging from
4                  this location."
5                  So in this statement you say in the
6      northernmost bedroom.
7   A.   Correct.
8   Q.   So you're saying that could be inaccurate.
9   A.   No.  I believe it was behind the door.  I just
10      couldn't remember without reading that if it was
11      actually, like, on the back of the door, so the
12      door's open, it's right here; or if the door's
13      closed, it's on the wall.  I -- I -- I just can't
14      remember.
15  Q.   And earlier you stated that it was significant to you
16      for finding probable cause that the key was located
17      in his bedroom.
18  A.   It was a piece of it, yes, sir.
19  Q.   Okay.  Did any other officers go with you?
20  A.   I don't remember.  The house would have still had
21      quite a few officers in it.
22  Q.   And you took these keys outside to the Cadillac?
23  A.   Yes, sir.
24  Q.   And you used them to open the doors to the Cadillac?
25  A.   Yes, sir.

 1   Q.   And you also used them -- you got in the car seat and
 2        you used them to turn the ignition.
 3   A.   Yes, sir.
 4   Q.   And when you turned the ignition, did that also --
 5        did that also work the locks?  Is it one of the cars
 6        where when you turn the ignition the locks come on
 7        and up?
 8   A.   It's -- I do remember it having electronic locks and
 9        windows, but there was no battery in the car, so if
10        you turn the ignition, it just unlocked the ignition.
11        It didn't do anything.
12   Q.   Well, in your statement you say:
13             "These keys did, in fact, turn the ignition
14             and operated the locks on the doors."
15             (The sound of a train passing was heard.)
16   A.   No, no, no.  The key turned it.  So you've got a --
17             MR. JONES:  Can we wait for just a half a
18                second until the train goes by?
19             (Brief pause.)
20             MR. JONES:  I think you're probably good now.
21                We can hear.  You're good?
22             COURT REPORTER:  Yes, thank you.
23             MR. JONES:  Okay.
24   A.   So the square key turns the ignition.  The round keys
25        work the locks.  What I wrote does not mean I turned

1        the ignition and then you could work the locks.  It

2        was -- the square key turned the ignition and the

3        other keys would work the lock.

4    BY MR. RUBERT-SCHEWEL:

5    Q.   Okay.  So -- I see.

6    A.   Yeah.

7    Q.   Okay.  But you did put the square key -- one of the

8        square keys into the ignition and it turned the

9        ignition.

10   A.   Yes.

11   Q.   Okay.

12   A.   And again, turned it to the "on" position.  Didn't

13       turn it on.

14   Q.   Got it.  All right.  I'm going to show you -- and I'm

15       sorry that this is a picture.  It's on my laptop.

16       And this is -- we'll mark this as Exhibit W.

17            MR. JONES:  And are you going to e-mail that

18                to the court reporter afterward --

19            MR. RUBERT-SCHEWEL:  I can, yes.

20            MR. JONES:  -- just so we --

21            MR. RUBERT-SCHEWEL:  Yeah, yeah.  And we'll --

22                we -- I'll  -- I'll need to -- we need to

23                turn this over to you.  I mean, it's the

24                pictures I took in evidence --

25            MR. JONES:  Uh-huh.

1              MR. RUBERT-SCHEWEL:  -- but I need to send

2                   these to you also.

3              MR. JONES:  Yeah.

4              (Plaintiff's Exhibit W was identified.)

5    BY MR. RUBERT-SCHEWEL:

6    Q.   So this is Exhibit W.  And I'm just going to come

7         stand over here.

8    A.   You're fine.

9    Q.   Do you recognize these keys?

10   A.   They look familiar.  They look like the keys that

11        were seized, but I'm not a hundred percent certain.

12   Q.   Okay.  And from looking at these keys today, do you

13        know which one of these keys operated the locks on

14        the door?

15   A.   I don't.

16   Q.   Do you know which one of these keys turned the

17        ignition on?

18   A.   This is not going off of what I did that day as much

19        as it is just what I know about keys.  And I believe

20        one of these two with the -- the square in it that

21        are, like, sensors were the ones -- that was one of

22        the ones that turned the ignition.  I believe.

23   Q.   Okay.  But you don't have any independent

24        recollection as you sit here today.

25   A.   I -- I don't -- don't remember.

1    Q.   Okay.  And there's not any other keys in addition to
2         those that you recall using.
3    A.   Not that I remember.
4    Q.   Okay.  They were all on a single key chain.
5    A.   Best I remember.
6    Q.   Did any officers observe you use the key to open the
7         doors?
8    A.   I don't know.
9    Q.   Okay.  Well, Officer Heaton -- was Officer Heaton the
10        K9 --
11   A.   No.
12   Q.   -- officer?  Who was the K9 officer?
13   A.   Dean.
14   Q.   Dean was present at least for the initial sniff and
15        search, right?  And I think Dean in his report says
16        that he did not use the dog to go in 'cause he was
17        worried about exposure from cocaine.
18   A.   That sounds right.
19   Q.   But you're -- you -- you don't think Dean was there
20        any longer when you opened the door.
21   A.   Oh, I don't know.
22   Q.   Okay.  So as far as --
23   A.   He could have been.
24   Q.   So your statement is that to your knowledge no
25        officers -- you don't recall if any officers

1     witnessed --
2  A.  I don't --
3  Q.  -- either of these events.
4  A.  Either of which events?
5  Q.  You opening the door.  Do you recall if any officers
6     witnessed you --
7  A.  I don't -- I don't remember.
8  Q.  And do you recall if any officers witnessed you turn
9     the ignition?
10 A.  I don't remember.
11 Q.  But you did later share that information with
12    Officer Perry?
13 A.  Yes.
14 Q.  Okay.  Sometime after you found the drugs, you had a
15    conversation with Lee Harris, Sr.?
16 A.  I believe so.
17 Q.  And just to be clear, you were -- this -- this is
18    not -- you were not present for the conversation that
19    was recorded by Jason Perry.
20 A.  Not when it was going on, no.
21 Q.  Have you -- but you've since heard that recording.
22 A.  I have.
23 Q.  Did you hear that recording on the day Mr. Harris was
24    arrested?
25 A.  I don't remember.  I remember Detective Perry

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 175 of 197

1        summarizing what was said, but I don't remember if I

2        heard it that day or not.

3    Q.  Where did your conversation with Mr. Harris occur?

4    A.  I believe in the yard.

5    Q.  Okay.  So --

6    A.  I don't -- I'm not sure.

7    Q.  -- he wasn't in the house?  He'd then been taken out

8        to the yard?

9    A.  Well, he was interviewed by Perry in the car --

10   Q.  Right.

11   A.  -- in Detective Perry's car.

12   Q.  Okay.

13   A.  So that conversation could have taken place there.

14       I'm -- I'm not sure where we spoke at.

15   Q.  Okay.  And you asked Mr. Harris if he owned any

16       firearms.

17   A.  Yes, sir.

18   Q.  Did any other officers witness this conversation?

19   A.  I do not know.

20   Q.  Did you record your conversation with Mr. Harris?

21   A.  No, sir.

22   Q.  Why not?

23   A.  I didn't really have a reason to.  I wasn't really

24       interviewing him.  And we didn't speak very long.

25   Q.  Well, I mean, Officer Perry recorded his

1       conversation, right?

2    A.   Yes.

3    Q.   So you're saying Officer Perry had a reason to, but

4         you didn't.

5    A.   Yes.

6    Q.   And -- and in your conversation with Mr. Harris, he

7         told you that he owned a number of different

8         firearms.

9    A.   I believe so.

10   Q.   Including a few rifles?

11   A.   Yes, sir.

12   Q.   A handgun?

13   A.   I believe so.

14   Q.   And you state in your report that Mr. Harris told you

15        that his son, when he stayed there, stayed in the

16        southernmost room of the house.

17   A.   Yes, sir.

18   Q.   And you state in your report that he also told you

19        that any weapon found in his son's room would be his

20        son's weapon.

21   A.   I don't recall.  (Witness reviews document.)

22   Q.   It's at the very --

23   A.   Yes.  Yes.

24   Q.   That's accurate.

25   A.   Correct.

1   Q.   And do you -- as you sit here today, do you recall

2        that -- him -- him stating that to you?

3   A.   I believe so, yes.

4   Q.   Now, one of the other indicators of probable cause

5        that you gave when I asked you about the facts that

6        led to your probable cause determination were that

7        Mr. Harris had been seen at different drug locations

8        interacting with known drug dealers.

9   A.   Uh-huh.  Yes, sir.

10  Q.   And this was specifically at 811 West New York

11       Avenue.

12  A.   Yes, sir.

13  Q.   Are you aware that Mr. Harris's mother-in-law,

14       Ms. Dickerson, lives next-door to that location?

15  A.   Yes.  Next-door, yes, sir.

16  Q.   Next-door, yeah.  And you -- you still thought it was

17       odd or a factor to be considered in probable cause

18       that Mr. Harris was present at the next-door address?

19  A.   Very much so.

20  Q.   How come?

21  A.   No one had any business being at 811 West New York

22       Avenue.  It was an abandoned property that was solely

23       used for selling drugs.  Mr. Harris had no business

24       being there.

25  Q.   Had you seen his son there?

1    A.    Yes.

2              MR. RUBERT-SCHEWEL:  We've just got to look at

3                   this for one second.  You know, I think

4                   what we should do is let's take a

5                   ten-minute, a five-minute break.  Let me

6                   talk to my client and then see if we have

7                   anymore questions.

8              MR. JONES:  Okay.

9              MR. RUBERT-SCHEWEL:  And then we should be

10                  done, unless you're going to have any.

11             MR. JONES:  Very minimal, if any.

12             MR. RUBERT-SCHEWEL:  So let's just step

13                  outside.

14             MR. JONES:  Okay.

15             (Recess from 2:21 p.m. to 2:34 p.m.)

16   BY MR. RUBERT-SCHEWEL:

17   Q.    I just want to ask you a little bit about your

18         training and experience that you had related to

19         investigations or drug investigations.

20   A.    Yes, sir.

21   Q.    Have you ever received training or in your experience

22         do -- where -- indicating that drug traffickers mark

23         their products or do anything to indicate that it is

24         their product?

25   A.    Yes.

1   Q.   And how would they do that?

2   A.   Well, I -- I received training.  It was interdiction

3        -- highway interdiction training years ago.  During

4        that training it was mentioned that some cartels, if

5        you will, would -- would label a -- a narcotic,

6        whether it be a stamp or sticker or something to that

7        effect.

8   Q.   Okay.  And narcotics are typically packaged, right?

9   A.   Yes.

10  Q.   And what are the different ways they're packaged?

11  A.   There's many different ways they can be packaged.

12       I've seen, you know, plastic used, tin foil, vacuum

13       seal.  A number of ways.

14  Q.   Okay.  I'm just going to direct you to your statement

15       that's in your supplemental report on page 7 where

16       you state -- I'll just start with:  "Lying in the

17       rear floorboard was packaging material."  Do you see

18       that?  And then up --

19  A.   Where am I at?

20            MR. JONES:  Up -- up near the top.

21  BY MR. RUBERT-SCHEWEL:

22  Q.   Sorry, yeah, it's about seven lines down, eight lines

23       down towards the middle.

24  A.   Yes.

25  Q.   "Lying in the rear floorboard was packaging material

1          that had white residue in it," comma, "and a strong

2          odor of cocaine.  One of the packages was black in

3          color and had the appearance to have once contained a

4          brick of substance consistent with a kilo of

5          cocaine."

6               So in the car you found -- in addition to

7          cocaine you also found packaging.

8     A.   Yes, sir.

9     Q.   And that packaging, to you, indicated that the

10         packaging had once held cocaine.

11    A.   That package, yes.

12    Q.   And why -- why did it indicate that to you?

13    A.   Smell, the manner -- so sometimes you could have a

14         vacuum-sealed or a kilo of cocaine wrapped in plastic

15         and then coated with axle grease and then taped, you

16         know.  I don't recall exactly, without looking at

17         photos, exactly what this packaging was, but it did

18         have a brick shape about the size of a kilo of

19         cocaine or heroin would be.  That's all I can really

20         remember right off the top of my head.

21    Q.   Have you ever identified drug dealers or used the

22         fact in a case that drug dealers used the same type

23         of packaging throughout their trafficking work?

24    A.   I'm not sure.

25    Q.   And I say "work" loosely.  Have you ever had a case

1          where a drug dealer marked their drugs in a way or
2          packaged their drugs in a way where you could say "I
3          know that that was that drug dealer's drugs or that
4          distributor's drugs"?
5   A.     I don't recall.
6   Q.     Okay.  Do you think that's possible?
7   A.     Yes.
8   Q.     Okay.  Do you recall an individual named Stanley
9          Harris?
10  A.     No, sir.
11  Q.     Do you recall -- well, I'll just tell you.  Stanley
12         Harris is Lee Harris, Sr.'s, brother.  Stanley Harris
13         called you to ask you about the investigation.  Do
14         you recall him calling you or speaking with him on
15         the phone?
16  A.     I don't recall.
17  Q.     Okay.  When you -- when he called you, you told him
18         that you were the lead detective on the case.  Is
19         that not something that you would say?  I'm basing
20         that on how you looked when I just asked you that
21         question.
22  A.     I wouldn't think so.
23  Q.     Okay.  Why not?
24  A.     Because I supervise the division, but it wasn't Kyle
25         Marsh's case, per se.

1    Q.   Okay.

2              (Brief pause.)

3    Q.   Did you speak to Carl Colasacco at 803 North

4         Sycamore --

5    A.   I'm sure I did.

6    Q.   -- on the day that you --

7              Okay.  Did you tell Carl Colasacco that you

8         were going to arrest Lee Harris, Sr., and charge him

9         with possession of the narcotics unless he informed

10        on his son?

11   A.   I don't remember.

12   Q.   Well, is it possible that you could have said that?

13   A.   It's possible.

14   Q.   And in your mind you think that that would be within

15        your discretion to do?

16   A.   To talk with Carl?

17   Q.   No, to -- to -- to tell Carl that you are going to

18        prosecute Lee Harris, Sr., unless he becomes an

19        informant for you or informs on his son.

20   A.   Never considered Mr. Harris being an informant.

21   Q.   Well, I don't mean an informant.  I mean, my original

22        question was did you tell Carl Colasacco that you

23        were going to prosecute Harris Senior and charge him

24        with possession of narcotics unless he informed on

25        his son for you?  I don't mean as a -- as a -- as a

Case 1:21-cv-00955-WO-JEP   Document 32-4   Filed 11/29/22   Page 183 of 197

1          -- in the strict word of informant.  I just mean if

2          he told you information about his son.

3     A.   I don't remember saying that.

4     Q.   But you're saying it's possible you could have.

5     A.   It's possible.

6     Q.   Was that true?  If -- if Lee Harris, Sr., when you

7          asked him to or when Officer Perry asked him to, had

8          given you information about his son and said, "Yes,

9          my son is a drug dealer; yes, I know he's involved in

10         all these things; yes, this is what he's done," would

11         you have prosecuted him or would you have charged him

12         with these crimes that you charged him with?

13    A.   I didn't need Mr. Harris, Sr., to tell me that his

14         son was a drug dealer.  If he would have said that

15         the drugs found in that Cadillac belonged to his son,

16         then, yes, his son probably would have been charged

17         with those drugs in addition to Harris Senior.

18    Q.   You're saying they both would have been charged.

19    A.   Most likely.

20    Q.   So there was no universe where him providing you any

21         information was going to stop him from being charged.

22    A.   It would depend on what that information was.

23    Q.   So you're saying it is possible.

24    A.   It is possible.

25    Q.   Well, what if he had told you that Lee Harris, Jr.,

1      had placed those drugs in the Cadillac?

2   A.   It would be possible.

3   Q.   That could have changed your mind as to whether or

4        not there was probable cause to charge Senior?

5   A.   No.  Wouldn't change my mind whether or not probable

6        cause was there to charge Senior, but it could have

7        changed my mind into actually charging Senior.

8   Q.   Okay.  I'm going to show you what I showed you

9        previously, which you said was officers' notes, and

10       -- I'm sorry, I have it -- I have it right here.

11  A.   Oh.

12  Q.   And I will hand it to you in one second.  I just want

13       to make sure I have the right exhibit.  Okay.  I

14       think it's P.  So I'm going to hand this to you and

15       I'm just going to ask you:  Exhibit P, what -- can

16       you just read what's -- out loud what's on the very

17       top?

18  A.   OCA 2018 00199.

19  Q.   And then can you read what's directly below that?

20  A.   Case supplemental information, the date, and then it

21       says "wood surveillance at 803 North Sycamore Street,

22       Aberdeen."

23  Q.   And can you now go to the -- sorry.  Can you now go

24       to the third paragraph that starts on "At or around

25       1509 hours"?

1    A.    Yes.

2    Q.    And can you read that out loud for the record?

3    A.    "At or around 1509 hours Lee Marvin Harris, Jr.,

4          arrives in a white in color Toyota Venza at the house

5          stated above; Calvin Fox was also in this same

6          vehicle as a right" -- or "front right passenger.

7          Lee Junior, wearing a black jacket with a hood that

8          was pulled over his head, gets out of his car and

9          goes to the right side of the home, near a silver in

10         color enclosed trailer.  He then approaches a vehicle

11         covered with a blue tarp on it.  He is over at this

12         vehicle approximately two to three minutes.  Lee

13         Junior then goes inside the home using the front

14         door, for one to two minutes, comes back out of the

15         house and gets back into the Venza."

16               Keep going?

17   Q.    That's -- that's fine.  Thank you.  And -- and just

18         to be clear, this note was written on January 31st,

19         2018.

20   A.    I don't know if that's when it was written or if that

21         is the date that --

22   Q.    The surveillance occurred.

23   A.    Yeah.

24   Q.    It is.  It's the date on which the surveillance

25         occurred.  You're right.  I'm not -- I don't know the

1      date it was written, but it involved -- and it

2      actually says, "I, MPO Lowery, and Officer Reilly."

3  A.   Who's -- Officer Reilly is a Aberdeen detective.

4  Q.   That paragraph that you just read out loud and

5      combined with knowing what you know about Lee Harris,

6      Junior, does that indicate to you some sort of drug

7      activity?

8  A.   It's possible.

9  Q.   And drug activity related to the Cadillac with the

10     cover on it?

11  A.   It says a blue tarp.

12  Q.   On top of the Cadillac parked in the rear of the

13     yard.  Sorry.  "He then approaches a vehicle" --

14  A.   I don't see Cadillac anywhere.

15  Q.   "He then approaches a vehicle covered with a blue

16     tarp on it."

17  A.   I don't remember a blue tarp.  There wasn't a blue --

18  Q.   Well --

19  A.   -- tarp that I recall on the Cadillac.

20  Q.   You don't recall a tarp being on the Cadillac?

21  A.   A cover, yes.  A tarp, no.

22  Q.   Okay.

23  A.   Now, there could have been.

24  Q.   Okay.  So for the purposes of my question, let's

25     presume that is the Cadillac, okay?

1   A.   Okay.

2   Q.   Your statement is still -- and -- and -- that this

3        happened three weeks before you executed your search

4        warrant.  Your statement is still what you said

5        earlier, that this information seeing Junior go

6        towards the car, be over the car for two to three

7        minutes, whatever he did, that does not contribute at

8        all to your probable cause determination to charge

9        Harris Senior.

10  A.   No.

11  Q.   It doesn't.

12  A.   No.

13  Q.   How come?

14  A.   Well, again, going back to February 20th, 2018,

15       Mr. Harris, according to what Detective Perry told me

16       then and I know to be true now, or now being after

17       February 20th, listening to the audio recording, he

18       knew all the ins and outs of the Cadillac registered

19       to him, and that's where the drugs were found.

20  Q.   I know, but you had information that his son, who was

21       a known drug dealer, had gone to the car three weeks

22       prior.

23  A.   If I'm not mistaken, in this it states that Junior

24       and Senior speak --

25  Q.   Okay.

1   A.   -- which goes against what --

2   Q.   Well, I'm --

3   A.   -- Harris Senior being --

4   Q.   First off --

5   A.   -- truthful in his statement.

6   Q.   It goes against Senior being truthful.  Okay.  So one

7        of the one -- of the reasons you claim you arrested

8        him was because you thought that he was untruthful,

9        right?

10  A.   He was arrested because we had probable cause to make

11       that arrest.

12  Q.   Right, and one of your indicators was that he was

13       untruthful.  And I -- I'm -- you've already said to

14       me that you hadn't seen this document.

15  A.   I don't remember seeing this document.

16  Q.   And -- and -- well, that's -- you said to me that you

17       had not seen this document and that you did not know

18       about this.  When I asked you if you knew that Junior

19       had gone to the car prior, you said you had never

20       heard that information.

21  A.   I don't -- I don't remember that.

22  Q.   Okay.  And -- and that's what I'm saying.  I'm -- I'm

23       saying that's what you told me earlier.  Now, so this

24       is information that at the time you made your

25       probable cause determination you stated you did not

1          know it.

2     A.   What do you mean?

3     Q.   When you and Perry met at Harris Senior's home, you

4          said you knew these facts, right, and that's what led

5          to your probable cause determination?  One of the

6          facts that you did not know of was this.  You -- you

7          were not aware of this surveillance.

8     A.   I was aware that they conducted surveillance at

9          Senior's home.

10    Q.   But you were not aware of this specific incident with

11         Lee -- I think we agree here.  You were not aware of

12         this specific -- you hadn't reviewed this note, you

13         had never seen this document before.  You were not

14         aware of this.

15    A.   I don't remember if I was or wasn't.

16    Q.   Okay.  Well, earlier you said you were not.

17    A.   I don't remember specifically seeing this document.

18         Now, was I ever told about the contents of it?  I

19         don't remember.

20    Q.   But either way, to you, it's entirely insignificant.

21    A.   I don't understand your question.

22    Q.   Well, it's what I've been asking you --

23              MR. JONES:  Well, insignificant to what?

24    BY MR. RUBERT-SCHEWEL:

25    Q.   To your probable cause determination.

1    A.    Yes.

2    Q.    Okay.  Are you aware that the Court of Appeals --

3          well -- for North Carolina has defined incriminating

4          factors that go to constructive possession of drugs

5          or a weapon or other items?

6    A.    I'm -- I'm not sure your question -- am I aware of

7          what?

8    Q.    That there's a case where the Court of Appeals in

9          North Carolina has said that there's a six-factor

10         test to look at to determine if there was -- if

11         someone constructively possessed an item.

12   A.    I'm not aware.

13   Q.    And that those factors are proximity, if they were

14         the only person who could have placed the contraband

15         in that position; if the person acted nervously; if

16         the person had some -- controlled it, resided, or

17         regularly visited the premises; if the contraband was

18         in plain view; or if the person possessed a large

19         amount of cash.  And you stated you're not aware of

20         that, right?

21   A.    That specific case?  No, I'm not aware of that

22         specific case, no.

23   Q.    Are those factors that you consider when determining

24         whether or not you have probable cause to arrest

25         someone for possession?

1    A.    Are those the types of factors considered?

2    Q.    Yes.

3    A.    Yes.

4    Q.    Okay.

5              MR. RUBERT-SCHEWEL:  I have no further

6                 questions.

7

8                 EXAMINATION BY MR. JONES

9    Q.    Captain Marsh, I -- I just have a -- a couple of

10         things.  I said I wasn't going to do that.  Couple of

11         things, though, that I want to go over.

12              One of the areas you were asked about was

13         about reporting -- your reviews of reporting

14         inaccurate statements that are in the reporting, and

15         I think your testimony was something to the effect of

16         if there are inaccuracies in there, one, you don't

17         change them; but two, sometimes you let them be and

18         sometimes you let -- you -- you tell the person to --

19         to change it.  Is that accurate?

20   A.    Yes.

21   Q.    Okay.  Is it your practice to have somebody correct a

22         report if you find something that is pertinent to the

23         investigation or important to the investigation that

24         is wrong in the report?

25   A.    If found, yes.

1   Q.   All right.  With regard to the review of -- sorry, is

2        that Officer Price?

3   A.   She was a crime scene technician.

4   Q.   -- Crime Scene Technician Price's reports, are there

5        other -- can -- can you explain the reason that you

6        may not have reviewed that -- the entirety of that

7        report?

8   A.   I don't recall.  There were a lot of reports.  And, I

9        mean, I believe there were at least four incident

10       reports that came out of that day, being February

11       20th.  I mean, it's highly likely that I didn't read

12       every single line of every report that came through.

13  Q.   Was there anything inaccurate or pertinently

14       inaccurate that you found in any of the reports that

15       you reviewed?

16  A.   Later on with Price's report, yes, but I don't

17       remember when that was discovered.

18  Q.   Sure.  And her report was contained within your

19       supplemental report as well, correct?  And strike

20       that.

21            Her report was -- was placed together

22       alongside your supplemental report of the same

23       information, correct?

24  A.   Yes.

25  Q.   And that was provided to now Judge McSweeney.  Is

1          that correct?

2     A.   Yes.

3     Q.   As part of the prosecution summary?

4     A.   Yes.

5     Q.   Okay.  The test that Mr. Rubert-Schewel just asked

6          you about for construction -- constructive

7          possession, do you know if that is the standard for

8          arrest, if it is the standard for probable cause, if

9          it is the standard for a conviction with regard to

10         constructive possession?

11    A.   Do I know?

12    Q.   Sure.

13    A.   No.  My feeling is that it goes towards conviction

14         and not towards probable cause, but I don't know for

15         sure.

16    Q.   Sure.

17              MR. JONES:  That's all I've got.

18              (The taking of the foregoing deposition was

19              concluded at 2:56 p.m. on September 20, 2022.

20              Signature was reserved.)

21

22                        *  *  *  *  *

23

24

25

Case 1:21-cv-00955-WO-JEP  Document 32-4  Filed 11/29/22  Page 194 of 197

## WITNESS CERTIFICATE

I have read the foregoing pages, 1 through 194, inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

Signed this _____ day of _____ 2022.

_____
KYLE A. MARSH

Sworn and subscribed before me this the _____ day of _____ 2022.

_____
Notary Public

My Commission Expires: _____.

**ERRATA SHEET**

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or email to Vreed@carolina.rr.com**

The reasons for making changes:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct major transcription errors.

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

**Page no.** _____ **Line no.** _____ **Reason:** _____

Change _____ to _____

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

STATE OF NORTH CAROLINA

COUNTY OF WAKE


# C E R T I F I C A T E


I, WANDA B. CONSTANTINO, CVR-CM-M, Notary Public, do hereby certify that KYLE ALAN MARSH was duly sworn prior to the taking of the foregoing deposition, that said deposition was taken and transcribed personally by me, and the foregoing pages constitute a true and accurate transcript of the testimony of said witness.

I do further certify that the parties were present as stated in the caption.

I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of said action.

I have hereunto subscribed my name this the 23rd day of October, 2022.


_____
WANDA B. CONSTANTINO, CVR-CM-M
Notary Number:  19971130022


REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575