IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:21-CV-955


LEE MARVIN HARRIS, SR.,                )
                                       )
                Plaintiff,             )
                                       )
    vs.                                )
                                       )
THE TOWN OF SOUTHERN PINES,            )
Officer JASON PERRY, Officer SEAN      )
LOWERY, and Officer KYLE MARSH,        )
sued in their individual              )
capacities, and Chief of Police        )
ROBERT TEMME, sued in his official )
and individual capacity,               )
                                       )
                Defendants.            )
_____)



D E P O S I T I O N

OF

**WALTER SEAN LOWERY**




At Southern Pines, North Carolina

Thursday, September 22, 2022


REPORTER:   WANDA B. CONSTANTINO, CVR-CM-M
            Notary Public


REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

A P P E A R I N G

On Behalf of the Plaintiff:

        Mr. Abraham Rubert-Schewel
        Mr. Nichad Davis
        TIN, FULTON, WALKER & OWEN, PLLC
        119 East Main Street
        Durham, North Carolina  27701
        Phone:  919-451-9216
        schewel@tinfulton.com
        ndavis@tinfulton.com


On Behalf of the Defendants:

        Mr. Glenn Jones
        HALL, BOOTH & SMITH, PC
        Suite 750
        11215 North Community House Road
        Charlotte, North Carolina  28277
        Phone:  980-859-0380
        gjones@hallboothsmith.com


In Attendance:

        Mr. Lee Marvin Harris, Sr.
        Officer Jason S. Perry



                    *  *  *  *  *

# C O N T E N T S

PAGE

Examination by Mr. Davis   . . . . . . . . . . . . . .  4

Examination by Mr. Jones   . . . . . . . . . . . . . . 81

Further Examination by Mr. Davis   . . . . . . . . . . 87


PLAINTIFF'S EXHIBITS:

Exhibit L  - Magistrate Order . . . . . . . . . . . . 55

Exhibit BB - IA, SPPD, Report_Complaint on Lowery . . . 72

Exhibit MM - January 24-25 Perry Surveillance   . . . . 90

Exhibit P  - Surveillance Harris, Jr. Drugs in Cadillac 88

Exhibit QQ - Investigation Targets_811 West NY Avenue . 40

DEFENDANTS' EXHIBITS:

Exhibit 1 -  Photograph of fence, storage shed,
             and blue tarp in distance  . . . . . . . . 84

Exhibit 2 -  Photograph of tarped car . . . . . . . . . 85

* * * * *

*Reporter's Note:  This transcript contains quoted material.
Such material is reproduced as read or quoted by the
speaker.*

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

1          This is the deposition of WALTER SEAN LOWERY,

2     taken in accordance with the Federal Rules of Civil

3     Procedure in connection with the above case.

4          Pursuant to Agreement, this deposition is

5     being taken at the Southern Pines Finance Building,

6     180 Southwest Broad Street, Southern Pines, North

7     Carolina, beginning at 9:45 a.m. on Thursday,

8     September 22, 2022, before Wanda B. Constantino, Certified

9     Verbatim Reporter and Notary Public.

10

11          WALTER SEAN LOWERY, upon first being duly

12     sworn, testified as follows:

13

14               EXAMINATION BY MR. DAVIS

15  Q.   All right.  Hey.  Good morning.  My name is Nichad

16       Davis.  I am with the law firm of Tin Fulton Walker &

17       Owen.  We represent Mr. Lee Harris, Sr., in this

18       lawsuit against the Town of Southern Pines and

19       individually named officers as yourself.

20            You recognize you are testifying under oath

21       and under the penalty of perjury -- perjury today, so

22       just as if you were in a court of law.  You

23       understand that, right?

24  A.   I do.

25  Q.   Okay.  And have you ever been deposed before?

1   A.   I don't believe so.

2   Q.   Okay.  So I'm going to go over a few ground rules

3        just to kind of give you the background on how we're

4        going to do it today.  And have you ever been a party

5        to a lawsuit?

6   A.   No.

7   Q.   Okay.  So we have a transcriber today, a court

8        reporter, who's going to be able to transcribe

9        today's deposition, so it's very important that a few

10       things be true.  One is if you are answering a

11       question, just for the record, that you say yes or no

12       or whatever your answer is and to try to speak

13       clearly and loudly instead of just nodding or saying

14       "uh-huh."  I know it's like a tendency that we do.

15            Do you agree to that?

16  A.   I do, yes.

17  Q.   Yeah.  And then I'll also have a general thing.  I'll

18       try not to interrupt you at -- at any time.  Same

19       courtesy here.  And then at any time I'll -- I'll

20       pause if we need to.  Are you okay with that?

21  A.   Yes.

22  Q.   And then if you need a break for any reason, I mean,

23       sometimes they can go longer than expected, but if

24       you need a break, you just let us know and we'll try

25       to accommodate that.

1           And then also, your attorney may object to
2       certain questions that I ask you.  You should know
3       that you're still required to answer every question
4       unless instructed not to, which will happen rarely.
5       Otherwise, you are required to answer each question
6       truthfully and completely to the best of your
7       understanding.  Is that clear with you?
8    A.  I do.  I understand.
9    Q.  All right.  So we can get started.  Please state your
10      full name for the record.
11   A.  My name is Walter Sean Lowery.
12   Q.  Okay.  And I'm glad you said that because I know
13      sometimes you -- on some documents that we'll go
14      through today you say W.S. Lowery or S. Lowery or
15      Walter Lowery.  So are W.S. Lowery, Sean Lowery all
16      the same people?
17   A.  Right.  They are all the same.  Yes, they're all the
18      same.
19   Q.  Okay.  And do you know if there's another Lowery that
20      works at Southern Pines Police Department?
21   A.  There's not another Lowery that works at Southern
22      Pines Police Department.
23   Q.  All right, perfect.  So in all the documents we go
24      through today, it's fair to assume that when we see
25      W. Lowery or S. Lowery, that's you?

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 6 of 93

 1  A.   That will be me, yes, sir.

 2  Q.   All right.  Thank you.  All right.  So let's first

 3       start with some general background.  What year did

 4       you become a police officer?

 5  A.   In 2013.

 6  Q.   Okay.  And were you always employed by Southern Pines

 7       Police Department?

 8  A.   I've always been employed by Southern Pines Police

 9       Department in my official capacity, yes.

10  Q.   Okay.  And when you say "official capacity," what do

11       you mean by that?

12  A.   As a police officer.

13  Q.   Okay.  Did you do any other work outside of your

14       official capacity before you became a law enforcement

15       officer?

16  A.   I used to work for Southern Pines building -- or

17       street department and water and sewer department back

18       in '99 and 2003.

19  Q.   Okay.  So you were an employee of Southern Pines but

20       not at the police department.

21  A.   Correct.

22  Q.   Okay.

23  A.   Yes.

24  Q.   So since 2013 you've been a law enforcement officer.

25  A.   Yes.

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 7 of 93

1  Q.   Okay.  And what is your current job title?

2  A.   Current job title is sergeant over patrol team.

3  Q.   Okay.  And we're going to walk through a little bit

4       about how you got up to this particular position in a

5       few minutes.

6            And so let's first start by talking about

7       before you became a sergeant.  What was your -- I

8       know you've gotten a few promotions or a few job

9       changes.  What was your role most recent to you

10      becoming a sergeant?

11 A.   Prior to becoming a sergeant, I was in

12      investigations.  I was an officer who -- who

13      conducted investigations or were assigned

14      investigations, assigned cases to investigate in the

15      Investigations Division.

16 Q.   Okay.  And do you remember what years those were?

17 A.   From 2014 to 2020.

18 Q.   Okay.  So at the time of the lawsuit that we're going

19      to be discussing, you were a part of the

20      investigations team?

21 A.   Yes, yes.

22 Q.   And what was your official title on the

23      investigations team?

24 A.   Investigator, Master Patrol Officer.

25 Q.   Okay.  And I see also on some of the documents that

1      we're going to go into today it says MPO.  What is
2      MPO again?
3  A.  Master patrol officer.
4  Q.  All right.  And then before you became an
5      investigator, you were MPO.  Do you remember for how
6      long and what years?
7  A.  I don't recall what year I made MPO.  I believe it
8      was in 2016, 2017, is whenever I attained that rank.
9  Q.  Outside of working specifically as an investigator or
10     a sergeant patrol officer with Southern Pines Police
11     Department, do you work with or for any other
12     agencies?
13 A.  I do not work for another law enforcement agency
14     outside of it.
15 Q.  All right.  I know you were also at one point
16     involved with the -- any federal work.  I think it's
17     Sandhills Transnational Organized Crime Task Force.
18     Is that true?
19 A.  Yes, sir.
20 Q.  Tell me a little bit about that task force and your
21     involvement with them.
22 A.  I believe it was at the end of -- mid 2019 to the end
23     of 2019 we were -- myself and at the time
24     Investigator Perry were assigned to this task force
25     with the FBI.

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 9 of 93

1   Q.   All right.  So you said that you and Officer Perry
2        were assigned to the task force.  Why were you two
3        selected?
4   A.   Because we were both working primarily at that time
5        narcotic investigations.
6   Q.   Correct.  And what were the qualifications for you
7        being selected to that task force?
8   A.   I think it was the chief recommendation and the
9        voluntariness to do it.  And, of course, there were
10       some security things we had to go through to go
11       through the whole process, but that was the only
12       qualifications that I remember for that that I
13       recall.
14  Q.   So technically you are -- and you do work in some
15       capacity as an FBI agent or on a task force outside
16       of Southern Pines or with Southern Pines Police
17       Department?
18  A.   I did at that time --
19  Q.   Okay.
20  A.   -- from two thousand -- like I said, mid 2019 on --
21  Q.   So it was a temporary task force?
22  A.   Yes.
23  Q.   All right.
24  A.   Or it was a temporary assignment.
25  Q.   Okay.  And -- but you -- you had FBI clearance?

1   A.   I did.

2   Q.   Okay.  And I know we spoke with Officer -- Captain

3        Marsh earlier this week and he said that you and

4        Perry were the only two people on the task force with

5        the police -- with SPPD.  Is that correct?

6   A.   Correct.

7   Q.   Okay.  So let's get a little bit deeper into actual

8        investigations.  Let's talk about warrant execution,

9        how you usually execute a warning in a -- after an

10       investigation.

11            So prior to executing a search warrant, what

12       occurs?

13  A.   Prior to executing a search warrant, it would be --

14       well, you have to establish -- establish why you need

15       to go there.  You would obviously have an

16       investigation prior to in reference to drug

17       investigation would be have knowledge of a scene or

18       have good information that there is drug activity

19       going on at a location.  You collect -- investigate,

20       and if there's evidence that you collect outside from

21       there from that area, you would hang onto that

22       evidence.

23            You would then talk with your team.  You would

24       then go to a magistrate and/or a -- a judge and give

25       them the facts of the case or the information of the

 1          case ,and you would either obtain a search warrant or
 2          you would not.  If you obtained a search warrant, you
 3          would go that day and execute that search warrant.
 4   Q.     Yeah.  Well, we're going to go through a lot of what
 5          you just stated, but I want to break it down a little
 6          bit.  I know you said that first you have to develop
 7          facts that would give you a reason to go there.  Are
 8          you -- are you talking about probable cause?
 9   A.     Yes.
10   Q.     Okay.  What is your definition of probable cause?
11   A.     Definition of probable cause.  I guess the best way I
12          can understand it -- or when I say "understand it,"
13          to convey it in words would be -- could be facts.  It
14          would be a situation where I would have to -- why
15          would I -- why am -- why am I there.  There has to be
16          a good reason why I'm there.  And -- and it comes to
17          arrest, it would have to be, "Hey, there's -- this is
18          -- X, Y, and Z has happened.  This is giving me the
19          -- the reason why I'm arresting you or why I'm here
20          to do a search of this house."
21   Q.     Okay.  And before you execute a search warrant,
22          before you go, like you stated a few minutes ago,
23          bring this before magistrate or a judge, as an
24          investigator, what are some of the things that you
25          would collect or what are some of the facts that

1          would lead you into establishing probable cause for a

2          potential search?

3    A.    It would be depending upon the case.  If it was a

4          robbery, it would be facts of where the suspect may

5          have went back to after the fact to his home or to a

6          friend's home.  If we know for a fact he went back

7          there and there's property there to obtain, then we

8          would go and say, "Hey, he went back here.  There's

9          probably property here that we -- that -- that is

10         there."

11              If he went to a jewelry store, have you been,

12         if there's property there in the jewelry store -- I'm

13         sorry -- a fence.  I can't think of it right now.

14         However -- he went to a place where he could pawn

15         something, a pawn shop, and they were not being

16         truthful with us and we felt that that -- the

17         property was there, we'd go get a search warrant,

18         especially if we saw the property and they're still

19         saying it wasn't.  Then we'd tell the facts of the

20         case to the judge or the magistrate and state what's

21         going on and then execute a search warrant either at

22         the home or at the pawn shop if we felt the property

23         was there.

24   Q.    Yeah.  Let's say if it was not a robbery and not a

25         pawn shop.  Let's say if it was more so a drug case

1        that involves trafficking or transporting or drug

2        transactions.  What would that look like in your

3        typical investigations?

4  A.   Typical investigation would be prior knowledge as

5        into if we get a complaint.  For example, if we get a

6        complaint of a certain area, it's a -- someone calls

7        in and say, "Hey, I believe these people are selling

8        drugs at this area."

9            We first go, do some surveillance, talk to

10       people in the area, and confirm this.  And whether it

11       be wood surveillance, whether it would be just

12       knowledge of a police officer saying, "Yeah, there's

13       a lot of traffic going on.  We haven't seen what's

14       going on.  We haven't seen it with our own eye."

15            Mostly would be surveillance first, and then

16       it would be, you know, what are we going to develop

17       after that when it comes to surveillance, the use of

18       a CI, something of that nature.

19  Q.   Prior to you being assigned to the FBI task force in

20       2018, between 2017 and 2018, what -- what were your

21       investigations like in drug trafficking cases?

22  A.   2017 -- March of 2017 is when I started working with

23       Detective Perry in the Narcotics Division.

24  Q.   And what was your primary role?

25  A.   Investigating narcotic activity in the Southern Pines

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 14 of 93

 1        Police Department -- or in the Southern Pines area.
 2    Q.  Okay.  And just going back to that -- those
 3        determinations in drug cases like this, would you
 4        usually then -- when would you apply for a warrant?
 5    A.  After obtaining information -- good information that
 6        would lead me to believe or Detective Perry to
 7        believe that there was a -- you know, drug activity
 8        happening in this house, drugs in this house,
 9        whether, you know, it was through a CI, whether it
10        was through our own vision, what we saw from wood
11        surveillance, or whether it was anything else in that
12        nature.  I mean, it's in -- we just know because of
13        good information, whether it be CI or something we
14        viewed ourself.
15    Q.  And what do you consider good information?
16    A.  Good information from a valid source, whether that be
17        through a CI, whether that be through an undercover
18        CI used, in that nature.
19    Q.  And -- and during your time as an investigator or as
20        a patrol -- as a MPO, did you ever have one-on-one
21        interaction with suspects or witnesses you yourself?
22    A.  One-on-one inter- -- with suspects?  Of course, yes.
23    Q.  And how were those interactions, let's say if you
24        were investigating a drug case?
25    A.  I would say they were good interactions.  I'm not

 1        sure what you mean, like --
 2   Q.   Well, I mean, you said good information to -- that
 3        you rely on when you're applying for --
 4   A.   Right.
 5   Q.   -- a warrant, and I'm only asking outside of
 6        confidential informants and outside of, like you
 7        said, reliable witness testimony, did you have direct
 8        interactions with the witnesses or suspects
 9        themselves?
10   A.   When it comes to suspects, probably not till after
11        the fact.  Witnesses, yes.
12   Q.   Okay.  And after you are -- apply for a warrant, what
13        goes on in the -- in the plan to -- how do you
14        execute that warrant?  Were you ever involved in
15        executing the warrants?
16   A.   Yes, I was.
17   Q.   Tell me about what that process is like.
18   A.   So after the warrant has been issued, we would come
19        back to the police department.  We would have a
20        meeting.  During that meeting we would describe the
21        circumstances of what we knew to be at the house, the
22        goals, at that -- to go to each -- or to the goal to
23        the one we went to, the target house.  SRT, the
24        commando at that time, would brief what was going on.
25        Myself or Detective Perry at the time would brief

1       what we'd done to be in the house or what we believed
2       to be there.
3  Q.   Okay.  Now, a few things I want to clarify.  When you
4       say "we," who were the people that you usually met
5       with and discussed these investigations before
6       executing a warrant?
7  A.   At that time it would have been Sergeant Edwards, who
8       was the sergeant over investigations.  It'd have been
9       Captain Marsh, then-Lieutenant Marsh who was over
10      investigations.  At that time I believe it was
11      Captain Heaton who was over the SRT team.  I believe
12      it was Captain Heaton at the time.  It would -- it
13      would have been then-Lieutenant Heaton.  Other
14      members of SRT, other members of the investigation
15      teams who would assist in this process.
16 Q.   How often did you discuss the investigations and the
17      information leading up to the execution of a warrant
18      with Officer Perry and Officer Marsh?
19 A.   Quite often.  I mean, there was -- if we were
20      executing a warrant that he would -- Detective Perry
21      at the time and Lieutenant Marsh at the time would --
22 Q.   So it was common practice for you to discuss things
23      with Perry and Marsh?  If either of you are executing
24      a warrant or part of that team, you guys communicated
25      pretty frequently.

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 17 of 93

1   A.   Yes.

2   Q.   And was this mandatory, or was it just common

3        practice or what?

4   A.   It was just common practice.  There was nothing

5        mandatory about it.

6   Q.   Okay.  And how were those communications?  Were they

7        text messages, e-mails, usually phone calls, or in

8        person?

9   A.   Prior to a search warrant, it would probably be a

10       sit-down.

11  Q.   And where would that usually occur?

12  A.   In either -- either of our offices at that time.

13  Q.   Okay.  But you guys would --

14  A.   They're very informal.

15  Q.   -- meet in a different location just to discuss it?

16  A.   Yes.

17  Q.   Okay.

18  A.   It would -- I wouldn't say meet in a specific

19       location.  It was just wherever we had the chance

20       that day.  It would usually be at the Southern Pines

21       Police Department at somebody's office.

22  Q.   Okay.  And then you -- you brought up the SRT.

23       Discuss your -- what's your involvement with -- what

24       was your involvement as an investigator with the SRT?

25  A.   My only involvement with them would be executing

1        search warrants.
2   Q.   Okay.  And what officers -- you just told me what
3        officers were involved, but what were -- were there
4        ever any circumstances where you executed a warrant
5        and you guys were in different locations if there
6        were multiple locations that needed -- where a
7        warrant needed to be executed?
8   A.   Yes.  This -- this current case is where -- that's
9        the question right now that we're talking about.
10  Q.   But were there other cases like that?
11  A.   I don't recall at this time.  I mean, I -- there
12       could be, but I -- I just don't remember off the top
13       of my head.
14  Q.   Okay.  In cases where you're executing a warrant -- a
15       search warrant and you guys are at different
16       locations, how do you guys communicate to make sure
17       everybody's on the same page?
18  A.   We would call, use the radio.  In most cases it was
19       call.
20  Q.   Okay.  And what was your badge number again?
21  A.   889.
22  Q.   Okay.  All right.  Let's talk a little bit -- a
23       little bit past executing the search warrant and talk
24       a little bit about your role in going --
25            MR. RUBERT-SCHEWEL:  Nichad?

Case 1:21-cv-00955-WO-JEP  Document 32-5  Filed 11/29/22  Page 19 of 93

1             MR. DAVIS:  Yeah.

2             (Mr. Rubert-Schewel and Mr. Davis conferred.)

3    BY MR. DAVIS:

4    Q.   Before we go to -- I want to still focus on

5         investigation too.

6    A.   Okay.

7    Q.   When you guys communicate and you said that you would

8         work with the SRT team, what type of documents would

9         you create to kind of archive or to -- to show what

10        you guys were learning as you're getting ready to

11        execute a warrant?

12   A.   Well, in my capacity, I would just indicate in my

13        report that SRT was there and they had made entry to

14        the house.  I can't speak on their behalf of what

15        documents they create, but I know there's documents

16        that are created whenever they execute a search

17        warrant or any type of activity like that, but I'm

18        just not privy to that information.  That's between

19        them and their SRT commander.

20   Q.   Are you familiar with what they call a supplemental

21        report?

22   A.   Yes, I am.

23   Q.   What is a supplemental report?

24   A.   A supplemental report, as it relates to a case

25        report, would be reported.  You would go into the

1        case, add whatever information you need to add to the

2        report, and that would be a supplement to that

3        report.

4   Q.   Okay.  And then as far as any reports, when it comes

5        down to communicating between team members before --

6        prior to an execution of a warrant, what kind of

7        reports or statements get made as you guys are

8        applying for that warrant?

9   A.   What do you mean, communication between teams?  Like

10       having a briefing or --

11  Q.   Well, obviously, one person alone can't just -- or

12       I'm assuming that one officer alone can't come up

13       with facts and -- and -- on their own without

14       discussing it with other members.  So what kind of

15       reports were made so that you guys communicated about

16       where you want to execute a warrant?  Or are there

17       any reports?

18  A.   There's no reports prior to executing a search

19       warrant.  The report would be completed after the

20       search warrant.

21  Q.   Okay.  And when -- when you guys have a warrant

22       execution plan, do you know what that is?

23  A.   Say that --

24  Q.   With the -- in the SRT, do you know what a warrant

25       execution plan is?

1   A.   I'm not familiar with their warrant execution plan,
2        if that's -- if they had one.
3   Q.   Okay.  So how -- how -- if you guys are prepared --
4        obviously, you guys have a plan when you're about to
5        execute a warrant, correct?
6   A.   Correct.
7   Q.   Whether you call it something different or not, how
8        do you enter that -- how do you enter that plan as
9        you're preparing to execute a warrant, or else you --
10       you know, what facts do you gather as you're
11       preparing to --
12  A.   Their --
13  Q.   -- execute a warrant?
14  A.   The SRT team is not based on the facts of the case.
15       The SRT team is there to assist us in their capacity
16       as we have a search warrant.
17  Q.   Okay.  And then what about the plan to enter the
18       home?  How do you prepare for that?
19  A.   Their plan.  That is on them.  They -- I give them
20       all the information that I know to be relevant.  I
21       know there could be safety issues there.  I give them
22       that information.  Their -- once that goes on, the
23       SRT commander makes that plan.  I'm there to just
24       give them a little bit of information when it comes
25       to safety, who -- who -- who the people that should

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 22 of 93

1       be at this house or the -- whatever location it may

2       be.

3   Q.  Okay.

4   A.  There -- an execution and plan and information like

5       that, that's based on the SRT team commander and SRT

6       team members.

7   Q.  So it sounds like primarily the SRT team is

8       responsible for how they enter a home during the

9       execution of a search warrant.

10  A.  And securing the --

11  Q.  And you've never been involved in executing a search

12      warrant?

13  A.  I have on the back end of them securing a home.

14  Q.  What does that mean?

15  A.  That means they would go in and secure the home and I

16      would execute a search warrant.

17  Q.  So during your time at Southern Pines Police

18      Department, you've never been a part of entering a

19      home during the execution of a search warrant in your

20      seven years?

21  A.  I'm sure I have, but not on the SRT team.

22              MR. JONES:  Object to form.  Are we talking --

23              so --

24              MR. DAVIS:  I'm just trying to clarify.  I was

25              asking Officer Lowery -- he's stating that

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 23 of 93

1              the execution of a warrant, as far as

2              entering a home, only the SRT team does it,

3              so he's not involved.  I'm just trying to

4              see how Officer Lowery, if he's ever been

5              involved in --

6         MR. JONES:  Right.

7         MR. DAVIS:  -- this case or any other case.

8         MR. JONES:  And I'm trying to determine --

9              when you're saying executing a search

10             warrant, are you talking about entering the

11             home or --

12        MR. DAVIS:  Yes.

13        MR. JONES:  -- or -- or all of the things

14             involved in executing, or are you just

15             talking about the entry point?  I --

16        MR. DAVIS:  The actual execution of the

17             warrant, which means --

18        MR. RUBERT-SCHEWEL:  You mean the initial

19             entry.

20        MR. DAVIS:  The initial entry of a -- of a

21             home.

22   BY MR. DAVIS:

23   Q.   You have a search warrant.  So let's back up for

24        clarification and for the record.  Hypothetically

25        speaking, you have now told us that during your time

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 24 of 93

1           in investigation -- as an investigator you gather

2           facts, that you communicate with your team, correct?

3    A.    Yes, sir.

4    Q.    And once you communicate these things with your team,

5           be it Officer Perry, Officer Marsh, members of the

6           SRT team, and all other officers involved, you then

7           decide that there is probable cause to be able to

8           apply for a warrant, correct?

9    A.    I would communicate this to the investigator team who

10          were privy to that information.  In most cases it was

11          Lieutenant Marsh, Sergeant Edwards, and Detective --

12          or at the time Detective Perry.  The SRT's

13          involvement would be the day of.  It would be more so

14          the safety concern, the -- the person or persons who

15          were on scene --

16   Q.    Yes.

17   A.    -- and any safety concerns.  They were not privy to

18          any information unless they were previously involved

19          in the investigation.

20   Q.    And that's exactly where I'm at in my question --

21   A.    Okay.

22   Q.    -- which is during your time at Southern Pines at any

23          case, involving this or any case, period, have you

24          ever been involved in the actual entry of a home to

25          execute a warrant is what I'm asking.

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 25 of 93

1   A.   I believe so, yes.

2   Q.   And can you tell me some of those examples?

3   A.   I can't think of anything off the top of my head.  I

4        know when I was on patrol prior to, I was asked to

5        help out to enter a home.  It was a -- it was not a

6        very -- I don't know to describe it.  It was a low-

7        risk search warrant.  They were using patrol officers

8        at the time and I made initial entry.  So I believe

9        SRT might have been tied up and -- but I can't

10       exactly remember the type of situation it was, what

11       type of crime, or what the search warrant was about.

12       But I have made entry into a home.

13  Q.   Yeah.  And so basically you are familiar with it --

14       with -- with the process of entering a home,

15       searching items --

16  A.   Yeah.

17  Q.   -- detaining any individuals who are present,

18       allowing dogs to sniff a premises if necessary.

19       You're familiar with how that looks and you've been a

20       part of that before.

21  A.   Yes, sir.

22  Q.   That's what I was just getting to.  I appreciate

23       that.  So now let's talk about your role as -- in

24       investigations when it comes down to surveillance.

25  A.   Yes, sir.

1  Q.  All right.  In particular, since you were placed on

2      the task force, I want to get specific to this case.

3      Are you familiar with Operation Leader?

4  A.  I am, sir.

5  Q.  And what is Operation Leader?

6  A.  It was the operation with everybody involved, with

7      the -- at that time what we knew as the DBC gang

8      members of -- which involved Lee Harris, Jr.,

9      Christian Terry, Lamar Sealy, and some other ones

10     that were not arrested on that day.

11 Q.  Okay.  And in this investigation of the DBC or this

12     -- in this drug investigation, what was your

13     particular role?

14 A.  My particular role was to investigate the -- the

15     narcotics activity that was happening in Southern

16     Pines.

17 Q.  And when you say "investigate," do you mean

18     surveillance or what -- what exactly -- can you walk

19     us through each -- each role that you played in this

20     investigation?

21 A.  It could have been surveillance that day.  It could

22     have been replacing the tracker battery.  It could

23     have been, you know, putting on a tracker.  It could

24     have been obtaining a court order for the tracker.

25     It could have been anything.  Talking with, you know,

 1     confidential informants, talking with witnesses,

 2     looking into drug activity that patrol had -- might

 3     -- may have arrested somebody in the location where

 4     this particular -- this particular house at 811 West

 5     New York Avenue to see if they had any interactions

 6     with there, to see if anybody had said anything on

 7     the scene while they were, you know, talking to these

 8     -- these subjects who had been arrested for drug --

 9     for possession of drugs not too far from there.

10          It -- it -- there was a plethora of things

11     that I did.  I don't -- I mean, it's -- to narrow it

12     down, it's fair to say mostly it was just to

13     investigate narcotics active in Southern Pines.  In

14     this particular case I did a lot of wood surveillance

15     and worked with a lot of witnesses.

16  Q. And just to remember -- and on the times where you

17     did -- I want to break it down in three different

18     parts.  I want to talk about surveillance, I want to

19     talk about the trackers that you mentioned, and I

20     want to talk about the individuals involved.

21          Let's first -- let's first talk about the

22     actual surveillance, and we're going to get to it

23     more specifically in a few seconds.

24          What were some of the locations that you

25     recall surveying in this particular case?

1   A.   811 West New York Avenue, 803 Sycamore in Aberdeen.

2        There was 1090 West Indiana.  There was a couple of

3        spots where they would -- when I say "they," the

4        -Terry and Sealy would sell their drugs.  There would

5        be people there and sell.  We had figured that out

6        and we would observe them selling their -- their --

7        their product to the -- their customers.

8   Q.   And you conducted wood surveillance.  Was there other

9        -- were you also were involved in any pole

10       surveillance?

11  A.   I was not involved in pole surveillance, per se, no.

12  Q.   But at any point did you review pole --

13  A.   I did --

14  Q.   -- surveillance?

15  A.   I did review it.

16  Q.   I'm only asking because in some of the pole

17       surveillance it seems as if it moves a little bit.

18       And so was that motion sensor?  There were voices

19       sometimes on the other side, so was there a control

20       by anybody?

21  A.   I believe -- I -- I can't recall the exact method of

22       how we moved the camera itself.  I -- I don't

23       remember if we had to call and ask or if we had

24       access to it.  I -- I just don't remember.

25  Q.   When you say call and ask, call and ask who?

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 29 of 93

1   A.   We would have to call a tech with the FBI if there

2        were any issues with -- with the pole camera or the

3        video or anything like that.

4   Q.   And from a -- from a Southern Pines Police Department

5        perspective, were you the lead person on

6        surveillance?  Outside of the FBI's personnel, were

7        you the Southern Pines person to --

8   A.   I don't --

9   Q.   -- conduct surveillance?

10  A.   There was no lead in surveillance.  It was who was

11       available that day when it come to me and Detective

12       Perry at the time.

13  Q.   Did you also --

14            MR. JONES:  I'm sorry.  Try and wait for him,

15                 just so you guys don't talk over --

16            THE WITNESS:  I'm sorry.

17            MR. JONES:  -- each other.  Try and wait for

18                 him to get the whole question out.  No

19                 worries.

20  BY MR. DAVIS:

21  Q.   No, that's fine.  I just wanted to know, and are you

22       familiar with a Officer Reilly?

23  A.   Yes, I am familiar with him.

24  Q.   Who was Officer Reilly?

25  A.   Officer Reilly is a Aberdeen detective.

1   Q.   So did you guys ever work together?

2   A.   Yes, we did.

3   Q.   Specifically, did you guys ever work together on

4        doing any wood surveillance?

5   A.   Yes, we did.

6   Q.   And how did you -- obviously, you didn't want to

7        remember all that, so how did you capture that

8        surveillance?

9   A.   Video.

10  Q.   What about any audio?

11  A.   If the -- if the audio picked it up -- or if the

12       video picked up audio, then yes.  Or if not, if it

13       was -- I would just remember it, recall it.

14  Q.   And how much experience did you have doing

15       specifically wood surveillance?

16  A.   It would be on the job.  I mean, prior to that I had

17       several -- at least a year prior to that or building

18       up to that particular event, you're talking about a

19       year of getting into the woods surveilling.

20  Q.   So you had at least --

21  A.   We had two targets.

22  Q.   -- before 2018, you had at least done wood

23       surveillance for a year or more for just that --

24  A.   Off and on in between then.

25  Q.   And would you say that you're good at wood

1       surveillance?

2    A.    I don't -- what do you mean?

3    Q.    I would imagine it's probably hard trying to remain

4          anonymous and, you know, you have to be in the woods.

5          So would you say you're good at --

6    A.    I would say --

7    Q.    -- wood surveillance?

8    A.    I would say that I'm able to do what needs to be done

9          to survey.  I -- I don't know if I'm good at it.

10         I -- I don't -- I don't know how to answer that

11         question.

12   Q.    How -- how far were you usually away from the objects

13         of your surveillance?

14   A.    It would just -- it would depend on how -- it just

15         depends.

16   Q.    On average in this particular case.

17   A.    In this particular case, anywhere a hundred, 200

18         feet.  Just depends.  I can't recall exactly where.

19   Q.    And usually you had a good view of wherever you are

20         watching?

21   A.    No, I would not have a good view.  The view would be

22         -- it could be obscured by trees, could be obscured

23         by anything; a car parked in the way.  Most of the

24         time, it would have been just like looking out this

25         window trying to look at that building over there.

 1          There would always be something in the way.  And
 2          obviously, I'm not trying to get caught, so I'm not
 3          going to move.
 4     Q.   Okay.  Let's specifically now -- we talked about
 5          surveillance.  Let's talk about some of the trackers.
 6          You say that there were trackers used in this case,
 7          right?
 8     A.   Yes, there was, sir.
 9     Q.   Do you mean GPS trackers?
10     A.   Yes, sir.
11     Q.   And do you remember which vehicles they were on?
12     A.   Let's see.  I do remember that the Toyota Venza had a
13          tracker.  I -- at this time I can't recall which
14          other vehicle Mr. Harris, Jr., had that we had a
15          tracker on.
16     Q.   And --
17     A.   If any.
18     Q.   -- and of the cars that had trackers through Southern
19          Pines, you guys were usually following who usually?
20          Who are -- whose -- whose movement were you usually
21          tracking?
22     A.   Harris, Junior.
23     Q.   And why was that?
24     A.   Because he was the one bringing in drugs to Southern
25          Pines or the area of Southern Pines.

1   Q.   And if there was somebody who you was -- thought was
2        involved in the transporting, storing, or accessing
3        of those particular drugs in this operation, would
4        you have also put a GPS tracker on their cars as
5        well?
6   A.   Yes, sir.
7   Q.   And if they -- I'm assuming if they didn't have a GPS
8        tracker on their car, it's because they were not the
9        key of the -- the -- they were not the key person
10       that you guys were trying to look at.
11  A.   Well, I will say that Lamar Sealy and Christian Terry
12       were not -- they -- it was not often seeing them
13       driving.  I don't even recall if they had a driver's
14       license.  I do remember Sealy had a moped.  It would
15       have been very difficult to attach a GPS tracker to
16       his moped.  He was not mobile other than somebody
17       picking him up, and there would have been no way of
18       obtaining a warrant to put on just random people's
19       cars or obtain a court order to put on random
20       people's cars.  Those two traveled in other people's
21       vehicles all the time.
22  Q.   What about cars that were not moving?  Did you ever
23       see -- not put a tracker on them, but were those ever
24       the object of your investigation?
25  A.   Not moving?

1  Q.   Yeah.  Cars that were not moving.

2  A.   No.

3  Q.   And why is that?

4  A.   If they weren't moving, there would have been no

5       reason to track those vehicles.  They were

6       stationary.

7  Q.   Outside of tracking, would there have been any reason

8       to survey those vehicles?

9  A.   If you -- if there was reason, yes.

10 Q.   What would be a reason?

11 A.   Are you referring to 803 Sycamore?

12 Q.   I'm referring to -- yeah, specifically any car that's

13      not moving.  We talked about cars that were moving

14      that were being tracked.

15 A.   Okay.

16 Q.   And I just was asking for let's say if there's not a

17      car moving.  And you told me that Junior was the

18      object of your surveillance when it came down to

19      tracking vehicles.

20 A.   Yes.

21 Q.   But I'm asking about cars that may not be moving.

22      Why would there be reason to track them in your

23      perspective?

24 A.   We would not --

25 Q.   Did you just say --

1    A.    -- we would not track a car that was not moving.  We

2          would surveil it if we felt there was a reason to

3          surveil it.

4    Q.    And my question is what would be a reason to survey a

5          vehicle that's not moving?

6    A.    If there was something of interest that pertained to

7          the investigation inside that vehicle.

8    Q.    Can you give me an example?

9    A.    Whether it be -- in this particular case, whether it

10         be drugs inside that vehicle.

11   Q.    Was that ever a concern in this investigation?

12   A.    Drugs in a vehicle?

13   Q.    Yes.

14   A.    Yes.

15   Q.    Give me a -- at -- let's be more specific.  Were

16         there ever any concerns about drugs inside of a

17         vehicle at 803 Sycamore Street in your perspec- --

18         from your surveillance?

19   A.    From my surveillance, yes.  There was a particular

20         time -- I don't recall the date.  However, I know it

21         was prior to -- obviously, it was prior to the

22         execution of the search warrant.  There was a time

23         where Junior had showed up with his friend Calvin

24         Fox.  Mr. Harris, Sr., was outside speaking to, I

25         believe, Calvin at the time, and Mr. Harris, Jr., had

 1       went to an object which appeared to be a vehicle near

 2       a trailer to the right side of Mr. Harris, Sr.,'s

 3       house.  I couldn't see exactly what was going on over

 4       there, but he did approach that vehicle.  I didn't

 5       hear anything from my vantage point.  I really don't

 6       know if he took something out or put something in.  I

 7       just know he was over there.

 8             And that's pretty much my gist of that day,

 9       that particular day, which I said I can't recall the

10       date.  But I do recall Calvin Fox was there and

11       Mr. Harris and Mrs. -- Mr. Harris, Sr., and

12       Mr. Harris, Jr., spoke at some point.

13  Q.   In that surveillance.

14  A.   In that surveillance.

15  Q.   To your recollection.

16  A.   That I recall, yes.

17  Q.   And if need be, we can go to any of those videos if

18       you need to.

19  A.   That's fine.

20  Q.   Specifically -- and before we move on to talking

21       about some of the purchases that were involved, and

22       -- and we can go into videos if we need to,

23       specifically.  But since you spent a significant time

24       at 803 West Sycamore Street doing surveillance, and

25       you just said that there was a time that you saw

 1          Junior retrieve or move some items to the car.  Which
 2          car are you talking about?
 3   A.   I don't recall him retrieving or moving any item.  I
 4          recall him going to it.
 5   Q.   Going to the --
 6   A.   To -- now, whether he took something in or out, he
 7          either -- I think -- I think how I worded it, he
 8          possibly could have took something out or he possibly
 9          could have put something in.  I couldn't see what was
10          in his hands from my vantage point.
11                    MR. RUBERT-SCHEWEL:  Nichad?
12   BY MR. DAVIS:
13   Q.   You saw --
14                    MR. DAVIS:  Yes?
15                    (Mr. Rubert-Schewel and Mr. Davis conferred.)
16   BY MR. DAVIS:
17   Q.   Okay.  Let's talk about some of the people involved,
18          and this time I'm going to use an exhibit.  I don't
19          know --
20                    MR. DAVIS:  Abe, did you -- you didn't print
21                        the one with all the people.  I'll have to
22                        show him --
23                    MR. RUBERT-SCHEWEL:  No.
24                    MR. DAVIS:  -- on my computer.  Court
25                        Reporter, do you mind if I show -- there's

 1                    an exhibit that I have.  It's -- and we're

 2                    going to publish it to you, but it's on my

 3                    computer.

 4               COURT REPORTER:  That's fine.

 5               MR. DAVIS:  It's not a video yet.

 6               COURT REPORTER:  That's fine.

 7               MR. DAVIS:  All right.  Glenn, is that okay

 8                    with you?

 9               MR. JONES:  Yeah, as long as I can see it.

10               MR. DAVIS:  Yeah.  Perfect.  Gotcha.

11               COURT REPORTER:  If you would identify the

12                    number.

13               MR. DAVIS:  Yeah.  If I'm not mistaken -- and

14                    I'll get to it in a few seconds.  I'm

15                    pretty sure it's Exhibit QQ, if I'm not

16                    mistaken.

17      BY MR. DAVIS:

18      Q.   All right.  Officer Lowery, I'm going to come sit

19           over here beside you.

20      A.   That's fine.

21               MR. DAVIS:  Court Reporter, I'm showing

22                    Mr. Lowery what has been marked as

23                    Plaintiff's Exhibit QQ.

24      BY MR. DAVIS:

25      Q.   I'll put it between you and Glenn.  Here is

1          Plaintiff's Exhibit --

2                    MR. DAVIS:  Glenn, this is Exhibit QQ, two Qs.

3     BY MR. DAVIS:

4     Q.   All right.  I'm showing you Exhibit QQ.  It's

5          41 pages.  We can go through it swiftly, but do you

6          recognize Exhibit QQ?  I'm going to -- I'm going to

7          sit beside you.

8     A.   I recognize this -- parts of this document, yes.  I

9          mean, I -- it's been a little while since I've seen

10         it.  I recognize the faces of the people on this

11         document, correct.

12                   (Plaintiff's Exhibit QQ was identified.)

13    Q.   And how do you recognize this document again?

14    A.   I believe it -- it looks like something that I may

15         have prepared or at least at the time investigated,

16         prepared -- might have prepared.

17    Q.   Okay.  I'm just going to scroll down so we can see

18         the whole page, so Glenn can see it.  It looks like

19         -- can you tell us, and for the record, how many

20         people are listed in this first page of this

21         document?

22    A.   Twelve that I can see right now.

23    Q.   And who are -- do you recognize any of the gentlemen

24         in this 12 -- these 12 people?

25    A.   I recognize just about all of those 12 people.

1    Q.   And how will you describe this group of 12 people

2         that are listed in this report?

3    A.   I would say -- two, three, four, five -- six of those

4         people were primarily at the house at 811 West New

5         York Avenue when the initial investigation had

6         started.  Other ones were just known associates and

7         people that Harris Junior at the time or his other

8         associates at the 811 West New York Avenue would

9         associate with.

10   Q.   Is it fair to say that based on what you said earlier

11        about the -- the DBC, is -- are these members of that

12        team that you were describing?

13   A.   It's fair to say, yes.

14   Q.   In the pictures here, is it -- is it also fair to say

15        that these were the primary targets of your

16        investigation at 811 West New York Avenue?

17   A.   I said -- it's fair to say that part of these are the

18        primary targets.  Most of this was put together --

19        especially the last three or four were just

20        associates, and it was just to have a face with a

21        name.

22   Q.   And when you say "part," what did you mean by "part"?

23        What is the other part?

24   A.   So like -- like saying before, Mr. Harris, Jr.,

25        Christian Terry, and Lamar Sealy were the primary

Case 1:21-cv-00955-WO-JEP  Document 32-5  Filed 11/29/22  Page 41 of 93

1           targets.  These other gentlemen had been seen at 811

2           West New York Avenue, or at least had been associated

3           with those three individuals at some point during

4           that investigation.

5   Q.   And this -- and as we go through this document, this

6           report where these individuals are identified, do you

7           remember if this was made before the -- the arrest of

8           these gentlemen?

9   A.   I -- I don't recall.

10  Q.   Okay.  Can any of --

11  A.   I know the pictures were obtained, but I don't recall

12          if it's complete -- this report was completed before

13          or after.

14  Q.   Okay.  In any of the pictures here -- I'm sorry if I

15          interrupted -- is Mr. Lee Harris, Sr., pictured here?

16  A.   In this particular photo, no.

17  Q.   Okay.  Why is that?

18  A.   He was not an intended target.  He was an associate,

19          but he wasn't an intended target.  He was an

20          associate because his son was laying his head there

21          at some point in time during the investigation.

22  Q.   And when you say "there," you mean?

23  A.   At 803 Sycamore Street in Aberdeen.

24  Q.   So why was it important to -- to have him listed in

25          the investigation at 811 West New York Avenue from

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 42 of 93

1          your perspective?

2     A.   Are you talking prior to or after?

3     Q.   Well, you said that these were people who were the

4          primary targets at 811 West New York, and then you

5          said that Mr. Harris was not one of the targets of

6          the investigation, but he was an associate, right?

7     A.   Yes.

8     Q.   And then I'm asking you why did you consider him an

9          associate.

10    A.   I'm not understanding.  So I just stated that these

11         people here that are in this picture were associates

12         with the -- the three or four targets that I had

13         already mentioned prior to with Harris Junior being

14         the main subject.  Refresh me where you're talking

15         about --

16    Q.   I'll go --

17    A.   -- about the --

18    Q.   I'll be more specific.  You said that the only reason

19         that Mr. Senior is not listed here as a target, but

20         he was a person --

21    A.   He was associated because of kin, and his -- I

22         believe his mother lived to the left of him.

23              MR. JONES:  Just wait for him to finish the --

24              MR. DAVIS:  Yeah.

25              MR. JONES:  -- question before you --

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 43 of 93

 1              THE WITNESS:  I'm sorry.
 2    BY MR. DAVIS:
 3    Q.   I'll just go back to my question.  It's very quick.
 4         It's just that you said that Lee Junior laid his head
 5         at --
 6    A.   At his --
 7    Q.   -- 803 West Sycamore Street, correct?
 8    A.   Sometimes.
 9    Q.   Yeah.  And that therefore -- and I'm asking why was
10         that important for your determination of Mr. Harris,
11         Sr.?  Is it simply because Mr. Junior laid his head
12         there from time to time?  That's all I'm asking.
13    A.   Mr. Harris, Sr., was also seen at 811 West New York
14         as well.
15    Q.   Okay.  So let's go through a few more of these
16         pictures in QQ.  All right.  Do you recognize this
17         picture on page 2 of Exhibit QQ?
18    A.   I do.
19    Q.   And what is this picture?
20    A.   This is -- it appears to be a picture taken from
21         Facebook and then with added notes and activity.
22    Q.   Okay.  I'm going to go -- let you scroll through.  If
23         this was printed out, you could go through each page.
24         And then I want you to let me know where you see
25         Mr. Senior -- Harris Senior.

1   A.   How do I move the --

2              MR. JONES:  You can just go down like this.

3   BY MR. DAVIS:

4   Q.   Oh, do you want me to do it?

5   A.   Yes, that's fine.

6   Q.   Okay.  Tell me when to slow down.

7   A.   You can keep going.

8   Q.   Well, I'll -- I'll do this.  Is he listed on page 2?

9   A.   He's not listed on page 2.

10  Q.   Instead of going through every page, you just let me

11       know if you see him.

12  A.   Okay.

13  Q.   We're going to go through 41 pages, and we're on

14       page 2.  On 3 now.

15             (Brief pause.)

16  A.   You can go to the next page.

17             (Brief pause.)

18  A.   You can continue.

19             (Brief pause.)

20  A.   Next page.

21             (Brief pause.)

22  A.   Next page.

23             (Brief pause.)

24  A.   Next page.

25             (Brief pause.)

1    A.   He's not listed, but he's observed.

2    Q.   What do you mean?

3    A.   That would be Mr. Harris right there.

4    Q.   That's -- that's not Mr. Harris.

5    A.   That's not Mr. Harris?

6    Q.   No, sir.

7    A.   Okay.  Well, he's -- from this vantage point, it

8         looks like it could be him.

9    Q.   Do you want me to zoom in?

10   A.   Yes, if you don't mind.

11              (Brief pause.)

12   A.   I would agree with your point.  That's not

13        Mr. Harris.

14              COURT REPORTER:  I'm sorry, sir?

15              THE WITNESS:  I would agree that's not

16                  Mr. Harris.

17              COURT REPORTER:  Thank you.

18              THE WITNESS:  I'm sorry.

19              MR. JONES:  And, again, Senior?

20              THE WITNESS:  Mr. Harris, Sr.

21   BY MR. DAVIS:

22   Q.   And from hereon, if we -- if we ever refer to

23        Mr. Harris, I'm assuming we're referring to Senior.

24        And if we say Junior, we'll probably say Junior

25        specifically.

1           So I can keep going.

2    A.   Yeah, just keep going.

3           (Brief pause.)

4    Q.   And you've seen this document before, so it's not new

5         to you.

6    A.   No, it's not.  Keep going.

7           (Brief pause.)

8    A.   You can keep going.  And keep going.

9           (Brief pause.)

10   A.   You can keep going.

11          (Brief pause.)

12   A.   Go back just one more time.  And keep going.  Next

13        page.

14   Q.   Do you want me to go to the very bottom or keep

15        going?

16   A.   Okay.

17   Q.   I'm asking you.

18   A.   You can keep going.  I'll tell you when to stop.

19          COURT REPORTER:  Gentlemen, I know it's

20             awkward because you're all right together

21             and you --

22          MR. DAVIS:  Yeah.

23          COURT REPORTER:  -- feel like you're yelling

24             at each other, but I need to be able to

25             hear you.

1           MR. DAVIS:  Okay.  And for the record, I just
2              said, "Would you like me to keep going
3              down?"
4           COURT REPORTER:  Thank you.
5           MR. DAVIS:  Yeah.
6  A.   That's Mr. Harris.
7  BY MR. DAVIS:
8  Q.   Okay.
9  A.   Senior.
10 Q.   All right.  I'm going to return back over here.
11 A.   That's fine.
12 Q.   All right.  So, for the record, we went through
13      Exhibit QQ, correct?
14 A.   Correct.
15 Q.   And that was 41 pages, and in Exhibit QQ you saw a
16      series of -- would you say it's fair to say there was
17      a series of surveillance at 811 West New York Avenue?
18 A.   That's fair to say.
19 Q.   And after all the pages, you said you saw Mr. Harris
20      just one time?
21 A.   Yes, sir.
22 Q.   And earlier you said that -- you said his mother-in-
23      law or someone lived next-door to that?
24 A.   It -- I was told that his mother-in-law lived
25      next-door.

1   Q.   Okay.   One second.

2               (Mr. Rubert-Schewel and Mr. Davis conferred.)

3   BY MR. DAVIS:

4   Q.   And just for clarity, I know you told us that you did

5        surveillance at multiple locations.   Were you ever

6        outside doing surveillance in any of these pictures?

7   A.   Very, very early on.   I do not believe I took any of

8        these photos.   We had the North Carolina National

9        Guard doing most, if not -- I would say 90 percent of

10       the surveillance at that -- at that location.

11              Early on, I believe myself and Detective

12       Perry, and there was somebody else -- I can't

13       remember who it was -- initially doing surveillance.

14  Q.   So there were times that you did do wood surveillance

15       at 811 New York Avenue?

16  A.   Very early on, yes.

17  Q.   Okay.   All right.   We can move on from this document,

18       and -- sorry.

19              (Mr. Rubert-Schewel and Mr. Davis conferred.)

20  BY MR. DAVIS:

21  Q.   All right.   Just a few more questions about

22       surveillance and then we're just going to -- I'm

23       going to go into the actual arrest of Mr. Harris.

24              So you stated that you did surveillance at

25       West New York Avenue.   You said that you did

1          surveillance at -- at -- on Sycamore Street and then

2          also on Indiana Avenue at various places, correct?

3    A.    Yes, sir.

4    Q.    At the -- on the date of -- let's -- let's fast

5          forward to the date of the arrest on February 20th,

6          2018.

7    A.    Yes, sir.

8    Q.    Do you recall where you were prior to Mr. Lee Harris,

9          Sr., being arrested on that day?

10   A.    Prior to his arrest, I was at 1090 West Indiana.

11   Q.    And, in fact, we have some communication that show

12         you were at West -- you were at Indiana Avenue.  And

13         why -- during the time that the search of

14         Mr. Harris's home was being conducted.  And why was

15         that?

16   A.    There was multiple locations.  Myself and other

17         members of the investigation team, which would

18         include myself and Detective Perry, at the time

19         Lieutenant Marsh, Sergeant Edwards, other members of

20         SRT, other members of Southern Pines Police

21         Department, and we were split up to go to these

22         multiple locations at the same time.

23   Q.    And, in fact, we talked to Lieutenant Marsh, and he

24         said that you were one of the lead investigators at

25         the premises on Indiana Avenue while Perry and Marsh

1        were at 803 Sycamore.  You agree with that?
2   A.   Yes, I was the lead investigator there.
3   Q.   So during the -- and are you familiar with what
4        occurred at 80- -- 803 West Sycamore Street regarding
5        Mr. Harris, Sr.?
6   A.   Yes, I'm familiar with what I was told.
7   Q.   And when you say you were familiar and you were told,
8        who were you told by and how did you get caught up to
9        speed?
10  A.   At some point I -- I know I spoke with Detective
11       Perry over the phone.  Later on into the evening I
12       had spoke with then-Lieutenant Marsh at the PD.
13  Q.   What did Officer or Detective Perry and Lieutenant
14       Marsh tell you while you were at Indiana Avenue?
15  A.   I do recall them -- remember them saying they told me
16       they had found drugs, an amount of cocaine.  I -- I
17       don't remember or recall the exact words, what was
18       told to me that day, however.
19            And then I remember Lieutenant Marsh came back
20       to the PD.  He explained to me in some words, in some
21       way, in some fashion what happened.  However, I don't
22       recall everything that was said to me in -- on that
23       particular day or anything around that timeframe
24       because it was such a long time ago.
25  Q.   At the time of the arrest of Mr. -- the -- the search

1          of Mr. Harris's home at 803 West Sycamore and then

2          later on his arrest, did you ever travel from Indiana

3          Avenue to West Sycamore Street?

4     A.   I did not, not that day.

5     Q.   So do you know how Mr. Lee Harris, Sr., was

6          transported from his address to the police

7          department?

8     A.   I know it was by a Southern Pines officer.  I just

9          don't know who it was.

10    Q.   So you don't recall which officer?

11    A.   I do not.

12    Q.   Okay.  And do you -- were you caught up to speed by

13         Officer Marsh or Perry in that communication about

14         what was -- exactly was found?

15    A.   Once Mr. Harris, Sr., was transported back, I'd have

16         been caught up to speed at some point during the --

17         prior to taking Mr. Harris and all the rest of the

18         people that are in custody at that time to the

19         magistrate's office.

20    Q.   And, specifically, what were you informed about what

21         was found at 803 West Sycamore?

22    A.   I was informed that there was drugs found at -- on --

23         at or on property.  I was informed that the drugs

24         were found in a -- in the red Cadillac.  It was also

25         to the right of the property.

1   Q.   And in that moment, what were your thoughts about

2        that when you were being told that?

3   A.   I -- I don't recall my thoughts at that moment.

4   Q.   Well, in a few minutes I'm -- well, I'll -- I'll get

5        to that in a few seconds.  So when did you encounter

6        Mr. Harris, Sr.?

7   A.   I don't know if I actually ever encountered him.  I

8        know I observed him through -- observed him at the

9        PD.  I don't know if I ever encountered him other

10       than at -- maybe at the magistrate's office.  Other

11       -- you know, in passing.  There was nothing ever --

12            When you say "encounter," what -- what do you

13       mean?

14  Q.   I mean, if you were not physically present at West

15       Sycamore Street and you just told us that --

16  A.   Yes.

17  Q.   -- Officer Marsh and Detective Perry called you

18       between the time of Mr. Harris's -- the search of his

19       home, the arrest, and then by the time he was in

20       custody at SPPD, that you were in communication with

21       those officers.  So I'm asking when was the first

22       time that you were in the same room or in the same

23       presence as Harris Senior?

24  A.   It would have been when he was being held or detained

25       at our facility at the Southern Pines Police

1       Department.

2  Q.   Okay.  In a few seconds I'm going to show you --

3              MR. DAVIS:  Do we still have a copy of

4                 Exhibit L?

5              MR. RUBERT-SCHEWEL:  Huh-uh.

6              MR. DAVIS:  Glenn, do you have Exhibit L?  I'm

7                 going to show him --

8              MR. JONES:  I assume so.

9              MR. DAVIS:  -- Exhibit L.

10             MR. JONES:  Yes.

11             (Brief pause.)

12 BY MR. DAVIS:

13 Q.   All right.  Officer Lowery, I'm showing you what has

14      been marked as Plaintiff's Exhibit L.

15             MR. DAVIS:  For the record, we have Exhibit L.

16 BY MR. DAVIS:

17 Q.   Before we get into this, because you told us that --

18      and we're going to -- we're going to get into

19      Exhibit L in just a second.  But before we get into

20      that, I had a question leading up to Exhibit L, which

21      is the magistrate's order that you referenced a few

22      seconds ago.

23             You stated that you were communicated to

24      Detective -- by Detective Perry and Lieutenant Marsh

25      about what was found at 803 West Sycamore Street,

1          correct?

2     A.   Yes, sir.

3               (Plaintiff's Exhibit L was identified.)

4     Q.   And you just stated on the record that you found out

5          that there were some drugs found in a vehicle on

6          Mr. Harris's property, correct?

7     A.   Yes, sir.

8     Q.   This was also a place, earlier today, you told us

9          that you had done surveillance on a number of times.

10         803 West Sycamore Street.  You had done wood

11         surveillance at this place.

12    A.   Yes.  I had done some wood surveillance there.

13    Q.   So at that time you had already seen the Cadillac on

14         this property.

15    A.   I did not observe a Cadillac.  I observed a vehicle

16         -- what appeared to be a vehicle and some other items

17         that were stored on that property.

18    Q.   Well, let's back up.  You know that there was a car

19         parked at Mr. -- at 803 West Sycamore during your

20         time doing surveillance, right?

21    A.   I know of several cars that were parked at that

22         residence, yes, sir.

23    Q.   So when you discovered through phone calls and

24         conversation with Perry and Marsh that there were

25         drugs found at Mr. Harris's -- at Harris Senior's

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 55 of 93

1          home at the Cadillac, did you believe in that moment
2          that there was sufficient evidence to establish
3          probable cause to arrest Mr. Senior?
4     A.   I don't recall my -- what I believed in that moment
5          at that particular time.
6     Q.   Do you now believe that there was probable cause to
7          arrest Mr. Harris, Sr., because there were drugs
8          found in the Cadillac?
9     A.   I do believe there was probable cause to arrest --
10    Q.   And --
11    A.   -- Senior.
12    Q.   -- and why do you believe that?
13    A.   Exactly what it states in right here.  It was on his
14         property.  It was cocaine in his property, drug
15         paraphernalia, trafficking amount on a vehicle that
16         was registered in his name, a vehicle that, all
17         accounts, was his.
18    Q.   So just for clarity, you're saying that then and now
19         you believe that -- the fact that there were drugs
20         found in a car parked at his house, that that was in
21         your opinion probable cause?
22    A.   Yes.  I want to believe that they had told me --
23         there was -- there may have been a conversation.
24         Like I say, I don't recall to everything that
25         happened or what was said on that particular day.

1           However, I -- that is -- they told me the PC of the

2           probable cause.  I agreed with the PC in the probable

3           cause and relayed that to the magistrate that day.

4    Q.    So Perry and Marsh is who told you what they believed

5           the PC was, and that's what you relayed to the

6           magistrate.

7    A.    There was at some point a phone conversation between

8           me and Detective Perry.  I don't recall if it was

9           while Perry was still at the house or where it was at

10          or where we were both located.  And at some point

11          Detective -- or Lieutenant Marsh at the time had

12          spoke with me at the PD reference everything that had

13          happened.

14   Q.    And for the record, just to -- just to clarify,

15          because you said a lot, and I want to make sure we're

16          slowing down before we get to this.  You're saying

17          that you relied on the -- the words and the opinions

18          of Marsh and Perry to establish PC, and that's what

19          you took to the magistrate.

20   A.    I did, sir.

21   Q.    Okay.  So let's point back to Plaintiff's Exhibit L.

22          Do you recognize Plaintiff's Exhibit L?

23   A.    I do, sir.

24   Q.    And the top left corner -- corner, what does it state

25          that this particular exhibit is?

1    A.    It's a magistrate's order for offense for trafficking

2          cocaine; maintain vehicle/dwelling/place controlled

3          substance; and possession of drug paraphernalia.

4    Q.    And the name and the address that's listed?

5    A.    Lee Marvin Harris, Sr., 803 Sycamore Street in

6          Aberdeen.

7    Q.    And I'm going to scroll down about -- one, two,

8          three, four -- five boxes.  And where it says

9          "arresting officer," who's the arresting officer on

10         this document?

11   A.    I am the arresting officer.

12   Q.    And why were you the -- what does it mean to be the

13         arresting officer?

14   A.    It means I took the facts of the case and took it

15         before the magistrate and explained to the magistrate

16         what we had and why Mr. Harris, Sr., would have been

17         in front of her -- him or her at the time.

18   Q.    And how was it determined that you, among the other

19         people that you stated earlier were involved in the

20         execution of the warrant, the search, and the arrest,

21         how was it determined that you were the arresting

22         officer?

23   A.    As stated earlier, there was multiple locations being

24         searched that day.  I believe there was at least four

25         locations, if I recall correctly.  I do remember

1        Mr. Perry had to go to another location shortly after
2        leaving 803.  It's not common for -- it's not
3        uncommon for one person to go swear out warrants or
4        to stand before a magistrate and swear to the facts
5        for all -- for everybody when it comes to the
6        offenders or the defendants at that time --
7   Q.   Okay.
8   A.   -- other people that are in custody --
9   Q.   So when somebody --
10  A.   -- based on what I was told.
11  Q.   Sorry.
12  A.   That's fine.
13  Q.   So it's not uncommon practice either for a person to
14       swear to testimony that they did not physically see.
15  A.   No.
16            MR. JONES:  Object to the form.  Go ahead.
17  BY MR. DAVIS:
18  Q.   You can still answer the question.
19  A.   No.  It is -- it was not uncommon for another officer
20       to relay information pertaining to this, in
21       particular, PC, probable cause, and if -- so
22       understands that, "Hey, this is what I got.  Can you
23       go tell the magistrate this?"  I agreed with what the
24       PC was.  I went to the magistrate and testified to
25       the facts of what I was told, and I agreed with those

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 59 of 93

1      facts.

2  Q.   Yeah.  I want to point you back to my question.  I

3       don't think --

4  A.   I'm sorry.

5  Q.   -- it's a hard question.  I'm going to make it clear.

6       I know he objected.  I wanted to kind of just clarify

7       something.

8            It's not uncommon -- we're talking about

9       common practices at Southern Pines Police Department.

10      It's not an uncommon practice for an officer to swear

11      testimony before a magistrate without having seen

12      physically the evidence that established probable

13      cause for that arrest.

14 A.   It's not --

15 Q.   That's my question.

16 A.   It's not common.  However, it does happen.

17 Q.   And in this particular case, that's what happened?

18 A.   That is what happened.

19 Q.   And in this particular case, you relied on things

20      that you heard and were discussed from both Officer

21      Perry and Marsh, correct?

22 A.   That is correct, sir.

23 Q.   That's all I was asking.  And based on everything put

24      in this particular exhibit to the magistrate, you --

25      you believed that this was enough for Mr. Harris to

1          be arrested.

2     A.   I do, sir.

3     Q.   Okay.  And this is you that signed off on this

4          particular affidavit, should I say, to the

5          magistrate.

6     A.   Yes, sir.

7     Q.   All right.

8               (Mr. Rubert-Schewel and Mr. Davis conferred.)

9     Q.   I've got a few more questions.  I just want to make

10         sure we get to the clarity of -- of it, and I think

11         you -- you're doing a good job.  Thank you.

12              Two other -- two or three other questions.  To

13         backtrack to what you stated earlier about -- you

14         said that there was a conversation that had happened

15         between you and Perry and -- and Marsh.  My question

16         is did -- what exactly did Perry --

17              In order for you to have sworn before a

18         magistrate judge that these are the facts that led to

19         probable cause, you had to retell some obviously what

20         you believed to be true facts, right?

21    A.   Yes, sir.

22    Q.   So what exactly did Marsh tell you and what exactly

23         did Perry tell you?

24    A.   I don't recall the conversations, the exact words

25         that they told -- what they told me that day.

 1          However, I know that I agreed to that and I had no

 2          problem going to the magistrate's office to swear to

 3          those facts.

 4     Q.   So -- so you don't remember what Marsh told you

 5          exactly, you don't remember what Perry told you

 6          exactly, but they did -- whatever words they told you

 7          showed up in this --

 8     A.   Showed up in --

 9     Q.   -- sworn testimony --

10     A.   -- the magistrate's --

11     Q.   -- by you to the magistrate.

12     A.   Yes, sir.  So it showed up in the magistrate's order.

13     Q.   Did you write these words or did you give the

14          magistrate these words for probable cause?  'Cause

15          the magistrate wasn't there, right?

16     A.   When?

17     Q.   The magistrate obviously was not there at the search

18          of 803 West --

19     A.   No.

20     Q.   -- Sycamore.

21     A.   They were not.

22     Q.   And you were not there either, correct?

23     A.   I was not.

24     Q.   So you had to be told information from someone.

25     A.   I don't remember -- I don't remember exactly whether

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 62 of 93

1        we typed up these magistrate's orders prior to.  I'm

2        pretty sure that's what happened.  And if that's what

3        would have happened, at some point Lieutenant Marsh

4        would have been there with me when typing up these

5        magistrate's orders.  I would have been typing up

6        magistrate's orders for the house at 10- -- 1090 West

7        Indiana.  At that same time I'd have been typing up

8        magistrate orders for Harris Senior over there as

9        well.

10              So there was conversation during that time.

11       It was typical to type up a magistrate's order, go to

12       the magistrate and say, "Here -- here's your CR.

13       Here's what we got."  We would read exactly what we

14       already wrote.  We would swear to the facts, read

15       what we had already, and we would go from there.

16              That -- I don't recall the conversation.  I

17       don't recall exactly how it was relayed to me.  I do

18       recall testifying to what was written and what was

19       put in here in front of the magistrate, and I agreed

20       with everything at that point.

21   Q.  So you do you -- you agree with what was written.

22       Did you yourself write it?

23   A.  I -- I wrote all of these --

24   Q.  And --

25   A.  -- if I recall correctly.

 1   Q.   And -- and just to clarify, because you were not
 2        there, you were relying on what you were being told
 3        by Marsh?
 4   A.   Yes.
 5   Q.   And was he sitting beside you when you were typing
 6        this?
 7   A.   I don't believe Mr. -- I don't believe Lieutenant
 8        Marsh was ever sitting beside me.  I think it was --
 9        he would come talk to me, give me some information,
10        and we -- we would go from there.  I don't -- I don't
11        actually recall exactly how the -- the information
12        was relayed or whether he was sitting beside me.  I
13        just know the information was given to me at some
14        point there.
15   Q.   In this particular Exhibit L, you do tell -- you do
16        state to the magistrate that drugs were found in a
17        Cadillac, correct?
18   A.   Yes, I do.
19   Q.   And you list the amount of what the -- of the drugs,
20        correct?
21   A.   I do, sir.
22   Q.   And you list the VIN number, the registration number,
23        who the car belonged to, correct?
24   A.   I do, sir.
25   Q.   At any -- at any point, did Detective Perry tell you

1     that the drugs -- that the -- the drugs that were
2     found in the Cadillac were found in the same car that
3     you had been doing surveillance on prior to the
4     search warrant?
5   A.  I was never told it was in the same car, and I -- I
6     couldn't -- I could never testify to the fact whether
7     it was the same car.
8   Q.  Did he ever tell you that it was the same car where
9     Lee Junior placed drugs in when you were doing
10    surveillance on it?
11  A.  That was never mentioned during that timeframe that I
12    recall.
13  Q.  Did you think at any point that the drugs that were
14    found when you were being told, since you were not
15    there, correctly [verbatim]?
16  A.  Yes, sir.
17  Q.  You were not there, so you were being told that there
18    were drugs found in the Cadillac, correct?
19  A.  Yes, sir.
20  Q.  And at any time did you make a connection between
21    drugs found in a Cadillac and then items that you saw
22    Lee Junior transport back and forth during your
23    surveillance?
24  A.  A connection with items --
25          MR. JONES:  Object to the form.  You can --

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 65 of 93

1              THE WITNESS:  Oh.

2    A.   Can you restate that question as what you're saying?

3    BY MR. DAVIS:

4    Q.   Yes.  I'm just trying to clarify that -- two things

5         that we already agree on, so this isn't a trick

6         question.

7    A.   I understand.  I just -- it was a lot, so --

8    Q.   Okay.

9    A.   -- so I just want to make sure I get it.

10   Q.   Okay.  I'll slow down.  So earlier you told us that

11        you saw -- you made -- on several occasions you did

12        wood surveillance on 803 West Sycamore, correct?

13   A.   I did, sir.

14   Q.   You also stated earlier that you saw, even though you

15        could not specify exactly what kind of car, you saw

16        Junior go to and come from, with items, a car on that

17        premises.

18   A.   If I remember correctly, I said he went over to a

19        vehicle --

20   Q.   Yes.

21   A.   -- whether he put something in or not, but there was

22        also other items that were stationary there to

23        include a trailer that was, I believe, registered to

24        Junior for a business he had.  I think it was called

25        Green Eyes.  It was a food truck or something of that

1       general nature.  That he had stuff over there.

2             I mean, like I said, he went over there.

3       Whether he took something, placed something, I do not

4       know.

5  Q.  Well, I'm just trying to point you back to earlier.

6       You said that you saw Junior with some items, and you

7       don't know if he placed them in or took them out.

8  A.  He walked over there.  I don't know if he took

9       anything or he placed anything.

10  Q.  And did you -- at any point did you think, when you

11       were relaying the facts to the magistrate, that the

12       drugs that were found in the car at 803 West Sycamore

13       were also any of the drugs that were taken

14       from/brought to by Lee Junior is my question.

15           MR. JONES:  Object to form.  You can answer.

16  A.  I can't -- I don't -- I don't know.  I don't know.

17       At that particular time, no.

18  BY MR. DAVIS:

19  Q.  And what -- did Detective Perry ever tell you that?

20  A.  Ever tell me what?

21  Q.  That the drugs that were found in the car at 803 West

22       Sycamore were also drugs that were suspected items

23       that you had done surveillance on is my question?

24  A.  I don't recall Detective Perry ever telling me that.

25  Q.  And you never made any connections yourself.

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 67 of 93

 1   A.   I don't recall making connections.

 2   Q.   Yeah.  Yeah.  All right.  So after you established

 3        there was probable cause in your opinion to the

 4        magistrate, you later on went to -- you'll -- you'll

 5        recognize that you guys had to convey this to the

 6        local district attorney, correct?

 7   A.   Yes.

 8   Q.   Do you remember who the local district attorney was

 9        at that time?

10   A.   The local district attorney was Maureen Krieger.

11   Q.   Do you remember a name, Warren McSweeney?

12   A.   Yes.  He was a ADA that worked for the District

13        Attorney's Office.

14   Q.   Are you familiar with what they call a prosecution

15        summary?

16   A.   I am, sir.

17   Q.   What is a prosecution summary?

18   A.   A prosecution summary is a summary of the case that

19        is -- are all the case documents, copies of evidence,

20        evidence of received items that get turned in to the

21        prosecution -- I mean, get turned into the -- to the

22        ADA's office for discovery.

23   Q.   And do you yourself make any reports that are

24        included in that prosecution summary?

25   A.   Case reports.  Anything that goes in there --

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 68 of 93

 1       anything that relates to the case would go in this

 2       prosecution summary.

 3   Q.  Okay.  And in those investigation reports concerning

 4       Lee Harris, Sr., do you recall any information that

 5       you conveyed in the -- to the prosecutor regarding

 6       Lee Harris, Sr.?

 7   A.  I don't recall information regarding -- I'm sure

 8       there was information, but I don't recall it offhand,

 9       no.

10   Q.  Okay.  A few more questions.  Give me a second.

11               (Mr. Rubert-Schewel and Mr. Davis conferred.)

12   Q.  All right.  Last few questions.  I know you stated

13       earlier you guys talked about -- we looked at --

14       extensively in Exhibit QQ persons who were involved,

15       and earlier you stated that you would have contact

16       with witnesses, you would have contact with sometimes

17       confidential informants.  Do you ever know of a

18       confidential informant Oliver Hines?

19   A.  I do not know Oliver Hines.

20   Q.  Okay.  And lastly, for you yourself, when you are

21       discussing -- well, for you yourself during your time

22       at Southern Pines, have you ever had any -- well,

23       have you ever had any complaints made against you for

24       any -- for anything in your time at Southern Pines

25       Police Department?

1   A.   Not that I'm -- you -- now, you say complaints.

2        You're talking about general public complaints?

3   Q.   Or Internal Affairs complaints or demotions or

4        reports regarding your particular conduct at Southern

5        Pines.

6   A.   The only thing I've ever had is a -- I was

7        disciplinaried [verbatim] for utilizing a town

8        vehicle at one point in time when I was -- it was a

9        small IA, but it was nothing other than that, so.

10  Q.   You said utilize.  I'm sorry, I didn't -- I didn't

11       get that.

12  A.   Long story short is that I had a class.  Excuse me.

13       I had a class at the Justice Academy in Salemburg, I

14       do believe.  I was investigating -- it was a two-day

15       class, and part of that -- part of the policy states

16       if it's more than a two-day class you're supposed to

17       stay there.

18            However, I came back to work that night and

19       stayed till Friday at 9:00.  On the way home, I

20       violated policy by leaving and coming back to the --

21       my place of residence, when in fact I was supposed to

22       stay there.  The reason on how I got caught up is

23       because I got into an accident on the way back.

24       Because of this, I violated policy and I was --

25       that's the only complaint that I -- that I'm aware

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 70 of 93

 1          of.
 2     Q.   And if there were any other complaints, they would
 3          certainly make you aware of --
 4     A.   I would assume they would make me aware of a
 5          complaint, yes, sir.
 6     Q.   Okay.
 7     A.   But I'm not aware of any other.
 8     Q.   Last -- last piece of -- the last document.
 9               MR. DAVIS:  Glenn, I'm going to show Officer
10                    Perry [verbatim] what's been marked as our
11                    Exhibit BB, double B.  For the record, I'm
12                    showing Officer Perry [verbatim] and his
13                    counsel what's been marked as Plaintiff's
14                    Exhibit BB.
15                    Do you mind if I swing around?  It's
16                    on my computer.
17               MR. JONES:  Yeah.
18               MR. DAVIS:  We'll get you printed versions
19                    as well.
20               THE WITNESS:  Me or -- ?
21               MR. JONES:  You.
22               THE WITNESS:  I'm Lowery.  Officer Lowery.
23               MR. JONES:  You said Officer Perry.
24               THE WITNESS:  Yeah, I was --
25               MR. DAVIS:  I apologize.

 1              THE WITNESS:  -- I was about to get up when he
 2                  asked that.
 3    BY MR. DAVIS:
 4    Q.   Officer Lowery, my apologies.  Officer Lowery, I am
 5         showing you what's been marked as Plaintiff's BB.
 6    A.   Okay.
 7    Q.   Can you -- do you recognize this type of form?
 8    A.   Not right offhand.  I'm just -- I see it's a
 9         complaint/investigation.
10              (Plaintiff's Exhibit BB was identified.)
11    Q.   Are you --
12    A.   Yes, yes, this is a -- a — a really recent IA that
13         I had, correct.
14    Q.   So you -- so just for the record 'cause we've got to
15         make sure we're helping the reporter, do you
16         recognize this form?
17    A.   Yes, I do recognize this form.
18    Q.   And how do you recognize these type of forms?
19    A.   This is a -- an inves- -- internal investigation
20         where I had a -- a -- an IA done on me.
21    Q.   And when you say "an IA," what is an IA?
22    A.   IA is an internal investigation which something that
23         -- where I've done something wrong or either violated
24         a policy.  They would do an investigation and go from
25         there.

1    Q.   And in this document where it says complainant, the
2         person making the report, whose name is beside that?
3    A.   Robert Heaton.
4    Q.   And who is Robert Heaton?
5    A.   Robert Heaton is the patrol captain --
6    Q.   Okay.
7    A.   -- or -- yeah, the patrol captain.
8    Q.   Is he one of your supervisors or superior officers?
9    A.   He would be the supervisor above my supervisor.  Yes,
10        superior officer.
11   Q.   And -- okay.  Where it says "Summary of case,
12        investigating facts," there are some officers' names
13        who are redacted, so there --
14   A.   Yes.
15   Q.   -- must have been multiple people, but can you read
16        the first line where it says "after interviewing"?
17   A.   "After interviewing Sergeant Lowery, the MVR VWC
18        footage" --
19             COURT REPORTER:  I'm sorry.  I'm sorry.
20             MR. DAVIS:  You've got to talk slow.
21             COURT REPORTER:  Slow down just a little bit.
22             THE WITNESS:  I'm sorry.
23   A.   "After interviewing Sergeant Lowery and reviewing the
24        MVR and VWC footage, violations of the SPPD General
25        Order 418 and General Order 406 were discovered."

1              And continue?

2  Q.   And then read the first line.

3  A.   "Officer" --

4  Q.   The unredacted parts.

5  A.   Okay.

6              "Sergeant Lowery were not -- were not -- were

7              not wearing and using the MVR wireless

8              microphone as required by General Order 418."

9              Third?

10 Q.   The second line.

11 A.   All right.

12             "Sergeant Lowery failed to acknowledge and

13             establish command over the pursuits for an

14             external period of time.  Additionally,

15             Sergeant Lowery failed to terminate pursuit

16             after the fleeing vehicle being pursued for a

17             minor traffic violation created unnecessary

18             risk to the public and caused a traffic crash

19             outside of the Town of Southern Pines.  This

20             is in violation of General Order 406."

21 Q.   All right.  And then at the bottom it's signed by

22      who?

23 A.   Captain Marsh.

24 Q.   All right.  So you had Captain Marsh and Officer

25      Wheaton [verbatim], your both superiors, and this is

 1        an internal -- another internal investigate --
 2        investigative complaint against you, correct?
 3   A.   Yeah.  I -- this one just totally slipped my mind.
 4        It was fresh.  However, I just -- I wasn't putting
 5        two and two together.  When you said "complaints," I
 6        thought you meant outside complaint.  However, yes,
 7        this -- this did happen and real recently.
 8   Q.   Yeah.  So other than the issue that happened with
 9        Salemburg, you have had more than one type of
10        complaint against you.
11   A.   If I recall correctly, those are the only two
12        complaints that I've had internally.
13   Q.   Okay.  For now, that concludes my questions of
14        Officer Lowery.
15             MR. RUBERT-SCHEWEL:  Let's -- let's take a
16                 ten-minute break.
17             MR. DAVIS:  Yeah, ten-minute break.  Yeah.
18             (Recess from 10:55 to 11:09 a.m.)
19   BY MR. DAVIS:
20   Q.   Just a few more questions is what I mean by -- just a
21        few more quick subjects.  So earlier we talked about
22        the prosecution summary, correct?  Do you remember
23        that?
24   A.   Yes, sir.
25   Q.   And what exactly do you remember being involved in

1          the prosecution summary?

2     A.   It was anything case-related that had anything to do

3          with the case gets sent to the DA's Office for

4          discovery.

5     Q.   And in this particular case regarding Mr. Harris,

6          Sr., you recognize that there was both a state case

7          and a federal case?

8     A.   There was initially a state case, yes, and then later

9          a federal case.

10    Q.   Let's talk about the state case.  Did you testify to

11         the -- at the grand jury in the state case?

12    A.   I cannot remember if I testified for -- at the grand

13         jury in the state case.

14    Q.   Okay.  Did you remember testifying to any facts that

15         were used in the prosecution summary by Warren

16         McSweeney, then Warren McSweeney who was the ADA?

17    A.   I cannot remember whether I was part of any of that.

18         It's possible.  It would have been myself or Perry,

19         but I don't recall which one of us had done it.

20    Q.   So it is possible that either you or Perry did

21         testify.  You just don't remember right now.

22    A.   Yes, sir.

23    Q.   And regardless if you were the one that testified or

24         not, you provided some facts that were used in the

25         prosecution summary.

 1   A.   I provided documentation that was sent up through the
 2        prosecution summary.
 3   Q.   And the documentation that you provided, was -- was
 4        this -- was any of your testimony about Lee Harris,
 5        Sr., evidence that you had heard from Detective Perry
 6        or Lieutenant Marsh?
 7             MR. JONES:  When you say "testimony"?
 8   BY MR. DAVIS:
 9   Q.   Any of the facts used either in the grand jury -- in
10        the -- in the grand jury or the prosecution summary,
11        are these facts that you had learned from Perry and
12        Marsh?
13   A.   If I would have testified or if I did testify at the
14        state level, written reference Harris Senior, yes, it
15        would have been facts that was relayed to me by
16        Detective Perry at the time and Lieutenant Marsh at
17        that time.
18   Q.   Thank you.  Same questions when it comes down to the
19        federal grand jury.  Do you remember testifying in
20        the federal --
21   A.   I believe I did testify at the federal level.
22             MR. JONES:  Try and wait for him to finish.
23             THE WITNESS:  I'm sorry.
24   BY MR. DAVIS:
25   Q.   It's okay.  For the record, you -- you -- you did

Case 1:21-cv-00955-WO-JEP   Document 32-5   Filed 11/29/22   Page 77 of 93

1        testify to the federal grand jury.

2   A.   I -- if I remember correctly, I believe it was me.

3        I'm pretty sure.

4   Q.   And you had communications, therefore, with the

5        United States attorney --

6   A.   I did.

7   Q.   -- as well.

8   A.   I did, sir.

9   Q.   Did the United States attorney have something similar

10       to a prosecution summary for the grand jury in the

11       federal case?

12  A.   Yes, sir.

13  Q.   And what were some of the communications, reports, or

14       facts that were used in that prosecution summary?

15  A.   It would have been the same as the state level, same

16       -- same facts, same -- the same method of relaying

17       information to the state level would have been

18       relayed as well to the federal level.

19  Q.   And so just like you said on a state level, the facts

20       that you would have given and that you did, in fact,

21       testify to in the federal grand jury were the same

22       set of facts that you learned from Detective Perry

23       and Lieutenant Marsh, correct?

24  A.   Yes.

25  Q.   And lastly, since we are just finishing up talking

1       about the prosecution, we -- we previously looked at

2       Exhibit L, correct, which is the magistrate order?

3    A.   Yes, sir.

4    Q.   And you were the arresting officer?

5    A.   Yes, sir.

6    Q.   And you were the one, that with the help of Perry and

7       Marsh, gathered the facts to place in the magistrate

8       order, correct?

9    A.   Yes, sir.

10   Q.   And usually when you're preparing this, do you ever

11      have a conversation with the magistrate themselves as

12      they're preparing to enter the -- the order?

13   A.   Standing before them, yes.

14   Q.   And when you were standing before Magistrate Carol

15      Wright, did you ever tell her that the drugs that

16      were found in the Cadillac at 803 West Sycamore were

17      the same drugs that you saw Junior place items in at

18      any time during your surveillance?

19   A.   That information was never relayed to Carol Wright.

20           MR. JONES:  Object to the form, but go ahead.

21   A.   I never saw anything being placed into the Cadillac

22      by Harris Junior.  I observed him walking to that

23      direction.  I never observed him take, place, or

24      anything into the Cadillac.  At that time when I

25      would have been in the wood line, I'd have never

 1          observed what kind of vehicle that was.  There was an

 2          object over there.  Part of it appeared to be a car.

 3          However, I was not sure.

 4   BY MR. DAVIS:

 5   Q.    And this will be one of my last questions.  For --

 6          for your attorney.

 7   A.    Yes, sir.

 8   Q.    I understand that you're saying you did not

 9          specifically see drugs, and I appreciate the clarity.

10          But just for your testimony to Carol Wright, the

11          magistrate judge, did you tell her when you were

12          standing before Magistrate Wright that the items

13          that you saw Junior coming to and from the car that

14          you were doing surveillance on were also the same

15          drugs --

16                MR. RUBERT-SCHEWEL:  Nichad?  Nichad, no.

17                MR. DAVIS:  My apologies.

18                (Mr. Rubert-Schewel and Mr. Davis conferred.)

19   BY MR. DAVIS:

20   Q.    You can strike that last question.  I'll rephrase it.

21          My apologies.

22                You said you stood before Carol Wright, the

23          magistrate, correct?

24   A.    Yes, sir.

25   Q.    And when you're standing before Magistrate Judge

Case 1:21-cv-00955-WO-JEP  Document 32-5  Filed 11/29/22  Page 80 of 93

1       Wright, did you tell her that the car where you found
2       drugs at 803 West Sycamore was the same car where you
3       saw Junior retrieving or taking items to?
4   A.  So as I understand what you're asking me, you're
5       asking me that -- did I tell the magistrate at that
6       point that it was the same vehicle that I observed
7       several weeks prior, that you're saying that I stated
8       into a note or made notes about where Junior was
9       going?  No, I -- I would not tell the magistrate
10      that.
11  Q.  Okay.  Yeah.
12          MR. DAVIS:  Nothing further.  Thank you.
13
14                 EXAMINATION BY MR. JONES
15  Q.  Officer Lowery, on that same point, did you see Lee
16      Harris, Jr., take any items to any object or vehicle
17      or anything at 803 North Sycamore on January 31st,
18      2018?
19  A.  I did not.
20  Q.  Okay.  Did you see him remove any items from an
21      object or vehicle on January 31st, 2018?
22  A.  I did not.
23  Q.  As part of your investigation and the surveillance
24      that we've been talking about on January 31st, 2018,
25      did you make any notes or reports based on your

 1         investigation that day?

 2    A.   I did.

 3    Q.   Would you defer to what is contained in that report

 4         over your memory today?

 5    A.   I would defer to that.

 6    Q.   Okay.  You talked a little bit -- we talked about the

 7         magistrate order and -- and that -- that process.  As

 8         part of that process, you've talked about the -- the

 9         order itself was typed up, but when you were talking

10         to the magistrate, are you giving -- are -- are there

11         any other -- do you give the magistrate any other

12         information in that hearing?

13    A.   Yes.  Typically, you would give whatever -- whatever

14         information you had to establish PC during that

15         hearing.

16    Q.   Sure.  The magistrate order contained in Plaintiff's

17         Exhibit L is not a transcript from that hearing, is

18         it?

19    A.   No, sir, it's not.

20    Q.   Okay.  You talked some also about what your testimony

21         was in -- in that hearing.  When you are testifying

22         to the magistrate, and in this case when you

23         testified to Magistrate Wright, did you inform the

24         magistrate that your testimony was informed by

25         conversations that you had with other investigating

1       officers?

2    A.   Yes, sir.

3    Q.   Okay.  You didn't, for instance, testify to facts and

4         -- and say that they were your own personal knowledge

5         if you were not the person who -- who gained that

6         knowledge, correct?

7    A.   No, sir.  I did not testify to that.

8    Q.   You told her the foundation for all of those,

9         correct?

10   A.   Yes, sir.

11   Q.   Okay.  I'm going to show you -- we've also talked

12        about the vehicle itself.  I'm going to mark --

13              MR. JONES:  I don't have mine pre-marked, Abe,

14                  so I apologize.  I -- I will try and keep

15                  these similar for ease of use, but we're

16                  going to call this Defendants' Exhibit 1.

17                  And I will show this to you.  Here, I'll

18                  give you one copy and we'll give that to

19                  the court reporter.

20   BY MR. JONES:

21   Q.   Do you recognize what's being shown in Defendants'

22        Exhibit 1?

23              MR. JONES:  Here, I'll make a note on that

24                  just so that we know.

25   BY MR. JONES:

 1  Q.   Do you recognize what's shown in Defendants'

 2       Exhibit 1?

 3  A.   I do recognize this.

 4  Q.   And what is that?

 5  A.   That is a tarped vehicle at Mr. Harris, Sr.'s, house.

 6            (Defendants' Exhibit 1 was identified.)

 7  Q.   All right.  And do you know when that photograph was

 8       taken?

 9  A.   I would assume it was taken the day of the search

10       warrant.

11  Q.   Okay.  Is that -- when you were taking your

12       surveillance at 803 North Sycamore on January 31st,

13       2018, did you see what is depicted in Defendants'

14       Exhibit 1?

15  A.   From surveillance, I probably cannot see exactly what

16       this is.

17  Q.   Okay.  Is this the item in your report that has

18       stated that it is -- "He approaches a vehicle covered

19       with a blue tarp on it"?  Is that the vehicle

20       described in -- in your report from January 31st,

21       2018?

22  A.   What I described in my report, it was a blue-tarped

23       vehicle.  And it -- it could have been something

24       blue-tarped.  I mean, but it -- from the distance, it

25       appeared to be some type of vehicle.

1   Q.   Is it -- what's shown in Defendants' Exhibit 1, is

2        that what you are referring to in your report?

3   A.   That is not what I saw on that day.

4   Q.   Okay.  I'm going to show you what we'll mark as

5        Defendants' Exhibit 2.  And I will ask you the same

6        question.  Do you recognize what's depicted in

7        Defendants' Exhibit 2?

8   A.   There appears to be some fence and a storage shed and

9        a blue tarp off in the distance.

10               (Defendants' Exhibit 2 was identified.)

11  Q.   And do you know when that photograph was taken?

12  A.   I would also assume that was taken the day of the --

13       the search warrant.

14  Q.   Okay.  And do you know who -- who took that

15       photograph?

16  A.   Most likely, Tori Price.

17  Q.   Okay.  And who -- who is Tori Price?

18  A.   Tori Price was, at the time, the CS- -- the CST, the

19       crime scene tech.

20  Q.   Okay.  And what is depicted in Defendants' Exhibit 2?

21  A.   A blue tarp laying in the wood line.

22  Q.   Okay.  Is that tarp the type of tarp that you

23       describe in your January 31st, 2018, report?

24  A.   Yes, sir.  That is the blue tarp, and that would have

25       been the color that I would have saw --

1   Q.   Sure.

2   A.   -- in the distance.

3   Q.   And we -- we -- no way to know if that is the exact

4        tarp, correct?

5   A.   Correct.  I can't say whether that's the exact tarp

6        or not.

7   Q.   Sure.  But the tarp that you identified in your

8        report on January 31st, is it that type of tarp or is

9        it a different kind?

10  A.   It was a tarp, a tarp being that type of tarp.  Not a

11       car cover, but a tarp that you normally use to cover

12       any type of item.

13  Q.   Sure.  Is it possible that that is the same tarp?

14  A.   It could be.  It's very -- it's very much the same

15       color of what I'm -- I'm describing.

16  Q.   Okay.  In Defendants' Exhibit 1, would you classify

17       that as a blue tarp?

18  A.   I would not.

19  Q.   Okay.

20  A.   I would classify it as a white or gray tarp or a gray

21       car cover.

22  Q.   Okay.  You talked also -- again, going back to the

23       magistrate order and the -- the procedure you had

24       before the magistrate in the case, and Mr. Davis was

25       asking you questions about how common it is for you

1      -- for an officer to go there who wasn't involved in

2      the -- the actual arrest.

3              Can you explain a little bit what you were

4      talking about, about how -- when that occurs in

5      investigations versus when it does not occur?

6  A.  Commonly, an officer would go testify to the facts

7      himself.  However, in investigations or in a division

8      of investigations, especially in a grand scale of

9      this particular investigation and what occurred that

10     day, well, it took a lot of manpower, so it would be

11     not uncommon for us to utilize one person to go swear

12     out to all the warrant -- magistrate warrants.

13  Q. This was a practice that -- strike that.

14              MR. JONES:  That -- that's all the questions

15          I've got.

16              MR. RUBERT-SCHEWEL:  Just -- can you give us

17          just two minutes?

18              MR. JONES:  Sure.

19          (Recess from 11:23 a.m. to 11:25 a.m.)

20

21          <u>FURTHER EXAMINATION BY MR. DAVIS</u>

22  Q. Officer Lowery, just a few more clarifying questions.

23     You just stated to your attorney that you do make

24     reports when you're doing surveillance, correct?

25  A.  Not necessarily reports.  Just notes that would be

 1         supplemented and would go into the prosecution
 2         summary.
 3    Q.   And the prosecution summary relied on these notes
 4         'cause they were what you saw at that time, correct?
 5    A.   I would assume the prosecution would rely on those
 6         notes given to the DA's Office, correct.
 7    Q.   All right.  I'm just going to read one portion of the
 8         notes that your attorney just referred to from
 9         1/31/2018, which is the same exhibit we produced,
10         Exhibit P.  All right.  And I'm going to read the
11         third paragraph concerning Lee Harris, Jr., out loud.
12         Is that okay?
13    A.   Yes, sir.
14              (Plaintiff's Exhibit P was identified.)
15    Q.   All right.
16              "At or around 1509 hours, Lee Marvin Harris,
17              Jr., arrives in a white in color Toyota Venza
18              at the house stated above; Calvin Fox was also
19              in this same vehicle as in front of the
20              passenger.  Lee Junior, wearing a black jacket
21              with a hood that was pulled over his head,
22              gets out of his car and goes to the right side
23              of the home, near a silver in color enclosed
24              trailer.  He then approaches a vehicle covered
25              with a blue tarp on it.  He is over at this

 1                     vehicle approximately two to three minutes.

 2                     Lee Junior then goes inside the home using the

 3                     front door, for one to two minutes, comes back

 4                     out of the house and gets back in the Venza."

 5                     Is that correct?

 6   A.    Yes, sir.

 7   Q.    And what you saw on that day on 1/31/18 is also what

 8         you reported in the prosecution summary, correct?

 9   A.    Yes, sir.

10   Q.    All right.  And then, likewise, you also -- I'm

11         pointing you to your notes from 1/25/18.

12                 MR. DAVIS:  If we haven't already produced

13                     that to you, this is Plaintiff's

14                     Exhibit MM.

15                 MR. JONES:  I don't believe we -- we've gotten

16                     a copy of it.

17                 MR. RUBERT-SCHEWEL:  Yeah.

18                 MR. DAVIS:  Yeah.

19                 MR. JONES:  Maybe we have it.  I just --

20                 MR. DAVIS:  I'll give you a copy.  This is --

21                     for the record, this is Plaintiff's

22                     Exhibit MM.  One for you, one for you.

23   BY MR. DAVIS:

24   Q.    And I won't read these in its entirety because it's

25         the same surveillance, but I just want to ask a

1      question.  If -- were these the same notes that you

2      relied on in your report that ended up in the

3      prosecution summary?

4  A.  These notes would have been added to the prosecution

5      summary as a report.  I'm -- I'm not -- I'm not

6      following the question.  This is -- this is what

7      would have been added to the --

8  Q.  These are what you relied on.

9  A.  As surveillance notes, yes, sir.

10         (Plaintiff's exhibit MM was identified.)

11 Q.  Thank you.

12         MR. DAVIS:  Nothing further.

13         MR. JONES:  That's it.

14         (The taking of the foregoing deposition was

15         concluded at 11:28 a.m. on September 22, 2022.

16         Signature was reserved.)

17

18                    *  *  *  *  *

19

20

21

22

23

24

25

## WITNESS CERTIFICATE

       I have read the foregoing pages, 1 through 90, inclusive, and find that they contain a correct transcription of the answers made by me to the questions therein recorded, with the exception of _____ corrections as listed on a separate sheet of paper and incorporated into this record.

       Signed this _____ day of _____ 2022.

                               _____

                               WALTER SEAN LOWERY

Sworn and subscribed before
me this the _____ day of
_____ 2022.


_____
Notary Public

My Commission Expires:  _____.

**ERRATA SHEET**

Please indicate any corrections to your deposition on this sheet of paper, giving the page number, line number, change and reason for the change, and return this form and the signature page to: **Reed & Associates, 2401 Whirlaway Court, Matthews, NC 28105, or email to Vreed@carolina.rr.com**

The reasons for making changes:

(1) To clarify the record;
(2) To conform to the facts; or
(3) To correct major transcription errors.

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

**Page no. _____ Line no. _____ Reason:** _____

Change _____ to _____

REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575

STATE OF NORTH CAROLINA

COUNTY OF WAKE


C E R T I F I C A T E


      I, WANDA B. CONSTANTINO, CVR-CM-M, Notary Public, do hereby certify that WALTER SEAN LOWERY was duly sworn prior to the taking of the foregoing deposition, that said deposition was taken and transcribed personally by me, and the foregoing pages constitute a true and accurate transcript of the testimony of said witness.

      I do further certify that the parties were present as stated in the caption.

      I do further certify that I am not of counsel for or in the employment of either of the parties to this action, nor am I interested in the results of said action.

      I have hereunto subscribed my name this the 25th day of October, 2022.


_____
WANDA B. CONSTANTINO, CVR-CM-M
Notary Number:  19971130022


REED & ASSOCIATES
MATTHEWS, NORTH CAROLINA  980.339.3575