1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3  UNITED STATES OF AMERICA,        Criminal Action
                                    No.  1:18CR249-5
4        Plaintiff,

5  vs.                              Greensboro, North Carolina
                                    August 14, 2018
6  LEE MARVIN HARRIS, SR.,

7        Defendant.

8  _____/

9

10      **PROCEEDINGS TRANSCRIBED FROM AN AUDIO RECORDING**

11           **TESTIMONY OF DET. JASON PERRY**
     **PARTIAL TRANSCRIPT OF ARRAIGNMENT AND DETENTION PROCEEDINGS**
12                  BEFORE THE HONORABLE
               UNITED STATES MAGISTRATE JUDGE
13  APPEARANCES:

14  For the Government:  ANAD RAMASWAMY, AUSA
                        Office of the U.S. Attorney
15                      101 S. Edgeworth Street
                        Fourth Floor
16                      Greensboro, North Carolina 27402

17

18  For the Defendant:  JAMIE VAVONESE, ESQ.
                        POB 1656
                        Raleigh, North Carolina 27602
19

20

21  Court Reporter:     J. Allen, RPR
                        Room 122, U.S. Courthouse Building
22                      324 West Market Street
                        Greensboro, North Carolina 27401
23                      (336) 332-6033

24

25         Proceedings reported by stenotype reporter.
        Transcript produced by computer-aided transcription.

# I N D E X

| GOVERNMENT WITNESS: | DIRECT | CROSS |
|---|---|---|
| Det. Jason Perry | 4 | 17 |

Case 1:21-cv-00955-WO-JEP   Document 32-11   Filed 11/29/22   Page 2 of 23

## P R O C E E D I N G S

1

2    (THE FOLLOWING PROCEEDINGS WERE TAKEN FROM AN AUDIO

3   RECORDING AND TRANSCRIBED TO THE BEST OF MY ABILITY.)

4            **THE COURT:**  You may call the case.

5            **MR. RAMASWAMY:**  Yes, Your Honor.  The government

6   calls for detention hearing and arraignment, United States

7   versus Lee Marvin Harris, Sr., 1:18CR249-5, represented by

8   Jamie Vavonese.

9            **THE COURT:**  Let me just have one moment.

10           All right.  You may proceed.

11           **MR. RAMASWAMY:**  Do you wish me to recall the matter

12   for the record?

13           United States versus Lee Marvin Harris, Sr.,

14   1:18CR249-5, represented by Jamie Vavonese, here for detention

15   hearing and arraignment.

16           **THE COURT:**  Good afternoon.  Who is counsel involved

17   here?

18           **MS. VAVONESE:**  Jamie Vavonese, Your Honor.

19           **THE COURT:**  I don't think we've met before.  We may

20   have.

21           **MS. VAVONESE:**  We have, Your Honor.

22           **THE COURT:**  Well, there used to be a time I would

23   remember, but I don't.

24           **MS. VAVONESE:**  It's absolutely okay.

25           **THE COURT:**  Good afternoon, Mr. Harris.

1         Counsel, have you had the opportunity to review the

2 indictment with your client?

3         **MS. VAVONESE:** Yes, Your Honor.

4         **THE COURT:** How does he plead?

5         **MS. VAVONESE:** He pleads not get.

6         **THE COURT:** Are you ready to proceed with the

7 detention hearing?

8         **MS. VAVONESE:** Yes, Your Honor.

9         **MR. RAMASWAMY:** Your Honor, before I begin, I want to

10 inform the Court that part of the evidence involved are

11 segments of jail phone calls. I have a device that I've had --

12 of course I can play them for the court. I have a transcript

13 of those segments and have previously provided them to counsel,

14 and of course would ask the Court's permission, at the

15 appropriate time.

16         The government would call Jason Perry.

17         **(DET. JASON PERRY, GOVERNMENT WITNESS, WAS SWORN.)**

18         **DIRECT EXAMINATION**

19 **BY MR. RAMASWAMY:**

20 **Q.** Would you state your name and occupation for the Court,

21 please.

22 **A.** Jason Perry, detective with the Southern Pines Police

23 Department.

24 **Q.** Did you investigate the matter involving this defendant

25 and the other defendants charged in the superseding indictment

1 that was under the file number I just mentioned?

2 **A.** I did.

3 **Q.** And as to that case in general, would you tell the Court

4 how it was that it came to your attention.

5 **A.** Okay. The case was initiated in February of 2017, into

6 the narcotics distribution of Lee Marvin Harris, Jr., in the

7 Southern Pines area, surrounding areas. Through the

8 investigation, two vehicles were identified as being the

9 primary vehicles used for transportation. Trackers were

10 applied for and granted and they were placed on the vehicles.

11 Through surveillance, we were able to identify a

12 Hispanic male that would meet with Lee Marvin Harris, Jr., on a

13 regular basis in the Asheboro area.

14 Numerous locations were identified in Southern Pines,

15 Aberdeen, Charlotte.

16 On February 20th, there was -- search warrants were

17 applied for. As Lee Marvin Harris, Jr., was leaving with the

18 Hispanic male, those search warrants were granted, and upon

19 return back to Southern Pines, the search warrants were

20 executed.

21 One of the locations included Lee Marvin Harris,

22 Sr.'s residence, 803 North Sycamore Street in Aberdeen. During

23 the execution of that search warrant, there was a vehicle

24 located outside, where 88 grams of cocaine and 13 grams of

25 crack cocaine was located, along with packaging that was

consistent with kilo packaging that was found at the Hispanic

male's residence in Davie County.

Also there was a firearm located at the residence.

**Q.**   Was there just one firearm or more than one firearm?

**A.**   There was more than one.

**Q.**   Describe the firearms and where they were found in the

Sycamore Street residence, please.

**A.**   There was one firearm located under the bed in the master

bedroom, under the mattress.  There were some others that were

located in a closet in the master bedroom, and there was one

firearm located in the back-left bedroom in the closet.

**Q.**   As to those locations in the bedrooms, did you determine

whose bedrooms those guns were found in?

**A.**   Did I determine whose bedroom they belonged to?

**Q.**   Yes.

**A.**   Yes.

**Q.**   Would you tell the Court as to each gun -- and what type

of gun it was -- let's start with the one that was found on the

top shelf in the closet.

**A.**   Okay.  That was a 40 caliber Springfield, I believe.  The

bedroom itself had items in the bedroom that led me to believe

it was used by Lee Marvin Harris Jr., the bedroom itself.

The other firearms were in the master bedroom.  Lee

Marvin, Sr., informed me of those firearms prior to us finding

them, I believe.

**Q.** So this defendant pointed them out. Is that correct?

**A.** The ones in the master bedroom, he notified me of the one under the mattress and other long guns that were in the closet.

**Q.** Whose bedroom was that determined to be, the master bedroom?

**A.** His and his wife's.

**Q.** Lee Harris, Sr.?

**A.** Yes.

**Q.** If you would continue.

**A.** So as I said, there were multiple search warrants executed on February 20th of this year. Another address was 1090 West Indiana Avenue in Southern Pines. That yielded over 500 grams of cocaine. That's where Lee Marvin Harris, Jr., was located.

There was another search warrant executed in a storage building where there were 2-ounces of cocaine. That's in Aberdeen.

The Hispanic male was identified, and his residence was searched and did yield 14 kilograms of cocaine and a large quantity of U.S. currency.

**Q.** When you say, "large quantity," can you give an approximate amount?

**A.** I believe it was around 70 to 80,000.

**Q.** Can you tell -- just tell again, in terms of the conspiracy that -- the largest amount of cocaine and that amount of cash, how is that related to the other defendants?

**A.**    Repeat that again.

**Q.**    In terms of the conspiracy, the interaction between the persons charged in the indictment, how is that -- how is it that that amount of cocaine and cash is related to the others?

**A.**    So on February 20th, through surveillance, we were able to watch Lee Harris Jr., meet the Hispanic male at the Lowes Hardware parking lot in Asheboro.  A transaction was observed through surveillance, and the Winston Salem PD was able to pick up surveillance on the Hispanic male as he returned back into their area.  He was stopped.

He cooperated and he gave a statement that he had been dealing with Lee Marvin Harris, Jr., for five to six months and had supplied him with an estimated 12 to 15 kilos of cocaine in that period of time.

**Q.**    Did you mention the name of any drug trafficking groups in the area?

**A.**    In the Southern Pines area?

**Q.**    Yes.

**A.**    So Lee Marvin Harris, Jr., is known to be a member, if not lead up the group called the DBC.  That's what they refer to themselves as.

**Q.**    Do you know what that stands for?

**A.**    The Dead Boy Crew.

**Q.**    I believe you ended with the execution of the search warrant were the largest amounts of cocaine and cash, correct?

**A.**   Yes.

**Q.**   Is there anything else that you found in your investigation after the execution of the search warrants?

**A.**   When the --

**Q.**   In one of the counts of the indictment there was an amount of cocaine that was attributed to this defendant, Lee Harris Sr.  Can you describe that for the Court?

**A.**   The vehicle that was on Mr. Lee Harris, Sr.'s property, I believe that was an older Cadillac registered to Lee Harris, Sr.  If I'm facing the property, it was on the right side of the house.  It was covered with a car cover.  Inside the backseat area, the armrest folded down, behind that was where the 88 grams of cocaine and 13 grams of crack cocaine was located.  The keys to the vehicle was located in Mr. Lee Harris, Sr.'s bedroom.

**Q.**   Did you ever find any other keys to that vehicle?

**A.**   No.

**Q.**   Was Mr. Harris, Sr. ever asked about that cocaine?

**A.**   I believe I asked him about the vehicle and I believe he said it was registered to him, but as far as the cocaine itself, he didn't know anything about drugs being on the property.

**Q.**   You mentioned that it was under a cover.  Was that vehicle operable?

**A.**   I do not believe so.

**Q.** You mentioned it was on the right side as you approach. Was it in a driveway or how was it parked in relation to the residence?

**A.** It was parked on the right side of the residence. Appeared to have been there for some time.

**Q.** Is there anything about the packaging of the drugs in that car consistent with the packaging of other drugs found in this investigation?

**A.** The cocaine and the crack cocaine that was located in clear plastic bags, in the same area the packaging for kilogram level cocaine was located, which was the exact same packaging located at the Hispanic male's residence in Davie County.

**Q.** So in this instance, there was 88 grams of powder in the car, correct?

**A.** Correct.

**Q.** And an additional amount of crack cocaine?

**A.** Right.

**Q.** Is it your testimony that there was empty packaging for what appeared to be a kilo amount?

**A.** That's correct.

**Q.** And that was consistent with what was later found in the storage unit?

**A.** Not the storage unit, at the Hispanic's males residence in Davie County.

**Q.** So you've already mentioned meeting in Asheboro, this

1  activity in Southern Pines, and another conspirator living in

2  Davie County, correct?

3  **A.**    Correct.

4  **Q.**    To your knowledge, are those the only three counties

5  involved, or does this conspiracy reach other places?

6  **A.**    Moore, Davie County, and a search warrant was executed in

7  Charlotte at his girlfriend's residence, Lee Harris, Jr.'s

8  girlfriend's residence, his partial residence.

9  **Q.**    Were there state arrests prior to this federal indictment,

10  superseding indictment?

11  **A.**    There was.

12          If I might go back to your last question.  There was

13  also a search warrant executed in Lee County after ours was in

14  Moore County.

15          I can go into further detail if you like.

16  **Q.**    If you would, please, on the Lee County search warrant.

17  **A.**    Right.  On February 20th, after leaving the Hispanic male

18  in Asheboro, Lee Harris, Jr., traveled to Timber Ridge Drive in

19  Sanford.  That address had been identified to belong to Calvin

20  Fox and his mother.  It was a normal routine for Lee Harris,

21  Jr., to go to that residence after leaving the Hispanic male in

22  Asheboro, and that's what happened on February 20th.

23          So after our search warrants were executed in

24  Southern Pines, we notified Lee County and they executed search

25  warrants at that residence.  It revealed 6-ounces of cocaine,

1  and Calvin Fox's mother was there.

2  **Q.**   In relation to the conspiracy, did any of the drug

3  trafficking or drug sales occur at this defendant's residence?

4  **A.**   Not to my knowledge.

5  **Q.**   Was the co-defendant, his son, involved -- was that his

6  residence also, the Sycamore Street?

7  **A.**   He grew up a lot of his life -- his young childhood, he

8  grew up there.

9  **Q.**   During the course of this investigation, did any of the

10  activity, not necessarily sale of drugs, involve any of the

11  co-defendants, not this defendant, but co-defendants coming or

12  going from that residence where this defendant lives to carry

13  out drug activity?

14  **A.**   Yes.   The co-defendants -- at least one co-defendant was

15  back and forth.

16  **Q.**   That being the defendant's son?

17  **A.**   Right.

18  **Q.**   I want to ask you about these jail calls.   Is there a time

19  in which Mr. Harris, Sr., was incarcerated in the Moore County

20  Jail?

21  **A.**   Yes.

22  **Q.**   Do you know when that period was?

23  **A.**   February 20th until July 10th.

24  **Q.**   Did he remain in that jail, to your knowledge?

25  **A.**   During that period of time he was.

1  **Q.**   After that, do you know what happened to him?  Was he

2  under the state conditions or --

3  **A.**   He was released on $25,000 secured bond.

4  **Q.**   That is after July 10th?

5  **A.**   Yes.

6  **Q.**   Do you know if he was under any conditions in relation to

7  witnesses or co-defendants between February and July 10th of

8  this year?

9  **A.**   Conditions were required to submit to electronic house

10  arrest and also to have no contact with co-defendants, if he

11  made bond.

12  **Q.**   Were you able to listen to some of the jail recordings

13  that involved Lee Harris, Sr., in the Moore County Jail?

14  **A.**   Yes.

15           **MR. RAMASWAMY:**  May I approach?

16           **THE COURT:**  You may.

17           **MR. RAMASWAMY:**  I would like to introduce this first

18  recording, and I have a copy for the Court.

19  **BY MR. RAMASWAMY:**

20  **Q.**   For the record, I would like to ask you to take a look at

21  Government's Exhibit 1.  That's a four page exhibit.  If you

22  would just take a look through it and tell me if you've seen

23  that before.

24  **A.**   Yes.

25  **Q.**   How can you identify it?

**A.**    This is paperwork that I initiated.  I typed this.

**Q.**    You created that yourself?

**A.**    Yes.

**Q.**    Is there any difference between what you created and Government's Exhibit 1?

**A.**    The only difference I see is the sticker at the top, Government's Exhibit 1, and the numbering at the bottom. That's the only difference.

**Q.**    What did you make Government's Exhibit 1 from?

**A.**    Recordings of the jail phone calls.

**Q.**    And did -- is it your verbatim transcript based on the time marks at the beginning and what you heard on those calls?

**A.**    Correct.

**Q.**    Was any one else with you?

**A.**    I have a partner that has listened to the jail phone calls also, but the transcripts themselves, no.

**MR. RAMASWAMY:**  Your Honor, I would like to introduce Government's Exhibit 1 at this time.

**THE COURT:**  Any objection?

**MS. VAVONESE:**  No objection, Your Honor.

**THE COURT:**  It is admitted.

**MR. RAMASWAMY:**  If I could, Your Honor, I would like to play this call.  It will take me just a moment to play the call so we can follow along.  Just a moment to activate this, please.

1          Your Honor, the files I have may not have the dates,

2     but I would have to advance them as we go, if I could ask the

3     Court's indulgence while we play the relevant portions,

4     according to which page of the exhibit we are on.

5          (Audio recording was played.)

6          **MR. RAMASWAMY:**  I need to advance this to the next

7     point, six minutes and 30 seconds point.

8          (Audio recording was played.)

9          **MR. RAMASWAMY:**  Your Honor, that's the extent of what

10    we consider relevant.  There are other nonrelevant portions of

11    the calls, if counsel wishes to play them in their entirety.

12          Just a couple more questions for the witness.

13    **BY MR. RAMASWAMY:**

14    **Q.**    When you -- in your review of these calls, did you hear

15    discussion using language of what appears to make reference to

16    the firearm.

17    **A.**    Yes.

18    **Q.**    And in what way is it referenced?

19    **A.**    The last phone call referred to it as a 40.

20    **Q.**    Was that the caliber of the firearm found in the bedroom

21    that you believe was Lee Harris, Jr.'s?

22    **A.**    Yes.

23    **Q.**    And he is a convicted felon, right?

24    **A.**    Yes.

25    **Q.**    So his possession of that would be unlawful?

**A.** Correct.

**Q.** Mr. Harris, Sr., is not a felon, is he?

**A.** That's correct.

**Q.** What other terms have you heard on there that refer to the firearm?

**A.** Referred to as him doing the bedroom, me doing the bedroom, him doing the old school. I interpret that as him doing -- the old school is the old school car sitting outside. Me doing the bedroom, I'm going to take the guns in the back room.

**Q.** And is there also reference to -- I'm sorry, go back a little bit. There is a woman's voice heard on it. Have you previously heard the defendant's wife speak?

**A.** Yes.

**Q.** Can you identify that as her voice? In the context of the calls, is that the defendant's wife speaking?

**A.** Yes, it is.

**Q.** And there is mention on the June 29th recording, her stating, the G, you don't want that G on you.

**A.** That's correct.

**Q.** Do you believe that is a reference also to the gun?

**A.** Yes, I do.

**Q.** And the final conversation we just heard in reference to constructive and actual, do you know what that is in reference to?

**A.** Whether the item was in his actual possession or whether constructive possession would be able to be proved.

      **MR. RAMASWAMY:** I have no other questions of the witness.

      **THE COURT:** Cross-examination.

      **MS. VAVONESE:** Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MS. VAVONESE:**

**Q.** You indicated that you conducted surveillance. How did you do that? How is that done?

**A.** Anything from -- we did wood surveillance for a period of time. Wood surveillance led to pole camera surveillance. That led to tracker surveillance. Many different ways.

**Q.** Who were the folks running these surveillance operations?

**A.** I was part of most of all of them.

**Q.** Were there other agencies that were helping you out?

**A.** There was -- the National Guard was assisting with wood surveillance.

**Q.** And how did that -- I'm sorry, I'm not familiar with wood surveillance. Can you talk me through that a little bit?

**A.** What part? What do you want to know?

**Q.** What exactly happens with wood surveillance?

**A.** So they are dropped out into the woods, and basically they take video and photo evidence.

**Q.** Okay. And where did that happen?

**A.**   Near the property of 811 West New York Avenue, Southern
Pines.

**Q.**   So not Mr. Harris, Sr.'s residence?

**A.**   I'm not sure if the National Guard assisted with
surveillance at Harris, Sr.'s residence, but I do know that
wood surveillance was conducted on his residence.

**Q.**   Okay.  Speaking specifically to Mr. Harris, Sr., what
other of these methods of surveillance were used on his
residence?

**A.**   On his residence, wood surveillance, and the vehicles that
were being used by his son had the trackers and they were also
at his residence.

**Q.**   Could you tell me what vehicles those were?

**A.**   A Toyota Venza and a Dodge Charger.

**Q.**   And those were Mr. Harris, Jr.'s cars.  Is that correct?

**A.**   Not registered to him, but he was driving.

**Q.**   But none of those were registered to Mr. Harris, Sr.  Is
that correct?

**A.**   That's correct.

**Q.**   Okay.  And in any of your surveillance conducted by you or
any one else, did you ever see Mr. Harris, Sr., with the
Hispanic male that you described?

**A.**   No.

**Q.**   Okay.  Can you -- can you tell me what information was
proffered in an effort to get the search warrant for

1  Mr. Harris, Sr.'s residence?

2  **A.**   On at least one occasion, Harris, Jr., would -- he left

3  Harris, Sr.'s residence and would go directly to the address of

4  811 West New York Avenue.  Once at that location, different

5  spots were pre-identified by Lee Harris, Jr., and I call it

6  drops.  He made drops of what appeared -- it appeared that he

7  was making narcotics drops beyond the residence, and then at a

8  later time, the folks that he was supplying would show up and

9  pick the item up.  So that was being done directly -- he was

10 traveling directly from Lee Harris Sr.'s residence and he was

11 traveling directly to the distribution spot on West New York

12 Avenue.

13 **Q.**   Okay.  This is clear, but Mr. Harris, Sr., is the father

14 of Mr. Harris Jr., correct?

15 **A.**   Correct.

16 **Q.**   And I think you indicated earlier, that Mr. Harris, Jr.

17 grew up in Mr. Harris, Sr.'s current or former residence.

18 **A.**   To my knowledge, yes.

19 **Q.**   Okay.  And you indicated that the vehicle that you said

20 was to the side of Mr. Harris, Sr.'s residence looked like it

21 was not in use.  Is that correct?

22 **A.**   Yes.

23 **Q.**   Okay.  And in regards to the firearms in Mr. Harris, Sr.'s

24 home, you indicated that there was one in the back-left bedroom

25 closet.  What other items were in that room?

**A.** There was a drivers license belonging to Marvin Harris,

Jr. There was also a tapestry on the wall that depicted

photographs of Lee Marvin Harris, Jr., and other members of the

DBC group.

**Q.** Okay. You said that you found a firearm in the closest.

Were Mrs. Harris's clothes in that closet as well?

**A.** I'm not sure.

**Q.** Okay. Did you search that closet?

**A.** I did not.

**Q.** Okay. And the drivers license of Mr. Harris, Jr., was

that an active license or an expired license?

**A.** I believe it was active, but without looking at

photographs of that, I'm not sure.

**Q.** Okay. Whose residence was 1090 West Indiana?

**A.** It was a gentleman named Christian Jovan Terry and

Marcelle Lee (ph). They were living there. It was used,

basically from my understanding, as a distribution point of

narcotics.

**Q.** Okay. And Mr. Senior -- Mr. Harris, Sr., was not there to

your knowledge.

**A.** No.

**Q.** Okay. And the storage facility, was Mr. Harris, Sr., ever

there, to your knowledge?

**A.** No.

**Q.** How about the Hispanic male's residence, was Mr. Harris,

1 Sr., ever there?

2 **A.**    Not to my knowledge.

3 **Q.**    Okay.  And you indicated that you believe that Mr. Harris

4 Jr., is either -- I think you said a member or leader of the

5 DBC.  Is Mr. Harris, Sr., to your knowledge, involved with the

6 DBC?

7 **A.**    No.

8 **Q.**    There were no drugs found at Mr. Harris, Sr.'s residence,

9 is that correct -- inside?

10 **A.**    Correct.

11 **Q.**    Okay.  And you indicated that Mr. Harris, Sr., was in the

12 Moore County Jail from February 20th to July 10th, and then he

13 was released on conditions.  Is that correct?

14 **A.**    Yes.

15 **Q.**    Okay.  To your knowledge, did he have any issues from

16 July 10th as it relates to his electronic house arrest or

17 anything else?

18 **A.**    Nothing that has been brought up so far.

19 **Q.**    Okay.  Based on these telephone recordings that you

20 transcribed, it is just your assumption that when Mr. Harris,

21 Sr., refers to the bedroom and the old school, that that's the

22 gun in the old school car, correct?

23 **A.**    You could say that.

24 **Q.**    Okay.

25          **MS. VAVONESE:**  Nothing further, Your Honor.

1           **THE COURT:**  Redirect.

2           **MR. RAMASWAMY:**  No, Your Honor.

3           Your Honor, we would proffer the contents of the

4    pretrial services report and that would be the evidence for the

5    government.

6           (Proceedings continued but were not transcribed.)

1                    C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4     Reporter for the Middle District of North Carolina, DO HEREBY

5     CERTIFY:

6

7          That the foregoing is a true and correct transcript of

8     the proceedings had in the above-entitled matter.

9

10

11

12    Date:   12-8-21

13                              J. Allen, RPR
                                United States Court Reporter
14                              324 W. Market Street
                                Greensboro, NC  27401
15

16

17

18

19

20

21

22

23

24

25