```
 1                    IN THE UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  UNITED STATES OF AMERICA        ) Greensboro, North Carolina
                                    ) March 26, 2019
 4      vs.                         ) 2:30 p.m.
                                    )
 5  LEE MARVIN HARRIS, JR.,         )
                                    ) Case No. 1:18CR249-2
 6      Defendant.                  )
    _____)
 7

 8                        TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE WILLIAM L. OSTEEN, JR.
 9                    UNITED STATES DISTRICT JUDGE

10  APPEARANCES:

11
    For the Government:  RANDALL GALYON
12                       OFFICE OF THE U.S. ATTORNEY
                         251 N. MAIN STREET, SUITE 726
13                       WINSTON-SALEM, NORTH CAROLINA 27101

14  For the Defendant:   PETER D. ZELLMER
                         PETER D. ZELLMER, PLLC
15                       421 N. EDGEWORTH ST.
                         GREENSBORO, NC 27401
16

17

18

19

20

21

22  Court Reporter:      Joseph B. Armstrong, FCRR
                         324 W. Market, Room 101
23                       Greensboro, NC  27401

24          Proceedings reported by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

Sentencing - March 26, 2019

1          P R O C E E D I N G S

2              (At 2:30 p.m., proceedings commence.)

3              (Defendant present.)

4          THE COURT:  All right.  Mr. Galyon, good afternoon.

5          MR. GALYON:  Good afternoon, Your Honor.

6          THE COURT:  You may proceed.

7          MR. GALYON:  The next matter is going to be United

8    States of America versus Lee Marvin Harris, Jr.  It's

9    1:18CR249-2.  He's represented by Peter Zellmer.  The matter is

10   on for imposition of sentence.

11         MR. ZELLMER:  Good afternoon, Your Honor.

12         THE COURT:  Mr. Zellmer, good afternoon.  Are you and

13   Mr. Harris ready to proceed?

14         MR. ZELLMER:  We are, Your Honor.

15         THE COURT:  And have you received a copy of the

16   presentence report and reviewed it with him?

17         MR. ZELLMER:  I have, Your Honor.

18         THE COURT:  Are there any objections remaining for

19   resolution?

20         MR. ZELLMER:  Yes, Your Honor, there are to the

21   presentence report.

22         THE COURT:  All right.  And if you would state those

23   objections just succinctly -- well, I'll state them for you.

24   An objection to the total drug quantity used in the presentence

25   report.  There's an objection to the two-level adjustment for

Sentencing - March 26, 2019

1  possession of a firearm during the commission of the offense.

2  I would say there is a factual objection to the reliability of

3  the statements included in the presentence report by -- what's

4  the -- Gomez?

5          MR. ZELLMER:  Cervantes-Gomez, Your Honor.

6          THE COURT:  Cervantes-Gomez, and then an objection to

7  the characterization of Mr. Harris' involvement in a security

8  threat group.

9          MR. ZELLMER:  Correct, Your Honor.

10          THE COURT:  Those are the objections?

11          MR. ZELLMER:  I think that's a very succinct

12  rendition, yes, sir.

13          THE COURT:  All right.  Mr. Harris, have you reviewed

14  the presentence report with Mr. Zellmer?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  And other than the four matters objected

17  to that I just described, do you agree with the report?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  All right.  You may have a seat.

20          Will there be any additional evidence, Mr. Galyon?

21          MR. GALYON:  No, Your Honor.  And if Mr. Zellmer and

22  I may approach?

23          THE COURT:  You may.

24          (Bench conference as follows:)

25          MR. GALYON:  So as far as the drug amount is

Sentencing - March 26, 2019

1  concerned, I --

2          THE COURT:  You want to stipulate?

3          MR. GALYON:  Right.  I just want to make sure --

4          THE COURT:  I think it's a reasonable stipulation.

5  We're going to talk about Gomez' reliability in some respects,

6  but I'll accept the stipulation.

7          MR. GALYON:  Okay.  And then as far as the gun is

8  concerned, I had -- I need to make a correction, because in

9  the -- in my argument related to the two levels for the

10 firearm, I believed at the time that there were documents in

11 that box that has the gun that were as recent as January of

12 2018.  Those documents --

13          THE COURT:  Mr. Harris has another problem.  He's

14 stipulated under terms of his plea agreement that the firearm

15 would be forfeited because it was used in furtherance of or

16 facilitated the offense of conviction, and then he's claiming

17 the handgun was there.  We'll talk about that in a little bit.

18          MR. GALYON:  Okay.  And then I don't -- I don't

19 intend on putting anything on related to the security threat

20 group, because I don't have anything else to say about that in

21 terms of information to provide the Court.

22          THE COURT:  We'll go over that, too.

23          MR. GALYON:  Okay.

24          (Bench conference concluded.)

25          THE COURT:  All right.  Well, the first matter is the

1  presentence report has to be -- or the guideline range has to
2  be properly calculated.  So at least two of the objections, the
3  drug quantity as well as the plus two for the firearm, need to
4  be addressed, and then we'll talk further about this issue with
5  respect to security threat group that's included in the
6  presentence report.

7         So lets start with drug quantity.  Mr. Zellmer, I
8  will say I accepted the plea agreement subject to the
9  stipulation of the parties of 100 -- I think it was 100 to
10 400 kilograms converted drug weight.  The presentence report
11 calculated a significantly larger drug quantity.

12        With respect to calculation of the guideline range, I
13 think, since both parties seem to agree that the Court should
14 rely on the drawing quantities separate and apart from
15 Cervantes-Gomez' statements and various other things, I'm
16 prepared to accept the stipulation and calculate the guideline
17 range based upon the lower stipulated quantity, that is 100 to
18 400 -- isn't it 100 to 400 kilograms, Your Honor?

19        MR. GALYON:  Yes, Your Honor.

20        THE COURT:  One hundred to 400 kilograms.

21        I am, I will say directly, extraordinarily troubled
22 by an argument that Gomez -- Cervantes-Gomez' statements should
23 be disregarded as irrelevant and unreliable, which is part and
24 parcel of the quantity objection.  The evidence in the case
25 that's set forth in the presentence report and not objected to,

1  as well as information -- we'll start first with the factual

2  basis that was agreed to at the time of the plea on -- let's

3  see -- February 20 -- or the search warrant was executed.

4          On the day prior to the execution, the defendant was

5  apparently driving the Toyota Venza that belonged to his then

6  girlfriend, was surveilled, and trackers were placed, according

7  to the factual basis, on those cars.  And on that same day,

8  prior to the execution of the search warrant, Mr. Harris was

9  seen meeting with Cervantes-Gomez at the Lowe's store in

10  Asheboro, Lowe's Home Improvement in Asheboro.

11  Mr. Cervantes-Gomez was arrested that same day.

12          The presentence report then goes on to describe facts

13  relating to that meeting as well as two other meetings that

14  were set up by text message apparently between Mr. Harris and

15  Cervantes-Gomez at various places; one at a Wendy's and one in

16  an IHOP parking lot.

17          And, I mean, this business about Mr. Cervantes-Gomez

18  identifying the defendant as Gucci, and this being a

19  misidentification, Cervantes-Gomez gave a statement where he

20  admitted that same day to law enforcement that he had met this

21  individual named Gucci in the Lowe's parking lot, which was

22  consistent with law enforcement surveillance, text messages.  I

23  mean, I don't see how Mr. Harris can deny that he and

24  Mr. Cervantes-Gomez knew each other.

25          MR. ZELLMER:  Your Honor, if my writing came across

1 as implying that he had not bought drugs from

2 Mr. Cervantes-Gomez on February 20, then that was certainly not

3 my intention.  What I was trying to express in that was that I

4 believe it is entirely possible when Mr. Cervantes-Gomez uses

5 the term "this is Gucci" and then says he's been selling drugs

6 to Gucci for a year and had sold this large quantity, the fact

7 that he had met with my client that day and sold drugs to him

8 that day yes, we admit.

9       The idea that my client is Gucci and that he has been

10 selling him this large quantity, we do not.  I think all of the

11 evidence that I have found, and in speaking to all of the

12 people that know my client well, no one has ever known him as

13 Gucci.  He's never been known as that.  Given

14 Mr. Cervantes-Gomez's description of the way that he operated

15 and did business, without knowing any of the people that he

16 contacted with, I think that there's a high probability that at

17 some point during his drug dealings he had sold drugs to

18 someone name Gucci, who was likely an African-American man;

19 that at some point he has confused at least two, or quite

20 possibly more, African-American men that he does not know as

21 each other.

22       So I think one of the kind of presumptions is that my

23 client was known to him on that particular day as Gucci,

24 whereas my theory of how he made this mistake and identifying

25 my client as the person named Gucci is that at some point --

1      THE COURT:  Listen to this:  "Defendant strongly
2   denies that he is called Gucci.  He has never been known or
3   referred to as Gucci by anyone.  Given Cervantes-Gomez's modus
4   operandi of dealing with numerous strangers, defendant believes
5   that it is probable that Cervantes-Gomez may have sold drugs at
6   some other time to an African-American known as Gucci and has
7   confused defendant for that man."
8          There wasn't -- did Mr. Harris meet Cervantes-Gomez
9   in that parking lot on that date as Cervantes-Gomez described?
10         MR. ZELLMER:  Yes.
11         THE COURT:  And Cervantes-Gomez identified that
12   individual as Gucci, right?
13         MR. ZELLMER:  Yes, but I would argue that he has
14   Mr. Harris's name incorrect, Your Honor.
15         THE COURT:  Well, there's a big difference between
16   incorrect and this denial that I'm reading in this pleading,
17   isn't there?
18         MR. ZELLMER:  When I would say he has his name
19   incorrect, Your Honor, I believe that he is incorrectly
20   confusing him with someone he has prior dealings with --
21         THE COURT:  Like who?
22         MR. ZELLMER:  Well, presumably some other
23   African-American man named Gucci.
24         THE COURT:  Who else did he deal with?  What evidence
25   is there he dealt with anybody else?

Sentencing - March 26, 2019

```
1              MR. ZELLMER:  Well, I believe his statement was that
2   he would receive text messages from numbers, presumably in
3   Mexico, to go meet with a number of different people that he
4   had never met before, that he would receive and distribute
5   drugs to those people that he had never met before, so --
6              THE COURT:  That's white, black, Asian, what?
7              MR. ZELLMER:  It does not detail in his post-arrest
8   statement all of their nationalities.
9              THE COURT:  So why then -- all right.  Anything else
10  on this point?
11             MR. ZELLMER:  No, Your Honor.
12             THE COURT:  All right.  Well, I am going to accept
13  the stipulation.  The quantity will be 100 to 400 kilograms of
14  controlled substance, and the guidelines will be modified
15  accordingly under chapter two.
16             I have to tell you, unless somebody convinces me
17  otherwise, given the nature of the surveillance, the text
18  messages that are described, the fact that the defendant was
19  observed going to his storage locker, and then going to meet
20  Cervantes-Gomez at a parking lot with some type of what
21  appeared to be some type of package, the arrest of
22  Cervantes-Gomez, the multiple kilograms of controlled
23  substances found at Cervantes-Gomez' residence, which was
24  searched later that day, it seems to me pretty clear that
25  Cervantes-Gomez does know Mr. Harris, Mr. Harris knows
```

1  Mr. Cervantes-Gomez, and that they were doing business together
2  with respect to controlled substances.

3           Let's turn to the plus two for the firearm.  Do you
4  want to be heard further on that?

5           MR. ZELLMER:  Your Honor, one of our positions would
6  be that since Mr. Harris has no interest in the firearm that he
7  would have no objections to its forfeiture.

8           THE COURT:  Well, let's back up, because the -- that
9  came up here, and I'll make the point further so it's clear
10 what we're arguing -- what we're discussing here.  There's an
11 objection to the plus two adjustment for the firearm.  The
12 defendant argues and states in his pleading that he did not
13 either actually or constructively possess the firearm.  He
14 argues that it is clearly improbable that the weapon was
15 connected to the offense, and it appears, although I'm not sure
16 it said specifically, the defendant has presented the statement
17 of his own father who says he's the one that placed the firearm
18 in the closet years before, and he had forgotten that he placed
19 the firearm in the closet.

20          The objection itself between the Government -- with
21 the Government's response and the defendant's pleading focused
22 on the factors -- facts, including the defendant's apparent
23 control and accessibility to that room where the gun was found,
24 the store of drugs on the premises in a car outside the
25 premises, and the fact that the gun was found on the top shelf

1 in a closet, I am concerned about this objection because the
2 plea agreement contains a provision -- paragraph 6, "The
3 defendant Lee Marvin Harris, Jr., knowingly and voluntarily
4 consents and agrees to forfeit to the United States pursuant to
5 Title 21, United States Code, Section 853 any property used or
6 intended to be used in any manner or part to commit or to
7 facilitate the commission of the offense in Count Seven.  The
8 specific property to be forfeited includes but is not limited
9 to the following:  A Springfield .40 caliber handgun, Serial
10 No. US 451270.  The defendant acknowledges that his interest in
11 the foregoing property is subject to forfeiture based on the
12 offense to which he is pleading guilty."

13         We addressed that provision in the Rule 11 colloquy
14 during which time, in describing the plea agreement, all
15 parties acknowledged that, and now it appears to me that in the
16 face of a plus two, Mr. Harris is denying that he either
17 possessed the firearm or that the firearm was connected to the
18 offense of conviction.

19         So you were starting to respond to that.

20         MR. ZELLMER:  Thank you, Your Honor.  It would be our
21 position that he has no ownership interest in the firearm, and,
22 therefore, he is happy to consent and agree to forfeiture of
23 his entire interest in that firearm, as well as to acknowledge
24 that any interest that he has in that property --

25         THE COURT:  That's not what he said, Mr. Zellmer, in

1 the forfeiture provision, is it?

2          MR. ZELLMER:  Your Honor, the forfeiture provision
3 states here that, the defendant knowingly and voluntarily
4 consents and agrees to forfeit to the United States any
5 property used or intended to be used in any manner or part to
6 commit or to facilitate the commission of the offense in Seven.
7 Specific property to be forfeited includes, but is not limited
8 to the following, the Springfield handgun.  Defendant
9 acknowledges that his interests in the foregoing property is
10 subject to forfeiture based on the offense to which he is
11 pleading guilty.

12          THE COURT:  So that last sentence would suggest, one,
13 that he has an interest, correct?

14          MR. ZELLMER:  I don't know that it absolutely does.
15 I would --

16          THE COURT:  Explain that to me.

17          MR. ZELLMER:  Your Honor, I would equate it to a
18 quitclaim deed.  That Mr. Harris is essentially giving to the
19 Government a quitclaim deed to his entire interest in this gun.
20 I can sign a quitclaim deed to any property that is out there
21 without entering into a general guarantee that I have an
22 interest in that property.  I would --

23          THE COURT:  That's not fraud?  So if you signed a
24 quitclaim deed to my property and gave it to somebody, that's
25 not a fraud?

Sentencing - March 26, 2019

1          MR. ZELLMER:  That is correct, Your Honor.  It is
2  not.

3          THE COURT:  It's not?

4          MR. ZELLMER:  A quitclaim deed is a deed that says
5  that I transfer my entire interest in a property to someone
6  else.  Assuming that I have made no other express statements
7  about any ownership of that property, I --

8          THE COURT:  But you did here, didn't you -- or
9  Mr. Harris did, right?  He represented in this that it was
10  subject to forfeiture because it was used or intended to be
11  used in any manner or part to commit or facilitate the
12  commission of the offense in Count Seven.  That's Mr. Harris's
13  representation.

14          MR. ZELLMER:  Your Honor, it's a statement that he
15  consents and agrees to the forfeiture, that is correct.  Your
16  Honor, I would argue that my interpretation of that would be
17  that he agrees that the forfeiture will be pursuant to that --

18          THE COURT:  If he didn't use that gun, who did?

19          MR. ZELLMER:  Well, Your Honor, it would be our
20  contention that the facts of the case are as the -- oh, I see
21  what you're saying, Your Honor, I apologize.  That if he did
22  not use that gun, why would it be subject to forfeiture?

23          THE COURT:  Yep.

24          MR. ZELLMER:  I would say because no one is objecting
25  that it is subject to forfeiture.

Sentencing - March 26, 2019

1          THE COURT:  Oh.  Why wasn't that brought to my
2    attention then?  Why didn't somebody bring that to my
3    attention?  Wouldn't you agree that it's reasonable to infer
4    from this that if Mr. Harris is agreeing to forfeiture, that he
5    is agreeing that this property was used in any manner or part
6    to commit or facilitate the commission of the offense in
7    Count Seven?
8          MR. ZELLMER:  I'm sorry.  I apologize.  I don't
9    understand the question, Your Honor.
10          THE COURT:  Wouldn't it be reasonable to find, based
11   upon this, that Mr. Harris is agreeing that firearm was used to
12   facilitate the offense committed charged in Count Seven?
13          MR. ZELLMER:  Whether it would be reasonable to
14   determine it from that?
15          THE COURT:  No, reasonable for anybody reading that
16   plea agreement to think that?
17          MR. ZELLMER:  I suppose it would be reasonable, yes,
18   Your Honor.
19          THE COURT:  All right.  Anything else with respect to
20   the plus two?
21          MR. ZELLMER:  No, Your Honor.
22          THE COURT:  Do you want to be heard on the plus
23   two --
24          MR. GALYON:  No.
25          THE COURT:  -- Mr. Galyon?

Sentencing - March 26, 2019

1        MR. GALYON:  No, Your Honor.

2        THE COURT:  All right.  This security threat group
3 issue is another issue that troubles me.  Mister -- the
4 defendant denies that he is a member of a gang.  The
5 defendant's father relays that he remembers these individuals
6 associating together when they were young and being interested
7 in Cadillacs and suggest that the tattoo "DBC" is indicative of
8 their interest in Cadillacs and their friendship and nothing
9 more.  Yet the definition cited with respect to the Department
10 of Justice's definition of a gang is as set forth in the
11 pleading on page 8, and I'm -- I'm troubled by saying how do I
12 get around to saying it is not a gang.

13        You've pointed out a few items that don't necessarily
14 apply based on the evidence, but in terms of the actual
15 definition.  One, an association of three or more individuals.
16 No question that applies.

17        Two, whose members collectively identify themselves
18 by adopting a group identity, which they use to create an
19 atmosphere of fear or intimidation.  Stop right there.  There's
20 no question that the individuals in this DBC group collectively
21 identify themselves by those initials.

22        When we go on to create an atmosphere of intimidation
23 frequently by employing one or more of the following, a common
24 name, an identifying sign, a tattoo, a style or color of
25 clothing.  At least two of those are present here, a common

Sentencing - March 26, 2019

1 name and a tattoo apparently.

2        Three, the association's purpose in part is to engage
3 in criminal activity, which this group is charged with and pled
4 guilty to the distribution of controlled substances.  The
5 criminal activity and the association uses violence or
6 intimidation to further its criminal objectives.  If I look
7 just above, intimidation by employing one or more of the
8 following, that level of intimidation appears to me to be
9 present.

10        Its members engage in criminal activity, as evidenced
11 by the guilty pleas, with intent to enhance or preserve the
12 association's power, reputation, or economic resources.  The
13 obvious motive for engaging in the distribution of controlled
14 substances is to enhance economic resources.

15        The association may also possess some of the
16 following characteristics:  Rules for joining and operating,
17 not applicable here with respect to whether or any are known;
18 the members meet on a recurring basis; and the association
19 provides physical protection of its members from other
20 criminals and gangs, and the association seeks to exercise
21 control over a particular location.

22        It seems to me, that based on the evidence presented,
23 that the individual defendants were regularly meeting for the
24 purpose of distributing controlled substances at this West New
25 York Avenue address and that that particular location seemed to

1  be their -- as well as Mr. Harris' parents' home to some
2  degree, seemed to be part of their, quote, base of operations.
3          I weigh these factors very differently from what's
4  been described here, so even if I should find that there is
5  some credibility issue with respect to the unknown informant as
6  you have described, if I look at this definition, I would say
7  these individuals in this group, whether it's known as the Dope
8  Boys Clique or Da Best Cadillac, whichever two names they
9  choose to go by appear to meet the definition of a gang.  Do
10 you have any response to that?
11          MR. ZELLMER:  I do, Your Honor.  I think, in
12 particular I believe it's elements two and four, it appears --
13 and I want to make sure I understand Your Honor's thinking
14 here -- that Your Honor's feeling is that this qualifies under
15 elements two and four because there is a name and because there
16 is a tattoo that the fact that there is a name Da Best
17 Cadillacs and there's a tattoo, DBC, that that equals
18 intimidation.  And I hope I'm not misunderstanding Your Honor's
19 thinking there.
20          THE COURT:  No.
21          MR. ZELLMER:  Okay.
22          THE COURT:  They used it to create an atmosphere of
23 fear or intimidation frequently by employing one or more of the
24 following.
25          MR. ZELLMER:  Your Honor, I think that that thinking

1  assumes that having a name to your club and having a tattoo for
2  your club equates to the club creating a sense of fear and
3  intimidation.
4          THE COURT:  Let's just focus on intimidation.
5          MR. ZELLMER:  Intimidation.  I would analogize this
6  to, you know, there are many people in this country that belong
7  to college fraternities where those college fraternities
8  frequently --
9          THE COURT:  Any of those college fraternities selling
10  drugs?
11          MR. ZELLMER:  Yes, many of them, Your Honor.
12          THE COURT:  Okay.  Then why aren't they gangs?
13          MR. ZELLMER:  Why aren't they?
14          THE COURT:  Under this definition?
15          MR. ZELLMER:  And I would say that probably, I'm sure
16  the reason why all those kids in those college fraternities
17  would say that they are not in gangs is because they -- even
18  though they have tattoos --
19          THE COURT:  I don't care what they say.  I want to
20  know why they wouldn't qualify under this definition as a gang
21  or a security threat group.
22          MR. ZELLMER:  Because they are not using fear and
23  intimidation, because they are not establishing turf, because
24  they are not using fear and intimidation for the betterment of
25  their gang -- of their group.

Sentencing - March 26, 2019

1          THE COURT:  So when this group of individuals chose
2   to operate out of this West New York Avenue location together,
3   jointly, in property that -- did any of them rent that
4   property?  Did any of them own that property?
5          MR. ZELLMER:  No, Your Honor.  It is abandoned
6   property, and I think one thing that should be pointed out, I
7   don't believe the Government is alleging that all of the
8   targets of the investigation at the West New York Avenue
9   location were members of the DBC or have the DBC tattoo.
10         THE COURT:  No, but the ones they've charged did,
11  right?
12         MR. ZELLMER:  I don't believe so, Your Honor.  I want
13  to say one of the charged codefendants here does not have the
14  DBC tattoo.
15         THE COURT:  Besides Mr. Harris' father?
16         MR. ZELLMER:  Besides Mr. Harris' father, yes.
17  Besides Mr. Harris' father, who, also, of course, does not.
18         THE COURT:  So then you disagree with the presentence
19  report?
20         MR. ZELLMER:  I believe I had stated that the
21  presentence report should refer -- should not refer to these
22  folks as gang members at all, but rather as targets of the
23  investigation.  It is our position that this is not a gang,
24  that these are not gang members.  There is no turf.  There are
25  no tags.  There are no beat-ins.  There are no rival gangs.

1  They are none of these things which you would think of in
2  belonging to a gang.

3         The group of individuals who gathered together for
4  these Cadillacs, you know, these big-rimmed, flashy paint job
5  Cadillacs, that disbanded years ago.  It's my understanding
6  that most of these Cadillacs have been sold or are immobile,
7  like the red one that was under the car cover here.  That there
8  was -- one of the photographs has a yellow one and a blue one
9  in there.  Those are long gone.  This red one is immobile.
10 It's my understanding there might be one brown Cadillac that's
11 still on the road.

12        But, Your Honor, I think that's one of the issues
13 here, too, is this idea, you know, this group -- I even
14 hesitate to call it a club because it's not even formal enough
15 for a club, but this group has been essentially defunct for
16 years, you know, and these men are now in their 30s, right?

17        I mean, these photographs of them around their
18 Caddies, you know, those photographs appear to have been taken
19 when they were in their late teens, early twenties, you know.

20        My understanding is that Mr. Harris' red Caddy has
21 been sitting there immobile under that car cover for years.

22        THE COURT:  Used as a base of operations from which
23 to distribute cocaine, right?

24        MR. ZELLMER:  I think the most telling part about all
25 these elements for a gang, these gangs are supposed to be

Sentencing - March 26, 2019

1 violent and use intimidation and --

2          THE COURT:  Let's see.  Pull out your photo, the last

3 page of Document 130, the sentencing memorandum.  Here you can

4 take a look at it.

5          MR. ZELLMER:  I have it on my computer, Your Honor.

6          Final page of the sentencing memorandum, Your Honor?

7          THE COURT:  Yeah.  I think these were the photos that

8 were sent through the Google Docs thing.

9          MR. ZELLMER:  Yes, Your Honor.  Yes, I'm familiar

10 with the photographs.

11          THE COURT:  All right.  The last one, the photo of

12 all these individuals in front of the yellow vehicle that has

13 "DBC" on the back.

14          MR. ZELLMER:  Yes, Your Honor.

15          THE COURT:  Would you say all those -- I mean, first

16 question is, how old was everybody when that photo was taken?

17          MR. ZELLMER:  It's hard to say.  The photo was

18 undated.  The photo was gathered -- it appears to be a person

19 holding a cell phone taking a picture of an old pre-digital

20 photograph on a glass frame because you can see the reflection

21 of the photo taker at the bottom of that picture, and then the

22 detective in the case pulled that off of Facebook.

23          If I had to venture a guess of when that photo was

24 taken --

25          THE COURT:  No, I mean, you said these individuals

1  were all together when they were younger.  They're now in their
2  30s.
3          MR. ZELLMER:  Fair enough.
4          THE COURT:  I mean, how old is everybody in that
5  picture?
6          MR. ZELLMER:  Absolutely.  If I could have just one
7  moment, Your Honor.
8          My client thinks that he was probably about 22 years
9  old.
10          THE COURT:  So he thinks 10 years ago?
11          MR. ZELLMER:  Roughly.
12          THE COURT:  All right.  Here's the thing,
13  Mr. Zellmer, I'm not going through this to try to make you
14  miserable.  What troubles me greatly about this is whether or
15  not to award the plus three for acceptance of responsibility.
16          The reason for that is that, number one, this
17  business with respect to the firearm, it may very well be that
18  there's some issues with respect to whether or not Mr. Harris
19  actively deployed that firearm in the closet, but it was, A,
20  found in a room that he clearly occupied, according to the
21  facts, arguably the bulk of the year; B, as the case points out
22  that both parties addressed -- not Milner -- *Manigan*, the
23  relationship between firearms and the distribution of drugs is
24  fairly well established, we'll say, with respect to
25  distribution of cocaine.

1          And even if -- even if I were persuaded -- and I have

2 great respect for Mr. Harris' father.  He's obviously a fine

3 person.  He cares about his son, but even if I were persuaded

4 to believe that that gun was acquired by Mr. Harris, Sr., as

5 described, ultimately it's not the acquisition of the firearm

6 that's at issue.  It's a question of whether the defendant

7 possessed it, and those facts alone, in my mind, are really

8 close to being sufficient in and of themselves.

9          However, when an individual stipulates in a plea

10 agreement that a particular firearm was used to facilitate the

11 offense of conviction, and then comes back later after

12 discovering that that would lead to a plus two for the

13 guideline calculation and says, A, I didn't know about it; and,

14 B, it didn't have anything to do with the offense of

15 conviction, clearly not connected to the offense of conviction,

16 that troubles me.

17          Second, I understand the difference between a

18 defendant's representation and a lawyer's argument, and it

19 appears to me by denying that -- by the defendant denying that

20 he's ever been known as Gucci -- which may very well be true,

21 but at least one individual seemed to know him as Gucci -- and

22 minimizing his contact with Cervantes-Gomez, that I find to be

23 troubling.

24          Ultimately, it may very well be that "DBC" stands for

25 Da Best Cadillac.  I don't know.  Mr. Harris and his group of

1 friends or whatever are the only ones that know the true name
2 of this organization.  But the photographs, the conduct of
3 these individuals, their conduct at this West New York address,
4 and everything else all seem to me to pretty clearly establish
5 that this was some type of gang activity.

6          It may not have been, and doesn't seem to have been,
7 the violent type of activity that many individuals associate
8 with gangs.  I understand that.  There's no evidence presented
9 here that these individuals were riding around this area
10 shooting up houses or doing anything else that is sometimes
11 associated with gang activity.

12          But it seems to me very clear that these individuals,
13 as detailed in the presentence report in the investigative
14 information, were collectively involved for some extended
15 period of time in the distribution of controlled substances;
16 the controlled buys from one of the individuals over and over
17 again, the storage of drugs at his -- Mr. Harris' parent's home
18 in the car, Mr. Harris' delivery of the heroin on a particular
19 day, and everything else seem to me these facts run contrary to
20 Mr. Harris' current position.

21          And then to read in the presentence report that he
22 blames a lot of his difficulties on one particular law
23 enforcement officer seemed -- I don't know how long whatever
24 that bad blood may have been going on between Mr. Harris and
25 that law enforcement officer, but Mr. Harris has been involved,

1  at least according to the facts set out in here, in the
2  distribution of drugs for an extended period of time, at least
3  two years.

4          It's centered around this West New York Street
5  address, and Mr. Harris, as I read these denials of his,
6  continues to, at least seems to me, minimize his conduct in
7  relation to this particular offense, and that, to me, seems to
8  be inconsistent with acceptance of responsibility.

9          Mr. Harris doesn't have to come in and admit
10 everything.  I'm not suggesting that, but when you get in the
11 business of denying what seems to be obvious, that gives me
12 concern.

13         MR. ZELLMER:  Your Honor, it certainly is not my
14 intention or his intention to deny what he's done.  Rather, I
15 do think it's important the investigation and the presentence
16 report has made certain assumptions about things that we'd say
17 simply are inaccurate.

18         It's not that he wasn't in the business of selling
19 cocaine.  He has -- he has pled guilty to possession with
20 intent to distribute cocaine on that day.  We have agreed to
21 the attributable quantities.  It's not that he's not saying
22 that.

23         What we are saying is that when they say that, you
24 know, yes, he sold cocaine and he's also in a gang, that simply
25 he is not in a gang.  This is not a gang.  It is -- not every

1  group of criminals who commit crimes together are a gang.
2          THE COURT:  All right.  Gun or no gun?  Yes or no?
3  Gun or no gun?  Yes or no.
4          MR. ZELLMER:  Certainly I understand Your Honor's
5  argument there and --
6          THE COURT:  What is Mr. Harris' position at this
7  point.  Gun or no gun?
8          MR. ZELLMER:  If I may have just one second, Your
9  Honor?
10          THE COURT:  You may.
11          MR. ZELLMER:  Your Honor, at this point we'll go
12  ahead and withdraw the objection to the plus two enhancement
13  for the firearm.
14          THE COURT:  All right.  Do you want to be heard on
15  any of this, Mr. Galyon?
16          MR. GALYON:  No, Your Honor.
17          THE COURT:  Lets take about a 10-minute recess.
18          (At 3:11 p.m., break taken.)
19          (At 3:22 p.m., break concluded.)
20          THE COURT:  All right.  Ms. Martin, I'm going to ask
21  you to announce the amended guideline calculation with respect
22  to the reduction in drug quantity at this point.
23          MS. MARTIN:  And, Your Honor, that is including the
24  plus two for maintaining as well as the dangerous weapon
25  enhancement?

Sentencing - March 26, 2019

1    THE COURT: Was there any objection to the
2  maintaining?

3    MR. ZELLMER: There was not, Your Honor.

4    THE COURT: Yeah, it'd be the plus two for the gun
5  and plus two for maintaining.

6    MS. MARTIN: Okay. Your Honor, the total offense
7  level would be a 25, his criminal history category would be a
8  III, and that would give us a guideline imprisonment range of
9  70 to 87 months imprisonment. Supervised release would stay
10  the same, and his fine range would be 20,000 to 2 million.

11    THE COURT: Okay. Thank you.

12    All right. I want to turn back to that photograph I
13  was referring to earlier. Let me ask you this, Mr. Zellmer:
14  Do you know who those individuals are in the photograph?

15    MR. ZELLMER: I do not personally, but I assume that
16  my client does. He did mention to me when he was trying to
17  date the photograph that one of the individuals in there passed
18  in 2009, so it would at least predate that --

19    THE COURT: All right.

20    MR. ZELLMER: -- but I can certainly ask him if Your
21  Honor would like me to get the names.

22    THE COURT: No, I'm not going to get into that at the
23  moment. I really don't know what to do with respect to
24  acceptance of responsibility here. I'm really troubled by how
25  exactly to interpret what's occurred in some respects.

Sentencing - March 26, 2019

1        I'll lay these statements out.  Defendant strongly

2  denies -- this is from the first sentencing memorandum.

3  "Defendant strongly denies that he is Gucci.  He has never been

4  known or referred to as Gucci by anyone."  I think the evidence

5  is clear that Cervantes-Gomez referred to the defendant as

6  Gucci based on the evidence that has been presented with

7  respect to -- you can have a seat --

8        MR. ZELLMER:  Thank you, Your Honor.

9        THE COURT:  -- with respect to the surveillance.  I'm

10  concerned about that statement.  I am concerned about the

11  denial with respect to the firearm that has occurred here, and

12  I personally am concerned about the minimization with respect

13  to the -- whether or not the DBC is some type of gang.

14        Again, the fact that it's a gang doesn't make it

15  something like MS-13, but at the same time this appears, based

16  on the information contained in the presentence report, to have

17  been a group of individuals who associated together through

18  similar tattoos and other symbols.  They associated together at

19  a particular location.  At least it appears at some point in

20  the past, whenever that may have been, this group of

21  individuals took photos and shared those photos showing their

22  collective nature.

23        And I would suggest in terms of the intimidation

24  factor the ability to intimidate through those associations and

25  shared values with respect to the distribution of controlled

1 substances. And it seems to me that ultimately by contending
2 this is not a gang, and the defendant contending this is a
3 loose association of a group of childhood friends that have a
4 shared interests in Cadillacs, is a further effort to minimize
5 the defendant's conduct in this case.

6     Under those circumstances, I just -- I'm going to
7 continue this sentencing, because I want some time to consider
8 whether or not acceptance of responsibility should be awarded.
9 And the only thing -- in all candor, the only thing that is
10 keeping me from striking acceptance at this particular point is
11 that I can understand the defendant's concern over drug
12 quantity and the manner in which defendant and his counsel
13 would have perhaps been caught by surprise by the increase in
14 drug quantity over and above the stipulation that was entered
15 into between the parties.

16     But that in and of itself does not excuse further
17 efforts to minimize and falsely deny, in my opinion, relevant
18 conduct, and the association of these individuals with each
19 other, the association of Mr. Harris and Mr. Cervantes-Gomez,
20 the issue of whether Mr. Harris may have possessed a firearm
21 during the commission of these offenses, that's all relevant
22 conduct to the offense of conviction under our rules.

23     And here it's clear that Mr. Harris has a lot of
24 support. It looks like, from everything I've seen, Mr. Harris
25 has wonderful parents who have supported him and think a lot of

him.  Mr. Harris has friends within the community, but this is
not the forum for Mr. Harris to come in and, at least in my
mind, artificially minimize -- I'm going to say falsely
minimize his conduct.  He doesn't have to concede to
everything, but when affirmative steps are taken to minimize
that conduct, that, in my mind, is inconsistent with acceptance
of responsibility.

So I'm going to continue this sentencing while I
consider that.  I will enter some kind of notice, not
necessarily giving my final ruling, but at least advising the
parties -- well, you've heard -- well, I don't need to do that.
You've heard my two main concerns.  One is with respect to the
firearm, and the other is what I perceive to be minimization
with respect to Mr. Harris' relationship to Cervantes-Gomez and
minimization with respect to the seriousness of the threat
created by a collective group of individuals who may have
gathered together at some point for innocent purposes, but it
appears were gathered together for other unlawful purposes, at
least at times, as well --

And ultimately with respect to that photograph,
Mr. Zellmer, I don't know who those individuals are in the
photograph.  I think it's apparent from the face of the
photograph, in light of the definition of gangs that's been
tendered, why I may be concerned with that particular
photograph.

1          The presentence report goes on to state that the

2   DBC -- individuals who were at the New York Avenue address

3   included the defendant, Korey McLeod, Jeremy Johnson, Tremayne

4   McLeod, Robert McRae, Jaquay McNeil, Lamar Sealy, Christian

5   Terry and Brian Scales.  I can't recognize the individuals in

6   that particular photograph, but if those same individuals are

7   some or all of the individuals in that photograph, that gives

8   me serious concern about minimizing this conduct.

9          Mr. Galyon, do you want to be heard on this?

10         MR. GALYON:  No, Your Honor.

11         THE COURT:  Mr. Zellmer, anything you wish to add or

12  be heard on with respect to this?

13         MR. ZELLMER:  Well, I guess at this time Your Honor's

14  continuing sentencing, is that correct?

15         THE COURT:  That's correct.

16         MR. ZELLMER:  Your Honor, are you asking for any

17  additional submissions pending the continuing of sentencing

18  or --

19         THE COURT:  It's up to you.  You can if you choose.

20  That's yours and Mr. Harris' decision.

21         MR. ZELLMER:  At this time I would have nothing to

22  add, Your Honor.

23         THE COURT:  All right.  Let's see.

24         (Off-the-record discussion.)

25         THE COURT:  Friday, April the 12 at 9:30.

Sentencing - March 26, 2019

```
1                    MR. ZELLMER:  I can make that work, Your Honor.
2                    MR. GALYON:  Yes, Your Honor.
3                    THE COURT:  All right.  I'm going to continue this
4    matter to Friday, April 12, 2019, at 9:30 a.m. here in
5    Greensboro, Courtroom 1.
6                    Let me see counsel up here at the bench.
7                    (Bench conference as follows:)
8                    THE COURT:  I'll tell you, Mr. Zellmer, I'm very
9    impressed with the amount of work that you put in to doing
10   these pleadings and your efforts on behalf of your client.  So
11   I know that some of the comments I made today, there can be --
12   they can be interpreted a number of different ways with respect
13   to your work.  But I am very impressed with the work that you
14   did, and I want you to understand that I've tried to focus my
15   concerns with respect to acceptance (indiscernible)
16   representations that your client made through you to this Court
17   (indiscernible) misinterpretation of what's been written.
18                   MR. ZELLMER:  I understand that, and --
19                   THE COURT:  No need to argue, but I just want to make
20   sure you knew that.
21                   MR. ZELLMER:  I completely understand, Your Honor.
22                   THE COURT:  Thank you.
23                   (Bench conference concluded.)
24                   THE COURT:  All right.  This matter is continued to
25   the 12th.
```

Sentencing - March 26, 2019

1          (At 3:36 p.m., court recessed.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              * * * * *

2                         C E R T I F I C A T E

3        I certify that the foregoing is a correct transcript
         from the record of proceedings in the above-entitled
4        matter.

5

6
                                _____
7        Date: 10/7/2022        Joseph B. Armstrong, FCRR
                                United States Court Reporter
8                               324 W. Market Street
                                Greensboro, NC  27401
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Sentencing - March 26, 2019