UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

| LEE MARVIN HARRIS, SR., | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 1:21-cv-955-WO-JEP |
| vs. | ) ) ) | DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT |
| TOWN OF SOUTHERN PINES, et al., | ) ) ) | |
| Defendants. | ) ) | |

1. **PLAINTIFF HAS FAILED TO ESTABLISH LACK OF PROBABLE CAUSE**

   **A. Introduction**

   The gravamen of Plaintiff's Opposition is that certain facts "were not provided to the Magistrate at the time of the probable cause determination, to the DA prior to indictment, to the state or federal grand jury, or to any federal authority at the time of arrest or indictment." (Doc. 31 at 20). Those allegedly missing facts were: "(1) that Lee Harris Sr. paid Robert McRae for a car wash; (2) that the alleged Cadillac car keys were actually located outside the bedroom where anyone in the household could access them; (3) that the Cadillac was inoperable and that the registration expired years ago; and (4) that Lee Harris Jr. had placed or received items from the Cadillac on numerous occasions just weeks prior and that the cocaine found in the Cadillac matched the packaging and marking of cocaine recovered from the supplier of Mr. Harris Jr." (Doc. 31 at 19).

   It is axiomatic that a defendant bears no liability for failing to disclose information that does not bear upon the determination of probable cause, or that the defendant did not

1

observe or learn about from others. As will now be shown, Plaintiff's assertions fall short of creating an issue of fact preventing summary judgment.

### B. Harris Jr's. Presence in the Yard Near the Red Cadillac

Plaintiff speculates that Sgt. Lowery observed his son placing or removing unknown items in the red Cadillac on both January 25 and 31, 2018, about three weeks prior to the February 20 search warrant execution. But that speculation is not borne out by the record. First, Lowery expressly testified at deposition he never made any such observation. (Doc. 32-5 at 81:15-22). Second, Lowery is adamant that although he saw several vehicles parked on Plaintiff's property, he never identified any one of them as a Cadillac. (*Id*. at 55:8-22). Third, Lowery's contemporaneous notes from the January 25 "wood surveillance" document Harris Jr. "go[ing] to the front right edge of the property and . . . placing or retrieving something from underneath a tarped item located to the right of the enclosed trailer." (Doc. 32-30). Significantly, Lowery has *never* described that tarped "item" as a motor vehicle, let alone a Cadillac. Moreover, as the photo submitted by Plaintiff demonstrates, there was in fact "a tarped item" located to the right of the trailer that was completely separate and apart from the Cadillac. (Doc. 31 at 9). A better photo of that tarp-covered item is Exh. A to this Reply.

When documenting Harris Jr.'s presence in the yard on January 31, Lowery similarly never described him as placing or removing anything from the Cadillac. In fact, due to distance, Lowery could not see if Harris Jr. had anything in his hands or if he appeared to be "moving or retrieving any item." (Doc. 32-5 at 37:20-38:10). Instead, what Lowery saw was Harris Jr. first go to the above-described trailer, and then to an

2

undescribed vehicle covered with a *blue* tarp for 2-3 minutes. (Doc. 32-31). Notably, the only blue tarp Plaintiff acknowledged possessing was a "weather beaten" one that had once been on the Cadillac, but which he had swapped out for the gray car cover appearing in the photos "quite a while" before February 20, 2018. (Doc. 32-2 at 126:19-127:3). That is entirely consistent with Lowery's testimony that the vehicle he saw Harris Jr. approach was covered by a blue tarp, "[n]ot a car cover" like the "white or gray" one covering the Cadillac the day of the search. (Doc. 32-5 at 85:20-86:21). Lowery further identified a blue tarp photographed on the ground in the yard's wood line as looking just like the one covering the vehicle that Harris Jr. approached on January 31. (*Id.*). (*See* photo of blue tarp, Exh. B hereto).

So when Lowery testified before Magistrate Carol Wright, there was no reason to suggest that Harris Jr. may have placed the drugs inside Plaintiff's Cadillac, as Lowery never "observed him take, place, or anything into the Cadillac," and, moreover, Lowery was uncertain the object under the tarp was even a motor vehicle. ("There was an object over there. Part of it appeared to be a car. However, I was not sure.") (Doc. 32-5 at 79:14-80:3). It is also worth mentioning that Sgt. Perry never told Lowery the drugs were found in the same car Lowery had seen during his surveillance. (*Id.*, 64:25-65:5). As Lowery points out, "I could never testify to the fact whether it was the same car." (*Id.*, 65:6-7).

It is therefore inaccurate and misleading for Plaintiff to describe Lowery as stating he saw Harris, Jr. place items into or remove items from the Cadillac. Equally feckless is Plaintiff's use of the U.S. Attorney's plea memorandum to further his argument, when the memorandum merely reflects that office's conclusion that Harris Jr.'s presence in the yard

3

near the Cadillac would be "consistent with placing and [sic] item in or retrieving an item from the vehicle." (Doc. 32-22 at 2). If Lowery had in fact recognized the tarped vehicle as a Cadillac, then the U.S. Attorney's conclusion might be reasonable. But the reasonableness of the U.S. Attorney's supposition is not the issue before this Court on summary judgment. Instead, the issue is: Did Lowery see Harris Jr. appear to place items into or remove items from the Cadillac, and then purposefully fail to disclose that fact to others? As the foregoing *uncontroverted* evidence demonstrates, the answer is no.

Accordingly, Plaintiff's effort to overstate the record evidence through inferences based upon sheer speculation necessarily fails. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) ("the nonmoving party must rely on more than conclusory allegations, mere speculation, [and] the building of one inference upon another").

### C. The Fact the Cadillac was Inoperable

Plaintiff argues Magistrate Wright should have been told the Cadillac's registration had expired and it was inoperable. But as Lowery explains, he provided Magistrate Wright the following information: That "there was a year-long drug investigation into Plaintiff's son and the DBC; Plaintiff's son lived at his home when he was not staying with his girlfriend; there was suspicion that Plaintiff's home was being used to keep and sell narcotics based on surveillance of Plaintiff's son; a search warrant was issued for the property; a sizable amount of cocaine and drug paraphernalia was seized from inside a Cadillac on Plaintiff's property; Plaintiff was the registered owner of the Cadillac; Plaintiff told Marsh that the trunk was broken on the vehicle and identified which door would be unlocked; Plaintiff led Marsh to the Cadillac's keys which were hanging on his bedroom

4

door; no other person claimed ownership of the narcotics found on his property; Plaintiff had been video recorded handing cash to a known drug dealer outside a known drug house in the weeks prior to the search warrant." (Doc. 26-2 at 4).

So, Magistrate Wright knew from the outset the drugs were found inside a car owned by Plaintiff and located on his property. Given that knowledge, the fact the car was inoperable is of no legal consequence. *See, e.g., U.S. v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990) (officers executing narcotics search warrant reasonably believed resident had "sufficient indicia of control" over an "inoperable" vehicle parked in his driveway where resident "had physical access to the keys left in the ignition and could easily use the trunk or other compartments in which to hide drugs"). In fact, compared to *Gottschalk*, the suspicion of Plaintiff's guilt was even more compelling given the Cadillac's keys were not present inside it, such that when Lt. Marsh asked for them, Plaintiff took him inside the house and gestured towards a key rack on his bedroom door. (Doc. 32-2 at 133:22-134:15). *See U.S. v. Brett*, 872 F.2d 1365, 1369 n.3 (8th Cir. 1989) ("We note that every other circuit to address this issue agrees that the holder of the key, be it to the dwelling, vehicle or motel room in question, has constructive possession of the contents therein."); *U.S. v. Bobb*, 471 F.3d 491, 497 (3rd Cir. 2006) ("Constructive possession may be found if the defendant was knowingly in a position . . . to exercise 'dominion and control' over the drug.").

It is also important that "no other person claimed ownership of the drugs." As the Supreme Court has concluded where drugs are found in a moving vehicle with multiple occupants—none of whom admit to ownership of the drugs—there is probable cause to charge all of them, since it is reasonable to infer they all "exercised dominion and control"

5

over the drugs. *Maryland v. Pringle*, 540 U.S. 366, 372, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (holding that officers had probable cause to arrest all three occupants of a car containing cocaine because it would have been "entirely reasonable" to infer they "had knowledge of, and exercised dominion and control over, the cocaine").

Lastly, the fact Sgt. Perry later determined the packaging of the cocaine found in the Cadillac "was consistent with kilo packaging" found at the residence of Harris Jr.'s supplier was hardly exculpatory, and was therefore unnecessary to the evaluation of probable cause.

### D. <u>The Location of the Key Rack</u>

The Opposition suggests the Cadillac keys that Lt. Marsh took from the rack on Plaintiff's bedroom door did not go with that particular Cadillac. That by itself is of no consequence, since Marsh wanted the keys only to access the trunk. Moreover, Plaintiff does not dispute he took Marsh into the house and "showed him where my key rack was," while only disputing Marsh's characterization that he "handed" him the keys. (Doc. 32-2 at 133:22-134:15). Neither does it matter that Plaintiff did not have sole access to the key rack. It was still located inside *his* house, on the outside of *his* bedroom door.

### E. <u>Plaintiff's Cash Transaction with a Known Drug Dealer</u>

Plaintiff argues the Defendants knew that when he handed cash to a known drug dealer, he was paying for a car wash. To support this argument Plaintiff points out Sgt. Perry knew the drug dealer owned a car wash business. Yet, at the same time, Plaintiff testified that day "was the first and only time" the drug dealer had washed one of his vehicles. (Doc. 32-2 at 116:2-5). And although Plaintiff offers photo evidence from

6

surveillance cameras showing an SUV towing a trailer with what appears to be cleaning equipment adjacent to the drug house, the surveillance video taken by the National Guard never shows Plaintiff's vehicle—or any vehicle—being washed.

To the contrary, what the video does show is Plaintiff standing in the street in front of the DBC drug house, walking over to a black pickup truck that pulls up, extending his right arm inside the open passenger window for about three seconds, and then walking over to the drug dealer and handing him cash. (*See* Exhibits C and D hereto) (still shots from Plaintiff's Exh. 16). When an officer investigating a large drug operation watches video footage showing the father of the operation's leader lean into the open window of a vehicle that briefly stops in the street, and then 20 seconds later hand over cash to a known drug dealer in front of a known drug house, it is a jump to conclude the officer should attribute the transaction to a mere car wash. Indeed, the more likely conclusion is a drug deal, and that is all the Fourth Amendment requires. *Sennett v. U.S.*, 667 F.3d 531, 537 (4th Cir. 2012) (probable cause not vitiated by suspect's "innocent explanation" where "other facts nevertheless permitted [the police] to reasonably conclude" suspect was involved in criminal activity); *U.S. v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (finding probable cause where "the inference of illegal conduct by trained and experienced officers is at least as probable as any innocent inference").

3. **THE SIXTH CLAIM FOR RELIEF AGAINST CHIEF TEMME AND THE TOWN STILL NECESSARILY FAILS**

As Defendants pointed out in their moving papers, the lack of a constitutional violation associated with Plaintiff's arrest and prosecution negates the separate theories of

7

liability against Chief Temme and the Town. Nonetheless, Plaintiff offers three scenarios wherein Sgt. Perry allegedly tried to "coerce individuals to falsely testify against others through wrongful arrests or the threat of arrest." (Doc. 31 at 15). Although Plaintiff identifies three people—Martha Dickerson, Tracy Williams, and Arthur Darby—only Darby's affidavit alleges Perry soliciting false testimony. But as pointed out in Defendants' moving papers, Darby's *pro se* lawsuit was dismissed prior to service based upon the recommendation of U.S. Magistrate Judge Joi Elizabeth Peake, who found that Darby "failed to allege facts which allow the Court to reasonably infer that Defendant Perry has violated any of Plaintiff's constitutional rights or otherwise violated any federal statute." (Doc. 26-12 at 4).

Collectively, these three scenarios—even if true—do not evidence the type of "widespread" rights violations sufficient to raise the specter of derivative liability. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014) ("Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will."). First, there is no showing that any of these three persons lodged a complaint—formal or informal—with the Southern Pines Police Dept. over Perry's alleged conduct. For a police chief or department to be deliberately indifferent to civil rights violations by its members, there must be "notice" of a problem requiring correction, followed by inaction. *See Estate of Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 672 (4th Cir. 2020) ("At its core, the strict *Monell* test asks for some level of notice."). Second, even if the chief or department was made aware of these accusations, it does not follow they would conclude Perry was likely to fabricate or conceal evidence as Plaintiff

8

accuses him of doing. Keep in mind that *Monell* liability does not turn upon the number of prior complaints, but whether the department received enough complaints of a *similar* nature to sound the alarm and require investigative and/or corrective action. *Carter v. Morris*, 164 F.3d 215, 219 (4th Cir. 1999) (*Monell* liability requires a pattern of "deliberate indifference to or condonation of particularized violations that are similar in kind to [the plaintiff's] own"). *See also Carpenter v. Reed*, 2015 WL 4979635 at *13 (W.D.N.C. 2015) (*Monell* liability based on a pattern of constitutional violations requires proof of prior misconduct that is "sufficiently similar to th[e] allegations made" by the plaintiff).

Plaintiff argues the Defendants "fabricated information that the Cadillac was operable, and that the registration was active." (Doc. 31 at 22). That is simply untrue, and Defendants' moving papers debunked the Complaint's allegation that Moore County District Attorney Warren McSweeney was so misled. (Doc. 27 at 10-11).

### 4. PLAINTIFF HAS FAILED TO OVERCOME THE INDIVIDUAL DEFENDANTS' ENTITLEMENT TO IMMUNITY

#### A. Qualified Immunity

Plaintiff's sole argument against qualified immunity is that immunity should not be available to an officer who makes "'intentionally or recklessly false material statements or omissions in order to obtain a warrant.'" (Doc. 31 at 20). But that is not what happened here. The underlying theme of Plaintiff's Opposition is that Sgt. Lowery should not have charged Plaintiff with drug possession, in large part because the cocaine was found in an unlocked inoperable car—registered to Plaintiff and parked in his yard—but which was accessible to others, including Plaintiff's son. The qualified immunity question therefore

9

asks if, as of February 20, 2018, the decision to seek charges under these circumstances was "clearly proscribed" by preexisting law. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). The answer is no, because there was no such "clearly established" precedent to the contrary, especially given the case law cited herein by Defendants on the strong inferences to be drawn from ownership and control.

Moreover, if there was in fact binding precedent to the contrary, it was up to Plaintiff to provide it, and he did not. *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (qualified immunity obtains where plaintiffs "have not brought to our attention any cases of controlling authority in their jurisdiction at the time of the incident which clearly established the rule on which they seek to rely"). *See also Estate of Rahim v. Doe*, 51 F.4th 402, 410 (1st Cir. 2022) ("[W]e hold that the officers are entitled to qualified immunity because the Estate has not identified any authority that would put the officers on notice that their actions were unlawful.").

Lastly, both the Complaint and Plaintiff's Opposition are rife with broad assertions that "Defendants" did this or that. But when it comes to the issue of liability—and especially qualified immunity—an individual government actor is accountable for only his or her own conduct. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. *Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct*.") (emphasis added).

Accordingly, Defendants remain entitled to qualified immunity as a matter of law.

## B. Public Official Immunity

Since Plaintiff's charges were supported by probable cause, the individual Defendants are necessarily entitled to public official immunity. But even if this Court were to decide probable cause was lacking, public official immunity still obtains. The North Carolina Supreme Court recently applied public official immunity to claims of malicious prosecution and false arrest—both intentional torts—although it concluded on the facts of that case the plaintiff had "presented sufficient evidence of malice to create a disputed issue of material fact" preventing summary judgment. *Bartley v. City of High Point*, 381 N.C. 287, 299, 873 S.E.2d 525, 536 (2022). *See also McDougald v. Kersey*, 2022 WL 17091685 at *10 n.7 (M.D.N.C. 2022) (noting the "relevant distinction" for public official immunity "is not whether the public official's action was an intentional tort or mere negligence [but] whether the act was done with corruption or malice"). Given Plaintiff's failure to show the Defendants acted with corruption or malice, they are entitled to public official immunity as a matter of law.

## 5. CONCLUSION

Plaintiff has failed to create a genuine issue of material fact over the existence of probable cause for being criminally charged. That being so, Defendants remain entitled to summary judgment as a matter of law.

Dated: December 12, 2022

s/Scott D. MacLatchie
Scott D. MacLatchie
North Carolina Bar No. 22824
Hall Booth Smith, P.C.
11215 North Community House Road
Suite 750
Charlotte, North Carolina 28277
Telephone No. (980) 949-7820
smaclatchie@hallboothsmith.com
*Attorney for Defendants*

## CERTIFICATE OF WORD COUNT

I hereby certify that this Reply contains 3,110 words, exclusive of caption, signature lines, and this Certificate, and therefore complies with Local Rule 7.3(d).

Dated: December 12, 2022                                    s/Scott D. MacLatchie