IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LEE MARVIN HARRIS, SR.,           )
                                  )
          Plaintiff,              )
                                  )
     v.                           )
                                  )
THE TOWN OF SOUTHERN PINES,       )     1:21-cv-955
OFFICER JASON PERRY, in his       )
individual capacity, OFFICER      )
SEAN LOWERY, in his individual    )
capacity, OFFICER KYLE MARSH,     )
in his individual capacity,       )
and CHIEF OF POLICE ROBERT        )
TEMME, in his official and        )
individual capacity,              )
                                  )
          Defendants.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendants' Motion for Summary
Judgment filed by the Town of Southern Pines, Chief of Police
Robert Temme in his official and individual capacities, and
Officers Jason Perry, Sean Lowery, and Kyle Marsh in their
individual capacities. (Doc. 26.) For the following reasons,
this court will grant Defendants' motion.

## I.   PROCEDURAL HISTORY

On December 16, 2021, Plaintiff Lee Marvin Harris, Sr.
initiated this action alleging six causes of action. (Compl.

(Doc. 1) at 11–20.)[1] Against Officers Perry, Lowery, and Marsh in their individual capacities ("Officer Defendants"), Plaintiff alleges claims for malicious prosecution under the Fourth Amendment and 42 U.S.C. § 1983, malicious prosecution under North Carolina state law, fabrication of evidence under 42 U.S.C. § 1983, and failure to intervene under 42 U.S.C § 1983. (See id. at 11–18.) Plaintiff also alleges a Monell claim for failure to train or supervise under 42 U.S.C. § 1983 against Chief of Police Robert Temme in his individual[2] and official capacities and against the Town of Southern Pines ("City

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[2] A Monell claim is a cause of action that holds a "government as an entity . . . responsible under § 1983." Monell v. Dep't of Soc. Serv. of the City of N.Y., 436 U.S. 658, 694 (1978). "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." Kentucky v. Graham, 473 U.S. 159, 159 (1985). Accordingly, a Monell claim is limited to municipal entities and government officials acting in their official capacities; "a Monell claim cannot lie against a municipal official sued in his individual capacity." Grim v. Baltimore Police Dep't, No. ELH-18-3864, 2019 WL 5865561, at *16 (D. Md. Nov. 8, 2019); see, e.g., Devi v. Prince George's Cnty., DKC-16-3790, 2017 WL 3592452 at *2 n.3 (D. Md. Aug. 21, 2017) ("Plaintiff cannot state a Monell claim against an officer in his individual capacity."); Harasz v. Katz, 239 F. Supp. 3d 461, 505 (D. Conn. 2017) ("Monell does not apply to state officials or individuals sued in their individual capacity."). To the extent Plaintiff brings a Monell claim against Chief of Police Temme in his individual capacity, summary judgment will be granted in Chief Temme's favor as to that claim.

Case 1:21-cv-00955-WO-JEP   Document 47   Filed 07/03/23   Page 2 of 50

Defendants"). (See id. (Doc. 1) at 19–20.) Although Plaintiff's complaint originally alleged a claim against Officer Perry in his individual capacity for First Amendment retaliation under 42 U.S.C. § 1983, (see id. at 19–20), Plaintiff has abandoned this claim, (see Pl.'s Resp. (Doc. 31) at 2 n.1).

Discovery completed on October 7, 2022. (See Ord. to Extend the Discovery Deadline (Doc. 24).) Subsequently, Defendants filed a Motion for Summary Judgment, (Doc. 26), along with a supporting memorandum, (Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") (Doc. 27)). Plaintiff filed a response in opposition. (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp.") (Doc. 31).) Defendants replied. (Defs.' Reply to Pl.'s Opp'n to Mot. for Summ. J. ("Defs.' Reply") (Doc. 34).) Defendants' motion for summary judgment, (Doc. 26), is ripe for adjudication.

## II. __FACTUAL BACKGROUND__

On a motion for summary judgment, the court views the evidence in the light most favorable to Plaintiff as the nonmoving party. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

### A. __Investigation of the Dope Boy Clic__

In 2017, Officer Jason Perry was a police officer for the Southern Pines Police Department ("SPPD") in the Investigations Division, focusing on narcotics investigations. (See Ex. A,

- 3 -

Perry Decl. ("Perry Decl.") (Doc. 26-1) at 2.) Officer Walter
Lowery was also a police officer for the SPPD in the
Investigations Division, focusing on narcotics investigations.
(See Ex. B, Lowery Decl. ("Lowery Decl.") (Doc. 26-2) at 2.)
Officer Kyle Marsh was lieutenant of the SPPD's Investigations
Division. (See Ex. C, Marsh Decl. ("Marsh Decl.") (Doc. 26-3)
at 2.) In October 2017, Officer Marsh was promoted to
"lieutenant in charge" of the Investigations Division; in that
role, he "oversaw the personnel that were assigned to the
Investigations Division, including Officers Lowery and Perry."
(Id.)

In February 2017, SPPD began investigating drug trafficking
by the "Dope Boy Clic" in Southern Pines, North Carolina, and
its surrounding areas. (See Perry Decl. (Doc. 26-1) at 2-3;
Ex. 3, Perry Tr. ("Perry Dep.") (Doc. 32-3) at 99-100.) The
investigation was titled Operation Leader. (See Perry Decl.
(Doc. 26-1) at 2.) Officers Perry and Lowery were in charge of
Operation Leader. (See id. at 2-3.) Officer Marsh "aid[ed] the[]
operation" by "conducting surveillance, as well as monitoring
trackers installed on vehicles [they] were tracking." (Marsh
Decl. (Doc. 26-3) at 2.)

The main targets of the investigation were Lee Harris, Jr.
(Plaintiff's son), Christian Terry, and Lamar Sealy. (See Perry
Dep. (Doc. 32-3) at 100.) Other targets included Korey McLeod,

- 4 -

Jeremy Johnson, Tremayne McLeod, Robert Marvin McRae, Jaquay McNeill, and Brian Scales. (See Perry Decl. (Doc. 26-1) at 2.) Plaintiff Lee Harris, Sr. was not a target of the investigation, nor was there any prior "indication or . . . observation of [Plaintiff] ever dealing in narcotics." (See Perry Dep. (Doc. 32-3) at 100 (cleaned up).)

As part of Operation Leader, the SPPD surveilled members of the Dope Boy Clic, as well as several locations in or near Southern Pines. (See Perry Decl. (Doc. 26-1) at 3; Marsh Decl. (Doc. 26-3) at 2.) Two of the locations surveilled included Plaintiff's house at 803 N. Sycamore Street, Aberdeen, NC, (see Marsh Decl. (Doc. 26-3) at 2-3), and 811 West New York Avenue, a suspected drug house for the Dope Boy Clic's activities, (see Perry Decl. (Doc. 26-1) at 3). Plaintiff's house was surveilled because it was Harris, Jr.'s "most frequented area during daytime and nighttime while in the Moore County area." (Ex. 9, Warrant Appl. (Doc. 32-9) at 11.) Additionally, several of the targets were surveilled through GPS monitoring trackers installed upon those individuals' vehicles. (Marsh Decl. (Doc. 26-3) at 2.)

As records of surveillance, the officers would aggregate notes from their individual physical surveillance that they personally observed, (see Perry Dep. (Doc. 32-3) at 135), notes from other officers' physical surveillance, (see id. at 135-36),

- 5 -

and information from GPS trackers on the targets' vehicles, (see id. at 136).

In one instance while conducting surveillance at 811 W. New York Avenue, Officer Perry observed Plaintiff handing cash to Robert McRae, one of the targets of the investigation and a known drug dealer — although Officer Perry does not remember whether he observed this while conducting physical surveillance or observed this through watching pole surveillance camera footage. (See id. at 122–23.)

Plaintiff testified that he was visiting his mother-in-law, who lived right next to 811 W. New York Avenue at 823 W. New York Avenue. (See Ex. 2, Harris Dep. Tr. ("Pl. Dep.") (Doc. 32-2) at 107.) Plaintiff explained that the two houses are "physically pretty [] close" and that there's only a "fence . . . that separates the two." (Id. at 107.) Plaintiff further testified that McRae had a cleaning business and that Plaintiff paid McRae $40 for cleaning Plaintiff's car on the day he was surveilled by law enforcement. (See id. at 115, 116.)

Officer Perry testified that he was not aware of Plaintiff's mother-in-law's address as of 2018, but acknowledged that "her listed address is 823 West New York Avenue." (See Perry Dep. (Doc. 32-3) at 36.) However, Officer Marsh testified that he was aware that Plaintiff's mother-in-law lived next door to 811 W. New York Avenue. (Marsh Dep. (Doc. 32-4) at 178.)

Officer Perry was aware at that time that McRae owned a car wash business. (See Perry Dep. (Doc. 32-3) at 123.) Further, the surveillance footage did show a car with cleaning supplies at the house. (See Ex. 17, Rod McRae Mobile Carwash for Harris Sr_Video 00002 ("Surveillance footage of McRae Mobile Carwash") (Doc. 32-17) at 00:00:02–00:01:12.) However, Officer Perry did not recall seeing Plaintiff's car being washed in any surveillance footage. (See Perry Dep. (Doc. 32-3) at 123–24.) Nor was there any surveillance footage actually showing a car being washed.

On January 24, 2018, Officer Lowery's surveillance notes from conducting physical surveillance at Plaintiff's house stated that Harris, Jr. arrived at his father's (Plaintiff's) house, went to a trash can near the driveway, went "to the rear of the home, out of sight" for two to three minutes, and went "inside the home using the front door" for five to ten minutes. (Ex. 30, Jan. 24, 25 Surveillance (Doc. 32-30) at 1.)

On January 25, 2018, Officer Lowery's surveillance notes stated that Harris, Jr. arrived at his father's house, retrieved something from the front porch, entered the house, exited the house, and placed something to the left of the door "possibly on the floor of the porch." (Id.) He then went to the right edge of the property and placed or retrieved "something from underneath

a tarped item located to the right of the enclosed trailer."
(Id.)

On January 31, 2018, Officer Lowery's surveillance notes
stated that Harris, Jr. arrived at his father's house and went
to "the right side of the home, near a silver in color enclosed
trailer. He then approache[d] a vehicle covered with a blue tarp
on it. He [was] over at this vehicle [for] approximately 2 to 3
minutes." (Ex. 31, Jan. 31 Surveillance (Doc. 32-31) at 1.)
Officer Perry's surveillance notes from that same day stated
that Harris, Jr. arrived at a "target house," subsequently went
to his father's house, and then went to a tarped area outside
his father's house for several minutes. (See Perry Dep. (Doc.
32-3) at 139-40.) Officer Perry was not conducting physical
surveillance at Plaintiff's house at that time, so Officer
Perry's notes concerning Harris, Jr. at his father's house
appear to be based on another officer's surveillance. (See id.
at 140.)

On February 20, 2018, Officer Perry's surveillance notes
state that first Harris, Jr. went to a storage locker in
Aberdeen, in which cocaine was later found. (See id. at 136-37.)
Eight minutes later, Harris, Jr. was at his father's house. (See
id. at 137.)

**B.  Search of Plaintiff's House**

On February 20, 2018, Officer Perry obtained a warrant to search 803 N. Sycamore Street, Plaintiff's house. (See id. at 125.) "The search warrant covered a search of the entire residence and all vehicles located on the property." (Perry Decl. (Doc. 26-1) at 3.) Prior to executing the warrant that same day, Officer Perry met with other officers in the SPPD to plan the execution of the warrant, including Officers Marsh and Lowery. (See Perry Dep. (Doc. 32-3) at 125–26.) Officer Lowery did not participate in the search of Plaintiff's house, as he participated in a search of 1090 W. Indiana Avenue that day. (Lowery Decl. (Doc. 26-2) at 3–4.) Officer Lowery did speak with Officer Perry over the phone "[a]t some point during the searches of [both] locations" "regarding the evidence obtained at both locations." (Id. at 3.)

Upon entering Plaintiff's house, Officer Perry handcuffed Plaintiff to detain him during the search and took Plaintiff outside to interview him. (See Perry Dep. (Doc. 32-3) at 128.) At this time, Plaintiff was not under arrest, but Officer Perry read Plaintiff his Miranda rights nonetheless. (See id. at 129.) During the interview, Plaintiff told Officer Perry: "I don't do dope. I don't curse. I don't drink liquor. . . . I don't even smoke cigarettes." (Id. at 130.)

Officer Perry did inform Plaintiff that "this was mainly about [Plaintiff's] son." (Id.) He asked Plaintiff: "Is there any place around your house that your son goes on a regular basis that is kind of strange?" (Id. at 154.) He also asked Plaintiff: "Has your son brought anything here?" (Id. at 132.) Officer Perry testified that Plaintiff responded that "nobody comes here" and that "nobody's brought nothing here." (Id. at 147–48.) Officer Perry testified that he believed Plaintiff "stated that [Plaintiff] hadn't seen his son at [Plaintiff's] property in the last month" until "earlier that day." (See id. at 157–58, 162.)

While executing the search warrant, Officer Kevin Dean conducted a K9 search of Plaintiff's property outside of Plaintiff's house; Officer Dean's dog "alerted to the presence of narcotics" on a "1994 red Cadillac that was parked on the side of the home." (Marsh Decl. (Doc. 26-3) at 3; see also Ex. 4, Marsh Tr. ("Marsh Dep.") (Doc. 32-4) at 162–63.) The Cadillac was covered by a gray tarp. (Marsh Decl. (Doc. 26-3) at 3.) When the gray tarp was pulled away, Officer Dean "observed apparent drugs inside the vehicle on the floorboard and behind the arm rest." (Id. at 3.) The car was registered to Plaintiff, (see Marsh Dep. (Doc. 32-4) at 151), but the license plate had expired in 2015, (see id. at 162–63). Officer Marsh also testified that he "believe[d] the registration was

expired," although he did not "recall specifically [the Communications Center] telling [him] that" when he called them concerning the license plate. (Id. at 139–40.) The car also had no battery. (See id. at 171.)

The driver-side door of the Cadillac was unlocked, but the other doors were locked. (See id. at 163.) When Officer Marsh opened the unlocked door to the Cadillac, he testified that there was a "smell of cocaine." (Id. at 163–64.) He found over two ounces of cocaine and digital scales in the backseat armrest of the car. (See id. at 152, 164–65.) "To continue the search of the Cadillac, [he] attempted to open the trunk. It appeared to be locked and the release from [the] inside was inoperable." (Marsh Decl. (Doc. 26-3) at 4.)

At some point during execution of the search warrant, Officer Marsh or Officer Perry asked Plaintiff if Plaintiff had a key to the Cadillac. (See Marsh Dep. (Doc. 32-4) at 169; see also Marsh Decl. (Doc. 26-3) at 4; Perry Dep. (Doc. 32-3) at 118, 150.) Plaintiff "took officers to his bedroom to a set of keys that contained the Cadillac emblem," (Perry Dep. (Doc. 32-3) at 118); the keys were hanging on a "hook or rack" by the door to the master bedroom, (see Marsh Dep. (Doc. 32-4) at 169). The keys "work[ed] on the doors" of the car and "unlocked the ignition." (See id. at 171–72.) Although "the keys did operate the ignition switch," "the car would not start."

- 11 -

(Marsh Decl. (Doc. 26-3) at 4.) The keys did not operate the
trunk lock, and ultimately, the trunk "had to be forced open."
(Marsh Dep. (Doc. 32-4) at 117.) "No contraband was located
within the Cadillac's trunk." (Marsh Decl. (Doc. 26-3) at 4.)

The parties dispute where the keys to the Cadillac were
found. (Compare Defs.' Br. (Doc. 27) at 5, 7–8, 17–18
(explaining that Plaintiff kept the keys to the Cadillac on his
bedroom door), with Pl.'s Resp. (Doc. 31) at 18 (arguing that
Defendants' claims about the location or Plaintiff's control of
the keys are inaccurate).) Officer Marsh's report of the search
stated:

> Mr. Harris walked me into his home in the northernmost
> bedroom to a hanger on the wall and provided me a key
> that was hanging from this location.

(Marsh Dep. (Doc. 32-4) at 169–70.) However, Officer Marsh
testified that the keys were "right by the master bedroom door,"
but he could not remember if the keys were "on the door or right
behind the door," with the latter scenario such that the keys
would be inside the master bedroom. (Id. at 169.) Even so,
Officer Marsh explained that the keys' location "was a piece of"
the probable cause determination. (Marsh Dep. (Doc. 32-4)
at 170.)

Additionally, "[d]uring the search of the residence, a
number of firearms were found. Most were located in
[Plaintiff's] bedroom, but Officer Greg Powers located a

- 12 -

Springfield .40 caliber semiautomatic pistol in a closet in a room used by Harris, Jr." (Perry Decl. (Doc. 26-1) at 4.) Plaintiff told Officer Marsh that Harris, Jr. had a "bedroom in [Plaintiff's] home." (Marsh Decl. (Doc. 26-3) at 4-5.) Additionally, Plaintiff told Officer Marsh "that any weapon found in [Plaintiff's] son's room would belong to his son and that [Plaintiff] would have no knowledge of it." (Id. at 5.)

Officer Perry spoke with Officer Marsh after the cocaine was found in the Cadillac. (Perry Decl. (Doc. 26-1) at 4.) "Based on a number of factors including a significant amount of cocaine, as well as drug paraphernalia discovered in his vehicle, the keys to which were hanging on his bedroom door, coupled with the . . . observation of [Plaintiff] at the New York Ave. drug house, it was decided that [Plaintiff] would be placed under arrest." (Id. at 4-5.) Officer Perry placed Plaintiff under arrest for trafficking cocaine, maintaining a vehicle to keep controlled substances, possession with intent to distribute cocaine, and possession of drug paraphernalia. (Id. at 5.)

Officer Perry testified to his basis for determining that probable cause existed to arrest Plaintiff, which included: Plaintiff's statement to Officer Perry that Plaintiff "hadn't seen his son at the property prior to that morning . . . [and] hadn't seen his son at the property within the past month or

two; Plaintiff's knowledge "of the inner workings of [the] Cadillac, [including] what doors were locked, what doors were unlocked, the fact that it was missing a battery, the fact that the trunk was not operable"; "the vehicle in question was registered to" Plaintiff; Plaintiff had access to the car keys; "Lee Harris, Jr. had so many other places that he could . . . sell drugs from," so "it made no sense for him to put his parents in harm's way [or] put their property in question by placing drugs on his parents' property"; and, "seeing [Plaintiff] at 811 West New York Avenue speaking with known drug dealers [at] the main narcotics distribution point of this investigation." (See Perry Dep. (Doc. 32-3) at 117–20 (cleaned up).)

### C.  **Criminal Proceedings Against Plaintiff**

Following his arrest, Plaintiff was transported to the Moore County Jail. (See Lowery Decl. (Doc. 26-2) at 4.) Officer Lowery testified to the facts underlying the officers' belief of probable cause to arrest Plaintiff before Magistrate Judge Carol Wright. (See id.) Officer Lowery did not inform the Magistrate that "the car where [the SPPD] found drugs at [Plaintiff's house] was the same car where [he] saw Junior retrieving or taking items to." (Ex. 5, Lowery Tr. ("Lowery Dep.) (Doc. 32-5) at 80–81.) Based on Officer Lowery's testimony and the evidence presented, Magistrate Wright concluded that probable cause

existed for Plaintiff's arrest. (See Lowery Decl. (Doc. 26-2) at 4-5.) Plaintiff was charged with trafficking cocaine, maintaining a vehicle to keep controlled substances, possession with intent to distribute cocaine, and possession of drug paraphernalia. (See id. at 5.) After Plaintiff's arrest, he was held in pretrial custody for at least four months; eventually, Plaintiff was released from pretrial custody on the condition of electronic location monitoring. (See Ex. 27, May 1 Hearing (Doc. 32-27) at 19, 22, 33; Ex. 26, July 10 Hearing (Doc. 32-26) at 11-13.)

Officer Perry testified before a state grand jury as to the facts that led him to find probable cause for Plaintiff's arrest. (See Perry Dep. (Doc. 32-3) at 103.) He did not testify before the state grand jury that he, or any other officer, observed Harris, Jr. placing items into the Cadillac in which cocaine was found. (See id. at 103-04.)

On August 2, 2020, Plaintiff's state charges were dismissed, as Plaintiff had been indicted in federal court a few days prior. (See Ex. F, State Court Dismissal (Doc. 26-6); see also Ex. G, Federal Arrest Warrant (Doc. 26-7).) On December 14, 2020, Plaintiff's federal charges were also dismissed. (See Ex. H, Federal Court Dismissal (Doc. 26-8).)

On December 18, 2020, federal prosecutors filed a Factual

- 15 -

Basis in the federal prosecution of Harris, Jr. (Ex. 22, Rule 11 Memorandum (Doc. 32-22).) The Factual Basis noted:

> On or about January 25 and January 31, 2018, officers surveilled the residence at 803 Sycamore Street, Aberdeen, NC. Harris Jr.'s parents live at the Sycamore Street residence, and Harris Jr. often stayed at the residence during 2017 and 2018. On both surveillance occasions, Harris Jr. arrived at the residence and then went over to a Cadillac covered with a gray car cover for a few minutes, consistent with placing an item in or retrieving an item from the vehicle. Powder cocaine and crack cocaine were later recovered from that covered Cadillac on February 20, 2018, pursuant to a search warrant.

(Id. at 2.) Officer Perry testified that federal prosecutors would only have received this information from either himself or Officer Lowery. (See Perry Dep. (Doc. 32-3) at 109.) Officer Perry agreed in his deposition that the above paragraph of the Factual Basis contradicts Officer Lowery's surveillance notes from January 31, 2018; Officer Perry explained that he believed the notes say "Lee Harris, Jr., went to a car covered with a blue tarp. There was no indication that anything was placed in or taken out of the vehicle." (Perry Dep. (Doc. 32-3) at 111–12.)

### D. <u>Allegations that SPPD Threatened to Arrest Individuals</u>

Plaintiff alleges that Chief Temme "failed to properly supervise SPPD officers, despite having actual knowledge of the need for better and additional training and supervision." (Compl. (Doc. 1) at 19.) More specifically, Plaintiff alleges

- 16 -

that "SPPD Chief Temme was aware of numerous . . . complaints and at least one lawsuit against Officer Perry," yet Chief Temme "took no disciplinary action against Detective Perry." (Id.)

Plaintiff testified that during the search of his house, Aberdeen Chief of Police Carl Colasacco said: "Marsh told me to tell you that if you didn't cooperate with him . . . about your son[, Marsh] was gonna take you to jail and lock you up." (Pl. Dep. (Doc. 32-2) at 166, 148.) Previously, Plaintiff had also sent complaints to SPPD or SPPD's Internal Affairs about various officers' conduct. (See id. at 51-61.) This included a written complaint about Officer Perry in 2013. (See id. at 61). The SPPD investigated the complaint and "determined . . . the complaint was unfounded." (Ex. J, Campbell Decl. (Doc. 26-10) at 2-3.) In 2013, Plaintiff also complained to the Wellford Police Department of South Carolina that their officers fabricated drug charges against his son, and Plaintiff may have but could not remember if he filed a pro se lawsuit regarding this concern. (See Pl. Dep. (Doc. 32-2) at 69-72.)

Martha Dickerson, Plaintiff's mother-in-law, (id. at 162), testified to a similar experience. (See Ex. 23, Dickerson Aff. (Doc. 32-23) at 1.) Dickerson testified that her son, Edwin, "was arrested on suspicion of drug-related charges." (Id.) "Despite having no knowledge about any criminal activity . . ., [she] was later arrested and Officer Perry stated, 'we are

working on you to get your son.'" (Id.) After her son entered a plea bargain, Dickerson's charges were dismissed. (Id. at 2.)

Another Southern Pines resident, Tracy Williams, testified that Officer Perry contacted her to conduct a controlled purchase of narcotics from Dickerson's son. (Ex. 38, Tracy Williams Aff. (Doc. 32-38) at 1.) Williams testified that Officer Perry told her: "[I]f I didn't do this, that he would make sure that I would spend a lot of time in prison because of my Criminal Record. He also told me that he would not lock me up if I cooperated." (Id.)

Finally, Arthur Darby testified that Officer Perry contacted Darby about becoming a confidential informant, "specifically to provide information on Lee Marvin Harris Jr., and any known drug activity in the area." (Ex. 13, Darby Aff. (Doc. 32-13) at 1.) Darby further testified that "[e]ven after I repeatedly told [Officer Perry] that I had no information to give, Officer Perry made numerous attempts to coerce me into falsifying evidence to help build his cases." (Id. at 2.) Darby filed a pro se complaint in this district against Officer Perry and the SPPD. (See Ex. 12, Darby Suit (Doc. 32-12); see also Compl., Darby v. Perry, No. 13-cv-185 (M.D.N.C. Apr. 29, 2013), Doc. 2.) Darby's complaint was ultimately dismissed without prejudice for failure to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B). Order and

Recommendation, Darby v. Perry, No. 13-cv-185 (M.D.N.C. Mar. 20, 2013), Doc. 4, recommendation adopted, J. Darby v. Perry, No. 13-cv-185 (M.D.N.C. Apr. 29, 2013), Doc. 6.

## III. LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). When reviewing a summary judgment motion, the court must view all evidence in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). This court's summary judgment inquiry is whether the evidence "is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. If the "moving party discharges its burden . . ., the nonmoving party then must come forward with specific facts showing that there is a genuine issue for trial." McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718–19 (4th Cir. 2003) (citing Matsushita Elec. Indus. Co, 475 U.S. at 586-87). Summary judgment "should be granted unless a reasonable jury could return a verdict for the nonmoving party

- 19 -

on the evidence presented." Id. at 719 (citing Liberty Lobby, 477 U.S. at 247–48).

IV.  **ANALYSIS**

Against Officer Defendants, Plaintiff alleges claims for malicious prosecution under 42 U.S.C. § 1983 and North Carolina state law, fabrication of evidence under § 1983, and failure to intervene under § 1983. (See Compl. (Doc. 1) at 11–18.) Plaintiff also alleges a Monell claim for failure to train or supervise under § 1983 against City Defendants. (See id. at 19–20.) Defendants move for summary judgment on all of Plaintiff's claims. (Defs.' Br. (Doc. 27) at 2.) Plaintiff's malicious prosecution claims fail under both § 1983 and North Carolina law because there was probable cause for Plaintiff's arrest. Plaintiff's fabrication of evidence claim fails because Plaintiff was held in pretrial custody and not ultimately convicted of any charges. Plaintiff's failure to intervene claim fails because Plaintiff has not created a genuine issue of material fact as to the existence of any underlying constitutional violation. Lastly, Plaintiff's Monell claim fails because Plaintiff does not forecast evidence to create a genuine issue of material fact that City Defendants were deliberately indifferent to individuals' constitutional rights.

## A. __Malicious Prosecution__

Plaintiff alleges claims for malicious prosecution in violation of the Fourth Amendment against Officer Defendants under 42 U.S.C 1983 and under North Carolina state law. (Compl. (Doc. 1) at 11–14, 16–18.) "A malicious prosecution claim brought under section 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." Hupp v. Cook, 931 F.3d 307, 323–24 (4th Cir. 2019) (internal citation and quotation marks omitted). "To prove such a claim, a plaintiff must show that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Id. at 324 (internal citation and quotation marks omitted) (emphasis added). Similarly, a claim for malicious prosecution under North Carolina law requires a showing "that the defendant (1) initiated or participated in the earlier proceeding, (2) did so maliciously, (3) without probable cause, and (4) the earlier proceeding ended in favor of the plaintiff." Turner v. Thomas, 369 N.C. 419, 425, 794 S.E.2d 439, 444 (2016) (emphasis added). Thus, under both § 1983 and North Carolina law, a showing that an arrest was made with probable cause will defeat a malicious prosecution claim arising from that arrest. Plaintiff fails to meet his burden of forecasting sufficient evidence to create a

genuine issue of material fact that Officer Defendants lacked probable cause to arrest him. Thus, Plaintiff's claims for malicious prosecution fail.

"To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" D.C. v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Md. v. Pringle, 540 U.S. 366, 371 (2003)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." Id. (internal quotations omitted). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n. 13 (1983). Probable cause is determined by a "totality of the circumstances approach." Id. at 213.

In United States v. Solomon, law enforcement arrested the defendant without a warrant after conducting a search of the defendant's residence and neighboring areas. No. 1:11CR32-1, 2011 WL 1704721, at *15 (M.D.N.C. May 4, 2011), aff'd, 480 F. App'x 732 (4th Cir. 2012). During that search, officers found incriminating evidence, including boxes of ammunition that the defendant was not permitted to own as a convicted felon, scales

containing a white powder residue, and drugs. See id. The court "agree[d]" that probable cause existed for a warrantless arrest of the defendant upon finding the "incriminating evidence." — the ammunition, scales, and drugs. Id. The court explained that finding "three boxes of ammunition inside Solomon's residence clearly warranted the belief that Solomon had committed or was committing a federal offense, namely, possession of ammunition by a convicted felon," so "probable cause existed at this point to support a warrantless arrest." Id.

In Ker v. Cal., when state law enforcement officers had probable cause to arrest George Ker for marijuana possession, the Supreme Court held that there also existed probable cause for arresting George Ker's wife, as marijuana was found in their apartment in plain view. See 374 U.S. 23, 36–37 (1963). The Supreme Court explained:

> Probable cause for the arrest of petitioner Diane Ker, while not present at the time the officers entered the apartment to arrest her husband, was nevertheless present at the time of her arrest. Upon their entry and announcement of their identity, the officers were met not only by George Ker but also by Diane Ker, who was emerging from the kitchen. Officer Berman immediately walked to the doorway from which she emerged and, without entering, observed the brick-shaped package of marijuana in plain view. Even assuming that her presence in a small room with the contraband in a prominent position on the kitchen sink would not alone establish a reasonable ground for the officers' belief that she was in joint possession with her husband, that fact was accompanied by the officers' information that Ker had been using his apartment as a base of operations for his narcotics

- 23 -

activities. Therefore, we cannot say that at the time
of her arrest there were not sufficient grounds for a
reasonable belief that [Diane] Ker, as well as her
husband, [was] committing the offense of possession of
marijuana in the presence of the officers.

Id.

In Taylor v. Walters, a Fourth Circuit panel explained that

a law enforcement officer "could reasonably have believed that

the facts known to him were sufficient to establish probable

cause for [the plaintiff's] arrest." 81 F.3d 429, 435 (4th Cir.

1996). The court went on to explain the facts consistent with

probable cause: the plaintiff had lived with a "confessed

narcotics dealer" for many years, the shared apartment was "a

base of operations for . . . drug distribution activities," a

pot with white residue, consistent with "convert[ing] cocaine

into cocaine base" was in plain view in the kitchen, the

defendant had knowledge of the pot's existence, plastic bags

"routinely used for packaging and distributing illegal drugs"

were located nearby, "an envelope containing a white powdery

substance" was found, and "the large amount of currency in [the

plaintiff's] bedroom and the information disclosed in his bank

statements were consistent with his involvement in a cocaine

distribution conspiracy." Id. Although the court ultimately

declined to decide the issue of probable cause, the court

concluded that the officer was "entitled to qualified immunity

on [the plaintiff's] § 1983 claim alleging that his arrest and prosecution were unsupported by probable cause." Id.

Here, Plaintiff does not forecast sufficient evidence to cast doubt on Officer Defendants' reasonable determination that probable cause existed to arrest Plaintiff without a warrant.[3] "[F]or probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." Durham v. Horner, 690 F.3d 183, 190 (4th Cir. 2012) (quoting Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002)) (analyzing § 1983 malicious prosecution claim) (cleaned up). Officer Perry testified to the facts known to Officer Defendants at the time of Plaintiff's arrest that supported their probable cause determination: surveillance that showed Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor, discovery of over two ounces of cocaine and drug paraphernalia in a Cadillac on Plaintiff's property, the Cadillac being registered to Plaintiff, Plaintiff's custody of the keys to the Cadillac, and Plaintiff's knowledge of and control over the Cadillac in which the narcotics were found. (See Perry Dep. (Doc. 32-3) at 117–20.)

---

[3] Courts have often found probable cause for a warrantless arrest following discovery of unlawful contraband. See, e.g., Solomon, 2011 WL 1704721, at *15; Ker, 374 U.S. at 36–37; Taylor, 81 F.3d at 435.

Officer Defendants also knew that another known drug distributor, Harris, Jr., stayed at Plaintiff's home and was seen going in and around the Cadillac. (See Perry Dep. (Doc. 32-3) at 139–40.) Although Lee Harris, Jr.'s use of the Cadillac suggests Plaintiff did not have exclusive possession of the Cadillac, Plaintiff's possession may also be constructive and joint.

Like in Solomon, the finding of illegal contraband on Plaintiff's property alone provides probable cause for his warrantless arrest. Solomon, 2011 WL 1704721, at *15. In Ker, drugs found in a common area — the kitchen — was enough to "establish a reasonable ground for the officers' belief that [Diane Ker] was in joint possession with her husband," particularly when the officers knew her husband had been using the apartment as a base of operations; all of which supported a finding of probable cause for her warrantless arrest. See Ker, 374 U.S. at 36–37. Even in Taylor, in which no drugs were actually found, the Fourth Circuit explained that "the facts known to [the law enforcement officer] appear[ed] more than adequate to support a finding of probable cause for Taylor's arrest." Taylor, 81 F.3d at 435. Here, illegal cocaine and drug paraphernalia were found in a Cadillac on Plaintiff's property, and Plaintiff had control over the Cadillac, as demonstrated by the Cadillac's registration in his name, Plaintiff's possession

of the car key that operated the ignition, and Plaintiff's
knowledge of which doors on the Cadillac were unlocked. Those
facts support Officer Defendants' reasonable belief that
Plaintiff was, at minimum, in constructive possession of the

narcotics found in the Cadillac.[4] See United States v. Shorter, 328 F.3d 167, 172 (4th Cir. 2003) (explaining that contraband found in the defendant's home "permits an inference of constructive possession," even when some of the contraband was

---

[4] "A defendant may have constructive possession of contraband even if it is not in his immediate possession or control." United States v. Shorter, 328 F.3d 167, 172 (4th Cir. 2003). "Constructive possession may be proved by demonstrating that the defendant exercised, or had the power to exercise, dominion and control over the item." United States v. Jackson, 124 F.3d 607, 610 (4th Cir. 1997) (internal citation and quotation marks omitted). "Constructive possession requires 'ownership, dominion, or control over the contraband or the premises or vehicle in which the contraband was concealed' and 'knowledge of the presence of the contraband.'" United States v. Moody, 2 F.4th 180, 189 (4th Cir. 2021). "If a factfinder determines a driver had dominion and control of a vehicle, that is sufficient to establish constructive possession of contraband hidden in that vehicle." Id. at 191. Although Plaintiff was not driving the vehicle at the time of the search, this court concludes the undisputed evidence is sufficient to establish Plaintiff's dominion and control of the vehicle at the time of the search. The totality of the circumstances requires consideration of the facts related to Plaintiff's dominion and control of the vehicle and any relevant additional facts including the fact that Plaintiff engaged in a hand-to-hand transaction with a target of the investigation in front of a suspected drug house at 811 West New York Avenue, (Doc. 26-1 at 3).

"Constructive possession may be proved by circumstantial as well as direct evidence." Id. And contraband need not be in plain view for a defendant to constructively possess it. See Shorter, 328 F.3d at 172. Here, the evidence is largely circumstantial and a trial on the merits or the benefit of a review of additional evidence following Plaintiff's arrest may show that any inferences drawn at the time of the arrest were not correct. Nevertheless, the issue of whether probable cause exists is based upon "the information the officers had at the time they sought the warrant," Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017), and not after consideration of later-disclosed or received evidence.

"not in plain view"); cf. United States v. Kitchen, 57 F.3d 516, 519–21 (7th Cir. 1995) (affirming conviction for constructive possession of firearm found in dresser drawer when evidence indicated that the defendant had access to the bedroom where the dresser was located); United States v. Surratt, 172 F.3d 559, 564 (8th Cir. 1999) (holding that evidence supported finding of constructive possession of narcotics, even though the narcotics were concealed). Moreover, the combination of finding narcotics and surveillance of Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor "provides ample evidence for a reasonable law enforcement officer to believe" Plaintiff was somehow involved with the drugs found, supporting probable cause for a warrantless arrest. See Durham, 690 F.3d at 190.

Plaintiff argues that there was an innocent explanation for the hand-to-hand transaction and that the drugs on his property were not his; Plaintiff also argues that Officer Defendants knew or should have known the drugs were not his, given Officer Lowery's surveillance notes showing Lee Harris, Jr., going to the tarped area and tarp-covered car. (Pl.'s Resp. (Doc. 31) at 17–20.) "Contrary to [Plaintiff's] assertions, [Officer Defendants] [were] 'not required to exhaust every potentially exculpatory lead or resolve every doubt about [Plaintiff's] guilt before probable cause was established.'" See Durham, 690

- 29 -

F.3d at 190 (citation omitted). Even so, this court will address each of Plaintiff's contentions in turn.

First, Plaintiff argues that Officer Defendants should have known that the surveillance at 811 W. New York Avenue of Plaintiff handing cash to McRae, one of the targets of the investigation and a known drug dealer, (see Perry Dep. (Doc. 32-3) at 122–23), was actually paying McRae for washing Plaintiff's car while Plaintiff visited his mother-in-law. (Pl.'s Br. (Doc. 31) at 19.) In support, Plaintiff points to several facts: Plaintiff testified that he was visiting his mother-in-law, who lived right next to 811 W. New York Avenue at 823 W. New York Avenue, (see Pl. Dep. (Doc. 32-2) at 107); Officer Perry was aware at that time that McRae owned a car wash company, (see Perry Dep. (Doc. 32-3) at 123); and Officer Perry at some point knew that Plaintiff's mother-in-law lived at 823 W. New York Avenue, (see id. at 36–37). Plaintiff further contends that the "SPPD surveillance videos prove that the alleged 'hand to hand' transaction was nothing more than payment for a car wash." (Pl.'s Resp. (Doc. 31) at 19.) However, the surveillance footage did not show a car being washed, nor did Officer Perry recall seeing Plaintiff's car being washed in any surveillance footage. (See Perry Dep. (Doc. 32-3) at 123–24.)

"[W]hen it is considered in the light of all of the surrounding circumstances, even 'seemingly innocent activity'

may provide a basis for finding probable cause." Porterfield v. Lott, 156 F.3d 563, 569 (4th Cir. 1998) (quoting Taylor v. Waters, 81 F.3d 429, 434 (4th Cir. 1996)); see also Wadkins v. Arnold, 214 F.3d 535, 540-42 (4th Cir. 2000) (explaining that when a law enforcement officer reasonably believed that probable cause existed for arrest, the officer need not pursue every potentially exculpatory lead, ultimately finding that the officer was entitled to qualified immunity on the plaintiff's malicious prosecution claim). Even though Plaintiff provides an innocent explanation for the hand-to-hand cash transaction, when the transaction's circumstances — a cash transaction with a suspected drug dealer in front of a suspected drug house — are considered alongside the narcotics found on Plaintiff's property, it provides a reasonable basis for finding probable cause. Cf. United States v. Ward, 465 F. App'x 260, 262 (4th Cir. 2012) (explaining that a defendant's hand—to-hand cash transaction, when considered alongside informants' statements that drug activity occurred at the defendant's residence and apprehending a customer who admitted to buying marijuana from defendant, provided reasonable suspicion that defendant was engaging in criminal activity). Although the evidence may be susceptible to different interpretations and probable cause may be defeated in proceedings following arrest, that does not mean probable cause did not exist at the time of Plaintiff's arrest.

Second, Plaintiff argues that Officer Defendants knew from their surveillance of Plaintiff's house that the drugs found in the Cadillac were Harris, Jr.'s, not Plaintiff's. (See Pl.'s Resp. (Doc. 31) at 17.) Further, Plaintiff contends that "Defendants' claims about the Cadillac keys are rife with inaccuracies or fabrications that when clarified prove the keys were accessible to anyone in the household." (See id. at 18.) At most, this argument suggests that Plaintiff may not have had exclusive access to or control over the Cadillac and drugs found inside, not that Plaintiff had no access to or control over the Cadillac or the drugs found inside.

This is akin to Ker, where there was probable cause to support joint possession of marijuana found in a common area of the apartment. 374 U.S. at 36–37. Although the narcotics in Ker supporting the probable cause determination were in plain view "in a prominent position on the kitchen sink," id. at 36–37, while the narcotics found here were found in a Cadillac on Plaintiff's property, Officer Defendants' observation of Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor provides an additional basis for probable cause.

Similarly, in United States v. Myers, the Fourth Circuit held that "[w]hen a law enforcement officer finds illegal drugs in an automobile that the officer has legally stopped and

searched and none of the occupants claim ownership of the drugs, it is 'entirely reasonable' for the officer to infer that all the automobile's occupants are in a common enterprise and therefore to arrest them on probable cause that they are committing a crime." 986 F.3d 453, 454 (2021). The court explained that "this [was] not a case where 'mere propinquity to others independently suspected of criminal activity' [was] advanced as the basis for probable cause." Id. at 457. Instead, the car occupants knew each other or had a preexisting arrangement with each other, and the drugs were "readily accessible" to them both. See id. at 457–58. Although the facts here suggest the Cadillac may be more like a storage area than a car, Myers is still helpful to show that multiple individuals' access to illegal drugs provided probable cause to arrest all the individuals present. See id.

Here, drawing all reasonable inferences in Plaintiff's favor as required at this stage of proceedings, the undisputed facts are as follows:

1. Regardless of whether the keys to the Cadillac were handed to Marsh or where the keys were hanging, Plaintiff admits that he showed Officer Marsh where the keys to the Cadillac were located. (See Marsh Dep. (Doc. 32-4) at 169; Perry Dep. (Doc. 32-3) at 118; Harris Dep. (Doc. 32-2) at 134.)

2. One of the keys found "operate[d] the ignition switch" of the Cadillac.[5] (Marsh Decl. (Doc. 26-3) at 4; <u>see also</u> Marsh Dep. (Doc. 32-3) at 171.)

3. The location of the keys — on the outside of the bedroom door — suggests the keys were accessible to anyone in the household.

4. The Cadillac was parked on Plaintiff's property, where Plaintiff resided with his wife and where Plaintiff's son, Harris, Jr., sometimes resided. (<u>See</u> Marsh Decl. (Doc. 26-3) at 2-3.)

5. The Cadillac was registered to Plaintiff until at least 2015. (<u>See</u> Marsh Dep. (Doc. 32-4) at 151, 162.) Although the registration was expired, (<u>id.</u> at 139), Plaintiff did not forecast any evidence that ownership of the Cadillac was transferred to anyone else, including Plaintiff's son.

6. Drugs and drug paraphernalia were found in the Cadillac, and they were in plain view once the tarp covering the Cadillac was removed. (<u>See</u> Marsh Decl. (Doc. 26-3) at 3.)

---

[5] Plaintiff argues that none of the keys operated the door locks and only one of the three keys operated the ignition. (Doc. 31 at 18.) These may be facts consistent with Plaintiff's innocence of an offense. However, with respect to constructive possession and a totality of the circumstances analysis, possession of a key and knowledge of where that key is located are evidence of constructive possession.

7. Plaintiff was observed engaging in a cash transaction with a known drug dealer at a house suspected to be a drug house for the Dope Boy Clic's activities. (See Perry Dep. (Doc. 32-3) at 122–23.)

Plaintiff offers no factual support for his argument that Officer Defendants knew Plaintiff paid McRae for a car wash. (See Pl.'s Resp. (Doc. 31) at 19.) It is possible that Officer Defendants did not see a car wash occur and only saw a payment made to a known drug dealer driving a trailer with cleaning supplies; nonetheless, that standing alone is not sufficient to create a genuine dispute of material fact that Officer Defendants were aware that a car wash occurred or that the hand-to-hand transaction was payment for a car wash.

Additionally, it is relatively undisputed that the keys to the Cadillac may have been accessible to anyone in the house. However, that fact is not sufficient to create a genuine dispute of material fact concerning Plaintiff's possession — whether actual or constructive, sole or joint — of the Cadillac in which the drugs and drug paraphernalia were found. Plaintiff has not presented evidence that anyone else exercised possession of the key or the car in a manner sufficient to negate the reasonable inferences drawn from the totality of the circumstances; those circumstances include the fact that Plaintiff was the last known and admitted owner of the vehicle.

- 35 -

Similarly, Plaintiff's argument that the Cadillac was inoperable also does not raise a genuine dispute of material fact concerning Plaintiff's possession of the Cadillac and its contents, as the undisputed facts show that Plaintiff had access to and control over the Cadillac, regardless of whether it was or could be driven.

Although Officer Defendants may have known from their surveillance that Harris, Jr. previously "went over to [the] Cadillac . . . for a few minutes, consistent with placing an item in or retrieving an item from the vehicle," (Ex. 22, Rule 11 Memorandum (Doc. 32-22) at 2), that fact does not negate Officer Defendants' reasonable belief that Plaintiff also had possession of the drugs found in the Cadillac. And "once probable cause to arrest a suspect is established, an officer is not required to continue to investigate for exculpatory evidence before arresting such suspect." United States v. Galloway, 274 F. App'x 241, 249 (4th Cir. 2008). Assuming that the officer's observations of Harris, Jr. going to the car connect Harris, Jr. to the contents of the car, it does not dispel Plaintiff's connection to the car and its contents. Harris Jr.'s guilt of drug distribution is not necessarily evidence of Plaintiff's innocence of the offense, nor does it diminish the presence of probable cause if otherwise present. That exculpatory evidence may have existed does not negate the probable cause established

by finding illegal narcotics in a common area of Plaintiff's property over which Plaintiff had possession and control.

Accordingly, this court finds that Officer Defendants had probable cause to arrest Plaintiff upon finding cocaine in the Cadillac on Plaintiff's property, even if Officer Defendants knew that Plaintiff's son also entered the Cadillac previously.[6] Because probable cause existed for Plaintiff's arrest,

---

[6] Plaintiff argues that Officer Defendants omitted allegedly exculpatory information material to the probable cause determination before the Magistrate Judge, the grand jury, and prosecutors. (See Pl.'s Resp. (Doc. 31) at 19-20.) However, since probable cause to arrest Plaintiff existed even considering the alleged exculpatory information, omission of that information does not impact the probable cause analysis. Stated another way, the facts Plaintiff argues are material to determining probable cause, (see id.), do not negate the existence of probable cause to arrest Plaintiff following Officer Marsh's discovery of cocaine in the Cadillac, particularly given prior surveillance of Plaintiff engaging in a hand-to-hand cash transaction with a known drug distributor at a location suspected to be a drug house for the Dope Boy Clic's activities.

Case 1:21-cv-00955-WO-JEP   Document 47   Filed 07/03/23   Page 37 of 50

Plaintiff's federal and state law claims for malicious prosecution both fail.[7]

_____

[7] In the alternative, Defendants argue that Plaintiff's claim under § 1983 is barred by qualified immunity and that Plaintiff's claim under state law is barred by public official immunity. (Defs.' Br. (Doc. 27) at 18–21.) Because this court finds probable cause for Plaintiff's arrest, this court need not reach the issues of qualified immunity or public official immunity definitively.

Even so, "[g]overnment officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998), aff'd, 526 U.S. 603 (1999) (quotation omitted). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). "It protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing bright lines.'" Id. (quoting Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992)). "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011). The qualified immunity defense is a two-step inquiry "that asks first whether a constitutional violation occurred and second whether the right was clearly established." Id. (quotation omitted). A clearly established right is one that is "sufficiently clear [such] that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up).

In light of the cases described herein, finding probable cause to arrest upon discovery of illegal contraband in a home or a vehicle, a reasonable law enforcement officer would not have understood that arresting Plaintiff upon finding narcotics on his property violated a clearly established constitutional right. See Durham, 690 F.3d at 190; Solomon, 2011 WL 1704721, at *15; Ker, 374 U.S. at 36–37; Taylor, 81 F.3d at 435. Thus, Officer Defendants are also entitled to qualified immunity on Plaintiff's malicious prosecution claim under § 1983.

- 38 -

**B.** **Fabrication of Evidence**

Plaintiff alleges a fabrication of evidence claim under 42 U.S.C. § 1983 against Officer Defendants. (Compl. (Doc. 1) at 14–15.) The alleged fabricated evidence here, "through false statements and material omissions," is: (1) evidence that Harris, Jr. had placed or removed items, namely illegal narcotics, from the Cadillac on Plaintiff's property; (2) evidence that others in Plaintiff's household had access to the keys to the Cadillac; (3) evidence that the Cadillac was inoperable and had an inactive registration; and (4) evidence that Plaintiff's hand-to-hand transaction with McRae was payment for a car wash. (Pl.'s Resp. (Doc. 31) at 21–22.) The elements of a due process claim based on fabrication of evidence include both fabrication of evidence and a loss of liberty. See Massey v. Ojaniit, 759 F.3d 343, 354 (4th Cir. 2014). As Plaintiff's criminal charges were eventually dismissed, (see Ex. F, State Court Dismissal (Doc. 26-6); Ex. H, Federal Court Dismissal (Doc. 26-8)), Plaintiff alleges his pretrial detention is the loss of liberty sufficient to establish a due process claim. (Pl.'s Resp. (Doc. 31) at 21.)

"We have recognized a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating activity." Massey, 759 F.3d at 354 (quotation omitted). "Fabrication of evidence

- 39 -

alone is insufficient to state a claim for a due process
violation; a plaintiff must plead adequate facts to establish
that the loss of liberty — i.e., his conviction and subsequent
incarceration — resulted from the fabrication." Id. (citing
Washington v. Wilmore, 407 F.3d 274, 282-83 (4th Cir. 2005)).
"The plaintiff must also be able to show that, despite any
intervening acts of independent decision-makers, the 'conviction
was a reasonably foreseeable result of the initial act of
fabrication.'" Id. (quoting Washington, 407 F.3d at 283.)

     Ultimately, Plaintiff's due process fabrication of evidence
claim fails because the charges against Plaintiff were dismissed
and the alleged loss of liberty was pretrial detention. Courts
consider claims concerning unlawful pretrial detention as
arising under the Fourth Amendment. See Albright v. Oliver, 510
U.S. 266, 273-74 (1994) (plurality opinion) (explaining that
claims for pretrial deprivation of liberty are properly brought
under the Fourth Amendment, not the Fourteenth Amendment's due
process clause); see Manuel v. City of Joliet, 580 U.S. 357,
365-67 (2017) (rejecting a plaintiff's attempt to frame a claim
about unlawful pretrial detention as a Fourteenth Amendment due
process claim instead of a Fourth Amendment claim). Yet a
fabrication of evidence claim is properly understood as arising
under the Fourteenth Amendment's due process clause. See
Washington, 407 F.3d at 283-84 (relying upon the Fourteenth

Amendment in identifying a constitutional right not to be deprived of one's liberty due to fabrication of evidence); Glass v. Anne Arundel Cnty., 38 F. Supp. 3d 705, 720 (D. Md. 2014), aff'd, 716 F. App'x 179 (4th Cir. 2018) ("There is a Fourteenth Amendment due process 'right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer.'") (citation omitted); Taylor v. Deaver, No. 5:11-CV-341-H, 2012 WL 12905868, at *3 (E.D.N.C. Sept. 28, 2012) ("[T]he Fourth Circuit recognized that the Fourteenth Amendment guarantees individuals the 'right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity.'") (citation omitted).

The Fourth Circuit has only recognized a fabrication of evidence claim when that fabrication of evidence resulted in a criminal conviction, not pretrial detention. See Wilmore, 407 F.3d at 283-84; Massey, 759 F.3d at 354. The Fourth Circuit has not yet recognized a due process violation for fabrication of evidence when the charges against a plaintiff were dismissed or when the plaintiff was not convicted of any crime and the plaintiff's "loss of liberty" consisted of pretrial detention. See Osborne v. Georgiades, No. 14-CV-182, 2017 WL 3978485, at *6 (D. Md. Sept. 11, 2017) (explaining that a fabrication of evidence claim under the Fourteenth Amendment does not provide a

remedy for pretrial detention), <u>aff'd</u>, 778 F. App'x 220 (4th Cir 2019) (per curiam) (unpublished); <u>McDougald v. Kersey</u>, No. 1:20-CV-666, 2022 WL 17091685, at *7 (M.D.N.C. Nov. 21, 2022) (granting summary judgment in favor of law enforcement officer on a fabrication of evidence claim for wrongful pretrial detention). Without addressing whether Officer Defendants did or did not fabricate evidence, this court finds that Plaintiff's claim for fabrication of evidence resulting in pretrial detention fails as a matter of law. Accordingly, this court will grant summary judgment in favor of Officer Defendants as to this claim.

### C.    **Failure to Intervene**

Plaintiff alleges a failure to intervene claim under 42 U.S.C. § 1983 against Officer Defendants. (Compl. (Doc. 1) at 15–16.) Plaintiff alleges that Officer Defendants were present for and aware of multiple constitutional violations — specifically, Plaintiff's warrantless arrest that lacked probable cause and resulted from fabrication of evidence — and that Officer Defendants failed to intervene to prevent these constitutional violations. (<u>Id.</u>)

A "failure to intervene claim" arises as a theory of "bystander liability," in which there is "an omission to act . . . coupled with a duty to act." <u>Randall v. Prince George's Cnty.</u>, 302 F.3d 188, 202–03 (4th Cir. 2002). "[A]n

- 42 -

officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Id. at 204 (footnote omitted). When there is no underlying constitutional violation, a plaintiff's claim for failure to intervene also fails. See Dodson v. Prince George's Cnty., No. JKS 13-2916, 2016 WL 67255, at *3 (D. Md. Jan. 6, 2016) ("Because the excessive force claim fails, the failure to intervene claim also fails."); see also Marshall v. Odom, 156 F. Supp. 2d 525, 531 (D. Md. 2001) ("In the absence of any underlying use of excessive force against the Plaintiff, liability cannot be placed on . . . Officer Tindal for failing to intervene . . . ."); Hinkle v. City of Clarksburg, W. Va., 81 F.3d 416, 420–21 (4th Cir. 1996) (holding that a claim for bystander liability was inapplicable when a jury rejected the plaintiff-appellant's claim of excessive force). Plaintiff has not raised a genuine issue of material fact that an underlying constitutional violation occurred in the first place. This court has found that Plaintiff's claims for malicious prosecution, see supra Section IV.A, and fabrication of evidence, see supra Section IV.B, both fail. Accordingly, Plaintiff's failure to intervene claim also fails as a matter of law. Summary judgment

will be granted in favor of Officer Defendants as to Plaintiff's failure to intervene claim.

### D. <u>**Failure to Train or Supervise and Monell Liability**</u>

Plaintiff alleges a <u>Monell</u> claim for failure to train or supervise under 42 U.S.C. § 1983 against Chief of Police Robert Temme and the Town of Southern Pines. (Compl. (Doc. 1) at 19–20.) Plaintiff argues that "[t]he Town of Sothern Pines is liable under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978) for a custom, pattern and practice of arresting or threatening innocent individuals in an attempt to coerce them into falsely testifying against others." (Pl.'s Resp. (Doc. 31) at 22.) Plaintiff alleges that "SPPD Chief Temme was aware of numerous . . . complaints and at least one lawsuit against Officer Perry," yet Chief Temme "took no disciplinary action against Detective Perry." (Compl. (Doc. 1) at 19.) Plaintiff alleges that Chief Temme "failed to properly supervise SPPD officers, despite having actual knowledge of the need for better and additional training and supervision." (<u>Id.</u>) Ultimately, Plaintiff alleges that City Defendants' "failure to train and properly supervise officers accused or guilty of misconduct is a pattern and practice of the SPPD" and that Chief Temme "authorized this failure to train and supervise." (<u>Id.</u> at 20.)

"Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, injunctive relief where . . .

- 44 -

the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690. "[A] municipality cannot be held liable solely because it employs a tortfeasor . . . in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691 (emphasis omitted). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694.

"To establish municipal liability under section 1983, the plaintiff must prove the existence of an official policy or custom of the municipality that proximately caused the deprivation of his rights." Wright v. Town of Glenarden, 89 F.3d 831, at *3 (4th Cir. 1996) (table decision) (citing Spell v. McDaniel, 824 F.2d 1380, 1385–87 (4th Cir. 1987)).

> Municipal policies include formal and informal decisions made by municipal officials authorized to make final decisions. Municipal customs are established by persistent, widespread practices of municipal officials, whether specifically authorized or not, which are so permanent and well settled as to have the force of law. Such practices are attributable to a municipality when they become so frequent in occurrence that actual or constructive knowledge is imputed.

Id. (internal citations omitted). Additionally, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). Plaintiff's Monell claim fails for two reasons.

First, because this court has found that Plaintiff suffered no constitutional deprivation, there is no basis for municipal liability even if Plaintiff could establish that the Town of Southern Pines failed to train or supervise its law enforcement officers. When a plaintiff has not suffered a constitutional deprivation himself, there is no basis for municipal liability. See Hoy ex rel. Brown v. Simpson, 182 F.3d 908, at *10 (4th Cir. 1999) (affirming a district court's dismissal of the appellant's claim for municipal liability "[i]n light of the jury verdict, herein affirmed, that none of the individual sheriff's deputies [were] deliberately indifferent to Brown's serious medical needs, and thus that he suffered no constitutional deprivation"); City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) ("[N]either Monell . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); Giancola v. W. Va. Dept. of Pub. Safety,

830 F.2d 547, 550 (4th Cir. 1987) ("If the officer' actions were in compliance with constitutional standards, there is no liability on the part of . . . the employing entities."). Because this court has found that Plaintiff's claims for underlying constitutional violations fail, Plaintiff's municipal liability claim also fails as a matter of law.

Second, Plaintiff does not establish that the Town of Southern Pines or Chief Temme had a policy or practice that caused deprivation of constitutional rights, nor that it was deliberately indifferent to constitutional violations. Plaintiff does not point to any official SPPD or Town of Southern Pines policy. Instead, Plaintiff alleges that City Defendants condoned law enforcement misconduct in the form of false arrests and failed to adequately train or supervise the SPPD. "Condonation by municipal officials of widespread unconstitutional police misconduct can constitute a policy or custom under section 1983" if "responsible policymakers of the municipality had actual or constructive knowledge of the misconduct, but failed, as a matter of specific intent or deliberate indifference, to stop or correct the practices." Wright, 89 F.3d at *3. In the alternative, if Plaintiff's claim is based solely upon a failure to implement necessary training or supervisory practices, "the need for more or different training must be so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See Sims v. Greenville Cnty., 211 F.3d 1265, at *2 (4th Cir. 2000) (table decision).

However, Plaintiff has failed to present evidence sufficient to create a genuine issue of material fact that the Town of Southern Pines or Chief Temme displayed deliberate indifference to individuals' constitutional right not to be falsely arrested. Viewing the evidence in the light most favorable to Plaintiff as the nonmovant, Shaw, 13 F.3d at 798, Plaintiff does not forecast sufficient evidence to show City Defendants ignored constitutional violations. Plaintiff only points to complaints that were unsubstantiated or isolated incidents. The undisputed facts show that the SPPD investigated Plaintiff's 2013 complaint against Officer Perry. (Ex. J, Campbell Decl. (Doc. 26-10) at 2–3.) The investigation cleared Officer Perry of wrongdoing; that does not indicate that the Town of Southern Pines or Chief Temme were deliberately indifferent to Plaintiff's constitutional rights. Similarly, Arthur Darby's complaint, filed in the Middle District of North Carolina, was also dismissed for failure to state a claim. Order and Recommendation, Darby v. Perry, No. 13-cv-185 (M.D.N.C. Mar. 20, 2013), Doc. 4, recommendation adopted, J. Darby v. Perry, No. 13-cv-185 (M.D.N.C. Apr. 29, 2013), Doc. 6. Further, Martha

- 48 -

Dickerson's and Tracy Williams' affidavits show that both of their complaints rested on the same SPPD investigation of Dickerson's son. (See Ex. 23, Dickerson Aff. (Doc. 32-23) at 1; Ex. 38, Tracy Williams Aff. (Doc. 32-38) at 1.) Officers' conduct during one investigation does not show a "'persistent and widespread practice' such that [the Town of Southern Pines or Chief Temme] could be held liable. . . . Isolated, unprecedented incidents such as this one are insufficient to create municipal liability." See Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000) (affirming the lower court's dismissal of a county for a Monell claim because a single incident of an unlawful search does not provide a basis for municipal liability, under either a policy or practice theory or under a failure to train theory). Thus, Plaintiff "has not 'set forth sufficient facts to establish that the supervising officials had knowledge, actual or constructive, that [Town of Southern Pines] police officers were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like [Plaintiff]." Cilman v. Reeves, 452 F. App'x 263, 270 (4th Cir. 2011) (affirming the lower court's grant of summary judgment in favor of the town on a municipal liability claim for Fourth Amendment violations). Accordingly, Plaintiff's Monell claim fails, and summary judgment will be granted in favor of City Defendants as to this claim.

V.     __CONCLUSION__

In sum, Plaintiff's malicious prosecution claims fail because there was probable cause for his arrest. Plaintiff's fabrication of evidence claim fails because his alleged deprivation of liberty was pretrial detention, not a criminal conviction. Plaintiff's failure to intervene claim fails because this court finds there were no underlying constitutional violations. Finally, Plaintiff's <u>Monell</u> claim fails, both because this court finds that Plaintiff's constitutional rights were not violated and because Plaintiff has not created a genuine issue of material fact that City Defendants were deliberately indifferent to constitutional violations by the SPPD. Accordingly, Defendants are entitled to summary judgment as a matter of law.

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 26), is **GRANTED.**

A Judgment dismissing this action will be filed herewith.

This the 3rd day of July, 2023.


_____
United States District Judge

- 50 -